```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

|   |   |
|---|---|
| _____ ) | |
| CAPITOL RECORDS, INC., *et al.*,       ) | |
|                                        ) | |
|             Plaintiffs,                ) | Civ. Act. No. |
|                                        ) | 03-CV-11661-NG |
| v.                                     ) | (LEAD DOCKET NUMBER) |
|                                        ) | |
| NOOR ALAUJAN,                          ) | |
|                                        ) | |
|             Defendant.                 ) | |
| _____ ) | |
|                                          | |
| _____ ) | |
| SONY BMG MUSIC ENTERTAINMENT, *et al.*,) | |
|                                        ) | |
|             Plaintiffs,                ) | Civ. Act. No. |
|                                        ) | 07-CV-11446-NG |
| v.                                     ) | (ORIGINAL DOCKET NUMBER) |
|                                        ) | |
| JOEL TENENBAUM,                        ) | |
|                                        ) | |
|             Defendant.                 ) | |
| _____ ) | |

**MEMORANDUM OF LAW TO SUPPLEMENT DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE DEFENDANT'S FAIR USE DEFENSE**

Cyberspace is a space for sharing. People of all ages, but especially young people, love to share music. Peer-to-peer sharing technology is technology for sharing music. From the first burst of Napster into the lives of the born-digital generation the recording industry's physical hold on its catalog of copyrighted music was gone. The music was and continues to be out in cyberspace in format sharable for free by anyone with a

1

net connection. That was and is the effect of technological progress, not Joel Tenenbaum's fault.

When Napster hit, the recording industry turned to its RIAA lawyers to stop the use of internet sharing technology. Napster proved vulnerable to legal targeting because its hub-and-spoke distribution architecture required a central server, and RIAA succeeded in shutting it down. But on its heels came Grokster. Advances in peer-to-peer sharing technology produced new software built on a network architecture of distributed nodes instead of hub-and-spoke (FastTrack/Gnutella). Using this technology a new company, Grokster eagerly appealed to the millions of noncommercial users who had been sharing music using Napster. RIAA failed to stop Grokster, first in the District Court in January 2003, *MGM Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Cal., 2003), and then again on appeal in the Ninth Circuit February 2004, *MGM Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154 (9th Cir. Cal., 2004). It was at this point that the industry started suing customers (non commercial users), beginning the litigation campaign of which the case against Joel Tenenbaum is example. The prospect of obtaining Supreme Court review and reversal of the Ninth Circuit decision allowing Grokster to stay in business seemed remote. Go after the direct infringers? What else was the industry to do?

**I. GROKSTER**

*Plaintiffs assert:* "The law is clear: Defendant's actions constitute copyright infringement." (Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment re Defendant's Fair Use Defense (hereafter "memo"), Doc. No. 872, at 7.) They cite their eventual victory in the Supreme Court in *Grokster* to support their position, *MGM Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005).

The law is not clear that Defendant's actions constitute copyright infringement. *Grokster* in no way precludes Joel Tenenbaum's fair use defense in this case. *Grokster* conceded that its users were infringing without contesting the issue. The fair use argument advanced here by Joel Tenenbaum was neither presented nor argued to the Supreme Court in any form. *Grokster* did not directly involve any noncommercial user. None were party to the case.  The *Grokster* opinion, therefore, can have no *stare decisis*, *res judicata* or judicial estoppel effect on Joel Tenenbaum. While the opinion characterized peer-to-peer sharing as infringement, the Court did so by assumption, and with no thought of opining on the fairness of lawsuits for massive statutory damages against noncommercial music consumers like Joel Tenenbaum.

Joel Tenenbaum's fair use defense starts from the proposition that he did nothing wrong: In no sense is he blameworthy. What he did was not unfair. It may be that, at the time, he believed he was acting illegally, but that does not mean that what he did was unfair, or that a jury could not now respond to that defense. If his conduct was fair, it was not in fact illegal, even though he may have believed it to have been illegal at the time. This is because the copyright law has fairness built right into it as the border of its reach in backing up the copyright holder's legitimate assertion of control.

**II. Burden of Proof**

Joel Tenenbaum is a noncommercial user for purposes of the Court's task of allocating burdens of proof. For this purpose, the Court should find as a fact pursuant to FRE 104(a) that Joel Tenenbaum is a noncommercial user who has come forward to contest a legal claim of infringement against him with his defense of fair use, and therefore the burden of proof of infringement at trial is entirely upon the plaintiffs, including proof at least to a preponderance that Joel Tenenbaum's use was unfair.

The burden of proof is on the plaintiffs to prove infringement. While fair use is an affirmative defense and in most cases the party advancing a defense bears the burden of proof, that is not always the case and is not the case here. Joel Tenenbaum is a noncommercial user in the sense used by the Supreme Court in *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). As such he is entitled to presumption in his favor.

Plaintiffs assert that *Sony* "did not declare a presumption of fair use in favor of commercial users; rather Sony established a presumption against fair use with respect to commercial activities." (memo at 15.) This is dead wrong. *Sony* involved unpermitted copying by noncommercial users. The Court's only mention of commercial users was in the context of contrasting and emphasizing the importance of the presumption it was recognizing in favor of noncommercial users. The Court was not really meaning to relieve suing copyright holders of any burdens of proof when suing commercial defendants asserting fair use.

The *Sony* Court said:

If the Betamax were used to make copies for a commercial or profit-making purpose, such use would presumptively be unfair. The contrary presumption is appropriate here, however, because the District Court's findings plainly establish that time-shifting for private home use must be

> characterized as a noncommercial, nonprofit activity. (at 449)

and then again

> although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter. (at 551)

and then again

> If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated. (at 551)

The Court corrected its dicta about commercial users in *Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994), making clear that it had not, in *Sony,* intended to burden the defense of fair use in any way. As in *Sony*, the *Campbell* Court again acted to protect fair use. Nothing in *Campbell* suggests any retreat whatever from the presumption protecting noncommercial users in *Sony*. (The Plaintiffs rely for contrary authority on an email from Professor Fisher!)

**III. The Four Mandatory Factors Favor Joel Tenenbaum**

Plaintiffs assert (memo at 21) not only that Joel Tenenbaum "fails the four statutory factors" but also that he recognizes this. Joel Tenenbaum disputes this with respect to each factor.

(1) The purpose and character of Joel Tenenbaum's use is non-commercial. Plaintiffs say otherwise but surely must recognize that there is a dispute, and must concede that if the

jury favors Joel Tenenbaum's side of this dispute then this factor favors Joel Tenenbaum. At the least Joel Tenenbaum is to be distinguished from persons in the business of selling infringing copies for profit in competition with the copyright holder.

   (2) The nature of the copyrighted work is music in the form of bits in free and open mp3 format. This factor favors Joel Tenenbaum because the idea of imposing law on the global ocean of free bits that has flooded into cyberspace is a gross and harmful over-extension of the power of the state and authority of the law.

   (3) The factor of the amount and substantiality of the portion used in relation to the copyrighted work as a whole favors Joel Tenenbaum. The copyrighted works in this case are albums with the separate song tracks registered as works for hire. That means, according to Plaintiffs, that the artists don't and never did own the copyright but rather performed as studio musicians hired by the company. And it means that the copyrighted work is the compilation of songs, not individual songs that Joel Tenenbaum is charged with sharing. Of the whole copyrighted work, Joel Tenenbaum used only part. It is thus at least equivocal which way this factor cuts.

   (4) Plaintiffs say, "Illegal online file-sharing, like the Defendant has engaged in, has caused significant harm to the

7

market for legitimate copies." It depends from which end you start. Imagine a world of perfect law enforcement in which no digital "piracy" occurs (the reciprocal of imagining the effect of generalizing Joel Tenenbaum's conduct on the potential market for the copyrighted work). Imagine also that every "piracy" transaction that would have occurred in the absence of enforcement becomes instead a purchase. Then, on those assumptions, peer-to-peer "piracy" costs the industry incredibly vast sums of money. It is from this perspective that the industry will no doubt claim that it lost vast sums of money following the death of Michael Jackson. But if one sees the buzz of free bits in the net as energy that now drives the market, a new commercial landscape opens up.
http://arstechnica.com/web/news/2009/06/internet-groans-under-weight-of-michael-jackson-traffic.ars
http://gawker.com/5302943/michael-jackson-traffic-melts-entire-internet
http://artsbeat.blogs.nytimes.com/2009/07/15/michael-jackson-record-sales-continue-to-soar/

**V. Additional Fairness Factors Favor Joel Tenenbaum**

   a. <u>Availability</u>: Plaintiffs assert (memo at 24) that Joel Tenenbaum's "availability" argument "fails on the facts". Repeating their disputed assertion that Joel Tenenbaum's primary

purpose was to avoid the cost of buying music, Plaintiffs follow with a recitation of facts about a vibrant market for legal downloads with 230 online services to choose from, as if to raise the question for the jury to consider, what would it have taken to shift Joel Tenenbaum and his social friendship group over from their music consumption pattern of mixed free-download and CD purchase to a new pattern of purchase from one or more of the 230 fledgling commercial digital services? The very argument Plaintiffs make and facts they assert to support it assume the relevance of "availability" as a fairness factor. It would have been unfair for the recording industry to have sued its music customers before there was any "legitimate" digital purchase alternatives? From Knopper, *Appetite for Self Destruction* (2009):

> *"Suing was an extreme step, but angry and desperate executives began batting around the idea as early as a 2002 RIAA summit in Washington, DC. Universal Music was especially hell-bent on the lawsuits, sources recall, but Roger Ames of Warner Music was fiercely opposed. By Ames's way of thinking -- and the association's then-chairman, Hilary Rosen, agreed with him -- it was totally unfair to sue customers for downloading free music when they had no legal way to pay for it online."* (at 185)

"Availability" is a matter of nuance and degree, and is surely a matter in dispute.

b. <u>Joel Tenenbaum's Purpose and State of Mind:</u> Plaintiffs assert that "Defendant's primary purpose was to avoid the cost of buying music." (memo at 24) This is a disputed issue of fact. Joel Tenenbaum testifies that his primary purpose was to listen to the music and share with his friends. Plaintiffs assert without citation that Joel Tenenbaum's "emotional ties to music" are irrelevant because Joel Tenenbaum's "subjective intent is not relevant." (memo at 26) But surely the defendant's state of mind is relevant both to the fairness and the willfulness of his actions.

c. <u>The Potential of Perfect Enforcement</u>

If we are to generalize the defendant's conduct and to imagine the potential market the copyright holder is losing, is it not also fair to generalize the enforcement of the infringement rule the Plaintiffs seek to impose on Joel Tenenbaum and to assess as part of the fair use judgment the dystopia that full enforcement would produce? See Zittrain, *The Future of the Net – And How To Stop It* (Yale University Press), 107-110 (2008).

                                       Respectfully submitted,

Dated:   July 20, 2009      /s/Charles R. Nesson_____
                                       Charles and Fern Nesson

**CERTIFICATE OF SERVICE**

    I, the undersigned hereby certify that on July 20, 2009, I caused a copy of the foregoing MEMORANDUM OF LAW TO SUPPLEMENT DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE DEFENDANT'S FAIR USE DEFENSE to be served upon the Plaintiffs via the Electronic Case Filing (ECF) system.

                                      /s/Charles R. Nesson_____
                                      Charles R. Nesson
                                      Attorney for Defendant