# EXHIBIT A

1                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

3                    VOLUME 1 PAGES 1-209

4

5    - - - - - - - - - - - - - - - - - - - - - - - -*

     CAPITOL RECORDS, INC., ET AL,
6                           Plaintiffs

     VS.                      Case No. 03CV11661-NG
7    NOOR ALAUJAN,                    LEAD DOCKET NO.
                        Defendant
8    - - - - - -- - - - - - - - - - - - - - - - - -*

     SONY BMG MUSIC ENTERTAINMENT, et al,
9                           Plaintiffs

     VS.                      Case No. 07CV11446-NG
10   JOEL TENENBAUM,              ORIGINAL DOCKET NO.
                        Defendant
11   - - - - - - - - - - - - - - - - - - - - - - - --*

12

13

14        CONTINUED DEPOSITION OF JOEL TENENBAUM,
     taken on behalf of the Plaintiffs, taken pursuant
15   to Notice under the Massachusetts Rules of Civil
     Procedure, before Kim M. Romaine, Notary Public
16   and Shorthand Reporter in and for the
     Commonwealth of Massachusetts at the Office of
17   Dwyer & Collora, 600 Atlantic Avenue, Boston,
     Massachusetts, on Wednesday, July 8, 2009
18   commencing at 9:30 a.m.
19

20

21

22

23

24

Page 2

1  APPEARANCES:
2  ON BEHALF OF PLAINTIFFS:
3  EVE GOLDSTEIN BURTON, ESQ.
    Holme Roberts & Owen, LLP
4  1700 Lincoln Street
    Denver, Colorado 80203-4541
5  303/866-0551
6  ON BEHALF OF PLAINTIFFS:
7  MATTHEW J. OPPENHEIM, ESQ.
    The Oppenheim Group
8  7304 River Falls Drive
    Potomac, Maryland 20854
9  301/299-4986
10 ON BEHALF OF JOEL TENENBAUM:
11 CHARLES NESSON, ESQ.
    1575 Massachusetts Avenue
12 Cambridge, Massachusetts 02138
    617/495-4609
13
    ON BEHALF OF JOEL TENENBAUM:
14 MATTHEW FEINBERG, ESQ.
    Feinberg Kamholtz
15 125 Summer Street
    Boston, Massachusetts 02110
16 617/526-0700
17 ALSO PRESENT:
    Isaac Meister
18 Victoria L. Steinberg, Esq.
19
20
21
22
23
24

Page 3

1              I N D E X
2  DEPOSITION OF:          JOEL TENENBAUM
3  EXAMINATION BY MS. BURTON ...........PAGE  4
4              ...........PAGE 205
5  EXAMINATION BY MR. FEINBERG .........PAGE 196
6
7
8
9          E X H I B I T S
10 No.       Description       Page
11 1          Packet          71
12 2       Letter 4/30/09     84
13 3        Schedule 1        107
14 4         Exhibit A        107
15 5          Packet         179
16 6          Packet         196
17
18
19
20
21
22
23
24

Page 4

1          P R O C E E D I N G S
2       MR. STEINBERG:  No stipulations?
3       MS. BURTON:  No stipulations.
4       JOEL TENENBAUM, the witness, having
5  been duly cautioned and sworn, testified upon his
6  oath as follows:
7       - - - - - - - - - - - -
8       EXAMINATION BY MS. BURTON:
9  Q.  Good morning, Joel.
10 A.  Good morning.
11 Q.  As you know, I'm Eve Burton.  I represent the
12    plaintiffs in this case.  I deposed you last
13    time.  Maybe nine months ago or so.
14 A.  You did.
15 Q.  Is there anything in that deposition that you
16    no longer believe to be accurate?
17       MR. FEINBERG:  Objection.  Motion to
18 strike.
19       MS. BURTON:  What?
20       MR. FEINBERG:  I said objection.
21 Motion to strike.  There are no stipulations on
22 the record so I will objecting whenever I hear
23 something that I do not like.
24       MS. BURTON:  Maybe I didn't

Page 5

1  understand.  In a deposition, usually form and
2  foundation need to be made.  The rest are
3  preserved.  Is that the stipulation you were
4  referencing?
5       MR. FEINBERG:  Yes.  There is a full
6  range of stipulations that we normally do.  I
7  don't know whether you did it before with Joel's
8  first deposition.  We usually reserve all motions
9  to strike and all motions except as to form until
10 the time of trial.
11       MS. BURTON:  That's fine.
12       MR. FEINBERG:  We also waive the
13 filing and the notarization of it, but we usually
14 have a 30-day period for Joel to read and sign
15 the deposition and make corrections.
16       MS. BURTON:  Obviously that is not
17 going to work here.
18       MR. FEINBERG:  We will need the
19 deposition well in advance of the trial in order
20 to do that.
21       MS. BURTON:  Okay.  As a preliminary
22 matter, let me back up.  I do want to say that I
23 do understand, Mr. Nesson, you are recording this
24 deposition on your audio recorder.  We do object

1    A.   No longer had utility to me.
2    Q.   Is that because of this lawsuit?
3    A.   No.
4    Q.   Why didn't that have utility to you?
5    A.   It didn't get me music.
6    Q.   Why?
7    A.   I don't know.
8    Q.   It stopped functioning?
9    A.   Yes.
10   Q.   Okay.  Approximately how many songs did you
11     download using Morpheus?
12   A.   No clue.  Probably order of magnitude ten.
13   Q.   Did you ever use stream cast on the Gateway?
14   A.   No.
15   Q.   Did you ever use Grokster?
16   A.   No.
17   Q.   So do you believe you've told me every peer to
18     peer you had on this Gateway computer?
19   A.   I do believe I have.
20   Q.   Do you believe you had all five of these peer
21     to peers on the computer at the same time?
22   A.   I have no idea.  I used whatever program
23     seemed the most useful to me at the time.
24   Q.   What do you mean by the most useful?

1    A.   The maximum amount of music sharing with the
2      minimal amount of wasted effort.
3    Q.   When you were -- when LimeWire was on the
4      Gateway but you were not actively using it, did
5      you take steps to -- what steps, if any, did you
6      take to shut the program down?
7          MR. FEINBERG:  Objection.  You are
8    asking him when he uninstalled it again?
9          MS. BURTON:  No.  If he was not
10   actually using it on his computer, did he click
11   on the X?  Did he file close?  Did he leave it
12   open?
13   BY MS. BURTON:
14   Q.   What did you do with the program when it was
15     on your computer but you were not actively using
16     it?
17   A.   What did I do with a program when I wasn't
18     using it?
19   Q.   So you are sitting down at your computer and
20     you are looking for music on LimeWire and then
21     you get up and you are done.  What did you do to
22     LimeWire?  Did you shut it down?  Did you leave
23     it open?  If you shut it down, how?
24   A.   I imagine it depended.

1    Q.   What is your standard practice when you are
2      finished using a program?
3    A.   I close the program.
4    Q.   How do you do that?
5    A.   You select close from the menu or you click
6      the X or you right click on the task bar and then
7      left click on close.
8    Q.   Did you ever --
9    A.   If it's a recalcitrant program, you will
10   control alt delete it and then you close it that
11   way.
12   Q.   That is exactly what I'm trying to get at.  Do
13     you know how you would close LimeWire, if at all?
14   A.   Probably a variety of ways.
15   Q.   Was it your practice to leave LimeWire running
16     while you were not using it?
17   A.   I think so.
18   Q.   Do you know what version of LimeWire you were
19     using?
20   A.   No clue.
21   Q.   Did you ever upgrade LimeWire?
22   A.   I don't think so.
23   Q.   Was it your practice when you purchased a CD
24     to rip it onto your computer?

1    A.   You mean to copy it to the computer's hard
2      drive?
3    Q.   Yes.
4    A.   Absolutely.
5    Q.   So other than peer to peers and purchased CDs
6      that you uploaded and music you purchased from
7      iTunes, is there any other source of music on the
8      Gateway?
9    A.   Yes.
10         MR. FEINBERG:  Can you say that
11   again?  Other than what?
12         MS. BURTON:  Other than music he
13   purchased from iTunes, music he got from peer to
14   peers and CD he purchased and unloaded how else
15   did music get on his computer.
16   A.   Through face-to-face interactions with
17     friends.
18   Q.   I don't understand that.
19   A.   The music can get onto the computer by either
20     using a program, whether it be a peer to peer
21     program or a network neighborhood type thing.  I
22     can also get it by buying the physical product
23     but buying it on iTunes.  Also a friend could
24     share it with me through either a CD or a USB or

Page 106

1   Q.  Okay.  That would include -- let me just be
2   clear.  Do you contend that all of the movies you
3   downloaded, copyrighted movies you downloaded
4   through peer to peer networks, that downloading
5   was fair use?
6           MR. FEINBERG:  Objection.  I am going
7   to instruct him not to answer that.  That is way
8   beyond the scope of this.  There is nothing in
9   the complaint and nothing in any of the pleadings
10  that has to do with movies.
11          MR. OPPENHEIM:  Answer the question.
12          MR. FEINBERG:  I've already told him
13  not to answer the question.
14          MR. OPPENHEIM:  It's not a privileged
15  objection.  You can't instruct him.
16          MR. FEINBERG:  Really?  Take it to
17  the judge.
18          MR. OPPENHEIM:  Can you mark this
19  please.  This is unbelievable.
20  BY MS. BURTON:
21  Q.  Do you contend that all of the TV episodes
22  that you downloaded using the peer to peer
23  network was fair use?
24          MR. FEINBERG:  Same instruction.

Page 107

1           MS. BURTON:  You are instructing him
2   not to answer?
3           MR. FEINBERG:  Yes.
4           (Exhibit Nos. 3 and 4 marked
5           for identification).
6   BY MS. BURTON:
7   Q.  Do you contend that your downloading of the
8   five recordings listed on Exhibit 4 was fair use?
9   A.  Yes.
10  Q.  Do you contend that your distribution of the
11  five sound recordings listed on deposition
12  Exhibit 4 was fair use?
13  A.  Yes.
14  Q.  Do you have any basis to -- is there any --
15  does the basis of your fair use defense differ as
16  to any of these songs on deposition Exhibit 4?
17  A.  You mean differ by a song?
18  Q.  In any respect.
19          MR. FEINBERG:  She is asking you
20  whether or not you have a different nuance of the
21  fair use defense as to each individual song or is
22  it all the same defense.
23  A.  Again, it's all a matter of the four factors,
24  plus other factors that we think are appropriate

Page 108

1   for consideration.
2   Q.  And do they vary based on which of the
3   recordings we are talking about on deposition
4   Exhibit 4?
5   A.  I think so.
6   Q.  Okay.  What is the basis of your fair use
7   defense as it pertains to Incubus, recording
8   title New Skin, album title Science?
9   A.  I will simplify the whole process here.  I
10  think the first four are the same.  Nirvana Come
11  as You Are might fall under fair use in a
12  different way.
13  Q.  How?
14  A.  I own the album.
15  Q.  So am I understanding you correctly that all
16  five songs listed on deposition Exhibit 4, the
17  basis of your fair use defense is the same except
18  as to Nirvana; there is this additional aspect
19  that you own the album?
20          MR. FEINBERG:  Objection to the form.
21  You can try to answer that if you can.
22  A.  Yes.
23  Q.  Okay.  And how does the fact that you own the
24  album pertain to your fair use defense?

Page 109

1   A.  As a question of sampling and purchase of
2   commerciality, of money spent, I think it's
3   relevant that I purchased the album of at least
4   one of these songs.
5   Q.  And so you listed the four things:  Sampling,
6   purchase, commerciality and money spent.  How
7   does the fact that you own the album pertain to
8   your -- do you contend that sampling is a factor
9   in fair use?
10  A.  I'm not that well versed in fair use.  I don't
11  know the specifics or the limit or the full
12  extent.  I don't have all of it in my head.
13  Q.  I'm just trying to understand what you are
14  telling me.  You say that the fact that you own
15  the album pertains to your fair use defense.
16  Actually, I will break it down.  Does the fact
17  that you own the album pertain to your fair use
18  defense as applied to downloading of the
19  recording?
20  A.  Yes.
21  Q.  Does the fact that you own the album pertain
22  to the fair use of your distribution of the
23  recording?
24  A.  I think so.

1   BY MS. BURTON:
2   Q.  When did you first use iTunes?
3   A.  I don't know.
4   Q.  Can you approximate?
5   A.  I would guess in the second half of college.
6   Q.  2004, 2005, is that right?
7   A.  I think it would be more likely 2005 through
8   2006.
9   Q.  Before you downloaded a sound recording
10  through a peer to peer network, did you go and
11  look if you could get it anywhere on a legal
12  alternative?
13  A.  Sorry?
14  Q.  Before you downloaded a sound recording on a
15  peer to peer network did you first go and check
16  if it was available through a legitimate
17  authorized service?
18  A.  The majority of what was downloaded on peer to
19  peer networks was available in a record store or
20  amazon if amazon was around then.
21  Q.  So you know the records were available.  Could
22  you download individual tracks online legally?
23  A.  It's possible I could have.  I don't know if I
24  was aware of it at the time.

1   Q.  What is in fact my question.  Before you
2   downloaded these -- we will start with Exhibit 4.
3   These five sound recordings on Exhibit 4 did you
4   first go and check whether there were any digital
5   authorized alternatives for which -- on which you
6   could download these tracks?
7   A.  You mean individually?
8   Q.  Yes.
9   A.  I don't remember if I checked, if I knew.
10  Q.  Do you believe that you checked if there were
11  legal alternatives available before downloading
12  the five recordings on Exhibit 4?
13  A.  It very much depends on how much I knew about
14  iTunes at the time.  I don't recall when I
15  learned about iTunes, when I downloaded and
16  signed up with iTunes.
17  Q.  Do you know whether the five recordings listed
18  on Exhibit 4 were available on iTunes in August
19  of 2004?
20  A.  I have no clue.
21  Q.  Would that impact your fair use defense?
22  A.  If I was aware if these were available on
23  iTunes?
24  Q.  If they were available on iTunes.

1   A.  It's possible the actual availability of these
2   songs plays a factor as much as my awareness of
3   that availability.
4   Q.  The question is did you believe.  And your
5   answer is it's possible?
6   A.  Those are not things I've considered in great
7   detail.
8   Q.  I'm asking you to consider it now.  Do you
9   believe that the availability of these songs on
10  iTunes, the songs listed on Exhibit 4 has an
11  impact on your fair use defense?
12      MR. FEINBERG:  I will stop him.  It's
13  the same question.  I think it's now five or six
14  times.  You have asked the same question.  I will
15  instruct him not to answer it.  You can take it
16  up with the judge.
17      BY MS. BURTON:
18  Q.  What are the facts that support your fair use
19  defense?
20  A.  The context of my downloading and distributing
21  music, the laws as are written on books, anything
22  else that goes into a legal proceeding that is a
23  relevant fact.
24  Q.  I'm asking you what those facts are?

1   A.  Well, those are what I can recall
2   specifically.
3   Q.  So the context, what do you mean by that?
4   A.  When and where and how much and the
5   commerciality, whether I had purchased music
6   through pay sources.
7   Q.  What do you mean by when?
8   A.  Any number of other factors.  My state of mind
9   at the time of downloading.
10  Q.  So your --
11  A.  My awareness.
12      MR. FEINBERG:  I would like to take a
13  bathroom break at some point.
14      THE WITNESS:  I have to too.
15      BY MS. BURTON:
16  Q.  Finish your answer and then we will take a
17  break.
18  A.  The state of the music industry, its change,
19  my music buying and music downloading habits, my
20  discussion of the music with friends and family,
21  the sales and revenues of those songs.  Possibly
22  other things I can't recall right now.
23  Q.  Is that a complete list to the best of your
24  knowledge?

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAPITOL RECORDS, INC., et al.<br>　　　　　　　Plaintiffs,<br><br>v.<br><br>NOOR ALAUJAN,<br>　　　　　　　Defendant. | Civ. Act. No. 03-CV-11661-NG<br>(LEAD DOCKET NUMBER) |

| | |
|---|---|
| SONY BMG MUSIC ENTERTAINMENT<br>et al.　　　　　　　Plaintiffs,<br><br>v.<br>JOEL TENENBAUM,<br><br>　　　　　　　Defendants. | Civ. Act. No 1:07-cv-11446-NG<br>(ORIGINAL DOCKET NUMBER) |

## PLAINTIFFS' REVENUE INTERROGATORY RESPONSE

Pursuant to the Court's June 30, 2009 Order, Plaintiffs are hereby providing revenue information relating to the 30 sound recordings at issue in this case. The estimates contained herein show revenue from U.S. sales of albums and individual tracks beginning in 1999 (or the date of first publication if after 1999) on an annualized basis, separated by whether the format was physical or digital.

While Plaintiffs have made good faith efforts to estimate revenues from physical and digital music sales the time to gather this information was limited, and as such, the information provided herein is not necessarily comprehensive, are only estimates, and does not include, among other categories, revenue generated from the licensing of the sound recording. Plaintiffs, Sony BMG Music Entertainment and Arista, note that only album revenue from the original

release is provided.  Sony is continuing to attempt to collect estimates for other albums that may have contained the sound recordings.

It is important to note that this financial information does not provide any context relating to the releases, such as when particular albums were initially released, rereleased, repackaged or the subject of a renewed marketing and promotion effort.

**A.    Red Hot Chili Peppers, Californication:**

1.  Physical album revenue

- 1999:  $23,000,000
- 2000:  $26,000,000
- 2001:  $5,000,000
- 2002:  $2,000,000
- 2003:  $2,000,000
- 2004:  $500,000
- 2005:  $700,000
- 2006:  $1,000,000
- 2007:  $650,000
- 2008:  $1,000,000
- 2009 (YTD):  $400,000

2.  Digital album sales

- 2003:  $250
- 2004:  $2,500
- 2005:  $3,500
- 2006:  $75,000
- 2007:  $90,000
- 2008:  $90,000
- 2009 (YTD):  $55,000

3.  Digital track sales

- 2003:  $1,000
- 2004:  $50,000
- 2005:  $150,000
- 2006:  $250,000
- 2007:  $350,000
- 2008:  $350,000
- 2009 (YTD):  $225,000

2

**B.     Red Hot Chili Peppers, By The Way:**

1.  Physical album revenue

- 2002:  $14,000,000
- 2003:  $7,000,000
- 2004:  $300,000
- 2005:  $400,000
- 2006:  $500,000
- 2007:  $350,000
- 2008:  $175,000
- 2009 (YTD):  $60,000

2.  Digital album sales

- 2004:  $4,000
- 2005:  $5,000
- 2006:  $60,000
- 2007:  $60,000
- 2008:  $60,000
- 2009 (YTD):  $40,000

3.  Digital track sales

- 2003:  $250
- 2004:  $10,000
- 2005:  $30,000
- 2006:  $150,000
- 2007:  $175,000
- 2008:  $200,000
- 2009 (YTD):  $100,000

**C.     Red Hot Chili Peppers, My Friends:**

1.  Physical album revenue

- 1999:  $250,000
- 2000:  $275,000
- 2001:  $200,000
- 2002:  $200,000
- 2003:  $200,000
- 2004:  $100,000
- 2005:  $70,000
- 2006:  $150,000
- 2007:  $100,000

- 2008: $25,000
- 2009 (YTD): $8,000

2. Digital album sales

- 2004: $500
- 2005: $1,500
- 2006: $20,000
- 2007: $20,000
- 2008: $20,000
- 2009 (YTD): $5,000

3. Digital track sales

- 2003: $100
- 2004: $3,500
- 2005: $8,000
- 2006: $25,000
- 2007: $45,000
- 2008: $50,000
- 2009 (YTD): $30,000

**D.     Linkin Park, Crawling:**

1. Physical album revenue

- 2000: $1,000,000
- 2001: $40,000,000
- 2002: $40,000,000
- 2003: $6,000,000
- 2004: $4,000,000
- 2005: $3,000,000
- 2006: $1,700,000
- 2007: $2,500,000
- 2008: $1,000,000
- 2009 (YTD): $500,000

2. Digital album sales

- 2003: $1,000
- 2004: $20,000
- 2005: $35,000
- 2006: $60,000
- 2007: $250,000
- 2008: $250,000

4

- 2009 (YTD):  $200,000

3. Digital track sales

- 2003:  $500
- 2004:  $6,000
- 2005:  $50,000
- 2006:  $100,000
- 2007:  $500,000
- 2008:  $650,000
- 2009 (YTD):  $450,000

**E.    Goo Goo Dolls, Iris:**

1. Physical album revenue

- 1999:  $22,000,000
- 2000:  $7,000,000
- 2001:  $1,250,000
- 2002:  $1,600,000
- 2003:  $750,000
- 2004:  $350,000
- 2005:  $700,000
- 2006:  $1,000,000
- 2007:  $250,000
- 2008:  $50,000
- 2009 (YTD):  -$7000

2. Digital album sales

- 2003:  $2,500
- 2004:  $10,000
- 2005:  $25,000
- 2006:  $40,000
- 2007:  $50,000
- 2008:  $40,000
- 2009 (YTD):  $30,000

3. Digital track sales

- 2003:  $10,000
- 2004:  $75,000
- 2005:  $225,000
- 2006:  $300,000
- 2007:  $400,000

5

- 2008: $500,000
- 2009 (YTD): $250,000

F.   **Green Day, When I Come Around:**

   1.  Physical album revenue

- 1999: $1,000,000
- 2000: $1,000,000
- 2001: $1,000,000
- 2002: $1,000,000
- 2003: $500,000
- 2004: $650,000
- 2005: $2,000,000
- 2006: $1,250,000
- 2007: $400,000
- 2008: $150,000
- 2009 (YTD): $270,000

   2.  Digital album sales

- 2003: $2,500
- 2004: $16,000
- 2005: $90,000
- 2006: $70,000
- 2007: $70,000
- 2008: $80,000
- 2009 (YTD): $70,000

   3.  Digital track sales

- 2003: $4,500
- 2004: $50,000
- 2005: $200,000
- 2006: $165,000
- 2007: $180,000
- 2008: $220,000
- 2009 (YTD): $165,000

G.   **Green Day, Minority:**

   1.  Physical album revenue

- 2000: $10,000,000
- 2001: $1,000,000

6

- 2002:  $130,000
- 2003:  $65,000
- 2004:  $80,000
- 2005:  $500,000
- 2006:  $500,000
- 2007:  $60,000
- 2008:  $10,000
- 2009 (YTD):  $25,000

2.  Digital album sales

- 2003:  $500
- 2004:  $3,500
- 2005:  $17,000
- 2006:  $14,000
- 2007:  $13,000
- 2008:  $13,000
- 2009 (YTD):  $13,000

3.  Digital track sales

- 2003:  $1,500
- 2004:  $15,000
- 2005:  $75,000
- 2006:  $65,000
- 2007:  $50,000
- 2008:  $45,000
- 2009 (YTD):  $30,000

H.    **Green Day, Nice Guys Finish Last:**

1.  Physical album revenue

- 1999:  $2,500,000
- 2000:  $1,000,000
- 2001:  $1,000,000
- 2002:  $300,000
- 2003:  $250,000
- 2004:  $200,000
- 2005:  $900,000
- 2006:  $600,000
- 2007:  $125,000
- 2008:  $40,000
- 2009 (YTD):  $80,000

7

2. Digital album sales

- 2003: $1,000
- 2004: $5,000
- 2005: $25,000
- 2006: $20,000
- 2007: $20,000
- 2008: $20,000
- 2009 (YTD): $16,000

3. Digital track sales

- 2003: $6,000
- 2004: $60,000
- 2005: $250,000
- 2006: $200,000
- 2007: $200,000
- 2008: $250,000
- 2009 (YTD): $150,000

**I.    Deftones, Be Quiet and Drive:**

1. Physical album revenue

- 1999: $1,300,000
- 2000: $1,300,000
- 2001: $750,000
- 2002: $350,000
- 2003: $350,000
- 2004: $200,000
- 2005: $200,000
- 2006: $200,000
- 2007: $175,000
- 2008: $85,000
- 2009 (YTD): $35,000

2. Digital album sales

- 2004: $2,000
- 2005: $6,000
- 2006: $15,000
- 2007: $20,000
- 2008: $25,000
- 2009 (YTD): $15,000

3. Digital track sales

- 2003: $1,000
- 2004: $3,000
- 2005: $8,000
- 2006: $12,000
- 2007: $18,000
- 2008: $20,000

2009 (YTD): $15,000

**J.   Ramones, The KKK Took My Baby Away:**

1. Physical album revenue

- 1999: $12,000
- 2000: $6500
- 2001: $20,000
- 2002: $90,000
- 2003: $17,000
- 2004: $15,000
- 2005: $25,000
- 2006: $13,000
- 2007: $5,000
- 2008: $6,000
- 2009 (YTD): $6,000

2. Digital album sales

- 2004: $50
- 2005: $300
- 2006: $1,000
- 2007: $1500
- 2008: $2,000
- 2009 (YTD): $1500

3. Digital track sales

- 2003: $200
- 2004: $1,700
- 2005: $4,000
- 2006: $5,000
- 2007: $7,000
- 2008: $8,000
- 2009 (YTD): $4,000.

9

**K. Aerosmith, Pink:**

   1.  Physical album revenue

- 1999: $1,000,000
- 2000: $300,000
- 2001: $500,000
- 2002: $100,000
- 2003: $40,000
- 2004: $50,000
- 2005: $30,000
- 2006: $35,000
- 2007: $4,000
- 2008: $40,000
- 2009 (YTD): $20,000

   2.  Digital album sales

- 2003: $1,000
- 2004: $4,000
- 2005: $13,000
- 2006: $8,000
- 2007: $2,000
- 2008: $5,000
- 2009 (YTD): $3,500

   3.  Digital track sales

- 2002: $1,000
- 2003: $6,500
- 2004: $25,000
- 2005: $50,000
- 2006: $60,000
- 2007: $25,000
- 2008: $30,000
- 2009 (YTD): $15,000

**L.    The Fugees, Killing Me Softly:**

   1.  Physical album revenue

- 1999: $1,250,000
- 2000: $600,000
- 2001: $600,000

- 2002: $500,000
- 2003: $500,000
- 2004: $700,000
- 2005: $500,000
- 2006: $400,000
- 2007: $300,000
- 2008: $200,000
- 2009 (YTD): $85,000

2. Digital album sales

- 2004: $1,000
- 2005: $2,000
- 2006: $1,500
- 2007: $20,000
- 2008: $50,000
- 2009 (YTD): $30,000

3. Digital track sales

- 2003: $14,000
- 2004: $100,000
- 2005: $175,000
- 2006: $250,000
- 2007: $150,000
- 2008: $150,000
- 2009 (YTD): $50,000

**M.    Incubus, New Skin:**

1. Physical album revenue

- 1999: $400,000
- 2000: $1,000,000
- 2001: $1,200,000
- 2002: $1,000,000
- 2003: $300,000
- 2004: $600,000
- 2005: $160,000
- 2006: $175,000
- 2007: $120,000
- 2008: $50,000
- 2009 (YTD): $30,000

2. Digital album sales

- 2004: $8,000
- 2005: $60,000
- 2006: $100
- 2007: $32,000
- 2008: $31,000
- 2009 (YTD): $14,000

3. Digital track sales

- 2003: $750
- 2004: $3,500
- 2005: $5,000
- 2006: $7,000
- 2007: $4,000
- 2008: $4,000
- 2009 (YTD): $1,500

**N.    Incubus, Pardon Me:**

1. Physical album revenue

- 1999: $1,600,000
- 2000: $11,000,000
- 2001: $10,000,000
- 2002: $2,000,000
- 2003: $750,000
- 2004: $1,000,000
- 2005: $550,000
- 2006: $500,000
- 2007: $225,000
- 2008: $180,000
- 2009 (YTD): $140,000

2. Digital album sales

- 2003: $1,500
- 2004: $4,000
- 2005: $7,500
- 2006: $4,000
- 2007: $56,000
- 2008: $82,000
- 2009 (YTD): $45,000

12

3. Digital track sales

- 2002: $2,000
- 2003: $9,000
- 2004: $75,000
- 2005: $250,000
- 2006: $300,000
- 2007: $125,000
- 2008: $100,000
- 2009 (YTD): $35,000

**O.    Outkast, Rosa Parks:**

1. Physical album revenue

- 1999: $4,000,000
- 2000: $1,000,000
- 2001: $1,000,000
- 2002: $350,000
- 2003: $450,000
- 2004: $550,000
- 2005: $325,000
- 2006: $400,000
- 2007: $165,000
- 2008: $85,000
- 2009 (YTD): $60,000

2. Digital album sales

- 2005: $250
- 2006: $700
- 2007: $27,000
- 2008: $50,000
- 2009 (YTD): $20,000

3. Digital track sales

- 2003: $100
- 2004: $5,000
- 2005: $5,000
- 2006: $10,000
- 2007: $18,000
- 2008: $28,000
- 2009 (YTD): $14,000

13

**P.    Outkast, Wheels of Steel:**

1.  Physical album revenue

- 1999: $1,000,000
- 2000: $1,000,000
- 2001: $1,000,000
- 2002: $500,000
- 2003: $500,000
- 2004: $700,000
- 2005: $275,000
- 2006: $500,000
- 2007: $170,000
- 2008: $105,000
- 2009 (YTD): $70,000

2.  Digital album sales

- 2005: $300
- 2006: $1,000
- 2007: $26,000
- 2008: $44,000
- 2009 (YTD): $20,000

3.  Digital track sales

- 2004: $1500
- 2005: $4,000
- 2006: $16,000
- 2007: $5,000
- 2008: $5,000
- 2009 (YTD): $2,000

**Q.    Rage Against the Machine, Guerrilla Radio:**

1.  Physical album revenue

- 1999: $26,000,000
- 2000: -$3,500,000
- 2001: $850,000
- 2002: $500,000
- 2003: $650,000
- 2004: $600,000
- 2005: $600,000
- 2006: $400,000

14

- 2007: $80,000
- 2008: $200,000
- 2009 (YTD): $120,000

2. Digital album sales

- 2003: $1,500
- 2004: $2,500
- 2005: $4,000
- 2006: $7,000
- 2007: $6,000
- 2008: $80,000
- 2009 (YTD): $30,000

3. Digital track sales

- 2000: $250
- 2001: $10
- 2002: $250
- 2003: $5,000
- 2004: $25,000
- 2005: $50,000
- 2006: $65,000
- 2007: $55,000
- 2008: $60,000
- 2009 (YTD): $20,000

**R.   Aerosmith, Water Song/Janie's Got A Gun:**

1. Physical album revenue

- 2000: $3,000,000
- 2001: $6,000,000
- 2002: $3,000,000
- 2003: $1,000,000
- 2004: $1,000,000
- 2005: $2,000,000
- 2006: $1,000,000
- 2007: $650,000
- 2008: $1,000,000
- 2009 (YTD): $100,000

2. Digital album sales

- 2003: $3,000

15

- 2004: $10,000
- 2005: $50,000
- 2006: $75,000
- 2007: $120,000
- 2008: $200,000
- 2009 (YTD): $100,000

3. Digital track sales

- 2003: $3,000
- 2004: $10,000
- 2005: $35,000
- 2006: $75,000
- 2007: $80,000
- 2008: $90,000
- 2009 (YTD): $35,000

**S.     Beastie Boys, (You Gotta) Fight For Your Right (To Party):**

1. Physical album revenue

- 2000: $1,750,000
- 2001: $4,000,000
- 2002: $1,750,000
- 2003: $1,250,000
- 2004: $1,500,000
- 2005: $500,000
- 2006: $500,000
- 2007: $400,000
- 2008: $250,000
- 2009 (YTD): $100,000

2. Digital album sales

- 2003: $200
- 2004: $10,000
- 2005: $40,000
- 2006: $60,000
- 2007: $115,000
- 2008: $120,000
- 2009 (YTD): $100,000

16

3.  Digital track sales

- 2003:  $2,500
- 2004:  $20,000
- 2005:  $45,000
- 2006:  $100,000
- 2007:  $175,000
- 2008:  $175,000
- 2009 (YTD):  $65,000

T.    **Beck, Loser**:

1.  Physical album revenue

- 2000:  $250,000
- 2001:  $150,000
- 2002:  $130,000
- 2003:  $75,000
- 2004:  $125,000
- 2005:  $175,000
- 2006:  $100,000
- 2007:  $65,000
- 2008:  $50,000
- 2009 (YTD):  $10,000

2.  Digital album sales

- 2003:  $20
- 2004:  $1,500
- 2005:  $20,000
- 2006:  $35,000
- 2007:  $25,000
- 2008:  $25,000
- 2009 (YTD):  $10,000

3.  Digital track sales

- 2003:  $4,000
- 2004:  $20,000
- 2005:  $100,000
- 2006:  $100,000
- 2007:  $130,000
- 2008:  $175,000
- 2009 (YTD):  $70,000

#1418936 v2 den

U.    **Blink 182, Adam's Song:**

    1.  Physical album revenue

- 2000:  $20,000,000
- 2001:  $3,000,000
- 2002:  $1,000,000
- 2003:  $500,000
- 2004:  $800,000
- 2005:  $6,500,000
- 2006:  -$50,000
- 2007:  $500,000
- 2008:  $350,000
- 2009 (YTD):  $150,000

    2.  Digital album sales

- 2003:  $3,000
- 2004:  $15,000
- 2005:  $100,000
- 2006:  $175,000
- 2007:  $150,000
- 2008:  $200,000
- 2009 (YTD):  $125,000

    3.  Digital track sales

- 2003:  $4,000
- 2004:  $20,000
- 2005:  $50,000
- 2006:  $75,000
- 2007:  $75,000
- 2008:  $100,000
- 2009 (YTD):  $50,000

V.    **Eminem, Cleaning Out My Closet:**

    1.  Physical album revenue

- 2002:  $100,000,000
- 2003:  $10,000,000
- 2004:  $3,000,000
- 2005:  $20,000,000
- 2006:  $7,500,000
- 2007:  $1,500,000

#1418936 v2 den

- 2008:  $1,000,000
- 2009 (YTD):  $850,000

2. Digital album sales

- 2003:  $10,000
- 2004:  $30,000
- 2005:  $65,000
- 2006:  $600,000
- 2007:  $200,000
- 2008:  $300,000
- 2009 (YTD):  $200,000

3. Digital track sales

- 2003:  $12,000
- 2004:  $20,000
- 2005:  $70,000
- 2006:  $125,000
- 2007:  $125,000
- 2008:  $115,000
- 2009 (YTD):  $55,000

**W.   Eminem, Drug Ballad:**

1. Physical album revenue

- 2000:  $100,000,000
- 2001:  $3,000,000
- 2002:  $5,000,000
- 2003:  $3,000,000
- 2004:  $2,000,000
- 2005:  $1,750,000
- 2006:  $600,000
- 2007:  $500,000
- 2008:  $400,000
- 2009 (YTD):  $200,000

2. Digital album sales

- 2003:  $10,000
- 2004:  $20,000
- 2005:  $60,000
- 2006:  $60,000
- 2007:  $75,000

19

- 2008: $115,000
- 2009 (YTD): $75,000

3. Digital track sales

- 2003: $1,000
- 2004: $4,000
- 2005: $10,000
- 2006: $15,000
- 2007: $15,000
- 2008: $15,000
- 2009 (YTD): $7,000

## X.   Eminem, My Name Is:

1. Physical album revenue

- 2000: $12,000,000
- 2001: $2,000,000
- 2002: $3,000,000
- 2003: $2,000,000
- 2004: $1,500,000
- 2005: $750,000
- 2006: $400,000
- 2007: $250,000
- 2008: $200,000
- 2009 (YTD): $250,000

2. Digital album sales

- 2004: $2,000
- 2005: $15,000
- 2006: $10,000
- 2007: $10,000
- 2008: $75,000
- 2009 (YTD): $50,000

3. Digital track sales

- 2003: $5,000
- 2004: $12,000
- 2005: $40,000
- 2006: $90,000
- 2007: $75,000
- 2008: $85,000

20

- 2009 (YTD): $50,000

**Y.** **Limp Bizkit, Rearranged:**

1. Physical album revenue

   - 2000: $20,000,000
   - 2001: $18,000,000
   - 2002: $-1,000,000
   - 2003: $1,000,000
   - 2004: $400,000
   - 2005: $2,000,000
   - 2006: $50,000
   - 2007: $350,000
   - 2008: $250,000
   - 2009 (YTD): $100,000

2. Digital album sales

   - 2003: $500
   - 2004: $1,700
   - 2005: $15,000
   - 2006: $35,000
   - 2007: $40,000
   - 2008: $50,000
   - 2009 (YTD): $35,000

3. Digital track sales

   - 2003: $1,500
   - 2004: $4,000
   - 2005: $10,000
   - 2006: $15,000
   - 2007: $20,000
   - 2008: $20,000
   - 2009 (YTD): $8,000

**Z.** **Limp Bizkit, Leech:**

1. Physical album revenue

   - 2000: $3,000,000
   - 2001: $1,300,000

#1418936 v2 den

- 2002: $200,000
- 2003: $150,000
- 2004: $130,000
- 2005: $75,000
- 2006: $30,000
- 2007: $25,000
- 2008: $10,000
- 2009 (YTD): $5,000

2. Digital album sales

- 2003: $650
- 2004: $1,500
- 2005: $5,000
- 2006: $6,500
- 2007: $10,000
- 2008: $15,000
- 2009 (YTD): $7,000

3. Digital track sales

- 2003: $100
- 2004: $100
- 2005: $300
- 2006: $250
- 2007: $350
- 2008: $400
- 2009 (YTD): $100

**AA.   Monster Magnet, Look To Your Orb For the Warning:**

1. Physical album revenue

- 2000: $10,000
- 2001: $15,000
- 2002: $6,000
- 2003: $3,000
- 2004: $2,500
- 2005: $3,500
- 2006: $2,000
- 2007: $0
- 2008: $0
- 2009 (YTD): $0

22

2.  Digital album sales

- 2003: $100
- 2004: $400
- 2005: $1,000
- 2006: $1,500
- 2007: $3,000
- 2008: $3,000
- 2009 (YTD): $1,500

3.  Digital track sales

- 2003: $50
- 2004: $100
- 2005: $300
- 2006: $400
- 2007: $500
- 2008: $500
- 2009 (YTD): $200

**BB.   Nine Inch Nails, The Perfect Drug:**

1.  Physical album revenue

- 2000: $200,000
- 2001: $100,000
- 2002: $85,000
- 2003: $50,000
- 2004: $50,000
- 2005: $50,000
- 2006: $35,000
- 2007: $35,000
- 2008: $15,000
- 2009 (YTD): $3,500

2.  Digital album sales

- 2003: $600
- 2004: $350
- 2005: $350
- 2006: $300
- 2007: $2,000
- 2008: $3,000
- 2009 (YTD): $1500

#1418936 v2 den

3.  Digital track sales

- 2003:  $1,200
- 2004:  $5,000
- 2005:  $20,000
- 2006:  $25,000
- 2007:  $25,000
- 2008:  $30,000
- 2009 (YTD):  $15,000

**CC.   Nirvana, Hearth Shaped Box:**

1.  Physical album revenue

- 2000:  $1,000,000
- 2001:  $1,000,000
- 2002:  $15,000,000
- 2003:  $700,000
- 2004:  $2,500,000
- 2005:  $3,500,000
- 2006:  $900,000
- 2007:  $1,35,000
- 2008:  $1,500,000
- 2009 (YTD):  $400,000

2.  Digital album sales

- 2003:  $2,500
- 2004:  $10,000
- 2005:  $85,000
- 2006:  $100,000
- 2007:  $150,000
- 2008:  $180,000
- 2009 (YTD):  $100,000

3.  Digital track sales

- 2003:  $2000
- 2004:  $9,000
- 2005:  $30,000
- 2006:  $60,000
- 2007:  $150,000
- 2008:  $160,000
- 2009 (YTD):  $50,000

**DD.    Nirvana, Come As You Are:**

    1.  Physical album revenue

- 2000:  $3,500,000
- 2001:  $4,000,000
- 2002:  $3,000,000
- 2003:  $1,500,000
- 2004:  $2,500,000
- 2005:  $2,000,000
- 2006:  $1,300,000
- 2007:  $4,000,0000
- 2008:  $500,000
- 2009 (YTD):  $200,000

    2.  Digital album sales

- 2003:  $15,000
- 2004:  $55,000
- 2005:  $110,000
- 2006:  $160,000
- 2007:  $250,000
- 2008:  $350,000
- 2009 (YTD):  $200,000

    3.  Digital track sales

- 2003:  $5,000
- 2004:  $20,000
- 2005:  $60,000
- 2006:  $125,000
- 2007:  $150,000
- 2008:  $200,000
- 2009 (YTD):  $80,000

25

Dated this 16th day of July, 2009.

SONY BMG MUSIC ENTERTAINMENT;
WARNER BROS. RECORDS INC.;
ATLANTIC RECORDING CORPORATION;
ARISTA RECORDS LLC; and UMG
RECORDINGS, INC.

By their attorneys,

By: _____

Timothy M. Reynolds (*pro hac vice*)
Eve G. Burton (*pro hac vice*)
Laurie J. Rust (*pro have vice*)
HOLME ROBERTS & OWEN LLP
1700 Lincoln, Suite 4100
Denver, Colorado 80203
Telephone:  (303) 861-7000
Facsimile: (303) 866-0200
Email:  tim.reynolds@hro.com
        eve.burton@hro.com
        laurie.rust@hro.com

Matthew J. Oppenheim (*pro hac vice*)
Oppenheim Group
7304 River Falls Drive
Potomac, Maryland  20854
Telephone: (301) 299-4986
Facsimile: (866) 766-1678
Email:  matt@oppenheimgroup.net

Daniel J. Cloherty
DWYER & COLLORA, LLP
600 Atlantic Avenue - 12th Floor
Boston, MA 02210-2211
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
Email:  dcloherty@dwyercollora.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of July, 2009, a true and correct copy of the foregoing **PLAINTIFFS' REVENUE INTERROGATORY RESPONSE** was served by email on the following and was placed in the United States Mail, postage prepaid, addressed as follows:

Charles Nesson, Esq.
1575 Massachusetts Ave.
Cambridge, MA 02138
Email:  nesson@law.harvard.edu; nesson@gmail.com;
imeister@cyber.law.harvard.edu

Matthew H. Feinberg, Esq.
Feinberg & Kamholtz
125 Summer Street, 6th Floor
Boston, MA  02110
Email:  mattfein@kamholtz.com

Eve G. Burton