UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - )

CAPITAL RECORDS, INC., ET AL.,  )   CV. NO. 03-11661-NG

               PLAINTIFFS        )

VS.                              )   COURTROOM NO. 2

NOOR ALAUJAN, ET AL.,            )   1 COURTHOUSE WAY

               DEFENDANTS        )   BOSTON, MA  02210

- - - - - - - - - - - - - - - - )

LONDON-SIRE RECORDS, INC.,       )   CV. NO. 04-12434-NG

ET AL.,                          )

               PLAINTIFFS        )

VS.                              )

DOES 1-4,                        )

               DEFENDANTS        )

- - - - - - - - - - - - - - - -

MOTION HEARING

JUNE 5, 2009

1:02 P.M.

BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

A P P E A R A N C E S:

    For The Plaintiffs:

    Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ.,
600 Atlantic Avenue, Boston, Massachusetts  02210-2211;

    The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ.,
7304 River Falls Drive, Potomac, Maryland  20854;

    Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ.,
1801 13th Street, Suite 300, Boulder, Colorado  80302

    For the Defendant:

    Harvard Law School, by CHARLES NESSON, ESQ.,
    1525 Massachusetts Avenue, Cambridge, Massachusetts
02138;

    For the Department of Justice:

    U.S. Deparmtent of Justice, Civil Division,
by MICHELLE BENNETT, ATTORNEY, 20 Massachusetts Avenue,
NW Washington, D.C.  20001.

ALSO PRESENT:  Jennifer Pariser, Debbie Rosenbaum

<u>PROCEEDINGS</u>

1
2          THE CLERK:  All rise.  United States District
3    Court is now in session.
4          THE COURT:  You can be seated.  Would everyone
5    please reintroduce themselves to me first.
6          MR. REYNOLDS:  Good afternoon, your Honor, Timothy
7    Reynolds with Holme Roberts & Owen on behalf of the
8    plaintiffs.
9          MR. CLOHERTY:  Good afternoon, your Honor, Daniel
10   Cloherty also here on behalf of the plaintiffs.
11         MS. PARISER:  Jennifer Pariser on behalf of the
12   plaintiffs.
13         MR. NESSON:  Charles Nesson here for the
14   defendant.
15         MS. ROSENBAUM:  Debbie Rosenbaum also here for the
16   defendant.
17         THE COURT:  I'm sorry, I missed you.
18         MS. BENNETT:  I'm Michelle Bennett from the DOJ.
19         THE COURT:  I suppose a first issue is the late
20   breaking motion to audio record this proceeding, which I
21   assume the plaintiffs oppose?
22         MR. CLOHERTY:  We do, your Honor.
23         THE COURT:  While -- I have to pick my words
24   carefully here.  While the Court of Appeals can audio, can
25   record their oral arguments and make them available online

1   moments after, and while the Supreme Court can audio record

2   arguments and make them available moments after, I

3   apparently cannot.  The rule that had been cited by the

4   First Circuit in the case that reversed my order underscores

5   that any recording can only be recording that the court

6   reporter does and only for the purposes of the court

7   reporter's functions and not for any other purposes.

8          So without directly commenting on the legitimacy

9   or the appropriateness or the fairness of that distinction,

10  I have to follow it, and that would mean there can be no

11  digital recording of this proceeding except for the purposes

12  of the court reporter and not for any other purposes and

13  certainly nothing to preserve the matter, so I will deny the

14  motion to audio record these proceedings.

15          MR. NESSON:  Your Honor --

16          THE COURT:  You're objecting?

17          MR. NESSON:  I am objecting.

18          THE COURT:  What a surprise.

19          MR. NESSON:  And I'd like also to make clear that

20  my request is for digital recording with this little

21  recorder, not just of this proceeding but of all further

22  public proceedings, and I do understand that the Court was

23  very likely to rule just as you have.  My purpose is to

24  preserve the issue as best I can so that the Supreme Court

25  can review it in response to the petition for certiorari we

1   filed, and it's in the alternative that I would ask the

2   Court to record this digitally and keep custody of it

3   pending the Supreme Court's review of that cert. petition so

4   that in some way this issue is preserved.

5          I can't imagine that the local court rule would be

6   construed to such a degree that the Court couldn't by itself

7   preserve the digital record for future use should the

8   Supreme Court take the opportunity to review the case.

9          THE COURT:  There are things, Mr. Nesson, beyond

10  our imaginings that have happened in this case, so the

11  answer is since the rule talks about recording, I don't

12  believe that I have the option to do what you're suggesting.

13  In any case, there will be further proceedings in this case,

14  and I expect that if the Supreme Court rules on your cert.

15  petition, further proceedings will be subject to whatever

16  rules they give me.

17         There are further activities in the District Court

18  where the local rule making activities you have

19  unquestionably shed a light on this issue, and as I

20  understand it, there's at least some effort to change this

21  at the judicial conference level, local level, but right now

22  I am a lowly District Court Judge, and I'm stuck, so your

23  motion is denied.

24         MR. NESSON:  Thank you, your Honor.

25         THE COURT:  Let me first lay out what I believe

1    the agenda is, and then you tell me the order in which you

2    wish to proceed.  Pending are the defendant's second motion

3    to amend the answer and the counterclaim, which was

4    superseded by the defendant's third motion, and the third

5    motion included an abuse of process counterclaim and also

6    the defendant seeks to add a fair use affirmative defense to

7    his answer.

8         So that's with respect to the third motion to

9    amend the answer, and the counterclaim deals with abuse of

10    process and the fair use affirmative defense.  The plaintiff

11    has moved to dismiss the counterclaim concerning abuse of

12    process.  The defendant has moved to join the RIAA as part

13    of its abuse of process claim.  The defendant has moved to

14    dismiss on the theory that noncommercial use is not covered

15    by the statute, unconstitutional delegation and an argument

16    that the statutory damages are excessive and

17    unconstitutional on that ground.

18         I think what I'd like to do is proceed first on

19    the question of whether or not the defendant should be

20    permitted to amend his answer and counterclaim and then

21    proceed from there if I conclude that he should be permitted

22    or I wish to reserve on that, then we can move onto the

23    second set of issues.

24         So, with respect to that, the plaintiff has

25    opposed amending the answer on abuse of process and the

1    nefarious defense.  Does someone want to speak to that?

2         MR. REYNOLDS:  Certainly, your Honor.  May I stand

3    at the podium so I can look at my notes?

4         THE COURT:  Sure.

5         MR. REYNOLDS:  And, your Honor, I will confine my

6    comments for now to the third motion to amend because I

7    believe that it incorporates --

8         THE COURT:  I agree, the second motion to amend is

9    essentially moot whatever else we do, I agree.

10        MR. REYNOLDS:  Thank you.  Your Honor, the

11   standard for amending pleadings -- may I move this closer?

12        THE COURT:  Sure.

13        MR. REYNOLDS:  Rule 15 governs the amendment of

14   pleadings, your Honor, and as we have stated in our briefs,

15   amendments should not be allowed where the amendment would

16   be futile, and under established law, an amendment is futile

17   if it could not survive a motion to dismiss, so, effectively

18   we're dealing with a Rule 12 standard, your Honor, and under

19   Rule 12, in order to state a claim, the party must raise

20   sufficient factual allegations to raise the right of relief

21   beyond the speculative level, and labels and conclusions and

22   conclusory statements in the pleadings do not state a

23   plausible claim for relief, and it is our position, your

24   Honor, that the defendant's counterclaims do not state a

25   cause for relief.

1          THE COURT:  This is both abuse of process and fair

2     use?

3          MR. REYNOLDS:  Fair use is an affirmative defense

4     which I'll get to in a moment.  I would like to address the

5     abuse of process claims first.  With respect to abuse of

6     process, the defendant has asserted two theories, one under

7     federal law and one under state law.

8          THE COURT:  We agree there is no such thing as a

9     federal abuse of process claim so you can move onto the

10    state.

11         MR. REYNOLDS:  Thank you, your Honor.  With

12    respect to the state law claim, your Honor, the elements are

13    well established under Massachusetts law.  The defendant

14    must show that process was used, it was used for an ulterior

15    or illegitimate purpose resulting in damages.  The essence

16    of the tort is that process was used somehow to accomplish

17    an ulterior purpose which is not a legitimate purpose in the

18    context of which the process is supposed to be employed.

19         In Massachusetts, and this is significant, your

20    Honor, the tort is construed narrowly.  In Massachusetts,

21    the law is that an abuse of process focuses on the use of

22    the process itself, it's not an ongoing thing that takes

23    place throughout the course of litigation, it is the use of

24    the process that must be an abuse.

25         That's established in the Jones vs. Brockton case,

1    369 Mass. 387, 1975.  In this case, your Honor, the only

2    process that was used is the filing of this lawsuit.  So the

3    defendant must show that the filing of this lawsuit in and

4    of itself was for an ulterior purpose that is not permitted

5    as part of this process.

6            Your Honor, I submit that the plaintiff's suit is

7    entirely consistent with the purpose and policies underlying

8    the copyright act.  This is a claim for copyright

9    infringement and plaintiff's complaint and the process used

10   is entirely consistent with the purposes that underlie the

11   copyright act.  Now, the defendant has named a number of

12   allegations, set forth a number of allegations in the

13   proposed amended answer that purport to support the idea of

14   abuse of process.

15           One of them is, and I'll quote, "Unlawfully

16   sacrificing the defendant to intimidate other Internet users

17   into altering the norms of Internet usage."  Another one is

18   "Unlawfully sacrificing the defendant to intimidate other

19   accused infringers into settling without exercising their

20   constitutional rights to have their defenses heard in

21   court."  Your Honor, I'd submit that these are conclusory

22   allegations and rhetoric of counsel, and they're not factual

23   allegations to support a claim for abuse of process.

24           Moreover, your Honor, this suit is about the

25   defendant's infringement in seeking to deter the defendant's

1   infringement and seeking redress.  The law is clear, and the

2   Supreme Court has stated multiple times including in 1952 in

3   the F.W. Woolworth case that copyright actions serve to

4   compel reparation for injury and to discourage wrongful

5   conduct.

6           THE COURT:  To some degree essentially what you're

7   saying is that the law allows the plaintiffs here to

8   intimidate individual users into settling?  That's well

9   within what the statutory framework.

10          MR. REYNOLDS:  The law allows -- I would submit

11  that the allegation that these suits are brought to

12  intimidate users into settling is merely, it's a conclusory

13  allegation.  What the law allows is parties to bring a

14  lawsuit in order to deter infringement, and that is what

15  this lawsuit is about, and so the fact that there's a

16  deterrence element has nothing to do, it cannot support an

17  abuse of process claim.

18          The defendant, your Honor, also alleges that we

19  seek damages that are grossly disproportionate to what

20  restitution or deterrence could justify.  I would submit,

21  your Honor, that the complaint and the allegations in this

22  case seek nothing more than what the law allows the

23  plaintiffs to seek.

24          THE COURT:  That actually is a claim that falls

25  into their claim about the excessiveness about the statutory

1    damages.

2        MR. REYNOLDS:  That's correct, your Honor, it

3    does, but in terms of the abuse of process claim, to the

4    extent the allegation is that we're seeking something that

5    we're not entitled to, that's simply not correct.  We're

6    seeking damages that are well within and that are expressly

7    set forth in the copyright act, and we're seeking nothing

8    more.

9        Your Honor, the defendant has also alleged that we

10   are "harassing the defendant."  It's well established under

11   Massachusetts law that a vague allegation of harassment in

12   the context of litigation does not support an abuse of

13   process claim.  There's also an allegation, your Honor, of

14   intimidating and coercing Internet service providers into

15   installing Internet content filters.

16       THE COURT:  I'm quoting from the complaint of

17   losses to convince Congress that it must require ISPs to

18   install filters as a way to put an end to the litigation

19   campaign.

20       MR. REYNOLDS:  That's correct, your Honor.

21   There's absolutely, I would submit that allegation has

22   absolutely no factual basis for it whatever, and I

23   understand we're not here to talk about the factual basis,

24   but the allegation itself has no factual support whatsoever.

25   It is, again, I submit hyperbole and rhetoric of counsel.

1    There's no factual support for that at all in the

2    defendant's allegations, and, more importantly, it has

3    nothing to do with the process that was issued in this

4    case.

5         This case was issued to seek redress for the

6    defendant's infringement and to deter infringement, and the

7    idea that it's somehow part of some conclusory allegation

8    that is part of intimidating into ISPs into content filters,

9    No. 1, there's no basis for that at all, there's no factual

10   support either in reality or in the defendant's allegations

11   to support that, and, No. 2, it has nothing to do with this

12   case.  There was no process issued in connection with the

13   ISPs in connection with filing this particular lawsuit and

14   the process that's at issue here.

15        Your Honor, as I said, the essence of the tort is

16   the use of process as a threat to coerce some collateral

17   advantage that's not properly involved in the proceeding.

18   We would submit that the plaintiff's motivation in bringing

19   this is to remedy and deter infringement, which is entirely

20   consistent with the purposes of the copyright act, and the

21   idea the ulterior motives that the defendant puts forth are

22   to some extent, No. 1, many of them aren't supported by any

23   factual allegations in the complaint, they're conclusory

24   allegations, and, therefore, fail to satisfy the claim, but

25   in other ways, even if they weren't supported by factual

1    allegations, they're part and parcel of the lawsuit itself.

2          The idea of deterring infringement is an

3    acceptable part, and so to the extent the defendant is

4    complaining that we seek to deter infringement, that's part

5    of what is permitted under the copyright act, and I would

6    submit, your Honor, and we've cited these cases in our

7    brief, there are many decisions that have rejected claims

8    that are very similar to the one the defendant brings here,

9    and I would also submit --

10          THE COURT:  The bottom line is you're saying

11    there's no ulterior purpose, whatever your purpose in this

12    case is fully comprised within the four corners of the

13    statute under which you're suing?

14          MR. REYNOLDS:  That's correct, your Honor.

15          THE COURT:  And this would also, if I were to

16    grant the motion to dismiss with respect to abuse of

17    process, that would also eliminate the motion to join the

18    RIAA since that is a motion completely tied to the abuse of

19    process claim?

20          MR. REYNOLDS:  Your Honor, I think that's correct.

21    I confess, I think that's correct because without that claim

22    there would be nothing.  I'm not sure what the allegations

23    are against the RIAA at all, but I think your Honor is

24    correct, yes.

25          THE COURT:  Okay.

1          MR. REYNOLDS:  I don't want to go by one by one

2     with respect to the cases cited by the defendant, your

3     Honor.

4          THE COURT:  I don't think you need to.

5          MR. REYNOLDS:  I'm happy to do so if the Court has

6     any questions, but I would submit that every of the cases,

7     of the state law cases that the defendant has cited involves

8     a situation where process was issued to achieve something

9     beyond what the party was entitled to and that that is

10    simply not the case here, there's absolutely no factual

11    allegations in the complaint or in reality to support that.

12         Your Honor, the other issue with respect to the

13    abuse of process claim is the Noerr-Pennington issue, and we

14    think this is extremely significant, especially in the

15    context of this case.

16         The record companies have a First Amendment right

17    to seek redress for the infringement of their copyrights, to

18    bring a cause of action in order to enforce their

19    copyrights.  Noerr-Pennington confers immunity against the

20    type of tort claim that the defendant is asserting for just

21    that action.  I know we've cited a lot of cases in our

22    briefs, your Honor, but what I'd like to talk about is the

23    DeSouza vs. DirecTV case in the Ninth Circuit because that

24    case really is on all fours with the situation here.

25         In that case there were a litigation program

1    similar to this one where the plaintiff had a list of

2    persons who purchased what were called smart cards that

3    allowed those people to configure their television sets or

4    the boxes that they had to receive satellite broadcasts

5    without obtaining a license.

6          Just the fact that they had the smart card, which

7    had many uses, but the fact that they had the smart card,

8    the plaintiff in that case sent out letters, prelawsuit

9    letters saying, hey, you bought one of these, we have reason

10    to believe that you are obtaining this broadcast without a

11    license, and we'd like to talk to you about and we intend to

12    file a lawsuit, very similar to the incident here, what

13    happened here where the record companies identified

14    Mr. Tenenbaum as an infringer of their copyrights, issued a

15    letter seeking to engage dialogue and expressly stating that

16    the lawsuit might be filed if the matter could not be

17    resolved.

18          Well, what the Ninth Circuit said in that case,

19    your Honor, is that the process of sending prenotification

20    letters, the process of filing lawsuits based on that

21    evidence, evidence that someone had a smart card that could

22    be configured to violate a license requirement was

23    sufficient and was protected under Noerr-Pennington and

24    barred a counterclaim for abuse of process for engaging in

25    that very activity, and I would submit that that case, your

1    Honor, as we said is on all fours with this case.

2          The defendant alleges that the record companies

3    abused process by filing this lawsuit.  This allegation

4    seeks nothing else but to prevent the plaintiffs from

5    protecting their copyrights, and what the Sosa Court said is

6    that that is contrary to my client's First Amendment rights

7    to seek redress in the courts.

8          Now, there is, of course, an exception to

9    Noerr-Pennington, it's the sham exception, and there's

10   absolutely.

11         THE COURT:  The lawsuit is a sham?

12         MR. REYNOLDS:  Right.  We don't believe there's

13   any basis for that, your Honor.  The first test and really

14   the only one we need to discuss is that the defendant would

15   have to show that the plaintiff's claims in this case are

16   objectively baseless, objectively baseless.  Your Honor, we

17   have submitted with our complaint, we submitted the evidence

18   of the 18.

19         THE COURT:  You don't even have to go there, I

20   understand.

21         MR. REYNOLDS:  I just want the Court to understand

22   in no way can the plaintiff's claims be considered

23   objectively baseless in this case.  And, again, your Honor,

24   we have cited authority to your Honor from the Middle

25   District of Pennsylvania, the Eastern District of

1    Pennsylvania and other cases including DeSouza where almost

2    identical claims have been rejected, and so with respect to

3    the abuse of process, your Honor, we submit there's no basis

4    for that claim.  It doesn't satisfy Twombly, it doesn't say

5    the requisite elements under Massachusetts law, and it's

6    futile and should not be allowed.

7             THE COURT:  Why don't you stop there and then an

8    answer and then we'll go onto the fair use issue which

9    raises different concerns.  Mr. Nesson.

10            MR. NESSON:  May I speak from here, your Honor?

11            THE COURT:  Yes, of course.

12            MR. NESSON:  Joel Tenenbaum I believe speaks for

13   his generation.  Beyond that, he is part of a broader

14   Internet generation that has an issue that has been raised

15   by the plaintiffs here in this federal court.  Essentially

16   their issue is that they have felt abused by a campaign that

17   the recording industry has brought effectively against that

18   generation.

19            It is an issue of great moment, it's an issue on

20   which Joel Tenenbaum claims an American jury trial.  What

21   the plaintiffs would like to do is they would like to

22   constrain the case in many possible ways so that the actual

23   issue, which is here in contest in this federal court, which

24   is what the recording industry has done to Joel's generation

25   and is doing to the net can be litigated and heard and

1    judged.

2         Now, counsel is completely right in his

3    description --

4         THE COURT:  Wait, back off for a second.  On the

5    one hand, Mr. Tenenbaum can defend the copyright

6    infringement.  We're only talking about this particular

7    abuse of process issue; and, No. 2, again, aren't you more

8    concerned not about them taking advantage of a statute that

9    was passed that enables them to do what they're doing, but

10   the statute itself that Congress provided, the definitions

11   of infringement, the amount of statutory damages that are

12   available, that's all.

13        In other words, you've beat this with Congress,

14   not necessarily with these plaintiffs, but get back to the

15   first point, which is focused, if you will, on the abuse of

16   process claim and then we can broaden.  In other words, the

17   inability to be able to have abuse of process here because

18   it doesn't fit, doesn't mean he can't have a public trial on

19   the question of whether he infringed.

20        MR. NESSON:  Let me start with the place where I

21   actually started coming into this case, which was reading

22   your Honor's comments in a transcript to the other side on

23   an earlier occasion.  I believe I have it here.  May I ask a

24   technical assistant to come?  "You know, it seems to me that

25   counsel representing the record companies have an ethical

1    obligation to fully understand that they are fighting people

2    without lawyers to fully understand that more than just how

3    do we serve them but just to understand that the formalities

4    of this are basically bankrupting people, and it's terribly

5    critical that you stop it."

6              THE COURT:  Eloquently said, but the question is

7    whether or not that says in a policy world on an issue of

8    judgment this was not the right strategy, it doesn't say

9    that they were not entitled to do what they did.

10             MR. NESSON:  So now come to the cause of action.

11   As they state, it depends on there being an ulterior purpose

12   regarding the state cause of action for a moment.  The

13   essence of the state cause of action can be summed up in the

14   kind of example of a lawsuit against a defendant on a

15   contract in order somehow to coerce them into buying or

16   selling a piece of property, something different.

17             It is our claim, my claim, Joel's claim, the

18   generation's claim that the purpose of the recording

19   companies, the purpose of the copyrighting giant, and,

20   frankly, it doesn't make any difference whether the bits are

21   books or music, is to close the net.  This was a realization

22   that came to them in the immediate wake of Napster when they

23   realized as a strategic entity that their attempt to compete

24   on the open net was bound for difficulty, and at that point,

25   I believe, and I point out to your Honor that our discovery

1   on the issue has been completely stayed by you, so I've had

2   no opportunity to ask an interrogatory or take a deposition

3   with respect to this.

4          Yet, it is my belief, and there is literature to

5   support the thought that the strategists for the record

6   companies back when Napster hit recognized that they needed

7   to close the net.  At that point they were in no position to

8   do it.  They had no campaign in place, they hadn't conceived

9   it, and at that point they were hemorrhaging, as they saw

10  it, to the peer-to-peer networks, and so their lawyers urged

11  upon them this radical strategy of suing noncommercial music

12  fans in large numbers.

13         They hesitated to do that until they actually

14  could offer a digital alternative, that is, they refused to

15  start, Hillary Rosen refused to let the RIAA proceed until

16  they had some digital alternative in place, and then as soon

17  as they had it, they loosed the hounds with thousands of

18  lawsuits that burdened the federal courts with pro se

19  defendants fighting off bankruptcy on the threat of in

20  Joel's case a million dollars.

21         If you take the number of songs they say he

22  downloaded and put it within their control to just name as

23  many songs as they want, it's up in the billions.  That's an

24  ulterior purpose, your Honor, their purpose was to hold the

25  fort, to maintain the rhetorical dam against the onslaught

1    of peer-to-peer until they could get their campaign in

2    place.

3            When they had it in place, they called off this

4    litigation campaign, all but the mopping up operations,

5    which as far as I can tell, are now solely to pay their

6    lawyers.  In August, they announced, no, we're not going to

7    go forward with this campaign anymore, no more new lawsuits,

8    just suits that were already in the pipeline, and at the

9    same time, you can read in the newspapers they have an

10   international and national campaign to establish treaties

11   and laws in Congress and contracts with commercial ISPs and

12   leverage on noncommercial ISPs like my university to close

13   the net.

14           THE COURT:  To close peer-to-peer sharing?  I

15   mean, that's specifically why?

16           MR. NESSON:  Yes, to create an environment where

17   if you download a copyrighted bit --

18           THE COURT:  The ISP would be responsible?

19           MR. NESSON:  -- you're off the net.

20           THE COURT:  So the question is whether or not,

21   even if that's true, that the protection of market share and

22   the protection of property rights, however critical you may

23   be, is precisely what's comprised in the copyright statute

24   which again goes to the point even if what you've said is

25   essentially a florid translation of what they've said but

1    still within the context of the kinds of motives behind any

2    copyright infringement case, in what respect is this

3    ulterior, in what respect is this outside the bounds of what

4    they're entitled to do to protect their property rights?

5            MR. NESSON:  Well, just stay within the framework

6    of state cause of action doing one thing for another

7    purpose.  Their lawsuit is against Joel Tenenbaum.  It's to

8    recover damages against him.  Their purpose is to create a

9    public environment which allows them the time to put

10   together their campaign lobbying and litigation to close the

11   net.  That's the equivalent in the state situation of

12   bringing a contract action against someone in order to put

13   the pressure on them to do something else.

14           THE COURT:  Not the pressure on Mr. Tenenbaum to

15   do something else.

16           MR. NESSON:  The pressure on the public, that's

17   their objective, their objective is to hang Joel's head high

18   on a post, to bankrupt him in front of the world to blair

19   out their message that P2P downloading must be stopped and

20   then move in with that message into a lobbying campaign and

21   a contracting campaign which allows them to put it across to

22   close the net.

23           THE COURT:  Doesn't this, again, we go back to

24   that was Congress's purpose when they substantially

25   increased the penalties to a point which you believe to be

1   excessive?  That was Congress's purpose, and so to some

2   degree Congress enabled them to sue individuals for damages

3   in the amounts that they're suing precisely to deter the

4   conduct on the net.

5          Now, you add to that a story about deter this

6   conduct so that they can accomplish other things, but the

7   ground work here, which is, you know, the damages that the

8   rates that they are seeking and the concept of suing

9   individuals for deterrence purposes is part of the

10  Congressional plan.  How could it then be an ulterior motive

11  and outside the framework if it's part of the Congressional

12  plan?

13         MR. NESSON:  Well, let me approach that obliquely

14  by addressing the question which you summarily dismissed at

15  the outset of your remarks to my Brother counsel.  If your

16  Honor says that the federal courts have no inherent power to

17  protect themselves against abuse of process, abuse of their

18  process, that is, that you seeing what led you to make this

19  striking statement unfolding in front of you, seeing an

20  industry, a huge industry, advised by its lawyers to bring

21  thousands of lawsuits against pro se people, which is, I

22  believe utterly unethical, in the process interpreting a

23  statute, and, yes, we can get to the statutory

24  interpretation, but taking the most aggressive statutory

25  interpretation coming in and putting the federal court,

1   making the federal court its instrument of oppression

2   against pro se defendants, the idea that the federal court

3   is powerless to recognize a cause of action which would

4   allow that even to be discussed runs dead against what the

5   Supreme Court has said.  It runs dead against any common

6   sense of what it must be to be a federal court.

7          In Wheelton, your Honor, which involved think how

8   small a committee member issuing, not even a staffer of a

9   committee, ripping off a subpoena on a pad and serving it to

10  someone to come before a committee for an ulterior purpose,

11  okay.

12         The federal court in that case, the Supreme Court,

13  Justice Douglas says, "Well, there's no federal cause of

14  action there."  Justice Brennan for two other judges in a

15  dissent in which he lays it out says, "Even here I'd say

16  there was a federal cause of action, but surely this idea

17  that there was federal common law is a gross overstatement."

18  The federal courts have inherent power to protect themselves

19  on federal matters.

20         This is clearly a federal matter, thousands of

21  lawsuits clogging the federal courts, clearly a federal

22  matter, and a matter on which it should at least be

23  discoverable, it should at least be possible for a plaintiff

24  to go forward with interrogatories and discovery to

25  penetrate what, as I say, seems and what seemed to your

1    Honor to be a clear-cut, unethical campaign of litigation

2    that they have subjected not just Joel to but thousands of

3    others.

4        THE COURT:  I understand your point.  I think that

5    there is a difference between doing something which it's

6    clear that Congress has allowed them to do, which is to say

7    sue individuals for copyrighting infringement for file

8    sharing of copyrighted songs at this level of damages and

9    since Congress has allowed them to do it, the beef is with

10   Congress.

11       There are many times in this court on the criminal

12   side and the civil side that I would say to a plaintiff, are

13   you sure you want to do this, say to the government, are you

14   sure you want to prosecute this small case of drug

15   possession with substantial federal penalties thousands of

16   times.  That's a different issue to tell the plaintiff that

17   we think it was the wrong policy, the wrong judgment than to

18   suggest that it was abuse of process for them to do

19   precisely what the statute allows them to do, so why don't

20   we go onto the next issue.

21       I take your point.  Go onto the next issue which

22   is the fair use issue, and you want to address the fair

23   use.

24       MR. NESSON:  If I may, your Honor, your assumption

25   about what the Congress clearly intended seems to me to be

1    utterly unreal.  There was never any discussion in Congress

2    of any kind of act of Congress that would somehow imagining

3    this kind of assault under this statute.  You look at the

4    Congressional record.  What you see is this amendment in '99

5    goes through without the slightest discussion, it's just put

6    through by Hatch and Berman, and it's not an issue.

7            It's like the idea that the United States

8    Congress, someone in the United States Congress, someone

9    wouldn't have risen on behalf of the digital generation that

10   has been mauled in this fashion by the recording industry.

11   The idea that the record is totally silent on that and yet

12   we're to infer that this is just what the Congress intended,

13   it doesn't make any sense in the real world.

14           THE COURT:  Whether it's what Congress intended,

15   the language that they're proceeding under, the language of

16   the copyright statute, the damages which were then increased

17   by Congress for behavior which given the state of the law at

18   that time had to have been behavior of individuals.  By that

19   point the Napster and Grokster cases had already been

20   decided.

21           It was clear what the next step was going to be

22   and perhaps wrong but the next step was going to be.  I can

23   say only -- I would reiterate, I agree with you in terms of

24   the policy, as I've said before, but I don't think that that

25   comprises an abuse of the process because the process is

1    precisely what Congress has allowed, and the place to change

2    it would be to get the millennium, the digital generation

3    into the halls of Congress, which is another question

4    entirely, but I'd like to move onto the fair use issue,

5    counsel.

6         MR. REYNOLDS:  Your Honor, if I may, I would just

7    like to say one thing about the abuse of process.

8    Mr. Nesson is very eloquent, but he is wrong when he accuses

9    me and my clients of ethical violations.  I take my ethical

10   obligations very seriously, my firm does, and my clients do

11   as well.  My clients act reasonably in every one of these

12   cases, and we reject the assertion that there's an ethical

13   violation here, your Honor.

14        Turning to the use of the issue of fair use, your

15   Honor, fair use, as your Honor knows, is an affirmative

16   defense.  Under Rule 8, it's waived if it's not pled.  This

17   case has been pending for two years.  The defendant never

18   asserted a fair use argument until a month or two ago.

19        THE COURT:  I understand that.  That's in the

20   record.  The case sort of begins with a pro se defendant and

21   isn't until, what is it, six or seven months ago that

22   there's finally counsel represented in this case, and so to

23   some degree, some of the concerns can be addressed because

24   this was a pro se claim, pro se defendant.

25        Let me ask you a concrete question.  Sometimes

1    it's helpful for me to get ahead of myself and say what

2    would happen if I allowed them to amend, to have a fair use

3    affirmative defense, what would that mean in terms of a

4    trial date, what would that mean in terms of whatever

5    discovery you need?

6         I don't understand how, to some degree, it seems

7    to me that the fair use affirmative defense is a matter of

8    argument.  The underlying facts are here.  They're really

9    not in contest dramatically, and it's really a question of

10   the characterization of that.  What discovery would you

11   need?  Why isn't it at the very least a summary judgment

12   issue, why isn't it a -- or a directed verdict issue?  Why

13   does this defense have to stop here?

14        MR. REYNOLDS:  Well, your Honor --

15        THE COURT:  It doesn't have the same futility

16   resonance as the abuse of process issue.

17        MR. REYNOLDS:  I understand, your Honor.  I would

18   submit I agree with you that the facts are with respect to

19   what we understand to be the fair use defense are well known

20   and are in fact dispositive, and that that's exactly what

21   makes it's futile, so I don't think permitting the defense

22   to go forward, I think we should argue it right now, and it

23   should be out of the case right now, if that's what the

24   Court wants to do, and so forget the waiver argument, if the

25   Court would like to do that, but there is no fair use

1    defense as a matter of law in the context of this case, and

2    every court to address it has reached the same conclusion.

3         But in terms of with respect to your Honor's

4    question, I want to address your Honor's question in terms

5    of what would it mean.

6         THE COURT:  What would it mean?

7         MR. REYNOLDS:  I think it would mean -- there are

8    really two things it would mean, one, it would mean

9    additional discovery for plaintiffs because the defendant

10   has never said what fair use is.  The defendant has never

11   given us one clue fair what is the defendant claiming is

12   fair use here.  I think we're entitled to know that before

13   we go to any type of trial.

14        You know, the whole purpose of Rule 8 is to allow

15   us to mount evidence to meet any fair use defense, and

16   that's why Rule 8 exists.  With respect to counsel not being

17   in the case, I agree with that, your Honor, but counsel has

18   been in the case now for six months.

19        Counsel, defendant's counsel stated to this Court

20   he was ready to go to trial last November and insisted on a

21   November trial date.  Since then, counsel has amended the

22   complaint two or three times.  It's not until the third one

23   a few weeks ago, I'm sorry, months ago that we get the fair

24   use defense.  I think the pro se factor here is a nonissue.

25   This defendant had been represented for counsel by some time

1    now, and if this defense if it was going to be raised,

2    should have been raised a long time ago.

3            But, more importantly, in terms I want to really

4    hone in on one thing, your Honor, that in terms of what it

5    would mean.  What it would mean in the context of this case

6    is the sole purpose for the defendant to assert this defense

7    is to seek jury nullification, and that is established by

8    the defendant's own pleadings.

9            The defendant wants -- the defendant doesn't want

10   to argue the elements of fair use, not even close.  What the

11   defendant wants to argue is, hey, it's the Internet

12   generation.

13           THE COURT:  What if this was done on summary

14   judgment?  Allow him to amend, do whatever little he

15   needs -- I'm not sure I see the additional discovery but we

16   take this on summary judgment?

17           MR. REYNOLDS:  I guess what I would say, your

18   Honor, is I agree with you, well, first of all, not knowing

19   what the fair use defense is in this case, we would

20   certainly need to know that at a minimum.

21           THE COURT:  Sure.

22           MR. REYNOLDS:  And then we would need, depending

23   on what that is, we would need discovery in order to flesh

24   out the details of what evidence the defendant would seek to

25   produce and to mount our own defense.  I would submit to

1   you, though, your Honor, that if the defense is downloading

2   and distribution is fair use, then the defense is gone as a

3   matter of law and it's futile and it should not be allowed.

4   It especially should not be allowed --

5            THE COURT:  Is it in the Minnesota case, Minnesota

6   case that is dealing with the exact same set of facts we're

7   about to go to trial the end of June?

8            MR. REYNOLDS:  That's correct, your Honor.  Very

9   interesting question, your Honor, the defendants in that

10  case have asserted for the first time a week ago --

11           THE COURT:  Fair use defense.

12           MR. REYNOLDS:  A fair use defense, yes, which is a

13  coincidence perhaps.

14           THE COURT:  What's going on and has the Judge

15  allowed that?

16           MR. REYNOLDS:  That will be heard next week, your

17  Honor.  The Judge has not allowed it yet, but the issue is

18  before the Court.

19           THE COURT:  That case was just reversed because of

20  the making available issue an error in the instructions and

21  more?

22           MR. REYNOLDS:  If by just you mean recently, it

23  was a while ago, but if just, that was the only reason, your

24  Honor, that's correct.

25           THE COURT:  September 25th, 2008.

1          MR. REYNOLDS:  It was the only making available

2     issue, and I submit, your Honor, the real issue here is we

3     see, No. 1, we see no reason for anyone to engage in further

4     discovery on this issue.  Under no set of circumstances can

5     there be fair use for what the defendant engaged in in this

6     case, and the only reason for the defendant to assert this

7     defense now is to seek jury nullification.

8          THE COURT:  You said that.  I understand.

9          MR. REYNOLDS:  What I'm saying there doesn't seem

10    to be a reason to engage in discovery and in further motion

11    practice when here we are, let's decide it right now

12    because --

13          THE COURT:  The defendant is going to try to do

14    jury nullification whether or not fair use is in this case,

15    so fair to say?

16          MR. REYNOLDS:  Fair to say but there's no reason

17    to provide the defendant with a vehicle, with the chosen

18    vehicle, I would submit, that's the defendant's chosen

19    vehicle and one that's not supported by the law, in fact,

20    one that based on every case is contrary to the law, so I

21    would submit that allowing the defendant to assert that

22    defense essentially would be for the sole purpose of jury

23    nullification.

24          We think that's significant, your Honor, and I

25    hope that addresses the Court's question about what would

1    happen.

2           THE COURT:  What would happen?  It would push off

3    the trial which is now scheduled the end of June.

4           MR. REYNOLDS:  Which we object to, your Honor,

5    this case has been pending for long enough.  We believe the

6    case should be tried.  We're prepared to try it.  We don't

7    think it's fair to assert a fair use defense, and we further

8    don't think there's a reason to push the trial off based on

9    a fair use defense in this context.  That's no reason to

10   push the trial date, your Honor, I would submit.

11          THE COURT:  You have cited I would say 15 or 20

12   times in your papers the e-mail, e-mails with Mr. Nesson and

13   the experts that he sought to consult, all of whom say there

14   is no fair use in this case.

15          MR. REYNOLDS:  I don't know if we cited them at

16   least 15 or 20 times, but I would like to quote them at

17   least twice today.

18          THE COURT:  Yes, okay.

19          MR. REYNOLDS:  So I would submit, your Honor, if I

20   could go through the analysis just briefly if the Court

21   would permit here.

22          THE COURT:  Yes, go on.

23          MR. REYNOLDS:  As we said, in this case the

24   defense is futile.  There are four elements that the Court

25   would consider.  The Court is well aware of them, the

1    purpose and character of the use, the nature of the

2    copyrighted work, the amount and substantiality of the

3    portion of the work copied and the effect upon the potential

4    market.

5            With respect to the first factor, your Honor, as

6    the Court has stated in the Fitzgerald case, there are

7    really three things to consider here.  One is whether the

8    use falls into a category specifically identified by

9    Congress, and that would include criticism, comment, news

10   reporting, et cetera.  I would submit the answer to that is

11   categorically no.  I don't think the defendant even

12   questioned that issue.

13           The other question, the second question for the

14   first element is whether the defendant's use was productive

15   or transformative.  We submit, your Honor that there's

16   absolutely nothing actually productive or transformative

17   about downloading or distributing copyrighted materials.

18   There's nothing added.  There's no benefit.

19           THE COURT:  In general or in this case?

20           MR. REYNOLDS:  In this case.  In this case, your

21   Honor.

22           THE COURT:  Okay.

23           MR. REYNOLDS:  There are two cases that support

24   that, your Honor, that we've cited in our briefs, both the

25   Napster case from the Ninth Circuit and the Princeton

1    University Press case from the Sixth Circuit also has a

2    similar holding.

3            The third question, your Honor, is whether the use

4    was commercial, and as the Court stated in the Fitzgerald

5    case, that issue focuses on "Whether it primarily served the

6    defendant's private interest rather than the public interest

7    in the underlying copyright law."  Your Honor, the only

8    interest here was Mr. Tenenbaum's private interest in

9    obtaining copyrighted music for free, and that is a

10   commercial use, and Joel Tenenbaum is a commercial

11   infringer.

12           THE COURT:  Also I think you raised in your papers

13   that this is a question of barter, that to some degree you

14   put up your songs and you get songs in exchange?

15           MR. REYNOLDS:  That is the purpose of peer-to-peer

16   networks, if no one is sharing files, there's no

17   peer-to-peer network.

18           THE COURT:  The commercial benefit that you get is

19   that you don't have to pay for any songs that you get?

20           MR. REYNOLDS:  To a large degree, that's

21   absolutely correct.  As the Ninth Circuit held in Napster,

22   the repeated and exploited unauthorized copying made to save

23   money at the expense of purchasing authorized copies

24   demonstrates the commercial use.

25           And, your Honor, the statute says the same thing

1    as the case law, but let me back up.  There are two cases

2    that say this is commercial use from the circuit courts, one

3    is the Napster case, the second one is the Gonzalez case,

4    which I'm sure your Honor is familiar with, as

5    Judge Easterbrook said, a copy that's downloaded and played

6    and retained on the hard drive, as is the evidence in this

7    case, is a direct substitute for a purchased copy.

8            And so we have the case law that all says that,

9    but the statute says the same thing, and this is the barter

10   point I think your Honor is pointing to.  Congress has made

11   clear that financial gain includes the expectation of

12   receipt of anything of value, including the receipt of other

13   copyrighted works, and, again, your Honor, that's the whole

14   purpose of a peer-to-peer network, your Honor, is to share

15   files and get something in return.

16           So we would submit, your Honor, that none of the

17   three questions that the Court outlined in the Fitzgerald

18   case and that are commonly applied to the first element

19   support the idea of fair use.  In fact, they all go against

20   fair use.  This was commercial infringement, and there is,

21   at least, if not a presumption, that weighs strongly in

22   favor of a finding against fair use.

23           The second factor, your Honor, is the nature of

24   the copyrighted work.  That's not an issue here.  As the

25   Supreme Court held in the Campbell case, sound recordings

1  are at the core of identified copyright protection, so that

2  factor ways against fair use.

3       The third factor, the portion of the work copied

4  clearly weighs against fair use.  The defendant copied whole

5  sound recordings, hundreds of them, not just one or two,

6  hundreds of them.  That weighs against fair use.

7       Your Honor, the fourth factor, the effect upon the

8  market or value of the work, of the copyrighted work, as the

9  Supreme Court has said, this is one of the most important

10  factors, and there's no question in this case, your Honor,

11  as has been found by numerous cases, included the Napster

12  case, that this type of activity harms the market for my

13  client's copyrighted works, and as pointed out in Napster,

14  it does so in two ways.  If you get a copy for free, why

15  would you buy one?  The second thing, and I think this is

16  significant --

17       THE COURT:  Although isn't the case that the

18  Internet has worked in both ways for your clients, on the

19  one hand, it has made music more accessible, nationally,

20  internationally.  You now have a platform in which to drum a

21  particular interest at a much cheaper cost.  On the other

22  hand, it creates the kind of situation you've described, but

23  isn't that a wash?

24       MR. REYNOLDS:  It's not a wash because we're

25  looking at two different things.  The Internet in general,

1    absolutely, great thing.  Peer-to-peer file sharing,

2    absolutely not.  Peer-to-peer file sharing, swapping illegal

3    files is not part of what benefits my clients.  In fact,

4    this is the second point --

5            THE COURT:  But the question is you get the

6    benefit from the songs being out there is outweighed by the

7    impact of peer-to-peer file sharing.  Has everyone done a

8    study exactly how much this has cut into your sales?

9            MR. REYNOLDS:  There had been studies, your Honor.

10   I'm not intimately familiar with those studies, but I am

11   aware of studies that say it certainly cuts into sales and

12   it certainly harms sales.  There was evidence presented,

13   there's been evidence presented in many cases that says

14   exactly that, and the Napster courts specifically found

15   that, so, yes, I mean, the Internet is certainly beneficial

16   in many ways, but peer-to-peer filing sharing and swapping

17   of illegal files is not beneficial to my clients.  It's a

18   substitute for the sale, but your question also gets to the

19   second issue, and that is that peer-to-peer file sharing

20   actually harms the record's company ability to get into the

21   market and to expand their market of legitimate sales on the

22   Internet.

23           Again, if you can go to a peer-to-peer file

24   sharing network and download something for free, why would

25   you go somewhere else on the Internet and pay for it?  I

1    think the incentive there is significant and it harms my

2    client's ability to expand their market on the Internet.

3              THE COURT:  Even the payment is 99 cents?

4              MR. REYNOLDS:  I would say it would probably be

5    true even if the payment was 20 cents, your Honor, 25 cents.

6    I think yes, people will gravitate towards what they can get

7    for free.  I think that's intuitive, your Honor.

8              Your Honor, that is why the Courts have

9    consistently rejected the fair use argument in this context.

10   I'm not aware of a single case that says that what the

11   defendant engaged here could possibly be considered fair use

12   under any theory of fair use, and we've cited the cases in

13   our brief, the Napster case, the Gonzalez case, there's also

14   the MP3.com case from the Southern District of New York.

15             You know, your Honor, the bottom line with fair

16   use is that the fair use doctrine exists, and it applies

17   where the copyright act's goal of encouraging creative and

18   original work would be better served by allowing the use

19   than preventing it.  In no way is the purpose of the

20   copyright act served by allowing people to trade files for

21   free.

22             There's no benefit there to creativity or to

23   anything, and that's why the fair use has been consistently

24   rejected in this context, and, your Honor, I promise two

25   quotes, I want to give them to you.  Professor Lessig, your

1   Honor, and these e-mails also demonstrate that this was a

2   belated theory for the express purpose of jury

3   nullification, and as Professor Lessig, when he first heard

4   about it, he expressed surprise that the defendant was

5   asserting this defense in the context of what the defendant

6   did and said, "Of course it was against the law, and you do

7   the law too much kindness to pretend that fair use excuses

8   what he did, it doesn't."  That's Professor Lessig.

9        We also have Professor Fisher, "It is not credible

10   to argue that the widespread peer-to-peer file sharing has

11   not and will not give rise to some meaningful likelihood of

12   future harm to the revenues of the holders of the copyrights

13   and the sound recordings and musical works."

14        Your Honor, the defendant's own consultants have

15   stated unequivocally this was not fair use, and this defense

16   should not be allowed, and there should be no further

17   briefing or discovery or mention of it at trial.

18        THE COURT:  Thank you.  Mr. Nesson.

19        MR. NESSON:  Well, first let me speak to the

20   timeliness issue.  It's true I've been in this case since

21   the fall, but it is also true that I have been quite

22   preoccupied with those issues involving the framework of

23   this case, specifically the Internet issues, the issues of

24   statutory construction and have been working all the way

25   through with a team of students in a process that is not

1    designed necessarily to be as efficient as the lawfirms that

2    we face on the other side.

3         And it's true also that in approaching the case

4    conceptually, the first stages have to do with

5    constitutional frame, and it was only later in the process

6    of thinking about how this case would go that we actually

7    get down to the jury trial, what is the jury trial, and it

8    was at that point that it started to grow on me that this

9    established understanding, which my opposing lawyers

10   described in fact was not correct, and so it brought me into

11   conflict as one professor against another with a question

12   about what is this thing, fair use?

13        So I went and read Pierre Laval, and I went and

14   read Terry Fisher, and it's perfectly clear reading them

15   that they say you can't say what fair use is, it's like a

16   fractal object, it's a principle, it's not something

17   reducible to rule.  It is the principle of fairness, which

18   is on the border.

19        You have the picture of the Constitution

20   establishing an authority in the Congress to create a

21   monopoly zone within the larger range of human liberty, that

22   is to use whatever is in your environment.

23        We walk through a world that is full of

24   copyrighted stuff, and the question is are we constrained in

25   using it in some way that is unfair to us?  All right.  So I

1    then read the Supreme Court cases, the big case, the big

2    case here is Sony, that's the grand case, and in Sony they

3    unmistakably declare and base the judgment on it a

4    presumption of fair use with a noncommercial user.

5          That makes complete sentence in the structure of

6    the copyright statute.  It is clear that the copyright

7    statute was designed in its origins and in its amendments to

8    deal with commercial copyright infringement.  That makes

9    sense.  It's a money business for them, and when somebody

10    comes along and steals their stuff and makes money from it,

11    they want the money.

12          THE COURT:  What about eliminating the market

13    for --

14          MR. NESSON:  Say it again.

15          THE COURT:  What about reducing the market for

16    whatever it is by giving it away for free, by sharing it for

17    free, you then reduce, diminish the market for those that

18    will pay for that?  There are two points.  You may not have

19    gotten the direct commercial benefit, but you've certainly

20    impacted their ability to get money for the product, No. 1;

21    then what of I think it was Judge Posner's comment in the

22    Seventh Circuit that it's more than that because you're not

23    selling it, but you're bartering it for other songs that you

24    then have access to, so you don't have to pay for that

25    either, why isn't that commercial?

1          MR. NESSON:  Well, let me approach it in two ways,

2    your Honor.  First, these cases that they cite, virtually

3    none of them involve noncommercial users, they simply have

4    never sued noncommercial users before.  It's true we get to

5    Gonzalez and Judge Easterbrook, and he is like counsel for

6    the copyright industry.  He lays out a map how they can

7    avoid the jury.  All they have to do is only ask for $750,

8    then get your Honor to issue summary judgment, and by God,

9    the jury doesn't even have to consider damages.

10          Judge Easterbrook, yes, they cite him, and he is

11   their God.  But Judge Easterbrook is not in this circuit and

12   it's not this Judge.  Fairness is an issue for the jury.  It

13   is the border to infringement, that which is fair is not

14   infringing, that which is infringing is not unfair, and they

15   have the burden of proof.

16          THE COURT:  No, you have the burden.

17          MR. NESSON:  The presumption of Sony says that if

18   Joel is a noncommercial user, then they have the burden of

19   proving.

20          THE COURT:  Where does affirmative defense fit

21   into this?  An affirmative defense means you have the

22   burden.

23          MR. NESSON:  Yes, but, your Honor, the

24   Constitution comes first.  This affirmative defense, it just

25   evolved in fact.  I would maintain that if in fact this

1    affirmative defense is to be construed as negating the

2    presumption in favor of a noncommercial user, then Sony is

3    just whistling in the wind.  That's not the case.  You don't

4    need an affirmative defense when the burden of proof is on

5    them to prove infringement.

6              THE COURT:  You're saying that when you get to

7    the -- your characterization of your client as a

8    noncommercial user --

9              MR. NESSON:  Yes.

10             THE COURT:  -- somehow shifts the burden to the

11   plaintiffs here in a way because it presumptively takes them

12   outside of the copyright act, but the premise that

13   Mr. Tenenbaum is a noncommercial user is exactly the premise

14   that they're challenging.  He's not a noncommercial user

15   because he has gotten something for nothing and because he

16   and others like him have undermined the market for the paid

17   works, so he's not a noncommercial user.

18             There are no additional facts we need to talk

19   about.  It seems to me I need to deal with that, but

20   certainly no other courts have held that anyone in this

21   situation is a noncommercial user is, and, therefore, the

22   framework that you're describing maintains, no one has held

23   that.  This doesn't mean anything you understand, but it

24   should give me some pause.

25             MR. NESSON:  I'm perfectly okay with that, your

1    Honor.

2              THE COURT:  Thank you.

3              MR. NESSON:  None of these other cases that they

4    refer to are jury cases.  Every one of them is a case in

5    which a Judge has purported to make this fair use decision.

6    Now, I have no question but that whether Joel is a

7    noncommercial user is an issue to be considered in the fair

8    use concern, but that to me is an issue for the jury, and I

9    believe that going to a jury on the proposition that Joel,

10   who didn't sell it, didn't trade it, didn't market it in any

11   way, didn't use it for any commercial purpose whatsoever,

12   that Joel is a noncommercial user, if ever there was one,

13   and if they have to win to the jury on the question of

14   whether Joel is a commercial user like a commercial

15   copyright printer who prints off thousands of things, then,

16   all right, good luck for them, it feels like a jury issue to

17   me.

18             So here now come further to the jury question.  Is

19   there a possibility that what Joel did was fair?  Well, I'd

20   come back to Hillary Rosen at the moment before they

21   provided a digital alternative, even the RIAA agreed that in

22   that case they couldn't sue because that would be unfair.

23             Now, the moment that a digital alternative is

24   prevented, does that immediately make everything fair?  We

25   are looking at this fairness issue, I hope, from the point

of view, the subjective point of view of a teenage boy.
That is, these are rules that are meant to guide the conduct
of teenage boys who have been brought up with principles of
sharing and justice and imbrued with the music of rebellion
and excited about the net and everything you can find on it,
and all of a sudden this sharing of music which by every
functional aspect is just like radio broadcast, just as your
Honor said, they used to pay payola to the radio stations to
spread their music free out to the world so it built up
market.

Joel, and, again I would take total issue with my
opponents on this question of the digital alternative.  We
have now iTunes.  iTunes is a very successful enterprise.
There are many, and by the way, peer-to-peer is still alive
and well and available for downloading tons of stuff for
free, but the fact is that people who have means and want to
use a nice, clean slick system like iTunes are delighted to
pay a dollar.

The group that we're talking about that they're
complaining about losing the revenue from are the kids.
These are kids without money.  These are kids who are
willing to take the time and trouble on the net to wade
through their spoofs and all of the other nonsense that you
get with downloading from a peer-to-peer in the form of
stuff loaded onto your machine.

1          These are the kids, and so, yes, there are indeed

2     studies that say not that peer-to-peer has hurt them but in

3     fact peer-to-peer in fact is helping them.  There are

4     forward-looking music groups like Radiohead and many others

5     now who see that this business that they're defending is the

6     CD business, it's not the music business.  New groups in the

7     music business are seeing that they want their fans

8     worldwide to have their music, and if their fans are

9     pleased, they can find ancillary ways for having revenue

10    come back to them.

11          THE COURT:  First, the Sony case was the betamax

12    case, and the Court characterized that essentially as a

13    time-shifting issue as opposed to a copying issue, in other

14    words, you were watching it at a different time.  The

15    critical case is MGM Studios vs. Grokster, in which although

16    the Court is not dealing with it directly, it finds there's

17    no finding of any fair use and little beyond anecdotal

18    evidence of noninfring uses.

19          So, having said that, let me sort of move on for a

20    moment to the next question.  If I were to allow you this

21    amendment, what additional discovery would you take, if at

22    all, and could you work out with your opponent a way of

23    making the case progress without necessarily delaying the

24    trial date?

25          MR. NESSON:  It depends on how fast they respond.

1   There are some things I want to know.  I would want to know

2   whether when the copyrightholder made the choice to publish

3   the seven songs, each of the seven songs into this

4   peer-to-peer environment, whether they were aware of the

5   risk that it would be ripped and copied further and whether

6   they made a cost benefit calculation that the right thing

7   for them to do was to release it, nonetheless.

8          THE COURT:  What does that have to do with whether

9   what Mr. Tenenbaum did was fair use, and why isn't this more

10  a back door way of getting at the abuse of process, which is

11  really what they're trying to do?

12         MR. NESSON:  No, this is not abuse of process,

13  your Honor, this is fairness, and an element of fairness

14  traditionally in tort law has been assumption of risk that

15  is a tried and true element of fairness, and I believe that

16  we would have an issue at least to argue to the jury that

17  they assumed the risk.

18         Second, I would be curious to find out whether

19  they made any effort whatsoever to find out who ripped this

20  song and put it up on the net in the first place.  That's

21  the person who actually ripped through something.  After

22  that, it's like confetti on the net and someone who

23  downloads it.  I mean, there are millions who can download

24  it.

25         Did they ever try to stop it at the seed?  There's

1    even a question, your Honor, with a couple of these songs

2    that I'd like to know the answer to whether the original

3    leak came out of for their studios.  That was for a while a

4    regular thing, the songs would actually be up on the

5    peer-to-peer net before they were ever released, and with

6    two of those songs, that's a possibility.  I would like

7    discovery into that.  Those are examples of the kinds of

8    things.

9             If you come back to the question of a young man

10   sitting at a computer 17 years old clicking his mouse seven

11   times, and the issue is whether something unfair is

12   happening at that point or whether he is doing something

13   unfair to that industry that's suing him now for these huge

14   damages.

15            THE COURT:  What about the other 800 songs that

16   are described in Exhibit B to the complaint?

17            MR. NESSON:  They have listed some 800.  They're

18   not prepared to prove them apparently.  If they were

19   prepared to prove them, they could multiply the damages, I

20   don't know what 800 is times 150,000, but that's what puts

21   it up into the billions.

22            THE COURT:  Would that affect your argument if it

23   wasn't just 7 songs but 800?

24            MR. NESSON:  I'm not sure.

25            THE COURT:  Would it affect your argument if it

1    was just not the episodic actions of someone, you know, late

2    night file sharing than someone who is actually doing

3    something at that level, that magnitude?

4           MR. NESSON:  And it might also affect my judgment,

5    your Honor, that Joel Tenenbaum is someone who has bought,

6    had bought a bunch of CDs.  He had put significant music,

7    money into the music business.  He listened to the radio.

8    He had stuff in his automobile, mixed tapes.  He was a kid

9    in musicland and a musician himself, a dedicated musician

10   himself from a musical family.

11          This was not someone who was out to disrespect the

12   artists.  He regarded these artists in the very highest

13   regard.  Those are elements of fairness, your Honor, and I

14   believe that Feltner, the Supreme Court of the United

15   States, Mr. Justice Thomas writing for the Court holds that

16   Joel has a Seventh Amendment right to a jury trial on the

17   issue of infringement and damages.

18          THE COURT:  We'll have a jury trial on the issue

19   of infringement.  The scope of that is what we're talking

20   about here.  I think I've heard enough.  Let me deal with

21   the argument with respect to -- the motion to dismiss based

22   on noncommercial use, unconstitution delegation and

23   excessive statutory damages, that is, as I understand it,

24   first an argument that to some degree is not right before me

25   now, which is the excessiveness of the damages depends upon

1    whether there's a liability finding, it would depend upon

2    what a jury would decide.

3              The argument about, as I understand it, that the

4    plaintiffs here would have to show commercial use as part of

5    its initial presentation, I think that that's what's

6    involved here in the motion to dismiss?  Do you want to

7    address that?  Have I mangled the argument for both sides?

8              MR. REYNOLDS:  Your Honor, I'm not sure that's

9    what the defendant's argument is, and I guess I would defer

10   to the defendant to clarify that.  I did not understand and

11   I don't think there's any obligation for the plaintiffs to,

12   you know, prove commercial infringement to the jury.  This

13   is an infringement.

14             THE COURT:  Mr. Nesson, do you want to argue the

15   motion to dismiss on nondelegation, excessive fines?

16             MR. NESSON:  Yes, your Honor.  First, when you say

17   that the issue is not right, I disagree with your Honor.

18   This issue has been right from the beginning because Joel

19   has been under the threat imposed by this statute from the

20   beginning, the threat that he has been under is 1,050,000.

21   That's what if the complaint is proved to its max he would

22   be responsible for.  That has been a present barrier.

23             THE COURT:  But you'd have an opportunity, if the

24   jury made such a finding, you would have an opportunity to

25   come back before me for a remittitur, which was back in the

1    Minnesota case, I believe.  You'd have an opportunity to

2    argue that that amount was excessive in the ways that you're

3    describing.  What you're asking me to do now is to say in

4    the abstract in advance the damages should be in this range

5    and that would be the appropriate range and the damages at

6    this point would be inappropriate.

7            Isn't that exactly what I should not be doing at

8    this stage?

9            MR. NESSON:  Well, just so that I make my point

10   clear, and I recognize that this may be a restatement of the

11   abuse claim, the abuse claim is that the federal court has

12   been made to be a part of an extortionate threat implemented

13   by the plaintiffs under this statute, and that is not to be

14   corrected simply by the fact that a jury finding may be

15   rational down the line and not impose a million dollars.

16           It's not correct if they opt to just go for $750

17   per claim.  That threat has been the thing that he has

18   labored under, and it is the issue on which we say this

19   prosecution is unfair.

20           Then take the second step.  Our claim is that this

21   statute properly interpreted doesn't apply statutory damages

22   to the noncommercial defendant.  The statutory damage

23   structure of the statute makes complete sense applied to

24   what is criminal, copyright infringement, commercial

25   copyright infringement.  It makes no sense whatsoever when

1    applied to the noncommercial defendant.

2         THE COURT:  But the criminal part of the statute

3    in fact makes a distinction between civil and criminal,

4    between commercial and noncommercial, a distinction that is

5    absent from the regular civil action for infringement.  Why

6    should I read it into it as you're suggesting?

7         MR. NESSON:  Well, you can take it two ways

8    around, your Honor.  You can say this statute originally was

9    drafted for the purpose of dealing with commercial copyright

10   infringement, and the statutory damage structure was set up

11   that way, and then we got to LaMacchia here in this Court

12   where they were shocked to find out that LaMacchia as a

13   noncommercial defendant was not covered by the statute and

14   so they go to Congress and they got him covered.

15        But the fact that they covered the noncommercial

16   LaMacchia, who is the gross violator who puts up, you know,

17   scabs of Microsoft software for the world to share for free,

18   the fact that they had to go to Congress to get that, that

19   doesn't somehow back door into the noncommercial copyright

20   the application of these statutory damages, it in fact

21   affirms that that wasn't the subject matter of the statute

22   to begin with.

23        THE COURT:  Okay.  I understand.

24        MR. NESSON:  Second argument, this statute, if

25   applied in this fashion to Joel is totally for deterrence.

1    There is, and I would love to discover this, I think never

2    been a single dollar out of this campaign of theirs that has

3    ever gone back to a copyrightholder.  It has all, I believe,

4    gone to pay their lawyers.  This is a legal campaign.

5         The suit against Joel is not for actual damages,

6    it is for deterrent purposes.  It is criminal in its

7    objective.  I believe that he is entitled to the protections

8    of a criminal trial.  One of those protections is that he

9    has a right for the jury to decide whether he's guilty.  No

10   directed verdicts in criminal cases.  For purposes of this

11   case against Joel Tenenbaum, your Honor should as much as

12   possible follow the protections afforded to criminal

13   defendants.  This is a prosecution that they're bringing.

14        THE COURT:  I understand.  I understand the

15   argument.  Let's leave it at that.  So just to summarize

16   then, clearly if I were to allow any of the counterclaims or

17   the fair use affirmative defense, it would put off the trial

18   date.  The arguments with respect to the motion to dismiss,

19   that has an unclear effect on the schedule.  Let me take

20   this under advisement.

21        The state of the Minnesota case is that that is

22   about to go next week, is it, or the end of June?

23        MR. REYNOLDS:  Yes, your Honor, June 15th.

24        THE COURT:  Okay.  I will take it under

25   advisement.  I do want to say one thing.  Every time I deal

1    with any issue in this case, there are sort of two

2    narratives.  One is the narrative that is similar to what

3    you just said, Mr. Nesson, which is that Mr. Tenenbaum

4    potentially confronts very substantial damages.  If I rule

5    in favor of the plaintiffs, if a jury comes out in favor of

6    the plaintiffs, if I rule in favor of the defendant, and I

7    am reversed, what hangs in the balance are very substantial

8    damages, and I assume that he knows that, that's the gist of

9    your argument.  So, that's one narrative which has always

10   concerned me, and to some degree the comments that you have

11   quoted were those very concerns that individuals, largely

12   unrepresented, were not necessarily understanding what they

13   were confronting.

14       The other narrative is one which the Judge in the

15   Minnesota case ended his decision with, and he said, "The

16   Court would be remiss if it did not take this opportunity to

17   implore Congress to amend the copyright act to address

18   liability and damages in peer-to-peer network cases such as

19   the one before the Court."  The Court begins by recognizing

20   the unique nature of this case.  The defendant is an

21   individual, a consumer, she's not a business, she sought no

22   profit from her acts.  The myriad of cases cited by

23   plaintiffs and the government in which the Court upheld

24   large statutory awards far above the minimum have limited

25   relevance in this case.  All involve corporate or business

1    defendants and seek to deter future illegal commercial

2    conduct.  The parties point to no case in which large

3    statutory damages were applied to a party who did not

4    infringe in search of commercial gain.

5         The Court says it didn't condone Thomas', the

6    defendant's actions, but would be a farce to say that a

7    single mother's act of using KazaA are the equivalent, for

8    example, to the acts of global financial firms illegally

9    infringing on copyrights in order to profit in the

10   securities market.

11        Unfortunately by using KazaA, he says, "Thomas

12   acted like countless other Internet users, her alleged acts

13   were illegal," but comment, "her status as a consumer who's

14   not seeking to harm her competitors or make a profit doesn't

15   excuse her behavior, but it does make the award of hundreds

16   of thousands of dollars in damages unprecedented and

17   oppressive."  This is Capital Records v. Thomas, 579 F.

18   Supp. 2d, 1210-1228, 2008.  That's the other narrative, and

19   to some degree on the one hand there's substantial risk here

20   because this is an area in which the overwhelming body of

21   law has gone in the direction of the plaintiffs.

22        On the other hand, at least one Judge has

23   expressed views on the fairness of this process, abuse with

24   which I share.  What that means in terms of what I will

25   concretely do is an open question, just as the Judge in the

1    Minnesota case made this comment, but, nevertheless, is

2    proceeding with a retrial with changed instructions, so the

3    question is going to be not necessarily where my personal

4    feelings are, because that's never the question here, or

5    what the fairness of the proceeding at large, as Mr. Nesson

6    is likely to say, but what the law requires me to do.

7            I will take that under advisement.  You'll hear

8    from us very shortly.  Is there anything I need to address?

9            MR. REYNOLDS:  One moment, your Honor.  Your

10   Honor, just with respect to the allegations, I think it was

11   a million dollars in damages.  I'm sure your Honor is aware,

12   my clients take a much more reasonable approach than that.

13   We're never demanded a million dollars from this defendant.

14   In the Thomas case, we invited the Judge to do a remittitur,

15   but the Judge decided to vacate the trial instead, I just

16   wanted to point that out.  With respect to there's one other

17   issue, and that's the RIAA.

18           THE COURT:  I think that's folded into the abuse

19   of process issue.  If there is no abuse of process claim,

20   then there is no issue with respect to the joined RIAA.

21           MR. CLOHERTY:  I apologize, your Honor, we did,

22   and I'm sure your Honor is aware, we have submitted some

23   proposals relating to the Court's schedule that relate to

24   outstanding discovery.  We want to, and we are trying to

25   comply with the July 20th order and --

1        THE COURT:  There's delinquent expert

2   disclosures.

3        MR. CLOHERTY:  That's probably No. 1 on our list.

4   We in fact filed today a motion to strike the experts which

5   we think is actually appropriate, given the track record

6   here, but in our proposed response to your scheduling order,

7   we've got, you know, we either can't have them, and we think

8   that's the appropriate way to do it, or we've got to get

9   them deposed.

10        THE COURT:  Mr. Nesson, what's the story about

11   expert disclosures?

12        MR. NESSON:  So far as I know, we've supplied

13   supplementary disclosures on two of the experts.  The third,

14   which is to be done, I have said I would complete by today,

15   and I'm still intending to send them something.

16        THE COURT:  Okay.

17        MR. CLOHERTY:  The problem, your Honor, is we're a

18   month and a half away from trial.  The schedule the Court

19   set, which was pretty clear and direct back, if I'm right,

20   it was in March, not only included expert disclosure, expert

21   discovery period, we need time to do rebuttal witnesses, and

22   we're extremely late on this.  The disclosures, and we've

23   submitted with the motion that we filed today and maybe your

24   Honor hasn't had a chance to look at it.

25        THE COURT:  I haven't had a chance.  Let's see

1    what Mr. Nesson files today.  In addition, some of the

2    issues I'm grappling with would have an impact on the trial

3    date in any event.  Just let me take a look at that.  Is

4    that the only discovery issue that is outstanding?

5            MR. CLOHERTY:  We also today filed with the motion

6    to compel documents.  We think that can be dealt with and we

7    would get them in time.  We also have, and we just wanted to

8    flag, and this is all I think set forth I think most clearly

9    in our response to your scheduling order which was filed on

10   Tuesday.  There remains a motion.

11           Compliance with the Court's order to produce

12   documents just happened this week.  We're working hard.  We

13   think we can make the trial date, but it triggers potential

14   additional expert issues because we're just getting

15   computers, we need to look at them.  We'll get our

16   information to Mr. Nesson as soon as possible.

17           In addition, that paper flags that there's a

18   motion pending in Rhode Island that has been pending in

19   Rhode Island since I believe Janaury.  It was argued in

20   January.  We have called the Rhode Island Court politely to

21   let them know about the Court's trial date.

22           THE COURT:  This is pending on what?

23           MR. CLOHERTY:  On a motion to compel production of

24   a computer.

25           THE COURT:  That's the computer that is to be used

1    for the mirror imaging?

2              MR. CLOHERTY:  No, there is not.  There were two

3    computers at issue.  The parties are in the midst of

4    compliance with the Court's order in connection with the

5    mirror imaging.

6              THE COURT:  Would that be a base for further delay

7    as well?

8              MR. CLOHERTY:  We hope not.  We are going to work

9    like gangbusters to meet the deadline.  I'm not saying it's

10   a delay, but in our proposal, particularly with respect to

11   the trial schedule, we do need to meet these depositions

12   which I asked the Court if the experts are going to testify

13   in any way, shape or form, and we think there's serious

14   questions about disclosures about even the content of the

15   testimony, which I'd hate to have the parties go through all

16   the exercise of these depositions which include, and there's

17   issues about getting these experts here which also have been

18   flagged.

19             THE COURT:  These are the defendant's experts?

20             MR. CLOHERTY:   These are the defendant's experts.

21   There's a lot of machinations to get that done, at the end

22   of which we certainly see based at least on what we can tell

23   they're going to testify about, we've got significant

24   serious Daubert motions to deal with again because we don't

25   think they ought to testify certainly as to the infringement

1    claim.  These things I believe are set forth in our

2    papers.

3            THE COURT:  Your papers were just filed today?

4            MR. CLOHERTY:  Some papers were filed today, and

5    we also filed the response to the scheduling order on

6    Tuesday, but, yes, there was a motion.

7            THE COURT:  This is plaintiff's submission in

8    response to the revised scheduling order and the defendant's

9    submission as well?

10            MR. CLOHERTY:  I do want to say we're confident

11    about the trial date, and we think we want to get to it.

12            MR. NESSON:  If I could offer a consideration that

13    might bear on your scheduling, my students all graduated the

14    day before yesterday, no, just yesterday, just yesterday, so

15    I have no team at this point.  Debbie has flown in from her

16    summer job in Washington to sit next to me today.  My other

17    students are strewn around the country.  I am a professor.

18            THE COURT:  But you can all communicate

19    electronically.

20            MR. NESSON:  Yes, we can, and we do, but the

21    problems of preparing for a trial on July 20th present great

22    difficulties.

23            THE COURT:  I will take a look at the responses of

24    both sides, and I've given, I mean, Mr. Nesson, I've given

25    you a fair amount of leeway in deference to your situation

1    and your role as a professor and the way in which you get

2    help in this case, but there's only a limited amount that I

3    can do.

4            Candidly a summer trial has advantages and

5    disadvantages for both sides.  If you want a summer jury

6    with students in them, the time to have it is over the

7    summer.  If you want a jury without students, the time to

8    have it is in the fall.  I don't know whether the parties

9    have thought about that, but it might be something you want

10   to consider.  In any event, I'll look at your scheduling

11   order and take all this under advisement.  Thank you.

12           THE CLERK:  All rise.

13           (Whereupon, the hearing was suspended at

14   4:18 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    )

5    CITY OF BOSTON               )

6

7              I, Valerie A. O'Hara, Registered Professional

8    Reporter, do hereby certify that the foregoing transcript

9    was recorded by me stenographically at the time and place

10   aforesaid in No. 03-11661-NG and No. 04-12434-NG, Capital

11   Records, Inc., et al. vs. Noor Alaujan, et al. and

12   thereafter by me reduced to typewriting and is a true and

13   accurate record of the proceedings.

14                         /S/ VALERIE A. O'HARA

15

16                         _____

17                         VALERIE A. O'HARA

18                         REGISTERED PROFESSIONAL REPORTER

19

20

21

22

23

24

25
```