```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3     - - - - - - - - - - - - - - - - )

 4     CAPITAL RECORDS, INC., ET AL.,   )   CV. NO. 03-11661-NG

 5               PLAINTIFFS             )

 6     VS.                              )   COURTROOM NO. 2

 7     NOOR ALAUJAN, ET AL.,            )   1 COURTHOUSE WAY

 8               DEFENDANTS             )   BOSTON, MA  02210

 9     - - - - - - - - - - - - - - - - )

10     LONDON-SIRE RECORDS, INC.,       )   CV. NO. 04-12434-NG

11     ET AL.,                          )

12               PLAINTIFFS             )

13     VS.                              )

14     DOES 1-4,                        )

15               DEFENDANTS             )

16     - - - - - - - - - - - - - - - - -

17                   MOTION HEARING

18                   JULY 20, 2009

19                     9:38 A.M.

20         BEFORE THE HONORABLE NANCY GERTNER

21         UNITED STATES DISTRICT COURT JUDGE

22

23               VALERIE A. O'HARA

24             OFFICIAL COURT REPORTER

25
```

A P P E A R A N C E S:

　　For The Plaintiffs:

　　Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ., 600 Atlantic Avenue, Boston, Massachusetts  02210-2211;

　　The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ., 7304 River Falls Drive, Potomac, Maryland  20854;

　　Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ., 1801 13th Street, Suite 300, Boulder, Colorado  80302

　　For the Defendant:

　　Harvard Law School, by CHARLES NESSON, ESQ.,
　　1525 Massachusetts Avenue, Cambridge, Massachusetts 02138;

　　Feinberg & Kamholtz, by MATTHEW H. FEINBERG, ESQ. and MATTHEW A. KAMHOLTZ, ESQ., 125 Summer Street, Boston, Massachusetts  02110;

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  United States District

3    Court is now in session.

4          THE COURT:  You can be seated.  This is

5    Chris Gross, this is the person who runs the technology.  If

6    anything goes wrong, we call him day or night.

7          In order to make certain that we could have a

8    trial that would be done expeditiously, and this is a very

9    difficult schedule for everyone, we've set the trial for

10   next week full days, which is not what we usually do but

11   full days to make sure it gets done because I, too, am

12   expected someplace else beginning August 1st.

13         From what I understand of both sides and what I

14   understand of the issues, this will not be easy, but it

15   seems to me it will not be impossible.  Let me first start

16   with jury selection.  I will do lawyer voir dire.  The way

17   we do it is this, the jurors will line up in this room.

18   They'll be seated in the seats that reflect their number.

19   That's a way that you'll know that the juror seated in seat

20   No. 1 will be juror No. 1.  You'll be able to get a sense of

21   who they are that way preliminarily.

22         What then happens is that I'll ask certain

23   questions of the jury in general to basically carve out

24   those who can't possibly sit.  It doesn't make sense to have

25   that the subject of lawyer voir dire.  Then we will begin to

1    question each juror individually, and that can be lawyer

2    voir dire.  Now I know I have questions from the plaintiffs

3    in terms of the questions, jury questions.  I don't have any

4    from the defendant, proposed voir dire from the defendant.

5    Will I be seeing that any time soon?

6         MR. NESSON:  Yes, I'll get it as soon as I can.  I

7    just haven't had time yet to get to them.

8         THE COURT:  Here's my proposal with respect to the

9    questions.  The best kind of jury selection, as you can

10   hear, I do a modified Massachusetts voir dire version.

11   There is no tradition of voir dire in Massachusetts, federal

12   or state, as you know, but I think that that's wrong, and so

13   I've come to try to modify that with this kind of selection.

14   In most cases in which we do individual lawyer voir dire,

15   the lawyers have also submitted a questionnaire.

16        Now, this is a very truncated schedule.  It may

17   not be that you have the time to do it this week, but, for

18   example, some of the questions in the plaintiff's

19   questionnaire, in the plaintiff's proposed voir dire

20   questions could be in a small questionnaire.

21        If what you are getting at by your questions, I'm

22   only looking at the plaintiffs because that's what I have in

23   front of me, is really someone with some familiarity with

24   the Internet and computers and technology.  You may want to

25   ask further questions once you identify who's in that

1    category, namely the familiarity with the Internet category,

2    but to get to this category, you may want a questionnaire.

3         In other words, both sides may want a

4    questionnaire that says have you used MP3 players, have you

5    downloaded songs, et cetera.  Because of the time here, my

6    proposal is that this be a two-page questionnaire, perhaps

7    10 questions from either side.  The logistics is terribly

8    important, which is to say that we then have to get the

9    questionnaire by Wednesday, I approve it, and it then has to

10   be submitted to the court no later than Friday.

11        It is produced in a quaint way.  It's very quaint.

12   It's the kind of paper that makes three copies

13   automatically, the juror fills out the top copy, and then we

14   get two more.  It's very quaint.  They do it in the jury

15   room.  I give it to you all to look at.  They'll be some

16   category of people that will be dismissed both sides

17   immediately from the questionnaire, everyone would agree,

18   but it's a way of focusing the question.

19        You then are questioning someone from their

20   answers in the questionnaire as opposed to everything you

21   wanted to know about the Internet.  You won't have time for

22   those kinds of questions.  When I said 10 minutes in my

23   endorsements, I meant ten minutes total per juror, it's five

24   per side.

25        So the way it would go would be this.  If you can

1    manage to do a questionnaire on the schedule I've described,

2    a proposed questionnaire both sides to me by Wednesday, the

3    final by Friday in the form I've described, if that timing

4    is not met, then we can't have a questionnaire.

5          MR. OPPENHEIM:  We're absolutely in favor of that,

6    your Honor, we think that makes sense.

7          THE COURT:  Well, I know there are some resource

8    questions on the defendant's side, so if you can't meet that

9    schedule, then we can't do it because that's the only way we

10   can manage.  Just to reiterate, the jurors will fill out the

11   questionnaire in the jury room before they get up here,

12   we'll give you an opportunity to look at them.

13         My theory about jury selection is that it's a

14   relative decision, not an absolute decision, so you look

15   through the pile, and you look at the venire, you look at

16   the group that you're choosing from.  We bring the jurors in

17   the courtroom, they sit in the seats that match their juror

18   number.

19         I will ask the general questions of them, narrow

20   the pool down based on general questions, can you sit, et

21   cetera, have you heard anything about this case, have you

22   heard anything about the lawyers, the kind of questions

23   candidly that are usually the sum and substance of voir dire

24   in the rest of the state.  You know, my personal favorite

25   was when the Judge leaned over and looked at the jurors and

1    said, "Any of you prejudiced, please raise your hand."

2    We're not doing that.

3         Then we'll go into usually I do it in the lobby,

4    but in this case we'll take another courtroom.  Everything

5    will be on the record in the open, and we'll question the

6    jurors individually in that other courtroom.  Anyone can

7    watch it who wishes to, and the individual questions would

8    be five minutes per side, and if there's a questionnaire, my

9    instinct here is you're going to know, for example, if you

10   have the elderly gentleman who's never turned on a computer.

11        So you don't have to go through the five questions

12   about MP3s because you'll get a sense of who the people are,

13   and then you'll ask whatever questions you'll ask of that

14   gentleman, maybe a different set of questions for somebody

15   else.

16        We'll select ten jurors.  I can -- the rules

17   provide eight.  We'll go to ten just in case, and there are

18   three peremptory challenges each side.  After all the jurors

19   have been passed for cause, in other words, I'll take cause

20   challenges after each juror has been questioned, and after

21   we hit 16 jurors because that's the only pool that is

22   relevant, then we'll stop, in other words, when we clear 16

23   jurors for cause, we'll stop and you'll exercise your

24   peremptory challenges.  The jurors that remain will be the

25   jury.  Yes, Mr. Nesson.

1          MR. NESSON:  Do I understand that --

2          THE COURT:  You can stand.  You don't have to

3     raise your hand but you do have to stand.

4          MR. NESSON:  Thank you.  Do I understand that the

5     jurors will be individually voir dired without the other

6     jurors present?

7          THE COURT:  Yes.

8          MR. NESSON:  After that is completed, where does

9     that juror go?

10          THE COURT:  They come back in the room with all

11     the other jurors, we tell them not to talk about the case.

12          MR. NESSON:  They join the rest of the jury?

13          THE COURT:  They join the rest, but we tell them

14     not to talk about it, yes.  The idea is that cause

15     challenges are individually juror-focused, but peremptory

16     challenges, most Judges have you exercise, once the

17     individual is cleared for cause, the Judge will turn to you,

18     and say, well, is there a peremptory challenge?  Again, I

19     don't agree with that, it's a relative determination.  You

20     have to know who else is in the pool.  You can't pick from

21     the best possible jury.  Both sides are going to pick the

22     jury that's relatively good for them, so you have to see the

23     whole pool.

24          Once we have selected 16 people who have been

25     cleared for cause, then you exercise your peremptory

1    challenges with respect to them.  Yes.

2              MR. NESSON:  Who challenges first?

3              THE COURT:  The plaintiff goes first and you

4    alternate, plaintiff first and defendant second.  That will

5    be, as I said, three challenges per side of the ten, then

6    we'll start immediately after the jury selection.  My goal

7    would be to have openings beginning in the afternoon on

8    Monday afternoon, openings and whatever witness.

9              What I have in front of me then are the motions

10   for, why don't we start with this, motions for summary

11   judgment on fair use, and I am candidly struggling with the

12   notion about whether this is a jury issue at all and then

13   whether it's appropriate in this case.

14             We expect to have an answer for you probably by

15   the middle of the week so you'll know what the scope of your

16   case is by the middle of the week.  Assuming fair use, I

17   conclude, just assuming that I concluded that fair use is

18   out of the case either because it's a Judge issue or because

19   of the facts that have been presented to me, then I

20   anticipate the case goes to trial on the issue of

21   infringement and the issue of damages.

22             What I can't tell from this record, and this is

23   all just a planning issue, does the plaintiff intend to

24   admit as part of its case in chief Mr. Tenenbaum's

25   admissions as to what he downloaded or did not download,

1    that part of the case?

2         MR. REYNOLDS:  Yes, your Honor, we do, and we will

3    do that either through deposition or by calling

4    Mr. Tenenbaum directly.

5         THE COURT:  Okay.  Again, I'm only digging into

6    the facts.  You know, you deal with a case at a certain

7    level in pretrial proceedings.   Assuming there are

8    admissions to at least the 7, would you move for a directed

9    verdict on those songs that he's admitted to, or would you

10   then say you want to go to the jury on the remaining 30?

11   There are three categories, right, there's 800 songs, there

12   are 30 that you listed in Exhibit B, and then there are 7

13   songs that you confirmed, you've now confirmed as

14   copyrighted some of the songs in Exhibit B as well; is that

15   right?

16        MR. REYNOLDS:  Yes, some of them, that's

17   correct.

18        THE COURT:  How does the plaintiff?

19        MR. REYNOLDS:  A couple things.  One, there are

20   five that were downloaded by MediaSentry that are at issue

21   right now, but we don't make a distinction overall, your

22   Honor, between those 5 and the 30, just in general in terms

23   of liability.  I don't anticipate us moving on just the 5 or

24   just the ones that we have recordings of.  It may be that we

25   do that, but I would anticipate us moving for a directed

1  verdict on all of them on the issue of liability.  Again, it

2  really depends on the evidence and what the evidence is at

3  the close of our case.

4       THE COURT:  Okay.  So there would be motion for a

5  directed verdict on that, and, again, I just want to

6  telescope what could be going on here.  I am candidly

7  perplexed about damages in this case.  The jury is given the

8  right to choose under 504(c) a sum of not less than 750 or

9  more than 30,000.  How do they make that decision?

10      MR. REYNOLDS:  They make that decision based on

11  the factors that are set out in the law which we've

12  submitted in our jury instructions, your Honor.  I don't

13  know that they involve the harm to the plaintiffs, any

14  profit the defendant may have achieved, the need for

15  deterrence and the willfulness of the defendant's conduct

16  vs. the innocence of the defendant's conduct.  Those are the

17  factors that are set out in the jury instructions.

18      THE COURT:  Because it occurred that some of what

19  Mr. Nesson, forgive me for describing it this way, has put

20  in the fair use box, if fair use is out of the case, for

21  whatever set of reasons, some of the issues that he's put in

22  the fair use box he also has in the damages box.  Some of

23  the issues that he wishes to raise as part of a fair use

24  concept actually would be fair play on the damages issue and

25  particularly on the willfulness issue.

1          MR. REYNOLDS:  I think to some degree that's

2     accurate, your Honor, I have to confess, I don't know

3     exactly what the things he's trying to put in play are

4     necessarily.

5          THE COURT:  Well, the commercial, the

6     non-commercial issue, the sort of norms of this generation

7     issue.  All of that it seems to me play into the question of

8     it's not where he wants it to play in, but it seems to me it

9     does play into the question of one willfulness and the other

10    is the difference between 750 and 30,000.

11         MR. REYNOLDS:  I would argue that the distinction

12    between commercial and noncommercial for purposes of the

13    jury is completely irrelevant.  If the defendant wants to

14    argue that he didn't proffer off this, I would argue that's

15    relevant, but the legal distinction between commercial and

16    noncommercial is not.

17         THE COURT:  I think we're saying the same thing.

18    I guess what I'm saying, I wanted to understand the scope of

19    my evidentiary rulings, and assuming, just for a moment,

20    that fair use were out of the case, just assuming that and

21    assuming you have moved for a directed verdict and there are

22    admissions, and, again, I don't know the state of the

23    evidence, then we would still have a trial on the question

24    of damages which would raise because of the indefiniteness

25    of the standards which would certainly raise some of the

1    equitable arguments that the plaintiff wishes to make.

2          It's not where they wish to be making them, but

3    they would be raising it on the question of willfulness, on

4    the question of where in this continuum of 750 to 30,000 the

5    damages ought to be.

6          MR. REYNOLDS:  And in the case of willfulness it

7    would be 150,000 would be the upper limit.

8          THE COURT:  Right.

9          MR. REYNOLDS:  Your Honor, I think there's no

10   question that there's some degree of overlap.  I don't think

11   I know the defendant has suggested that the overlap is 100

12   percent.  I would strongly disagree with that.  I think

13   there are certainly many things in fair use that would not

14   come in.

15         THE COURT:  It's possible, but there is certainly

16   some overlap.

17         MR. REYNOLDS:  Absolutely.

18         THE COURT:  I need a sense of the case so I

19   understand the -- Mr. Nesson's papers candidly raise

20   philosophical, political policy questions which are

21   interesting and important questions.  I have to decide what

22   fits my courtroom and the four corners of this institution

23   and that to some degree I believe that some of what he is

24   saying fits the question of damages, the litigation on

25   damages, that's all.  I want to understand precisely what,

1   that's all.

2         What is pending in front of me is the motion to

3   suppress the MediaSentry evidence which you'll have by the

4   end of today.  There is a Daubert issue with respect to

5   Pouwelse, the plaintiff's motion to exclude Pouwelse, a

6   Daubert challenge with respect to Palfry which you'll hear

7   from me by the end of the day, and there are plaintiffs

8   motions for sanctions which I'm deferring.

9         Are there any other motions that I haven't

10   mentioned that are pending?

11         MR. NESSON:  Yes, your Honor.  I'd like to make an

12   oral motion to ask you to reconsider your judgment striking

13   Wayne Marshall as an expert on the grounds of lateness.  I'd

14   like to bring to the Court's attention, perhaps this is not

15   the time for me to make it, but if you'd like to hear it at

16   this moment, I'm prepared to make it orally to you.

17         THE COURT:  You better do it now.

18         MR. NESSON:  The plaintiffs have indicated that

19   they have attempted to cooperate fully with us in terms of

20   getting to this trial point.  It's simply not true, your

21   Honor.  The first thing that I bring to your Honor's

22   attention is that Stan Lebowitz, who is their fair use

23   expert, brought into the case after Wayne Marshall, I asked

24   if we could depose him last Thursday and will submit to you,

25   your Honor, the e-mail correspondence in which the request

1    ultimately comes down we have an agreement that we can do it

2    the same way we did with Pulsar, with X Meetings so that it

3    doesn't cost me anything.

4           They were willing to talk about not charging

5    $1,000 for his fee, which I couldn't afford, but when they

6    refused to stipulate to Liebowitz taking the oath without it

7    being given to him by someone I have to pay as an authority

8    of Massachusetts authorized to give the oath, and so no

9    deposition of Stanley Liebowitz last Thursday.

10          I offered to them the opportunity to depose

11   Wayne Marshall before your Honor had struck him but so that

12   they would have the opportunity to have the deposition of

13   Wayne set for last Friday, and they just totally refused to

14   do that.  So that the situation, your Honor, is that while

15   just in terms of the time frame, a tremendous amount of our

16   focus was on the abuse issue, which was postponed until very

17   late in this year and then ultimately denied us, then when

18   we go to the fair use issue, which we put in in a timely

19   fashion, we are late with listing an expert but well within

20   the discovery period, and from what I remember the civil

21   litigation back from the Schlichtmann days depositions right

22   up until the time trial starts, no real problem and to have

23   him struck because it's late, it seems to me just dead

24   wrong.

25          Now, the other thing that they've done is there

1    were three depositions that were taken under oath in a class

2    action case against these very same defendants.  One, the

3    deposition of Matt Oppenheim, one the deposition of

4    Doug Jacobson, whom we've not been able to depose, and one,

5    the deposition, who's the fellow from the ISP that we're

6    going to face?  These were under protective order out there

7    in the other case.  The lawyers from that other case got in

8    touch with me and said, "Subpoena these, these would be very

9    useful to you.  I can't tell you what's in them exactly,

10    they're under protective order," but you can imagine that if

11    I depose these people, it would be very useful for you.

12          So I served them a subpoena; they objected then.

13    They moved to quash the subpoena out in that court because

14    it hadn't been properly noticed.  We hadn't given them

15    notice, although by the time they moved to quash, of course,

16    they had notice, and our opposition, because we hadn't

17    figured out how you do local counsel and everything else is

18    getting blitzed goes in an hour after the Judge quashes the

19    motion, so at the moment we're in a situation in which, no,

20    we can't have those depositions, even though they're already

21    done, sworn, right on this case and could be of extreme use

22    to us.  I can give you the list.

23          THE COURT:  In other words, as to those,

24    Oppenheim, Jacobson and this ISP person, there was a

25    subpoena in Minnesota, was that where it was?

1          MR. NESSON:  No, this is my subpoena to the

2    lawyers in I think it's the state of Washington where this

3    class action is going on and where these three people were

4    deposed.

5          THE COURT:  So another Judge quashed that

6    subpoena?

7          MR. NESSON:  Yes, another Judge quashed that.

8          THE COURT:  How can I do anything about that?

9          MR. NESSON:  I don't know, your Honor, I'm not

10   local counsel out there, I'm up against a group that is

11   national in their dimension.  They have no problem with any

12   jurisdiction.  I am here in a local jurisdiction.  I'm not

13   even able to put in an opposition paper to their motion to

14   quash out in wherever it is, and yet here they are with

15   control of material, which would be genuinely useful.

16         THE COURT:  I don't have the authority to order a

17   deposition of someone there.

18         MR. NESSON:  Just making the point on cooperation,

19   your Honor.  The next one is Cary Sherman and Mitch Bainwol,

20   the leading spokesmen for their industry, Cary Sherman who

21   was in Deluth wanting to testify at the first Jamie Thomas

22   case and me wanting to have their best case.  I want their

23   best case, and so I ask for their best people to come, and

24   they put up this stuff about no, he's beyond the

25   jurisdiction and we haven't got the power to get him

1    either.

2           Well, these people have the power.

3           THE COURT:  Voluntarily?

4           MR. NESSON:  Yes.

5           THE COURT:  These are members, these are

6    plaintiffs, in other words, they're part of the plaintiffs?

7           MR. NESSON:  Cary Sherman is the president of the

8    Recording Industry of America.  He is the strategist, the

9    architect from the beginning of this whole campaign.

10          THE COURT:  They don't want to turn it over

11   because they don't think the case is about that.

12          MR. NESSON:  Oh, well, they did out in Deluth, and

13   they do think it's about the whole thing that this

14   generation has done.  I think that there are tremendous --

15   Cary Sherman knows all the facts with respect to everything

16   about this industry that relates to this case, whether it's

17   fairness or damages.  These would be our best source.

18          THE COURT:  I understand, Mr. Nesson, if they

19   don't do it voluntarily, there's a rule that says I cannot

20   subpoena somebody outside of the area of the District of

21   Massachusetts.

22          MR. NESSON:  I do understand that, your Honor, and

23   I would have to say the thing that has shocked me more than

24   anything else coming into this case and having the

25   experience of litigating this is how amazing out of

1  proportion the balance of this system is when you have a

2  commercial litigant on one side and a noncommercial litigant

3  on the other side.  This court is not built for

4  noncommercial people, that's just a fact.

5         THE COURT:  Mr. Nesson, first of all, the timing

6  of this trial was agreed upon by both sides.  If there was

7  additional depositions or whatever, we've indicated that I

8  was prepared to delay the trial in order to give people on

9  either side an opportunity.  This was a very onerous trial

10  schedule which everybody agreed to, and some of the things

11  you're describing come from the fact that it was an onerous

12  trial schedule.

13         That was not the case in the Woburn case where

14  this was done over an extended period of time.  If you want

15  a trial next year, you want a trial in the fall, you can be

16  taking depositions all over again, neither side wanted that,

17  and so that's part of the reason.

18         2, I understand the imbalance here, but I thought

19  having a lawyer on Mr. Tenenbaum's side and particularly a

20  lawyer with the resources of the Berkman Center would

21  redress some of that balance and particularly a lawyer who

22  at least could call upon some of the volunteer Army that is

23  blogging day and night all across the country that would be

24  able to address some of that imbalance, not totally, but at

25  least some of it.  Instead what I've seen, well, you've seen

1    it in my papers in the orders that I've drafted.

2          There have been things that have been fought about

3    which have needlessly wasted time which were somebody didn't

4    look at the rule, somebody didn't check the local rules,

5    somebody didn't realize what civil procedure was all about

6    so that some of the raining in place that you've been doing

7    has come from the fact that there was sort of minimal kinds

8    of rules that were not being paid attention to.

9          It's not at all clear to me that the imbalance

10   that you describe would have been quite this bad if the

11   defendant's presentation had been tighter and more adhering

12   to the rules.  I can't believe you couldn't have found

13   counsel out there to do this in Minnesota or wherever this

14   was to put in an appearance for a two-minute appearance

15   before a court, but I don't want to go there.

16         Both the timing of this and some of the burdens

17   that you're facing come from the timing which everyone

18   agreed upon and comes from decisions which the defendant has

19   made and the defendant asks counsel as opposed to a pro se

20   defendant.

21         MR. NESSON:  So, your Honor, please.

22         THE COURT:  I'll take this as an oral motion to

23   reconsider the marshal striking.

24         MR. NESSON:  I haven't completed my motion, your

25   Honor.

1          THE COURT:  What's the point of it other than

2    Marshall?

3          MR. NESSON:  My motion is based on a request that

4    you reconsider and on the grounds that you have abused your

5    discretion and particularly in respect to the presumption

6    due to the noncommercial user, and my motion is to delay

7    this trial and give me the opportunity, if that's what you

8    think is required, to call this witness to have him deposed

9    in good time and to put on the defense that I believe I

10    deserve to be able to put on for my client.

11          THE COURT:  Mr. Marshall is the ethnomusicologist?

12          MR. NESSON:  Yes, he is.

13          THE COURT:  And so his testimony will go to fair

14    use?

15          MR. NESSON:  Yes, and it will also go to damages

16    as well, your Honor.

17          THE COURT:  All right.  Anything else?  Counsel.

18          MR. OPPENHEIM:  May I respond?

19          THE COURT:  Yes.

20          MR. OPPENHEIM:  Your Honor, Mr. Nesson has raised

21    a number of issues.  First of all, with respect to

22    Wayne Marshall, this was an expert witness who was disclosed

23    not a little late but over three months after the deadline,

24    and while Mr. Nesson may complain about resource imbalance,

25    with all due respect, if we had spent less time fighting

```
 1    over recording in the courtroom, sending letters to

 2    Supreme Court Justices and more time on litigating this

 3    case, this would not be an issue today, but beyond that, in

 4    looking at Mr. Marshall's expert report, there is nothing

 5    that he has to offer from a Daubert perspective should come,

 6    in any event.

 7            With respect to Professor Liebowitz, yes, he was

 8    disclosed recently.  He is a rebuttal witness.  He was

 9    disclosed pursuant to the timeline set for that.  We

10    offered -- the defendant asked to take his deposition.  We

11    agreed.  We offered multiple different dates.  We even

12    agreed to forego them paying his fee, which is traditional

13    by the rules what they should have done.

14            THE COURT:  Is Liebowitz the ISP guy?

15            MR. OPPENHEIM:  No, I'm sorry, Professor Liebowitz

16    is an economist down at the University of Texas who has an

17    emphasis in studying the effects of file sharing on the

18    music industry, has written numerous papers on it.

19            THE COURT:  And if fair use were out of this case,

20    this would be your rebuttal on damages?

21            MR. OPPENHEIM:  It could be a rebuttal on damages,

22    depending on what their arguments are on damages, yes, your

23    Honor.  We offered, Mr. Liebowitz, we offered him without

24    his fee, and Mr. Nesson suggested that he should have an

25    undergraduate administer the oath and that they were going
```

1    to record it by some kind of Internet recording device, and

2    we said that that was not acceptable.

3           Now, I recognize Mr. Nesson is arguing repeatedly

4    to this Court that the impecunious status of his client, but

5    in all fairness, that really is not accurate.  I wish that I

6    had the resources of his client when I was his age.  I never

7    lived in a fancy condo.

8           MR. NESSON:  I'm 70.

9           MR. OPPENHEIM:  His client.  His parents are very

10   well off.  I just think that this argument that we keep

11   hearing over and over again without any substantiation just

12   doesn't deserve any merit.  Professor Liebowitz was

13   available.  We made him available.  They chose not to take

14   his deposition.  With respect to the three depositions from

15   the Anderson case, I don't even understand why Mr. Nesson

16   believes it's appropriate to get copies of a deposition of

17   counsel.

18          The notion of that is --

19          THE COURT:  Deposition of counsel?

20          MR. OPPENHEIM:  Yes, one of the depositions he

21   sought was a deposition of me.

22          THE COURT:  What was the theory that they took

23   your deposition?

24          MR. OPPENHEIM:  In that case, they had asserted

25   it's a class action claim for abuse of process.

1          THE COURT:  Oh, I see.

2          MR. OPPENHEIM:  We argued it was inappropriate

3    there as well, but we went forward with it.  The notion it

4    would be appropriate here when that defense isn't in the

5    case isn't appropriate, 1; and, 2, we briefed it, your

6    Honor, to that Court, that Court chose to quash it.

7    Mr. Nesson had an opportunity to submit an opposition.  He

8    chose not to do that.  He also had an opportunity to take

9    depositions in this case.  He could have taken the

10   deposition of a MediaSentry witness.  They chose not to.

11   They could have taken the deposition of others in the case.

12   They chose not to.

13          With respect to Mr. Sherman and Mr. Bainwol, first

14   of all, I'm a little confused because the motion that they

15   filed actually didn't say Mitch Bainwol, it said Mitch

16   Glazier.  I understand there are two Mitches.  It doesn't

17   matter.  All of them are located out of the jurisdiction.

18   None of them were for the plaintiffs in this case.

19          To the extent that Mr. Nesson is concerned that

20   we're not bringing our best people, I can assure him we are.

21   They will be on the stand.  He will have an opportunity to

22   cross-examine them and ask them whatever questions they

23   would like.

24          This case has been going on for quite some time.

25   A delay at this point isn't going to change the face of this

1    trial.  We don't believe if you change the date of the trial

2    it's going to change the question of whether Mr. Marshall

3    gets to testify.  The deadline was the deadline, and they

4    missed it.  The fact that he is offering testimony about

5    music as a shared thing isn't going to change the fact that

6    that's not relevant in this case.

7          We could go through each of these issues.  It's

8    not going to change by virtue of delaying the trial at this

9    point, your Honor.

10         THE COURT:  Yes, Mr. Nesson.

11         MR. NESSON:  I didn't hear an answer to your

12   Honor's question of on what basis the deposition of

13   Mr. Oppenheim was taken out there if he is a lawyer.  The

14   premise of the first proceeding that actually got me in

15   trouble with your Honor was an effort to depose

16   Mr. Oppenheim not as a lawyer but as basically the business

17   executive behind the whole settlement operation that results

18   in our case, and it was that line that you said you were

19   worried about getting into because of the lawyer-client

20   problem.

21         THE COURT:  I understand.  If abuse of process is

22   not in this case, how is it relevant to this proceeding?  If

23   abuse of process is not in the case, then it doesn't matter

24   whether he was deposed on Mars, it still wouldn't be in this

25   case.

1          MR. NESSON:  I haven't seen these depositions,

2     your Honor, but I have now sat through a bunch of them, and

3     my bet would be that when an excellent lawyer on behalf of

4     the plaintiff's class action on the issue of abuse is asking

5     the chief executive or the under executive of the operation

6     about everything connected with it that in that deposition

7     there will be a raft of relevant information to the

8     arguments that I want to make on behalf of my client.

9          THE COURT:  I understand.

10         MR. NESSON:  It's discoverable material.

11         THE COURT:  I understand.

12         MR. NESSON:  Already on paper, under oath, done.

13         THE COURT:  I understand.  The problem is that I'm

14    a rather creative Judge, as you may or may not know, but I

15    can't do much about issues that are in another Judge's

16    jurisdiction as to which that other Judge has ruled.  It's

17    just not within my can, and if what you're saying is that

18    it's unfortunate that the plaintiffs haven't shared this

19    with you, that may be so, but I can't rule on that which is

20    not in my jurisdiction.  It's not an issue of activism, it's

21    an issue of lawlessness, and I just can't rule on something

22    outside of my jurisdiction.

23          So I'm going to take under advisement the oral

24    motion, MediaSentry exclusion, the motion to exclude these

25    two experts and the fair use issue.  I expect the

1    defendant's pretrial memorandum by the end of today.

2         Let me just say generally these cases have been

3    going on in my court since 2003 I believe the first one that

4    was filed.  My concern from the beginning, which I

5    reiterated in every written material that I could, every

6    order and every docket entry and every conference was the

7    differential in resources.

8         I constantly set up conferences so that the

9    defendants could come and I could talk to them because I

10   wasn't sure they were getting any advice from anyone, we

11   couldn't get any lawyers to be involved in these cases,

12   perhaps because of the odds.

13        I welcomed the participation of you, Mr. Nesson,

14   and the Feinberg firm as well.  I welcome the participation

15   of that as a way of getting professionalism and competence

16   into this so Mr. Tenenbaum could know about precisely what

17   was litigable and what was not, what was policy and

18   political and important to raise but what could fit within

19   the litigation at hand, and that's what my effort has been,

20   what are the meaningful defenses here, what are the

21   meaningful legal challenges, and I have been open to almost

22   anything that the defendant has said, but in the final

23   analysis, they have to be meaningful, legal, and they have

24   to be sustainable in the framework that I am operating in.

25        So while you may be disappointed, Mr. Nesson, one

1    would imagine that we all understand the rules of this place

2    that we're in, and those are the rules that I have to

3    follow.  I'm happy to know that Mr. Tenenbaum has been

4    represented.  That's really what I wanted to see.  I wanted

5    to see some of these issues aired in a fashion that made

6    legal sense to air them, and that's what my goal is.

7         The trial will be about whatever legal defenses

8    there are.  If I rule, and I'm struggling with this on the

9    fair use issue that either this really was always a Judge

10   issue, because they think the law is ambiguous, or that the

11   facts of this case, whatever the issue might be in other

12   situations, but the facts of this case make it clear that

13   fair use should be the subject of summary judgment could be

14   a jury question in other forms but not in this case, then

15   that will narrow the case as well.

16        It's not my intent to narrow the case, but I am

17   bound by the law.  Likewise, if the plaintiff puts on a case

18   that fits within the rules and directed verdict is

19   appropriate, then I will direct a verdict for the plaintiffs

20   on the issue of infringement.  I've heard in the papers

21   about admissions that were made.  I haven't looked at them,

22   I haven't evaluated them.

23        The area which certainly will be litigable not

24   matter what else happens will be the question of damages,

25   which I always understood to be the core or one of the cores

1   of the defendant's concern, which is what do you do in a

2   situation in which you are not going for actual damages, at

3   what point is even 750 punitive and all those issues which I

4   see as a jury trial issue and raising some of the concerns,

5   not all, to be sure, but some of the concerns and that we'll

6   go with that.

7        So I expect to hear from the plaintiff's motions

8   by the end of the day today, the plaintiff's pretrial memos.

9   Do I need to address anything else?

10       MR. REYNOLDS:  Your Honor, just a few housekeeping

11  matters.  One, Mr. Oppenheim had moved for pro hoc vice

12  admission, I don't believe that had been ruled on yet.

13       THE COURT:  Granted.  Next.

14       MR. REYNOLDS:  Thank you, your Honor.  Next, we

15  wanted to make an oral motion to drop the claims of Atlantic

16  Recording Corporation.  When we filed the lawsuit, they had

17  one sound recording that had been downloaded by MediaSentry.

18  It turned out to be a live recording as opposed to the one

19  that we initially sued on, so we wanted to drop Atlantic

20  Recording and withdraw all claims from Atlantic Recording

21  Corporation.

22       THE COURT:  Can you put that in writing?  That

23  will be granted.

24       MR. REYNOLDS:  Yes.  We also had an issue with

25  respect to deposition designations and wanted to know how

1    your Honor would like to handle that.  We had a number of

2    witnesses who we wanted to call by deposition who are either

3    outside of the jurisdiction or at this point avoiding

4    service, including the defendants Judith Tenenbaum and

5    Arthur Tenenbaum, we believe they're avoiding service of

6    process.  We would like to work that out with Mr. Nesson,

7    but we haven't had an opportunity to yet.  In the event we

8    call people by deposition, what does your Honor prefer in

9    terms of whether we just read the deposition or we have a

10   live witness to read the deposition, to read the answers?

11           THE COURT:  It depends on the timing on where we

12   are in the case.  In other words, the optimal situation or

13   just because it's more interesting for the jury is to have,

14   you know, someone play the role and read it.  It depends on

15   the time.  I have the discretion to do that, I also have the

16   discretion to simply have you designate portions of the

17   deposition and the jury reads it back in the jury room, so

18   the issue will be just time at this point.

19           MR. REYNOLDS:  These are relatively short, your

20   Honor, for the most part.

21           THE COURT:  You can read it, if there's time for

22   it, I don't care whether a witness is reading it or someone

23   from your team reads it.

24           MR. REYNOLDS:  I understand.

25           THE COURT:  The story is that in Hollywood you

1    hire actors to read it so the jury believes that the person

2    on the stand really does look like Michelle Pfeiffer or

3    whatever, but, you know, you don't have to go that far.

4            MR. REYNOLDS:  Understood.

5            MR. OPPENHEIM:  A few other housekeeping matters,

6    your Honor, three in particular.  One is your Honor said you

7    were going to defer the motion for sanctions.  With respect

8    to that motion, your Honor, we would like some clarity that

9    in the interim period that none of those recordings would be

10   posted to the Internet including the video recording which

11   while Mr. Nesson has responded to our papers, he doesn't for

12   a moment suggest that there was consent by any of the other

13   parties that were involved in it.

14           THE COURT:  The video recording of the deposition,

15   the beginning of whose deposition was that?

16           MR. OPPENHEIM:  There are a number of recordings

17   at issue.  The video recording is of the deposition of

18   Pouwelse in which the video is taken surreptitiously of

19   Mr. Reynolds and the witness, and while there may be a

20   disagreement about whether or not it was surreptitious,

21   there's absolutely no disagreement there was no consent, and

22   so we'd like an interim order that these will not be posted

23   or distributed in any manner while the Court has that motion

24   pending.

25           THE COURT:  Mr. Nesson.

1           MR. NESSON:  Well, I object to that, your Honor.

2    I'm not sure that it's a real issue because I'm not

3    suggesting it's my intent, but the idea that somehow the

4    fear that a jury will be tainted in a process like we're

5    going to go through by something that I post and speak to my

6    class, my students, the people following my case through my

7    blog and my Twitter and just my life out in the world, the

8    idea that the Court should order that everything associated

9    with this is somehow truncated, I feel as a total intrusion

10   on myself and on my client.

11          What in fact happens here, your Honor, just think

12   of it, my client gets picked out from millions, hit with

13   this lawsuit, then in the process of litigating it, he is

14   shut up, he is prevented from speaking out in a way that

15   could protest what he sees to be outrageous conduct, and now

16   it appears conduct that he will not get to address a jury in

17   terms of fairness but the only question being one of damage

18   when he says he did nothing wrong.

19          THE COURT:  Mr. Nesson.

20          MR. NESSON:  I'm sorry, your Honor, I just feel

21   upset about this.

22          THE COURT:  No, no, this is another issue.  First,

23   your client is not prevented from speaking out.  I've never

24   entered an order stopping any lawyer or any client from

25   speaking about anything because of how strongly I believe in

1    that.  Indeed, there was a way to litigate the question of

2    whether deposition transcripts, deposition videos could have

3    been posted, could have been made public.  There was a way

4    to litigate that.  That's what we do.

5          There was even a First Amendment issue, robust

6    First Amendment issue with respect to deposition,

7    interrogatories, et cetera, which was never raised in front

8    of me, and instead when I said the depositions will take

9    place, you agreed not to tape or post them, you said yes and

10   then did it.

11         So the place for the litigation, the place for

12   this indignation was it seems to me several frames earlier

13   and not now, and, again, I better than many understand those

14   issues, but you didn't raise them and instead violated an

15   order of the Court.

16         If the parties don't make it an issue, you can't

17   make it an issue post hoc, that was the way to do it.  So

18   there's now an existing order that says things may not be

19   posted on the Internet during this week before trial, and I

20   am unwilling to withdraw that because you agreed to it and

21   because it's a week before trial.  The process that we are

22   trying to deal with jurors shouldn't be made more

23   complicated.  Had you raised a First Amendment issue a month

24   ago, I would have considered it.  I would have looked at it

25   because there's an open question in the law about whether or

1    not the First Amendment interests in discovery materials,

2    but you didn't raise it then, you can't raise it now.

3         Your client has not been prevented from saying

4    anything about this case nor have you under the

5    circumstances.  We were talking only about literally trying

6    trial evidence posting it on the Internet.  That's the only

7    issue involved in this case, so I'll stand by that order,

8    and if you want to risk another accusation of contempt by

9    posting it this week, that's your choice.

10        I might add the other way of doing this, which I

11   used to do as a lawyer, you challenge a discovery order, you

12   say you're going to disobey, you take contempt, you take it

13   up to the Court of Appeals, if necessary, to raise a First

14   Amendment associational issue, privacy issue, if you're not

15   doing that, then I have to deal with the litigation as it's

16   been presented to me.  You have that order in place this

17   week.

18        MR. OPPENHEIM:  Your Honor, I don't know when the

19   Court is going to get to the motion for sanctions, we just

20   want to make sure it exists and the order continues even

21   beyond necessarily this week until the Court does deal with

22   it apart from the issue of potentially affecting --

23        THE COURT:  You don't need an order on sanctions,

24   you already have the underlying order.

25        MR. OPPENHEIM:  Your Honor, what I want to make

1    sure is that neither Mr. Reynolds nor I have any desire to

2    have recordings of us posted during the trial or after the

3    trial by Mr. Nesson or others so that we can become part of

4    some public scourge by others.

5            THE COURT:  During the trial is a different issue.

6    We've already litigated that.  During the trial nothing can

7    be broadcast from this courtroom.  You all know that this is

8    180 degrees opposite of what I believe, but that's the rule

9    now.  Actually this is an issue that we need to address.

10   There was a motion to have access to the Internet.

11           MR. OPPENHEIM:  That's also on my list.

12           THE COURT:  You have access to the Internet, but

13   whether it works is always an open question, but there's

14   supposed to be access to the Internet.  I would love to see

15   a demonstration of how KazaA, Napster works for the jury.  I

16   didn't understand what the issues were with the defendants

17   on that.  What was the concern?

18           MR. OPPENHEIM:  Well, your Honor, I don't know, we

19   don't know what it is that the defendant intends to do.  If

20   the defendant intends to demonstrate certain web pages, then

21   we'd like to know what they are in advance.  If the

22   defendant intends to show certain programs, then we'd like

23   to know what they are in advance.

24           I asked Mr. Nesson this morning when he intends to

25   tell us, to disclose this to us, and he said, "Well, some

1    time soon."  Your Honor, it's a week before trial.  To the

2    extent that he intends to show certain web pages, we want to

3    have an opportunity to see them and determine whether or not

4    it's appropriate.  We may stipulate, we may say it's fine.

5    If he intends to use certain programs, you know, we'd want

6    to see how is he going to use them?  What version is it?  Is

7    it an accurate version?  Is this an accurate demonstration?

8    Those are questions that we shouldn't have to deal with on

9    the fly, that's why we have pretrial disclosures.

10        THE COURT:  Is there any problem, Mr. Nesson,

11   showing him what you want to show?

12        MR. NESSON:  Only that I haven't really gotten

13   through exactly working it through myself and have had to

14   respond to the summary judgment motion, the jury question,

15   now have a preliminary memorandum that's due at five

16   o'clock, and I don't mean to whine, your Honor, but I do

17   mean to correct any misimpression that you have that I have

18   any resources behind me except just you see here.

19        Because of the politics of this case with Harvard,

20   Berkman Center is scrupulously out of it and Harvard

21   University is scrupulously out of it.  It is me and my

22   laptop against this team over here.  That's just the fact of

23   it.

24        THE COURT:  Let's leave it with respect to this, I

25   can't imagine that this is not going to be a big deal, and

1   so my suggestion is that Mr. Nesson is after all the

2   defendant in this case, you go first.  There won't be a

3   demonstration like this in his opening.  There can't be a

4   demonstration in court unless he shared it with you, and

5   then we can litigate like that, in other words, I don't

6   think that that's --

7           MR. OPPENHEIM:  Maybe we can just ask that we have

8   disclosure by Thursday of this week?

9           THE COURT:  Well, yes, but, on the other hand,

10  this is a rule of reason.  You go first, if he's going to

11  hook up the computer and go onto the Internet at any point

12  in that trial, we can suspend so you can look at it, but I

13  don't envision that it's going to be rocket science.

14          MR. OPPENHEIM:  Okay, your Honor.  Two last

15  things.

16          THE COURT:  The version of is it Napster, the

17  version of KazaA would be of significance it seems to me

18  because from my preliminary research, there was a point when

19  KazaA had a big warning about downloading, and there was an

20  earlier point when it was part of the click, wrap, click,

21  whatever it is, but it was part of the terms and conditions

22  that you had to accept and there may have been a point when

23  there wasn't a warning at all, and which version he used

24  might be of significance.

25          MR. OPPENHEIM:  Your Honor, the infringement at

1     issue took place here on KazaA, though the defendant

2     continued to use LimeWire through 2008.

3          THE COURT:  And were there warnings on LimeWire?

4          MR. OPPENHEIM:  And we have disclosed, yes, your

5     Honor, very, very clear warnings, and we intend to show that

6     to your Honor and the jury, and we've disclosed screen

7     captures of those warnings so that we can describe it.  We

8     just want to have an adequate opportunity to see the same.

9     I would be very concerned if we end up in a courtroom

10    demonstration of the wrong piece of software.

11         THE COURT:  No, I agree with you completely.  I'm

12    saying that that demonstration will not take place unless it

13    has been shared with you.

14         MR. OPPENHEIM:  Thank you, your Honor.

15         THE COURT:  Because it's, you know, a five-minute

16    demonstration and ten screen shots, it seems to me we can

17    do, if Mr. Nesson can get it to you by the end of the week,

18    fine, or we can deal with it in the middle of trial.

19         MR. OPPENHEIM:  Very well, your Honor.  Two last

20    issues, and one is a sensitive one.  This case has been

21    shall we say somewhat untraditional, and this Court has

22    recognized in prior hearings that there is a different

23    discussion that occurs outside the courtroom as what occurs

24    within this courtroom.

25         And we know that the lawyers on both sides in this

1   case feel very passionately about their clients, and we just

2   want to make sure that this discussion that happens in the

3   courtroom follows the rules, and to use Mr. Nesson's term

4   that it's fair, and, you know, we've heard a lot from

5   defense counsel over the course of this case of things that

6   have caused us some cirrus, as my grandmother would say.

7           THE COURT:  It's a legal term.  I'll tell you how

8   to spell it.

9           MR. OPPENHEIM:  Things like that the plaintiffs

10  have been trying to shut down the Internet or that we

11  represent the CD industry, not digital music, that referred

12  to counsel as big money, suggested that Judge Estabrook is

13  on our payroll, though we'd love to do that, I suspect he's

14  not available.

15          You know, every time somebody buys a digital track

16  off of iTunes or Rapsody or Amazon.com, they're buying it

17  from our clients, and the notion that we represent just the

18  CD business or that we're trying to shut down the Internet,

19  these are just false, they're inflammatory and misleading,

20  and we want to make sure that we don't end up in a situation

21  that in voir dire or opening statements, which is supposed

22  to be a statement, not an argument, that we don't

23  immediately have a mistrial right out of the box.

24          We want to make sure that counsel has a good faith

25  basis for what he says, that he doesn't engage in

1    incompetent attacks on counsel or clients and that this

2    isn't a free-for-all, as the Supreme Court has noted, it's

3    not necessarily adequate to try to repair misstatements by

4    counsel afterwards by instructions to the jury, so we just

5    kind of want to make sure that the box we're in is a box

6    that all of us understand where the walls are.

7           THE COURT:  Mr. Nesson, do you want to address

8    that?  You know what the rules are?

9           MR. NESSON:  I'm happy to, your Honor.  I don't

10   want anything from this Court other than what I'm entitled

11   to for myself or for Joel Tenenbaum.  I don't want anything

12   from this Court that the Seventh Amendment doesn't entitle

13   my client to and that the cases in the Supreme Court don't

14   entitle him to.  They conclude their memo on this summary

15   judgment with this talk about emotion and nullification.

16   Well, this is not a nullification case, as I see it, as I

17   see it, fairness is built right into the law that's to go to

18   the jury and that the opportunity to talk to an American

19   jury about the fairness of what the plaintiffs claim to have

20   been an infringement is the essence of the case.

21          I don't want anything that the Seven Amendment or

22   that the Supreme Court or that the law doesn't give us.

23   This argument this morning has gone forward on the apparent

24   assumption that your Honor is going to exclude fair use from

25   the case.

1       That to me is just wrong, it's just wrong.  If you

2   look at the BB study, there are no -- I think there are

3   three noncommercial defendants in the whole thing.  It's

4   true that if you want to do commercial litigation and

5   copyright, okay, let the courts decide but if you're up

6   against a noncommercial defendant, just a kid like a million

7   others who gets snaked out by a big industry and held up,

8   that's a case to go to a jury.

9       The Seventh Amendment, here, start from the state

10  of liberty, we start from a state of liberty before we form

11  a Constitution, we are we, the people.  We are in a state of

12  liberty.  We have no law yet.  Now, we form a Constitution.

13  We create a government starting from our state of liberty,

14  and we empower this government to give creators an exclusive

15  right, but what's the limit of that right?  It's within the

16  whole framework of the presumption of liberty from which we

17  start, the Ninth Amendment position, and that fair limit is

18  a principle, it's not a rule, it's a feeling of fairness as

19  opposed to a logical rule that you can set out with bright

20  lines.

21      It's in the nature of guilty, it's in the nature

22  of things juries do like negligence.  It has emotion in it

23  because it is feeling.  It is transcendental in the way that

24  pii is different from ones and zeros.  It's not for Judges.

25  Judges make legal decisions.

1        I submit to your Honor that the fairness decision

2   has a principle at the bottom of it, and it's a principle

3   that if you as a Judge take on the job of deciding that that

4   whole thing that happened shouldn't ever be litigated to

5   anyone who can make a judgment of wisdom about it.

6        THE COURT:  Mr. Nesson, Judges determine all the

7   time that negligence -- that the facts of a particular case,

8   while negligence may go to the jury, while X might have been

9   reasonable in all other situations but in the case in front

10  of you what the defendant did was not reasonable, and there

11  are boundaries even as to jury questions.

12       MR. NESSON:  Yes, indeed.

13       THE COURT:  So the question here that I've been

14  struggling with as to which you have given me nothing,

15  nothing is whether or not it is possible to say that there

16  is a commercial-noncommercial fair use line, in other words,

17  that so long as students are doing it and sharing and not

18  making any money from it, that somehow this is per se fair

19  use.

20       That's the principle that I understand you to be

21  saying and wanting to be arguing to the jury.  It seems to

22  me a principle of that breadth is inconsistent with this

23  statutory scheme, is fundamentally inconsistent with this

24  statutory scheme, and you may have lots of problems with the

25  statutory scheme, as I do, but that principle, then we

1    looked as well to perhaps you were looking at something less

2    than commercial-noncommercial, something about, as you

3    describe Mr. Tenenbaum, the individual user who in the

4    middle of the night shares one or two songs, sort of the

5    diminimus, we're looking at, for example, individuals who

6    were sharing songs perhaps after the Napster litigation but

7    before iTunes became available, sort of in the interregnum

8    people may not have known what was lawful and what was not.

9         But your client is after the Napster litigation

10   and after iTunes became available and other evidence

11   suggesting Napster, KazaA line, LimeWire, et cetera, so

12   there is the broad principle, commercial-noncommercial,

13   which is very difficult for me to acknowledge as a fair use

14   issue given the statutory structure, there is a subcategory

15   of the diminimus user as to who it may be fair use, and the

16   question is whether the facts of this case involve a

17   diminimus user, there was a timing issue after the Napster

18   decision but before iTunes, and there was an alternative,

19   but that's not necessarily your client.

20        So I understand what you're saying, and I

21   understand what you're saying in general.  The question is

22   whether or not the law remotely supports that, and I wanted

23   to give you every opportunity to see if the law remotely

24   supports that, and I think that the law should support that,

25   but that's not what I'm being asked to do.  You'll hear from

1    me on this question.

2           You were being asked a much more pointed question,

3    which is, once the rules of the game are established, I'm

4    going to assume that you'll abide by them and that if

5    there's an objection, that the objections will be made and

6    sustained if either side is getting out of line.

7    Mr. Oppenheim.

8           MR. OPPENHEIM:  Your Honor, we will do everything

9    possible to not object during the defendant's opening, of

10   course.  To the extent that fair using might stay in the

11   case, the type of thing that Mr. Nesson just said would

12   raise concerns, to get up before the jury in an opening

13   statement and say it is up to you, the jury, to decide

14   whether or not his uploading and downloading was fair

15   because that is not the appropriate articulation of what the

16   law of fair use is, so we just want to make sure that as we

17   get into this that we're not saying things to the jury that

18   aren't appropriate.

19          THE COURT:  Not a problem, we will address that.

20   Is there anything, other concrete issues that I have to

21   address?

22          MR. OPPENHEIM:  Yes.

23          MR. NESSON:  Yes.  Why does he always get to go

24   first?

25          THE COURT:  Because he was standing up.

1          MR. NESSON:  I was standing up the whole time.

2          MR. OPPENHEIM:  I'm happy to defer to Mr. Nesson.

3          THE COURT:  Go on, Mr. Nesson, you can go first.

4          MR. NESSON:  They've made a motion to strike

5     John Palfry, your Honor.

6          THE COURT:  Yes.

7          MR. NESSON:  I would love you to look at that

8     motion.  The premise of that motion, if you simply read the

9     opening to it, is it really sums up the whole problem that

10    we're having here.  I'm not saying that you should decide

11    something that sweeps across every case.

12          I'm picking out Joel Tenenbaum case-by-case

13    analysis, as the Supreme Court says we're supposed to do,

14    that is Joel's case in August 10, I'm putting it on the five

15    songs, that's the case I'd like to try to the jury, whether

16    with those 5 songs so that they could understand it, not 30,

17    and not 108, I don't mind them finding out about the others,

18    I'm not complaining about that, but just in terms of what

19    the jury actually has to do, decide whether his use of 5

20    songs was fair in the context of Joel Tenenbaum, August 10,

21    2004.

22          Yes, iTunes had come on with 230 different

23    possibilities that had come on.  iTunes was fledgling, the

24    rest of them are fledgling, you've got a friendship group

25    that's been in KazaA and peer-to-peer for four years, and

1   suddenly because they start marketing something, wam, the

2   law changes.

3            Well, that is a spectral issue.  You recognize

4   when there was no alternative, that's fair.  How about the

5   first day when the first one came on and he didn't know

6   about these?  It was not a world he was keeping up with.

7   What would it take to take his friendship group that was

8   totally into listening, sharing music, CDs, all the stuff

9   they did, they live in this digital environment and suddenly

10  say change the way you do business.  From here on, your

11  entire thing has got to shift over to iiTunes.  That's a

12  fairness issue.

13           All right.  Now look at what they say to Palfry.

14  They say Palfry was an expert on the way children learn

15  about fair use, an expert on the way children understand

16  fair use.  They say that can't even conceivably be relative

17  to any claim or defense in this case.  If that's true, your

18  Honor, and that's what you're going to have to say if you

19  direct the verdict against us on fair use then, okay,

20  fairness has now been taken over by the law, it's no longer

21  a jury matter.

22           THE COURT:  Mr. Palfry, it seems to me his

23  testimony, one, pivots on fair use, it's also that his

24  testimony could be relative on the question of damages, so

25  I'm going to look at the Daubert challenge.  Okay.  Anything

1    else?

2             MR. OPPENHEIM:  Yes, sorry, I was just trying to

3    digest that, your Honor.  Your Honor, the jury questionnaire

4    that you raised earlier, how exactly, I'm sorry,

5    procedurally is this supposed to work?  We're supposed to

6    get to the Court a joint 10 questions each?

7             THE COURT:  Right, it has to be joint.  You got to

8    confer.

9             MR. OPPENHEIM:  By Wednesday?

10            THE COURT:  Yes.  Come out with a questionnaire

11   that you think -- a two-page questionnaire that you think

12   Mr. Nesson would want as well, share it with him, he adds or

13   subtracts, and get it us by the end of the day on Wednesday,

14   I add or subtract.  Okay.  Once it's approved, you put it in

15   this wonderful old-fashioned form, what is it, carbonless

16   paper?  All right.  We'll see you on Monday morning.  You'll

17   hear from me before then.  Thank you.

18            (Whereupon, the hearing was suspended at

19   11:15 a.m.)

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3    UNITED STATES DISTRICT COURT )

 4    DISTRICT OF MASSACHUSETTS    )

 5    CITY OF BOSTON               )

 6

 7              I, Valerie A. O'Hara, Registered Professional

 8    Reporter, do hereby certify that the foregoing transcript

 9    was recorded by me stenographically at the time and place

10    aforesaid in No. 03-11661-NG and No. 04-12434-NG, Capital

11    Records, Inc., et al. vs. Noor Alaujan, et al. and

12    thereafter by me reduced to typewriting and is a true and

13    accurate record of the proceedings.

14                        /S/ VALERIE A. O'HARA

15

16                        _____

17                        VALERIE A. O'HARA

18                        REGISTERED PROFESSIONAL REPORTER

19

20

21

22

23

24

25
```