1            UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - )

4    CAPITAL RECORDS, INC., ET AL.,   )   CV. NO. 03-11661-NG

5              PLAINTIFFS          )

6    VS.                           )   COURTROOM NO. 2

7    NOOR ALAUJAN, ET AL.,           )   1 COURTHOUSE WAY

8              DEFENDANTS          )   BOSTON, MA  02210

9    - - - - - - - - - - - - - - -

10                        EXCERPT

11                   JURY TRIAL DAY 1

12                   JULY 27, 2009

13

14                    9:12 A.M.

15

16

17

18

19

20

21        BEFORE THE HONORABLE NANCY GERTNER

22        UNITED STATES DISTRICT COURT JUDGE

23

24            VALERIE A. O'HARA

25          OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2        For The Plaintiffs:

3        Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ.,
     600 Atlantic Avenue, Boston, Massachusetts  02210-2211;

4
         The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ.,
5    7304 River Falls Drive, Potomac, Maryland  20854;

6        Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ.,
     1801 13th Street, Suite 300, Boulder, Colorado  80302

7
         For the Defendant:
8
         Harvard Law School, by CHARLES NESSON, ESQ.,
9        1525 Massachusetts Avenue, Cambridge, Massachusetts
     02138;

10
         Feinberg & Kamholtz, by MATTHEW H. FEINBERG, ESQ. and
11   MATTHEW A. KAMHOLTZ, ESQ., 125 Summer Street, Boston,
     Massachusetts  02110.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.

3          THE COURT:  Good morning, everyone, you can be

4     seated.

5          MR. OPPENHEIM:  Good morning, your Honor.

6          THE COURT:  Please ignore the gentleman who is

7     wandering around.  It's Mr. Barra, who's our lifeline to the

8     Internet, our lifeline in general.  I wanted to just set the

9     stage for what's going to happen today.  Here's what my

10    understanding is.  Right now the jurors are filling out

11    questionnaires, the questionnaires that the parties have

12    drafted last week and that I approved.

13          We anticipate that that will take between 9:00 and

14    10:00.  At 10:00, they'll get the questionnaires.  We'll

15    give you a short time to look them over, perhaps a half an

16    hour if we are in fact going to have lawyer voir dire so you

17    will have each questionnaire for each juror, in any event,

18    and then we'll proceed.  Maryellen, which courtroom?

19          THE CLERK:  Next door.

20          THE COURT:  Courtroom 3.  We will interview jurors

21    individually, the public will be able to -- they will be

22    individually interviewed, but the public will be able to

23    come in and listen, if they choose.  We'll be picking, as I

24    mentioned, a jury of 10.  There are peremptory challenges

25    per side which would then be 16 jurors, so once we have

1   cleared 16 jurors for cause, then we'll suspend the jury

2   selection.  You come back in here and exercise your

3   peremptory challenges.

4        After the jurors have filled out the

5   questionnaires again at about 10:00 or so the jurors will

6   be -- the jurors from whom we are selecting will come into

7   the courtroom so the public will have to crunch over to one

8   side so the jurors can fill the seats.

9        In addition, late last night, very late last

10  night, I issued just an endorsement on the fair use issue.

11  A larger, a longer decision will follow, and that

12  endorsement granted the plaintiff's motion for partial

13  summary judgment on the defendant's fair use defense thereby

14  taking fair use out of the case.

15       Briefly what I said was that summary judgment,

16  obviously the question is whether or not there are

17  sufficient facts to establish a decision as a matter of law.

18  If material facts are in genuine dispute, the question has

19  to go to the jury; if they're not, the Court has to

20  determine their legal consequences.

21       The Seventh Amendment doesn't guarantee a right to

22  a jury trial on every issue, just those that turn on

23  reasonably disputed facts.  I found that Mr. Tenenbaum has

24  not met the burden of identifying the disputed facts.  Part

25  of the reason for that he proposes a fair use so broad that

1    it would swallow the copyright protections that Congress has

2    created.

3            Indeed, I say the Court can discern almost no

4    limiting principle.  His rule would shield from liability

5    any person who downloaded copyright songs for his or her own

6    private enjoyment.  Likewise, his demand for a jury

7    determination on this issue is essentially standardless.

8    Fair use would in effect be any use whatsoever that a jury

9    deemed fair.

10           In the end, fair use I concluded is not a

11   referendum on fairness in the abstract but an effort to

12   measure the purpose and effects of Mr. Tenenbaum's use

13   against the incentives for artistic and literary creation

14   that Congress established in the copyright act.  I indicated

15   that Mr. Tenenbaum made no effort to fit his alleged file

16   sharing into this framework, that is to say, the framework

17   of the copyright act, no claim of transformative use or

18   public benefit, et cetera.

19           I noted that there were circumstances in which a

20   defendant sued for file sharing could assert a plausible

21   fair use defense, and I cited in that regard very a

22   interesting amicus brief that had been filed in this action

23   by the Berkman Center at the Harvard Law School, and that

24   brief outlined the kinds of circumstances in which a fair

25   use defense would be possible, and that in quoting, "This is

1    a defendant who deleted MP3 files after sampling them,

2    created MP3 files exclusively for space shifting purposes

3    from audio CDs they had previously purchased."

4         As I indicated last week, I could also imagine a

5    fair use defense for a defendant who shared files during the

6    period of time before the law concerning fire sharing was

7    clear and paid outlets were readily available, and I

8    describe that I recognize that the advent of the Internet in

9    the late '90s through a number of norms into disarray

10   offering sudden access to a wealth of digitized media and

11   giving the venire of privacy or unanimity to acts that had

12   obvious public consequences.

13        At the beginning of this period, the law and the

14   technology were unsettled.  A defendant who shared files

15   during this interregnum but later shifted to paid outlets

16   once the law became clear and authorized services available

17   would present a strong case for fair use.

18        It obviously mattered with whom the defendant

19   shared files, his friends or the world, as well as how many

20   copyrighted works and for how long.  The problem with this

21   case, however, is that the defendant has offered no facts to

22   suggest that he fits within these limited categories.

23        Again, categories made legitimate by the case law,

24   and which I found particularly interesting in the Berkman

25   Center brief.  Mr. Tenenbaum is accused of sharing hundreds

1    of songs over a number of years far beyond the infancy of

2    this new technology or any legal uncertainty, and in his

3    summary judgment opposition, he has contested few of the

4    facts offered by the plaintiff.

5           I'm not making a finding with respect to these

6    facts, all I'm saying is that the plaintiff has identified

7    facts in their papers which the defendant on the face of the

8    summary judgment record has not disputed.

9           1, the main purpose of Tenenbaum's file sharing

10   was his own private enjoyment and that of his friends, not

11   profit making; 2, he downloaded entire songs but not entire

12   albums of music; 3, he did not transform the 30 works at

13   issue in the sense that he added something new with a

14   different purpose or a different character.  His file

15   sharing spanned more than four years and different software

16   platforms before and after this activity was detected in

17   August, 2004.

18          At that time his file sharing software made more

19   than 800 songs available to KazaA users to download.  Again,

20   the issue is not whether I find these to be true or false,

21   the issue is that having identified them as undisputed

22   facts, the defendant has not raised a serious factual

23   challenge to them which would have transformed the summary

24   judgment issue.

25          The only fair use factor on which the defendant

1    raises a serious challenge is the effect of his file sharing

2    on the potential market or value for the copyrighted works.

3    He argues that file sharing has not diminished the record

4    company's revenues or curtailed overall artistic creation,

5    but, again, there are no facts that Tenenbaum has put into

6    evidence on which the Court could rely for summary judgment

7    purposes.  There's no affidavit, expert report, deposition

8    testimony or evidence of any kind described by the rules.

9         In any event, what I'm obliged to do is to look at

10   the market for the specific works identified by the

11   plaintiff, and in this regard I have to consider whether

12   "unrestricted and widespread conduct of the sort engaged by

13   the defendant --" I'm quoting from the Supreme Court --

14   "would result in a substantially adverse impact on the

15   potential market for the original."

16        Plaintiffs have argued that continuous, high

17   volume file sharing offering exact duplicates to millions of

18   peer-to-peer users for free would negatively affect the

19   market for these copyrighted works.

20        In their summary judgment papers, the defendant

21   has offered no facts to the contrary.  While I recognize

22   that not every unauthorized download would represent a lost

23   sale, it seems some clear that some portion of paying

24   customers would shift to free downloads if this activity

25   were a fair use.

1          Based then on these findings, I conclude that

2   Tenenbaum's alleged infringement was not fair use.  As I

3   said, I'll put this in a more full opinion.  In brief, the

4   case law, the amici participation carves out an exception

5   for fair use, but there was no effort in the defendant's

6   pleadings to put his case within that exception.

7          And rather the argument was so broad, as I

8   suggested, that it was essentially standardless.  One

9   further note, to the extent that some of the defendant's

10  fair use arguments may be relevant to the issue of damages,

11  and in that case should we get to that, he'll have an

12  opportunity to present them to the jury at the trial.

13         So fair use defense is out of the case.  I

14  anticipate then the case will proceed on infringement and

15  should infringement be found on damages and willfulness.  I

16  also have reserved constitutional issues with respect to

17  damages should we get to that point.

18         Those are the issues with respect to the scope of

19  damages, the relationship between damages and actual loss

20  that defendants have raised which I said I won't get to

21  unless there's a damage award, so there will be a time when

22  the jury, if the jury gets to this point, we'll issue a

23  verdict with respect to damages and they'll be probably

24  post-trial motions challenging them much in the same way

25  that's going on in the Minnesota case.

1          I think that I'm not sure at this point what the

2     issue was with respect to the Internet demonstration.  Are

3     you on the Internet now?  Has people gotten their

4     connections?

5          MR. FEINBERG:  So far as I know, no, Judge.

6          THE COURT:  Okay.  We'll have some time.  I don't

7     anticipate openings until probably around one o'clock.  My

8     hope is that you would have, as I said, between 10:00 and

9     10:30 to go over the materials, the questionnaires that the

10     jury has filled out.  It will then go into individual voir

11     dire.  My hope is that we'll select a jury by 1:00.  We'll

12     break for an hour.  At 2:00, we'll go onto opening

13     statements.  I'll give general instructions to the jury.  Is

14     there anything else I need to address now?

15          MR. OPPENHEIM:  Good morning, your Honor.  Two

16     things, if I may raise a question with respect to the

17     summary judgment ruling, and then I think Mr. Reynolds has

18     some process questions.  We would like to know whether or

19     not we can have permission to file a supplemental brief with

20     respect to the hypothetical that the Court has posited that

21     was not briefed in our papers.

22          We respectfully disagree both factually and

23     legally with the conception that there would be fair use

24     defense in the scenario that the Court suggested similarly

25     because the defendant is not aware of the law obviously.

        THE COURT:  But what difference does it make if

there are no facts that are relevant here, why isn't that

just dicta in my decision?

        MR. OPPENHEIM:  Well, your Honor, our concern

quite frankly, for the very reason that the Court is

expressing it, it will be cited back in later cases as

though it has the authority of the Court.

        THE COURT:  You can file whatever you like, but

it's obviously dicta.  What I was trying to do was to

understand what the sort of metes and bounds of this defense

comprised so I was obviously speculating, and it is

obviously dicta, you can file whatever you like.  Whatever

those boxes consist of, there was no effort to put this case

in them.

        MR. OPPENHEIM:  I appreciate that, your Honor.

You will hopefully during the course of the trial, for

instance, hear testimony that this music has been available

online since 1999 and digitally on CDs since the mid-'80s,

and I hope that all of that testimony that you'll hear may

help you when you write your fuller decision.

        THE COURT:  Okay.  Yes, counsel.

        MR. REYNOLDS:  Yes, I have a few issues.  One,

with respect to the access to the Internet, we still do not

have any indication from the defendant as to what is

proposed, what is going to be shown.  We would ask that a

1  deadline be set.  We're now on the first day of trial.  It

2  was never disclosed in any discovery to us, it was never

3  disclosed in any of the pretrial filings.  When we here a

4  week ago, we were promised some information without a

5  timetable.

6         Now we're here the day of trial, and we still

7  don't have anything, so I would appreciate some sense of

8  some deadline that the defendant must have to produce and

9  explain to us what would be shown so that we may have an

10 opportunity to consider it before it's actually presented to

11 the jury.

12         THE COURT:  Again, I don't see this as an

13 intergalactic problem because it seems clear to me that what

14 the defendant wants to do is to show what it is done.  Is

15 that right?  What does the defendant propose to do with

16 respect to the demonstration?

17         MR. NESSON:  I'm proposing to have Wayne Marshall

18 demonstrate how kids today would get access to these songs

19 on the net.

20         THE COURT:  Would it be possible to provide the

21 defendant with -- the plaintiff with screen shots of what

22 you're going to do.

23         MR. NESSON:  I believe so, your Honor.  I've asked

24 Wayne if he would give me the URLs that he would use in

25 that.

1        THE COURT:  That would be great.

2        MR. NESSON:  I've not heard back from him, but I

3  will certainly by the opening of our case.

4        THE COURT:  That's fine.  Anything else?

5        MR. REYNOLDS:  Obviously we would reserve our

6  rights to object on the grounds it's obviously expert

7  testimony coming in through the back door.

8        THE COURT:  Well, we'll have to see.  If all he's

9  doing is to say here's how I turn on my computer, here's how

10 I go online, here's how I download, here's how I upload,

11 et cetera, then I don't see where it's going to be a major

12 deal, but you have a right to be cautious.

13       MR. REYNOLDS:  Thank you.  Your Honor, with

14 respect to Dr. Pouwelse, I was curious --

15       THE COURT:  I have an endorsement coming on

16 that.

17       MR. REYNOLDS:  Thank you, your Honor.  Then we've

18 also, the parties have stipulated to Exhibits 1 through 54.

19 Can we now move for admission of that?

20       THE COURT:  Better to move after the jury has been

21 sworn, just to be on the safe side.

22       MR. REYNOLDS:  Okay.  When the jury is sworn move

23 right away for all the exhibits?

24       THE COURT:  That's right, and that's not a

25 problem, 1 through 54, not a problem.

1          MR. REYNOLDS:  Thank you, your Honor.

2          THE COURT:  Do I have an agreed description of the

3    case that I can read to the jury, that is to say, in the

4    course of selection?

5          MR. REYNOLDS:  I think we provided one in our

6    pretrial filings, your Honor, and I'm not sure --

7          THE COURT:  What did the defendant think about

8    this?  In other words, I want to say to the jury this case

9    is about X, has anyone read, seen or heard anything about

10   this in my opening instructions?  You can probe further

11   individually, but I have your pretrial memorandum in front

12   of me.

13         MR. NESSON:  I don't think we gave you anything

14   special on that, your Honor.

15         THE COURT:  Okay.

16         MR. REYNOLDS:  Your Honor, it's on page 19.

17         THE COURT:  17.

18         MR. REYNOLDS:  I have page 19.

19         THE COURT:  Share that with the defendant.  Let me

20   know if that's a problem.  I'd be happy to read it to the

21   jury just to sort of see if anyone, title of the case

22   doesn't convey what the case is about.

23         THE COURT:  Why don't we do this.  We won't be

24   talking to the jury until about an hour.  If you have any

25   changes, give it to Ms. Molloy, we can reiterate to them.

1    Just to reiterate, right now the jury is filling out

2    questionnaires.  Between 10 and 10:30, you'll be able to

3    review them quickly just to get a sense of the pool.  At

4    10:30, I'll question the jurors in open court initially who

5    I am, who you are, what the case is about, excuses to see if

6    people can't sit.

7         The plan is to sit 9 to 4 all week, then we'll go

8    into individual lawyer voir dire five minutes per side per

9    juror, shorter if you think you know what you're doing, then

10   once we have cleared 16 jurors, which is the amount we would

11   need for the final jury plus peremptory challenges for each

12   side, we come back here, each side exercises their

13   peremptory challenges.

14        My hope and goal is this would finish by 1:00.  We

15   then have lunch.  At 2:00, we'll have openings.  The trial

16   will be about everything, will be about infringement,

17   damages but not about fair use.

18        As I said, I anticipate a substantive proceeding

19   if there's a damage award raising the kinds of

20   constitutional issues that the plaintiff has raised, the

21   defendant has raised.

22        MR. FEINBERG:  Judge, we've had some discussion

23   with plaintiffs' counsel about the scheduling for the whole

24   week, and they anticipate finishing their case some time on

25   Thursday.  We feel strongly that we need more time than

1   that, and I would wonder whether or not the Court would

2   consider time limitations on witnesses or doing something

3   since we're under such a tight schedule and the jury would

4   be going out presumably some time Friday mid-morning,

5   wouldn't have much time for our side of the case, so I just

6   want to raise that issue since we don't have -- what we

7   propose frankly was to split the week, and that has been

8   rejected at least at this point.

9           THE COURT:  You know, it's interesting.  As an old

10  trial lawyer, I don't like time limits imposed in the

11  abstract.  I understand time limits, that is to say, if a

12  witness is wandering, I will enforce those rules, if the

13  testimony is repetitive, I'll enforce those rules, but I do

14  think that it is in everyone's interest that this case be

15  finished.

16          I'm going to tell the jury that they will have the

17  case for their deliberation by Friday, and that's a bargain

18  that I strike with the jury, and I do everything I can to

19  make that possible.

20          I mean, I don't know enough about the plaintiff's

21  case in a situation to say, I mean, splitting it would mean

22  the plaintiff's case would be over by mid-day on Wednesday

23  and then you would have between Wednesday afternoon and

24  Thursday afternoon.  That seems reasonable to me.

25          MR. REYNOLDS:  Your Honor, the defense have three

witnesses.  We have at least 12.  We've done a very good

job, I think, of agreeing on exhibits and getting most of

the exhibits in.  We can move through our case very quickly,

but there's no way we can get done our case by Wednesday,

Wednesday afternoon, by Wednesday noon.

Potentially we could finish by Wednesday, but I'm

thinking that the case will go our Thursday and wrap up

Thursday.  We will move our case very quickly.

THE COURT:  How much do the defendants need?

MR. FEINBERG:  We don't know.  I'm assuming that

the plaintiffs will call Mr. Tenenbaum, and that would open

up our cross-examination of Mr. Tenenbaum.

THE COURT:  How about this, why don't we see if

this works, that the case will be concluded by Friday

because if they get the case at the end of Friday, if I

instruct and you close by Friday afternoon, on Monday

morning, another Judge could preside over the deliberations

and take a verdict, if necessary, and, if necessary, I can

be here as well.  It wouldn't be the optimal situation, but

I could here as well, if necessary.

What I tell the jury is that the evidence will

close them in X time.  I can give them on the outside Friday

afternoon.  They have to understand that they have to save

time for deliberations, so we'll clear jurors who could stay

this week and next week.  Anybody who can't stay for the

1    next two weeks, we will exclude from the pool so you don't

2    wind up with someone with an airline ticket on next Tuesday

3    who's going to rush through deliberations, we can do that.

4    I won't be pleased if I have to come back on Monday.

5             MR. REYNOLDS:  I will assure you we will move our

6    case as quickly as I can.  In that regard, we've stipulated

7    to many exhibits that will help facilitate a quick trial.

8    There are two exhibits that the defendant objected to prior

9    to the Court's ruling regarding the 30 songs that are issue.

10            I was wondering if we could revisit it that right,

11   it's Exhibit A and B on the disputed exhibits, which are a

12   list of the 5 song recordings and the 25 song recordings

13   which together comprise the list of sound recordings at

14   issue.  For the plaintiff's case, it would make our case go

15   much faster if we can present so the jury can see as we're

16   going through the evidence which songs are at issue.  I'm

17   not sure if the defendants will withdraw their objections,

18   but we'd ask that we'll get a ruling on this now and maybe

19   move things along faster rather than with witnesses.

20            MR. FEINBERG:  The issue, Judge, we objected to

21   the grounds we were limiting it to the 5 songs and not the

22   30.  We can allow it if that objection is saved.

23            THE COURT:  I've ruled against you.  This comes in

24   simply as a list.  The registrations you would be providing

25   separately --

1        MR. REYNOLDS:  That's correct.

2        THE COURT:  -- as a list.  They can come in as the

3    next number is.  Ms. Molloy is the keeper of the exhibits.

4        MR. REYNOLDS:  55 and 56 then, your Honor.

5        ( Lists of songs were marked Exhibit Nos. 55 and

6    56 and entered into evidence.)

7        MR. NESSON:  I have three things, your Honor.  The

8    first is I request to know whether your Honor intends to

9    instruct the jury at the end in the language of the statute

10    indicating the statutory range or whether you simply intend

11    to ask the jury to return a damage award that is just.  I

12    ask this because my opening statement depends completely on

13    which way you go.  I believe that it's wrong to tell the

14    jury the statutory range, that they have no context for it,

15    their mandate is to decide what is just.

16         They can determine what's just.  By giving them

17    Congress's mandate of range, it just will screw them up on

18    their idea of what is just.  If their verdict comes back

19    either below or above the range, it's completely within the

20    Court's control to deal with it at that time, and if you

21    tell them the range, then we never really do find out what

22    the jury felt was just, and it's certainly an issue for us

23    on appeal and an issue to you that the jury has the right

24    under Felton to decide all issues relating to statutory

25    damages including whether there should be any statutory

1    damages.

2         THE COURT:  Has anybody ever done such an

3    instruction she asks pointedly?  Has anyone, is there any

4    authority for this instruction other than necessary on

5    copyright?

6         MR. NESSON:  Just the statute, the statutory

7    standard is just and Feltner vs. United States argued to the

8    Supreme Court by Mr. Justice Roberts decided unanimously by

9    the Supreme Court says absolutely explicitly, and I have the

10   quote here, two quotes from the case that are immediately on

11   target that I'll provide you in one second.  "The right to a

12   trial by jury includes the right to have a jury determine

13   the amount of statutory damages, if any, awarded to the

14   copyright owner," and then the holding case, right down at

15   the bottom, the holding, "The Seventh Amendment provides a

16   right to a jury trial on all issues pertinent to an award of

17   statutory damages under Section 504C of the copyright act

18   including the amount itself."  That's my authority.

19        THE COURT:  And that you conclude doesn't focus

20   the jury's attention on between 750 and 30,000 but enables

21   them to pick any number from outside the range or inside the

22   range?

23        MR. NESSON:  What is just, your Honor, that's the

24   statutory standard, yes.

25        THE COURT:  I'll take a look at this.  This is not

1    something I intended to resolve at the beginning of the

2    case, but if it bears on your opening, I will resolve on it.

3    You object?

4              MR. REYNOLDS:  Yes.

5              THE COURT:  What a surprise.

6              MR. OPPENHEIM:  Surprisingly, counsel objects.

7    Your Honor, should we go down this road, we're just begging

8    for a potential mistrial one way or the other.  The object

9    of the jury is more than just to do justice, it's to apply

10   the facts to the law, and one of the things that we have to

11   do is charge the charge with the law.  Congress has set

12   forth the law.

13             Part of the law that Congress has set forth is

14   what is the statutory range.  Congress has prescribed that.

15   It is a due process requirement that they apply the facts to

16   that statutory range.  If we don't give them that statutory

17   range, we're not giving them the law that they need to apply

18   to the facts in this case.

19             THE COURT:  The Minnesota case, the Minnesota jury

20   instructions, the Judge instructed under the copyright agent

21   which plaintiff is entitled to a sum of not less than 750 or

22   more than 30,000 per act of infringement as you consider

23   just.  That's essentially what you're asking for?

24             MR. OPPENHEIM:  No, your Honor, not quite.  The

25   instruction went on to address if you should find that the

1      defendant's conduct is willful.

2              THE COURT:  Yes.

3              MR. OPPENHEIM:  That damages then can go up to

4      150,000 per, and the special verdict form in that case

5      specifically provided that range on the verdict form so that

6      the jury could easily and unmistakenly determine what the

7      damages should be.

8              THE COURT:  So you interpret "just" to mean just

9      within the range set by statute?

10             MR. OPPENHEIM:  Of course, your Honor.

11             THE COURT:  Okay.

12             MR. NESSON:  Your Honor, that's exactly why the in

13     the Jamie Thomas-Rasset case took between 750 and 150,000,

14     split the difference at just about 80, multiplied it by 24

15     and came out to 1.92 million as the just amount clearly

16     completely disconnected from any sense of real justice.

17             THE COURT:  But you will have an opportunity -- I

18     actually agree with you that between 750 and 30,000 per

19     song, there are no standards at all.  I can find none in the

20     law that I can instruct the jury as to where to go between

21     750 and 30,000.  That said, the safest alternative is for me

22     to give this instruction in the language of the statute, and

23     after the -- when damages are rendered, at that point

24     there's a remittitur motion I understand in the Minnesota,

25     address the issue at that point because telling the jury to

1    pick a number anywhere.

2         MR. NESSON:  Is just --

3         THE COURT:  Well, this is 750 to 30,000 as they

4    find just.  In other words, in one sense the statutory

5    language is more focused than the language you would have

6    and has more standards than the language you would proffer.

7    What is just below 750, what is just within the range?

8         MR. NESSON:  I rely on Feltner, your Honor.

9         THE COURT:  Anything else?

10        MR. OPPENHEIM:  Your Honor, nothing other than the

11   fact that Feltner doesn't really stand for the proposition

12   that defense counsel suggests, and I'd like to see where in

13   Feltner the Court decided not to instruct the jury on the

14   range of statutory damages because I don't believe that's

15   what happened.

16        THE COURT:  I'll take a look at it.  Is there

17   anything else that I need to resolve for your openings other

18   than that?  You had three things, Mr. Nesson.  That's one.

19        MR. NESSON:  Yes.  The second thing has to do with

20   the geography of the courtroom, your Honor.  In terms of

21   rhetorical space of this courtroom, it is radically

22   unbalanced to the defendant's disadvantage.  From the point

23   of view of the jury, the plaintiffs have the foreground.

24        THE COURT:  Where would you like to be?

25        MR. NESSON:  Sorry.

1          THE COURT:  Where would you like to be?

2          MR. NESSON:  Switch tables.

3          THE COURT:  They have the -- to some degree

4    because they are plaintiffs, they have the sort of obvious

5    arguably closer to the jury position.  If you'd like, you

6    could be behind them.

7          MR. NESSON:  I don't see why the presumption in

8    favor of the noncommercial litigant doesn't prevail at least

9    to have equality in the courtroom.  If anything, it should

10   be to his advantage.  The idea that they're in the

11   foreground, that we have to look at the jury through their

12   teeth, that we have to look at you through this barrier here

13   that's in front, that's just a disadvantage for us.  We're

14   like in the background here.

15         THE COURT:  I understand.  The problem is they

16   have the burden of proof, and that's the reason that the

17   seats are arranged as they are.

18         MR. NESSON:  We have the burden of proof on

19   summary judgment apparently.

20         THE COURT:  Pardon.

21         MR. NESSON:  We have the burden of proof on

22   summary judgment apparently.

23         THE COURT:  Because they presented facts that you

24   didn't contest.

25         MR. NESSON:  And we can --

1          THE COURT:  At trial you, the plaintiff, has the

2     burden of proof.  In terms of other aspects of geography, I

3     am very loose about that.  You can wander wherever you want

4     to go.  I don't require people to stand by the podium.  If

5     you can't see something, people can change their positions,

6     that's not a problem.  What's the third point?

7          MR. NESSON:  The third, an assistant,

8     Debbie Rosenbaum who was certified to the court, still is, I

9     believe, but Harvard Law School has made it clear that she

10     is no longer permitted as far as they're concerned to

11     practice, and the position is somewhat awkward because I

12     feel conflicted.  I am both Harvard Law School and a lawyer

13     wanting her assistance, and so I feel somewhat awkward about

14     it.

15          THE COURT:  I don't have any problem, the

16     certification rules address who can address the Court.  In

17     terms of someone helping you, I don't have any problem if

18     you can squeeze her in at the table, she can sit at the

19     table.

20          MR. NESSON:  Thank you, your Honor.  Just one

21     final.

22          THE COURT:  That's four.  Go on.

23          MR. NESSON:  Just to place on the record one more

24     time my complete disappointment that this event is being

25     stifled as far as the digital public is concerned, that is,

1    Joel's argument will be heard by these people, that's it.

2    That's too bad.

3              THE COURT:  Mr. Nesson, you're preaching to the

4    Court.

5              MR. NESSON:  Just putting it on the record one

6    more time.

7              THE COURT:  Well, I don't mind being reversed but

8    being reversed four or five times on the same issue it does

9    seem to be to be a waste of time so the previous order not

10   allowing webcasting stands.  You won't see me until you have

11   an opportunity to look at the questionnaires.  We'll resume

12   at about 10:30 assuming the questionnaires are ready at that

13   time.  Thank you.

14             THE CLERK:  All rise.

15             (A recess was taken.)

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    )

5    CITY OF BOSTON               )

6

7              I, Valerie A. O'Hara, Registered Professional

8    Reporter, do hereby certify that the foregoing transcript

9    was recorded by me stenographically at the time and place

10   aforesaid in No. 03-11661-NG, Capital Records, Inc., et al.

11   vs. Noor Alaujan, et al. and thereafter by me reduced to

12   typewriting and is a true and accurate record of the

13   proceedings.

14                          DATED JANUARY 15, 2010

15                          _____

16                          /S/ VALERIE A. O'HARA

17                          _____

18                          VALERIE A. O'HARA

19                          REGISTERED PROFESSIONAL REPORTER

20

21

22

23

24

25