# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONY BMG MUSIC ENTERTAINMENT; WARNER BROS. RECORDS INC.; ATLANTIC RECORDING CORP.; ARISTA RECORDS LLC; and UMG RECORDINGS, INC.,     Plaintiffs, <br><br> v. <br><br> JOEL TENENBAUM,     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      **Civil Action No. 07cv11446-NG**<br>)<br>)<br>) |

GERTNER, D.J.:

# TABLE OF CONTENTS

## MEMORANDUM & ORDER RE:
## DEFENDANT'S MOTION FOR NEW TRIAL OR REMITTITUR
July 9, 2010

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

III.   TENENBAUM'S CHALLENGE TO THE DAMAGES AWARD . . . . . . . . . . . . . . . . -9-
    A.   Tenenbaum's Constitutional Challenge to the Jury's Award must Be Addressed -9-
    B.   Tenenbaum's Due Process Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        1.   What standard should the Court employ in evaluating Tenenbaum's constitutional challenge? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
            a.   *Williams* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
            b.   *The Supreme Court's Punitive Damages Jurisprudence* . . . . . . -16-
            c.   *Is the Supreme Court's recent punitive damages jurisprudence relevant to this case?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-
        2.   The <u>BMW</u> Guideposts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-
            a.   *The Third <u>BMW</u> Guidepost* . . . . . . . . . . . . . . . . . . . . . . . . . . -30-
            b.   *The Second <u>BMW</u> Guidepost* . . . . . . . . . . . . . . . . . . . . . . . . . -42-
            c.   *The First <u>BMW</u> Guidepost* . . . . . . . . . . . . . . . . . . . . . . . . . . . -51-
        3.   What is the maximum constitutionally permissible damages award in this case? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -52-

IV.   MISCELLANEOUS ITEMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -55-
      A.      Fair Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -55-
      B.      Tenenbaum's Evidentiary Challenge  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -57-

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -61-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SONY BMG MUSIC** | ) |
| **ENTERTAINMENT; WARNER BROS.** | ) |
| **RECORDS INC.; ATLANTIC** | ) |
| **RECORDING CORP.; ARISTA** | ) |
| **RECORDS LLC; and UMG** | ) |
| **RECORDINGS, INC.,** | ) |
|      **Plaintiffs,** | ) |
| | ) |
|      **v.** | )          **Civil Action No. 07cv11446-NG** |
| | ) |
| **JOEL TENENBAUM,** | ) |
|      **Defendant.** | ) |

**GERTNER, D.J.:**

**MEMORANDUM & ORDER RE:**
**DEFENDANT'S MOTION FOR NEW TRIAL OR REMITTITUR**
July 9, 2010

## I.    INTRODUCTION

This copyright case raises the question of whether the Constitution's Due Process Clause is violated by a jury's award of $675,000 in statutory damages against an individual who reaped no pecuniary reward from his infringement and whose individual infringing acts caused the plaintiffs minimal harm.  I hold that it is.

Joel Tenenbaum ("Tenenbaum"), the defendant in this action, was accused of using file-sharing software to download and distribute thirty copyrighted songs belonging to the plaintiffs. The plaintiffs are a group of the country's biggest recording companies.[1]  Their lawsuit against Tenenbaum is one of thousands that they have brought against file sharers throughout the country. Tenenbaum, like many of the defendants in these suits, was an undergraduate when his file-sharing was detected.

---

[1] In particular, the plaintiffs are Sony BMG Music Entertainment, Warner Bros. Records Inc., Atlantic Recording Corp., Arista Records LLC, and UMG Recordings, Inc.

Although the plaintiffs presented evidence that Tenenbaum illegally downloaded and shared thousands of recordings, the trial focused on his infringement of the plaintiffs' copyrights in thirty songs. As to these songs, Tenenbaum's liability for infringement was not seriously in question. Since he admitted engaging in conduct that clearly constituted copyright infringement at trial, I directed judgment in the plaintiffs' favor on this issue. The only questions for the jury were whether Tenenbaum's infringements were willful and what amount of damages was appropriate.

In Tenenbaum's case, the plaintiffs chose statutory damages over actual damages as the remedy. See 17 U.S.C. § 504(a), (c)(1). "Statutory damages" are damages specially authorized by Congress that may be obtained even in the absence of evidence of the harm suffered by the plaintiff or the profit reaped by the defendant. Under the relevant statute, the jury's award could be no less than $750 for each work that Tenenbaum infringed and no more than $30,000 or $150,000, depending on whether the jury concluded that Tenenbaum's conduct was willful. Id. § 504(c)(1)-(2). The jury did find that Tenenbaum willfully infringed the plaintiffs' copyrights and imposed damages of $22,500 per song, yielding a total award of $675,000.

While that award fell within the broad range of damages set by Congress, Tenenbaum challenged it as far exceeding any plausible estimate of the harm suffered by the plaintiffs and the benefits he reaped. He filed a motion for new trial or remittitur, raising both common law and constitutional grounds.[2] In addition to the plaintiffs opposing Tenenbaum's motion, the United States government also intervened and filed a memorandum in support of the constitutionality of

---

[2] Tenenbaum raised a similar argument in a pretrial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Def.'s Mot. to Dismiss, Case No. 03-cv-11661-NG, document #779.) I denied Tenenbaum's motion without prejudice to his right to file a post-trial motion challenging the constitutionality of any award the jury might return. (Order re: Def.'s Mot. to Dismiss, Case No. 03-cv-11661-NG, document #847.)

17 U.S.C. § 504(c) as applied in this case.  (Electronic Order Granting United States' Mot. to Intervene, March 25, 2009, Case No. 03-cv-11661-NG); see also 28 U.S.C. § 2403(a) (providing that the Attorney General of the United States must be notified of, and may intervene in, any case in which the constitutionality of a federal statute is questioned); Fed. R. Civ. P. 5.1.

Significantly, the common-law doctrine of remittitur would have enabled this Court to entirely avoid the constitutional challenge, always the better choice.  Remittitur permits a court to review a jury's award to determine if it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1197 (1st Cir. 1995) (quoting Segal v. Gilbert Color Sys., Inc., 746 F.2d 78, 81 (1st Cir. 1984)).  If the court so finds, it may reduce the damages, but only if the plaintiffs accept the reduced amount; if they do not, the court is obliged to grant a new trial.

The plaintiffs in this case, however, made it abundantly clear that they were, to put it mildly, going for broke.  They stated in open court that they likely would not accept a remitted award.  And at a retrial on the issue of damages, I would again be presented with the very constitutional issues that the remittitur procedure was designed to avoid.  I am thus obliged to deal with Tenenbaum's constitutional challenge.

For many years, businesses complained that punitive damages imposed by juries were out of control, were unpredictable, and imposed crippling financial costs on companies.  In a number of cases, the federal courts have sided with these businesses, ruling that excessive punitive damages awards violated the companies' right to due process of law.  These decisions have underscored the fact that the Constitution protects not only criminal defendants from the

imposition of "cruel and unusual punishments," U.S. Const. amend. VIII, but also civil defendants facing arbitrarily high punitive awards.

While this body of law is not entirely clear or consistent, it has both a procedural and substantive component.  It prevents the awarding of damages without adequate procedural protections, but it also seeks to define the outer limits of what excessive punishment is.  Thus, the Supreme Court has held that punitive damages awarded against BMW were grossly excessive, and therefore unconstitutional, in a lawsuit claiming that the manufacturer failed to disclose that the plaintiff's new luxury car had been repainted prior to sale.  BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996).  More recently, the Court found unconstitutional damages awarded against the insurance company State Farm in a case claiming it had engaged in bad faith claim settlement practices.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003).

To be sure, Tenenbaum's case is different in several respects from the Court's punitive damages jurisprudence.  Since the jury's award fell within the range set by Congress, Tenenbaum was arguably on notice of the amount of damages that might be awarded to the plaintiffs.  But that fact -- notice -- does not preclude constitutional review.  While the parties disagree as to the content of the review of an award of statutory damages, they agree that some form of constitutional review is appropriate.

In reviewing the jury's award, I must "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for" copyright infringement.  BMW, 517 U.S. at 583 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301 (1989) (O'Connor, J., concurring in part & dissenting in part)).  There are plainly legitimate reasons for providing statutory damages in copyright infringement actions.  They ensure that plaintiffs are

-4-

adequately compensated in cases where the plaintiffs' actual damages are difficult to prove.  They also deter copyright infringement and thereby encourage parties to procure licenses to use copyrighted works through ordinary market interactions.

But since constitutional rights are at issue, deference must not be slavish and unthinking. This is especially so in this case since there is substantial evidence indicating that Congress did not contemplate that the Copyright Act's broad statutory damages provision would be applied to college students like Tenenbaum who file-shared without any pecuniary gain.

I must also accord deference to the jury's verdict.  As a general matter, damages are uniquely in the jury's competence.  But unlike the Court, the jurors did not have access to data regarding the amount of statutory damages imposed in other copyright infringement actions.  A comparison between the jury's award in this case and the statutory damages awards in other copyright cases demonstrates that the jury's award here was a serious outlier.  The statutory provision under which the jurors imposed their award also did not offer any meaningful guidance on the question of what amount of damages was appropriate.  It merely instructs the fact finder to select an amount within an extraordinarily broad range -- which here went from $22,500 to $4,500,000 given Tenenbaum's willful infringement of thirty works -- that it "considers just."  17 U.S.C. § 504(c)(1)-(2).

Weighing all of these considerations, I conclude that the jury's award of $675,000 in statutory damages for Tenenbaum's infringement of thirty copyrighted works is unconstitutionally excessive.  This award is far greater than necessary to serve the government's legitimate interests in compensating copyright owners and deterring infringement.  In fact, it bears no meaningful relationship to these objectives.  To borrow Chief Judge Michael J. Davis'

characterization of a smaller statutory damages award in an analogous file-sharing case, the award here is simply "unprecedented and oppressive." Capitol Records Inc. v. Thomas, 579 F. Supp. 2d 1210, 1228 (D. Minn. 2008). It cannot withstand scrutiny under the Due Process Clause.

For the reasons I discuss below, I reduce the jury's award to $2,250 per infringed work, three times the statutory minimum, for a total award of $67,500. Significantly, this amount is more than I might have awarded in my independent judgment. But the task of determining the appropriate damages award in this case fell to the jury, not the Court. I have merely reduced the award to the greatest amount that the Constitution will permit given the facts of this case.

There is no question that this reduced award is still severe, even harsh. It not only adequately compensates the plaintiffs for the relatively minor harm that Tenenbaum caused them; it sends a strong message that those who exploit peer-to-peer networks to unlawfully download and distribute copyrighted works run the risk of incurring substantial damages awards. Tenenbaum's behavior, after all, was hardly exemplary. The jury found that he not only violated the law, but did so willfully.

Reducing the jury's $675,000 award, however, also sends another no less important message: The Due Process Clause does not merely protect large corporations, like BMW and State Farm, from grossly excessive punitive awards. It also protects ordinary people like Joel Tenenbaum.[3]

---

[3] Although I grant Tenenbaum's motion for a new trial or remittitur insofar as it seeks a reduction of the jury's statutory damages award, I deny the motion in all other respects. In particular, I reaffirm my prior rejection of Tenenbaum's affirmative defense of fair use and deny his request for a new trial based on my admission of a redacted letter that Tenenbaum mailed to the plaintiffs soon after his file-sharing was detected.

## II.        BACKGROUND

Peer-to-peer networks allow users to share with others digital files stored on their computers.  See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1011-13 (9th Cir. 2001).  Although such networks have legitimate uses, they are often used to share copyrighted works without authorization from the copyrights' owners.  See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 922 (2005) (citing a study showing that nearly 90% of the files available for download on one peer-to-peer network were copyrighted works).

In 1999, Tenenbaum began using the peer-to-peer network Napster to download copyrighted sound recordings from other users.  He also made copyrighted songs saved on his computer available to other users through his "shared folder."  (See Tr. Tenenbaum Trial Testimony 41:13 to 42:3, 91:16-20, July 30, 2009, Case No. 07-cv-11446-NG, document #20.)  After Napster was forced to shut down for contributing to copyright infringement on a massive scale, see A&M Records, 239 F.3d 1004; Matt Richtel, Napster Is Told To Remain Shut, N.Y. Times, July 12, 2001, at C7, Tenenbaum transitioned to other peer-to-peer networks, including AudioGalaxy, iMesh, Morpheus, Kazaa, and LimeWire.  (Tr. Tenenbaum Trial Testimony 41:13 to 47:9.)  From 1999 to approximately 2007, he used these peer-to-peer networks to download and distribute thousands of songs for free and without authorization from the owners of the songs' copyrights.  (Tr. Tenenbaum Trial Testimony 41:13 to 42:3, 91:16-20; Trial Exs. 13, 35 & 43, attached as Exs. D, E & F to Pls.' Opp'n to Def.'s Mot. for New Trial or Remittitur, Case No. 07-cv-11446-NG, document #36.)

Tenenbaum was aware that his conduct was illegal.  Before he began using Kazaa, he understood that Napster had closed because it was facilitating copyright infringement.  (Tr.

Tenenbaum Trial Testimony 42:9 to 43:11.)  In addition, a student handbook published by Tenenbaum's undergraduate institution clearly warned that the sharing of copyrighted works over peer-to-peer networks could subject a student to civil liability, criminal penalties, and academic disciplinary action.  (Trial Ex. 26 at 11-12, Ex. G to Pls.' Opp'n to Def.'s Mot. for New Trial or Remittitur.)  He even continued to file-share after the plaintiffs sent him a letter demanding that he cease his infringing activities.  (See Tr. Tenenbaum Trial Testimony 10:18 to 11:12, 49:5-7, 72:10-23.)

On August 7, 2007, the plaintiffs in this case -- five major recording companies -- brought suit against Tenenbaum for infringing their registered copyrights through his online downloading and distribution.  Instead of accepting responsibility for his actions, Tenenbaum sought to shift blame to his family members and other visitors of his family's home by suggesting that they could have used the file-sharing software installed on his computer.  (Id. at 17:18 to 21:19.)  He admittedly lied in sworn responses to discovery requests.  (Id. at 89:7-13, 98:12-15.)  He also made several misleading or untruthful statements in his deposition testimony.  For example, he suggested that a computer he used to download and distribute songs through Kazaa had been destroyed when in fact it had not.  (Id. at 48:2 to 49:18, 73:12-24, 99:18 to 101:9.)

As explained above, Tenenbaum's liability to the plaintiffs for copyright infringement was never seriously in dispute at trial.  In fact, I granted the plaintiffs' motion for judgment as a matter of law on the issue of infringement after Tenenbaum admitted to downloading and distributing the thirty sound recordings at issue in this case.  (Electronic Order, July 31, 2009, Case No. 03-cv-11661-NG.)  The only issues for the jury, then, were whether Tenenbaum's infringing conduct was willful and how much the plaintiffs should be awarded in damages.

The jury's damages award was governed by 17 U.S.C. § 504.  Section 504 provides a copyright owner a choice as to the damages that she may recover from an infringer.  The owner may select to recover her actual damages and the infringer's profits, or she may instead elect to recover statutory damages.  17 U.S.C. § 504(a), (c)(1).  For an ordinary case of non-willful infringement, permissible statutory damages range from $750 to $30,000 per infringed work.  Id. § 504(c)(1).  For a case of willful infringement, the statutory damages range is $750 to $150,000. Id. § 504(c)(2).  If the infringer can prove that she "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright," statutory damages of not less than $200 may be awarded.  Id.

The plaintiffs in this case elected to receive statutory damages.  As explained above, the jury found that Tenenbaum's infringements were willful and imposed damages of $22,500 per song, for a total award of $675,000.

## III.    TENENBAUM'S CHALLENGE TO THE DAMAGES AWARD

### A.    Tenenbaum's Constitutional Challenge to the Jury's Award must Be Addressed

Tenenbaum contends that the jury's award of $675,000 in statutory damages was grossly excessive and thus violated the Due Process Clause.  He suggests, however, that I can avoid reaching the question of the award's constitutionality in a number of ways.  First, I could hold that section 504 does not permit the plaintiffs to receive statutory damages because they have not offered evidence that they suffered more than nominal actual damages.  Second, I could order a

new trial based on alleged errors in my jury instructions.  Third, I could reduce the award under the common law doctrine of remittitur.[4]

Generally, courts prefer to avoid confronting constitutional questions when they can reasonably rest their holdings on other grounds.  See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statue would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").  In this case, however, I cannot easily evade Tenenbaum's constitutional challenge.

First, his proffered interpretation of section 504 is implausible.  Section 504(c)(1) clearly provides that a copyright owner suing for infringement "may elect, at any time before final judgment is rendered," to recover statutory damages instead of actual damages and the infringer's profits.  17 U.S.C. § 504(c)(1).  The statute does not contain any provision requiring the copyright owner to prove that she suffered more than nominal damages before she may make this election.  Tenenbaum does not cite any evidence from section 504's legislative history or any case law that supports his interpretation of the statute.  Indeed, every authority confirms what the language of section 504 clearly indicates -- statutory damages may be elected even if the plaintiff cannot, or chooses not to, prove that she incurred more than nominal damages.  See, e.g., L.A. News Serv. v. Reuters Television Int'l, Ltd., 149 F.3d 987, 996 (9th Cir. 1998); Harris v. Emus Records Corp., 734 F.2d 1329, 1335 (9th Cir. 1984); H.R. Rep. No. 94-1476, at 161 (1976) ("[T]he plaintiff in an

---

[4] I could also avoid Tenenbaum's constitutional challenge by holding that I erred in granting the plaintiffs summary judgment on Tenenbaum's affirmative defense of fair use or admitting into evidence the redacted text of a letter that Tenenbaum sent to the plaintiffs in November 2005.  However, as I discuss in Part IV below, I reject each of these grounds for granting Tenenbaum a new trial.

infringement suit is not obliged to submit proof of damages and profits and may choose to rely on the provision for minimum statutory damages."); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.04[A], at 14-66 (2009).  I cannot avoid a difficult constitutional question by adopting an interpretation of a statute that is "plainly contrary to the intent of Congress."  Edward J. DeBartolo Corp., 485 U.S. at 575; see also Boumediene v. Bush, 128 S. Ct. 2229, 2271 (2008); Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 345-47 (1998) (refusing to adopt a proposed interpretation of 17 U.S.C. § 504(c) that would have averted the constitutional question of whether the Seventh Amendment protects a party's right to demand that a jury determine the amount of statutory damages to be imposed for copyright infringement).

Tenenbaum's challenge to my jury instructions also fails.  He argues that I should not have instructed the jury in the language of the statute, specifically that its damages award had to fall within the range of $750 to $150,000 per infringed work.  Instead, he contends that I should merely have instructed the jury to return whatever award it considered "just" without mentioning the statutory minimum and maximum.  If the jury's award then fell outside of the permissible statutory range, I could have adjusted the wayward award to bring it within the bounds set by Congress.  My instructions, however, correctly articulated the statutory damages ranges authorized by Congress and did so in a way that was neither confusing nor misleading.  See Davet v. Maccarone, 973 F.2d 22, 26 (1st Cir. 1992) ("Our focus in examining jury instructions is to determine whether they adequately explained the law or 'whether they tended to confuse or mislead the jury on the controlling issues.'" (quoting Brown v. Trs. of Boston Univ., 891 F.2d 337, 353 (1st Cir. 1989))).  Indeed, as the plaintiffs point out, several pattern jury instructions for copyright infringement cases refer to the minimum and maximum statutorily authorized awards.

See, e.g., 3B Kevin F. O'Malley, Jay E. Grenig & Hon. William C. Lee, Federal Jury Practice and

Instructions -- Civil § 160.93 (5th ed. 2001); Ninth Circuit Manual of Model Civil Jury

Instructions § 17.25 (2007).  Absent any evidence that Congress intended to shield jurors from

knowledge of section 504(c)'s statutory damages ranges,[5] informing them of the range in which

the law requires their award to fall cannot be grounds for a new trial.[6]

Finally, I cannot easily avoid Tenenbaum's constitutional challenge through the remittitur

procedure.  Remittitur is a common law doctrine that permits a court to reduce an award by a jury

that is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it

would be a denial of justice to permit it to stand."  Correa, 69 F.3d at 1197 (quoting Segal, 746

F.2d at 81).  As a doctrinal matter, the remittitur procedure is distinct from the Supreme Court's

recent jurisprudence requiring the reduction of unconstitutionally excessive punitive awards in

civil cases and can be employed even in the absence of constitutional concerns.  Thus, the

---

[5] While Congress has instructed courts not to inform juries in Title VII cases that their awards are subject to a statutory ceiling, see 42 U.S.C. § 1981a(c)(2); Sasaki v. Class, 92 F.3d 232, 236-37 (4th Cir. 1996), it has not compelled courts to take a similar approach in copyright infringement actions.  The fact that Congress spoke to this issue in the context of Title VII cases, while omitting any reference to it in the Copyright Act, suggests that it intended to permit judges to inform juries of section 504(c)'s statutory damages ranges.

[6] I instructed the jurors that they could consider the following non-exhaustive list of factors in awarding statutory damages:

    (a)      The nature of the infringement;
    (b)      The defendant's purpose and intent;
    (c)      The profit that the defendant reaped, if any, and/or the expense that the defendant saved;
    (d)      The revenue lost by the plaintiff as a result of the infringement;
    (e)      The value of the copyright;
    (f)      The duration of the infringement;
    (g)      The defendant's continuation of infringement after notice or knowledge of copyright claims; and
    (h)      The need to deter this defendant and other potential infringers.

(Jury Instructions 3, Case No. 03-cv-11661-NG, document #909.)  In addition, I informed them that if they found that Tenenbaum's infringements were willful, they could also consider this fact in arriving at a statutory damages award.  (Id. at 4.)

procedure in theory provides an avenue for me to avoid Tenenbaum's constitutional challenge while still reducing the jury's award.

Remittitur, however, requires the plaintiffs' cooperation.  In deference to a civil litigant's Seventh Amendment right to trial by jury, a court employing the remittitur procedure must offer the plaintiff the option of rejecting the reduced award and instead proceeding to a new trial on the issue of damages.  See 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §§ 2807, 2815 (2d ed. 1995 & Supp. 2010).  In contrast, when a court concludes that a jury's award is *unconstitutionally* excessive, it can simply reduce the excessive award without giving the plaintiff the option of a new trial.  See Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 27 (1st Cir. 2006); see also Mendez-Matos v. Municipality of Guaynabo, No. 3:05-cv-01599-JP-JA, slip op. at 12 & n.1 (D.P.R. June 26, 2007) (reducing an excessive punitive damages award on constitutional grounds without giving the plaintiff the option of a new trial), aff'd, 557 F.3d 36, 56 (1st Cir. 2009).

The plaintiffs in this case have made it clear that they almost certainly would not accept a remitted award and would instead opt for a new trial.  In an analogous file-sharing case in the District of Minnesota, Capitol Records Inc. v. Thomas-Rasset, the recording-company plaintiffs -- four of whom are also plaintiffs in this case -- rejected a remitted damages award of $2,250 per infringed work.[7]  Notice of Pls.' Decision Re: Remittitur, Capitol Records, Inc. v. Thomas-Rasset, No. 06-cv-1497-MJD-RLE (D. Minn. Feb. 8, 2010).  At the hearing on Tenenbaum's motion for new trial or remittitur, I specifically asked the plaintiffs' counsel whether they would also reject

---

[7] The jury had originally awarded $80,000 per song, for a total award of $1,920,000.  Capitol Records Inc. v. Thomas-Rasset, 680 F. Supp. 2d 1045, 1050 (D. Minn. 2010).

remittitur in this case.  Their attorney answered that "in all likelihood" they would.  (Hearing Tr. 4-5, Feb. 23, 2010, Case No. 07-cv-11446-NG, document #42.)

Thus, it appears that I cannot avoid a new trial on the issue of damages through the remittitur procedure.  And at the retrial of damages, I would be forced to confront the very constitutional question that the remittitur procedure was intended to avoid.  In particular, I would have to decide whether to limit the range within which the jury could award damages in order to ensure that the jury's award was not constitutionally out-of-bounds.  I would also have to consider Tenenbaum's objections to the constitutionality of any award that the new jury returned.

Since Tenenbaum's constitutional challenge appears unavoidable in light of the plaintiffs' stated reluctance to accept a reduced damages award, I will not enter an order of remittitur. Instead, I will proceed to consider whether the jury's award violated the Fifth Amendment's Due Process Clause.[8]

---

[8] Although I do not employ the remittitur procedure, I reject the plaintiffs' contention that it is unavailable in cases where a jury has returned a statutory damages award under the Copyright Act.  See Thomas-Rasset, 680 F. Supp. 2d at 1050-51.  The Supreme Court's holding in Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 355 (1998), that the Seventh Amendment protects a party's right to a jury determination of statutory damages in a copyright infringement action does not mean that a jury's award of statutory damages is impervious to review for excessiveness under Federal Rule of Civil Procedure 59(a).  The Supreme Court has explicitly held that a district court judge's review of a jury's verdict for gross excessiveness is compatible with the Seventh Amendment's guarantee of the right to trial by jury in civil cases.  See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996) (noting that the Seventh Amendment does not prohibit a district court from "overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)"); Dimick v. Schiedt, 293 U.S. 474, 482-85 (1935) (recognizing the constitutionality of remittitur); Ark. Valley Land & Cattle Co. v. Mann, 130 U.S. 69, 74 (1889) (noting that remittitur "does not . . . impair the constitutional right of trial by jury" and that "[i]t cannot be disputed that the court is within the limits of its authority when it sets aside the verdict of the jury, and grants a new trial, where the damages are palpably or outrageously excessive"; see also Blunt v. Little, 3 F. Cas. 760, 761-62 (C.C.D. Mass. 1822) (employing remittitur in an early opinion written by Justice Story, who was at the time sitting as a circuit justice).  Since Feltner merely held that the Seventh Amendment right to trial by jury applies to the awarding of statutory damages, and since the Seventh Amendment does not prohibit district court judges from ordering a new trial or using the remittitur procedure when a jury's damages award is grossly excessive, Feltner does not preclude a court from policing the size of a jury's statutory damages award under 17 U.S.C. § 504(c).

Furthermore, if judicial review were not available, section 504(c) would arguably be unconstitutional.  In Honda Motor Co. v. Oberg, 512 U.S. 415 (1994), the Supreme Court held that states must allow for judicial review of the size of punitive damages awards and thus struck down an amendment to the Oregon Constitution insofar as it had been interpreted by Oregon courts to prohibit judicial review of the amount of punitive damages awarded by a

B.     **Tenenbaum's Due Process Challenge**

1.     **What standard should the Court employ in evaluating Tenenbaum's constitutional challenge?**

a.     *Williams*

Tenenbaum, the plaintiffs, and the U.S. government all agree that the jury's statutory damages award is subject to some form of review under the Due Process Clause.  They simply disagree as to the standard that I should use in evaluating whether the jury's award is unconstitutionally excessive.  The Supreme Court case most directly on point -- and the only one that the plaintiffs and the government concede applies to this case -- is St. Louis, I.M. & S. Ry. Co. v. Williams, 251 U.S. 63 (1919).

In Williams, the Supreme Court squarely considered the issue of whether a jury's award within a statutorily prescribed range violated the Due Process Clause.  The plaintiffs in the case, two sisters, sued a railroad that charged them 66 cents more than the statutorily prescribed fare. Id. at 64.  The Arkansas statute under which the sisters brought their suit allowed a jury to assess a penalty of $50 to $300 for each overcharge.  Id. at 63-64.  The sisters both obtained judgments of $75, meaning that the total award was approximately 114 times greater than the 66 cents in damages each sister had incurred.  Id. at 64.  The railroad argued that the award was excessive and violated its right to due process.  Id. at 66.

In rejecting this claim and upholding the constitutionality of the Arkansas court's awards, the Supreme Court noted that the awards' validity should not be tested merely by comparing the

---

jury.  Since statutory damages awards in copyright infringement cases are at least partly punitive because they are intended to deter future infringement, Oberg suggests that such awards must be subject to "meaningful and adequate review by the trial court" to satisfy the requirements of the Due Process Clause.  Id. at 420 (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 20 (1991)).

small amount of the overcharges with the magnitude of the judgments obtained by the sisters.  Id. at 67.  Instead, the Court also considered "the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates" in assessing the awards' constitutionality.  Id.  The Court ultimately concluded that, when these factors were considered, the jury's awards were constitutionally permissible since they were not "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable."  Id.

b.      *The Supreme Court's Punitive Damages Jurisprudence*

Although Williams upheld the constitutionality of the Arkansas jury's awards, it recognized the possibility that civil damages may in some instances be so excessive as to violate the Constitution.  Over the past two decades, the Supreme Court has built on this insight by constructing a rather elaborate doctrinal framework for testing the constitutionality of punitive damages awards.

The Court's recent punitive damages jurisprudence, which I survey in detail below, is animated by the basic premise that "[t]he touchstone of due process is protection of the individual against arbitrary action of government."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 281 (1989) (Brennan, J., concurring) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  By the late 1980s, several Justices were voicing their concern that "skyrocketing" punitive damages awards, especially at the state level, smacked of arbitrariness. Id. at 282 (O'Connor, J., concurring in part & dissenting in part).  In responding to this perceived problem, the Court has developed standards for evaluating a jury's punitive damages award.

There is no question that these standards have both substantive and procedural components.  In other words, while the Supreme Court requires courts imposing punitive damages to afford defendants certain procedural protections, procedural regularity is not alone sufficient for a punitive damages award to survive scrutiny under the Due Process Clause. Instead, the amount of the award produced by proper procedures must also not be "'grossly excessive' in relation to [the] legitimate punitive damages objectives" of deterring and punishing misconduct.  BMW, 517 U.S. at 586 (Breyer, J., concurring); see also Blaine Evanson, Due Process in Statutory Damages, 3 Geo. J.L. & Pub. Pol'y 601, 602 (2005) (arguing that the "core" of the Court's punitive damages jurisprudence is a mandate of "'narrow tailoring' of the award to the state's *only* legitimate interests: punishing and deterring wrongful conduct").

In Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257 (1989), one waste-disposal business in Burlington, Vermont, sued another in federal district court for allegedly engaging in anti-competitive practices to monopolize the local market and interfering with the plaintiff's contractual relations.  The jury returned a verdict of $51,146 in compensatory damages and $6 million in punitive damages, which corresponds to a ratio of punitive to compensatory damages of approximately 117:1.  Id. at 262; see also id. at 282 (O'Connor, J., concurring in part & dissenting in part).  The Court rejected the defendant's challenge to the award under the Eighth Amendment's Excessive Fines Clause, holding that the Eighth Amendment "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded."  Id. at 263-64.  The Court refused to entertain the defendant's alternative argument that the jury's award violated the Due Process Clause because it had failed to raise the argument

-17-

before the district court or court of appeals.  Id. at 276-77.  Nevertheless, the majority opinion

cited Williams for the proposition that "the Due Process Clause places outer limits on the size of a

civil damages award made pursuant to a statutory scheme."  Id. at 276.

     In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1 (1991), the plaintiff sued her

insurance company for damages she suffered when her health insurance lapsed because the

insurance company's agent misappropriated her premium payments instead of forwarding them to

the insurer.  Id. at 4-6.  The Court explicitly subjected the state court's award of punitive damages

to scrutiny under the Due Process Clause and concluded that the award was constitutionally

permissible even though it was more than four times the amount of compensatory damages and

more than 200 times the plaintiff's out-of-pocket expenses.  Id. at 18-24.  The Court noted that

"unlimited jury discretion . . . in the fixing of punitive damages may invite extreme results that jar

one's constitutional sensibilities."  Id. at 18.  The Court, however, concluded that the award did

not violate the Due Process Clause because the jury that returned the award was given

instructions sufficient to ensure that its discretion was "exercised within reasonable constraints"

and the jury's award was subject to thorough post-trial review.  Id. at 19-23.  Nevertheless, the

Court noted that the jury's award came "close to the line" separating constitutional from

unconstitutional awards, suggesting that a punitive damages award much more than four times a

compensatory award might violate the Due Process Clause.  Id. at 23.

     TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993), upheld the

constitutionality of a $10 million punitive damages award on a slander-of-title claim.  Although

Justice Stevens' plurality opinion noted that the jury awarded compensatory damages of only

$19,000 (for a punitive-to-compensatory ratio of approximately 526:1), it also observed that the

title slanderer's conduct could potentially have inflicted millions of dollars in harm, thus making the jury's verdict appear more reasonable.  Id. at 460-62 (plurality op.).  Importantly, Justice Stevens, joined by Chief Justice Rehnquist and Justice Blackmun, observed that the Due Process Clause places substantive limits on the size of punitive damages awards.  Id. at 453-54.

Honda Motor Co. v. Oberg, 512 U.S. 415, 432 (1994), held that the Due Process Clause requires courts to review juries' awards of punitive damages to ensure that they are not grossly excessive.  Thus, Oregon's legal regime, which generally prohibited its courts from scrutinizing the amount of punitive damages awarded by juries, was unconstitutional.  Id. at 418.  Justice Stevens' majority opinion noted that the Court's "recent cases have recognized that the Constitution imposes a substantive limit on the size of punitive damages awards."  Id. at 420.

In BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), the Court finally declared a jury's award of punitive damages unconstitutional.  The Alabama jury in BMW awarded the plaintiff $4,000 in compensatory damages and $4 million in punitive damages based on BMW's failure to disclose that the plaintiff's supposedly "new" car had been repainted before it was sold to him, thus reducing the car's value.  BMW, 517 U.S. at 563-65.  On appeal, the Alabama Supreme Court reduced the punitive damages award to $2 million, representing a ratio of punitive to compensatory damages of 500:1.  Id. at 567.  Despite this reduction, the U.S. Supreme Court held that the award violated the Due Process Clause.  Id. at 585-86.

The Court began its inquiry into the constitutionality of the jury's award using the language of substantive due process review.  The Court noted that "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."  Id. at 568.  "Only when an award can fairly be categorized as 'grossly

excessive' in relation to these interests," the Court observed, "does it enter the zone of arbitrariness that violates the Due Process Clause . . . ." Id.   The Court was plainly concerned not only with the procedures that Alabama employed in assessing punitive damages, but also with the size of that award and its relationship to the state's interests in punishment and deterrence.

The Court's opinion, however, then took a turn for the procedural.  In the introduction to the majority's discussion of the three famous BMW guideposts, the Court stated:

> Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.  Three guideposts, each of which indicates that BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose . . ., lead us to the conclusion that the $2 million award against BMW is grossly excessive . . . .

Id. at 574-75 (footnote omitted).

The guideposts, however, seem to contemplate a highly substantive review of a jury's punitive damages award.  They require a court reviewing the constitutionality of a jury's punitive damages award to consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  State Farm, 538 U.S. at 418; see also BMW, 517 U.S. at 575.

In reviewing the reprehensibility of the defendant's conduct, a court should consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial

vulnerability; the conduct involved repeated actions or was an
isolated incident; and the harm was the result of intentional malice,
trickery, or deceit, or mere accident.

State Farm, 538 U.S. at 419.  "The existence of any one of these factors weighing in favor of a

plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them

renders any award suspect."  Id.

The second guidepost's ratio analysis requires a court to "consider whether punitive

damages bear a reasonable relationship to the harm that the defendant's conduct caused or is

likely to have caused."  Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 54 (1st Cir.

2009).  Although the Court has refused to identify a maximum, bright-line ratio between punitive

and compensatory damages that is constitutionally tolerable, it has noted "that, in practice, few

awards exceeding a single-digit ratio between punitive and compensatory damages, to a

significant degree, will satisfy due process."  State Farm, 538 U.S. at 425.  However, the Court

has also observed that "low awards of compensatory damages may properly support a higher ratio

than high compensatory awards."  BMW, 517 U.S. at 582.  Thus, relatively high ratios may be

permitted when "a particularly egregious act [results] in only a small amount of economic

damages" or when an "injury is hard to detect or the monetary value of noneconomic harm [is]

difficult to determine."  Id.

The third guidepost instructs a court to compare the punitive damages award to civil

penalties authorized or imposed for similar misconduct.  State Farm, 538 U.S. at 428.  This

guidepost reflects the Court's recognition that the judiciary should "accord 'substantial deference'

to legislative judgments concerning appropriate sanctions for the conduct at issue."  BMW, 517

U.S. at 583 (quoting Browning-Ferris, 492 U.S. at 301 (O'Connor, J., concurring in part & dissenting in part)).

As noted above, these guideposts -- although introduced with rhetoric regarding the Court's procedural concern about "fair notice" -- have a significant substantive bite to them. This tension in the language used by the Court in its punitive damages case law is of more than mere academic interest. The distinction between substantive and procedural due process is an important component of the plaintiffs' and the U.S. government's argument that the BMW guideposts do not apply to Tenenbaum's case. If the Court's major concern in BMW was ensuring that defendants have notice of the civil penalties that may be imposed upon them, BMW's relevance to the case at bar may be minimal. Unlike in BMW, where the jury's discretion to award punitive damages was not capped by any statutory maximum, the jury's award in this case had to fall within the range of $750 to $150,000 per infringed work. Although I have doubts whether this extraordinarily broad statutory range afforded Tenenbaum *fair* notice of the liability he might face for file-sharing, see infra note 13, it is indisputable that section 504(c) clearly set forth the minimum and maximum statutory damages available for each of his acts of infringement.

Cases decided after BMW, however, have reaffirmed that a court's review of a jury's punitive award under the Due Process Clause has a significant substantive component. Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001), held that the constitutionality of a jury's punitive damages award is subject to de novo review on appeal, not merely abuse-of-discretion review as some circuits had held. In reaching this decision, the Supreme Court made it clear that the Due Process Clause imposes "substantive limits" on

punitive damages awards insofar as it prohibits states and the federal government from "imposing 'grossly excessive' punishments on tortfeasors." Id. at 433-34.

State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 412, 429 (2003), held that a $145 million punitive damages award in favor of plaintiffs who suffered $1 million in compensatory damages (for a punitive-to-compensatory ratio of 145:1) was unconstitutionally excessive.  The insurance company State Farm refused to settle a personal-injury suit brought against Curtis Campbell, a State Farm policyholder, even though the injured party offered to settle for an amount equal to Campbell's policy limit. Id. at 413.  State Farm assured Campbell and his wife that they would bear no personal liability as a result of the lawsuit. Id.  When the jury returned a verdict against Campbell which exceeded his policy limit, however, State Farm initially refused to indemnify him for the excess liability. Id.  The attorney hired by State Farm to represent Campbell even went so far as to instruct him and his wife to prepare their home for sale so that they could satisfy the portion of the verdict for which they were liable. Id.; see also Campbell v. State Farm Mut. Auto. Ins. Co., 65 P.3d 1134, 1141-42, 1166 (Utah 2001).

The Campbells sued State Farm for its bad faith failure to settle for an amount within the policy limit, and during the damages phase of the trial, they introduced evidence that State Farm's conduct was part of a broader, nationwide policy to maximize profits by capping payouts on claims. State Farm, 538 U.S. at 414-15.  They also produced evidence that "State Farm's actions, because of their clandestine nature, [would] be punished at most in one out of every 50,000 cases as a matter of statistical probability." Id. at 415 (quoting Campbell, 65 P.3d at 1153).

Significantly, the Supreme Court began its review of the constitutionality of the $145 million punitive damages award by noting that "there are procedural and substantive constitutional limitations" on such awards.  Id. at 416.  It then subjected the award to the crucible of the BMW guideposts and concluded that it was unconstitutionally excessive.  Id. at 418-29.

Finally, in Philip Morris USA v. Williams, 549 U.S. 346 (2007), plaintiff Mayola Williams sued Philip Morris for causing the death of her husband, who died of lung cancer after many years of smoking Philip Morris cigarettes.  Id. at 349-50.  In closing arguments, Williams' lawyer urged the jury to punish Philip Morris not only for the harm caused to her husband, but also for the harm visited upon all of the thousands of other smokers in the state who had been injured by smoking Philip Morris cigarettes.  Id. at 350.  The jury apparently complied, awarding Williams $79.5 million in punitive damages.  Id.  On appeal, the Oregon Supreme Court rejected Philip Morris' claim that "the Constitution 'prohibits [a] state, acting through a civil jury, from using punitive damages to punish a defendant for harm to nonparties.'"  Id. at 356 (quoting Williams v. Philip Morris Inc., 127 P.3d 1165, 1175 (Or. 2006)).

 The U.S. Supreme Court vacated the Oregon Supreme Court's judgment and remanded for reconsideration of the propriety of a jury instruction that Philip Morris offered at trial.  Id. at 357-58.  In its opinion, the Court made it clear that a jury may not use punitive damages to punish a defendant for his misconduct toward individuals who are not parties to the case at bar.  However, a jury may consider harm to nonparties in evaluating the reprehensibility of the defendant's conduct toward the plaintiff.  Id. at 355.  The Court's opinion did not reach the

question of whether the jury's $79.5 million punitive damages award was unconstitutionally

excessive.  Id. at 352-53, 358.[9]

> c.    *Is the Supreme Court's recent punitive damages jurisprudence relevant to this case?*

The plaintiffs and the government argue that the Supreme Court's recent punitive damages

jurisprudence does not apply to statutory damages.  Instead, they contend that the only standard

applicable to this case is the one articulated in Williams.  There is a split of authority on this

issue,[10] but as described below, the damages award in this case fails under either test.

---

[9] Although the Supreme Court relied on its common-law authority in maritime cases, not on the Due Process Clause, in reducing the punitive damages award in Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2619-34 (2008), its decision emphasized the dangers of unpredictable punitive damages awards.  In particular, the majority opinion noted that a bedrock principle of the rule of law is that like parties should be treated similarly.  Id. at 2625 ("Courts of law are concerned with fairness as consistency . . . .").  "[E]ccentrically high" punitive awards violate this principle and thus are in conflict with fundamental notions of fairness underlying the legitimacy of our legal system.  Id. at 2627.

[10] Compare Zomba Enters., Inc. v. Panorama Records, Inc., 491 F.3d 574, 587 (6th Cir. 2007) (reviewing a total statutory damages award of $806,000 for the infringement of twenty-six copyrighted works under Williams after noting that BMW and State Farm's applicability to statutory damages was questionable); Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., No. C 07-03952 JW, slip op. at 25 n.25 (N.D. Cal. Mar. 19, 2010) (holding that defendants' reliance on BMW in challenging a statutory damages award was "misplaced"); Verizon Cal. Inc. v. Onlinenic, Inc., No. C 08-2832 JF (RS), 2009 WL 2706393, at *6-*9 (N.D. Cal. Aug. 25, 2009) (concluding that "it is highly doubtful" that BMW and State Farm "apply to statutory damages awards" but admitting that certain principles announced in the Supreme Court's recent punitive damages cases, such as the principle that a defendant should not be punished "for wrongful acts other than . . . those committed against the plaintiff," might apply in statutory damages cases); DirecTV, Inc. v. Cantu, No. SA-04-cv-136-RF, 2004 WL 2623932, at *4-*5 (W.D. Tex. Sept. 29, 2004) (refusing to apply the BMW guideposts to a state statutory damages remedy since the civil penalties the defendant might face were capped by statute and thus did not implicate BMW's "fair notice" concerns); Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P., 329 F. Supp. 2d 789, 808-09 (M.D. La. 2004) (refusing to apply BMW and State Farm in reviewing the constitutionality of statutes providing statutory damages for plaintiffs who have received junk faxes because the statutes' provision of damages ranges obviated BMW and State Farm's "fair notice" concerns); and Lowry's Reports, Inc. v. Legg Mason, Inc., 302 F. Supp. 2d 455, 460 (D. Md. 2004) (refusing to apply the BMW guideposts in evaluating the constitutionality of a statutory damages award in a copyright infringement case); with Murray v. GMAC Mortgage Corp., 434 F.3d 948, 954 (7th Cir. 2006) (suggesting in dictum that statutory damages awarded under the Fair Credit Reporting Act would be subject to review under State Farm); Parker v. Time Warner Entm't Co., 331 F.3d 13, 22 (2d Cir. 2003) (suggesting in dictum that the aggregation of statutory damages in a class action under the Cable Communications Policy Act of 1984 might raise due process concerns under BMW and State Farm); Romano v. U-Haul Int'l, 233 F.3d 655, 672-74 (1st Cir. 2000) (applying BMW to a punitive damages award in a Title VII employment discrimination action even though the award was subject to a statutory cap); Centerline Equip. Corp. v. Banner Pers. Serv., Inc., 545 F. Supp. 2d 768, 778 n.6 (N.D. Ill. 2008) (suggesting in dictum that State Farm might provide grounds for remitting statutory damages awarded under the Telephone Consumer Protection Act); Leiber v.

While I conclude that the due process principles articulated in the Supreme Court's recent punitive damages case law are relevant to Tenenbaum's case, the differences between the two approaches are, in practice, minimal. At their root, the standards articulated in <u>Williams</u>, <u>BMW</u>, and <u>State Farm</u> all aim at providing defendants with some protection against arbitrary government action in the form of damages awards that are grossly excessive in relation to the objectives that the awards are designed to achieve. Indeed, early twentieth century cases such as <u>Williams</u> were the seedlings from which the Supreme Court's recent punitive damages jurisprudence sprouted. <u>Browning-Ferris</u>, the case that rejected a challenge to a punitive damages award under the Excessive Fines Clause, cited <u>Williams</u> as an example of a prior opinion in which the Court had expressed "the view that the Due Process Clause places outer limits on the size of a civil damages award pursuant to a statutory scheme." <u>Browning-Ferris</u>, 492 U.S. at 276. And <u>BMW</u> itself cites <u>Williams</u> for the proposition that "punitive award[s] may not be 'wholly disproportioned to the offense.'" <u>BMW</u>, 517 U.S. at 575 (quoting <u>Williams</u>, 251 U.S. at 66-67).

Furthermore, <u>BMW</u> and <u>State Farm</u> are not irrelevant in a case involving statutory damages merely because the defendant arguably has "fair notice" of the amount of damages that might be imposed on him. As noted above, the Supreme Court has recognized that its punitive damages jurisprudence has both procedural and substantive components. <u>State Farm</u>, 538 U.S. at

---

Bertelsmann AG (<u>In re Napster, Inc. Copyright Litigation</u>), No. C MDL-00-1369 MHP, C 04-1671 MHP, 2005 WL 1287611, at *10-*11 (N.D. Cal. June 1, 2005) (suggesting in dictum that the court would apply <u>BMW</u> and <u>State Farm</u> in considering whether statutory damages for copyright infringement were unconstitutionally excessive); Evanson, <u>supra</u>, at 601-02 (arguing for the application of the Supreme Court's recent punitive damages case law to statutory damages cases); Pamela Samuelson & Tara Wheatland, <u>Statutory Damages in Copyright Law: A Remedy in Need of Reform</u>, 51 Wm. & Mary L. Rev. 439, 491-97 (2009) (arguing that statutory damages awards for copyright infringement should be subject to analysis under the <u>BMW</u> guideposts); <u>and</u> J. Cam Barker, Note, <u>Grossly Excessive Penalties in the Battle Against Illegal File-Sharing: The Troubling Effects of Aggregating Minimum Statutory Damages for Copyright Infringement</u>, 83 Tex. L. Rev. 525, 536-56 (2004) (arguing that the Supreme Court's punitive damages jurisprudence applies to the aggregation of multiple statutory damages awards in file-sharing cases).

416.  Thus, the due process concerns articulated in BMW and State Farm are not obviated merely "because the defendant [could] see [the grossly excessive award] coming."  Barker, supra, at 542.

Lower courts have recognized as much by applying the BMW guideposts to punitive damages awards subject to statutory caps.  For example, the First Circuit in Romano v. U-Haul International, 233 F.3d 655, 672-74 (1st Cir. 2000), applied the BMW guideposts to a punitive damages award in a Title VII employment discrimination case even though the punitive award was capped by statute and thus the defendants had notice of their potential liability.

Even the rigorous BMW guideposts, however, suggest that a district court judge should afford "substantial deference" to a jury's award of statutory damages within the range set by Congress.  BMW, 517 U.S. at 583 (quoting Browning-Ferris, 492 U.S. at 301 (O'Connor, J., concurring in part & dissenting in part)).  As the First Circuit has stated, "[a] congressionally-mandated, statutory scheme identifying the prohibited conduct as well as the potential range of financial penalties goes far in assuring that [the defendant's] due process rights have not been violated."  Romano, 233 F.3d at 673.

In addition, when applying BMW's second guidepost, which looks at the ratio of punitive to compensatory damages, I must remain mindful of the fact that statutory damages in copyright infringement cases are not only, or even primarily, intended to punish copyright infringers.  They are also intended to compensate copyright owners in instances where the harm imposed by the infringer's conduct is difficult to calculate.  See F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 231 (1952) (noting that statutory damages "give the owner of a copyright some recompense for injury done him, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits" (quoting Douglas v. Cunningham, 294 U.S. 207, 209

(1935)); <u>Lowry's Reports</u>, 302 F. Supp. 2d at 460 ("Statutory damages exist in part because of the difficulties in proving -- and providing compensation for -- actual harm in copyright infringement actions."). Indeed, in a highly influential 1961 report that served as the foundation for the Copyright Act of 1976, the Copyright Office noted that one of the reasons that statutory damages remedies are appropriate in copyright cases is because "[t]he value of a copyright is, by its nature, difficult to establish, and the loss caused by an infringement is equally hard to determine. As a result, actual damages are often conjectural, and may be impossible or prohibitively expensive to prove." Staff of Copyright Office, 87th Cong., <u>Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law</u> 102 (Comm. Print 1961) [hereinafter <u>Register of Copyrights Report</u>]; <u>see also</u> <u>Sony Corp. of Am. v. Universal City Studios, Inc.</u>, 464 U.S. 417, 462 n.9 (1984) (Blackmun, J., dissenting) (discussing the report); Samuelson & Wheatland, <u>supra</u>, at 451.

Nevertheless, even in a copyright infringement action, there should be some nexus between the jury's statutory damages award and the actual damages suffered by the plaintiff and the profits, if any, obtained by the defendant. 4 Nimmer & Nimmer, <u>supra</u>, § 14.04[E][1][a], at 14-95; <u>id.</u> at 14-96 ("[S]tatutory damages . . . should be woven out of the same bolt of cloth as actual damages."); <u>see also</u> <u>Thomas-Rasset</u>, 680 F. Supp. 2d at 1048 ("[A]lthough Plaintiffs were not required to prove their actual damages, statutory damages must still bear *some* relation to actual damages."); <u>Webloyalty.com, Inc. v. Consumer Innovations, LLC</u>, 388 F. Supp. 2d 435, 443 (D. Del. 2005) ("[T]he amount of a statutory damages award must also take into account the actual profits earned by the defendant and revenues lost by the plaintiff."); <u>Bly v. Banbury Books, Inc.</u>, 638 F. Supp. 983, 987 (E.D. Pa. 1986) ("[N]umerous courts have held that assessed statutory

damages should bear some relation to the actual damages suffered."); <u>RSO Records, Inc. v. Peri</u>, 596 F. Supp. 849, 862 (S.D.N.Y. 1984) ("Undoubtedly assessed statutory damages should bear some relation to actual damages suffered.").  In fact, Senator Orrin Hatch, a sponsor of the Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, which increased section 504(c)'s statutory damages ranges to their current levels, stated in remarks regarding a predecessor of that bill, "In most cases, courts attempt to do justice by fixing the statutory damages at a level that approximates actual damages and defendant's profits."  145 Cong. Rec. 13,785 (1999).

        In summary, I conclude that it is appropriate to apply the three <u>BMW</u> guideposts to the jury's award in this case.  However, in applying these guideposts, I will remain cognizant of two factors that distinguish this case from a typical case in which punitive damages are awarded: (1) the jury's award fell within a range authorized by Congress, and (2) the maximum and minimum amount of statutory damages that could be imposed for each of Tenenbaum's acts of infringement was clearly set forth in section 504(c).  While the <u>BMW</u> guideposts are helpful aids, my ultimate task is to determine whether the jury's statutory damages award is "grossly excessive" in relation to the government's legitimate interests in prescribing such awards -- namely, compensating copyright owners and deterring infringement.  <u>BMW</u>, 517 U.S. at 568 ("Only when an award can fairly be categorized as 'grossly excessive' in relation to [a State's legitimate interests] does it enter the zone of arbitrariness that violates the Due Process Clause . . . ."); <u>see also</u> <u>Register of Copyrights Report</u>, <u>supra</u>, at 103 ("[S]tatutory damages are intended (1) to assure adequate compensation to the copyright owner for his injury, and (2) to deter infringement.").

## 2. The <u>BMW</u> Guideposts

### a. *The Third <u>BMW</u> Guidepost*

Since the third <u>BMW</u> guidepost is arguably the most troublesome for Tenenbaum's argument that the jury's award violated the Due Process Clause, I begin with it.  On its face, this guidepost, which counsels courts to consider "the difference between [the jury's punitive award] and the civil penalties authorized or imposed in comparable cases," weighs heavily in the plaintiffs' favor.  <u>BMW</u>, 517 U.S. at 575.  Since the jury's award in this case fell within the range set forth in section 504(c), there is an identity between the damages authorized by Congress and the jury's award.  Nevertheless, it is far from clear that Congress contemplated that a damages award as extraordinarily high as the one assessed in this case would ever be imposed on an ordinary individual engaged in file-sharing without financial gain.  Just because the jury's award fell within the broad range of damages that Congress set for *all* copyright cases does not mean that the members of Congress who approved the language of section 504(c) intended to sanction the eye-popping award imposed *in this case*.  In fact, a careful review of section 504(c)'s legislative history suggests that Congress likely did not foresee that statutory damages awards would be imposed on noncommercial infringers sharing and downloading music through peer-to-peer networks.

The most recent act of Congress addressing section 504(c)'s statutory damages provisions is the Digital Theft Deterrence and Copyright Damages Improvement Act of 1999 (hereinafter "Digital Theft Deterrence Act"), Pub. L. No. 106-160, 113 Stat. 1774, which increased the

section's statutory damages ranges to their current levels.[11]  The timing of the Act suggests that

legislators did not have in mind the problem of consumers sharing music through peer-to-peer

networks when the Act was drafted.  While the predecessor to the bill that eventually became the

Digital Theft Deterrence Act was first introduced on May 11, 1999, see 145 Cong. Rec. 9233

(1999), Napster -- the peer-to-peer network that brought file-sharing into the mainstream -- was

not released until June 1, 1999.  Matt Hartley, The Phenom That Launched a Billion Downloads,

Globe & Mail (Can.), May 11, 2009, at A7.

To be sure, the legislation's timing does not unambiguously militate in Tenenbaum's

favor.  As the plaintiffs note, the Digital Theft Deterrence Act was not signed into law until

December 1999, at which point Napster had been up and running for six months.  Furthermore,

the House Judiciary Committee's report on the No Electronic Theft (NET) Act of 1997, Pub. L.

No. 105-147, 111 Stat. 2678, which amended various statutory provisions governing the

availability of criminal penalties for copyright infringement, noted that "an audio-compression

technique, commonly referred to as MP-3, now permits infringers to transmit large volumes of

CD-quality music over the Internet."  H.R. Rep. No. 105-339, at 4 (1997).  And well before 1999,

recording companies had begun suing the operators of websites that provided users with

unauthorized access to copyrighted sound recordings.  (See Pls.' Opp'n to Def.'s Mot. for New

Trial or Remittitur 31, Case No. 07-cv-11446-NG, document #36 (listing cases).)

---

[11] Before this bill was passed, the statutory damages range for ordinary non-willful infringement was $500 to $20,000 per infringed work and the maximum award for willful infringement was $100,000.  See Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, § 10(b), 102 Stat. 2853, 2860.

Although Congress again revised section 504 in 2004, it merely added paragraph (3) of section 504(c), which creates a rebuttable presumption that an infringement was committed willfully if the infringer knowingly provided materially false contact information to a domain name registry "in registering, maintaining, or renewing a domain name used in connection with the infringement."  Intellectual Property Protection & Courts Amendments Act of 2004, Pub. L. No. 108-482, § 203, 118 Stat. 3912, 3916-17 (codified at 17 U.S.C. § 504(c)(3)).  This provision is not implicated in this case.

The plaintiffs also emphasize the following language from the House Judiciary

Committee's report on an early version of the Digital Theft Deterrence Act:

> By the turn of the century the Internet is projected to have more
> than 200 million users, and the development of new technology will
> create additional incentive for copyright thieves to steal protected
> works. . . .  Many computer users are either ignorant that copyright
> laws apply to Internet activity, or they simply believe that they will
> not be caught or prosecuted for their conduct.  Also, many
> infringers do not consider the current copyright infringement
> penalties a real threat and continue infringing, even after a
> copyright owner puts them on notice that their actions constitute
> infringement and that they should stop the activity or face legal
> action.  In light of this disturbing trend, it is manifest that Congress
> respond appropriately with updated penalties to dissuade such
> conduct.

H.R. Rep. No. 106-216, at 3 (1999).  According to the plaintiffs, this paragraph clearly indicates

that Congress intended section 504(c)'s increased statutory damages ranges to deter individuals

such as Tenenbaum from exploiting the Internet to engage in copyright violations.

Tenenbaum rejoins that this language from the committee report does not indicate that

Congress intended for *file sharers* to face massive statutory damages awards.  Much of the

paragraph quoted by the plaintiffs was taken verbatim from the House Judiciary Committee's

report on the 1997 NET Act.  Compare H.R. Rep. No. 106-216, at 3, with H.R. Rep. No.

105-339, at 4.  The NET Act was intended to "reverse the practical consequences of United

States v. LaMacchia, 871 F. Supp. 535 (D. Mass. 1994)."  H.R. Rep. No. 105-339, at 3.  In

LaMacchia, Judge Stearns dismissed an indictment charging an MIT student who created an

electronic bulletin board through which users could share software programs with conspiracy to

commit wire fraud.  871 F. Supp. at 536.  In dismissing the indictment, Judge Stearns noted that

LaMacchia could not be prosecuted under the criminal copyright statute, 17 U.S.C. § 506(a),

because his infringements, though willful, were not carried out for the purpose of commercial

advantage or private financial gain.  Id. at 540, 542-43.  The NET Act reversed this decision by

"criminaliz[ing] computer theft of copyrighted works, whether or not the defendant derives

financial benefit from the act(s) of misappropriation."  H.R. Rep. No. 105-339, at 5.  In addition,

the Act instructed the U.S. Sentencing Commission to consider increasing the penalties set forth

in the provisions of the U.S. Sentencing Guidelines applicable to copyright infringers.  NET Act,

sec. 2(g), 28 U.S.C.A. § 994 note.

Since the Digital Theft Deterrence Act of 1999 was passed only two years after the NET

Act and explicitly renewed its call for the Sentencing Commission to reevaluate the guidelines

provisions for criminal copyright infringement, see Digital Theft Deterrence Act, sec. 3, 28

U.S.C.A. § 994 note; H.R. Rep. No. 106-216, at 4 (indicating that the low sentences meted out to

criminal infringers discouraged the Department of Justice from bringing such prosecutions),

Tenenbaum argues that Congress passed the 1999 Act primarily to target "malicious large scale

operations like LaMacchia's," not individual file sharers such as Tenenbaum.  (Def.'s Mot. &

Mem. for New Trial or Remittitur 21, Case No. 07-cv-11446-NG, document #26.)  While

Tenenbaum's account of the Act's legislative history is interesting, I am skeptical whether there

is as big a difference between Tenenbaum and LaMacchia as Tenenbaum claims.  True,

Tenenbaum did not create a software program that would allow users to share copyrighted

materials.  In this sense, he was more like a user of LaMacchia's electronic bulletin board than

he was like LaMacchia himself.  In any event, Tenenbaum, like LaMacchia, not only

downloaded copyrighted materials without authorization, he also distributed them by putting

them in his shared folder.  Furthermore, like LaMacchia, Tenenbaum's conduct was willful, even though it was not carried out for commercial gain.

However, later statements by Senators Orrin Hatch and Patrick Leahy, two sponsors of the Digital Theft Deterrence Act, strongly suggest that Tenenbaum is correct; they did not anticipate that individuals such as Tenenbaum who engaged in noncommercial file-sharing would be subjected to liability for statutory damages under section 504(c).  Hatch and Leahy presided over a Senate Judiciary Committee hearing titled "Music on the Internet: Is There an Upside to Downloading?" on July 11, 2000.  Music on the Internet: Is There an Upside to Downloading?: Hearing Before the S. Comm. on the Judiciary, 106th Cong. (2000).  During the hearing, the committee members demonstrated how the peer-to-peer system Gnutella is used by downloading and then playing a song by the band Creed.  Id. at 7.  As the committee was downloading the Creed song, Senator Leahy proudly proclaimed that he was doing some of his own downloading on his laptop.  Id. at 7, 61.  When one of the developers of Gnutella pointed out to the committee members that they might be engaging in copyright infringement, Senator Hatch responded that their downloading and public performance of the Creed song qualified as "fair use" since it was carried out for "educational and governmental purposes."  Id. at 40. Nevertheless, the senators' willingness to download copyrighted sound recordings through a peer-to-peer network during a committee hearing suggests, at the very least, that they did not view such downloading as particularly reprehensible.

And this inference from the senators' conduct is largely confirmed by their words. Although Senator Hatch noted that peer-to-peer technology had the capacity, "if misused, to rob

[artists] of their livelihood," id. at 3, he also praised the development of Gnutella as "quite an accomplishment," id. at 8.  And Senator Leahy added:

> [W]hen I go on college campuses, as many of us do, to talk and everybody is talking about what they have downloaded, how they share, and so on, and when my kids pick up a "Black Muddy River," which happens to be one of my favorites of the Dead, and send it to me -- they have heard a new version -- and I log on in the morning while I am having my breakfast and there it is, I mean this is a whole different world, and I think we have to recognize that on where we go.

Id. at 62.

Senator Hatch's tolerance of, if not admiration for, peer-to-peer networks was even more on display at a special Judiciary Committee hearing held on October 9, 2000, at Brigham Young University ("BYU").  See Utah's Digital Economy and the Future: Peer-to-Peer and Other Emerging Technologies: Hearing Before the S. Comm. on the Judiciary, 106th Cong. (2000). Shawn Fanning, the founder of Napster, was the star witness at this hearing, and Senator Hatch repeatedly praised Fanning, expressing how "proud" he was of Fanning and even suggesting that Fanning should become a professor at BYU or run for political office.  See id. at 2-3, 29, 34. Obviously, Senator Hatch's comments should be taken with a large grain of salt.  They are not authoritative statements of Congress and certainly do not control how the copyright statutes should be interpreted.  (Also, Senator Hatch's effusive praise of Fanning may well have stemmed from his awareness that he was appearing before an audience of college students, a sizable portion of whom likely used Napster.)  But his comments nevertheless suggest that he did not anticipate that the statutory damages scheme over which his committee had jurisdiction would be applied to users of Napster and other peer-to-peer networks.

My analysis here has used legislative history not to divine the meaning of an ambiguous statutory provision.  The plain language of 17 U.S.C. § 504(c) authorized the jury's award in this case.  I must give effect to this clear statutory language, at least to the extent that the jury's award does not run afoul of the Due Process Clause.  See Caminetti v. United States, 242 U.S. 470, 485, 490 (1917) ("[I]f [a statute's language] is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms," unless doing so would "lead[] to absurd or wholly impracticable consequences.").

Rather, I have examined section 504(c)'s legislative history to better understand the types of defendants members of Congress had in mind when they last increased the provision's statutory damages ranges.  If Congress did not foresee that section 504(c) would be used to mulct individual file sharers such as Tenenbaum in damages, it makes no sense to say that I must defer to Congress' judgment that section 504(c)'s statutory damages ranges are appropriate in cases such as Tenenbaum's; section 504(c) does not embody any such judgment.

Congress undoubtedly intended for the Copyright Act to be flexible enough to account for the rise of new technologies.  However, the fact that peer-to-peer file-sharing was just emerging when Congress passed the Digital Theft Deterrence Act suggests that I should not simply defer to Congress' statutory regime and assume that the jury's award, because it is within the statutorily authorized range, is sufficiently related to the government's legitimate interests in compensating copyright owners and deterring potential infringers to pass constitutional muster. Further inquiry is required.

Although <u>BMW</u>'s third guidepost focuses on the magnitude of civil penalties authorized

by legislators, it is also helpful to compare the jury's award in this case to the awards imposed in

other copyright cases.[12]  <u>See</u> <u>Zimmerman v. Direct Fed. Credit Union</u>, 262 F.3d 70, 83 (1st Cir.

2001) (recognizing that awards in other cases "are relevant" to a court's analysis under <u>BMW</u>'s

third guidepost, even though "positive law -- statutes and regulations -- are even more

critical").[13]  Presumably, courts impose statutory damages awards that they believe are sufficient

to achieve the twin goals of compensating copyright owners and deterring infringement.  If the

---

[12] I note that the jurors in this case could not perform a similar analysis.  Congress originally intended for judges, not juries, to determine the appropriate amount of statutory damages in copyright infringement actions.  <u>See</u> <u>Feltner</u>, 523 U.S. at 345-47.  Unlike juries, judges can draw on their experience of setting awards in other copyright cases, as well as their research regarding the awards imposed by other judges, in settling on an appropriate figure. <u>See, e.g.</u>, <u>Sailor Music v. IML Corp.</u>, 867 F. Supp. 565, 570 (E.D. Mich. 1994) (noting that plaintiffs had provided the court "with a survey of statutory awards throughout the country"); 4 Nimmer & Nimmer, <u>supra</u>, § 14.04[C][3], at 14-92 ("[I]t is doubtful that juries can be meaningfully instructed to compare the facts at bar against those of prior cases in order to slot an appropriate award into the scheme of precedent.").  In 1998, however, the Supreme Court held that the Seventh Amendment accords parties the right to demand that a jury "determine the actual amount of statutory damages under § 504(c)."  <u>Feltner</u>, 523 U.S. at 355.  Congress has not responded to this decision by amending section 504(c)'s parsimonious text, which merely requires that a statutory damages award be "just," to reflect that a different decision maker in need of additional guidance is now entrusted with the responsibility of awarding statutory damages.

[13] I recognize that <u>Zimmerman</u> stated that "a reviewing court should search for comparisons solely to determine whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall."  262 F.3d at 83.  For the reasons I discussed above, I question whether this narrow focus on the issue of "fair notice" is faithful to the Supreme Court's repeated assertion that there are <i>both</i> "procedural <i>and</i> substantive constitutional limitations" on punitive damages awards. <u>State Farm</u>, 538 U.S. at 416 (emphasis added).  (I also note that <u>Zimmerman</u> preceded the Supreme Court's decision in <u>State Farm</u>.)
     But even under <u>Zimmerman</u>, my analysis of the statutory damages awards returned in other copyright cases is appropriate.  Notice of section 504(c)'s extraordinarily broad statutory damages ranges, standing alone, does not in any meaningful sense constitute "fair notice" of the liability that an individual might face for file-sharing.  In a case of willful infringement such as this one, the maximum damages per infringed work -- $150,000 -- are 200 times greater than the statutory minimum of $750.  Since the jury found that Tenenbaum willfully infringed thirty copyrights, its award could have ranged from a low of $22,500 to a high of $4,500,000.  For anyone who is not a multi-millionaire, such "notice" is hardly more illuminating than the notice that BMW and State Farm had that their fraudulent conduct might lead to the imposition of a punitive damages award ranging from $0 to infinity.
     Since section 504(c) failed to provide Tenenbaum with <i>fair</i> notice of the liability he could incur for file-sharing, it is imperative that I review other copyright cases to determine whether the jury's $675,000 award here fell within a discernible pattern of awards of which Tenenbaum could have taken note, or was instead an unforeseeable outlier.

award in this case is significantly out of line with other awards, that would suggest that the award is not reasonably related to these objectives and is thus unconstitutionally excessive.

The case most comparable to Tenenbaum's is that of Jammie Thomas-Rasset, the only other file sharer to go to trial.  The first jury to hear Thomas-Rasset's case found her liable for willfully infringing twenty-four sound recordings and awarded the plaintiffs $9,250 per song, for a total award of $222,000.  <u>Thomas</u>, 579 F. Supp. 2d at 1213.  Although Chief Judge Davis, who presided over the case, ordered a new trial because of an error in the jury instructions, not because of the size of the award, he noted in dictum that "the award of hundreds of thousands of dollars in damages" for file-sharing was "unprecedented and oppressive."  <u>Id.</u> at 1228.  When the second jury returned a verdict of $80,000 per song, for a total award of $1,920,000, Chief Judge Davis required that the plaintiffs accept a remitted award of $2,250 per song or submit to a new trial.  <u>Thomas-Rasset</u>, 680 F. Supp. 2d at 1048, 1050.  (As explained above, the plaintiffs rejected the reduced award.)

Tenenbaum's culpability seems roughly comparable to that of Thomas-Rasset.  Both knew that file-sharing was illegal but engaged in it anyway.  Both refused to accept responsibility for their actions, trying to shift blame to others and even lying under oath.  And both engaged in multiple acts of infringement.  <u>See id.</u> at 1053.  Thus, it seems that the awards in both cases should be about the same, suggesting that the jury's award of $675,000 in this case should be significantly reduced.

The jury's $675,000 award appears especially excessive when it is compared to the damages imposed on other file sharers whose cases have not made it to trial.  Most individuals sued in the recording industry's campaign against file-sharing have either settled with the

recording companies or have allowed default judgments to be entered against them.  When

defendants have defaulted, the recording companies have generally asked courts to impose the

statutory minimum damage amount of $750 per infringed work, and courts have routinely

granted these requests.  See, e.g., Elektra Entm't Group Inc. v. Carter, 618 F. Supp. 2d 89, 94 (D.

Me. 2009); Interscope Recordings v. Tabor, No. 08-03068, 2009 U.S. Dist. LEXIS 25854, at *2-

*3 (W.D. Ark. Mar. 16, 2009); see also UMG Recordings, Inc. v. Alburger, No. 07-3705, 2009

U.S. Dist. LEXIS 91585, at *13, *15 (E.D. Pa. Sept. 29, 2009) (granting an uncontested motion

for summary judgment and imposing the minimum statutory damages per infringed work).  If the

minimum statutory damages of $750 per infringed work are sufficient to compensate the plaintiff

and deter potential infringers in an ordinary file-sharing case where the defendant defaults, it is

hard to see how an award of thirty times this amount is appropriate in this case.  Even if

Tenenbaum is more blameworthy than the average file sharer, and thus should receive an award

somewhere above the statutory minimum, it is absurd to say that he is *thirty times* more culpable.

The plaintiffs cannot reasonably rely on the argument that higher damages are

appropriate in this case because Tenenbaum insisted on taking his case to a jury.  Under 17

U.S.C. § 505, the plaintiffs may move for the court to award them the costs of their action and

any attorneys' fees that they have reasonably incurred.  The threat of bearing the opposing

party's court costs and attorneys' fees should generally deter a defendant in a copyright

infringement action from unduly prolonging the proceedings when his liability is clear.  While

the damages award should be sufficient to cover the plaintiffs' costs of *detecting* Tenenbaum's

infringement, this cost is incurred by copyright owners even in cases where the defendant

defaults.  Recording companies' willingness to accept damages of only $750 per infringed work

in such cases suggests that section 504(c)'s minimum damages provision is roughly sufficient to encourage the recording industry to ferret out copyright infringement.  Since section 505 provides for the awarding of attorneys' fees and court costs, there is no reason to further inflate awards under section 504(c) to allow plaintiffs to recover their litigation expenses.

The jury's award in this case also appears egregious in light of the damages typically imposed on restaurants, bars, and other businesses that play copyrighted songs in their establishments without first acquiring the appropriate licenses.  These defendants are arguably more culpable than Tenenbaum.  Unlike Tenenbaum, who did not receive any direct pecuniary gain from his file-sharing, defendants in these cases play copyrighted music to create a more pleasurable atmosphere for their customers, thus generating more business and, consequently, more revenue.  See EMI Mills Music, Inc. v. Empress Hotel, Inc., 470 F. Supp. 2d 67, 70 (D.P.R. 2006) (noting that defendants derived financial benefit from the public performance of unlicensed musical works insofar as the performances "attract[ed] or entertain[ed] paying patrons" of their business).  In addition, defendants accused of unlicensed public performances often receive several notices that their conduct is unlawful before they are sued.  Thus, like Tenenbaum's file-sharing, their infringing conduct is generally willful.  See, e.g., Broadcast Music, Inc. v. It's Amore Corp., No. 3:08cv570, 2009 U.S. Dist. LEXIS 55721, at *22-*23 (M.D. Pa. June 30, 2009) (holding that infringing public performances by defendants who ignored a cease-and-desist letter and other notices from plaintiffs were willful); EMI Mills, 470 F. Supp. 2d at 70, 72-73 (detailing the warnings that the defendants received that their conduct violated the Copyright Act and concluding that the defendants' "public performance . . . was deliberate and willful").  Nevertheless, the awards in such cases are generally no more than "two

to six times the license fees defendants 'saved' by not obeying the Copyright Act"—a ratio of statutory to actual damages far lower than the ratio present in this case.  EMI Mills, 470 F. Supp. 2d at 75; see also Sailor Music, 867 F. Supp. at 570 (stating that in cases involving bar and restaurant owners who have failed to purchase licenses to play copyrighted songs, "courts typically award three times the amount of a properly purchased license for each infringement"); Roger D. Blair & Thomas F. Cotter, An Economic Analysis of Damages Rules in Intellectual Property Law, 39 Wm. & Mary L. Rev. 1585, 1661, 1667 (1998) (concluding, based on a review of "every reported decision from 1992 to 1997 in which a court has awarded statutory damages," that "when (1) some basis [such as the cost of a standard licensing agreement] exists upon which to quantify the plaintiff's loss, and (2) detection costs are high, courts tend to award statutory damages roughly equal to double or treble damages").  The magnitude of the awards in public-performance cases is also often substantially -- even shockingly -- lower than the $675,000 award at issue here.  See WB Music Corp. v. S. Beach Rest., Inc., No. CV-09-1528-PHX-LOA, 2009 U.S. Dist. LEXIS 119158, at *9, *15 (D. Ariz. Dec. 1, 2009) (awarding, in a report and recommendation adopted by the district court, $30,000 for the unauthorized public performance of four songs, where a license would have costed approximately $3,345.88; Broad. Music, Inc. v. Northern Lights, Inc., No. 1:07-CV-476 (GLS/RFT), 2009 U.S. Dist. LEXIS 64715, at *4-*6 (N.D.N.Y. July 27, 2009) (awarding $40,000 for the unlicensed public performance of ten works, where a license would have cost approximately $24,890.61); It's Amore Corp., 2009 U.S. Dist. LEXIS 55721, at *24  ($34,500 for twenty-three works; license cost approximately $9,753.75); EMI April Music Inc. v. Jet Rumeurs, Inc., 632 F. Supp. 2d 619, 625-26 (N.D. Tex. 2008) ($21,000 for six works; license cost approximately $12,421.46); Charlie Deitcher Prods.,

Inc. v. Cuevas, No. SA:06-cv-00601-WRF, 2008 U.S. Dist. LEXIS 50939, at *8-*9 (W.D. Tex.

June 17, 2008) ($6,750 for three works; license cost approximately $3,725); Broad. Music, Inc.

v. Spring Mount Area Bavarian Resort, Ltd., 555 F. Supp. 2d 537, 545 (E.D. Pa. 2008) ($16,000

for eight works; license cost approximately $10,340).[14]

      I cannot conceive of any plausible rationale for the discrepancy between the level of

damages imposed in public-performance cases and the damages awarded in this case.  The

disparity strongly suggests that the jury's $675,000 award is arbitrary and grossly excessive.


           b.    *The Second BMW Guidepost*

      The second BMW guidepost requires a court to consider the ratio between the actual or

potential harm to the plaintiff and the punitive award assessed by the jury.  517 U.S. at 575.  The

plaintiffs argue that any such inquiry is inappropriate in this case.  As noted above, one of the

principal reasons that the Copyright Act allows copyright owners to recover statutory damages is

that the actual or potential harm caused by infringing activity is often difficult to measure.  See

Register of Copyrights Report, supra, at 102.  Furthermore, since the plaintiffs were not required

to prove their actual damages at trial, any assessment of their damages at this stage in the

litigation would necessarily be somewhat speculative.  Nevertheless, numerous authorities

indicate that there must be *some* relationship between the jury's verdict and the damages the

plaintiffs incurred and the benefits Tenenbaum gained through his infringements.  See, e.g.,

---

[14] These cases were not cherry picked to highlight the excessiveness of the jury's award.  To get a better sense of the amount of statutory damages awarded in copyright actions, the Court ran a Lexis-Nexis search for all cases decided between January 1, 2008, and January 1, 2010, discussing statutory damages awards under section 504(c).  The Court randomly selected approximately fifty of these cases to review; the cases included in the string cite above come from this list.  Based on its independent review of the case law, the Court feels certain that these cases are not in any way abnormal.

Thomas-Rasset, 680 F. Supp. 2d at 1049; Webloyalty.com, 388 F. Supp. 2d at 443; Bly, 638 F.

Supp. at 987; RSO Records, 596 F. Supp. at 862; 4 Nimmer & Nimmer, supra, § 14.04[E][1][a],

at 14-95 to 14-96.  Without this requirement, the threat of arbitrarily high statutory damages

awards could unduly deter socially beneficial activities that run some risk of giving rise to

liability for copyright infringement.[15]  See Blair & Cotter, supra, at 1638, 1659 (discussing the

problem of overdeterrence).  In addition, an unscrupulous plaintiff could use the threat of an

unpredictably high statutory damages award to extract an unfair settlement.

My analysis under the second BMW guidepost must focus squarely on Tenenbaum's

individual conduct, the benefits that he derived from that conduct, and the harm that he caused.

While the plaintiffs argue that they have lost billions of dollars in revenue due to file-sharing, the

jury was not permitted to punish Tenenbaum for harm caused by other infringers.  Cf. Philip

Morris, 549 U.S. at 353-55 (holding that a jury may not award punitive damages to punish a

defendant for harming nonparties).  The jury could certainly have considered Tenenbaum's

conduct more reprehensible, and thus assigned a higher level of statutory damages, because he

chose to participate in a common practice that was causing great harm to the recording industry.

But it was not allowed to compensate the plaintiffs for the harm caused by these other file

sharers by taking money from Tenenbaum.

---

[15] To be clear, I do not intend to suggest that the unauthorized sharing of copyrighted works over peer-to-peer networks is a socially beneficial activity.  Aside from being illegal, such conduct may reduce demand for music from legitimate sources and thus dampen the monetary incentive for artists to create new works.  See Sony BMG Music Entm't v. Tenenbaum, 672 F. Supp. 2d 217, 231 (D. Mass. 2009) ("It is difficult to compete with a product offered for free.").  Nevertheless, if I were to adopt the plaintiffs' and the government's position that statutory damages awards within the range set by Congress are rarely, if ever, constitutionally suspect, my decision would threaten to unduly deter individuals from engaging in other activities that might confer greater benefits on society than file-sharing does.

In assessing the plaintiffs' actual damages, it is helpful to ask the following question: Assuming that Tenenbaum was entitled to file-share, how much would the plaintiffs have been willing to pay Tenenbaum not to engage in the activity?  Presumably, the plaintiffs would have been willing to pay an amount equal to the profits they lost as a result of Tenenbaum's conduct. Each of the songs that Tenenbaum illegally downloaded can now be purchased online from the iTunes Music Store and other retailers for approximately $0.99 or $1.29 a piece.  And for each $0.99 song sold on the iTunes Music Store, it appears that the recording companies only receive about $0.70.  See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 319 (2d Cir. 2010) (noting that the major recording companies charge a wholesale price of approximately $0.70 for every song sold through online retailers such as iTunes); Ed Christman, The Price You Pay: Labels Deal with Digital Music Discounting, Billboard, Jan. 31, 2009, at 12 (mentioning the $0.70 figure, but recognizing that the market for digital music is in a state of flux); Jeff Leeds, U.S. Inquiry on Online Music, N.Y. Times, Mar. 3, 2006, at C6 ("The prices for songs from the major companies can run from 70 cents to 80 cents a song, executives say.  Digital music services such as Apple Computer's iTunes then sell the songs for a retail price of 99 cents.").  Finally, even before the advent of online music retailers, the songs Tenenbaum downloaded could be obtained by purchasing the albums on which they were featured for approximately $15 from a traditional brick-and-mortar store.  See Thomas-Rasset, 680 F. Supp. 2d at 1052 (using the $1.29 per song and $15 per album figures).

If we use the $0.70 wholesale price for music sold on the iTunes Music Store as a rough proxy for the plaintiffs' profits from each sale, then Tenenbaum's illegal downloading of the thirty sound recordings for which he was found liable deprived the plaintiffs of approximately

$21 in profit, for a ratio of statutory damages to actual damages of approximately 32,143:1.  If we assume that the damages to plaintiffs equaled $1 per song, then the ratio is 22,500:1, and if we assume damages of $15 per song (because before individual songs were widely available online through services such as iTunes, Tenenbaum would have needed to purchase an entire album to obtain a song he desired), the ratio is 1,500:1.

The plaintiffs rejoin that Tenenbaum did not merely download the thirty songs listed on the jury's verdict form.  He also downloaded thousands of other songs and distributed these songs to countless other file sharers through his shared folder.  However, it is hard to believe that Tenenbaum's conduct, when viewed in isolation, had a significant impact on the plaintiffs' profits.  He almost certainly would not have purchased all of the songs he downloaded if they were not available for free; thus, not all of his downloads represented lost sales for the plaintiffs.  Also, it seems likely that the individuals who downloaded songs from Tenenbaum's shared folder would simply have found another free source for the songs had Tenenbaum never engaged in file-sharing.  While file-sharing may be very economically damaging to the plaintiffs in the aggregate, Tenenbaum's individual contribution to this total harm was likely minimal.

The harm suffered by the plaintiffs, however, is not the only factor relevant to my analysis under BMW's second guidepost.  I must also consider the benefits that Tenenbaum reaped from file-sharing.  We generally require individuals who wish to reproduce or distribute a copyrighted work to purchase a license from the copyright owner in a voluntary transaction.  In this sense, copyrights are protected by what academics in the field of law and economics call a "property rule."  See Guido Calabresi & A. Douglas Melamed, Property Rules, Liability Rules, and Inalienability: One View of the Cathedral, 85 Harv. L. Rev. 1089, 1092 (1972); see also

Blair & Cotter, supra, at 1614 ("[I]ntellectual property rights are a paradigm example of entitlements protected by property rules.").  Property rules are distinguished from liability rules, which permit one party to deprive another party of something to which the law says he is entitled by paying an objectively determined value for it.  Calabresi & Melamed, supra, at 1092.  The quintessential example of a liability rule is a rule that permits a factory to pollute only if it compensates surrounding homeowners by paying them an amount of damages determined by a court.  See id. at 1115-24; see also Boomer v. Atl. Cement Co., 257 N.E.2d 870 (N.Y. 1970).

Protecting copyrights with property rules rather than liability rules helps ensure that copyright owners reap the full benefit of their legally sanctioned monopoly power, which in turn provides an incentive for individuals to engage in creative endeavors.  When copyrights are protected by property rules, the price of a license to use a copyright is determined through ordinary market interactions.  If copyrights were protected by liability rules, however, the price of a license would effectively be determined by judges and juries, and their valuations might well be less than the price that would be established by market forces.  See Blair & Cotter, supra, at 1589 & n.16, 1615-16.

To avoid transforming the property rule protecting copyrights into a liability rule, the damages awarded in this case must be great enough to ensure that potential file sharers have an adequate incentive to purchase copyrighted songs from legitimate sources instead of downloading them from peer-to-peer networks.  See Calabresi & Melamed, supra, at 1125 ("For us to charge the thief with a penalty equal to an objectively determined value of the property stolen would be to convert all property rule entitlements into liability rule entitlements.").  As a result, it would have been reasonable for the jury to return an award sufficiently high to disgorge

the benefits Tenenbaum derived from file-sharing.  The jury could also reasonably have increased its award to account for the fact that there was some probability -- perhaps a significant one -- that Tenenbaum's file-sharing would go undetected.  When there is some chance that infringing behavior will not result in civil liability, damages awards must be greater than the benefit that the potential infringer expects to derive from his illegal activity in order to achieve adequate deterrence.  See Taylor v. Meirick, 712 F.2d 1112, 1120 (7th Cir. 1983) ("[P]reventing infringers from obtaining any net profit . . . makes any would-be infringer negotiate directly with the owner of a copyright that he wants to use, rather than bypass the market by stealing the copyright and forcing the owner to seek compensation from the courts for his loss.  Since the infringer's gain might exceed the owner's loss, especially as loss is measured by a court, limiting damages to that loss would not effectively deter this kind of forced exchange."); Rodgers v. Eighty Four Lumber Co., 623 F. Supp. 889, 892 (W.D. Pa. 1985) ("The courts have applied many standards as a guideline in the imposition of statutory damages.  Running through them as a common thread is the principle that defendant should not reap a benefit from its violation of the copyright laws . . . ."); Blair & Cotter, supra, at 1590-92, 1620; A. Mitchell Polinsky & Steven Shavell, Punitive Damages: An Economic Analysis, 111 Harv. L. Rev. 869, 947 (1998) ("[P]unitive damages may sometimes have appeal when it is possible for a potential injurer to communicate with a potential victim before causing harm, in order to encourage market transactions.").

But even when these factors are considered, the jury's award still appears grossly excessive.  Tenenbaum did not derive any direct pecuniary gain from file-sharing.  He did not, for example, sell the songs he illegally downloaded or charge for access to his shared folder.

Instead, the "profit" that he reaped from his activities was more amorphous; he gained the ability to access an essentially unlimited variety of music on demand.  In theory, we could quantify this benefit of file-sharing by asking how much Tenenbaum would have been willing to pay to engage in his infringing conduct.  Although the record does not contain sufficient evidence to calculate this figure with precision, it is instructive to consider how much consumers are now willing to pay to have unlimited access to a large library of music.  Today, a number of services allow users to access millions of songs from their computers and certain portable devices such as iPhones for a flat monthly fee of less than $15.  See Brad Stone, Now Selling Music Files, Not Sharing, N.Y. Times, June 3, 2010, at B1; see also Napster, http://www.napster.com (last visited July 7, 2010); Rhapsody, http://www.rhapsody.com/-discover (last visited July 7, 2010). Although these services are not the same as Napster or Kazaa, they do provide users with a wide assortment of music on demand.  Tenenbaum began file-sharing in 1999 and was sued in 2007. Ignoring inflation and similar considerations, the cost of using a subscription service such as Rhapsody or "Napster to Go" for eight years would be approximately $1,440 or less.[16]  Thus, it seems fair to say that the average consumer today would be willing to pay no more than $1,500 to engage in conduct roughly similar to Tenenbaum's between 1999 and 2007.

I emphasize that I am *not* offering a definitive estimate of the benefit that Tenenbaum derived from file-sharing.  Again, I recognize that the legal subscription services available today are not perfect substitutes for peer-to-peer networks such as Napster and Kazaa.  Also, as the supply of a new technology increases, one would expect its price to correspondingly decline. Thus, the amount that an average consumer would be willing to pay for a subscription service

---

[16] $15 per month for ninety-six months equals a total cost of $1,440.

today is almost certainly not the same as the amount that Tenenbaum would have been willing to pay to engage in file-sharing several years ago.  Nevertheless, there can be no doubt that the benefit Tenenbaum derived from file-sharing is far less than the $675,000 in damages imposed in this case.

If we assume that Tenenbaum would have paid approximately $1,500 to engage in file-sharing from 1999 to 2007, the ratio between the statutory damages awarded in this case and the benefit he derived from his infringing conduct is 450:1,[17] far higher than the 114:1 ratio between the statutory damages awards approved in <u>Williams</u> and the profits reaped by the defendant railroad company from its overcharges.  This shockingly high ratio between the jury's statutory damages award and Tenenbaum's non-pecuniary "profits" cannot be justified by the fact that there was some probability that Tenenbaum's file-sharing would not be detected.  Since most individuals are risk averse, adequate deterrence can undoubtedly be obtained with an award that is much, much lower.[18]  <u>See</u> Blair & Cotter, <u>supra</u>, at 1622; Polinsky & Shavell, <u>supra</u>, at 886-87, 913.

Two additional factors are relevant to my analysis under <u>BMW</u>'s second guidepost.  First, section 504(c)'s statutory damages ranges likely include some amount to compensate copyright owners for the costs entailed in investigating and detecting infringing behavior.  <u>See</u> <u>Register of Copyrights Report</u>, <u>supra</u>, at 103 (discussing how statutory damages help ensure a

---

[17] $675,000 / $1,500 = 450 / 1.

[18] An individual is risk averse if she "prefer[s] a certain income to a risky income with the same expected value."  Robert S. Pindyck & Daniel L. Rubinfeld, <u>Microeconomics</u> 157 (5th ed. 2001).  For example, a risk-averse individual would prefer a job with "a certain income of $20,000" to "a job yielding an income of $30,000 with probability .5 and an income of $10,000 with probability .5 (so that the expected income is $20,000)."  <u>Id.</u>  A risk-neutral individual, in contrast, would be indifferent between the two jobs because their expected incomes are equivalent.  <u>Id.</u>

recovery sufficient "to warrant the expense of detecting infringements").  However, the Copyright Act does not contain a provision to correct for the fact that once a recording company has decided to devote the resources necessary to detect one act of infringement by a file sharer, the marginal cost of detecting additional acts of infringement is likely low since the investigation of the file sharer's account on a peer-to-peer network will generally reveal a treasure trove of unlawfully downloaded works.  As a result, the imposition of statutory damages in file-sharing cases where multiple copyrighted works have been infringed can produce awards much greater than necessary to provide copyright owners with an adequate incentive to investigate and detect infringement.

Similarly, section 504(c) is not attuned to what one author has called the issue of "proportionate reprehensibility."  Barker, supra, at 550, 552-53.  Congress certainly had a legitimate interest in setting statutory damages ranges that would impose a measure of retribution on copyright infringers.  However, the reprehensibility of a file sharer's conduct does not increase linearly with the number of songs he downloads and shares.  Someone who illegally downloads 1,000 songs may be more blameworthy than an individual who illegally downloads only one, but it seems odd to say that his conduct is 1,000 times more reprehensible.  Section 504(c) ignores this issue entirely, providing the same statutory damages ranges for each infringed work no matter how many works are infringed.  Consequently, the aggregation of statutory damages awarded under section 504(c) may result in unconscionably large awards.

In summary, the asymmetry between the relatively small harm suffered by plaintiffs and benefit reaped by Tenenbaum, on the one hand, and the jury's extraordinarily high award, on the other, is so extreme as to "jar [the Court's] constitutional sensibilities."  Haslip, 499 U.S. at 18.

The award in this case is much higher than is reasonably necessary to further the legitimate interests of compensating the plaintiffs and deterring future infringement.  It lacks any rational foundation and smacks of arbitrariness.  The second <u>BMW</u> factor thus weighs heavily in Tenenbaum's favor.

c.      *The First <u>BMW</u> Guidepost*

The "degree of reprehensibility of the defendant's conduct" is "[p]erhaps the most important indicium of the reasonableness" of a punitive award.  <u>BMW</u>, 517 U.S. at 575.  Several of the reprehensibility factors identified by the Supreme Court militate in Tenenbaum's favor. The harm he caused was economic, not physical.  <u>State Farm</u>, 538 U.S. at 419.  His conduct did not "evince[] an indifference to or a reckless disregard of the health or safety of others," and the large recording companies that he harmed are not financially vulnerable.  <u>Id.</u>; <u>cf. Bridgeport Music, Inc. v. Justin Combs Publ'g</u>, 507 F.3d 470, 486-87, 490 (6th Cir. 2007) (reducing a punitive damages award in favor of a copyright holder that brought a state common-law claim of infringement and noting that the "defendants' conduct, although willful, was not highly reprehensible").

Other factors, however, militate against Tenenbaum.  He willfully engaged in thousands of acts of copyright infringement, knowing his conduct to be illegal but acting anyway.  <u>See State Farm</u>, 538 U.S. at 419 (instructing courts to consider whether the defendant's "conduct involved repeated actions or was an isolated incident" and whether the harm to the plaintiffs "was the result of intentional malice, trickery, or deceit, or mere accident").  He even lied under oath and tried to shift blame to family members and others who had access to his computer in an effort to escape liability.

-51-

It seems fair to say that file-sharing, in general, is fairly low on the totem pole of reprehensible conduct.  Although the activity is quite pernicious in the aggregate, it regrettably is quite common, and most file sharers do not receive any direct pecuniary gain from their activity (although they do save money by avoiding the need to pay for the music they download).  But among this group of comparatively venial offenders, Tenenbaum is one of the most blameworthy since he engaged in the activity for a long period of time, knowing it to be illegal, and then lied in a futile attempt to cover his tracks.

> **3.**     **What is the maximum constitutionally permissible damages award in this case?**

Based on my review of the <u>BMW</u> factors and the standard articulated in <u>Williams</u>, I conclude that the jury's award of $675,000 violates the Due Process Clause.  The award bears no rational relationship to the government's interests in compensating copyright owners and deterring infringement.  Even under the <u>Williams</u> standard, the award cannot stand because it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable."  251 U.S. at 66-67.  In <u>Williams</u>, the Supreme Court upheld the constitutionality of a $75 statutory damages award when the actual damages were 66 cents, for a statutory-to-actual-damages ratio of approximately 114:1.  The nominal amount of damages that the plaintiffs suffered in this case was hardly much greater than the plaintiffs' damages in <u>Williams</u>.  The plaintiffs here may have suffered approximately $1 in actual damages for each song that Tenenbaum illegally downloaded, but the jury awarded the plaintiffs $22,500 per song, for a statutory-to-actual-damages ratio of approximately 22,500:1.  Even when I take into account the benefits that Tenenbaum derived from file-sharing, as I should for the reasons given above, the punitive nature of the jury's award still dwarfs that in <u>Williams</u>.  As explained above,

even if we assume that Tenenbaum derived approximately $1,500 in benefits from his file-sharing, the ratio of statutory damages to Tenenbaum's "profits" is 450:1, about four times the ratio approved by the Supreme Court in <u>Williams</u>.

And as Tenenbaum notes, a highly punitive award is likely less called for in his case than in <u>Williams</u>.  Tenenbaum was an ordinary young adult engaging in noncommercial file-sharing, not a wealthy railroad bilking customers for its own profit.  Furthermore, for the reasons set forth above, the egregiousness of the jury's award becomes even more apparent when it is analyzed in light of the Supreme Court's recent punitive damages jurisprudence.  The amount of statutory damages imposed on Tenenbaum is simply "unprecedented and oppressive."  <u>Thomas</u>, 579 F. Supp. 2d at 1228.  Such an award cannot be constitutional.

I must reduce the jury's unconstitutional $675,000 award to the maximum amount that is consistent with the dictates of the Due Process Clause.  <u>See, e.g.</u>, <u>Bach v. First Union Nat'l Bank</u>, 486 F.3d 150, 156-57 (6th Cir. 2007) (ordering that the district court remit a punitive damages award to an amount constituting "the outer boundary of what the Constitution will permit"); <u>Leatherman Tool Group, Inc. v. Cooper Indus., Inc.</u>, 285 F.3d 1146, 1152 (9th Cir. 2002) (reducing excessive punitive damages to the "maximum award . . . consistent with due process on the facts of th[e] case").  Much like Chief Judge Davis in <u>Thomas-Rasset</u>, I conclude that an award of $2,250 per song, three times the statutory minimum, is the outer limit of what a jury could reasonably (and constitutionally) impose in this case.[19]  680 F. Supp. 2d at 1048.  As

---

[19] Although Chief Judge Davis reduced the jury's award in <u>Thomas-Rasset</u> under the common-law doctrine of remittitur and thus did not reach the question of whether the award violated the Due Process Clause, I nonetheless find Chief Judge Davis' decision on the remittitur issue instructive in determining the maximum constitutionally permissible award in Tenenbaum's case.  While Chief Judge Davis relied on different grounds in reducing the jury's award in <u>Thomas-Rasset</u>, the question he confronted was essentially identical to the one I face: What is "the maximum amount a jury could reasonably award to both compensate Plaintiffs and address the deterrence aspect of the Copyright Act"?  <u>Thomas-Rasset</u>, 680 F. Supp. 2d at 1057.

Chief Judge Davis notes, there is a long tradition in the law of allowing treble damages for willful misconduct.  Id. at 1056-57.  Chief Judge Davis also cites two federal statutes -- the Digital Millennium Copyright Act, 17 U.S.C. § 1203(c)(4), and the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227(b)(3), (c)(5) -- that explicitly "allow for an increase in statutory damages, up to triple statutory damages, when the statutory violation is willful or demonstrates a particular need for deterrence."  Id. at 1056; see also Symantec Corp. v. Waszkiewicz (In re Waszkiewicz), Nos. 6:07-bk-03080-KSJ, 6:07-ap-169, 2009 Bankr. LEXIS 582, at *3-*4 (Bankr. M.D. Fla. Mar. 16, 2009) (awarding damages of three times the statutory minimum for copyright infringement).  Of course, 17 U.S.C. § 504(c) does not, by its own terms, limit the statutory damages available in cases such as Tenenbaum's to three times the statutory minimum.  However, capping the statutory damages range at $2,250 in this case serves the objectives of compensating the plaintiffs and deterring illegal file-sharing while at the same time ensuring that the total award is not grossly excessive.

Some will undoubtedly murmur that my decision to draw the constitutional line at $2,250 per infringed work is to some extent arbitrary.  But this criticism applies to *any* line drawing process; it is always possible to argue that the line should have been drawn a bit differently.  Cf. Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 468 (3d Cir. 1999) (recognizing the difficulties involved in determining how much to reduce an unconstitutionally excessive punitive damages award).  Given the record before me, I conclude that the most reasoned approach is to reduce the jury's award to three times the statutory minimum.  Although this decision will not be entirely satisfactory to some, it at least has the virtue of finding some basis

in the long history of courts and legislators sanctioning treble damages to deter willful misconduct.

I again emphasize that the total of the reduced award, $67,500, is significant and harsh. It adequately compensates the plaintiffs for the relatively minor harm that Tenenbaum caused them and, even more importantly, should serve as a strong deterrent against unlawful file-sharing.  The award is higher than I might have awarded in my own independent judgment and is the maximum that the Constitution will permit given the facts of this case.

## IV.   MISCELLANEOUS ITEMS

The other issues raised in Tenenbaum's motion for a new trial or remittitur warrant little comment.  I address them briefly below.

### A.   Fair Use

More than one and a half years after Tenenbaum filed his original answer to the plaintiffs' complaint, and well after his attorney entered an appearance in this case, he amended his answer to include an affirmative defense that his file-sharing constituted a "fair use" under the Copyright Act.  Sony BMG Music Entm't v. Tenenbaum, 672 F. Supp. 2d 217, 219 (D. Mass. 2009).  Although I might have been willing to entertain a more limited fair-use defense, id. at 220-21, 238, Tenenbaum's argument was "completely elastic, utterly standardless, and wholly without support," id. at 221.  He argued that every noncommercial use is "presumptively fair" and that the question of fair use in his case "belong[ed] entirely to the jury, which [was] entitled to consider any and all factors touching on its innate sense of fairness."  Id.  Faced with this "broadside attack" that threatened to "swallow the copyright protections that Congress created," id., I granted the plaintiffs' motion for summary judgment on Tenenbaum's fair-use

defense in an electronic order entered on July 27, 2009.  I then issued a fuller opinion explaining

my reasoning on December 7, 2009.  Id.  Tenenbaum's motion for new trial or remittitur requests

that I reconsider my denial of his fair-use defense.

In my December 2009 opinion, I hypothesized that "a defendant who used the new file-

sharing networks in the technological interregnum before digital media could be purchased

legally, but who later shifted to paid outlets," might be able to rely on the defense of fair use.  Id.

I concluded, however, that Tenenbaum could not assert such a defense because the plaintiffs

detected his file-sharing in August 2004, more than a year after the iTunes Music Store, which

made authorized digital downloads widely available, debuted in April 2003.  Id. at 222, 236.

Tenenbaum now argues that the "technological interregnum" recognized in dicta in my

prior opinion actually extended to 2007, when the plaintiffs finally allowed consumers to

purchase songs online that were not encrypted with digital rights management technologies

("DRM").  He also argues that I improperly rejected his argument that the plaintiffs created an

"attractive nuisance" for young adults such as Tenenbaum by aggressively promoting their

copyrighted works in a world in which file-sharing was prevalent.  Finally, he claims that I erred

by failing to afford sufficient weight to particular factors in my fair-use analysis, including the

costs "borne by parents and schools charged with policing the online activities of children and

students; costs on universities compelled to disclose the names of their own students using

computers connected to their university network; and the intrusions upon the privacy of

individuals entailed by forced inspections of their computers."  (Def.'s Mot. & Mem. for New

Trial or Remittitur 7.)

I reaffirm my prior ruling on Tenenbaum's fair-use defense.  I considered both Tenenbaum's "attractive nuisance" argument and the "policing costs" required to crackdown on file-sharing in my December 7 opinion.  See Tenenbaum, 672 F. Supp. 2d at 234-35, 236-37. Tenenbaum has not provided any persuasive reason for me to depart from my previous analysis.

Tenenbaum's argument about the length of the technological "interregnum" is also unavailing.  Tenenbaum effectively blames the plaintiffs for his conduct because they did not make their copyrighted works available in the format he preferred.  Even if a copyrighted work's commercial availability factors into the fair-use analysis, a consumer does not have a right to demand that a copyright owner make his work available in the exact format that the consumer desires.  Cf. Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539 (1985) (rejecting fair-use defense raised by a magazine that published quotes from President Gerald Ford's unpublished memoirs).  Tenenbaum's argument is also disingenuous.  There is no evidence that he turned to peer-to-peer networks because he wanted DRM-free music; he used Napster, Kazaa, and their brethren because he wanted free music.  And as I have previously ruled, his efforts to thwart the plaintiffs' right to charge for the enjoyment of their copyrighted works did not constitute fair use.

**B.      Tenenbaum's Evidentiary Challenge**

At trial, Tenenbaum attempted to introduce into evidence the full text of a letter that he wrote on November 21, 2005, offering to settle the plaintiffs' claims against him for $500 and tendering a money order in that amount.  Tenenbaum wrote the letter in response to a letter that the plaintiffs sent him in September 2005 demanding that he cease his file-sharing activities.

(See Tr. Tenenbaum Trial Testimony 10:18 to 11:12, 49:5-7, 72:10-23.)  In addition to the

settlement offer, the letter contained the following promise from Tenenbaum:

> While I do not have access to the computer [on which Tenenbaum
> had saved illegally downloaded files] at college, I will be home on
> November 22nd.  If there are any files existing in violation of
> copyrights, I will destroy them at that time.

(Def.'s Mot. & Mem. for New Trial or Remittitur 9 (quoting the full text of the letter).)  I

allowed the plaintiffs to introduce the above-quoted language from the letter but required that

Tenenbaum's settlement offer be redacted.

Tenenbaum argues that this decision was erroneous in two respects: (1) his settlement

offer need not have been excluded under Federal Rule of Evidence 408; and (2) shorn of its

context in a letter offering settlement, the language quoted above appeared to the jury to be an

unconditional promise to delete illegally downloaded music files, which provided fodder for the

plaintiffs since evidence presented at trial showed that Tenenbaum did not in fact delete the files.

Rule 408 provides that evidence of "offering . . . to furnish . . . valuable consideration in

compromising or attempting to compromise [a] claim" is "not admissible on behalf of any party .

. . to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or

amount."  Fed. R. Evid. 408(a).  Such evidence, however, may be admissible for other purposes,

such as "proving a witness's bias or prejudice; negating a contention of undue delay; and

proving an effort to obstruct a criminal investigation or prosecution."  Id. 408(b).

Tenenbaum argues that his offer of settlement was admissible to show that as early as

November 2005, he was willing to take responsibility for his file-sharing.[20]  He contends that this

---

[20] He also argues that Rule 408 does not apply when a party seeks to admit his own settlement offer.  This
seems to have previously been the prevailing view, see Innovative Eng'g & Consulting Corp. v. Hurley & Assocs.,
Inc., No. 1:05CV0764, 2006 U.S. Dist. LEXIS 70502, at *30 (N.D. Ohio Sept. 28, 2006), but a 2006 amendment to

evidence could have been used to combat the plaintiffs' attempts to portray him as an

unrepentant, "hardcore" file sharer.  According to Tenenbaum, proof of his alleged acceptance of

responsibility is not excludable under Rule 408 because he was not seeking to introduce it to

"prove liability for, invalidity of, or amount of a claim."  Fed. R. Evid. 408(a); see also id.

408(b) (providing that Rule 408 "does not require exclusion if the evidence is offered for

purposes not prohibited by subdivision (a)").

Even if Tenenbaum was offering the redacted portion of the November 2005 letter for a

purpose permitted by Rule 408, my ruling was nevertheless proper under Rule 403.  See Fed. R.

Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or

by considerations of undue delay, waste of time, or needless presentation of cumulative

evidence.").  Admitting evidence of Tenenbaum's settlement offer would have opened the door

to further inquiry into the course of the parties' settlement negotiations.  Plaintiffs would have

tried to show that Tenenbaum was intransigent in *subsequent* settlement discussions.  This line

of inquiry would have had little probative value, likely would have wasted the Court's time, and

potentially could have confused the jurors by inundating them with information that had little

pertinence to the matters they were to decide.  It also may have required the parties' attorneys to

take the stand as witnesses to testify about the course of the settlement discussions.  This could

have triggered a wave of disqualifications, a result that Rule 408 was intended to avert.  See Fed.

---

Rule 408 clarified that the rule applies even to a party's own settlement offer, see Fed. R. Evid. 408 advisory
committee's notes (2006 amendment) ("The amendment makes clear that Rule 408 excludes compromise evidence
even when a party seeks to admit its own settlement offer or statements made in settlement negotiations."); see also
Pierce v. F.R. Tripler & Co., 955 F.2d 820, 828 (2d Cir. 1992) (case cited by the Advisory Committee that
interpreted Rule 408 in this manner even before the 2006 amendment).

R. Evid. 408 advisory committee's notes (2006 amendment) ("[P]roof of statements and offers made in settlement would often have to be made through the testimony of attorneys, leading to the risks and costs of disqualification.").

Tenenbaum's argument that the plaintiffs improperly used the redacted letter as "damning evidence of perfidy" by showing that he failed to "destroy[] the offending files as he had apparently and unequivocally promised to do" is meritless.  (Def.'s Mot. & Mem. for New Trial or Remittitur 9.)  To start, the plaintiffs primarily used the November 2005 letter to impeach Tenenbaum's credibility by showing that he had waffled on the issue of whether a computer he used to download and distribute copyrighted works had been destroyed.  While his November 21, 2005, promise to delete any unlawfully downloaded files on the computer suggested that the computer was operational as of that date, Tenenbaum later appeared to take the position that the computer had been destroyed before his promise was made.  (Tr. Tenenbaum Trial Testimony 52:1 to 53:6.)  In fact, it was Tenenbaum's own attorney, not the plaintiffs, who made explicit the fact that he had failed to fulfill his promise to delete the files.[21] (Id. at 73:12.)

But even if I ignore this serious hole in Tenenbaum's argument, my ruling still stands. Despite Tenenbaum's protestations to the contrary, a reasonable jury could not have construed his promise as contingent on the plaintiffs' acceptance of his settlement offer.  Tenenbaum did not use conditional language; instead, he directly asserted: "I will be home on November 22nd. If there are any files existing in violation of copyrights, I will destroy them at that time."  He also dated this letter November 21, 2005, and the date he set for the destruction of the files was

---

[21] The plaintiffs, however, did make a fleeting reference to Tenenbaum's failure to delete the files in their closing argument.  (Trial Tr. 77:6-9, July 31, 2005, Case No. 03-cv-11661-NG, document #916.)

November 22.  It seems unlikely that the plaintiffs or their attorneys even received Tenenbaum's letter by November 22.  Thus, it is hard to see how Tenenbaum's promise to destroy the files while home on a break from school could have been contingent on the plaintiffs' acceptance of his settlement offer by that date.

In addition, any harm caused by my rulings with regard to the November 2005 letter was mitigated by the parties' stipulation that they engaged in settlement negotiations that ultimately failed.  (Joint Stipulation re Settlement Negotiations, Ex. J to Pls.' Opp'n to Def.'s Mot. for New Trial or Remittitur.)  Thus, even if I erred by excluding Tenenbaum's settlement offer and admitting the redacted letter, the error was harmless because the jury was informed that the parties had attempted to resolve their dispute through a settlement agreement.  See Fed. R. Civ. P. 61 (setting forth the harmless error standard).

## V.    CONCLUSION

The jury's $675,000 award is wholly out of proportion with the government's legitimate interests in compensating the plaintiffs and deterring unlawful file-sharing.  No plausible rationale can be crafted to support the award.  It cannot withstand scrutiny under the Due Process Clause.

The fact that I reduce this award, however, obviously does not mean that Tenenbaum's actions are condoned or that wholesale file-sharing in comparable circumstances is lawful.  I have determined that Tenenbaum's conduct was not "fair use" and that it infringed the plaintiffs' copyrights.  Furthermore, the jury's award, even as reduced, is unquestionably severe and is more than adequate to satisfy the statutory purposes and the plaintiffs' interests.

I **GRANT** Tenenbaum's Motion for a New Trial or Remittitur (**document #26**) insofar as it seeks a reduction in the jury's award on the grounds that it is so grossly excessive as to violate the Constitution.  I **DENY** the balance of Tenenbaum's motion for the reasons stated in this opinion.  I will amend the judgment in this case to reduce the jury's award to $2,250 for each of the thirty infringed works.

**SO ORDERED.**

**Date:  July 9, 2010**          /s/ Nancy Gertner
                                 **NANCY GERTNER, U.S.D.C.**