1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - - - -
                                    )
4    SONY BMG MUSIC                 )
     ENTERTAINMENT, ET AL.,         )    CV. NO. 03-11661-NG
5                                   )    CV. NO. 07-11446-NG
                                    )
6              PLAINTIFFS           )
                                    )
7    VS.                            )    COURTROOM NO. 2
                                    )
8    JOEL TENENBAUM,                )    1 COURTHOUSE WAY
                                    )
9              DEFENDANTS           )    BOSTON, MA  02210
                                    )
10   - - - - - - - - - - - - - - - - - -

11

12                 JURY TRIAL DAY 1

13                 JURY IMPANELMENT

14                 JULY 27, 2009

15

16                   9:12 A.M.

17

18

19

20

21

22       BEFORE THE HONORABLE NANCY GERTNER

23        UNITED STATES DISTRICT COURT JUDGE

24

25              VALERIE A. O'HARA

1                     OFFICIAL COURT REPORTER

2      A P P E A R A N C E S:

3          For The Plaintiffs:

4          Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ.,
       600 Atlantic Avenue, Boston, Massachusetts  02210-2211;
5
           The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ.,
6      7304 River Falls Drive, Potomac, Maryland  20854;

7          Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ.,
       1801 13th Street, Suite 300, Boulder, Colorado  80302
8
           For the Defendant:
9
           Harvard Law School, by CHARLES NESSON, ESQ.,
10         1525 Massachusetts Avenue, Cambridge, Massachusetts
       02138;
11
           Feinberg & Kamholtz, by MATTHEW H. FEINBERG, ESQ. and
12     MATTHEW A. KAMHOLTZ, ESQ., 125 Summer Street, Boston,
       Massachusetts  02110.

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2        THE CLERK:  All rise.

3        THE COURT:  Good morning, everyone, you can be

4 seated.

5        MR. OPPENHEIM:  Good morning, your Honor.

6        THE COURT:  Please ignore the gentleman who is

7 wandering around.  It's Mr. Barra, who's our lifeline to the

8 Internet, our lifeline in general.  I wanted to just set the

9 stage for what's going to happen today.  Here's what my

10 understanding is.  Right now the jurors are filling out

11 questionnaires, the questionnaires that the parties have

12 drafted last week and that I approved.

13        We anticipate that that will take between 9:00 and

14 10:00.  At 10:00, they'll get the questionnaires.  We'll

15 give you a short time to look them over, perhaps a half an

16 hour if we are in fact going to have lawyer voir dire so you

17 will have each questionnaire for each juror, in any event,

18 and then we'll proceed.  Maryellen, which courtroom?

19        THE CLERK:  Next door.

20        THE COURT:  Courtroom 3.  We will interview jurors

21 individually, the public will be able to -- they will be

22 individually interviewed, but the public will be able to

23 come in and listen, if they choose.  We'll be picking, as I

24 mentioned, a jury of 10.  There are peremptory challenges

25 per side which would then be 16 jurors, so once we have

1    cleared 16 jurors for cause, then we'll suspend the jury

2    selection.  You come back in here and exercise your

3    peremptory challenges.

4         After the jurors have filled out the

5    questionnaires again at about 10:00 or so the jurors will

6    be -- the jurors from whom we are selecting will come into

7    the courtroom so the public will have to crunch over to one

8    side so the jurors can fill the seats.

9         In addition, late last night, very late last

10   night, I issued just an endorsement on the fair use issue.

11   A larger, a longer decision will follow, and that

12   endorsement granted the plaintiff's motion for partial

13   summary judgment on the defendant's fair use defense thereby

14   taking fair use out of the case.

15        Briefly what I said was that summary judgment,

16   obviously the question is whether or not there are

17   sufficient facts to establish a decision as a matter of law.

18   If material facts are in genuine dispute, the question has

19   to go to the jury; if they're not, the Court has to

20   determine their legal consequences.

21        The Seventh Amendment doesn't guarantee a right to

22   a jury trial on every issue, just those that turn on

23   reasonably disputed facts.  I found that Mr. Tenenbaum has

24   not met the burden of identifying the disputed facts.  Part

25   of the reason for that he proposes a fair use so broad that

1    it would swallow the copyright protections that Congress has

2    created.

3            Indeed, I say the Court can discern almost no

4    limiting principle.  His rule would shield from liability

5    any person who downloaded copyright songs for his or her own

6    private enjoyment.  Likewise, his demand for a jury

7    determination on this issue is essentially standardless.

8    Fair use would in effect be any use whatsoever that a jury

9    deemed fair.

10           In the end, fair use I concluded is not a

11   referendum on fairness in the abstract but an effort to

12   measure the purpose and effects of Mr. Tenenbaum's use

13   against the incentives for artistic and literary creation

14   that Congress established in the copyright act.  I indicated

15   that Mr. Tenenbaum made no effort to fit his alleged file

16   sharing into this framework, that is to say, the framework

17   of the copyright act, no claim of transformative use or

18   public benefit, et cetera.

19           I noted that there were circumstances in which a

20   defendant sued for file sharing could assert a plausible

21   fair use defense, and I cited in that regard very a

22   interesting amicus brief that had been filed in this action

23   by the Berkman Center at the Harvard Law School, and that

24   brief outlined the kinds of circumstances in which a fair

25   use defense would be possible, and that in quoting, "This is

1    a defendant who deleted MP3 files after sampling them,

2    created MP3 files exclusively for space shifting purposes

3    from audio CDs they had previously purchased."

4         As I indicated last week, I could also imagine a

5    fair use defense for a defendant who shared files during the

6    period of time before the law concerning fire sharing was

7    clear and paid outlets were readily available, and I

8    describe that I recognize that the advent of the Internet in

9    the late '90s through a number of norms into disarray

10   offering sudden access to a wealth of digitized media and

11   giving the venire of privacy or unanimity to acts that had

12   obvious public consequences.

13        At the beginning of this period, the law and the

14   technology were unsettled.  A defendant who shared files

15   during this interregnum but later shifted to paid outlets

16   once the law became clear and authorized services available

17   would present a strong case for fair use.

18        It obviously mattered with whom the defendant

19   shared files, his friends or the world, as well as how many

20   copyrighted works and for how long.  The problem with this

21   case, however, is that the defendant has offered no facts to

22   suggest that he fits within these limited categories.

23        Again, categories made legitimate by the case law,

24   and which I found particularly interesting in the Berkman

25   Center brief.  Mr. Tenenbaum is accused of sharing hundreds

1    of songs over a number of years far beyond the infancy of

2    this new technology or any legal uncertainty, and in his

3    summary judgment opposition, he has contested few of the

4    facts offered by the plaintiff.

5         I'm not making a finding with respect to these

6    facts, all I'm saying is that the plaintiff has identified

7    facts in their papers which the defendant on the face of the

8    summary judgment record has not disputed.

9         1, the main purpose of Tenenbaum's file sharing

10   was his own private enjoyment and that of his friends, not

11   profit making; 2, he downloaded entire songs but not entire

12   albums of music; 3, he did not transform the 30 works at

13   issue in the sense that he added something new with a

14   different purpose or a different character.  His file

15   sharing spanned more than four years and different software

16   platforms before and after this activity was detected in

17   August, 2004.

18        At that time his file sharing software made more

19   than 800 songs available to KazaA users to download.  Again,

20   the issue is not whether I find these to be true or false,

21   the issue is that having identified them as undisputed

22   facts, the defendant has not raised a serious factual

23   challenge to them which would have transformed the summary

24   judgment issue.

25        The only fair use factor on which the defendant

1   raises a serious challenge is the effect of his file sharing

2   on the potential market or value for the copyrighted works.

3   He argues that file sharing has not diminished the record

4   company's revenues or curtailed overall artistic creation,

5   but, again, there are no facts that Tenenbaum has put into

6   evidence on which the Court could rely for summary judgment

7   purposes.  There's no affidavit, expert report, deposition

8   testimony or evidence of any kind described by the rules.

9          In any event, what I'm obliged to do is to look at

10  the market for the specific works identified by the

11  plaintiff, and in this regard I have to consider whether

12  "unrestricted and widespread conduct of the sort engaged by

13  the defendant --" I'm quoting from the Supreme Court --

14  "would result in a substantially adverse impact on the

15  potential market for the original."

16         Plaintiffs have argued that continuous, high

17  volume file sharing offering exact duplicates to millions of

18  peer-to-peer users for free would negatively affect the

19  market for these copyrighted works.

20         In their summary judgment papers, the defendant

21  has offered no facts to the contrary.  While I recognize

22  that not every unauthorized download would represent a lost

23  sale, it seems some clear that some portion of paying

24  customers would shift to free downloads if this activity

25  were a fair use.

1          Based then on these findings, I conclude that

2     Tenenbaum's alleged infringement was not fair use.  As I

3     said, I'll put this in a more full opinion.  In brief, the

4     case law, the amici participation carves out an exception

5     for fair use, but there was no effort in the defendant's

6     pleadings to put his case within that exception.

7          And rather the argument was so broad, as I

8     suggested, that it was essentially standardless.  One

9     further note, to the extent that some of the defendant's

10    fair use arguments may be relevant to the issue of damages,

11    and in that case should we get to that, he'll have an

12    opportunity to present them to the jury at the trial.

13         So fair use defense is out of the case.  I

14    anticipate then the case will proceed on infringement and

15    should infringement be found on damages and willfulness.  I

16    also have reserved constitutional issues with respect to

17    damages should we get to that point.

18         Those are the issues with respect to the scope of

19    damages, the relationship between damages and actual loss

20    that defendants have raised which I said I won't get to

21    unless there's a damage award, so there will be a time when

22    the jury, if the jury gets to this point, we'll issue a

23    verdict with respect to damages and they'll be probably

24    post-trial motions challenging them much in the same way

25    that's going on in the Minnesota case.

1          I think that I'm not sure at this point what the

2     issue was with respect to the Internet demonstration.  Are

3     you on the Internet now?  Has people gotten their

4     connections?

5          MR. FEINBERG:  So far as I know, no, Judge.

6          THE COURT:  Okay.  We'll have some time.  I don't

7     anticipate openings until probably around one o'clock.  My

8     hope is that you would have, as I said, between 10:00 and

9     10:30 to go over the materials, the questionnaires that the

10    jury has filled out.  It will then go into individual voir

11    dire.  My hope is that we'll select a jury by 1:00.  We'll

12    break for an hour.  At 2:00, we'll go onto opening

13    statements.  I'll give general instructions to the jury.  Is

14    there anything else I need to address now?

15         MR. OPPENHEIM:  Good morning, your Honor.  Two

16    things, if I may raise a question with respect to the

17    summary judgment ruling, and then I think Mr. Reynolds has

18    some process questions.  We would like to know whether or

19    not we can have permission to file a supplemental brief with

20    respect to the hypothetical that the Court has posited that

21    was not briefed in our papers.

22         We respectfully disagree both factually and

23    legally with the conception that there would be fair use

24    defense in the scenario that the Court suggested similarly

25    because the defendant is not aware of the law obviously.

```
 1          THE COURT:  But what difference does it make if

 2   there are no facts that are relevant here, why isn't that

 3   just dicta in my decision?

 4          MR. OPPENHEIM:  Well, your Honor, our concern

 5   quite frankly, for the very reason that the Court is

 6   expressing it, it will be cited back in later cases as

 7   though it has the authority of the Court.

 8          THE COURT:  You can file whatever you like, but

 9   it's obviously dicta.  What I was trying to do was to

10   understand what the sort of metes and bounds of this defense

11   comprised so I was obviously speculating, and it is

12   obviously dicta, you can file whatever you like.  Whatever

13   those boxes consist of, there was no effort to put this case

14   in them.

15          MR. OPPENHEIM:  I appreciate that, your Honor.

16   You will hopefully during the course of the trial, for

17   instance, hear testimony that this music has been available

18   online since 1999 and digitally on CDs since the mid-'80s,

19   and I hope that all of that testimony that you'll hear may

20   help you when you write your fuller decision.

21          THE COURT:  Okay.  Yes, counsel.

22          MR. FEINBERG:  Yes, I have a few issues.  One,

23   with respect to the access to the Internet, we still do not

24   have any indication from the defendant as to what is

25   proposed, what is going to be shown.  We would ask that a
```

1    deadline be set.  We're now on the first day of trial.  It

2    was never disclosed in any discovery to us, it was never

3    disclosed in any of the pretrial filings.  When we here a

4    week ago, we were promised some information without a

5    timetable.

6          Now we're here the day of trial, and we still

7    don't have anything, so I would appreciate some sense of

8    some deadline that the defendant must have to produce and

9    explain to us what would be shown so that we may have an

10   opportunity to consider it before it's actually presented to

11   the jury.

12         THE COURT:  Again, I don't see this as an

13   intergalactic problem because it seems clear to me that what

14   the defendant wants to do is to show what it is done.  Is

15   that right?  What does the defendant propose to do with

16   respect to the demonstration?

17         MR. NESSON:  I'm proposing to have Wayne Marshall

18   demonstrate how kids today would get access to these songs

19   on the net.

20         THE COURT:  Would it be possible to provide the

21   defendant with -- the plaintiff with screen shots of what

22   you're going to do.

23         MR. NESSON:  I believe so, your Honor.  I've asked

24   Wayne if he would give me the URLs that he would use in

25   that.

1          THE COURT:  That would be great.

2          MR. NESSON:  I've not heard back from him, but I

3     will certainly by the opening of our case.

4          THE COURT:  That's fine.  Anything else?

5          MR. FEINBERG:  Obviously we would reserve our

6     rights to object on the grounds it's obviously expert

7     testimony coming in through the back door.

8          THE COURT:  Well, we'll have to see.  If all he's

9     doing is to say here's how I turn on my computer, here's how

10    I go online, here's how I download, here's how I upload,

11    et cetera, then I don't see where it's going to be a major

12    deal, but you have a right to be cautious.

13         MR. REYNOLDS:  Thank you.  Your Honor, with

14    respect to Dr. Pouwelse, I was curious --

15         THE COURT:  I have an endorsement coming on

16    that.

17         MR. REYNOLDS:  Thank you, your Honor.  Then we've

18    also, the parties have stipulated to Exhibits 1 through 54.

19    Can we now move for admission of that?

20         THE COURT:  Better to move after the jury has been

21    sworn, just to be on the safe side.

22         MR. REYNOLDS:  Okay.  When the jury is sworn move

23    right away for all the exhibits?

24         THE COURT:  That's right, and that's not a

25    problem, 1 through 54, not a problem.

1        MR. REYNOLDS:  Thank you, your Honor.

2        THE COURT:  Do I have an agreed description of the

3   case that I can read to the jury, that is to say, in the

4   course of selection?

5        MR. REYNOLDS:  I think we provided one in our

6   pretrial filings, your Honor, and I'm not sure --

7        THE COURT:  What did the defendant think about

8   this?  In other words, I want to say to the jury this case

9   is about X, has anyone read, seen or heard anything about

10  this in my opening instructions?  You can probe further

11  individually, but I have your pretrial memorandum in front

12  of me.

13       MR. NESSON:  I don't think we gave you anything

14  special on that, your Honor.

15       THE COURT:  Okay.

16       MR. REYNOLDS:  Your Honor, it's on page 19.

17       THE COURT:  17.

18       MR. REYNOLDS:  I have page 19.

19       THE COURT:  Share that with the defendant.  Let me

20  know if that's a problem.  I'd be happy to read it to the

21  jury just to sort of see if anyone, title of the case

22  doesn't convey what the case is about.

23       THE COURT:  Why don't we do this.  We won't be

24  talking to the jury until about an hour.  If you have any

25  changes, give it to Ms. Molloy, we can reiterate to them.

1    Just to reiterate, right now the jury is filling out

2    questionnaires.  Between 10 and 10:30, you'll be able to

3    review them quickly just to get a sense of the pool.  At

4    10:30, I'll question the jurors in open court initially who

5    I am, who you are, what the case is about, excuses to see if

6    people can't sit.

7            The plan is to sit 9 to 4 all week, then we'll go

8    into individual lawyer voir dire five minutes per side per

9    juror, shorter if you think you know what you're doing, then

10   once we have cleared 16 jurors, which is the amount we would

11   need for the final jury plus peremptory challenges for each

12   side, we come back here, each side exercises their

13   peremptory challenges.

14           My hope and goal is this would finish by 1:00.  We

15   then have lunch.  At 2:00, we'll have openings.  The trial

16   will be about everything, will be about infringement,

17   damages but not about fair use.

18           As I said, I anticipate a substantive proceeding

19   if there's a damage award raising the kinds of

20   constitutional issues that the plaintiff has raised, the

21   defendant has raised.

22           MR. FEINBERG:  Judge, we've had some discussion

23   with plaintiffs' counsel about the scheduling for the whole

24   week, and they anticipate finishing their case some time on

25   Thursday.  We feel strongly that we need more time than

1    that, and I would wonder whether or not the Court would

2    consider time limitations on witnesses or doing something

3    since we're under such a tight schedule and the jury would

4    be going out presumably some time Friday mid-morning,

5    wouldn't have much time for our side of the case, so I just

6    want to raise that issue since we don't have -- what we

7    propose frankly was to split the week, and that has been

8    rejected at least at this point.

9           THE COURT:  You know, it's interesting.  As an old

10   trial lawyer, I don't like time limits imposed in the

11   abstract.  I understand time limits, that is to say, if a

12   witness is wandering, I will enforce those rules, if the

13   testimony is repetitive, I'll enforce those rules, but I do

14   think that it is in everyone's interest that this case be

15   finished.

16          I'm going to tell the jury that they will have the

17   case for their deliberation by Friday, and that's a bargain

18   that I strike with the jury, and I do everything I can to

19   make that possible.

20          I mean, I don't know enough about the plaintiff's

21   case in a situation to say, I mean, splitting it would mean

22   the plaintiff's case would be over by mid-day on Wednesday

23   and then you would have between Wednesday afternoon and

24   Thursday afternoon.  That seems reasonable to me.

25          MR. REYNOLDS:  Your Honor, the defense have three

1    witnesses.  We have at least 12.  We've done a very good

2    job, I think, of agreeing on exhibits and getting most of

3    the exhibits in.  We can move through our case very quickly,

4    but there's no way we can get done our case by Wednesday,

5    Wednesday afternoon, by Wednesday noon.

6            Potentially we could finish by Wednesday, but I'm

7    thinking that the case will go our Thursday and wrap up

8    Thursday.  We will move our case very quickly.

9            THE COURT:  How much do the defendants need?

10           MR. FEINBERG:  We don't know.  I'm assuming that

11   the plaintiffs will call Mr. Tenenbaum, and that would open

12   up our cross-examination of Mr. Tenenbaum.

13           THE COURT:  How about this, why don't we see if

14   this works, that the case will be concluded by Friday

15   because if they get the case at the end of Friday, if I

16   instruct and you close by Friday afternoon, on Monday

17   morning, another Judge could preside over the deliberations

18   and take a verdict, if necessary, and, if necessary, I can

19   be here as well.  It wouldn't be the optimal situation, but

20   I could here as well, if necessary.

21           What I tell the jury is that the evidence will

22   close them in X time.  I can give them on the outside Friday

23   afternoon.  They have to understand that they have to save

24   time for deliberations, so we'll clear jurors who could stay

25   this week and next week.  Anybody who can't stay for the

1   next two weeks, we will exclude from the pool so you don't

2   wind up with someone with an airline ticket on next Tuesday

3   who's going to rush through deliberations, we can do that.

4   I won't be pleased if I have to come back on Monday.

5           MR. REYNOLDS:  I will assure you we will move our

6   case as quickly as I can.  In that regard, we've stipulated

7   to many exhibits that will help facilitate a quick trial.

8   There are two exhibits that the defendant objected to prior

9   to the Court's ruling regarding the 30 songs that are issue.

10          I was wondering if we could revisit it that right,

11  it's Exhibit A and B on the disputed exhibits, which are a

12  list of the 5 song recordings and the 25 song recordings

13  which together comprise the list of sound recordings at

14  issue.  For the plaintiff's case, it would make our case go

15  much faster if we can present so the jury can see as we're

16  going through the evidence which songs are at issue.  I'm

17  not sure if the defendants will withdraw their objections,

18  but we'd ask that we'll get a ruling on this now and maybe

19  move things along faster rather than with witnesses.

20          MR. FEINBERG:  The issue, Judge, we objected to

21  the grounds we were limiting it to the 5 songs and not the

22  30.  We can allow it if that objection is saved.

23          THE COURT:  I've ruled against you.  This comes in

24  simply as a list.  The registrations you would be providing

25  separately --

1          MR. REYNOLDS:  That's correct.

2          THE COURT:  -- as a list.  They can come in as the

3   next number is.  Ms. Molloy is the keeper of the exhibits.

4          MR. REYNOLDS:  55 and 56 then, your Honor.

5          ( Lists of songs were marked Exhibit Nos. 55 and

6   56 and entered into evidence.)

7          MR. NESSON:  I have three things, your Honor.  The

8   first is I request to know whether your Honor intends to

9   instruct the jury at the end in the language of the statute

10  indicating the statutory range or whether you simply intend

11  to ask the jury to return a damage award that is just.  I

12  ask this because my opening statement depends completely on

13  which way you go.  I believe that it's wrong to tell the

14  jury the statutory range, that they have no context for it,

15  their mandate is to decide what is just.

16          They can determine what's just.  By giving them

17  Congress's mandate of range, it just will screw them up on

18  their idea of what is just.  If their verdict comes back

19  either below or above the range, it's completely within the

20  Court's control to deal with it at that time, and if you

21  tell them the range, then we never really do find out what

22  the jury felt was just, and it's certainly an issue for us

23  on appeal and an issue to you that the jury has the right

24  under Feltner to decide all issues relating to statutory

25  damages including whether there should be any statutory

1    damages.

2          THE COURT:  Has anybody ever done such an

3    instruction she asks pointedly?  Has anyone, is there any

4    authority for this instruction other than necessary on

5    copyright?

6          MR. NESSON:  Just the statute, the statutory

7    standard is just and Feltner vs. United States argued to the

8    Supreme Court by Mr. Justice Roberts decided unanimously by

9    the Supreme Court says absolutely explicitly, and I have the

10   quote here, two quotes from the case that are immediately on

11   target that I'll provide you in one second.  "The right to a

12   trial by jury includes the right to have a jury determine

13   the amount of statutory damages, if any, awarded to the

14   copyright owner," and then the holding case, right down at

15   the bottom, the holding, "The Seventh Amendment provides a

16   right to a jury trial on all issues pertinent to an award of

17   statutory damages under Section 504C of the copyright act

18   including the amount itself."  That's my authority.

19         THE COURT:  And that you conclude doesn't focus

20   the jury's attention on between 750 and 30,000 but enables

21   them to pick any number from outside the range or inside the

22   range?

23         MR. NESSON:  What is just, your Honor, that's the

24   statutory standard, yes.

25         THE COURT:  I'll take a look at this.  This is not

1    something I intended to resolve at the beginning of the

2    case, but if it bears on your opening, I will resolve on it.

3    You object?

4            MR. REYNOLDS:  Yes.

5            THE COURT:  What a surprise.

6            MR. OPPENHEIM:  Surprisingly, counsel objects.

7    Your Honor, should we go down this road, we're just begging

8    for a potential mistrial one way or the other.  The object

9    of the jury is more than just to do justice, it's to apply

10   the facts to the law, and one of the things that we have to

11   do is charge the charge with the law.  Congress has set

12   forth the law.

13           Part of the law that Congress has set forth is

14   what is the statutory range.  Congress has prescribed that.

15   It is a due process requirement that they apply the facts to

16   that statutory range.  If we don't give them that statutory

17   range, we're not giving them the law that they need to apply

18   to the facts in this case.

19           THE COURT:  The Minnesota case, the Minnesota jury

20   instructions, the Judge instructed under the copyright agent

21   which plaintiff is entitled to a sum of not less than 750 or

22   more than 30,000 per act of infringement as you consider

23   just.  That's essentially what you're asking for?

24           MR. OPPENHEIM:  No, your Honor, not quite.  The

25   instruction went on to address if you should find that the

1    defendant's conduct is willful.

2              THE COURT:  Yes.

3              MR. OPPENHEIM:  That damages then can go up to

4    150,000 per, and the special verdict form in that case

5    specifically provided that range on the verdict form so that

6    the jury could easily and unmistakenly determine what the

7    damages should be.

8              THE COURT:  So you interpret "just" to mean just

9    within the range set by statute?

10             MR. OPPENHEIM:  Of course, your Honor.

11             THE COURT:  Okay.

12             MR. NESSON:  Your Honor, that's exactly why the in

13   the Jamie Thomas-Rasset case took between 750 and 150,000,

14   split the difference at just about 80, multiplied it by 24

15   and came out to 1.92 million as the just amount clearly

16   completely disconnected from any sense of real justice.

17             THE COURT:  But you will have an opportunity -- I

18   actually agree with you that between 750 and 30,000 per

19   song, there are no standards at all.  I can find none in the

20   law that I can instruct the jury as to where to go between

21   750 and 30,000.  That said, the safest alternative is for me

22   to give this instruction in the language of the statute, and

23   after the -- when damages are rendered, at that point

24   there's a remittitur motion I understand in the Minnesota

25   case, address the issue at that point because telling the

1    jury to pick a number anywhere --

2              MR. NESSON:  Is just.

3              THE COURT:  -- is equally -- well, this is 750 to

4    30,000 as they find just.  In other words, in one sense the

5    statutory language is more focused than the language you

6    would have and has more standards than the language you

7    would proffer.  What is just below 750, what is just within

8    the range?

9              MR. NESSON:  I rely on Feltner, your Honor.

10             THE COURT:  Anything else?

11             MR. OPPENHEIM:  Your Honor, nothing other than the

12   fact that Feltner doesn't really stand for the proposition

13   that defense counsel suggests, and I'd like to see where in

14   Feltner the Court decided not to instruct the jury on the

15   range of statutory damages because I don't believe that's

16   what happened.

17             THE COURT:  I'll take a look at it.  Is there

18   anything else that I need to resolve for your openings other

19   than that?  You had three things, Mr. Nesson.  That's one.

20             MR. NESSON:  Yes.  The second thing has to do with

21   the geography of the courtroom, your Honor.  In terms of

22   rhetorical space of this courtroom, it is radically

23   unbalanced to the defendant's disadvantage.  From the point

24   of view of the jury, the plaintiffs have the foreground.

25             THE COURT:  Where would you like to be?

1        MR. NESSON:  Sorry.

2        THE COURT:  Where would you like to be?

3        MR. NESSON:  Switch tables.

4        THE COURT:  They have the -- to some degree

5   because they are plaintiffs, they have the sort of obvious

6   arguably closer to the jury position.  If you'd like, you

7   could be behind them.

8        MR. NESSON:  I don't see why the presumption in

9   favor of the noncommercial litigant doesn't prevail at least

10  to have equality in the courtroom.  If anything, it should

11  be to his advantage.  The idea that they're in the

12  foreground, that we have to look at the jury through their

13  teeth, that we have to look at you through this barrier here

14  that's in front, that's just a disadvantage for us.  We're

15  like in the background here.

16        THE COURT:  I understand.  The problem is they

17  have the burden of proof, and that's the reason that the

18  seats are arranged as they are.

19        MR. NESSON:  We have the burden of proof on

20  summary judgment apparently.

21        THE COURT:  Pardon.

22        MR. NESSON:  We have the burden of proof on

23  summary judgment apparently.

24        THE COURT:  Because they presented facts that you

25  didn't contest.

1          MR. NESSON:  And we can --

2          THE COURT:  At trial you, the plaintiff, has the

3     burden of proof.  In terms of other aspects of geography, I

4     am very loose about that.  You can wander wherever you want

5     to go.  I don't require people to stand by the podium.  If

6     you can't see something, people can change their positions,

7     that's not a problem.  What's the third point?

8          MR. NESSON:  The third, an assistant,

9     Debbie Rosenbaum who was certified to the court, still is, I

10     believe, but Harvard Law School has made it clear that she

11     is no longer permitted as far as they're concerned to

12     practice, and the position is somewhat awkward because I

13     feel conflicted.  I am both Harvard Law School and a lawyer

14     wanting her assistance, and so I feel somewhat awkward about

15     it.

16          THE COURT:  I don't have any problem, the

17     certification rules address who can address the Court.  In

18     terms of someone helping you, I don't have any problem if

19     you can squeeze her in at the table, she can sit at the

20     table.

21          MR. NESSON:  Thank you, your Honor.  Just one

22     final.

23          THE COURT:  That's four.  Go on.

24          MR. NESSON:  Just to place on the record one more

25     time my complete disappointment that this event is being

1    stifled as far as the digital public is concerned, that is,

2    Joel's argument will be heard by these people, that's it.

3    That's too bad.

4            THE COURT:  Mr. Nesson, you're preaching to the

5    Court.

6            MR. NESSON:  Just putting it on the record one

7    more time.

8            THE COURT:  Well, I don't mind being reversed but

9    being reversed four or five times on the same issue it does

10   seem to be to be a waste of time so the previous order not

11   allowing webcasting stands.  You won't see me until you have

12   an opportunity to look at the questionnaires.  We'll resume

13   at about 10:30 assuming the questionnaires are ready at that

14   time.  Thank you.

15           THE CLERK:  All rise.

16           (A recess was taken.)

17           THE CLERK:  All rise.  Court is now in session.

18           THE COURT:  You can be all be seed.  Good morning,

19   everyone.  My name is Nancy Gertner, and I'm the presiding

20   Judge in this session.  We're going to have jury selection

21   now in the case of Sony BMG Music Entertainment vs.

22   Joel Tenenbaum, and I will describe that to you in a

23   moment.

24           Here's the way jury selection is going to work.

25   First we'll ask all of you to stand up and swear under oath

1    that the answers to the questions that we pose to you will

2    be truthful and complete.  After that, I'll ask questions to

3    you as a group.  Although it's a little awkward, typically

4    they're yes or no questions, and if the answer is yes, then

5    you stand up and we note what your number is and then we

6    talk to you at sidebar, which is this area over here.

7            After that, we'll question jurors individually in

8    the courtroom next door.  The reason why we question jurors

9    individually, there may be things people are not happy to

10   say in open court in front of other jurors but would be

11   willing to say to the lawyers when we are next door in

12   another courtroom.  It's an open proceeding as well, but

13   you're talking only to the lawyers in the case.

14           So I don't anticipate that the jury selection will

15   take a great deal of time, and if you are excused from this

16   jury, you go back down to the second floor and perhaps

17   you'll be picked in another trial that's going on in the

18   building today.  We try to make it as expeditious as

19   possible.

20           Understand that the goal here is to put together a

21   jury, to select a jury that would be the kind of jury you

22   would want to have if you were in the shoes of the parties

23   in this case, a jury that is fair.

24           With that, ladies and gentlemen, would you please

25   stand.

1          (Jurors were sworn)

2          THE COURT:  You can be seated.  I'm going to

3     describe to you what the case is, and then I'm going to ask

4     you if you can serve.  Usually if people know what kind of

5     case it is, that could affect how hard they will try to make

6     sure they will be here.

7          This is a case alleging copyright infringement on

8     the Internet.  The plaintiffs are Sony BMG Music

9     Entertainment, Warner Brothers Records, Inc. and UMG

10    Recordings, Inc.  The defendant, Joel Tenenbaum, is a

11    graduate student.  The plaintiffs allege that they own or

12    control the copyrights to certain copyrighted sound

13    recordings including the sound recordings at issue in this

14    case.

15         The plaintiffs allege that Mr. Tenenbaum used a

16    peer-to-peer file sharing network, in this case, KazaA, to

17    download plaintiff's copyrighted sound recordings from other

18    users on the Internet and to distribute in the language of

19    the statute the copyrighted sound recordings with others on

20    the Internet without plaintiffs' consent or permission.

21         The plaintiffs contend that they're entitled to

22    statutory damages under the copyright act for defendant's

23    infringement on each of their 30 sound recordings.  The

24    defendant contends that he's not liable to the plaintiffs

25    for any damages.

1          Has anyone read, seen or heard anything about this

2     case?  There are no affirmative responses.  So this is a

3     civil case, as I've described, for copyright infringement.

4     We anticipate that the evidence will conclude on Friday

5     afternoon.  The case will go from 9 until 5, possibly

6     earlier, but 9 until 5, and, as I said, the evidence we

7     anticipate will conclude by Friday afternoon.

8          Now, what that means is that the jury that's

9     selected in this case will get the case for its deliberation

10    on Friday, but the length of the deliberations, I can

11    control when the evidence ends and the closings and the

12    arguments to counsel.  What I can't control and shouldn't

13    control is the length of the jury's deliberations, so if the

14    case closes on Friday, we anticipate the jury deliberations

15    would begin on Monday for as long as the members of the jury

16    believe is necessary to render a fair verdict.

17         Okay.  So, you anticipate that the evidence

18    concludes on Friday.  The case will go into next week it is

19    anticipated.  So, is there anyone among you that cannot

20    serve bearing in mind that the system only works, the jury

21    system only works when everyone participates to the extent

22    that they can, everyone from all walks of life participate.

23         So, with that frankly major guilt trip, is there

24    anyone among you that cannot serve for this period of time

25    probably into next week when we count deliberations?  Please

1    stand.  Okay.  I'm going to read out your numbers, jury

2    numbers.  Counsel can find them as well, and then we'll talk

3    to these jurors at sidebar.

4            So, Mr. Bannister, juror No. 1.  You can be seated

5    after I say your name.  Mr. Tanzer, juror No. 3;

6    Mr. McIntosh, juror No. 4; Ms. Livni.  Okay.  Juror No. 5,

7    Ms. Murphy?

8            THE JUROR:  Yes.

9            THE COURT:  Juror No. 11.  Ms. Bottone, juror

10   No. 12; Ms. Curley, No. 15; Ms. Legocki, is that right,

11   juror No. 16; Mr. Malliaros, is that close, Mr. Malliaros,

12   juror No. 18; sorry for mangling your name.  Ms. Larochelle,

13   juror No. 23; Mr. Wolfe, juror No. 27; Mr. Rantanen, is that

14   right?

15           THE JUROR:  Yes.

16           THE COURT:  Juror No. 29.  Ms. Kuschel, juror

17   No. 32; Ms. McLeod, juror No. 33; Ms. Brumfield, thank you,

18   juror No. 34; Mr. Desrochers, juror No. 39; Ms. Keigan,

19   juror No. 40; Mr. Perkins, no, Clark.  I'm just going to go

20   down the list until I hit the right name.  Ms. Britton,

21   juror No. 45; Ms. Tetreault, juror No. 47.  Okay.  At

22   sidebar, counsel.

23           MR. FEINBERG:  Your Honor, may I have a moment

24   with counsel?

25           THE COURT:  Sure.

1               (THE FOLLOWING OCCURRED AT SIDEBAR:)

2               MR. FEINBERG:  The joint preliminary instruction

3      left out one of the four plaintiffs, but we can cure that if

4      you can ask each juror whether you know each of the

5      plaintiffs.

6               MR. OPPENHEIM:  I think it's five.

7               MR. KAMHOLTZ:  Is it, okay.  If Mr. Tenenbaum

8      comes up to sidebar?

9               THE COURT:  Of course.  I'm going to be liberal

10     with the excuse so we don't waste time unless someone is

11     completely off the wall.  Juror No. 1, please.

12     Mr. Bannister.  Hi, sir, can you tell me what the problem

13     is?

14              THE JUROR:  Yes, I only have one car and my wife

15     works, and I live 45 miles away.

16              THE COURT:  You don't have any way of getting

17     here?

18              THE JUROR:  No.

19              THE COURT:  Can you build a railroad so you can

20     get there?

21              THE JUROR:  Sure.

22              THE COURT:  I'll excuse you.  Juror No. 1 is

23     excused.  Mr. Tanzer.  Hi, Mr. Tanzer.

24              THE JUROR:  Hi.

25              THE COURT:  What's the problem?

1          THE JUROR:  I have a planned vacation that begins

2     next Thursday morning, so as long as it ends by Wednesday

3     night, I'm fine, but if I can't be guaranteed, I'm not going

4     to be here.

5          THE COURT:  We'll keep you in the pool.  I think

6     that's probably okay.  Okay.  We'll keep you in the pool.

7          THE JUROR:  Where am I going?

8          THE COURT:  You go back to your seat.  Thank you.

9     Mr. McIntosh.  I'm sorry.  Hi.

10          THE JUROR:  Yes, your Honor, I had a death in the

11     family this past Friday, and it caused me to be out of the

12     state till tomorrow.

13          THE COURT:  You're excused then and I'm so

14     sorry.

15          THE JUROR:  Thank you.

16          THE COURT:  Juror No. 4, please.  My

17     recommendation is that he be excused for all purposes.

18     Juror No. 5, Ms. Livni.  Hi.

19          THE JUROR:  I have a dental procedure as a matter

20     of fact today at quarter of one.  I had an emergency.  I

21     won't be able to be here.

22          THE COURT:  Okay.  I'll excuse you.  Thank you

23     very much.  Juror No. 11, who is Ms. Murphy.

24          THE JUROR:  Hello.  I have four small children.  I

25     breast feed.  That's my story.  My handicapped father is

1    baby-sitting today.

2            THE COURT:  I'll excuse you.

3            THE JUROR:  Thank you.

4            THE COURT:  You go back to the second floor.

5    Juror No. 12, Ms. Bottone.

6            MR. FEINBERG:  Was that juror No. 6?

7            THE COURT:  That was juror No. 11.

8            THE JUROR:  I work for an occupational center with

9    kids with significant psychological problems, and I'm

10   missing one on one sessions, and it kind of impacts on their

11   ability.

12           THE COURT:  You have sessions scheduled for the

13   rest of this week?

14           THE JUROR:  Yes, they come in, it's individual

15   treatments.

16           THE COURT:  Every day?

17           THE JUROR:  Yes.

18           THE COURT:  There's no one that can substitute?

19           THE JUROR:  No, I have my own caseloads, and it

20   kind of sets them back to miss a week or more.

21           THE COURT:  I'll excuse you.  We'll send you back

22   if there is a trial for a day that may be in the building.

23           THE JUROR:  Okay.

24           THE COURT:  Thank you.  Ms. Bottone is excused.

25   Juror 15 is Ms. Curley.  Hi.

1           THE JUROR:  Hi.

2           THE JUROR:  I work in a small bank, and I'm the

3      backup to somebody, the IT officer, and she's on vacation

4      this week.

5           THE COURT:  Yes.

6           THE JUROR:  And then the next week my backup is

7      going on vacation.

8           THE COURT:  I'll excuse you.  There may be a

9      one-day case that you'd be able to serve on.

10           THE JUROR:  Okay, thank you.

11           THE COURT:  Juror No. 15 is excused.  Juror

12      No. 16, Ms. Legocki.  Ms. Curley was excused.  Now this is

13      Ms. Legocki.

14           THE JUROR:  I got a planned vacation, family

15      reunion for a year.  The 1st of August we're going to

16      Montreal for family reunion.  The 1st of August is Monday.

17           THE COURT:  I'll excuse you.  Thank you.

18      Ms. Legocki is excused.  Juror No. 18, David Malliaros.  Hi.

19           THE JUROR:  Hi.

20           THE JUROR:  My wife is having day surgery Friday

21      and she needs a ride back.

22           THE COURT:  You're the only one that can do it?

23           THE JUROR:  Yes.

24           THE COURT:  Nobody else could do it?

25           THE JUROR:  I could make arrangements.  Her mother

1    could come.  She lives out in the Worcester area.

2            THE COURT:  Worcester is not the other side of the

3    earth.

4            THE JUROR:  Okay.

5            THE COURT:  If you could make arrangements, we

6    would prefer that, that would be helpful.  You may not be

7    selected for the ultimate jury, but at least hang around

8    until we see.

9            THE JUROR:  Okay.

10           THE COURT:  Thank you.  Juror No. 23,

11   Ms. Larochelle.  Hi.

12           THE JUROR:  Hi.  I'm not available Wednesday

13   morning.  I have a medical procedure at Mass. General.

14           THE COURT:  I'll have to excuse you then.  I don't

15   have to see it.  Thank you.  You may have to be on a trial

16   for one day like tomorrow.

17           THE JUROR:  Okay, thank you.

18           THE COURT:  Thank you.  Juror No. 23 is excused.

19   Mr. Wolfe, juror No. 27.

20           THE JUROR:  How are you?  I'm responsible for a

21   two and a half year-old and a five year-old morning and

22   afternoon.

23           THE COURT:  There's no backup?

24           THE JUROR:  We got it today.

25           THE COURT:  Okay.  Your wife works?

1          THE JUROR:  Yes.

2          THE COURT:  I would say bring them, but I

3  suppose --

4          THE JUROR:  You don't know my daughter.

5          THE COURT:  If it's anything like my kids, I

6  understand.  Okay.  I'll excuse you.  Thank you.

7  Mr. Rantanen.  29.  Hi.

8          THE JUROR:  Good morning.  I was laid off recently

9  and I managed to get a few interviews this week.

10          THE COURT:  Okay.  So this is critical.

11          THE JUROR:  I appreciate that.  I'll excuse you.

12          THE COURT:  Okay.  Ms. Kuschel, did I get that?

13          THE JUROR:  Kuschel.  Hi.

14          THE COURT:  Hi.

15          THE JUROR:  On Saturday I'm flying to Africa for a

16  two-week safari.

17          THE COURT:  I'll excuse you.  I'd like to

18  accompany you, but I'll excuse you.  Ms. McCloud, juror

19  No. 33.  Hi.

20          THE JUROR:  Hi.

21          THE JUROR:  I just -- I've been suffering with

22  sciatica, and I'm on pain killers, and I just think sitting

23  9 to 5 I would be needing to take the pain killers.

24          THE COURT:  And the pain killers?

25          THE JUROR:  It's Percocet and muscle relaxers.

1          THE COURT:  I'll excuse you.  Thanks.  Juror 33.

2     Juror No. 34, Ms. Brumfield.  Hi.

3          THE JUROR:  Hi.  I'm a victim of a murder, my son

4     in '98.

5          THE COURT:  I'm so sorry.  Do you think it's hard

6     for you to be a juror in a civil case, not a criminal case?

7          THE JUROR:  Both.

8          THE COURT:  Pardon?

9          THE JUROR:  It still.  I'm a diabetic, too.

10          THE COURT:  You're a diabetic so it's hard for you

11     to sit.  I'll excuse you.  Thank you.

12          THE JUROR:  I appreciate it.  Thank you.

13          THE COURT:  Mr. Desrochers.  Hi.

14          THE JUROR:  Hi.

15          THE JUROR:  I'm scheduled to act and co-direct in

16     an independent film production.

17          THE COURT:  When?

18          THE JUROR:  Starting next Sunday for two weeks.

19          THE COURT:  I'll excuse you.

20          THE JUROR:  I appreciate it.

21          THE COURT:  Ms. Keigan.

22          THE JUROR:  Hi.  I have family arriving from out

23     of state on Friday, and depending on how long the jury would

24     deliberate, I'm leaving on a cruise already paid for next

25     Friday, the 7th.

```
1              THE COURT:  Do you think having family would make

2    it hard for you to come in on Monday and Tuesday, let's

3    assuming?

4              THE JUROR:  It would be Friday because they're

5    only passing through.  They're from New Jersey, visiting my

6    sister and her new baby.

7              THE COURT:  So you anticipate --

8              THE JUROR:  And I haven't seen the baby or my

9    sister since she had it.

10             THE COURT:  I'll excuse you.

11             THE JUROR:  Thank you very much.  Mr. Clark, juror

12   No. 42.  Hi.

13             THE JUROR:  Hi.  I found out on Friday my 87

14   year-old mother has cancer and she's having surgery now in

15   New Jersey.

16             THE COURT:  And you want to get down to see her?

17             THE JUROR:  If she survives the surgery.

18             THE COURT:  I'll excuse you.

19             THE JUROR:  Thank you.

20             THE COURT:  Mr. Clark, 42 is excused.

21   Ms. Britton, juror No. 45.  Hi.

22             THE JUROR:  Good morning.

23             THE COURT:  Hi.  What's the problem?

24             THE JUROR:  For the past three months my husband

25   is self-employed and he hasn't worked, and I'm also pretty
```

1    much self-employed.  I get paid by commission.  I'm a

2    hairdresser, so if I'm not there, I don't get paid.

3              THE COURT:  The whole week?

4              THE JUROR:  Yes.

5              THE COURT:  Financial?

6              THE JUROR:  Not only me but also the owner of the

7    salon doesn't get money either.

8              THE COURT:  Working evenings is not going to make

9    a difference, and that would be hard?

10             THE JUROR:  Leaving here at 5 and getting there.

11             THE COURT:  I'll excuse you.  Thank you.

12             THE JUROR:  Thank you.  Ms. Tetreault.  Hi.

13             THE JUROR:  Hi, your Honor.  I baby-sit my

14   grandkids.

15             THE COURT:  It looks fun.

16             THE JUROR:  It is fun, 6 years, 7, 13 all week.

17   My daughter works for Hospice.

18             THE COURT:  There is no backup?

19             THE JUROR:  No, there is nothing.

20             THE COURT:  All right.  I'll excuse you.  Thank

21   you.  We'll send you back down to the second floor.  There

22   may be a one-day trial that you perhaps could get back and

23   forth, not the whole week.

24             THE JUROR:  Yes, the week would be awful.

25             THE COURT:  Juror No. 47 is excused.  Okay.  We'll

1   go back.

2           MR. FEINBERG:  There's 28?

3           THE CLERK:  28.

4           THE COURT:  He had angina, we decided that was a

5   sufficient excuse.  You agree, I assume.  All right.

6           (SIDEBAR CONFERENCE WAS CONCLUDED)

7           THE COURT:  Okay.  I'd like the lawyers to each

8   stand and anyone else at counsel table and introduce

9   themselves and their clients.  Counsel, first, the

10  plaintiffs.

11          MR. REYNOLDS:  Good morning, your Honor.  My name

12  is Tim Reynolds.  I represent the plaintiffs.  With me at

13  counsel table is Matthew Oppenheim --

14          MR. OPPENHEIM:  Good morning.

15          MR. REYNOLDS:  -- and Jennifer Pariser,

16  representative of the plaintiffs --

17          MS. PARISER:  Hello.

18          MR. REYNOLDS:  -- and Daniel Cloherty --

19          MR. CLOHERTY:  Hello.

20          MR. REYNOLDS:  -- and Ms. Eve Burton.

21          MS. BURTON:  Hello.

22          THE COURT:  And you want to give the jurors also a

23  list of the plaintiffs who you represent.

24          MR. REYNOLDS:  Yes, this is the list we submitted

25  to the Court listing the witnesses or just the plaintiffs?

1          THE COURT:  No, just the parties whom you

2     represent.

3          MR. REYNOLDS:  The plaintiffs that I represent are

4     Sony BMG Music Entertainment, Capital Records, Incorporated,

5     Arista Records LLC and UMG Recordings Incorporated.  Thank

6     you.

7          THE COURT:  Okay.  And the defendant?

8          MR. NESSON:  My name is Charles Nesson.  This is

9     Joel Tenenbaum.  He is my client.

10          MR. FEINBERG:  Thank you, Judge.  Matthew Feinberg

11     also assisting Mr. Nesson in representing Joel Tenenbaum.

12          MR. KAMHOLTZ:  Good morning, ladies and gentlemen,

13     my name is Matthew Kamholtz, and I also will be representing

14     Mr. Tenenbaum.

15          MS. ROSENBAUM:  Hi.  My name is Debra Rosenbaum.

16     I'm a student helping Mr. Nesson in representing

17     Joel Tenenbaum.

18          THE COURT:  So, are any of you familiar with any

19     of the lawyers or the parties, when I say familiar with,

20     have you any relationship to, retained, been involved with

21     the parties or their counsel?  Okay.  There are no

22     affirmative responses.  I'm now going to read a witness list

23     which I've asked the parties to give me every conceivable

24     witness that they might call.  The list sounds longer than

25     the case, but we do this to make sure that no one appears in

1    the middle of the trial who you, you know, are related to,

2    the juror's long lost cousin.

3         So, here's the list.  After I read the list to

4    you, I'll ask you if you know or you're familiar with or

5    related to anyone on this list:  Wade Leak, New York,

6    New York; Mark Matteo, Lincoln, Rhode Island;

7    Chris Connelly, Marstown, New Jersey; Dr. Doug Jacobson,

8    Ames, Iowa; Silda Palerm, New York, New York; JoAn Cho,

9    Santa Monica, California; Stanley J. Liebowitz, Richardson,

10   Texas; Brad Buckles, Washington D.C; David Hughes,

11   Washington D.C.; Ron Wilcox, New York, New York;

12   Joel Tenenbaum, Brighton, Massachusetts; Arthur Tenenbaum,

13   Providence, Rhode Island; Abbey Nathan, Philadelphia,

14   Pennsylvania; Judith Tenenbaum, Providence, Rhode Island;

15   Tova Tenenbaum, Pittsburgh, Pennsylvania; Samuel

16   Volchenboum, Chicago, Illinois; James Chappel, Providence,

17   Rhode Island; Jonathan Velazquez, Apopka, Florida;

18   Richard Barth, Providence, Rhode Island; Antonio Franco,

19   Providence, Rhode Island; Cary Sherman, Washington D.C.;

20   Mitch Glazer, Washington D.C; Wayne Marshall, Cambridge,

21   Massachusetts; Janis Adriaan Pouwelse of the Netherlands;

22   Isaac Meister of Cambridge, Massachusetts.

23        Are any of you familiar with any of the witnesses

24   whose names I have just related, familiar with, related to,

25   long lost cousin, uncle, whatever?  There are no affirmative

1    responses.

2         What we're going to do now, what we'll do now is

3    begin to question jurors individually.  As I said, it will

4    not take a long time, but my feeling has always been that

5    it's easier to question people individually than it is to

6    question people as a group.  Again, this will not take a

7    long time.  There will be brief questioning in open court

8    but in a courtroom in which it's just one juror.  We would

9    ask you that when you're questioned, don't come back and

10   share with the rest of the jury what you've been questioned

11   about.  This is not a multiple choice exam.  We really want

12   your honest answers, and so the last thing we want to have

13   is somebody say X and it's repeated down the line of every

14   juror in the place, so you will keep what you've been

15   questioned about to yourself.

16        You also shouldn't spend the time while you're

17   waiting in here speculating about what this case is about

18   beyond what I have told you.  You don't know anything about

19   the case.  The information that you'll learn about the case

20   if you should be a juror in this case will come from the

21   four corners of this courtroom and nowhere else.  We'll be

22   as quick as we can be, and we'll see you all individually in

23   the courtroom next door.

24        THE CLERK:  All rise.

25        (A recess was taken.)

1          THE COURT:  As I said, the rules here are that you

2     don't preview the legal questions with the jury.  I am

3     confident that I can instruct jurors about the law, so the

4     issue is only a question of attitudes, factual issues and

5     that's it, and if there's an inappropriate question, someone

6     can object, and I would rule on the objection right there.

7     I will keep the time and I think it will be more than

8     adequate.  Ms. Demoranville.

9          MR. KAMHOLTZ:  How are we going to treat the

10    jurors for cause?

11         THE COURT:  After the juror, we'll understand what

12    the challenges for cause are, pretty much everyone will

13    understand.  There are some that will be clear without any

14    issue.  If there is an issue, when the juror leaves, you'll

15    tell me to ask her to wait or him to wait.  Ms. Molloy will

16    hold the juror outside the door, we'll talk about it.

17           This is Melanie Demoranville.  Hi.

18           THE JUROR:  Hi.

19         THE COURT:  So you'll be questioned by the lawyers

20    and I will keep the time.

21           THE JUROR:  Okay.

22         THE COURT:  And it shouldn't be a problem.

23    Plaintiffs should begin.

24         MR. OPPENHEIM:  Good morning, Ms. Demoranville, is

25    it?

1        THE JUROR:  Demoranville.

2        MR. OPPENHEIM:  Demoranville, my apologies.  My

3   name is Matt Oppenheim, a name that also frequently gets

4   butchered.  As we indicated in the courtroom, I along with

5   my co-counsel represent the plaintiffs, five record

6   companies, who have sued the defendant Mr. Tenenbaum, who I

7   believe is down at the end of the table, for copyright

8   infringement for downloading and uploading copyrighted works

9   in a peer-to-peer network without permission.

10        First of all, let me start by thanking you for

11   being a juror.  We're here as part of our job, and you're

12   here as part of your civic duty.  We appreciate that.  As

13   part of the process, we're going to ask you some questions,

14   some follow-up questions to the questionnaire you filled

15   out.

16        THE JUROR:  Okay.

17        THE COURT:  And also some questions to understand

18   a little bit more about it.

19        THE JUROR:  Okay.

20        MR. OPPENHEIM:  So, as I indicated, we represent

21   five record companies.  Do you have a view or opinion about

22   record companies?

23        THE JUROR:  No.

24        MR. OPPENHEIM:  Have you or any of your family

25   members ever owned a business themselves?

1          THE JUROR:  No.

2          MR. OPPENHEIM:  So I mentioned earlier that the

3     record companies are suing Mr. Tenenbaum for copyright

4     infringement.  Do you have a view or an opinion about the

5     use of peer-to-peer networks such as Napster, KazaA or

6     LimeWire?

7          THE JUROR:  No.

8          MR. OPPENHEIM:  Have you heard or read anything in

9     the press about record companies or movie studios or other

10    copyright holders suing individuals who infringe their

11    copyrights?

12         THE JUROR:  No.

13         MR. OPPENHEIM:  Do you have an opinion one way or

14    the other regarding record companies enforcing their rights

15    against individuals who take and give their music away?

16         THE JUROR:  No.

17         MR. OPPENHEIM:  You hesitated?

18         THE JUROR:  Not really, no.

19         MR. OPPENHEIM:  Have you or anyone you know ever

20    received any kind of notice from a copyright holder, an ISP,

21    an Internet service provider, maybe a school regarding a

22    possible violation of copyright law?

23         THE JUROR:  No.

24         MR. OPPENHEIM:  Do you have any view on whether

25    music, movies, books, games should be free on the Internet

1    or whether the laws should apply to the Internet the same

2    way they apply to the physical world?

3           THE JUROR:  I don't think it should be free.  I

4    think that if like the people that are producing it,

5    whatever, should get like a cut, too, like from the people

6    that are buying it.  Do you know what I mean?

7           MR. OPPENHEIM:  Okay.  You work at a nursing home;

8    is that correct?

9           THE JUROR:  I do.

10          MR. OPPENHEIM:  As a nursing assistant?

11          THE JUROR:  Yes.

12          MR. OPPENHEIM:  You indicated on your

13   questionnaire that you use a computer frequently?

14          THE JUROR:  I do.

15          MR. OPPENHEIM:  Can you give us a sense of the

16   kinds of things you do on the computer?

17          THE JUROR:  I do a lot of like research like

18   online, I do a lot of like shopping, eBay, download from

19   iTunes, that kind of stuff.

20          MR. OPPENHEIM:  And do you do this regularly?

21          THE JUROR:  I do, yeah.

22          MR. OPPENHEIM:  You also indicated on your

23   questionnaire that you own or use an iPod or an MP3 player?

24          THE JUROR:  I do.

25          MR. OPPENHEIM:  Is it an iPod?

1           THE JUROR:  iPod.

2           MR. OPPENHEIM:  Do you listen to music?

3           THE JUROR:  I do.

4           MR. OPPENHEIM:  Where do you get the music you put

5     onto it?

6           THE JUROR:  Mostly from iTunes.

7           MR. OPPENHEIM:  And so then you have a question

8     you answered about downloading music, books and movies from

9     the Internet that you said you do.  Is that the iTunes

10    downloading that you described?

11          THE JUROR:  Yeah.

12          MR. OPPENHEIM:  Any other downloading of music or

13    movies or books?

14          THE JUROR:  No.

15          MR. OPPENHEIM:  No further questions, your Honor.

16    Thank you.

17          THE COURT:  Okay.  From the defendant?

18          MR. NESSON:  Hello, I'm Charlie Nesson.

19          THE JUROR:  Hi.

20          MR. OPPENHEIM:  Hi.  I'm defending Joel on a

21    voluntary basis, that is, I'm not being paid here as his

22    counsel, and I'd just like to ask you some things about your

23    own musical tastes.

24          THE JUROR:  Of course.

25          MR. NESSON:  What sort of music do you like?

1          THE JUROR:  I like a like of hip-hop, reggae,

2     punk.

3          MR. NESSON:  Have you been listening for a long

4     time?

5          THE JUROR:  Yeah, yeah.

6          MR. NESSON:  What would you say are your favorite

7     artists?

8          THE JUROR:  Probably No Effects and Pavement.

9          MR. NESSON:  Say it again.

10         THE JUROR:  No Effects.

11         THE DEFENDANT:  No Effects.

12         MR. NESSON:  No Effects and Pavement.  I'm a

13    teacher in my regular life, I'm not a litigator, and I

14    actually made a choice as to how to dress when I came here

15    as to whether I should dress up in a suit that is normally

16    in court or I should just wear what I normally wear.  I

17    decided I'd wear just what I normally wear so I could hang

18    onto my identity here.  Is that going to offend you in any

19    way?

20         THE JUROR:  No, of course not.

21         MR. NESSON:  It's better to be comfortable than

22    uncomfortable.

23         MR. NESSON:  Would it offend you if you were to

24    learn that I at some point in the past smoked marijuana?

25         THE JUROR:  No.

1          MR. NESSON:  You wouldn't hold that if you knew

2     that about me against my client?

3          THE JUROR:  No.

4          MR. NESSON:  Okay.  Thank you.

5          THE COURT:  Okay.  You can go back to the jury

6     room.  Don't talk about --

7          THE JUROR:  Oh, no.

8          THE COURT:  Just relax if you can in a courtroom.

9     Okay.  Thank you.  Tanzer, Gregory Tanzer and close the door

10    first.

11          Mr. Nesson, the terms of your representation for

12    Mr. Tenenbaum are not relative to this and should not be

13    described to the juror nor anything that is not going to

14    come out at trial, which is whether or not you smoked

15    marijuana in the past is also irrelevant to this case, so if

16    you ask the question again, the juror that you ask of it

17    will be excused regardless of what the issue is so you're

18    directed not to ask that kind of question.  Anything

19    further?

20          MR. FEINBERG:  I'm sorry, could I ask --

21          THE COURT:  The clothing is different, if that's

22    what you want, how I dress, et cetera.

23          MR. FEINBERG:  Other than the personalization of

24    the marijuana issue, it seems to me we ought to ask a

25    question, that is to say, marijuana was a criminal offense,

1    it's now a civil infraction, and is there an issue with

2    asking that as an abstract question?

3              THE COURT:  As an abstract question is a different

4    issue.

5              MR. FEINBERG:  Okay.  I just wanted to clarify.

6              THE COURT:  Right.  I don't understand what

7    relationship it has to this case unless you're saying that

8    the things that were once legal are not illegal.

9              MR. FEINBERG:  It also reflects attitudes of the

10   perspective juror.

11             THE COURT:  Nice try, Mr. Feinberg.  I'll allow

12   that, not professional because presumably those confessions

13   will not be part of the case, one hopes.

14             MR. OPPENHEIM:  Just so I understand, we're going

15   to allow questions to the jury that says what is your view

16   on the use of marijuana in a copyright case?  It strikes me

17   as --

18             THE COURT:  It's a little bit of a stretch.

19             MR. OPPENHEIM:  More than a little of a stretch,

20   your Honor.

21             THE COURT:  If the inquiry here is that norms and

22   values change, things go from criminal to civil and you just

23   want to find out what the jury thinks about that, it's not

24   an argument you'll make to the jury because nullification is

25   not part of this case, but as a general attitude, yes, I

1    will allow that in jurisdictions that have robust voir dire,

2    lawyers can go anywhere, so this is a version of that.  Call

3    in the next.

4              MR. OPPENHEIM:  Your Honor, two things.  One is I

5    believe Mr. Nesson should be instructed rather than say if

6    he raises it again the juror gets stricken because that will

7    give you --

8              THE COURT:  You're absolutely right, so the way to

9    describe it is he's ordered not to, and it would be contempt

10   were he to disobey that order.  You're absolutely right, he

11   shouldn't hold the key to the disqualification of a juror, I

12   appreciate that.

13             MR. OPPENHEIM:  And having said that, I presume we

14   can now strike the first juror, his having done that?  If it

15   would be an adequate basis going forward, it should be an

16   adequate basis with respect to this first juror.

17             THE COURT:  Counsel.

18             MR. NESSON:  I totally object to that.  This juror

19   gives every indication of being a fair and impartial juror.

20   There's no disqualification that --

21             THE COURT:  I'm not going to strike her.  Let's go

22   forward.  Your objection is noted.  Mr. Tanzer is next.  Hi,

23   Mr. Tanzer.

24             THE JUROR:  How are you?

25             THE COURT:  We're keeping in mind your vacation

1    schedule.

2            THE JUROR:  Thank you.

3            THE COURT:  Start with the defendant in this

4    case.

5            MR. NESSON:  That's me.  Good morning.  Again, I'm

6    Charlie Nesson defending Joel Tenenbaum here.  You're not

7    married?

8            THE DEFENDANT:  No.

9            MR. NESSON:  Girlfriend?

10           THE JUROR:  Yes.

11           MR. NESSON:  Tell me your taste in music, what do

12   you like?

13           THE JUROR:  Country and hip-hop.

14           MR. NESSON:  Country and hip-hop.  Have you been a

15   long time country and hip-hop fan?

16           THE JUROR:  Country since I've been to college

17   Upstate New York, hip-hop for a long time.

18           MR. NESSON:  You're aware this is a civil action?

19           THE JUROR:  Uh-hum.

20           MR. NESSON:  For a civil infringement?

21           THE JUROR:  Uh-hum.

22           MR. NESSON:  You're from Massachusetts obviously?

23           THE JUROR:  Uh-hum.

24           MR. NESSON:  Are you familiar with what's been

25   happening in Massachusetts with the change of marijuana from

1    a status of criminal to civil?

2            THE JUROR:  Yes.

3            MR. NESSON:  So that marijuana is now a civil

4    infraction?

5            THE JUROR:  Uh-hum.

6            MR. NESSON:  As this infringement is a civil

7    infraction.  Did you, when you filled this out with Napster

8    and Napster, LimeWire, KazaA, Rapsody and the rest unsure,

9    did the questionnaire make you feel defensive at all when

10   you were filling this out?  You didn't feel like this was

11   intrusive in any way?

12           THE JUROR:  No.

13           MR. NESSON:  When you say you've ripped CDs to a

14   computer, what does that mean to you?

15           THE JUROR:  Taking a CD and uploading it to your

16   computers that you can put it on iTunes or put it on your

17   iPod.

18           MR. NESSON:  Just stick it in the machine?

19           THE JUROR:  Just put it in the machine so the

20   music is now uploaded onto your computer.

21           MR. NESSON:  You're not breaking codes or anything

22   like that, you're just putting the CD in there?

23           THE JUROR:  Sure.

24           MR. NESSON:  The websites that you're listing that

25   you visit regularly are Google, Gmail, then I'm having

1    trouble reading, Fannie Mae?

2          MR. NESSON:  That's because you're in the real

3    estate business?

4          THE JUROR:  Yeah, Fannie Mae, Freddie Mac.

5          MR. NESSON:  And City --

6          THE JUROR:  I work in real estate finance.

7          MR. NESSON:  You work in real estate finance.

8    Good.  Fine.  Thank you.

9          THE COURT:  Counsel.

10          MR. OPPENHEIM:  Good morning, Mr. Tanzer, my name

11   is Matt Oppenheim.  Along with my co-counsel, we represent

12   five record companies as was described in the courtroom

13   earlier.  We've sued Mr. Tenenbaum for copyright

14   infringement for uploading and downloading copyrighted music

15   on peer-to-peer networks without permission.  Let me begin

16   by thanking you for being a juror.  I recognize that we're

17   here as part of our job.  For you it's more of a burden but

18   a civil duty, and we appreciate that.

19          I'm going to follow up on the questionnaire with a

20   few other questions, if that's all right, and then ask some

21   questions about the questionnaire.  Do you have a view or

22   opinion about record companies?

23          THE JUROR:  In general?

24          MR. OPPENHEIM:  Yes, in general.

25          THE JUROR:  I guess.

1          MR. OPPENHEIM:  Can you tell me a little bit about

2     that?

3          THE JUROR:  Sure.  I believe they're entitled to

4     make money and to sign and record whoever they want.

5     Specifically in this matter, I don't think they have the

6     right to prevent anybody from doing whatever they want with

7     their own music.

8          MR. OPPENHEIM:  Okay.  Do you think they should

9     have a right to enforce their copyrights for people who

10    don't buy the music?

11         THE JUROR:  No.

12         MR. OPPENHEIM:  So if a record company pays,

13    creates with an artist a sound recording, let's take Bruce

14    Springstein and they invest in creating it, marketing it,

15    promoting it, and then they go to sell it, if somebody takes

16    that sound recording without permission for their own use

17    and then gives it to others without permission, they should

18    be allowed to do that?

19         THE JUROR:  Uh-hum.

20         MR. NESSON:  You say they should be allowed to do

21    that?

22         THE JUROR:  They should be allowed to do that.

23         MR. OPPENHEIM:  Do you recognize that doing that

24    is a violation of the copyright laws?

25         THE JUROR:  Uh-hum.

1          MR. OPPENHEIM:  You indicate on your form that

2    you've used a variety of peer-to-peer networks.  Have you

3    used those peer-to-peer networks to upload and download

4    music?

5          THE JUROR:  No, actually I have not used them.

6    They create too many viruses.  I have many friends who have

7    used them though.

8          MR. OPPENHEIM:  With respect to your views on

9    uploading and downloading copyrighted works, is that a

10   strongly held view on your part?

11         THE JUROR:  Uh-hum.

12         MR. OPPENHEIM:  Are you likely to maintain that

13   view throughout this action?

14         THE JUROR:  Uh-hum.

15         MR. OPPENHEIM:  Have you or anyone you know ever

16   received a notice from a copyright holder or an ISP or a

17   university?

18         THE JUROR:  I think somebody I went to undergrad.

19   with did, but I cannot remember who it was or if I actually

20   knew him personally.  It was somebody in a dorm that I lived

21   in, yes.

22         MR. OPPENHEIM:  Do you have a view of those

23   notices?

24         THE JUROR:  I wasn't too familiar with that, with

25   what happened.  He was immediately removed, and I never

1    talked to him after that.

2            THE COURT:  Let me get back to your answer.  You

3    said you didn't think that the record companies have a right

4    to do, to enforce their copyrights against people who didn't

5    buy the song.

6            THE JUROR:  Uh-hum.

7            THE COURT:  If the law says they have a right to

8    enforce their copyright as against people who didn't buy

9    their songs, would you be able to follow the law, or do you

10   think that your personal opinions would make it hard for you

11   to follow the law?

12           THE JUROR:  I could follow the law.  I just --

13           THE COURT:  That's your personal, you can separate

14   your personal opinion from your obligations as a juror?

15           THE JUROR:  Absolutely.

16           THE COURT:  Okay, go on.

17           MR. OPPENHEIM:  Who do you know who's used these

18   peer-to-peer networks?

19           THE JUROR:  Family members, friends.

20           MR. OPPENHEIM:  Your girlfriend?

21           THE JUROR:  Sure.

22           MR. OPPENHEIM:  And when you say family members,

23   immediate family members?

24           THE JUROR:  Sure.

25           MR. OPPENHEIM:  I'm not looking for names and

1    addresses.  And how frequently do they tend to use these

2    peer-to-peer networks?

3            THE JUROR:  Maybe daily basis, maybe weekly,

4    monthly.  I don't know.

5            MR. OPPENHEIM:  Have you ever used them?  I mean,

6    did you have some occasion where you learned that they had

7    lots of viruses?

8            THE JUROR:  Yes, my freshman year of college.

9    Never again.

10           MR. OPPENHEIM:  Which network were you using?

11           THE JUROR:  I want to say LimeWire and I

12   downloaded one song, got a virus and never touched it

13   again.

14           MR. OPPENHEIM:  You indicate on your questionnaire

15   that you've heard about these lawsuits of record companies

16   suing individuals who downloaded and upload music files over

17   the Internet.  What have you heard and what are your views

18   beyond what you've told us?

19           THE JUROR:  Cases similar to this where copyright

20   is, you know, you're not allowed to download, upload music

21   and share it and people are being sued for what I consider

22   to be a much larger sum of money than what they should be.

23   I guess my main point though is that, and maybe this was

24   also an issue, but back in the '90s when people were using

25   those cassette tapes, you could just dub right into it like

1    off the radio, and there was no way to ever know.  People

2    made mixed tapes all the time.  I feel like it's the same

3    exact thing.  If I buy a CD or if I'm listening to radio and

4    there's a way for me to burn it, I don't see why I shouldn't

5    be able to do that.

6            MR. OPPENHEIM:  What about somebody creating those

7    cassette tapes and then selling them or giving them away on

8    the street to millions of people for free, do you have a

9    view of that?

10           THE JUROR:  Selling them, I could see where that

11   would be an issue.  Making money off of that, yes, that's

12   fine, I understand that, that's against the law, and I don't

13   think that's right, but giving them away for free, it's

14   art.

15           MR. OPPENHEIM:  What if somebody gave away

16   mortgages for free such as the mortgage broker couldn't sell

17   the mortgages, could that be a problem for you?

18           THE JUROR:  It would, yeah, I mean, the same way

19   that it would inhibit the way to make money for my company,

20   but there are people that are cutting rates, and they're

21   cutting their fees, and it happens.

22           MR. OPPENHEIM:  Earlier I asked you whether your

23   views were strongly held views with respect to the copyright

24   laws, and you said yes, I think, and you said you'd maintain

25   those views, but when the Judge asked you, you said that

1    you'd be able to follow the law.  You realize there's a

2    direct conflict in your views and the laws?

3            THE JUROR:  Sure.  I would maintain my views, but

4    I can still follow the law.

5            MR. OPPENHEIM:  So you would be prepared if the

6    facts demonstrated that somebody had downloaded and uploaded

7    copyrighted music, you'd be prepared to enter a verdict of

8    liable?

9            THE JUROR:  Sure, if someone could prove to me

10   that there was evidence there and that it was totally

11   against the law, sure.

12           MR. OPPENHEIM:  No further questions, your

13   Honor.

14           THE COURT:  All right.  Mr. Tanzer, you can go

15   back to your seat.  Thank you.

16           MR. OPPENHEIM:  Yes, your Honor.

17           THE COURT:  I'm going to persist in the standard

18   Judge question, which is that if a jury believes, as a Judge

19   has to do, that your personal opinions are in one place and

20   the law is in another that that juror has to stand.  If

21   there was any ambiguity about his answers, it would be one

22   thing, but there was no ambiguity, so I am going to deny the

23   challenge.

24           MR. OPPENHEIM:  Your Honor, may I at least argue

25   it to create a record and maybe potentially change your

1    mind?

2          THE COURT:  Yes, very quickly, please.

3          MR. OPPENHEIM:  Yes, I understand that.  Your

4    Honor, as your own treatise indicates on this issue, bias

5    can be implied where the juror has a social, legal or other

6    relationship to the party such as a juror suffering from

7    injury that was extremely similar in type and time of

8    occurrence to one of which plaintiff complains.

9          This is exactly the same kind of situation.  He

10   has admitted that he has engaged in the same kind of conduct

11   as the defendant, he has admitted that he thinks that that

12   conduct is okay and that the record companies should not

13   pursue these types of claims.

14         That is, I believe, your Honor, bias, and while he

15   may say to you when faced directly with the question, oh, of

16   course I could try to apply the law, this is a juror who's

17   indicated a clear bias on the issue, and I believe for that

18   reason should be recused.  Moreover, I will note, this is

19   the same juror who earlier indicated that he had a

20   forthcoming vacation and really didn't want to serve on this

21   jury in the first instance, so I believe a for cause

22   challenge here is appropriate not only because of his bias

23   but also he has an impending vacation.

24         THE COURT:  As I've said, if there was any

25   ambiguity in his responses to me, it would be one thing, but

1    there was no ambiguity.  You asked the question, I asked the

2    question.  It's one thing if someone answers that way when

3    the Judge asks the question, then it's a civics lesson, but

4    you asked the question, you got the same answer, and he was

5    categorical about it, so I'm going to let him stand by his

6    answer.  There may be circumstances where that won't happen,

7    but it seems to me that where he expressed his opinion so

8    clearly, we can let it happen.

9          Ms. Lalonde is next, juror No. 6.

10          THE COURT:  Hi.  Won't you come in.  You're

11    already in.  Ms. Lalonde, questions begin with the

12    defendants.  I'm sorry, with Mr. Nesson -- plaintiff.

13          MR. OPPENHEIM:  Good morning, Ms. Lalonde.

14          THE JUROR:  Good morning.

15          MR. OPPENHEIM:  As we indicated earlier, my name

16    is Matt Oppenheim.  I, along with my co-counsel, represent

17    five record companies who have brought claims against

18    Mr. Tenenbaum for copyright infringement for downloading and

19    uploading to a peer-to-peer network our music without

20    authorization.

21          Let me start by thanking you for coming as a

22    juror.  I know we're here as part of our job, but for you

23    it's more of a civic responsibility.  I'm going to go ahead,

24    if it's all right with you, and ask you a few follow-up

25    questions to your prior questionnaire.

1          As I indicated, we represent five record

2     companies.  Do you have a view or opinion regarding record

3     companies?

4          THE JUROR:  I, at one point in my life, I did

5     graduate studies in library and information science, and I'm

6     familiar with some of the -- well, with many of the

7     arguments on both sides of copyright law and feel like I

8     definitely have a bias against record companies when it

9     comes to copyright issues.

10         MR. OPPENHEIM:  Okay.  Why do you have that bias?

11         THE JUROR:  Because I philosophically come out on

12    the side that information is free and it's ultimately better

13    for creative people and artists to have more control over

14    their own work product.

15         MR. OPPENHEIM:  And do you have that view if an

16    artist signs a contract with a record company and gets paid

17    for their work and the record company then owns the rights,

18    having paid for it, should the record company then be able

19    to control the work, or you feel less so?

20         THE JUROR:  Well, I know contractually they're

21    entitled to, it but I feel like the artists just because of

22    the way the business model works, artists have to basically

23    sign contracts in order to make their lives into a business

24    and to make money, and so I guess I just feel like the

25    practice of record companies kind of having the rights to

1    artists' work is kind of a dying business model.

2         MR. OPPENHEIM:  If you knew that record companies

3    were able to sign less artists because they were making less

4    money because of the problem of copyright infringement,

5    would that change your view on this issue?

6         THE JUROR:  Could you say that again?

7         MR. OPPENHEIM:  Sure.  So, I think you said

8    something to the effect of, well, you know, artists have to

9    sign with record companies because they need to earn a

10   living, but my question to you is, well, would it make a

11   difference in your view if you knew that record companies

12   really could pay artists, less artists money because they

13   had less money to pay because of the problem of copyright

14   infringement and so less artists would actually get paid to

15   make music?  Would that have an effect on your views?

16        THE JUROR:  No.

17        MR. OPPENHEIM:  Do you have a view on whether or

18   not the rights of the record companies should be different

19   on the Internet than in the physical world, whether

20   individuals should be more free to upload and download

21   music, copyrighted music, on the Internet than they should

22   say in taking a CD out of a store as a shoplifter and making

23   CDs and giving them away on the corner?

24        THE JUROR:  I think the Internet has changed, the

25   reality of the Internet has basically changed the whole

1     model, and if you had asked me that question before the

2     Internet came into existence, I would have probably been

3     more favorably disposed towards the record companies' rights

4     towards the physical, you know, the CD, but I think the

5     reality of the Internet is that there's now a way of people

6     exchanging information in a lot more, you know, free form

7     manner and that it really -- it's just changing the way the

8     world works, so I'm not really able to say that I come out

9     one way or the other.

10                MR. OPPENHEIM:  Do you think that artists should

11    have the right to choose whether or not to protect their

12    works on the Internet or not?

13                THE JUROR:  Yes.

14                MR. OPPENHEIM:  But you believe that there's a

15    difference between the artists and the record companies?

16                THE JUROR:  Yes.

17                MR. OPPENHEIM:  Even if the record companies are

18    signing contracts with the artists?

19                THE JUROR:  Yes.

20                MR. OPPENHEIM:  Do you have an opinion -- it

21    indicates here on your questionnaire that you did some

22    postgraduate work.  What was that in?

23                THE JUROR:  Theological studies.

24                THE COURT:  Let me just go back over the question.

25    You said you philosophically believe that information should

1   be free, and it's better for this product to be free based

2   on the changes in the Internet.  The law entitles the record

3   companies to sue for copyright infringement.  The question

4   is whether or not you think as a juror you would be able to

5   enforce that law even if your personal feelings are in one

6   direction and the law goes in another?  Do you think you

7   could be a juror and enforce this law?

8        THE JUROR:  I think I'm too biased, I don't think

9   I could.

10        THE COURT:  Okay.  I'm going to excuse you.  Thank

11   you.

12        If a juror expresses an opinion directly and an

13   attitude towards cases like this pro or con, I will allow

14   the lawyer to probe that.  We cut things short if you're

15   getting nowhere, and we will extend it if that kind of

16   attitude pro or con is shown.

17        MR. NESSON:  Your Honor, could I ask when you

18   asked the juror if she could follow the law that you include

19   in your statement about what the law is that it would be the

20   juror's task to decide what damages just.

21        THE COURT:  Well, I'm going to resolve the Feltner

22   question against you, so I'm going to stick to this notion

23   if the juror's expressing a view about the entitlement of

24   the record companies to sue, I'll address that attitude.  If

25   they express a view, as did Mr. Tanzer, about suing for a

1   larger sum of money than they should, then I'll address the

2   damages, otherwise I'll pivot the question to what they have

3   said.

4           MR. NESSON:  In other words, you won't allow the

5   jury to return a verdict of no damage, even if they find

6   infringement, you will not allow them to return a verdict?

7           THE COURT:  Right, the law seems not to allow it,

8   but, in any event, that's not something to be played out

9   here.  Chandler, Ms. Chandler is next.  Hi.

10          THE JUROR:  Hi.

11          THE COURT:  Who goes next?

12          MR. OPPENHEIM:  Mr. Nesson is up.

13          THE COURT:  Go on.  Ms. Chandler, hi.

14          MR. NESSON:  Good morning.  I'm Charlie Nesson,

15  I'm representing Joel Tenenbaum.  I want to first thank you

16  for being here.  Can you tell me something about your

17  musical tastes, what do you like in music?

18          THE JUROR:  Almost anything, I was raised with

19  classical, kids music because I have two kids, my husband,

20  pretty much anything.

21          MR. NESSON:  How old are your kids?

22          THE JUROR:  Three and six.

23          MR. NESSON:  How many brothers and sisters do you

24  have?

25          THE JUROR:  I have two, I have a brother and a

1    sister.  My mom plays the piano, so we were raised with

2    music; my dad was a music major in college.

3         MR. NESSON:  Have you ever burned a CD?  You said

4    yes to that one?

5         THE JUROR:  My husband downloads music.  With the

6    Bible Gateway, you can down load the bible, we do CDs at the

7    church.

8         MR. NESSON:  I'm a teacher rather than a

9    litigator.  My regular job is teaching.  I very seldom have

10   been in a court.  I have come to court wearing what I

11   normally wear to teach because I feel most comfortable in

12   it.  I'm just concerned people think it might be out of

13   disrespect for the court.  Would it be bother you in any

14   way?

15        THE JUROR:  No.

16        MR. NESSON:  This is a civil action as opposed to

17   a criminal action, although many features of it you'll see

18   are quite like a criminal action.  One of the features of a

19   civil action as opposed criminal is that a lawyer, a

20   defendant does not have a right in a civil action to

21   appointed counsel.

22        Another distinction in a civil action is that the

23   subject of infringement, it's a civil infringement, it's

24   like other forms of civil infringement.  Have you followed

25   the marijuana history here in Massachusetts and the recent

1    referendum that took it from being a criminal offense to a

2    civil offense?

3              THE JUROR:  I actually never see news.  I watch

4    kids shows, and I don't keep the news on when my kids are

5    around so I don't really know anything that goes on around

6    the world.

7              MR. FEINBERG:  That's why she's so happy.

8              THE JUROR:  I don't want my kids hearing it.

9              MR. NESSON:  All right.  Thank you very much.

10             THE COURT:  Counsel.

11             MR. OPPENHEIM:  Thank you.  Good morning.  My name

12   is Matt Oppenheim.  Along with my co-counsel, I represent

13   four record companies.  We've sued the defendant,

14   Mr. Tenenbaum, for copyright infringement for uploading and

15   downloading from a peer-to-peer network music that our

16   clients own, and as part of the jury selection process, we

17   want to follow up on the questionnaire that you filled out

18   and ask you a few further questions if that's all right.  So

19   as I indicate, we represent record companies.  Do you have a

20   view one way or the other about record companies?

21             THE JUROR:  Honestly, I don't get into it much.

22   My husband downloads music.  I don't know what he downloads

23   them from.

24             MR. OPPENHEIM:  What kind of music does he

25   download?

1           THE JUROR:  A wide variety.

2           MR. OPPENHEIM:  Popular music?

3           THE JUROR:  Yeah, popular, kids, different ones

4    like that.

5           MR. OPPENHEIM:  Rock and roll.  Where does he

6    downloaded it from?

7           THE JUROR:  I honestly have no idea.

8           MR. OPPENHEIM:  Does he download from a network

9    where he doesn't have to pay for it?

10          THE JUROR:  No, I know he pays for them.  I don't

11   know where he does.  I know iTunes he's done a couple from,

12   but beyond that I really don't know.

13          MR. OPPENHEIM:  I think you indicated a moment ago

14   that your father was a musician or music major?

15          THE JUROR:  He was a music major.  Now he leads

16   the church.  He's a minister now.

17          MR. OPPENHEIM:  Did he ever become a professional

18   musician or enter the music industry or anything like that?

19          THE JUROR:  No.  My sister was born and was quite

20   ill, and that kind of took over.

21          MR. OPPENHEIM:  Sorry to hear that.

22          THE JUROR:  Changed the path of his career.

23          MR. OPPENHEIM:  Have you heard or read anything in

24   the press about record companies suing individuals for

25   copyright infringement?  You said you don't listen to the

1    press, of course.  Do you have an opinion as to whether or

2    not record companies should be able to enforce their rights

3    as against individuals who take their music for free and

4    then give it away to others for free?

5          THE JUROR:  I think they should be able to enforce

6    their rights.

7          MR. OPPENHEIM:  Do you believe that the laws with

8    respect to copyright as it deals with music and movies,

9    books and games should apply to the Internet in the same way

10   that it applies to the physical world?

11         THE JUROR:  I think it should.  I think it's on

12   the Internet, so I don't know.  I don't know enough about

13   how the rules apply on the Internet for it.

14         MR. OPPENHEIM:  No further questions.  Thank you.

15         THE COURT:  Okay.  We'll ask you to go back to the

16   courtroom and sit.

17         THE JUROR:  Okay.

18         THE COURT:  Thank you very much.  Donald Moran is

19   the next juror.

20         MR. OPPENHEIM:  Your Honor, you indicated earlier

21   that we might be able to look at the white copies.  This is

22   one of the reasons for whatever reason it didn't come

23   through.

24         THE COURT:  Hi.  Mr. Moran, whose turn is it?  I

25   won't try to guess.

1          MR. OPPENHEIM:  I think it's mine, your Honor.

2          THE COURT:  Good.  Good morning, it's Dr. Moran,

3     right?

4          THE JUROR:  Yes.

5          MR. OPPENHEIM:  My name is Matt Oppenheim.  I

6     along with my co-counsel represent four record companies.

7     We're here because we filed a lawsuit against Mr. Tenenbaum

8     for copyright infringement and specifically downloading from

9     a peer-to-peer network, KazaA, and uploading to the network

10    copyrighted music that my clients own.  We're going to, if

11    it's all right with you, follow up your questionnaire with a

12    series of questions to better understand you.

13         Also, let me thank you for coming here.  I

14    recognize this is our job, but you're here as a matter of

15    civil duty, and we appreciate that.  You indicated you're a

16    physician.  What kind of physician are you?

17         THE JUROR:  An internist, it's internal

18    medicine.

19         MR. OPPENHEIM:  Sure.  How long have you been

20    practicing?

21         THE JUROR:  About ten years now.

22         MR. OPPENHEIM:  And where, do you have a private

23    practice or do you practice in a hospital?

24         THE JUROR:  In a hospital.

25         MR. OPPENHEIM:  What hospital is that?

1          THE JUROR:  Cambridge Hospital.

2          MR. OPPENHEIM:  You indicate on your questionnaire

3    that you use a computer frequently.  In what way do you

4    typically use a computer?

5          THE JUROR:  Essentially for data management, as a

6    communication tool.

7          MR. OPPENHEIM:  And you indicated to the question,

8    "Do you or does anyone in your family or close friend have a

9    connection to Harvard, Harvard University?"  You answered,

10   "Yes."

11         THE JUROR:  Yes, sort of as an instructor through

12   the medical school.

13         MR. OPPENHEIM:  Harvard Medical School?

14         THE JUROR:  Yes.

15         MR. OPPENHEIM:  Would it impact your view one way

16   or the other if you knew that defendant's counsel was

17   associated with Harvard Law School?

18         THE JUROR:  No.

19         MR. OPPENHEIM:  Have you been -- you were asked

20   the question, "Have you heard of lawsuits brought by

21   recording companies against people who download and upload

22   music files over the Internet?"  You answered, "Yes."  Can

23   you describe what you heard?

24         THE JUROR:  Just in general terms.  I don't really

25   know specific cases but just in general terms knowing that

1    there's copyright infringement issues online.

2          MR. OPPENHEIM:  We represent record companies.  Do

3    you have a view one way or the other about record companies?

4          THE JUROR:  No.

5          MR. OPPENHEIM:  And as I mentioned, you know,

6    there is a lawsuit about uploading and downloading on a

7    peer-to-peer network.  Do you have a view on the propriety

8    of that, on whether people should be allowed to do that or

9    not?

10         THE JUROR:  I think it depends on the source.

11   Certainly I do recognize copyright issues, and, you know, I

12   think they need to be honored.

13         MR. OPPENHEIM:  Do you have a view one way or the

14   other on whether or not the copyright laws should be

15   enforced differently on the Internet as opposed to the

16   physical world?

17         THE JUROR:  I don't feel there's a difference.

18         MR. OPPENHEIM:  No further questions, your Honor.

19   Thank you.

20         MR. NESSON:  When you say no difference, do you

21   feel there's no difference between the virtual of the world

22   of the Internet and the physical world of scores and

23   physical objects and all of that?

24         THE JUROR:  I don't feel there's much

25   difference.

1      MR. NESSON:  You don't see a difference between

2 atoms on the one hand and bits on the other?

3      THE JUROR:  I don't.

4      MR. NESSON:  I'm concerned about my clothing.  Is

5 it going to bother you at all that I wear my normal stuff

6 instead of wearing a suit and tie?

7      THE JUROR:  No, I actually like it.

8      MR. OPPENHEIM:  Wait, wait, wait.

9      MR. NESSON:  If you're in a situation where you're

10 called upon to judge a case in which defendants have been

11 charged with downloading and sharing songs, 30 songs, would

12 you have any feelings about the fact that the lawsuit

13 against a defendant like Joel for just downloading and

14 sharing 30 songs not for his own personal profit in any way,

15 not selling them at all subjects him potentially to millions

16 of dollars of damages?

17      THE JUROR:  I heard the facts of the case, but

18 that seems like a big leap.

19      MR. NESSON:  It does.  And could you tell me a

20 little bit about your own musical tastes?

21      THE JUROR:  Somewhat varied, probably from Warren

22 to the pop culture I would think.

23      MR. NESSON:  Do you have a favorite artist, who

24 did you like when you were growing up?

25      THE JUROR:  Bruce Springstein.

1          MR. NESSON:  My man, absolutely.  All right.

2     Good.  Thank you very much.

3          THE COURT:  Okay.  Mr. Moran, you should go back

4     to the jury room.  Thank you very much, and I agree about

5     Springstein.

6          MR. OPPENHEIM:  I think we can all agree.

7     Assigned to one of my clients, by the way.

8          THE COURT:  Bring in Ms. Russell here.

9          MR. OPPENHEIM:  Here, your Honor, let me return

10    that sheet.  Thank you very much.

11         MR. NESSON:  What happened to Ms. Rise?

12         THE COURT:  Hi, come sit down.  You're

13    Ms. Russell, right?

14         THE JUROR:  Yes.

15         THE COURT:  Whose turn?

16         MR. OPPENHEIM:  I believe it's the defendants,

17    your Honor.

18         MR. NESSON:  Hello, I'm Charlie Nesson.

19         THE JUROR:  Nice to meet you.

20         MR. NESSON:  I'm defending Mr. Tenenbaum.  I'm a

21    teacher in my ordinary life, not a litigator, so there will

22    be times when there are things that much come familiar to my

23    opponents here than come to me.  One thing I was concerned

24    about is my clothing.  I chose to wear what I normally wear

25    when I teach rather than to dress up in something that

1    didn't feel comfortable.  I was concerned that you might

2    think that that is out of some disrespect to the court or

3    anything else?

4              THE JUROR:  No.

5              MR. NESSON:  You wouldn't hold that against Joel

6    here?

7              THE JUROR:  No.

8              MR. NESSON:  Could you tell me something about

9    your musical tastes, what kind of music do you actually

10   like?

11             THE JUROR:  All kinds, eclectic.

12             MR. NESSON:  Say that again.

13             THE JUROR:  Eclectic.

14             MR. NESSON:  That's been true for your whole life?

15             THE JUROR:  Yes.

16             MR. NESSON:  Have you followed over the course of

17   your life the switch from the physical world of LP records

18   and 45s then to CDs and then to Internets and iPods?

19             THE JUROR:  Yes.

20             MR. NESSON:  How do you listen to music now?

21             THE JUROR:  Internet radio.

22             MR. NESSON:  You turn to an Internet radio

23   station?

24             THE JUROR:  Yes, background music while I'm

25   working.

1          MR. NESSON:  Where do you work?  What is it you

2     work in?

3          THE JUROR:  I work at a bank, State Street

4     Bank.

5          MR. NESSON:  You used Rapsody at some point.  Tell

6     me about that.

7          THE JUROR:  It was free with something I bought at

8     Wal-Mart.

9          MR. NESSON:  A long time ago?

10          THE JUROR:  Yeah, a couple years ago.

11          MR. NESSON:  But iTunes is your basic thing?

12          THE JUROR:  Yes.

13          MR. NESSON:  Do you recall how long ago it was you

14     got into iTunes?

15          THE JUROR:  Several years.  A couple years.

16          MR. NESSON:  A couple years.  Do you have an iPod

17     yourself?

18          THE JUROR:  Yes, I did from when I commuted.

19          MR. NESSON:  Tell me about your family.  You have

20     children?

21          THE JUROR:  I have one son, 30.

22          MR. NESSON:  One son, 30.  He's married?

23          THE JUROR:  No.

24          MR. NESSON:  So no grandchildren?

25          THE JUROR:  Not yet.  No pressure, but...

1          MR. NESSON:  Tell me what sociable singles is.

2          THE JUROR:  It was a singles group I started after

3   I got divorced.

4          MR. NESSON:  How long ago did you get divorced?

5          THE JUROR:  About 15 years.

6          MR. NESSON:  So, this was your group, you actually

7   started this group?

8          THE JUROR:  Yes, it was part of a support group at

9   a church, and we liked the social aspects, so we kept it

10  going.

11         MR. NESSON:  And it's still going?

12         THE JUROR:  Very strong, couple hundred members.

13         MR. NESSON:  So this is a civil action.

14         THE JUROR:  Uh-hum.

15         MR. NESSON:  It's not criminal, although there's

16  going to be lots of things that you'll notice that are very

17  like in criminal action.  It's for a civil infringement.

18  Can you think of any other civil infringements besides

19  copyright, any others come to mind?

20         THE JUROR:  No.

21         MR. NESSON:  Have you followed the marijuana

22  debate in Massachusetts and the fact it's now a civil

23  infringement?

24         THE JUROR:  No, I haven't.

25         MR. NESSON:  Would you consider underage drinking

1    to be a civil infringement?

2           THE JUROR:  I'd have to think about that.  I don't

3    know.

4           MR. NESSON:  Kind of think you get a -- what does

5    it mean, a civil infringement, to you, how would that

6    distinguish in your mind from criminal?

7           THE JUROR:  Criminal I tend to think of more

8    violence and that type of thing.

9           MR. NESSON:  And punishment, you punish the civil

10   offender, excuse me, the criminal offender, punishment for

11   the crime?

12          THE JUROR:  Yeah.

13          MR. NESSON:  And civil is like --

14          THE JUROR:  In my mind it's the high level

15   disagreement.

16          MR. NESSON:  Between private people?

17          THE JUROR:  Yeah, that can't be resolved.

18          MR. NESSON:  Typically for damage that one person

19   has done to the other, at least that's the claim?

20          THE JUROR:  Yeah, in broad terms, yeah.

21          MR. NESSON:  Do you understand in this case that

22   they're not claiming any damage from him, no actual damage

23   whatsoever?

24          THE COURT:  That's not a proper question.

25          MR. OPPENHEIM:  Your Honor --

1          THE COURT:  Next question, that's not a proper

2     question.

3          MR. NESSON:  Nothing further, thank you.

4          THE COURT:  Counsel.

5          MR. OPPENHEIM:  Good morning, Ms. Russell, my name

6     again is Matt Oppenheim.  I'm here with my co-counsel, and

7     we represent four record companies.  As the Court indicated

8     to all the jurors earlier, we've sued Mr. Tenenbaum for

9     uploading our music or our client's music on a peer-to-peer

10    network without permission.  With your permission, I'm going

11    to follow up on your questionnaire with some further

12    questions.

13          THE JUROR:  Sure.

14          MR. OPPENHEIM:  As I indicated, we represent four

15    record companies.  Do you have a view one way or the other

16    about record companies?

17          THE JUROR:  No.

18          MR. OPPENHEIM:  Have you or any of your immediate

19    family members ever owned a business?

20          THE JUROR:  No.

21          MR. OPPENHEIM:  So, as I said, we've sued

22    Mr. Tenenbaum for uploading and downloading copyrighted

23    works on a peer-to-peer network.  Do you have a view or

24    opinion about the use of peer-to-peer networks such as

25    Napster, KazaA, LimeWire or other networks like that?

1          THE JUROR:  No, I don't have an opinion.

2          MR. OPPENHEIM:  Have you heard or read anything in

3    the press about record companies or movie studios or book

4    companies suing individuals who infringe their copyrights?

5          THE JUROR:  The only one that comes to mind is

6    Napster.  It was a while ago, and I think the thing that

7    stuck more in my mind was that it was a student than --

8          MR. OPPENHEIM:  A student who created Napster?

9          THE JUROR:  Yeah.

10          MR. OPPENHEIM:  Shawn Fanning?

11          THE JUROR:  Someone in the Boston area,

12    Northeastern or something like that.  That's my own

13    recollection.

14          MR. OPPENHEIM:  Your recollection is right on the

15    mark.  Did you have a view one way or the other about that?

16          THE JUROR:  No, I just found it interesting.

17          MR. OPPENHEIM:  Okay.  Do you have a view or

18    opinion about record companies enforcing their rights for

19    people who infringe their copyrights?

20          THE JUROR:  Not one way or the other.  I haven't

21    really thought about it.

22          MR. OPPENHEIM:  Do you have a view as to whether

23    or not music or movies or books or games should be available

24    free on the Internet as opposed to the laws that apply in

25    the physical world?

1          THE JUROR:  I haven't really thought about it one

2     way or the other.

3          MR. OPPENHEIM:  You indicated on your

4     questionnaire that you owned an iPod or MP3 player?

5          THE JUROR:  Yes.

6          MR. OPPENHEIM:  What is it you own?

7          THE JUROR:  An iPOD.

8          MR. OPPENHEIM:  Do you use it regularly?

9          THE JUROR:  Yes.

10          MR. OPPENHEIM:  And how do you -- where do you get

11     the music for it?

12          THE JUROR:  ITunes.

13          MR. OPPENHEIM:  And you indicated that you've used

14     iTunes and Rapsody.  Have you ever used any of the other

15     peer-to-peer networks?

16          THE JUROR:  No.

17          MR. OPPENHEIM:  You indicate that you had heard

18     about the lawsuits brought by record companies against

19     people who download and share music files over the Internet.

20     Other than the Napster --

21          THE JUROR:  That's the only one.

22          MR. OPPENHEIM:  That's the only one, okay.  A

23     moment ago I think you said that you listened to Internet

24     radio; is that right?

25          THE JUROR:  Yes.

1            MR. OPPENHEIM:  Where do you listen to Internet

2     radio?

3            THE JUROR:  At work.

4            MR. OPPENHEIM:  I mean where on the Internet,

5     which Internet radio, Pandora or AOL Music or --

6            THE JUROR:  I just have one website, I go to

7     107mix.com.

8            MR. OPPENHEIM:  It's a normal radio station that

9     rebroadcasts on the Internet?

10           THE JUROR:  Yes, only because my radio didn't work

11    in the office where my office was so I went online plus

12    there's no commercials.

13           MR. OPPENHEIM:  Great.  A moment ago Mr. Nesson

14    indicated to you improperly that the plaintiffs were

15    claiming that there were no damages in this case.  Just as a

16    matter of clarifying the record, the evidence will be

17    presented at trial and the plaintiffs will present evidence

18    of substantial damages.  Will you be able to disregard

19    Mr. Nesson's comment to you?

20           THE JUROR:  Yeah.

21           MR. OPPENHEIM:  I have no further questions.

22    Thank you very much.

23           THE COURT:  Okay.  Ms. Russell, you should go back

24    to the jury room and wait.  Very exciting.  Thank you so

25    much.  Ms. Rise is the next, juror No. 10.  We have 1, 2, 3,

1    4, 5 jurors.

2              MR. OPPENHEIM:  We have a number of issues here.

3    First of all, obviously Mr. Nesson should not be saying that

4    we're not going to show any damages.

5              THE COURT:  Right.

6              MR. OPPENHEIM:  But, further, Mr. Nesson continues

7    to --

8              MR. NESSON:  May I say they're not claiming any

9    actual damages?

10             THE COURT:  I understand that, but that's not

11   to -- that's besides the point.

12             MR. OPPENHEIM:  It's not true.

13             THE COURT:  Go on.

14             MR. OPPENHEIM:  He continues to try to analogize

15   to these jurors that copyright infringement is the same as

16   drinking or marijuana use, and there simply is no analogy

17   here.  It's improper.  He keeps referring to this as a

18   criminal case, and there are many aspects like a criminal

19   case.  This is not a criminal case.  This is subject to the

20   rules that the Court will set forward to the jurors, and he

21   should not be preloading this with terms like charged and

22   criminal aspects, and we should deal with this as a

23   copyright case, not as some other type of case.

24             THE COURT:  The purpose of voir dire is to allow

25   you to sort through the attitudes that the jurors have so

1    you can challenge for cause or exercise a peremptory

2    challenge.  Because of that, voir dire is somewhat broad to

3    see what their attitudes are, and if Mr. Nesson say that

4    attitudes to marijuana decriminalization will -- that a

5    juror that has a particular attitude to that might be a

6    juror you'd want to have for whatever set of reasons, I will

7    allow him to ask the question.

8         MR. OPPENHEIM: I have no problem with that

9    question, your Honor.  I have a problem with his commentary

10   that there are many aspects of this case that are like a

11   criminal case which he has now said with two or three

12   different jurors.  I think that he's essentially trying to

13   preload with a juror a conception of the law, which is

14   wrong.  If he wants to ask the question, ask the question.

15   Don't relate it to copyright infringement, don't relate it

16   to criminal actions, just ask the question.

17        THE COURT:  I will allow a question about

18   attitudes with respect to whatever, marijuana, et cetera,

19   but I agree with you that he can't analogize this case to a

20   criminal case.

21        MR. OPPENHEIM:  Thank you, your Honor.

22        THE COURT:  Next juror which is juror No. 10,

23   Margaret Rice.  Hi, Ms. Rice.  Mr. Oppenheim, you go.

24        MR. OPPENHEIM:  Good morning, Ms. Rice.

25        THE JUROR:  Good morning, afternoon actually.

1           MR. OPPENHEIM:  Are we already at afternoon?

2           THE COURT:  We're going to count this as morning

3     still.

4           MR. OPPENHEIM:  We haven't gone to lunch, we'll

5     call it morning.  My name is Matt Oppenheim.  I along with

6     my co-counsel represent the plaintiffs in this case which

7     are a bunch of record companies.  We have sued Mr. Tenenbaum

8     for copyright infringement for downloading from a

9     peer-to-peer network and uploading to that peer-to-peer

10    network copyrighted music that my clients own.

11          THE JUROR:  Right.

12          MR. OPPENHEIM:  Do you have a view one way or the

13    other about record companies?

14          THE JUROR:  No, not really.

15          MR. OPPENHEIM:  Okay.

16          THE JUROR:  I enjoy music, but, no, I don't have

17    any particular view one way or the other.

18          MR. OPPENHEIM:  How do you listen to music?

19          THE JUROR:  How do I listen to music?

20          MR. OPPENHEIM:  Yes.

21          THE JUROR:  My stereo, then I have an iPOD Nano.

22          MR. OPPENHEIM:  Where do you get the music for

23    your iPod?

24          THE JUROR:  My son helped me download it from

25    iTunes.

1          MR. OPPENHEIM:  Do you or any of your family

2     members own a business or have you ever owned a business?

3          THE JUROR:  No.

4          MR. OPPENHEIM:  So I indicated that we've sued

5     Mr. Tenenbaum for copyright infringement on peer-to-peer

6     networks.  Do you have a view or opinion about the use of

7     peer-to-peer networks like Napster, KazaA or LimeWire, among

8     others?

9          THE JUROR:  I'm not familiar with them.

10          MR. OPPENHEIM:  Have you heard or read anything in

11     the press about record companies or movie studios suing

12     individuals who infringe their copyrights?

13          THE JUROR:  Vaguely.  I don't have any specific

14     memory of a specific case, but I have heard about it.

15          MR. OPPENHEIM:  Do you have a view about the

16     record companies or movie studios bringing those types of

17     cases one way or the other?

18          THE JUROR:  No, I don't believe that people should

19     download something that's not of their own.

20          MR. OPPENHEIM:  Do you have a view as to whether

21     or not the copyright laws or intellectual property laws

22     should be different for the Internet as opposed to the

23     physical world?

24          THE JUROR:  No.

25          MR. OPPENHEIM:  You're a nurse; is that correct?

1          THE JUROR:  Yes, I am.

2          MR. OPPENHEIM:  And where do you work?

3          THE JUROR:  I work at Acton Medical Associates.  I

4    manage a satellite office of Acton Medical.

5          MR. OPPENHEIM:  Your husband is a CPA; is that

6    correct?

7          THE JUROR:  Yes.

8          MR. OPPENHEIM:  And where does he work?

9          THE JUROR:  He works in a company called JP

10   Sullivan in Ayer.

11         MR. OPPENHEIM:  What kind of work does he do?

12         THE JUROR:  I'm not sure exactly his job

13   description.  He's sort of the financial guy.

14         THE COURT:  Formal description, financial guy,

15   okay.

16         THE JUROR:  Controller maybe.

17         MR. OPPENHEIM:  Okay.  You indicate on your form

18   you use a computer frequently?

19         THE JUROR:  Yes.

20         MR. OPPENHEIM:  What kind of things do you do?

21         THE JUROR:  In our office we use EMR, Electronic

22   Medical Records, so I'm on the computer all day.

23         MR. OPPENHEIM:  Of course.

24         THE JUROR:  Also as manager of the office, I need

25   to -- I get updates from cdc.com, cdc.gov. especially in

1      recent of the recent Swine flu epidemic, just getting

2      updates on how the epidemic is being managed, and from the

3      Department of Public Health, we were getting updates on how

4      to handle cases that arrived in our office.

5              MR. OPPENHEIM:  Sure.  Thank you very much.  I

6      have no further questions.

7              THE COURT:  You have to stay for one more round.

8      Mr. Nesson.

9              MR. NESSON:  Hello.  I'm Charlie Nesson.  Tell me

10     about your children and their musical tastes.  Your son

11     helped you with iTunes.  Are the kids into music?

12             THE JUROR:  My middle child, in particular, he's

13     an electronic engineering student, and I think he's very

14     interested in the music aspect of that.

15             MR. NESSON:  Can you tell me about your own

16     musical tastes?

17             THE JUROR:  Oh, all over the board, I mean, Hoodie

18     and The Blowfish to Beethoven.  I mean, I just have a wide

19     range of musical interests.

20             MR. NESSON:  I'm a teacher in my regular life, not

21     a lawyer.  I'm concerned about my clothing, not upsetting

22     people thinking that somehow I'm being disrespectful to the

23     court by not wearing a suit and a tie, wearing what I wear

24     just because I want to feel like who I am than somebody

25     different.  Would that bother you in any way?

1            THE JUROR:  Not at all.

2            MR. NESSON:  You wouldn't take offense to it?

3            THE JUROR:  No.

4            MR. NESSON:  This is a civil case --

5            THE JUROR:  Yes.

6            MR. NESSON:  -- for copyright infringement.  Have

7    you followed the course of the legalization of marijuana

8    that's gone on in Massachusetts where it went from being a

9    criminal offense to being a civil offense?

10            THE JUROR:  Oh, just vaguely.  I'm not up to date

11    on the latest.

12            MR. NESSON:  When you think of civil infractions,

13    what kinds of things come to your mind?  How serious is a

14    civil infraction?

15            THE JUROR:  Well, I'm not really familiar.

16            MR. NESSON:  Joel's being charged with sharing 30

17    songs, and he will be contesting in various respects, but

18    ultimately he's not being charged with having sold them to

19    anybody or having done anything except share with his

20    friends.

21            THE JUROR:  Right.

22            MR. NESSON:  And enjoy it himself.  Do you have

23    any feelings about him for that being exposed to charges

24    that can be in the millions of dollars?

25            THE JUROR:  No, I don't think that that would seem

1  like an offense that would be worth millions of dollars.

2  MR. NESSON:  So, you will, I believe, be asked at

3  the conclusion of the trial to make a judgment if you found

4  that he has infringed, you will be asked to make a judgment,

5  an award of money that will be just.  Is that something you

6  can see yourself doing in a way that feels comfortable, that

7  is, would you feel comfortable about making a judgment about

8  what it would be just for him to have to pay to the record

9  companies for his sharing of these 30 songs?

10  THE JUROR:  I believe I can.

11  MR. OPPENHEIM:  Your Honor, can we correct the

12  misstatement of the fact by Mr. Nesson?

13  THE COURT:  What was that misstatement?

14  MR. OPPENHEIM:  He said that he's been charged,

15  really sued, for nothing other than sharing 30 songs with

16  his friends.  That's obviously not what we've alleged.

17  We've alleged that he's downloaded and uploaded hundreds of

18  works and we've sued on 30 of them, and he's done it to

19  millions of people.

20  THE COURT:  Well, the facts will be the facts that

21  will come out.

22  MR. OPPENHEIM:  I agree, your Honor.

23  THE COURT:  This inquiry is just to see what the

24  attitudes of the juror is, attitudes are, so I'm going to

25  find you'll remain in the pool.  Go back to the courtroom

1  and we'll let you know where to go from here.  Thank you so

2  much.

3        The next juror is James Pierce.

4        MR. FEINBERG:  Judge, I'm going to object to

5  Mr. Oppenheim doing what he just did on the record.  If he

6  wants to do that, let him do it in the absence of the juror.

7  If there's going to be a problem.

8        THE COURT:  Listen, let's stop this, if there's

9  going to be a correction, the juror will leave the room,

10  we'll bring the juror back, if necessary.  We'll do it that

11  way.  You can object, state your objection at the conclusion

12  of it.  If you don't understand, I'll have the juror hold

13  and we'll talk about it so I'll make whatever corrections

14  there are.

15        MR. FEINBERG:  Thank you, Judge.

16        MR. OPPENHEIM:  I hope going forward Mr. Nesson is

17  not going to use that phrase again because that is a

18  misstatement of our allegations.

19        THE COURT:  Okay.  Call in the next juror, please,

20  James Pierce, juror No. 13.  Hi, come on in.

21        THE JUROR:  Hi.

22        THE COURT:  Start with Mr. Nesson.  Mr. Pierce,

23  this is Mr. Nesson.

24        MR. NESSON:  I'm representing Joel Tenenbaum

25  here.

1           THE JUROR:  Hi.

2           MR. NESSON:  Could you tell me what GOAL is.

3           THE JUROR:  Gun Owners' Action League.

4           MR. NESSON:  Say it again.

5           THE JUROR:  Gun Owners' Action League.

6           MR. NESSON:  Gun Owners' Action League.  You're

7    really into the guns here with the Gun Owners' Action

8    League?

9           THE JUROR:  It's a hobby.

10          MR. NESSON:  What's your involvement with it?

11          THE JUROR:  Nothing really, just a member.

12          MR. NESSON:  Are you a hunter?

13          THE JUROR:  No, just target shooting.

14          MR. NESSON:  What sort of guns do you actually

15   shoot?

16          THE JUROR:  Rifle, shotguns, pistols.

17          MR. NESSON:  So tell me about your own music

18   tastes a little.  What do you like?

19          THE JUROR:  Alternative, a little bit of punk.

20          MR. NESSON:  Who's your favorite artist?

21          THE JUROR:  Stained.

22          MR. NESSON:  Say it again.

23          THE JUROR:  Stained, S-t-a-i-n-e-d.

24          MR. NESSON:  You'll have to fill me in on this.

25   So I see you have used a number of peer-to-peer softwares?

1          THE JUROR:  Occasionally.

2          MR. NESSON:  First, in filling out this form, did

3  it put you on the defense in some way?  Were you worried in

4  some way that maybe you were going to be admitting to

5  something that you shouldn't be admitting to?

6          THE JUROR:  No, that would be illegal.

7          MR. NESSON:  You might get in trouble.  So tell me

8  about what you've heard about the lawsuits.

9          THE JUROR:  Not much.  I don't really follow the

10  news much.

11          MR. NESSON:  But you have heard something about

12  these lawsuits that the recording industry has brought

13  against individual music fans?

14          THE JUROR:  I have heard some people have lost

15  monetary values.  I can't remember the exact amounts.

16          MR. NESSON:  But big numbers?

17          THE JUROR:  Yes.

18          MR. NESSON:  Big numbers like in the millions?

19          THE JUROR:  Yes.

20          MR. NESSON:  Do you have feelings about that?

21          THE JUROR:  Not particularly.

22          MR. NESSON:  So now you are single?

23          THE JUROR:  Yes.

24          MR. NESSON:  Brothers and sisters?

25          THE JUROR:  Yes, I have two.

1          MR. NESSON:  Married brothers and sisters?

2          THE JUROR:  No.

3          MR. NESSON:  So, no next generation in your

4    family?

5          THE JUROR:  No.

6          MR. FEINBERG:  Not that he knows of.

7          MR. NESSON:  Just tell me a little bit about your

8    background.  Where did you go to school?

9          THE JUROR:  I went to school at New Bedford Voc.,

10   it's a vocational school in New Bedford.  I went to school

11   for electrical.

12         MR. NESSON:  Have you been employed in the past

13   and you're just not employed now?

14         THE JUROR:  Yes.

15         MR. NESSON:  What did you do before?

16         THE JUROR:  I worked at Flagship Cinemas.  It's a

17   movie theater in New Bedford.

18         MR. NESSON:  All right.  I think that's all for

19   me.

20         THE JUROR:  All right.

21         THE COURT: Wait, one more round, Mr. Oppenheim.

22         MR. OPPENHEIM:  Good afternoon, Mr. Pierce.  My

23   name is Matt Oppenheim.  Along with my co-counsel, I

24   represent four record companies that have sued Mr. Tenenbaum

25   for copyright infringements on peer-to-peer networks.  With

1    your permission, I'll ask you some follow-up questions to

2    your questionnaire.

3              THE JUROR:  Sure.

4              MR. OPPENHEIM:  Do you have an opinion one way or

5    the other about record companies?

6              THE JUROR:  No.

7              MR. OPPENHEIM:  I know that you indicated you

8    worked as a projectionist.  Do you have a view one way or

9    the other about movie studios?

10             THE JUROR:  No, it was just a job, a fun job, but

11   it was just a job.

12             MR. OPPENHEIM:  You like movies?

13             THE JUROR:  Yes.

14             MR. OPPENHEIM:  I mentioned that the record

15   companies have sued Mr. Tenenbaum for copyright infringement

16   on peer-to-peer networks.  Do you have a view or an opinion

17   about the use of peer-to-peer networks like Napster or KazaA

18   or LimeWire?

19             THE JUROR:  Not really.

20             MR. OPPENHEIM:  In response to one of Mr. Nesson's

21   questions, you indicated that would be illegal.  Can you

22   give me, I didn't quite understand.

23             THE JUROR:  Would you like me to elaborate?

24             MR. OPPENHEIM:  That would be great.

25             THE JUROR:  Being a courtroom, I figured that if

1    you were going to ask me a question which would incriminate

2    myself, it would be illegal, the Fifth Amendment.

3            MR. OPPENHEIM:  We're not here to cross-examine

4    you about your conduct.

5            THE JUROR:  Yeah, I figured that.

6            MR. OPPENHEIM:  So you indicated that you used,

7    you've used, you or someone you know have used Napster,

8    LimeWire and KazaA; is that correct?

9            THE JUROR:  Yes.

10           MR. OPPENHEIM:  And is that you or is that

11   somebody else?

12           THE JUROR:  Both.

13           MR. OPPENHEIM:  And do you still use them now?

14           THE JUROR:  Not really.  I don't really listen to

15   music.

16           MR. OPPENHEIM:  And it indicates that you've used

17   iTunes.  Do you still use iTunes?

18           THE JUROR:  I don't.

19           MR. OPPENHEIM:  Somebody you know?

20           THE JUROR:  Yes.  I don't know how to use it.

21           MR. OPPENHEIM:  You don't know how to use it?

22           THE JUROR:  No.

23           MR. OPPENHEIM:  Why did you stop using Napster,

24   LimeWire and KazaA?

25           THE JUROR:  Because my interest falls more into

1    movies than music.  I've never really been that I guess want

2    to say dedicated to it.

3              MR. OPPENHEIM:  Not as much of a fan.

4              THE JUROR:  Yeah.

5              MR. OPPENHEIM:  When it comes to movies, are you

6    aware that people download and upload movies onto the

7    Internet?

8              THE JUROR:  Yes.

9              MR. OPPENHEIM:  Do you have a view about that one

10   way or the other?

11             THE JUROR:  Other than the fact it would take a

12   long time and it's not worth it.  I have HBO.

13             MR. OPPENHEIM:  To download it.  Do you have an

14   opinion one way or the other about record companies

15   enforcing their rights against individuals who do infringe

16   their copyrights?

17             THE JUROR:  No.

18             MR. OPPENHEIM:  And do you have a view as to

19   whether or not music, movies, books or games should be free

20   on the Internet just because they're on the Internet?

21             THE JUROR:  No.  Yahoo wouldn't be worth $400 a

22   share if it was.

23             MR. OPPENHEIM:  Sorry about that.

24             THE JUROR:  That's okay.

25             MR. OPPENHEIM:  Do you think that it should be

1    okay for individuals to be able to download copyrighted

2    music from peer-to-peer networks?

3          THE JUROR:  Well, there are some instances where

4    they charge fees for it, so that means someone is getting

5    something.  I don't know.  It's a very touchy issue.  I

6    haven't really thought about it that much.

7          MR. OPPENHEIM:  Okay.  No further questions, your

8    Honor.  Thank you very much.

9          THE COURT:  Okay.  Mr. Pierce, go back to the

10   courtroom and wait.

11         THE JUROR:  Awesome.

12         MR. OPPENHEIM:  Thank you very much.  I don't know

13   about awesome, but thank you.

14         THE JUROR:  Have a good day.

15         THE COURT:  You, too.  Mr. Turnbull is the next

16   juror, Ms. Turnbull.  Mr. Oppenheim you begin.  I'm getting

17   this now.

18         MR. OPPENHEIM:  You got it.  Good morning,

19   Ms. Turnbull.

20         THE JUROR:  Good morning.

21         MR. OPPENHEIM:  My name is Matt Oppenheim.  I'm

22   here with my co-counsel.  We represent four record companies

23   that have brought a suit against Mr. Tenenbaum for copyright

24   infringement for his downloading from and uploading to a

25   peer-to-peer network the music that our clients own.  With

1   your permission, I'm going to ask you some follow-up

2   questions to your questionnaire.

3          THE JUROR:  Sure.

4          MR. OPPENHEIM:  As indicated, we represent the

5   record companies.  Do you have a view one way or the other

6   about record companies?

7          THE JUROR:  No.

8          MR. OPPENHEIM:  Have you or any of your family

9   members ever owned a business?

10         THE JUROR:  No.

11         MR. OPPENHEIM:  So I mention that we've sued

12  Mr. Tenenbaum for downloading and uploading on a

13  peer-to-peer network.  Do you have a view as to or an

14  opinion about the use of peer-to-peer networks such as

15  Napster or KazaA or LimeWire?

16         THE JUROR:  No.

17         MR. OPPENHEIM:  Have you heard or read anything in

18  the press about record companies or movie studios suing

19  individuals who infringe their copyrights?

20         THE JUROR:  I've just heard but never paid

21  attention, heard it from the news media.

22         MR. OPPENHEIM:  Do you have a view on it one way

23  or the other?

24         THE JUROR:  No, I don't really know much about

25  it.

1          MR. OPPENHEIM:  Do you have a view or an opinion

2   about record companies should be able to enforce their

3   rights as against people who take their music for free and

4   give it away to others for free?

5          THE JUROR:  No.

6          MR. OPPENHEIM:  Have you or has anyone that you

7   know ever received a notice from a copyright holder or an

8   Internet service provider or school regarding a possible

9   copyright violation?

10          THE JUROR:  No.

11          MR. OPPENHEIM:  Do you have a view as to whether

12  music, movies, books or games should be free on the Internet

13  or whether the laws should apply to the Internet the same

14  way they apply to the physical world?

15          THE JUROR:  Do I have a view, no.

16          MR. OPPENHEIM:  Your survey indicates that you

17  completed some postgraduate studies.  What were those in?

18          THE JUROR:  I have an M.B.A. from Boston

19  College.

20          MR. OPPENHEIM:  And you currently work for

21  Johnson & Johnson?

22          THE JUROR:  Correct.

23          MR. OPPENHEIM:  And you indicated on this form

24  that you or a member of your family had been a plaintiff or

25  a defendant in a lawsuit; is that correct?

1          THE JUROR:  Yes, personal injury accident, car

2    accident.

3          MR. OPPENHEIM:  Was it you or somebody?

4          THE JUROR:  It was myself years and years ago.

5          MR. OPPENHEIM:  You were a plaintiff or a

6    defendant?

7          THE JUROR:  I was both.

8          MR. OPPENHEIM:  Multiple parties?

9          THE JUROR:  Yes.

10          MR. OPPENHEIM:  Sounds messy.  Did that process in

11    any way taint your views as to lawsuits?

12          THE JUROR:  No.

13          MR. OPPENHEIM:  You indicated that you use a

14    computer frequently.  What kinds of things do you tend to do

15    on the computer?

16          THE JUROR:  While I work at a manufacturing

17    facility, and so I work on a computer every day.  You know,

18    most of our stuff is done electronically, our records are

19    kept electronically.

20          MR. OPPENHEIM:  Sure.  You indicated you use an

21    iPOD or an MP3 player; is that right?

22          THE JUROR:  Correct.

23          MR. OPPENHEIM:  An iPOD?

24          THE JUROR:  An iPOD, I have an iPOD.

25          MR. OPPENHEIM:  Do you have load music onto that?

1          THE JUROR:  I do.

2          MR. OPPENHEIM:  Where do you load it from?

3          THE JUROR:  ITunes.

4          MR. OPPENHEIM:  There was a whole list on this

5    questionnaire of various peer-to-peer networks.  You've

6    never used any of these peer-to-peer networks?

7          THE JUROR:  No.

8          MR. OPPENHEIM:  Do you know anybody who has?

9          THE JUROR:  No, not that I know of.

10         MR. OPPENHEIM:  And when you were in grad. school,

11   were you working?

12         THE JUROR:  Yes.

13         MR. OPPENHEIM:  What were you doing while you were

14   working at grad. jobs?

15         THE JUROR:  I worked for Tyco Healthcare at the

16   time and also Johnson & Johnson.

17         MR. OPPENHEIM:  You're still with J & J?

18         THE JUROR:  Yes.

19         MR. OPPENHEIM:  Thank you very much.  No further

20   questions.

21         THE COURT:  Mr. Nesson.

22         MR. NESSON:  Charlie Nesson again.

23         THE JUROR:  Hi, how are you?

24         MR. NESSON:  Tell me about your musical tastes.

25         THE JUROR:  Probably '70s, '80s, mix.  I use my

1    iPod to work out.  I'm not working out right at the moment

2    though, just walking.

3           MR. NESSON:  Like any favorite artist that comes

4    to mind?

5           THE JUROR:  No, Jimmy Buffet is one of my

6    favorites.

7           MR. NESSON:  You like movies?

8           THE JUROR:  Yeah.

9           MR. NESSON:  Have you seen My Cousin Vinny?

10          THE JUROR:  Yes.

11          MR. NESSON:  Have you seen The Verdict?

12          THE JUROR:  I don't know if I've seen it.  Is that

13   with Paul Newman?

14          MR. NESSON:  Yes, absolutely.

15          THE JUROR:  Yes, years ago.

16          MR. NESSON:  Do you know what these things that

17   were listed here on the page are, Napster, Grokster, KazaA,

18   Bittorrent, Morpheus, do you know what they are?

19          THE JUROR:  I've only heard of Napster.  I don't

20   really know much about them other than they're Internet-type

21   forums, but I've never used them.

22          MR. NESSON:  I'm a teacher in my ordinary life,

23   not a litigator.  This is what I wear to teach in, so I

24   figured I'd just stick with it when I came down here.  It

25   won't bother you at all that I'm wearing a T-shirt?

1          THE JUROR:  No.  We're business casual at J & J,

2   too.

3          THE COURT:  Then I'm going to just get rid of the

4   robe.

5          THE JUROR:  I know.

6          THE COURT:  It is really.  Go on, Mr. Nesson.

7          MR. NESSON:  I won't go there.  Are you -- this is

8   a civil action, it's not a criminal action, it's a civil

9   action for a civil infringement.  Did you follow the way

10  marijuana went from being criminal to civil in Massachusetts

11  in the last year referendum?

12         THE JUROR:  I wouldn't say I followed it closely.

13  I understand what it did depending on --

14         MR. NESSON:  Did you vote on the referendum?

15         THE JUROR:  No, unfortunately I had to travel so I

16  wasn't voting on the referendum.

17         MR. NESSON:  But you feel okay about the

18  referendum?

19         THE JUROR:  Yes, it was voted by the people.

20         MR. NESSON:  Voted by the people.  So a civil

21  infraction.

22         THE JUROR:  Uh-hum.

23         MR. NESSON:  And in this case -- I need to be

24  careful about this -- the defendants allege that -- well,

25  let me see if I get this accurately.  They're suing, they

1    actually want money paid to them on the basis of 30 songs

2    that he shared, downloaded and shared from this peer-to-peer

3    network, and for that they're seeking damages that could be

4    as high as $4.5 million.  Does that strike you as somewhat

5    disproportionate to downloading 30 songs, not selling them

6    to anybody, not doing anything except sharing them with his

7    friends and listening to them himself?

8            THE JUROR:  I guess I'd have to understand all the

9    facts in the case in order to understand that.

10           MR. OPPENHEIM:  Objection, your Honor.

11           THE COURT:  All right.  Very good.  Thank you.

12   Ms. Turnbull, unfortunately you go back to the courtroom and

13   sit.  Thank you.

14           The next juror, we're going to keep on going

15   notwithstanding our grumbling stomachs.  You're going to

16   keep going notwithstanding your grumbling stomachs.

17   Counsel, your turn, Mr. Nesson.

18           MR. NESSON:  I'm Charlie Nesson.  I'm a teacher

19   rather than a lawyer.  I'm a lawyer, I really am a lawyer,

20   but I'm a law teacher rather than a litigator.

21           THE JUROR:  Okay.

22           MR. NESSON:  This is what I normally wear to

23   teach.  It's not going to bother you I'm wearing a T-shirt,

24   no disrespect meant to the Court or anybody else.  So you

25   work at Wolf, Greenfield, Sacks.  What is that?

1          THE JUROR:  It's an IP law firm.

2          MR. NESSON:  What do you do?

3          THE JUROR:  Billing.

4          MR. NESSON:  So you're kind of in this IP world

5    where they're talking about patents and copyrights all the

6    time?

7          THE JUROR:  Yes.

8          MR. NESSON:  Do you think that's going to affect

9    the way you listen to this case?

10         THE JUROR:  I'm not sure.  I guess it could

11   potentially affect it because I do this every day for a

12   living.

13         MR. NESSON:  And you're pretty much on the side of

14   the copyright and the patentholder in the law firm?

15         THE JUROR:  Yes.

16         MR. NESSON:  You're not defending the law firm?

17         THE JUROR:  No.

18         MR. NESSON:  You're suing, you're like these guys

19   over here?

20         THE JUROR:  For the most part, yeah.

21         MR. NESSON:  And how do you expect that might

22   affect you?

23         THE JUROR:  I guess just knowing the field it

24   could potentially affect, I guess.  I don't know if it

25   really would affect it or not.  I guess I wouldn't really

1   know until --

2        MR. NESSON:  Are you worried you're be biased in

3   favor of the copyright holder?

4        THE JUROR:  I guess kind of.  I work with Sony at

5   the law firm and things like that, so I don't know if that

6   would affect my opinion or not.

7        MR. NESSON:  So Sony is actually a law firm

8   client?

9        THE JUROR:  It's a client, yeah.

10       THE COURT:  It's a client of your firm?

11       THE JUROR:  Yes.

12       THE COURT:  I think I'm going to excuse you.

13       MR. OPPENHEIM:  Your Honor, may I ask what the

14  client is?  There are many different aspects.

15       THE COURT:  Go right ahead, why don't you ask

16  that.

17       MR. OPPENHEIM:  So when you say Sony is a client

18  of the law firm's, is it Sony Electronics?

19       THE JUROR:  We do a lot of patent work for them.

20  It's not specifically electronics or whatnot, we do

21  litigation for them.

22       MR. OPPENHEIM:  You never deal with Sony Music, do

23  you, the music company?

24       THE COURT:  I'm going to excuse you.  Thank you

25  very much.  Just so that the rulings are clear, someone

1    who's a client, even broadly speaking, a related company who

2    does similar kind of work it seems to me is directly

3    involved, an apropos with your discussion earlier with

4    respect to Juror Tanzer I think was the one who had an

5    opinion about copyright infringement.

6           Again, there's a difference between someone who

7    suffered the same kind of injury, has a personal interest in

8    terms of being involved in the firm, someone who is

9    themselves sued.  Those are the people for whom any

10   protestation of no bias I wouldn't accept because of the

11   closeness of their relationship to the issues.  Even though

12   she's not necessarily working for Sony Music it seems to me

13   that's close enough both in terms of what she does and the

14   client.

15          So the question is lunch.  Now, the cafeteria

16   closes at two.  As much as I'd like to go on, I think we

17   have to stop, otherwise they will not be able to eat.  You,

18   on the other hand, I don't care whether you don't eat.

19          MR. OPPENHEIM:  It's probably better I don't

20   eat.

21          THE COURT:  Maryellen, can you go in and excuse

22   them and ask them to come back can we say 1:45.  Let's try

23   1:45.  We're running behind here.  There's nothing we can do

24   about it.

25          MR. OPPENHEIM:  With an instruction obviously not

**JURY TRIAL DAY 1**

1    to discuss the matter?

2              THE COURT:  I've already given that instruction.

3    I don't think I need to give it again.  We have 8 jurors

4    already cleared for cause, so we need 16 total.  So it may

5    well be that we just have time to do openings today and

6    nothing further.  I want to let you know we're going to

7    barrel on through here.  Thank you, all.

8              (A recess was taken.)

9              THE COURT:  We're talking to Juror Melissa

10   Collazo.  I'm sorry, Malliaros.  Does that sound right?

11             MR. OPPENHEIM:  Yes, that's right.

12             THE COURT:  Hi.  Won't you sit down.  I don't

13   remember whose turn it is.  Mr. Oppenheim seems to be

14   thinking it's your turn.

15             MR. OPPENHEIM:  I think it is.  I think I go on

16   the odd jurors and Mr. Nesson goes on the even ones.

17             THE COURT:  Okay, go on.

18             MR. OPPENHEIM:  Beginning, Mr. Malliaros, I got

19   that right?

20             THE JUROR:  You did.

21             MR. OPPENHEIM:  Good afternoon, my name is

22   Matt Oppenheim.  I'm here with my co-counsel.  We represent

23   four record companies as the Judge described in the

24   courtroom earlier.  We're here, we filed claims against

25   Mr. Tenenbaum for copyright infringement for his activities

1    uploading and downloading our copyrighted works, our music,

2    on a peer-to-peer network.

3              With your permission, I'll ask you a few follow-up

4    questions from your questionnaire and a few questions as

5    part of the jury process.  As I indicated, we represent a

6    number of record companies.  Do you have a view or opinion

7    about record companies?

8              THE JUROR:  No.

9              MR. OPPENHEIM:  Have you or any of your family

10   members ever owned a business?

11             THE JUROR:  You mean my father owned a business.

12   I don't know if that counts.

13             MR. OPPENHEIM:  Yes, sure.  What kind of business?

14             THE JUROR:  Grocery.

15             MR. OPPENHEIM:  And does he still own it?

16             THE JUROR:  No, he's deceased.

17             MR. OPPENHEIM:  Sorry.  And I mention that we've

18   sued Mr. Tenenbaum for uploading and downloading copyright

19   works on a peer-to-peer network.  Do you have a view or

20   opinion about the use of peer-to-peer networks such as

21   Napster, KazaA or LimeWire?

22             THE JUROR:  No real dogma or anything.  I know a

23   little bit about it, but I don't really know enough details

24   to have any opinion.

25             MR. OPPENHEIM:  Okay.  What have you heard about

1    the use of those networks?

2         THE JUROR:  Well, I've read a little bit about it

3    in the papers.  There was a suit that I read about where a

4    woman was, went to court, and I think she had to pay

5    $200,000.  I read it recently, fairly recently.

6         MR. OPPENHEIM:  And did you have a view one way or

7    the other about what you read?

8         THE JUROR:  It seemed like a high fine, but other

9    than that.

10         MR. OPPENHEIM:  Okay.  Do you have a view about

11    whether or not record companies and movie studios should be

12    allowed to enforce their copyrights against those who

13    infringe them?

14         THE JUROR:  No, I'm pretty neutral.

15         MR. OPPENHEIM:  And have you or has anyone you

16    know or has anyone you know ever received a notice from a

17    copyright holder or an Internet service provider or a school

18    about a potential copyright violation?

19         THE JUROR:  No.

20         MR. OPPENHEIM:  And do you have a view as to

21    whether music, movies, books, games should all be free on

22    the Internet or whether the laws should apply to the

23    Internet the same way they apply to the physical world?

24         THE JUROR:  I certainly understand the concept of

25    copyright protection and would certainly understand

1    restrictions around copying.

2         MR. OPPENHEIM:  In your questionnaire, you

3    indicated that you had completed some postgraduate or

4    professional studies.  Can you describe that for us?

5         THE JUROR:  I have a doctorate degree in

6    biochemistry.

7         MR. OPPENHEIM:  Now, I amend my remarks, and I

8    should say Dr. Malliaros.

9         THE JUROR:  That's fine.  I'm not a real doctor,

10   as they say.  I did a postdoctoral fellowship at Harvard

11   School of Public Health for a few years.

12        MR. OPPENHEIM:  Okay.  The fact that one of the

13   lawyers for defense counsel is a professor at Harvard Law

14   School, would that affect your view of the defendant or the

15   plaintiffs in any way given your relationship with Harvard?

16        THE JUROR:  No.

17        MR. OPPENHEIM:  You have one child who's 14; is

18   that correct?

19        THE JUROR:  Yes.

20        MR. OPPENHEIM:  And do you know whether or not

21   your child has uploaded or downloaded music on the Internet?

22        THE JUROR:  I believe she has.

23        MR. OPPENHEIM:  Do you know what software or

24   system or network she's used?

25        THE JUROR:  I don't know.  When I found out, I

1    cautioned her about doing it because it seemed like we were

2    getting into a gray area.

3            MR. OPPENHEIM:  And did she abide by that caution?

4            THE JUROR:  Well, yeah, our hard drive crashed

5    right afterwards and we don't have it back yet, so she's

6    de facto abided by it, will hopefully continue to when we

7    get it back.

8            MR. OPPENHEIM:  You'd expect her to?

9            THE JUROR:  Yes.

10           MR. OPPENHEIM: And your wife is a teacher; is that

11   correct?

12           THE JUROR:  That's correct.

13           MR. OPPENHEIM:  What does she teach?

14           THE JUROR:  She's a reading specialist, she

15   teaches learning disabled children.

16           MR. OPPENHEIM:  You indicated on your form in

17   response to the question, "Have you or has anyone in your

18   family or close friend ever downloaded music, movies, books

19   from the Internet?"  You said, "Yes."  Is that in reference

20   to your daughter?

21           THE JUROR:  Yes.

22           MR. OPPENHEIM:  Anybody else?

23           THE JUROR:  No.

24           MR. OPPENHEIM:  You indicated that you or someone

25   in your family or close friend had a connection to Harvard,

1    Harvard Law School or The Berkman Center, is that just the

2    connection you indicated earlier?

3            THE JUROR:  Yes.

4            MR. OPPENHEIM:  And you also indicated you had

5    heard of lawsuits being brought by recording companies

6    against people who download and upload music onto the

7    Internet.  Is that just in reference to the case you

8    discussed a moment ago?

9            THE JUROR:  I've read related articles to that

10   one, but that one stood out.

11           MR. OPPENHEIM:  Okay.  Thank you.  Your Honor, I

12   have no further questions.  Thank you.

13           THE COURT:  Mr. Nesson.

14           MR. NESSON:  Hello.

15           THE JUROR:  Hi.

16           MR. NESSON:  Charlie Nesson.  Are you a poker

17   player?

18           THE JUROR:  No.

19           MR. NESSON:  Play any kind of cards?

20           THE JUROR:  No, not for years.

21           MR. NESSON:  What do you do for recreation?

22           THE JUROR:  Recreation?

23           MR. NESSON:  What's fun?

24           THE JUROR:  What's fun, I play guitar and I'm an

25   avid runner.

1           MR. NESSON:  And do you listen to music?

2           THE JUROR:  Oh, extensively.

3           MR. NESSON:  Tell me about that.  What do you

4    listen to?

5           THE JUROR:  I listen to a lot of Jazz.

6           MR. NESSON:  While you're running?

7           THE JUROR:  No, usually in the car.

8           MR. NESSON:  Do you listen to music when you run?

9           THE JUROR:  No.

10          MR. NESSON:  No.

11          THE JUROR:  I like to hear the traffic around

12   me.

13          MR. NESSON:  Thank you.

14          THE JUROR:  Okay.

15          THE COURT:  Mr. Malliaros, why don't you go back

16   to the other courtroom and wait.  We're almost done.  Thank

17   you very much.

18          THE JUROR:  Okay.

19          THE COURT:  Mr. White is next.  Hi.  Mr. White,

20   come sit down.  Mr. Nesson, I believe you go first.

21          MR. NESSON:  How do you do, Mr. White?

22          THE JUROR:  Hi, how are you?

23          MR. NESSON:  Tell me about yourself.

24          THE JUROR:  What would you like to know?

25          MR. NESSON:  What's your passion?

1           THE JUROR:  My passion, music and playing

2    soccer.

3           MR. NESSON:  Music and soccer?

4           THE JUROR:  Yeah.

5           MR. NESSON:  Which comes first?

6           THE JUROR:  It's difficult.

7           MR. NESSON:  How long have you been into music?

8           THE JUROR:  My whole life.

9           MR. NESSON:  Where were you born?

10          THE JUROR:  Ireland.

11          MR. NESSON:  Ireland.  And soccer means like

12   football?

13          THE JUROR:  Yeah.

14          MR. NESSON:  So like what do you play?  What's

15   your position?

16          THE JUROR:  Playing soccer?

17          MR. NESSON:  Yes.

18          THE JUROR:  I vary.

19          MR. NESSON:  Do you think you could be fair to

20   both sides in this case?

21          THE JUROR:  I'd like to think so, yeah.

22          MR. NESSON:  On the one hand, you've got the

23   biggest record companies in the world, and on the other

24   hand, you've got basically a kid like any other kid.

25          THE JUROR:  Uh-hum.

1          MR. NESSON:  Can you be fair as between these two?

2          THE JUROR:  I believe so.

3          MR. NESSON:  Thank you very much.

4          THE COURT:  Mr. Oppenheim.

5          MR. OPPENHEIM:  Good afternoon, Mr. White.  My

6    name is Matt Oppenheim.  Along with my co-counsel, I

7    represent the record companies in this case.  We've brought

8    a lawsuit, as the Judge explained earlier, against

9    Mr. Tenenbaum for uploading and downloading our client's

10   music on peer-to-peer networks.  So, as part of the jury

11   selection process, we want to ask you a few questions, if

12   that's all right.  Do you have any views about record

13   companies?

14         THE JUROR:  Possibly, yeah.

15         MR. OPPENHEIM:  Do you want to give us a sense of

16   what those views are?

17         THE JUROR:  It's just based on like what I've read

18   and so forth.  I don't have any experience with them

19   personally.

20         MR. OPPENHEIM:  What kinds of things have you

21   read?

22         THE JUROR:  Oh, that they're pimps and thieves and

23   so forth.

24         MR. OPPENHEIM:  And where do you read these kind

25   of things?

1          THE JUROR:  Magazines.

2          MR. OPPENHEIM:  What kind of magazines?

3          THE JUROR:  Online, any one from Rolling Stones to

4   Pitchfork.

5          MR. OPPENHEIM:  And do you believe there is some

6   element of truth to these articles?

7          THE JUROR:  Element of truth, yes.

8          MR. OPPENHEIM:  And do you hold this view that

9   they are pimps and thieves is a strongly held view of yours?

10         THE JUROR:  No, not strongly held view.

11         MR. OPPENHEIM:  Do you believe that even in spite

12  of that view that the plaintiff record companies may be

13  upstanding corporate citizens?

14         THE JUROR:  I'm sorry?

15         MR. OPPENHEIM:  That the record companies that we

16  represent may not be pimps and thieves?

17         THE JUROR:  I think it's possible, yeah.

18         MR. OPPENHEIM:  Would you start with the

19  presumption that they were or weren't upstanding?

20         THE JUROR:  No.

21         MR. OPPENHEIM:  Which way would you view that?

22         THE JUROR:  I wouldn't.

23         MR. OPPENHEIM:  Either way?

24         THE JUROR:  No.

25         MR. OPPENHEIM:  So I mentioned that the record

1    companies are suing Mr. Tenenbaum for copyright infringement

2    on a peer-to-peer network.  Do you have a view one way or

3    the other about the use of peer-to-peer networks such as

4    Napster, KazaA or LimeWire?

5            THE JUROR:  It depends on what you're doing with

6    them.

7            MR. OPPENHEIM:  Okay.  Fair enough.  Let's assume

8    that you're downloading and uploading music owned by record

9    companies which is not authorized for uploading and

10   downloading.

11           THE JUROR:  Downloading and uploading?

12           MR. OPPENHEIM:  Yes.  Do you have a view on that?

13           THE JUROR:  It depends.  It really depends on the

14   situation, I suppose, like how much you're doing it and to

15   whom you're uploading it to and so forth.

16           MR. OPPENHEIM:  If you're uploading it to the

17   network so that any one of tens of thousands to millions of

18   people could downloaded it, would that affect your view?

19           THE JUROR:  Possibly.

20           MR. OPPENHEIM:  And how would it affect your view?

21           THE JUROR:  I suppose if you don't own it, you

22   probably shouldn't be doing it.

23           MR. OPPENHEIM:  And what about downloading it from

24   the network if you don't own it?

25           THE JUROR:  It depends like, oh, if you don't own

1    it?

2              MR. OPPENHEIM:  Yes.

3              THE JUROR:  I suppose it depends like if you're

4    planning on owning it at some point or not.

5              MR. OPPENHEIM:  Let's assume that you downloaded

6    it and you keep it in your share directory and you don't

7    delete it so it's not there for just a short period of time,

8    then would that affect your view?

9              MR. FEINBERG:  Objection.

10             THE COURT:  Overruled.  Go on.

11             MR. OPPENHEIM:  Would that affect your view?

12             THE JUROR:  Possibly.

13             MR. OPPENHEIM:  Possibly?

14             THE JUROR:  Yes.

15             MR. OPPENHEIM:  Do you have an opinion as to

16   whether or not record companies should be enforcing the

17   rights against people who take their music from peer-to-peer

18   networks without permission and then give it away to others

19   without permission?

20             THE JUROR:  You mean targeting individual users?

21             MR. OPPENHEIM:  Yes.

22             THE JUROR:  I suppose I don't really understand

23   it, the purpose of it.

24             MR. OPPENHEIM:  You don't understand why record

25   companies enforce their rights?

1          THE JUROR:  Well, why they target individual users

2    as opposed to --

3          MR. OPPENHEIM:  You think that they probably

4    shouldn't be bringing those kind of cases?

5          THE JUROR:  Probably not.

6          MR. OPPENHEIM:  Is that a strongly held view of

7    yours?

8          THE JUROR:  Not a strongly, but it's kind of more

9    of a hunch I would say.

10          MR. OPPENHEIM:  Have you or has anyone you have

11    known ever received a notice from a copyright holder or an

12    Internet service provider or maybe a university or a school

13    regarding a possible copyright violation?

14          THE JUROR:  Someone I know, yes.

15          MR. OPPENHEIM:  Whatever came of that, do you

16    know?

17          THE JUROR:  I think it was kind of a slap on the

18    wrist.

19          MR. OPPENHEIM:  Did you have a view about that one

20    way or the other?

21          THE JUROR:  Not really, no.

22          MR. OPPENHEIM:  Do you have a view as to whether

23    music, movies, books, other games should all be free on the

24    Internet or whether the laws should apply to the Internet

25    the same way they apply to the physical world?

1          MR. OPPENHEIM:  Objection.

2          THE COURT:  Overruled.

3          THE JUROR:  No, I think the law should be

4     different.

5          MR. OPPENHEIM:  You do?

6          THE JUROR:  Yes.

7          MR. OPPENHEIM:  How do you see the difference?

8          THE JUROR:  Well, there's a difference between a

9     physical object and a file that can be duplicated millions

10    of times.  I don't think it's, you know, I don't think it's

11    stealing so much as in the same way it's stealing from a

12    store or something.  There's a difference there.

13         MR. OPPENHEIM:  And if you were told that the law

14    didn't distinguish between digital and nondigital, would

15    that affect the way you would look at the case?

16         MR. NESSON:  Objection.

17         THE COURT:  Overruled.

18         THE JUROR:  You mean if the law did not

19    distinguish?

20         MR. OPPENHEIM:  Right.

21         THE JUROR:  I guess I don't think it would.

22         MR. OPPENHEIM:  It wouldn't change your view?

23         THE JUROR:  I don't think so.

24         THE COURT:  The question is the law we're

25    operating under, the law that entitles the record companies

1    to sue for copyright infringement for downloading, uploading

2    and fire sharing for music that someone doesn't own, given

3    your views, do you think it would be hard for you to be a

4    juror in this case and follow the law?

5              THE JUROR:  It's possible, I suppose.

6              THE COURT:  I'm going to excuse you.  Thank you

7    very much.  Thanks.

8              MR. OPPENHEIM:  Thank you.

9              MR. NESSON:  I would like on the record to

10   vociferously object to this witness being excused for

11   cause.

12             THE COURT:  I appreciate that.  Call your next

13   witness, Mr. Ryan.

14             MR. NESSON:  He was just browbeaten and then you

15   ask him a question that isn't even the same question you

16   asked him before.

17             THE COURT:  Mr. Nesson, you've got the benefit of

18   my rulings in a number of these jurors.  If we imposed a

19   different standard, we would be striking a number of jurors

20   that I've already allowed.  I also want to say that

21   Mr. Tenenbaum should not be smiling broadly at opinions of

22   jurors that he agrees with.  We're too close at the table to

23   be able to do that.  Everyone needs to control themselves.

24   Bring in the juror.  Hi, Mr. Ryan, Patrick Ryan.

25             THE JUROR:  Yes.

1          THE COURT:  Mr. Oppenheim, you go next.

2          MR. OPPENHEIM:  Good afternoon, Mr. Ryan.

3          THE JUROR:  Hello.

4          MR. OPPENHEIM:  Hi, I'm Matt Oppenheim.  I

5    represent four record companies who are the plaintiffs in

6    this case along with my co-counsel here today and the rest

7    of the week.  Our clients have brought claims against

8    Mr. Tenenbaum, as the Court explained earlier, for copyright

9    infringement for his activities uploading and downloading

10   copyrighted music on the Internet using peer-to-peer

11   networks.

12          THE JUROR:  Okay.

13          MR. OPPENHEIM:  Do you have a view one way or the

14   other about record companies?

15          THE JUROR:  No.

16          MR. OPPENHEIM:  Have you or any immediate family

17   member ever owned a business?

18          THE JUROR:  My father owns a business, yeah.

19          MR. OPPENHEIM:  What kind of business?

20          THE JUROR:  It's a signs supply company.  They

21   have plastics and sign supplies and glazing.

22          MR. OPPENHEIM:  A manufacturing-type business?

23          THE JUROR:  No, they're a wholesale

24   distributing.

25          MR. OPPENHEIM:  Does he still own that business?

1          THE JUROR:  Yeah.

2          MR. OPPENHEIM:  As I mentioned, the record

3     companies have sued Mr. Tenenbaum for uploading and

4     downloading works, copyrighted works on a peer-to-peer

5     network.  Do you have a view one way or the other about the

6     use of peer-to-peer networks such as KazaA or LimeWire or

7     Napster?

8          THE JUROR:  No, I can't say I do either way.

9          MR. OPPENHEIM:  Have you heard or read anything in

10    the press about record companies or movie studios suing

11    individuals who infringe their copyrights?

12         THE JUROR:  I've heard of it.  I don't know any

13    specific details about the Internet sort of thing, but, I

14    mean, I've heard of it kind of offhand, you know, secondhand

15    through the news.

16         MR. OPPENHEIM:  Do you have a view based on what

17    you've heard?

18         THE JUROR:  No, I don't really have a view either

19    way.

20         MR. OPPENHEIM:  Do you have an opinion or a view

21    regarding record companies enforcing their rights against

22    individuals who are giving their music away for free?

23         THE JUROR:  No.

24         MR. OPPENHEIM:  Have you or anyone you know ever

25    received a notice from a copyright holder on an Internet

1    service provider or a school about a possible copyright

2    violation?

3              THE JUROR:  No.

4              MR. OPPENHEIM:  Do you have a view as to whether

5    music, movies, books, games should be free on the Internet

6    or whether the laws should apply to the Internet in the same

7    way they apply to the physical world?

8              THE JUROR:  No, nothing, no.

9              MR. OPPENHEIM:  Mr. Ryan, on your questionnaire,

10   it indicates that you have is it one child?

11             THE JUROR:  Yeah.

12             MR. OPPENHEIM:  Six weeks old?

13             THE JUROR:  Six weeks, baby.

14             MR. OPPENHEIM:  Congratulations.

15             THE COURT:  Are you sleeping?

16             THE JUROR:  He sleeps all night.  We lucked out.

17             MR. OPPENHEIM:  You did.  It indicates on your

18   form that your spouse is a collegiate coach; is that

19   correct?

20             THE JUROR:  Yeah, she coaches field hockey at

21   Babson College.

22             MR. OPPENHEIM:  And you indicate on the form that

23   you use a computer frequently?

24             THE JUROR:  Yeah, day-to-day.

25             MR. OPPENHEIM:  What kind of stuff do you do on

1    the computer?

2           THE JUROR:  I'm in sales, so I do a lot of online

3    research of different companies that I will be calling on.

4           MR. OPPENHEIM:  And you work for?

5           THE JUROR:  It's a company called Pri-Med, they do

6    medical conferences for primary care physicians, so I sell

7    to the pharma companies to sponsor these events.

8           MR. OPPENHEIM:  Sure.  You indicated that you own

9    an iPOD, is that correct, or MP3 player?

10          THE JUROR:  Yeah, iPod.  I think my wife does

11   iTunes.  She does it all for me, I'm not very into that.

12          MR. OPPENHEIM:  You indicated on the form that you

13   or someone in your family or close friend has used LimeWire

14   and iTunes; is that right?

15          THE JUROR:  Yes.

16          MR. OPPENHEIM:  Who is it that you know who has

17   used LimeWire?

18          THE JUROR:  A buddy of mine.  I asked him where he

19   got all his music, and he said Limewire, and he burned me a

20   bunch of CDs.

21          MR. OPPENHEIM:  Do you have a view of that one way

22   or the other?

23          THE JUROR:  I thought it was kind of neat.

24          MR. OPPENHEIM:  Did you have a view as to whether

25   or not it was possibly wrong for him to be taking music?

1            THE JUROR:  No, I really didn't know.

2            MR. OPPENHEIM:  You didn't think about it at the

3       time?

4            THE JUROR:  No, it didn't occur to me.

5            MR. OPPENHEIM:  Other than what you indicated to

6       me earlier about reading some articles, have you heard about

7       lawsuits that the record companies have brought against

8       individuals who download and upload music?

9            THE JUROR:  No.  I mean, I thought it was kind of

10      an urban myth.  I didn't know that it actually happened.

11           MR. OPPENHEIM:  Now that you know it happens, do

12      you have a view of it one way or the other?

13           THE JUROR:  Obviously I'm not going to do it going

14      forward, but I don't have any view.

15           MR. OPPENHEIM:  Last question, it indicates that

16      you have someone in the family who's a musician; is that

17      correct?  Is it you or anyone in your family?

18           THE JUROR:  I have some friends that are drummers

19      and stuff.

20           MR. OPPENHEIM:  Oh, that's great.  They're in a

21      band?

22           THE JUROR:  Yeah, just like local small time

23      bands, nothing big time.

24           MR. OPPENHEIM:  Do they sell their music?

25           THE JUROR:  I think so.

1          MR. OPPENHEIM:  They're trying to, at least?

2          THE JUROR:  Yeah, T-shirts and maybe some CDs, I

3    think so, yeah.

4          MR. OPPENHEIM:  Thank you very much.  I have no

5    further questions.

6          THE COURT:  Mr. Nesson.

7          MR. NESSON:  Hi.

8          THE JUROR:  Hi.

9          MR. NESSON:  Charlie Nesson.  "We, The People,"

10   what does that phrase mean to you?

11         THE JUROR:  Oh, gees, you know, I guess in the

12   courtroom, everyone in the United States, we, the people,

13   people I live with, interact with on a day-to-day basis.

14         MR. NESSON:  "We, The People" form the

15   Constitution, those are the first words of the Constitution,

16   We, The People."  What does it mean to be a peer?

17         THE JUROR:  A friend, an associate, colleague,

18   somebody I look up to, somebody I interact with on a

19   day-to-bay basis.

20         MR. NESSON:  So you're being asked to be a member

21   of a jury of Joel's peers.  So say again what "peer" means

22   to you?

23         THE JUROR:  A friend, a colleague, an associate,

24   somebody I look up to, maybe a business partner, a friend.

25         MR. NESSON:  Tell me a little bit about yourself.

1  What's your passion?

2  THE JUROR:  My passion is family, fishing,

3  golfing.  I guess it's really family and just spending time

4  outside of work.  I work, I work doing a career in order to

5  earn a living, but my passion is to be home with my family

6  and spending time doing things outside of work.

7  MR. NESSON:  What kind of fishing do you like?

8  THE JUROR:  Striper fishing, tuna fishing, not so

9  much with a six-week old but a little bit before then.

10  MR. NESSON:  All right.  Thank you very much.

11  THE COURT:  Mr. Ryan, you can go back to the jury

12  room and we'll call you down.  We have 11 jurors.  We need 5

13  more.  The next one is Mr. Ascolese.

14  MR. NESSON:  I may be wrong, but I've had the

15  impression that Mr. Oppenheim is exceeding his five minutes.

16  THE COURT:  You're wrong.

17  MR. NESSON:  It just seems like that.

18  MR. OPPENHEIM:  It's only because you're hanging

19  on every word, Charlie.

20  MR. NESSON:  That's for sure.

21  THE COURT:  Nice informal setting.  Mr. Nesson,

22  you go first.

23  MR. NESSON:  Hi, sir, how are you?

24  THE JUROR:  How are you?

25  MR. NESSON:  I'm good.  You're in the autobody

1    business.  Tell me what do you do actually.

2              THE JUROR:  I repair vehicles.

3              MR. NESSON:  Do you run a place?

4              THE JUROR:  No, I work for a man in Melrose.

5              MR. NESSON:  My name is Charlie Nesson, I should

6    have introduced myself, and I should thank you for coming

7    and sitting through the day which must be quite something.

8    I represent Joel here.

9              THE JUROR:  Yeah.

10             MR. NESSON:  I'd just like to know something about

11   you.  What's your passion?

12             THE JUROR:  Fishing.

13             MR. NESSON:  Fishing.  What kind, stripers?

14             THE JUROR:  Fresh water, stripers, no.

15             MR. NESSON:  And music, tell me how you feel about

16   music.

17             THE JUROR:  I listen to music.

18             MR. NESSON:  Do you really like music?

19             THE JUROR:  Yeah, listen to it during the day.

20             MR. NESSON:  Just kind of like listen to the

21   radio, that kind of thing?

22             THE JUROR:  Yeah, it gets you through the day.

23             MR. NESSON:  Is this like a thing that goes way

24   back with you with music?

25             THE JUROR:  No.

1          MR. NESSON:  Not particularly?

2          THE JUROR:  No, I try to find other things to do

3    with my time and do electronic stuff, do you know what I'm

4    saying?

5          MR. NESSON:  So you're not into any of the

6    peer-to-peer electronics, that's not the way you're talking

7    about?

8          THE JUROR:  As much as I can stay away from it I

9    stay away from it.

10         MR. NESSON:  What kind of electronics are you

11    into?  Is it like digital electronics or is it like wires

12    and things?

13         THE JUROR:  I just repair cars that have wires

14    that go to taillights and stuff like that, headlights, I fix

15    that.  The least amount I deal with it, the better off I

16    am.

17         MR. NESSON:  Have you ever been a juror before?

18         THE JUROR:  Yes.

19         MR. NESSON:  Tell me about that.

20         THE JUROR:  In Cambridge in probably 1990.

21         MR. NESSON:  What kind of case?

22         THE JUROR:  It was a rape case.

23         MR. NESSON:  So a serious criminal case?

24         THE JUROR:  Yes, I would say so.

25         MR. NESSON:  Guilty verdict, not guilty verdict?

1          THE JUROR:  Yes, guilty.

2          MR. NESSON:  Guilty.  Well, Joel here just by

3     comparison you understand, you've got rape on the one hand,

4     Joel is charged with clicking on his computer screen to

5     downloaded music files.

6          THE JUROR:  Yeah.

7          MR. NESSON:  And then in his share folder they get

8     shared, that's what he's charged with.

9          THE JUROR:  I see.

10         MR. NESSON:  This is a civil case, it's not

11    criminal.  I don't know whether that has meaning

12    particularly to you, but it's like criminal is between the

13    state and a criminal defendant like the rape defendant.

14    Civil is between two private parties.  On the one hand here

15    we've got these four, is it four or five, five record

16    companies?

17         MR. OPPENHEIM:  Four record company plaintiffs.

18         MR. NESSON:  Four record company plaintiffs, it's

19    the whole industry basically, 80 percent of the industry,

20    something like that.

21         MR. OPPENHEIM:  Objection.

22         THE COURT:  This is objectionable.  The only issue

23    is what the nature of the proceeding is, not the size of the

24    plaintiffs and the size of the defendant.  Please go on.

25         MR. NESSON:  I'm just interested in asking, do you

1    think you could be fair in making a judgment between an

2    individual like Joel who's like basically just a kid and

3    these giant record companies?

4              THE JUROR:  I'd have to hear the whole thing, you

5    know what I'm saying?  I would be fair about it.  I have to

6    hear.

7              MR. NESSON:  As far as starting out, you feel like

8    you would start out completely open to points of view on

9    either side?

10             THE JUROR:  Yeah.

11             MR. NESSON:  All right.  Good.  Thanks.

12             THE COURT:  Mr. Oppenheim.

13             MR. OPPENHEIM:  Good afternoon.  I'm going to

14   mispronounce --

15             THE JUROR:  Ascolese.

16             MR. OPPENHEIM:  My name is Matt Oppenheim.  We

17   represent four record companies, as you've heard, and we've

18   sued Mr. Tenenbaum for uploading and downloading from a

19   peer-to-peer network music that my clients own.  Do you have

20   a view one way or the other about record companies?

21             THE JUROR:  What do you mean?

22             MR. OPPENHEIM:  Have you heard anything about

23   record companies?  Are you predisposed to have a particular

24   opinion about record companies?

25             THE JUROR:  No.

1            MR. OPPENHEIM:  Have you or any of your family

2    members ever owned any kind of business?

3            THE JUROR:  My brother owns a business.

4            MR. OPPENHEIM:  What kind of business is that?

5            THE JUROR:  Landscaping business.  My uncle owns a

6    business, too.

7            MR. OPPENHEIM:  What kind of business is that?

8            THE JUROR:  The same thing.

9            MR. OPPENHEIM:  What happened, you didn't end up

10   in the landscaping business?

11           THE JUROR:  My father wanted me to be a mechanic

12   and I went autobody instead.

13           MR. OPPENHEIM:  I've mentioned that our clients

14   have sued Mr. Tenenbaum for copyright infringement for his

15   uploading and downloading on a peer-to-peer network.  Do you

16   have a view one way or the other about the use of a

17   peer-to-peer network like Napster or KazaA or LimeWire?

18           THE JUROR:  I don't know anything about whatever

19   you're talking about.  My kids go onto the computer.  I stay

20   away from it.  I think it's poison between me and you.  Most

21   of the stuff on there is not --

22           MR. OPPENHEIM:  Right.  Do you know whether your

23   kids have ever used Napster or KazaA?

24           THE JUROR:  I would assume they did.

25           MR. OPPENHEIM:  Do you have a view one way or the

1    other based on that?

2            THE JUROR:  No.

3            MR. OPPENHEIM:  Do you have a view or opinion as

4    to whether or not record companies should be able to enforce

5    their rights against people who take and give away their

6    property?

7            THE JUROR:  Your property, not their property?

8            MR. OPPENHEIM:  The record company's property?

9            THE JUROR:  I would say so.  If it's a law, then

10   you should abide by it.

11           MR. OPPENHEIM:  I just want to thank you for your

12   service.

13           THE JUROR:  Okay.

14           MR. OPPENHEIM:  No further questions.

15           THE COURT:  You need to go back to the other room.

16   Thank you very much, sir.

17           THE JUROR:  Okay.

18           THE COURT:  The next juror is Mr. Kibbe,

19   Christopher Kibbe.  Hi, Mr. Kibbe.

20           THE JUROR:  Hello.

21           THE COURT:  Come sit down.

22           THE JUROR:  Thank you.

23           THE COURT:  Mr. Oppenheim you begin.  Good

24   afternoon, Mr. Kibbe, did I pronounce that properly?

25           THE JUROR:  Yes, you did.

1          MR. OPPENHEIM:  My name is Matt Oppenheim.  I

2    represent four record companies that have brought claims

3    against Mr. Tenenbaum for uploading and downloading their

4    music from a peer-to-peer network on the Internet.  I'd like

5    to ask you a few questions --

6          THE JUROR:  Sure.

7          MR. OPPENHEIM:  -- about your views as part of

8    this process, if that's all right.

9          THE JUROR:  Sure.

10         MR. OPPENHEIM:  So, as I indicated, we represent

11   record companies.  Do you have a view one way or the other

12   about record companies?

13         THE JUROR:  Actually I do, yes.  Well, see, my son

14   just graduated from college, U-Mass Amherst, my daughter is

15   a music teacher, so we talk music all the time.  It was

16   definitely a big issue, especially out at Amherst, they had

17   some people that were doing that kind of thing.  It was

18   something that I definitely talked to my kids a lot about,

19   and I have some very strong views as far as that.

20   Truthfully?

21         MR. OPPENHEIM:  Yes, absolutely, we'd like your

22   honesty.

23         THE JUROR:  I place most of the blame actually on

24   the companies, I really do, because I'm a teacher right now,

25   but I was a web programer for years with insurance

1    companies, and I know that the software companies went

2    through this same problem, multiple copies of software, so

3    the record industry was aware of the fact this could be a

4    problem.

5          They went to CDs, and they didn't pay attention to

6    that, so I said, well, these kids get on the Internet and

7    think everything is free and just take what they want and

8    then find out later they're in trouble because of that when

9    maybe that wasn't totally their fault and that maybe the

10   record companies should have taken a better stance let's say

11   on how do we protect our stuff before we put it out there,

12   and then also the computer companies were creating software

13   that would rip the music right off the CDs so we knew it

14   could be removed, then used and put wherever you wish so it

15   was something that maybe was not thought of, maybe should

16   have by the companies.

17         MR. OPPENHEIM:  It sounds like it's a pretty

18   strongly held view?

19         THE JUROR:  It is.

20         MR. OPPENHEIM:  Probably a view you won't depart

21   with readily?

22         THE JUROR:  I try to be fair and impartial, but,

23   yeah, it is something I feel very strongly about.

24         THE COURT:  Here's the question.

25         MR. NESSON:  May I question before he gets --

1          THE COURT:  I'm going to follow up with this

2     question.  The question is whether or not these feelings

3     that you have would interfere with your ability to be fair

4     in this case?  This case is a case in which the record

5     companies have alleged copyright infringement, and the

6     question is whether the feelings that you have would stand

7     in the way of your, you know, what we're looking for is a

8     level playing field.  If you start with one side up, that's

9     not a level playing field.  Do you think you could be fair?

10         THE JUROR:  I would try very hard to be.  I don't

11    know.

12         THE COURT:  Mr. Nesson, you can finish.

13         MR. OPPENHEIM:  Can I?

14         THE COURT:  Go on, finish, then Mr. Nesson.  Go

15    on.

16         MR. OPPENHEIM:  You indicated that you think to a

17    certain extent the record companies may be at fault?

18         THE JUROR:  Yes.

19         MR. OPPENHEIM:  Would it influence your view if

20    you were to learn at the time that the record companies

21    adopted the CD format that there was no ability to encrypt

22    the content on the CD, and so would that affect your view of

23    whether or not they accepted the risk?

24         THE JUROR:  No, it would not.

25         MR. OPPENHEIM:  Would it impact your view if you

1    realized that this was costing massive harm to the copyright

2    holders?

3              THE JUROR:  Not necessarily.

4              MR. OPPENHEIM:  And would it impact your view if

5    you were told that the law doesn't necessarily distinguish

6    between somebody who protects their copyrights with

7    encryption or copyright protection or not?

8              THE JUROR:  That, would, yes, that is an issue I

9    have talked about that as far as copyright infringement

10   which are things that I have issues with when I was working

11   within web building because I was also doing technical

12   writing and putting information on the web, and so we

13   discussed lots of copyrighted issues types of things.  That

14   is a problem that I have with it.

15             MR. OPPENHEIM:  And you've discussed copyright

16   issues with your family?

17             THE JUROR:  Oh, absolutely, sure.

18             MR. OPPENHEIM:  And do you believe that you

19   understand the copyright law?

20             THE JUROR:  I have a basic understanding of the

21   copyright law, yes, I do.

22             MR. OPPENHEIM:  And can you describe what that

23   understanding is, please?

24             THE JUROR:  That if you purchase something you can

25   use it for your use only, but some have come out and say you

1    can make one digital copy of this, so my understanding is if

2    they do that, I can take that and put it on the laptop and

3    play it on the laptop as a copy.

4              MR. OPPENHEIM:  Do you think that when somebody

5    purchases a CD, they should be allowed to make those copies

6    available to millions of other people for free?

7              THE JUROR:  If it's a copyrighted CD, no, I do

8    not.

9              MR. OPPENHEIM:  And that if somebody did that, you

10   would view that under your view of the copyright laws as a

11   violation?

12             THE JUROR:  Yes, I would.

13             MR. OPPENHEIM:  You indicated on your form that

14   you or someone in your family or close friend had used

15   Napster?

16             THE JUROR:  Yes.

17             MR. OPPENHEIM:  Who exactly was that?

18             THE JUROR:  I did that.  We were doing all kinds

19   of computer work, and when Napster first came out, of course

20   you have to take a look at Napster, how are they doing, can

21   we use it for downloaded software.

22             MR. OPPENHEIM:  You don't use it?

23             THE JUROR:  No, just iTunes.  I don't know if

24   that's peer-to-peer network, I don't think it is.  That's my

25   favorite.

1          MR. OPPENHEIM:  No further questions.

2          THE COURT:  Mr. Nesson.

3          MR. OPPENHEIM:  Thank you, Mr. Kibbe.

4          MR. NESSON:  Hello.

5          THE JUROR:  Hello.

6          MR. NESSON:  My name is Charles Nesson.

7          THE JUROR:  It's been a long day.

8          MR. NESSON:  Thank you, by the way, for sitting.

9          THE JUROR:  I like sitting in a comfortable seat.

10    The wood is uncomfortable.

11          MR. NESSON:  I'm Charlie Nesson.  I represent

12    Joel.  Our interest -- well, let me just put it straight to

13    you.  Do you really think that you can be fair in this case,

14    fair?

15          THE JUROR:  It's hard to say.

16          MR. NESSON:  All right.  Let me follow that down a

17    little bit.

18          THE JUROR:  Sure.

19          MR. NESSON:  We all start with our backgrounds,

20    you have a deep background.  You're really into this

21    subject, the copyright law, to some extent, computers to

22    some extent.  You've discussed, you're really in the world.

23    The issues in this case are going to be, first,

24    infringement, did Joel infringe their copyrights, and that's

25    going to depend for their proof on their establishing that

1    they really owned those copyrights and that what Joel

2    downloaded and shared was really their stuff.

3           There is then a question of willfulness that is

4    introduced by their allegation.  They claim Joel did this

5    willfully and that they are claiming has an effect on how

6    much you should award for damage to them when it comes to

7    that point, that that process of awarding the damage calls

8    upon you to be just, so now what I'm looking for is the

9    sense of confidence that if it came to that you could be

10   just.

11          THE JUROR:  I can be just as a teacher.  That's

12   something that's always in my mind within my students is to

13   be just in what I'm doing.

14          MR. NESSON:  Well --

15          THE JUROR:  I haven't heard any evidence.

16          MR. NESSON:  No, I just want to ground it.  "We,

17   The People," the first words of the Constitution, the Sixth

18   Amendment of the Constitution speaks of a criminal defendant

19   having a jury of his peers, the Seventh Amendment speaks for

20   a civil defendant having a jury of his peers, so what Joel

21   is looking for, what I'm looking for is a peer relationship

22   that is as a jury of peers.  I mean, we all start in the

23   state of equality.

24          THE JUROR:  Right.

25          MR. NESSON:  We all are peers under the

1    Constitution.  We assume our role, the Judge has a role, I

2    have a role, the jury is to be the jury of the defendant's

3    peers.

4              MR. OPPENHEIM:  Your Honor, is there a question

5    coming?

6              THE COURT:  Mr. Nesson, do you have a question?

7              MR. NESSON:  Can -- I'll just leave it that.

8              THE COURT:  Well, the question is whether you can

9    be fair to both sides, just a second, the question is

10   whether you can be fair to both sides here and start off

11   with a level playing field?

12             THE JUROR:  I hope so.  I mean, I believe I can.

13             THE COURT:  You believe you can?

14             THE JUROR:  I try to within the classroom no

15   matter what I know of students before they come into the

16   classroom that I need to keep it level and not point them

17   out or do anything to -- I try to keep it level and just as

18   possible.

19             THE COURT:  We all come to the table with opinions

20   and views, and the enterprise here is to try to set them

21   aside and apply the law to the facts.  Do you think you

22   could do that?

23             THE JUROR:  I think I could do that.

24             THE COURT:  Mr. Nesson, anything further?

25             MR. NESSON:  Yes, just one question.  You have a

1   connection with somebody at Harvard?

2           THE JUROR:  A lot of people, my brother-in-law is

3   a teacher there, he teaches Scandanavian folklore, my wife

4   was a student there, she worked at the Kennedy School of

5   Government for many years, my sister-in-law was going

6   through her Ph.D. in botany there for a while and left, and

7   my brother-in-law is a graduate and now is a lawyer.

8           MR. NESSON:  Will the fact that I'm a teacher at

9   Harvard Law School in my real life prejudice you one way or

10  the other?

11          THE JUROR:  No.

12          MR. NESSON:  You won't hold it against us?

13          THE JUROR:  No.

14          THE COURT:  For or against, either way.

15  Mr. Kibbe, if you could wait outside for just a second.

16          (Juror left the courtroom.)

17          THE COURT:  I'm going to give you an opportunity

18  to object.

19          MR. OPPENHEIM:  Yes, your Honor.  Twice Mr. Kibbe

20  indicated both in response to your Honor's question,

21  actually three times in response to my question and in

22  response to Mr. Nesson's question, he indicated that it was

23  hard to say whether he could be fair.  He wasn't sure he

24  could be fair.

25          On further pushing by the Court, he said, well, I

1   try to be fair in the classroom, and he clearly comes to

2   this with a bias.  He says he has a bias.  He says his views

3   are strongly held views.  If this doesn't constitute the

4   kind of bias that constitutes for cause, I'm not sure why we

5   go through the process of asking any questions other than

6   can you be fair and unbiased because clearly he brings to

7   the jury a preconceived notion which he himself acknowledges

8   strongly held and that he believes will impact his views.

9           THE COURT:  Mr. Nesson.

10          MR. NESSON:  You heard what I heard, your Honor.

11  I heard a man who thought, committed to being fair,

12  committed to being just, clearly a man of solid principle.

13  The idea to me that this is a citizen who is struck off a

14  jury of Joel's peers for cause is simply a form of excluding

15  anyone who really starts out with a disposition on this to

16  me major issue that divides a lot of knowledgeable people on

17  the side that they oppose.  It's like just clear out the

18  opposition.

19          MR. OPPENHEIM:  Your Honor, if I may.

20          MR. NESSON:  I prefer that they use a peremptory

21  if they are going to try and challenge this man.

22          THE COURT:  Yes, Mr. Oppenheim.

23          MR. OPPENHEIM:  When I asked the potential juror,

24  Mr. Kibbe, whether or not it would impact his views if he

25  were told facts contrary to what he understands, he said,

1    "No, it wouldn't."  That is a clear expression of his

2    inability to be fair because he has preconceived notions.

3         THE COURT:  This is on the line.  I'm going to err

4    on the side of keeping him in the pool because the comment

5    of I would try to be fair, if it's copyrighted, someone

6    shouldn't make copies of it, looking at the CD world, his

7    insistence that he hasn't heard any evidence one way or the

8    other and the notion of trying to be fair seems to me is in

9    play here, so I'm going to keep him in the pool.  Your

10   rights are saved.

11        Okay.  Next juror.  Mr. Medeiros.  We have 13.

12   Hi, Mr. Medeiros.  Come and sit down.  I believe we begin

13   with Mr. Nesson.

14        MR. NESSON:  Hi, Mr. Medeiros.

15        THE JUROR:  Hi.

16        MR. NESSON:  Tell me about your kids, have you got

17   them?

18        THE JUROR:  No, they're all grown up now, they're

19   married.

20        MR. NESSON:  Tell me about their kids.

21        THE JUROR:  My daughter only has one.

22        MR. NESSON:  One grandchildren?

23        THE JUROR:  That's it.

24        MR. NESSON:  How old is she?

25        THE JUROR:  Two in April.

1          MR. NESSON:  So no teenagers these days?

2          THE JUROR:  No.

3          MR. NESSON:  How long ago was it when you had

4     teenagers?

5          THE JUROR:  Well, my daughter was a teenager,

6     she's 22 now.

7          MR. NESSON:  She's 22 now.  Did she like music?

8     Does she like music?  Was she like into it?

9          THE JUROR:  Uh-hum.

10         MR. NESSON:  So tell me about yourself.  What's

11    your passion?  What do you really like?

12         THE JUROR:  Fishing.

13         MR. NESSON:  Fishing is big today.  What kind of

14    fishing?

15         THE JUROR:  Stripers.

16         MR. NESSON:  Stripers.

17         THE JUROR:  Ocean fishing.

18         MR. NESSON:  Off on the rips?

19         THE JUROR:  Mostly down the canal in Buzzards Bay,

20    Cape Cod Bay.

21         MR. NESSON:  And in life you're a stone man

22    somewhat, you work with stone?

23         THE JUROR:  Gem setter.

24         MR. NESSON:  What does that mean?

25         THE JUROR:  I set stones and diamonds.

1          MR. NESSON:  Oh, whoa.  So very close work?

2          THE JUROR:  Uh-hum.

3          MR. NESSON:  And into computers at all?  Not at

4     all?

5          THE JUROR:  No.

6          MR. NESSON:  Is your daughter into computers?

7          THE JUROR:  No.  I don't know.  Not really.

8          MR. NESSON:  Do you have any feelings one way or

9     the other about big corporations, that that is somehow

10    corporatism and all that sort of thing?

11         THE COURT:  That is an objectionable question.

12    Next question.  Really that's an objectionable question.  Go

13    on, Mr. Nesson.

14         MR. NESSON:  Do you have any feelings about the

15    record companies, big record companies?

16         THE JUROR:  Not really.

17         MR. NESSON:  Just not been part of your --

18         THE JUROR:  I like music.

19         MR. NESSON:  So who do you like?

20         THE JUROR:  Who do I like?

21         MR. NESSON:  Yes.

22         THE JUROR:  I come from the '60s.

23         MR. NESSON:  Me, too.  How old are you?

24         THE JUROR:  I'm 59.

25         MR. NESSON:  I'm 70.  I guess I come from the 50's

1    or the 40's.  All right.  Well, thank you very much.  Nice

2    to meet you.

3              THE COURT:  Mr. Oppenheim, you go.

4              MR. OPPENHEIM:  Good afternoon, Mr. Medeiros.

5              THE JUROR:  Hi.

6              MR. OPPENHEIM:  My name is Matt Oppenheim.  I

7    represent four record companies in this case, as the Judge

8    explained to you earlier.  We start by thanking you.  I

9    realize you've been sitting in the other courtroom a long

10   time.  The plaintiff record companies have sued

11   Mr. Tenenbaum for downloading from a peer-to-peer network

12   and uploading to a peer-to-peer network, the record

13   companies copyrighted music and doing without permission and

14   for free.  Do you have a view one way or the other about the

15   use of peer-to-peer networks?

16             THE JUROR:  I figure if you put it on the

17   computer, it should belong to anybody, I guess.

18             MR. OPPENHEIM:  So that if an individual buys a

19   CD, should they be allowed to take that CD and give it to

20   the rest of the world for free?

21             THE JUROR:  Which way do you mean?

22             MR. OPPENHEIM:  I don't know.  You tell me.

23             THE JUROR:  If they're selling it?

24             MR. OPPENHEIM:  What if they're giving it away for

25   free, the record companies at the corner store selling it at

1    an online site but somebody else decides I'm just going to

2    give it away instead of selling it even though it's not

3    mine, do you have a view about that?

4              THE JUROR:  I think they have a right to do

5    that.

6              MR. OPPENHEIM:  Yeah.  Do you feel that way?

7              THE JUROR:  My daughter did it for me.

8              MR. OPPENHEIM:  She made copies for you.

9              THE JUROR:  She made a CD for downloading music,

10   gave me a CD.

11             MR. OPPENHEIM:  And is your view a strongly held

12   view that record companies ought to or individuals ought to

13   be allowed to do this?

14             THE JUROR:  Well, if they don't sell it.

15             MR. OPPENHEIM:  So it's okay for an individual to

16   take a CD, get a CD from a store and to copy it and give it

17   to a million other people, but it's not okay for them to get

18   it from the store, copy it and sell it to a million people?

19   Is that the distinction?

20             THE JUROR:  Uh-hum.

21             MR. OPPENHEIM:  And you agree with that?

22             THE JUROR:  (Witness nodding head.)

23             MR. OPPENHEIM:  Does it make a difference to you

24   whether or not they bought it in the store in the first

25   instance, let's say they took it for free from the Internet,

1    should they be allowed to do that?

2         THE JUROR:  Yeah.

3         MR. OPPENHEIM:  They should because it's on the

4    Internet.  Have you heard or read anything about the record

5    companies or movie studios bringing cases against

6    individuals who distribute things on the Internet without

7    permission?

8         THE JUROR:  Uh-hum.

9         MR. OPPENHEIM:  What have you heard or read?

10         THE JUROR:  Just heard it on the news.

11         MR. OPPENHEIM:  What was your reaction to those

12   stories?

13         THE JUROR:  Never had an opinion at all about

14   it.

15         MR. OPPENHEIM:  And do you have an opinion about

16   this case?

17         THE JUROR:  Probably.

18         THE COURT:  What's your opinion?

19         THE JUROR:  I figured if he wanted to download

20   music, he could download music if he wanted to.

21         THE COURT:  Here's the question.  The law allows

22   the record companies to sue for copyright infringement for

23   downloading and uploading, if that's what the jury finds.

24   Would you be able to apply that law even though you

25   personally think he should be able to do that?

1          THE JUROR:  Not really.

2          THE COURT:  I'll excuse you, thank you,

3    Mr. Medeiros, thank you very much.  You're excused.

4          MR. OPPENHEIM:  Thank you.

5          THE COURT:  Next juror is Patrick Conlon.  Hi,

6    Mr. Conlon.  It's a long day, and thank you for waiting.  We

7    start with Mr. Nesson.

8          MR. OPPENHEIM:  Mr. Nesson, I believe.

9          MR. NESSON:  I'm sorry, I was engrossed in my own

10   thought for a moment.  Charlie Nesson representing Joel.

11   I'm a teacher in my regular life, I'm not used to doing

12   this, so the lawyers do it the way it's done.  So I'd just

13   like to learn about you, what's your passion?

14         THE JUROR:  Okay.  I work in biotech.  I'm a

15   chemist, been at Biogen for a little over ten years.  My

16   passion, a lot of it is my family.  I have two kids in

17   college, and I have one in high school and stuff, so I'm

18   very active with them as far as their sports and coaching

19   and things like that over the years.  I enjoy the summers.

20   We haven't had much of a summer this year.

21         THE COURT:  Right.

22         THE JUROR:  But I want to take my vacation in the

23   summer and just relax.

24         MR. NESSON:  And have your kids been into the

25   computer world?

1          THE JUROR:  Much more than I am.  I'm still, you

2    know, when I was in high school and college, it was just

3    calculators coming in.  When I wrote my thesis, it was on a

4    Mac Plus.  My kids, they're very into the cell phones and

5    computers and everything else, and I guess I'm a little bit

6    behind them on the whole thing, but I do use a computer at

7    work, but I'm not a person that just likes to spend a lot of

8    time on the computer.  I'd rather be doing other things.

9          MR. NESSON:  To be a juror, it's a remarkable

10    event really.  It's like one of the few things that we

11    actually get to do, participate in government.  "We, The

12    People" formed the Constitution, created a right to a trial

13    by jury.

14          THE JUROR:  Right.

15          MR. NESSON:  And Joel is being tried by a jury of

16    his peers.

17          THE JUROR:  I understand that, yes.

18          MR. NESSON:  And it's really the jurors'

19    obligation to be willing to be open to both sides, see both

20    sides.

21          THE JUROR:  No, I feel that, you know, I am not

22    saying that I'd personally like not to be on it.

23          THE COURT:  Oh, sure, we understand.  We would

24    worry about who said, boy, I can't wait to sit here for the

25    next week.

1           THE JUROR:  I really, I was wondering if I can get

2     off.  I didn't stand up at the beginning.

3           THE COURT:  Why would you need to get off?

4           THE JUROR:  Well, I have diabetes, too, and I

5     didn't realize that that would have been a good excuse

6     whereas the other woman I heard got off and I'm on insulin.

7     I have a medical alert bracelet.

8           THE COURT:  The question is we could -- we take

9     breaks.  We start at nine, at eleven o'clock, we take a

10    snack break.  We could accommodate to your needs.

11          THE JUROR:  I know you could.

12          THE COURT:  It doesn't work like that, per se.

13    There were other issues she had.

14          THE JUROR:  I thought I would ask you directly

15    right now.

16          THE COURT:  We'll, in fact, I will allow you to

17    snack in the jury box if necessary to keep you, intravenous

18    feeding in the jury box, whatever you need.  Go on,

19    Mr. Nesson.

20          THE JUROR:  I'm sorry.

21          MR. NESSON:  Are you a poker player?

22          THE JUROR:  Over the years, yeah, but I don't

23    gamble that much any longer.  I have two kids in college, so

24    that takes my money.  They went to private school.  That

25    takes even more.

1          MR. NESSON:  Tell me about your own musical taste.

2     Who do you like?

3          THE JUROR:  You're talking to the wrong person.

4     I'm not musically inclined.  My daughter plays even marching

5     band in college, still plays and stuff, but I'm a Beach Boy

6     fan from the olden days.  They were just here.  I didn't get

7     to go and see them.  I heard the concert was really good.

8          MR. NESSON:  Thank you very much.  That's great.

9          THE COURT:  Mr. Oppenheim.

10          MR. OPPENHEIM:  Good afternoon, Mr. Conlon.  My

11     name is Matt Oppenheim.  Along with my co-counsel, we

12     represent four record companies, and you can share glucose

13     tablets with Mr. Reynolds who's also a diabetic.  We've

14     filed claims and filed suit against Mr. Tenenbaum for

15     uploading and downloading copyrighted works, our clients'

16     music on a peer-to-peer network without permission.

17          Do you have a view or opinion one way or the other

18     about record companies?

19          THE JUROR:  No.  As I said, I'm not very musically

20     inclined, and I kind of listen to a song a hundred times,

21     and I couldn't tell you who the artist is so really I can't

22     give you the answer on that.  I don't have an opinion on

23     it.

24          MR. OPPENHEIM:  Fair enough.  Do you have an

25     opinion one way or the other about the use of peer-to-peer

1    networks?

2            THE JUROR:  I don't even know really what they

3    are.  I guess I don't have an opinion.

4            MR. OPPENHEIM:  Okay.  Do you have a view one way

5    or the other about companies enforcing their intellectual

6    property rights?

7            THE JUROR:  I would say yes.  I worked for

8    Polaroid for many years, and I think the American tradition,

9    I think there's some intellectual proprietariness to that.

10           MR. OPPENHEIM:  You indicated that your daughter

11   is a musician; is that correct?

12           THE JUROR:  Well, she's played in college.  She's

13   not a professional musician in any way.

14           MR. OPPENHEIM:  Any aspirations?

15           THE JUROR:  No, she wants to be a high school

16   teacher.

17           MR. OPPENHEIM:  Very good.  Your wife is a high

18   school teacher?

19           THE JUROR:  Yes, she is.

20           MR. OPPENHEIM:  What does she teach?

21           THE JUROR:  Mathematics.

22           MR. OPPENHEIM:  At what level?

23           THE JUROR:  At what level, at the high school.

24   She teaches actually in the special ed. group so it's the

25   consumer math and maybe algebra and some of the earlier

1    levels of math.

2         MR. OPPENHEIM:  Do you know as a high school

3    teacher whether she's had to deal with the issue of peer

4    infringement at all?

5         THE JUROR:  I doubt it.

6         MR. OPPENHEIM:  You indicated on your lawsuit you

7    have heard about lawsuits brought by record companies.  Can

8    you share with us a bit what you shared?

9         THE JUROR:  I can't go into much detail.  I know

10   there are lawsuits because of that, because of copyright

11   infringement.  I don't know of any detail.  I haven't

12   followed it.  It's not an interest, and I don't follow it

13   that closely.

14        MR. OPPENHEIM:  Fair enough.  Thank you very much.

15   Your Honor, no further questions.

16        THE COURT:  All right.  Wait, Mr. Conlon.  You

17   have to go next door and wait some more.  Thank you very

18   much, sir.

19        THE JUROR:  Thank you.

20        THE COURT:  Mr. Korecki is next, 14, two more.

21   Mr. Korecki.

22        THE JUROR:  Yes.  Mr. Oppenheim begins.

23        MR. OPPENHEIM:  Hi, Mr. Korecki.  Let me start,

24   I'm Matt Oppenheim.  I represent the plaintiffs along with

25   my co-counsel here, and the plaintiffs are a bunch of record

1    companies.  I'll begin by thanking you for what has now

2    become a long day for you.  We're here as a matter of jobs,

3    and you're here as a matter of civic duty, so thank you.  My

4    clients, the four record companies, have asserted claims

5    against Mr. Tenenbaum for infringing their copyrights by

6    uploading and downloading their music on peer-to-peer

7    networks.

8            Do you have a view one way or the other about

9    record companies?

10           THE JUROR:  I can say that I've done it in the

11   past.

12           MR. OPPENHEIM:  Okay.

13           THE JUROR:  So, unfortunately, I could probably be

14   sitting in that seat myself.  I don't do it anymore.  As far

15   as the record companies go, I don't have a view one way or

16   the other.

17           MR. OPPENHEIM:  I appreciate your candor in this

18   process.  It's important and recognized.  When you say

19   you've downloaded in the past, can you describe?

20           THE JUROR:  When Napster first came out.

21           MR. OPPENHEIM:  Sure.

22           THE JUROR:  Then I think I was part of that, I got

23   banned from that from the whole Metallica lawsuit, and I

24   haven't done it since.

25           MR. OPPENHEIM:  On your questionnaire, you checked

1    yes to Napster, LimeWire, KazaA and Morpheus?

2              THE JUROR:  Yes.

3              MR. OPPENHEIM:  Were all of those peer-to-peer

4    systems that you accessed at some point?

5              THE JUROR:  Me or someone I know, yes.

6              MR. OPPENHEIM:  When you say somebody you know, is

7    it somebody in your family?

8              THE JUROR:  I'm not sure if it was family,

9    friends, work associates.

10             MR. OPPENHEIM:  And do you have a view one way or

11   the other about it?

12             THE JUROR:  Obviously I don't feel that it's 100

13   percent right.  That's about it.

14             THE COURT:  Not think, what is 100 percent right?

15             THE JUROR:  Well, you're downloading something

16   that someone uploaded that maybe they purchased and now

17   you're downloading it for free.

18             THE COURT:  Okay, go on.

19             MR. OPPENHEIM:  I'm sorry, your Honor.

20             THE COURT:  No, that's okay, you go on.

21             MR. OPPENHEIM:  So, do you have a view then one

22   way or the other about whether or not people who use

23   peer-to-peer networks should be held responsible for their

24   actions?

25             THE JUROR:  Yes, they should.

1          MR. OPPENHEIM:  And do you have a view one way or

2     the other about whether music and movies or books should be

3     treated differently in terms of distribution on the Internet

4     as opposed to the application of the laws in the physical

5     world?

6          THE JUROR:  No, they shouldn't.

7          MR. OPPENHEIM:  And do you have a view one way or

8     the other about record companies enforcing their rights

9     against people who are not only downloading but distributing

10    the works up onto a peer-to-peer network?

11         THE JUROR:  I believe that they should enforce it,

12    but I'm not sure to the upload and download of the amount of

13    distribution should affect on how much they should enforce

14    that copyright.

15         MR. OPPENHEIM:  So --

16         THE JUROR:  The quantity.

17         MR. OPPENHEIM:  The decision by the record

18    companies as to whether or not to enforce should depend in

19    part on the extent of the infringement?

20         THE JUROR:  The infringement, yes.

21         MR. OPPENHEIM:  Okay.  On your questionnaire, you

22    indicate that you have a 7 year-old; is that right?

23         THE JUROR:  Yes.

24         MR. OPPENHEIM:  And I take it your 7 year-old is

25    not using the Internet yet?

1          THE JUROR:  No.

2          MR. OPPENHEIM:  You indicated that you use a

3    computer frequently; is that right?

4          THE JUROR:  Yes, it's part of my job.

5          MR. OPPENHEIM:  Why don't you tell me a little bit

6    about that.

7          THE JUROR:  Network administrator for my

8    company.

9          MR. OPPENHEIM:  Do you find people working in the

10   company using peer-to-peer networks from time to time?

11         THE JUROR:  Yes.

12         MR. OPPENHEIM:  What does the company do about it?

13         THE JUROR:  Unfortunately nothing-right now.  We

14   don't have any rules, regulations in process at this point,

15   but we've just been published by a public company so that

16   will all most likely change.

17         MR. OPPENHEIM:  I suspect so.

18         THE JUROR:  Yes.

19         MR. OPPENHEIM:  And does the use of the

20   peer-to-peer networks at the company affect your network;

21         THE JUROR:  Does they affect the network?

22         MR. OPPENHEIM:  Does it impact the network that

23   you're administering?

24         THE JUROR:  I believe it would if it was

25   bandwith-related, chewing up our bandwith or getting

1    infected with some Spywire that they think they're

2    downloading things and they get what they don't want to get,

3    viruses, Spyware.

4            MR. OPPENHEIM:  You listen to music on Pandora; is

5    that right?

6            THE JUROR:  Yes.

7            MR. OPPENHEIM:  But you don't download from any of

8    the peer-to-peer networks?

9            THE JUROR:  No.

10            MR. OPPENHEIM:  Thank you very much.  No further

11    questions, your Honor.

12            THE COURT:  Mr. Nesson.

13            MR. NESSON:  Hi, Charlie Nesson.

14            THE JUROR:  Nice to meet you.

15            MR. NESSON:  How much downloading did you do when

16    you were doing it?

17            THE JUROR:  Not much, just some of the artists I

18    would like, I would download their song, see if I liked a

19    new album or somebody.

20            MR. NESSON:  Who did you like?

21            THE JUROR:  Aerosmith, Incubus, a couple different

22    ones.

23            MR. NESSON:  So tell me about yourself besides

24    your work, what do you like to do?

25            THE JUROR:  What do I like to do, mostly

1    computers, building computers.  You know, I'm a big gamer,

2    World of Warcraft, stuff like that, go to the zoo with the

3    family, Disney World.

4            MR. NESSON:  So you have a family?

5            THE JUROR:  Yes.

6            MR. NESSON:  Tell me about your family.

7            THE JUROR:  Is that relevant to this?

8            MR. NESSON:  No, it really isn't.  You have a

9    7 year-old?

10           THE JUROR:  Yes.

11           MR. NESSON:  I don't mean to intrude, sorry.

12           THE JUROR:  That's fine.

13           THE COURT:  You don't have to answer the question.

14   That's okay.  He's going to move on.

15           MR. NESSON:  It just wasn't that important.

16           THE JUROR:  We're a very tight-knit, close family,

17   and everything is good as long as we survive this financial

18   crisis that we're in.

19           MR. NESSON:  So just a word about being a juror.

20   I just want to ground this as solidly as possible in the

21   law.  We start from, "We, The People."  We form the

22   Constitution.  As part of the Constitution, we adopted the

23   idea of people being tried by a jury.

24           MR. OPPENHEIM:  Objection, your Honor.  If there's

25   a question, I think the question should be posed.

1        THE COURT:  There has to be a question in there.

2        MR. NESSON:  What does it mean to you to be a

3  peer?

4        THE JUROR:  Peer, I'm asking to judge someone on

5  an action that they performed, whether it was breaking the

6  law or not breaking the law based on what the law is.

7        MR. NESSON:  And what if you thought the law was

8  unwise?

9        THE JUROR:  I'm not sure if that's my place to say

10  whether the law is unwise.  It's basically what the words

11  are.

12        MR. NESSON:  And do you have a sense yourself of

13  justice, that is, assuming that you were asked to do

14  justice, would you have a sense that arose from something

15  inside you?

16        THE JUROR:  I think everyone has a personal

17  opinion, if that's where the question is being asked.

18        MR. NESSON:  Do you have a strong sense, do you

19  have sense of yourself as someone who has a feeling of

20  justice?

21        THE JUROR:  I would like to think that my compass

22  points in the right direction as far as right or wrong.

23        MR. NESSON:  Would you ever think of yourself as a

24  fighter for justice?

25        THE JUROR:  Depending on the facts, yes.

1          MR. NESSON:  All right.  Well, the base question

2    is do you believe that you can be a completely fair juror in

3    this case to both sides?

4          THE JUROR:  I'm not sure if I can because, like I

5    said, I could be sitting in that seat myself based on the

6    facts that I know.  I don't know the details of everything,

7    but, you know, in the past I have downloaded songs that I

8    know were copyright protected.

9          MR. NESSON:  But you know that you could follow

10   the law as the Judge gives it to you?

11         THE JUROR:  I think, yes, I could.

12         MR. NESSON:  And if you had some personal view

13   that was inconsistent with the law, you would follow the law

14   as the Judge gives it to you?

15         THE JUROR:  Yes.

16         MR. NESSON:  Thank you.

17         THE COURT:  Okay.  Would you wait outside for just

18   one second, okay.  Thank you, Mr. Korecki.

19         THE JUROR:  You've welcome.

20         (Juror exited the courtroom.)

21         THE COURT:  Is there an objection either side?

22         MR. OPPENHEIM:  One moment, your Honor, please.

23   Your Honor, we do object.  We move to strike for cause.

24   When asked whether he thought he could be fair, he said he

25   didn't know, not sure if he could be fair given that he

1    could be sitting in that chair.  That was I think exactly

2    what he said.

3         THE COURT:  Tell me the imperative of what he said

4    was that he had been sued in the Metallic lawsuit.  What was

5    that?

6         MR. OPPENHEIM:  Your Honor, I think what he was

7    referring to is that he had downloaded in the course of

8    Napster and that in that case, Metallica, the artist, sent

9    notices.  I don't think he was sued, but he was taken down

10   off of Napster through a take-down because he was found

11   infringing Metallica or accused of infringing Metallica's

12   sound recordings or sound recordings of Metallica, I should

13   say.

14        THE COURT:  Mr. Nesson, you think he should stay

15   in the pool?

16        MR. NESSON:  I do.

17        MR. OPPENHEIM:  This is a juror who has admitted

18   to having engaged in the very same conduct.

19        THE COURT:  Again, these are not easy

20   distinctions.  To some degree, the notion when he says, "I

21   will try to be fair" puts him in the category of Mr. Kibbe

22   and some of the other people who said I have these opinions,

23   but I could try to be fair.  Mr. Korecki, however, is in a

24   different category because he was precisely in the same

25   shoes as Mr. Tenenbaum, so he's in the category of someone

1   to whom it seems to me is too close.  I will strike him.

2   Your objection is noted.  Mr. Korecki is struck, Maryellen.

3   The next juror is Mr. Papadopoulos.

4           MR. OPPENHEIM:  Do you still have 14, Judge?

5           THE COURT:  You're right, I had 13.  He would have

6   been the 14th.  Mr. George Papadopoulos.

7           MR. OPPENHEIM:  Mr. Nesson goes first.

8           THE COURT:  Is it Mr. Papadopoulos?

9           THE JUROR:  Yes.

10          THE COURT:  Mr. Nesson.

11          MR. NESSON:  How do you do, sir?  Charlie Nesson

12  here.  I'm starting from scratch.  Tell me about yourself.

13  What's your passion?

14          THE JUROR:  Passion, it's my family, I work to

15  some extent, recreation, those type things.

16          MR. NESSON:  Is music any serious part of your

17  life?

18          THE JUROR:  I like to listen to it occasionally on

19  the radio, but I wouldn't say I spend a whole lot of time

20  listening.

21          MR. NESSON:  You don't typically follow bands or

22  other music collection?

23          THE JUROR:  I used to, but I follow more with my

24  kids listen to it now.

25          MR. NESSON:  How old are your kids?

1          THE JUROR:  10 and 6.

2          MR. NESSON:  10 and 6.  Are they into computers

3    yet?

4          THE JUROR:  A bit, yeah.

5          MR. NESSON:  Are you worried about them using

6    computers?

7          THE JUROR:  Oh, yeah, at this age.  We monitor

8    what they get into obviously and trying not to look at

9    anything inappropriately obviously, get them to do well

10   educationally.

11         MR. NESSON:  Do you have to kind of police what

12   they look at on the machine?

13         THE JUROR:  Yeah, we do, yeah.  We have one

14   computer in the common area so we keep track what they get

15   into.

16         MR. NESSON:  The oldest one is a boy or girl?

17         THE JUROR:  Boy.

18         MR. NESSON:  Are you worried when he gets a little

19   older and he's out of the house?

20         THE JUROR:  Worried for what?

21         MR. NESSON:  Worried about what he's going to do

22   on machines, where he's going to go on the net, what he's

23   going to download, what he's going to share?

24         THE JUROR:  There's a lot of troublesome material

25   on the Internet.  I suppose I'm concerned.

1        MR. NESSON:  This is a civil action.

2        THE JUROR:  Right.

3        MR. NESSON:  It's not criminal.

4        THE JUROR:  Sure.

5        MR. NESSON:  Do you have a sense of what a civil

6   action is as opposed to a criminal action?

7        THE JUROR:  I'm not quite sure.  Maybe the

8   penalties aren't as severe on the civil vs. criminal.

9        MR. NESSON:  Did you follow the decriminalization

10  of marijuana from a crime down to a civil penalty that's

11  just happened in Massachusetts?

12       THE JUROR:  Not a whole lot, no.

13       MR. NESSON:  Do you have a sense of -- what is

14  your sense of what it means to be a peer in the sense of

15  jury of peers?  Joel here is the defendant.

16       THE JUROR:  Right.

17       MR. NESSON:  He's got a right to a jury of his

18  peers.

19       THE JUROR:  Of course.

20       MR. NESSON:  It's actually a constitutional right

21  to have his case actually put before a jury of his peers.

22       THE JUROR:  Right.

23       MR. NESSON:  Just say a word how that registers

24  with you.

25       THE JUROR:  The word "peer," it all implies equals

1   or I guess the common citizens or people that are just

2   picked out of the jury pool.

3          MR. NESSON:  So what I'm interested in asking is

4   you'll be told by the Judge that it is your duty to apply

5   the law, find the facts.  You'll be given all sorts of

6   direction.

7          THE JUROR:  Sure.

8          MR. NESSON:  And it will lead you perhaps to think

9   that you have a duty to the Judge.  What I'm asking is do

10  you see that actually by becoming a juror that you have a

11  duty to Joel?

12         MR. OPPENHEIM:  Objection, your Honor.

13         THE COURT:  Sustained.  You don't have to answer

14  that.  Your job as a juror will be to be fair to both sides.

15  Go on, Mr. Nesson.

16         MR. NESSON:  Yes, I agree, fair to both sides, but

17  that includes the duty to be fair to Joel.

18         THE COURT:  Mr. Nesson, move to the next question,

19  please.

20         MR. NESSON:  Thank you for spending so much time

21  here today.

22         THE JUROR:  You're welcome.

23         THE COURT:  Mr. Oppenheim.

24         MR. OPPENHEIM:  Good afternoon, my name is

25  Matt Oppenheim.  I along with my co-counsel represent the

1    four record companies.  These four record companies have

2    asserted claims against Mr. Tenenbaum for uploading and

3    downloading copyrighted works or their music on the Internet

4    using a peer-to-peer network.  Do you have a view one way or

5    the other about record companies?

6              THE JUROR:  A view in terms of what?

7              MR. OPPENHEIM:  View, opinion, sentiment, a sense?

8              THE JUROR:  A lot of people enjoy music, so it

9    serves its purpose in getting music out there and producing

10   all different types of music.

11             MR. OPPENHEIM:  Okay.  Do you have a view one way

12   or the other about individuals using peer-to-peer networks

13   like KazaA, LimeWire, Napster to download and upload music

14   they don't own?

15             THE JUROR:  Can you explain to me what

16   peer-to-peer means?  Is it like one person to another?

17             MR. OPPENHEIM:  Let me rephrase the question.  Do

18   you have a view one way or the other about people

19   downloading and uploading music on the Internet that they

20   don't own?

21             THE JUROR:  That they don't own?  To the extent

22   that it's copyright law, I suppose I have a problem with

23   that.

24             MR. OPPENHEIM:  Have you read or heard anything in

25   the press about record companies or movie studios asserting

1    claims against individuals who are giving away their

2    copyrighted works for free?

3          THE JUROR:  What comes to mind is the Napster case

4    that seemed to come back years back.  It was taken to court,

5    and it seems like the outcome of that was that this site is

6    now a pay for music site, but beyond that I don't know the

7    details of it.

8          MR. OPPENHEIM:  Okay.  Thank you very much.  We

9    realize that this is -- while this is our jobs, you're here

10   as a matter of your civic duty, and we appreciate your time.

11   Your Honor, no further questions.

12         THE COURT:  Thank you very much.  You have to go

13   into the other courtroom.  Thank you, sir.  Now 14.

14   Mr. Cavarretta, have I pronounced your name right?

15         THE JUROR:  Yes, you did very well.

16         THE COURT:  How about that.  Mr. Oppenheim, you

17   go.

18         MR. OPPENHEIM:  Good afternoon.

19         THE JUROR:  Good afternoon.

20         MR. OPPENHEIM:  My name is Matt Oppenheim.  I

21   along with my co-counsel represent four record companies.

22   Those record companies have sued Mr. Tenenbaum for copyright

23   infringement, and, in particular, for uploading and

24   downloading from a peer-to-peer network on the Internet

25   their music for free.  Do you have a view one way or the

1     other about record companies?

2         THE JUROR:  Not really because I'm not familiar

3     with it.  I'm not going to lie to.  You I have no idea how

4     that works or anything.  I know that there are different

5     programs on there that people do download music from.  I

6     don't know if it's supposed to cost anything or what the

7     story is, it's just not something I'm into in my age

8     bracket.

9         MR. OPPENHEIM:  Fair enough.  Do you have a view

10    one way or the other whether people should be allowed to go

11    onto the Internet and get music that they didn't pay for for

12    free?

13        THE JUROR:  It's kind of confusing because they're

14    paying for the Internet service to begin with, and if it's

15    on the Internet, shouldn't it be available to them for their

16    own use, not for a profit or anything like that, but if

17    they're paying for the Internet service and that music is

18    available on the Internet, haven't they already paid for it?

19        MR. OPPENHEIM:  Well, let's say a record company

20    pays an artist -- who's your favorite artist?  Do you have

21    anybody you ever listen to?

22        THE JUROR:  I'm a Frank Sinatra man.

23        MR. OPPENHEIM:  Okay.  My clients happened to have

24    worked with Frank Sinatra for many, many years.

25        MR. FEINBERG:  Objection to that, Judge.

1          THE COURT:  Go on.

2          MR. OPPENHEIM:  You object to Frank Sinatra?

3          MR. FEINBERG:  I do, I love Frank Sinatra, but I

4    don't think you should associate yourself with

5    Frank Sinatra.

6          THE COURT:  Okay, gentlemen.

7          MR. OPPENHEIM:  Let's assume for the moment you

8    could go to the record store and you could buy a

9    Frank Sinatra album, but instead of doing that where some

10   royalties would be paid to the record companies who created

11   the album to the Sinatra estate because Mr. Sinatra created

12   the album, it's all the backup musicians, the producer, the

13   song writer, so on and so forth, you could go to the record

14   store, and you could pay for that CD or that LP or that

15   cassette, or, alternatively, you could go on the Internet

16   and you could download it for free where record companies

17   and the artists and the backup musicians and nobody gets any

18   money.  Do you have any view one way or the other --

19         THE JUROR:  You keep saying for free, and I keep

20   saying isn't it already paid for if he's paying an Internet

21   service?

22         MR. OPPENHEIM:  Let's assume that the Internet

23   service isn't paying anything to the record company or the

24   artist.

25         THE JUROR:  How do I know that?  I'm paying the

1    Internet service.

2              MR. OPPENHEIM:  Right.

3              THE JUROR:  I'm paying for the use of the

4    Internet, I don't know whether they're paying you or not,

5    that's between you and them.

6              MR. OPPENHEIM:  Okay.  Let me try another example

7    with you.

8              THE JUROR:  All right.

9              MR. OPPENHEIM:  Let's assume in this case that you

10   don't pay an Internet service provider, you go on the

11   Internet for free and you download the music.  Do you have a

12   view about it then?

13             THE JUROR:  I want to know how it's done.

14             MR. OPPENHEIM:  Okay.

15             THE JUROR:  Because I don't know how you can get

16   on it for free.  I have to pay for it.

17             MR. OPPENHEIM:  Okay.  What if the record

18   companies testify that they never got paid a cent for the

19   use of the music?

20             THE JUROR:  Okay.  We're back to square one again.

21   That's between you and the Internet service.

22             MR. OPPENHEIM:  Right.

23             THE JUROR:  I've paid my fee for the month or

24   whatever the yearly fee for the Internet service.  Whether

25   the Internet service is paying you your royalties or not, I

1    have no clue, and it's not really any of my concern.

2           MR. OPPENHEIM:  This view you have is a pretty

3    strongly held view?

4           THE JUROR:  I'm pretty strong with that, yeah.

5           MR. OPPENHEIM:  And if the Judge instructs you

6    that the law says that somebody uploads and downloads

7    copyrighted works on the Internet without permission even if

8    they pay their Internet service provider that that is

9    illegal?

10          THE JUROR:  That should be their permission right

11   there.

12          MR. OPPENHEIM:  Let's say that that is not

13   permission, would you be able to apply that law?

14          THE JUROR:  I don't believe so.  I honestly

15   don't.

16          THE COURT:  Mr. Nesson, do you want to ask a

17   question?

18          MR. NESSON:  Yes, I do.  I just admire your way of

19   arguing, it's very solid.

20          THE JUROR:  I'm just trying to be honest.

21          MR. NESSON:  All right.  So, here's the thing.

22   We're in the United States Federal District Court, and the

23   idea is to apply the law to Joel, and this law actually has

24   two parts of it which are important to this.  The first is

25   the question of whether Joel was guilty of infringing their

1    copyright, liable for infringing their copyright, and the

2    second part is if he is, then how much should he have to

3    pay?  That second part is big, right.

4           Now, the question is if the Judge were to instruct

5    you on the law and make it absolutely clear to you that

6    under the law the fact that Joel had paid his Internet

7    service provider wasn't a defense to infringement, that is,

8    there had to be some permission from them right to him to do

9    it, and the Internet service provider didn't get it to him

10   and she instructed you that's the way it is and then you

11   say, okay, we go from there to the next question, if we get

12   there, how much should he have to pay?

13          The question is could you follow the Judge's

14   instructions?  Could you take the law as she gives it to you

15   and apply that law, or are you -- I understand that your

16   personal view is strong, but the question is could you set

17   that personal view aside for the purpose of doing what she's

18   going to be telling you to do to apply the law to the facts

19   of the case and then make a judgment of well, how much.

20          THE JUROR:  I think I've already answered that

21   question.  I don't believe I can.

22          THE COURT:  Okay.  Thank you, Mr. Cavarretta.

23   We'll excuse you.  Thank you.  We're still at 14.

24   Andrew Valle is next, yes.  We have two more.  Needless to

25   say, the two will take hours.  It always happens.  Hi,

1    Mr. Valle.

2            THE JUROR:  Yes.

3            THE COURT:  Mr. Valle, begin with Mr. Nesson.

4    Proceed.

5            MR. NESSON:  Hello, Mr. Valle.

6            THE JUROR:  How are you?

7            MR. NESSON:  John Nesson.  You're a student.

8    Where are you student?

9            THE JUROR:  University of Denver.

10           MR. NESSON:  Are you into music?

11           THE JUROR:  Somewhat.

12           MR. NESSON:  Who do you like?

13           THE JUROR:  Whatever is on the radio I like to

14   scroll through.

15           MR. NESSON:  Do you believe that you will be able

16   to apply the law to this case as the Judge gives it to you?

17           THE JUROR:  Yes.

18           MR. NESSON:  If she tells you that something is

19   infringement, that's going to be infringement?

20           THE JUROR:  Right.

21           MR. NESSON:  And if she tells you that something

22   is willful, it's going to be willful?

23           THE JUROR:  Right.

24           MR. NESSON:  And if she tells you that you're to

25   award damages that are just, you will award damages that are

1    just?

2              THE JUROR:  Correct.

3              MR. NESSON:  Is it your feeling that you can be

4    fair to both sides in this litigation?

5              THE JUROR:  Yes.

6              MR. NESSON:  You can be as fair to Joel as you're

7    being to the companies?

8              THE JUROR:  Yes.

9              MR. NESSON:  And to the companies as fair as

10   you're being to Joel?

11             THE JUROR:  Yes.

12             MR. NESSON:  Tell me just a little bit yourself.

13   What's your passion?

14             THE JUROR:  I like politics, involved in that.

15             MR. NESSON:  Okay.  Are you planning to be active

16   in politics?

17             THE JUROR:  I don't know.  Things change all the

18   time, but I work at a restaurant now.  That's what I do,

19   move around, I like to work around the house.

20             MR. NESSON:  "And have you ever heard of lawsuits

21   brought by the recording companies?"  Answer:  "Yes."  What

22   do you have in mind?

23             THE JUROR:  Yes.

24             MR. NESSON:  What do you have in mind?

25             THE JUROR:  I search generally on the specific

1      cases.

2              MR. NESSON:  And you've used LimeWire, Bittorrent?

3              THE JUROR:  I have not used Bittorrent.

4              MR. OPPENHEIM:  You've checked it on here?

5              THE JUROR:  It says if a friend.

6              MR. NESSON:  Friend.  How long ago LimeWire?

7              THE JUROR:  Probably about half a month.

8              MR. NESSON:  And what sort of stuff do you

9      download on LimeWire?

10             THE JUROR:  I downloaded 15 songs last time.

11             MR. NESSON:  And is the fact that you have, may

12     have done that yourself going to put you in a position where

13     you're not able to be fair to both sides in this case?

14             THE JUROR:  I don't think so.

15             MR. NESSON:  That is, you will be able to set

16     aside with whatever your personal history and views are and

17     follow the law as the Judge gives it to you?

18             THE JUROR:  Yes, I will.

19             MR. NESSON:  All right.  Good enough for me.

20             THE COURT:  Mr. Oppenheim, you go.

21             MR. OPPENHEIM:  Good afternoon.  Is it Valle?

22             THE JUROR:  Valle.

23             MR. OPPENHEIM:  Hi.  My name is Matt Oppenheim.  I

24     along with my co-counsel represent the plaintiffs in this

25     case.  The plaintiffs are four record companies who have

1    brought claims against Mr. Tenenbaum for downloading and

2    uploading their music on a peer-to-peer network.  In this

3    instance, it was KazaA.  Do you have a view one way or the

4    other about record companies?

5              THE JUROR:  No.

6              MR. OPPENHEIM:  Do you have a view one way or the

7    other about the use of peer-to-peer networks since you have

8    used LimeWire yourself?

9              THE JUROR:  No.

10             MR. OPPENHEIM:  Do you believe that people should

11   be permitted to use LimeWire to download and upload music

12   owned by others?

13             THE JUROR:  I would put all my views aside for the

14   facts of the case.  I would listen to what is presented to

15   me.

16             MR. OPPENHEIM:  Would you do that even though you,

17   yourself, have engaged in the same conduct that

18   Mr. Tenenbaum's been accused of engaging in?

19             THE JUROR:  Yes.  I do buy songs additionally.

20             MR. OPPENHEIM:  You do?

21             MR. FEINBERG:  I didn't hear.

22             THE JUROR:  I purchase songs also, I will admit my

23   use of LimeWire.  It was the first time I used it in about

24   seven years.

25             MR. OPPENHEIM:  Okay.  Do you have an opinion as

1    to whether or not record companies should enforce their

2    rights as against individuals who are infringing their

3    rights?

4              THE JUROR:  I do.

5              MR. OPPENHEIM:  Can you share with us your views?

6              THE JUROR:  Well, I believe that songs should be

7    purchased, and I do quorum with that sometimes when I do

8    download songs.

9              MR. OPPENHEIM:  Okay.  Have you ever received

10   notice of a copyright violation?

11             THE JUROR:  Not personally.

12             MR. OPPENHEIM:  Do you know somebody who has?

13             THE JUROR:  I've heard the stories on college

14   campuses, but I've never met face to face with somebody.

15             MR. OPPENHEIM:  I noted you said that you were at

16   the University of Denver; is that correct?

17             THE JUROR:  Yes, it is.

18             MR. OPPENHEIM:  Just out of an abundance of

19   caution, a number of our counsel are at the law firm of

20   Holme, Roberts & Owen, which is based in Denver.  Are you

21   aware of anybody or do you have any connection to that law

22   firm at all?

23             THE JUROR:  No, I don't.

24             MR. OPPENHEIM:  You're a student.  What year are

25   you?

```
 1            THE JUROR:  I'm a freshman heading into sophomore
 2   year.
 3            MR. OPPENHEIM:  Have you figured out what you're
 4   studying yet?
 5            THE JUROR:  I'm an undeclared business major.
 6            MR. OPPENHEIM:  If you're like the rest of us, it
 7   will change.
 8            THE JUROR:  It is a good choice because you can
 9   move with it, so...
10            MR. OPPENHEIM:  And you indicated that a friend of
11   yours has used Bittorrent?
12            THE JUROR:  Yes.
13            MR. OPPENHEIM:  Can you tell us a little bit about
14   that?
15            THE JUROR:  He downloads movies.
16            MR. OPPENHEIM:  Do you have a view of that one way
17   or the other?
18            THE JUROR:  I don't like that.  I think movies --
19   he downloads programs, too, which I've never done that.  The
20   way I look at it, a song you can purchase for 99 cents off
21   iTunes, a program can cost $300.  He shouldn't be taking
22   that away for free.
23            MR. OPPENHEIM:  So you have a different view about
24   the value of the copyright with respect to music as opposed
25   to say software?
```

**JURY TRIAL DAY 1**

1          THE JUROR:  I look at the total cost, three people

2     downloading three songs would be 2.97, three people

3     downloading three Adobe whatever they make that's expensive

4     could be upwards of $1500.

5          MR. OPPENHEIM:  Would it impact your view if the

6     individual wasn't just downloading but was distributing back

7     to the millions of other people on the network?

8          THE JUROR:  Yes.

9          MR. OPPENHEIM:  How would that affect your view?

10          THE JUROR:  Well, that's not the same as personal

11     use, that would be distribution.  I would not like that as

12     much.

13          MR. OPPENHEIM:  Even if they weren't selling it?

14          THE JUROR:  Even if so, yes.

15          MR. OPPENHEIM:  And you own an iPOD; is that

16     right?

17          THE JUROR:  I do.

18          MR. OPPENHEIM:  And you do download from iTunes as

19     well as LimeWire; is that right?

20          THE JUROR:  Yes.

21          MR. OPPENHEIM:  And you indicated that you've

22     ripped CDs to your computer; is that right?

23          THE JUROR:  I have.

24          MR. OPPENHEIM:  And do you in the process of doing

25     that, do you ever upload those to a network to be

1     distributed?

2          THE JUROR:  No, I don't.

3          MR. OPPENHEIM:  Do you believe in light of your

4     own activities that it would impact how you would assess the

5     potential value of damages in a case of copyright

6     infringement?

7          THE JUROR:  Could you clarify that for me?

8          THE COURT:  Yes, clarify that.  I have no idea

9     what you just asked.

10         THE JUROR:  I glad I'm not the only one.

11         THE COURT:  He has to be even clearer.

12         MR. OPPENHEIM:  If the defendant is found by the

13    jury ultimately to be liable, the jury will then be asked to

14    assess damages?

15         THE JUROR:  Okay.

16         MR. OPPENHEIM:  Given that you've indicated that

17    you've engaged in downloading from LimeWire, will that, the

18    fact that you've done that impact how you would view the

19    assessment of damages against the defendant?

20         THE JUROR:  No, it wouldn't.

21         MR. OPPENHEIM:  Thank you very much for your time.

22    We realize you've been here all day and it's a matter of

23    civic duty and we appreciate it.  Your Honor, we have no

24    further questions.

25         THE COURT:  Mr. Valle, if you could go back into

1    the other room and wait.  We'll almost finished.  Thank

2    you.

3              THE JUROR:  You're welcome.

4              THE COURT:  15, one more.

5              MR. OPPENHEIM:  Your Honor.

6              THE COURT:  Do you want to challenge him?

7              MR. OPPENHEIM:  Yes.

8              THE COURT:  Can you just go back out again and ask

9    Mr. Valle to wait outside.

10             MR. OPPENHEIM:  Under the same basis that we dealt

11   with Mr. Korecki, I'm not sure I pronounced that correctly,

12   that the same set of facts exist here.  He indicated that he

13   had engaged in peer-to-peer downloading, and that was the

14   basis upon which you said that while this isn't a gray area,

15   this goes over the line.

16             THE COURT:  In other words, where someone is doing

17   precisely or precisely being accused, which you didn't ask.

18   He said he downloaded, he didn't say that he uploaded, and

19   when you asked the question about whether somebody -- this

20   may be a distinction without a difference, but I made a note

21   of it, which is to say not the same thing as personal use if

22   someone uploaded it, so he's making a distinction between

23   his behavior and the behavior at issue here.  Is that a

24   meaningful distinction?

25             MR. OPPENHEIM:  Well, it's copyright.  Whether

1    it's uploading or downloading, you don't need to do both to

2    be on the hook.  Clearly the damages may be different, but

3    he clearly --

4         THE COURT:  It is a lot to believe that someone

5    who himself did this conduct, at least admitting to it,

6    would be able to be fair with respect to somebody else who

7    did this conduct, so if you want to object.

8         MR. FEINBERG:  That's basically all I was going to

9    be saying, Judge, is that unlike the other fellow who said

10   I'm not sure because I could have been in his position, this

11   fellow was absolutely clear that he could be fair and

12   impartial and he could put that aside.

13        THE COURT:  We excused Korecki who had been sued.

14   I think the abundance of caution is to excuse Mr. Valle, so

15   we still need two more.  I do believe in this process.

16   Mr. Cole, Mr. Oppenheim goes.

17        MR. OPPENHEIM:  Good afternoon, Mr. Cole.  How are

18   you doing?

19        THE JUROR:  Okay.

20        MR. OPPENHEIM:  My name is Matt Oppenheim.  I

21   along with my co-counsel represent four record companies who

22   have brought claims against Mr. Tenenbaum for uploading and

23   downloading copyrighted works on the Internet using a

24   peer-to-peer network.  As part of this process, if it's okay

25   with you, I'm going to ask you some questions to follow up

1    on your questionnaire and some additional questions.  So we

2    represent record companies.  Do you have a view one way or

3    the other about record companies?

4              THE JUROR:  I'm sorry.

5              MR. OPPENHEIM:  We represent record companies, and

6    they're the plaintiffs here.

7              THE JUROR:  Yes.

8              MR. OPPENHEIM:  Do you have a view, a personal

9    view or opinion about record companies?

10             THE JUROR:  No, no.

11             MR. OPPENHEIM:  Not really?

12             THE JUROR:  No, no opinion.

13             MR. OPPENHEIM:  Does anybody in your family or do

14   you own a business?

15             THE JUROR:  No.

16             MR. OPPENHEIM:  So, as I mentioned, the record

17   companies have sued Mr. Tenenbaum for downloading and

18   uploading copyrighted works on the Internet.  Do you have a

19   view or an opinion about the use of peer-to-peer networks

20   such as Napster, KazaA, LimeWire, Morpheus?

21             THE JUROR:  I don't disagree with it.

22             MR. OPPENHEIM:  You don't disagree with it?

23             THE JUROR:  No.

24             MR. OPPENHEIM:  Okay.  I see on your questionnaire

25   that you indicated that you or someone in your family or

1    close friend has downloaded music, books or movies from the

2    Internet; is that right?

3              THE JUROR:  Correct.

4              MR. OPPENHEIM:  Have you engaged in some of that

5    activity?

6              THE JUROR:  Yes.

7              MR. OPPENHEIM:  What networks have you used in the

8    past?

9              THE JUROR:  ITunes, mostly iTunes.  I've used all

10   those others that are listed on there.

11             MR. OPPENHEIM:  Napster?

12             THE JUROR:  Yeah.

13             MR. OPPENHEIM:  LimeWire?

14             THE JUROR:  Yeah.

15             MR. OPPENHEIM:  And KazaA.  And so coming back to

16   my last question, so given that you've done it, do you have

17   a view one way or the other about it?

18             THE JUROR:  Do I, yes.

19             MR. OPPENHEIM:  Okay.  Could you share that with

20   us?

21             THE JUROR:  I don't really see anything wrong with

22   it.  I don't do it anymore because those LimeWire and all

23   those others, they're just a hassle now to me, you know.

24             MR. OPPENHEIM:  How so?

25             THE JUROR:  Just you never know if you're going to

1    get a virus or whatever, that's why I stopped doing it

2    pretty much.

3           MR. OPPENHEIM:  Do you -- I'm sorry.

4           THE JUROR:  I just go to the record store and buy

5    records now or CDs, excuse me.  It's much easier.

6           MR. OPPENHEIM:  When was the last time that you

7    used the Internet to get music?

8           THE JUROR:  Probably a couple weeks ago, two weeks

9    ago.

10          MR. OPPENHEIM:  Which network were you using?

11          THE JUROR:  ITunes.

12          MR. OPPENHEIM:  ITunes?

13          THE JUROR:  Yes.

14          MR. OPPENHEIM:  When was the last time you used

15   KazaA or LimeWire?

16          THE JUROR:  Two, three years ago maybe.

17          MR. OPPENHEIM:  Have you read about the fact that

18   record companies and movie studios have brought cases

19   against individuals?

20          THE JUROR:  Yes, I've heard about it, yes.

21          MR. OPPENHEIM:  What's your reaction been to the

22   fact that the record companies have done that?

23          THE JUROR:  I think it's kind of silly going after

24   an individual.

25          MR. OPPENHEIM:  Would it change your view if you

1    knew that the record companies had been significantly harmed

2    by the infringement?

3            THE JUROR:  If I knew the facts about it, I

4    guess.

5            MR. OPPENHEIM:  Do you have an opinion one way or

6    the other about record companies enforcing the rights

7    against individuals who are giving their music away for

8    free, giving the record companies music away for free?  Not

9    really?

10            THE JUROR:  No, nothing.

11            MR. OPPENHEIM:  I appreciate your candor in being

12    forthright.  This is not an easy process.  Do you have a

13    view as to whether -- strike that.  Let me try something

14    else.  When you use the peer-to-peer networks, how often

15    would you use them?  Was it something you did frequently?

16            THE JUROR:  When I did use them?

17            MR. OPPENHEIM:  Yes.

18            THE JUROR:  It was maybe once, twice a week.

19            MR. OPPENHEIM:  And what kind of content were you

20    downloading?

21            THE JUROR:  Music.

22            MR. OPPENHEIM:  Any images?  Short films?

23            THE JUROR:  Not really, just music.

24            MR. OPPENHEIM:  Games?

25            THE JUROR:  Mostly music.

1           MR. OPPENHEIM:  Mostly music?

2           THE JUROR:  Yes.

3           MR. OPPENHEIM:  What kind of music?

4           THE JUROR:  Rock music.

5           MR. OPPENHEIM:  Do you remember any bands offhand?

6           THE JUROR:  No, not off the top of my head.

7           MR. OPPENHEIM:  It indicates that you've ripped

8    CDs to your computer on the questionnaire; is that right?

9           THE JUROR:  Yes.

10          MR. OPPENHEIM:  When you ripped them, did you put

11   them in the share directory?

12          THE JUROR:  No.

13          MR. OPPENHEIM:  And it indicates that you had an

14   iPOD or MP3 player; is that right?

15          THE JUROR:  Correct.

16          MR. OPPENHEIM:  Would you take the music that you

17   got from LimeWire, KazaA and Napster and put it into that

18   iPod?

19          THE JUROR:  No, just basically on the computer.

20          MR. OPPENHEIM:  On the computer?

21          THE JUROR:  Yes.

22          MR. OPPENHEIM:  Did you ever burn the music from

23   the computer onto CDRs?

24          THE JUROR:  No.  The only time I'd burn a CD would

25   be just to back up a copy that I bought.

1          MR. OPPENHEIM:  Of something you bought?

2          THE JUROR:  Yes.

3          MR. OPPENHEIM:  Okay.  In light of the fact that

4     you've engaged in the conduct that's at issue in this case,

5     do you think that you'd be able to view this case fairly

6     since you've done some of what the record companies are

7     accusing the defendant of here?

8          THE JUROR:  Yes, I think I could be impartial.

9          MR. OPPENHEIM:  Even though you've engaged in the

10    same conduct?

11         THE JUROR:  Yes.

12         MR. OPPENHEIM:  I appreciate that you've been

13    sitting there all day.  I realize we do this as a matter of

14    our job, but for you, it's a matter of your civic duty.

15    Thank you.

16         THE JUROR:  No problem.

17         THE COURT:  Mr. Nesson.

18         MR. NESSON:  The music downloading that you did

19    was like back three years?

20         THE JUROR:  Yeah, about two or three years ago.

21         MR. NESSON:  And so in the sense you're a reformed

22    character?

23         THE JUROR:  Yeah.

24         MR. NESSON:  And were you doing anything different

25    back then than all the rest of your friends were doing?

1          THE JUROR:  No, not really, no.

2          MR. NESSON:  So it's like a lot of people were

3     doing what you were doing?

4          THE JUROR:  Yeah.

5          MR. NESSON:  Thank you.  I don't think I have

6     anything further.

7          THE COURT:  Mr. Cole, I just want to ask the

8     question again.  You said you stopped using Napster because

9     it was a hassle, because the possibility of viruses?

10          THE JUROR:  Yes.

11          THE COURT:  Now you're buying your music?

12          THE JUROR:  Yeah.

13          THE COURT:  So the question is since you had once

14     been doing what the defendant here is accused of doing, this

15     is a terribly important question, do you think it would make

16     it hard for you to sit as a juror in this case, sit in

17     judgment essentially?

18          THE JUROR:  It may.  You know, I don't know.  I

19     don't know the whole...

20          THE COURT:  But if he's accused of doing what you

21     were doing, it would make it hard?

22          THE JUROR:  Yes, I guess it would.

23          THE COURT:  I'm going to excuse you.  Thank you

24     very much.

25          MR. NESSON:  Your Honor, I want an opportunity to

1    put objections on the record.

2         THE COURT:  Just one second until the juror

3    leaves.  The principle here is that someone who is either

4    sued or engaged in the same conduct is in a different

5    category than someone who merely has opinions about it, and

6    while I've been indulgent about people who had opinions

7    about it and whether they could set it aside, the same

8    conduct to be consistent is a different issue.  Your rights

9    are saved.

10        MR. NESSON:  You understand that the rule your

11   Honor is applying basically eliminates a whole generation

12   from the jury.  It means that there are none of Joel's

13   peers.

14        THE COURT:  Actually that's not true as a matter

15   of fact on this jury.  There are numbers that are his

16   peers.

17        MR. NESSON:  Nobody who downloaded.

18        THE COURT:  I see.  So the peer is someone who

19   also engaged in infringing conduct.  Your rights are noted

20   here.  Call the next juror.  Mr. Aten.  Hi, Mr. Aten.

21        THE JUROR:  Hi.

22        THE COURT:  I'm sorry it's taken longer than I

23   anticipated.  Mr. Nesson, you go first.

24        MR. NESSON:  Hi.

25        THE JUROR:  Hi.

1          MR. NESSON:  Charlie Nesson is my name.

2          THE JUROR:  Nice to meet you, Paul Aten.

3          MR. NESSON:  How are you?  Paul, tell me just a

4    little bit about yourself.  What do you like?  What's your

5    passion?

6          THE JUROR:  Well, I'm a father of two beautiful

7    girls, so they are certainly a lot of my passion.  I enjoy

8    golf, going outside, doing yard work, things like that.

9          THE COURT:  You enjoy doing yard work?  I'm sorry.

10   Go on, Mr. Nesson, I'm sorry.

11         MR. NESSON:  Have you any kind of involvement with

12   computers?  What do you do, you use it frequently?

13         THE JUROR:  Yes, I use a laptop for my job, I'm

14   director of customer service and sales for a small medium

15   size oil retailer.  Microsoft, Windows, Internet, the

16   basics.  No offense to anybody, I'm not a geek, but I know

17   my way around, I guess.

18         MR. NESSON:  When were you in high school?

19         THE JUROR:  Graduated in 1987.

20         MR. NESSON:  Where did you go?

21         THE JUROR:  Brockton High School.

22         MR. NESSON:  Brockton High School, 1987.  So that

23   was a little bit before the Internet kind of swept in?

24         THE JUROR:  Yes.

25         MR. NESSON:  Do you consider yourself to be a

1    pre-Internet generation then?

2            THE JUROR:  Yeah, I think so.  I'm not, you know,

3    I don't play a lot of video games.  I think I was just

4    before that so I was more active outside and doing things.

5    I know it, I utilize it, I like it, but I've not --

6            MR. NESSON:  Have you had any occasion to be

7    involved with kids who really get into Internet, you know,

8    and playing the video games and downloading the music and

9    doing the whole kind of geeky scene?

10           THE JUROR:  Not really.

11           MR. NESSON:  You don't know kids that are like

12   that?

13           THE JUROR:  I wouldn't say, not really.  My kids

14   are 7 and 2.  You know, I have nieces and nephews the same

15   age.  I guess no.

16           THE COURT:  You checked off here that you ripped a

17   CD to a computer?

18           THE JUROR:  Yes.

19           MR. NESSON:  What does that mean to you?

20           THE JUROR:  I took a Van Halen CD and put it on my

21   drive at home.

22           MR. NESSON:  And then for purposes of listening to

23   it or transferring it to something?

24           THE JUROR:  Exactly, just listen to it at home.

25           MR. NESSON:  All right.  Thank you very much.

1          THE JUROR:  Sure.

2          THE COURT:  Mr. Oppenheim.

3          MR. OPPENHEIM:  Sure.  Good afternoon.  My name is

4    Matt Oppenheim.  Along with my co-counsel, we represent four

5    record companies who have brought claims against

6    Mr. Tenenbaum for uploading and downloading our clients'

7    music on the Internet using a peer-to-peer network for free.

8    Do you have a view one way or the other about record

9    companies?

10         THE JUROR:  I don't think so.  I guess not.  I

11   mean, I've used, you know, like walmart.com and things like

12   that, I've downloaded some music there very, very rare, but

13   I've bought numerous CDs in my life.  I guess that's

14   probably my view.

15         MR. OPPENHEIM:  Okay.  So, as I mentioned, the

16   record companies are asserting claims against Mr. Tenenbaum

17   for the use of a peer-to-peer network to upload and download

18   copyrighted works.  Do you have a view on using peer-to-peer

19   networks to upload and downloaded copyrighted works?

20         THE JUROR:  I would think that based on, you know,

21   I guess I would look at it as propriety information that if

22   you download you should pay for I guess would be my view on

23   it.

24         MR. OPPENHEIM:  Do you have any view on whether

25   record companies should be enforcing their rights against

1    individuals who are giving away their music for free on the

2    Internet?

3            THE JUROR:  Yeah, I mean, I think that if you are,

4    you know, if you're the record company and you're paying to

5    have someone put this information together for you and

6    you're selling it and someone is giving it away for free,

7    you should have some recourse against that, sure.  It's a

8    product like anything else.

9            MR. OPPENHEIM:  On your form it indicates that you

10   have heard about these lawsuits that the record companies

11   have brought.  What have you heard?

12           THE JUROR:  I was thinking about it.  I could be

13   wrong, but didn't like Metallica or somebody sue somebody

14   for downloading?  I'm sure I read about it, and I guess I

15   don't know a lot about it, but I do vaguely remember

16   something to that effect.

17           MR. OPPENHEIM:  You don't have a strong opinion

18   based on that recollection, do you?

19           THE JUROR:  No, I never really thought about it

20   until today, to be honest with you.

21           MR. OPPENHEIM:  You realize it's been a very long

22   day.  Thank you very much for your patience and your civic

23   duty.  No further questions.

24           THE COURT:  I'm sorry, you have to go back to the

25   other room.  It's almost over.  One more.  Next is Mr. Aten,

1    this is Mr. Barrett.  Cole was struck.  Hi, Mr. Barrett.  It

2    has been a long day for all of us.  Mr. Oppenheim, would you

3    go ahead.

4             MR. OPPENHEIM:  Good afternoon, Mr. Barrett.  My

5    name is Matt Oppenheim.  I along with my co-counsel

6    represent four record companies who have brought claims

7    against Mr. Tenenbaum for uploading and downloading our

8    client's music on the Internet using a peer-to-peer network

9    for free.

10            THE JUROR:  Okay.

11            MR. OPPENHEIM:  If it's all right with you, I'm

12   going to ask you a few questions about that and about your

13   questionnaire.

14            THE JUROR:  Okay.

15            MR. OPPENHEIM:  Do you have a view one way or the

16   other about record companies?

17            THE JUROR:  You mean as far as the music, as far

18   as --

19            MR. OPPENHEIM:  Not so much the quality of the

20   music because that varies but about record companies, any

21   view?

22            THE JUROR:  Yes, I have some views on it.

23            MR. OPPENHEIM:  Do you want to share it with us?

24            THE JUROR:  Well, I believe that personally if the

25   record company owns the music, then people should have to

1  pay for it, if that's what you mean.

2          MR. OPPENHEIM:  Okay.

3          THE JUROR:  That's my view.  No offense but

4  downloading the music I think in my opinion is almost like

5  stealing.

6          MR. OPPENHEIM:  Okay.

7          THE JUROR:  That's just my view.

8          MR. OPPENHEIM:  You are entitled to your view.  I

9  realize it's been a long day.  Thank you very much.  No

10  further questions for the plaintiffs, your Honor.

11          THE COURT:  Mr. Nesson.

12          MR. NESSON:  So downloading is like stealing?

13          THE JUROR:  Well, in my mind.  I have an MP3

14  player, but I only do my own CDs or my children's CDs, I

15  don't go from the Internet.  To me, if you go to the

16  Internet and buy it, get it off of a site, you should have

17  to pay for it, I would think.

18          MR. NESSON:  And then if you don't do that then

19  you're a pirate?

20          THE JUROR:  Well, I guess you could say pirate,

21  sure.

22          MR. NESSON:  So stealing something off the

23  Internet by downloading a song is just like stealing

24  something out of a store?

25          THE JUROR:  I would think so, yes.  I mean, to me

1   if the record company is selling music and you want it, you

2   should have to pay for it.  If you're getting it elsewhere

3   through bootleg or anything else, to me it's illegal.

4           MR. NESSON:  Would it make any difference to you

5   if it were just like freely available out in the

6   environment?

7           THE JUROR:  If it was free to everybody.

8           MR. NESSON:  It's out there, it's like free bits

9   out on the net.  There it is, it's free.

10          THE JUROR:  Is it free though?

11          MR. NESSON:  If you went on the net and you said

12  to yourself, what can I reach for free, you would reach all

13  these songs.

14          THE JUROR:  Legally free?

15          MR. NESSON:  Well, it gets into an argument,

16  doesn't it?

17          THE JUROR:  See, that's my point is it really

18  free?  I mean, somebody has made the music and produced it

19  and should be paid.  If you're getting it for nothing, to me

20  it's --

21          MR. NESSON:  Would it make any difference if the

22  only way that you -- here you are, you're in this digital

23  world, and you hear this, you hear here's this free thing,

24  would it make any difference if there was no other way to

25  get digitally?

1          THE JUROR:  If there was no other way, I would say

2     then you'd have to do it that way.

3          MR. NESSON:  You'd have to do it that way?

4          THE JUROR:  But if there's other ways by buying it

5     or such legally or rightfully.

6          MR. NESSON:  So up until the time, I mean the way

7     this happened was all of a sudden it was all free on the

8     net?

9          MR. OPPENHEIM:  Objection, your Honor.

10          THE JUROR:  Well --

11          THE COURT:  Mr. Nesson shouldn't be telling you

12     what the facts that you may be hearing.  He shouldn't be

13     announcing what his view of the facts are, but he can

14     certainly ask you what your attitudes are.  Go on.

15          THE JUROR:  Well, see, my theory also is I've got

16     a collection of CDs that I have bought at home, probably 200

17     or 300 CDs, probably another 200 or 300 albums, I have had

18     to pay them, and if I think if somebody else wanted them,

19     they should have to pay for them.

20          MR. NESSON:  Well, all right.  All right.  I hear

21     you.  And do you think that you would hold that view so

22     firmly that you wouldn't be able to fair to Joel if he were

23     able to come forward with some defense?

24          THE JUROR:  I'm pretty stubborn.

25          MR. NESSON:  Pretty stubborn.  No matter what

1    defense he came forward with, you would feel that if he

2    downloaded and shared, that would be it?

3            THE JUROR:  To me, it's wrong.  To me, it's wrong.

4    No offense.  That's just the way I feel.

5            MR. NESSON:  Thank you very much.

6            THE COURT:  Okay.  Can you wait outside for just a

7    second?

8            THE JUROR:  Sure.

9            (Juror exited the courtroom.)

10            THE COURT:  So if he downloaded and shared, would

11   it be wrong?  The answer is it would be infringement.  Are

12   you going to challenge this juror for being -- I'm not sure

13   I understand your question or where to go because it seems

14   to me he stated the law.

15            MR. NESSON:  He goes beyond the law, your Honor,

16   he states that it's wrong.  This is a civil infringement.

17   There's no blame worthiness in this.  He is as biased in his

18   direction as the three jurors that you struck before for

19   being people who had shared Joel's position.

20            MR. OPPENHEIM:  If I may, your Honor, I'm sorry.

21            THE COURT:  No, I understand.  This is not an

22   equivalent situation in one sense.

23            MR. OPPENHEIM:  I think I was about to address.

24            MR. FEINBERG:  Before Mr. Oppenheim starts, may I

25   just consult or speak for Mr. Nesson?

1          MR. NESSON:  Please speak.

2          MR. OPPENHEIM:  Wait a minute.

3          THE COURT:  Go on, Mr. Feinberg.

4          MR. FEINBERG:  The difference here, Judge, is that

5     this fellow says he would not consider any defense to

6     infringement.

7          THE COURT:  All right.

8          MR. FEINBERG:  That's the critical difference

9     here.

10          THE COURT:  All right.  Mr. Oppenheim, your last

11     word.

12          MR. OPPENHEIM:  Your Honor, what Mr. Barrett said

13     was a correct articulation of the law, and the question was

14     if Mr. Tenenbaum had engaged in uploading and downloading of

15     copyrighted works, you know, would you, da-da-da, and that

16     he presupposed a set of facts which came to the conclusion

17     that this juror should come to.  If you strike this juror,

18     then the question is why didn't you strike juror No. 3?

19     Juror No. 3 you refused to strike even though he said he had

20     strong views regarding this conduct.  He himself said

21     though --

22          THE COURT:  Is this Mr. Tanzer?

23          MR. OPPENHEIM:  Yes.  And you refused to strike

24     him on the basis that he had strong views.  This is not the

25     equivalent of somebody who had engaged in the conduct.  Now,

1    if we had a potential juror here who said not only do I

2    think it's wrong but I'm a vigilante who goes out and stops

3    other people who engages in it by using unlawful conduct to

4    make sure that they don't engage in this infringing

5    behavior, then maybe you've got the mirror image, but you

6    don't.  What you've got is somebody who articulated the law

7    correctly.  Frankly every juror should be this way.

8           THE COURT:  The juror's job will be to deal with

9    infringement and also deal with damages and deal with

10    damages if the infringement is found in a universe in which

11    there are really no meaningful standards as between 750,000

12    per song and 30,000 per song.  I think that someone for whom

13    this is moral approbrium rather than the factual, I mean,

14    I'm concerned about the vehements of his opinion.  Let's

15    call him in.  I want to ask him some more questions.

16           MR. OPPENHEIM:  I want to ask him some more

17    questions about that, your Honor.

18           THE COURT:  Can you call Mr. Barrett in again.

19           MR. OPPENHEIM:  I will ask him if he can follow

20    your instructions.

21           MR. FEINBERG:  Objection, your Honor.

22           THE COURT:  I will ask the questions.  We got a

23    little bit flustered here because I spilled Diet Coke all

24    over everybody.  It's something that Judges do, so here's my

25    question to you:  You said that if you had to pay, someone

1    else should have to pay, and you said you had strong

2    feelings about this.  If you're a juror in this case, I

3    would instruct you as to the law, and the law may not match

4    your strong feelings.  There may be defenses that may not

5    match your strong feelings, there may be judgments you have

6    to make about damages, and the question is whatever your

7    strong feelings are, do you think you could follow the law

8    in this case, or would you be --

9              THE JUROR:  In other words, put my feelings aside?

10             THE COURT:  Could you put your feelings aside,

11   right.

12             THE JUROR:  I don't know if I could because of

13   what I've invested in my...

14             THE COURT:  If you don't think you could, then

15   I'll excuse you.  Thank you very much.  It's a good thing

16   you weren't here, otherwise you'd have Diet Coke on you,

17   too.  Thank you, sir.  Mr. Welch is the next one.

18   Mr. Welch, come and sit down.  I think Mr. Nesson is

19   first.

20             MR. NESSON:  Hello, Mr. Welch.

21             THE JUROR:  Good afternoon.

22             MR. NESSON:  How are you?

23             THE JUROR:  Good thanks.

24             MR. NESSON:  Tell me just a bit about yourself.

25   What's your passion, what do you live for?

1          THE JUROR:  My passion, I like to golf and ski,

2     family man, just had a second child.  My daughter is just

3     about two and a half months.  My son is going to turn two

4     next week.

5          MR. NESSON:  Fantastic.  So I see on your chart

6     here that you've downloaded, you've used or you know people

7     who you've had Napster, LimeWire and Bittorrent?

8          THE JUROR:  Correct.

9          MR. NESSON:  Tell us about that.

10          THE JUROR:  Well, myself, I use iTunes, but I had

11     a friend a couple years ago that used Bittorrent and

12     probably about five years ago LimeWire.

13          MR. NESSON:  This is the friend, not you?

14          THE JUROR:  Correct.

15          MR. NESSON:  You've not used these other

16     peer-to-peer networks?

17          THE JUROR:  No.

18          MR. NESSON:  Do you have a grasp of what

19     peer-to-peer is?  I mean, you understand it as a technology

20     level?

21          THE JUROR:  Yes.

22          MR. NESSON:  You never got into it?

23          THE JUROR:  Not really.

24          MR. NESSON:  I have quite a bit of music myself

25     and used iTunes on a regular basis, but as far as music, I

1      mean, this is just a collection I've had since college.

2              MR. NESSON:  Who do you like?

3              THE JUROR:  Pretty much everything except for

4      country.

5              MR. NESSON:  Well, to be a juror means to be a

6      group of peers of the defendant, he has a constitutional

7      right to trial by jury.

8              MR. OPPENHEIM:  Objection.

9              THE COURT:  Both sides have the right to trial by

10     jury.  Go on, Mr. Nesson.

11             MR. NESSON:  Both sides have a right to trial by

12     jury, which at its base is a matter of having a sense

13     yourself of fairness and justice.  Do you have a sense

14     yourself of yourself as a fair and just person?

15             THE JUROR:  Definitely.

16             MR. NESSON:  Great, thank you.

17             THE COURT: Mr. Oppenheim.

18             MR. OPPENHEIM:  Good afternoon, Mr. Welch.

19             THE JUROR:  Good afternoon.

20             MR. OPPENHEIM:  I'm Matt Oppenheim.  Also with my

21     co-counsel, we represent four record companies who are the

22     plaintiffs in this case that have been brought against

23     Mr. Tenenbaum.  This is a suit, as the Court described for

24     you briefly in the courtroom this morning, about in which

25     the record companies allege that the defendant,

1    Mr. Tenenbaum, uploaded and downloaded copyrighted music

2    that they own on peer-to-peer networks without permission.

3            Do you have a view one way or the other about

4    record companies?

5            THE JUROR:  Not so much.  I mean, I understand it.

6    It's a business.

7            MR. OPPENHEIM:  Okay.  Does anybody in your family

8    or do you own a business?

9            THE JUROR:  My father.

10           MR. OPPENHEIM:  What kind of business?

11           THE JUROR:  Electrical company.

12           MR. OPPENHEIM:  Has he still got it?

13           THE JUROR:  Yes.

14           MR. OPPENHEIM:  So I mention that the record

15   companies have sued Mr. Tenenbaum for using peer-to-peer

16   networks.  Do you have a view about individuals using

17   peer-to-peer networks like KazaA and Napster and LimeWire?

18           THE JUROR:  I mean, if it's legal and if it's a

19   file sharing, I mean, if it's not breaking the law, then I

20   don't have a problem with it.

21           MR. OPPENHEIM:  And what if it's not authorized by

22   the copyright holder?

23           THE JUROR:  Then, I mean, it's an issue.

24           MR. OPPENHEIM:  Have you heard or read anything in

25   the press about record companies or movie studios suing

1    individuals?

2         THE JUROR:  Yeah.

3         MR. OPPENHEIM:  Yeah.  Do you want to tell us a

4    little bit what you've heard?

5         THE JUROR:  Probably the most popular comes to

6    mind with Metallica, Lars or the drummer trying to --

7         MR. OPPENHEIM:  From the Napster days?

8         THE JUROR:  Yeah, yeah.

9         MR. OPPENHEIM:  Did you have a view about that?

10        THE JUROR:  I looked at it from both sides.  I

11   mean, I can see both points.  At the end of the day if it's

12   illegal, then I'm opposed to it.

13        MR. OPPENHEIM:  On your questionnaire it indicates

14   that have ripped CDs to your computer; is that correct?

15        THE JUROR:  Correct.

16        MR. OPPENHEIM:  When you rip them to your

17   computer, do you ever upload them to your computer for other

18   people to download?

19        THE JUROR:  No.

20        MR. OPPENHEIM:  And you indicate on the survey

21   that you use a computer frequently.  What kinds of things do

22   you do with the computer?

23        THE JUROR:  Just basically mostly e-mails on my

24   personal computer and my work computer, my work computer is

25   strictly for work, but for personal use mostly just Internet

1    purposes.

2           MR. OPPENHEIM:  And it says here you do bus. dev.

3    work?

4           THE JUROR:  Correct.

5           MR. OPPENHEIM:  Business development?

6           THE JUROR:  Correct.

7           MR. OPPENHEIM:  What is Burke Distributing?

8           THE JUROR:  It's a beer company out of Randolph,

9    but I'm actually in the Red Bull division so basically try

10   to solicit new business, sales rep.

11          MR. OPPENHEIM:  Of Red Bull?

12          THE JUROR:  For the Red Bull, but I work for Burke

13   Distributing, which is a local distributor for Red Bull.

14          MR. OPPENHEIM:  Sure.  You indicated on here that

15   your wife is a supervisor?

16          THE JUROR:  Correct.

17          MR. OPPENHEIM:  Other than the two little ones,

18   what is she a supervisor of?

19          THE JUROR:  Medical software for a company called

20   Meditech.

21          MR. OPPENHEIM:  Okay.  We realize it's been a very

22   long day.  We're here as part of our jobs, you're doing this

23   as a matter of civic duty.  We appreciate your time.  Thank

24   you.  No further questions, Your Honor.

25          THE COURT:  Thank you very much.  Now if you could

1    go back to the other room.  The end is near.

2              THE JUROR:  Okay.  Thank you.

3              THE COURT:  According to my calculation, that's

4    it.  We will certainly not -- I will instruct the jury,

5    opening instructions, but we'll give you 10 minutes to

6    figure out your peremptory challenges.  All the remaining

7    jurors beyond Mr. Welch can be excused, okay.  We'll

8    reconvene in 10 minutes.

9              (A recess was taken.)

10             THE CLERK:  All rise.  United States District

11   Court is now in session.

12             THE COURT:  You can all be seated.  Ladies and

13   gentlemen, I appreciate how long a day this is.  I am

14   committed to taking time to pick juries, again, for the

15   reason that I described so that the jury that we have is a

16   jury that is the jury that is the best we can do.  In other

17   jurisdictions jury selection takes months, and so this is my

18   compromise, which is one very long, very tortured day.

19             Now, at this point the lawyers have an opportunity

20   to challenge jurors without having to give a reason.  That

21   may sound a little strange, but what that means is if we

22   gave the lawyers the right to ask questions until everyone

23   was satisfied, we would be here for decades, so we stop the

24   questioning but give people an opportunity to challenge

25   jurors without having to give a reason as a way of making up

1    for the amount of time that the perfect jury selection might

2    take, so if you can indulgence a little more, we'll go to

3    sidebar, the lawyers will tell me what the challenges are

4    and the remaining people will be on the jury.  Counsel at

5    sidebar, please.

6              (THE FOLLOWING OCCURRED AT SIDEBAR:)

7              THE COURT:  We alternate starting with the

8    plaintiff.  You are the plaintiff, yes.  Right, go on.  I'm

9    sorry.

10             MR. OPPENHEIM:  I will strike No. 3, your Honor.

11             THE COURT:  Juror No. 3.  Defendant?

12             MR. FEINBERG:  No. 37.

13             THE COURT:  Mr. Aten, No. 37.

14             MR. OPPENHEIM:  Okay.  No. 22, your Honor.

15             THE COURT:  No. 22, Mr. Kibbe.  Okay.

16             MR. FEINBERG:  No. 21.

17             THE COURT:  No. 21 is Mr. Ascolese.

18             MR. OPPENHEIM:  No. 13, your Honor.

19             THE COURT:  No. 13 is Mr. Pierce.

20             MR. FEINBERG:  I'm sorry, he didn't hear.

21             THE COURT:  No. 13.

22             MR. FEINBERG:  Pierce.

23             THE COURT:  Last challenge for you.

24             MR. FEINBERG:  No. 30, George Papadopoulos.

25             THE COURT:  So the jury is Demoranville is 1;

1    Chandler is 2; Moran is 3; Russell is 4; Rice is 5; Turnbull

2    is 6; Malliaros is 7; Ryan is 8; Conlon is 9; and Welch is

3    10.

4              MR. OPPENHEIM:  Wait a minute.  Peter Medeiros had

5    been struck.

6              THE COURT:  Malliaros.

7              MR. OPPENHEIM:  I'm sorry, I didn't have that,

8    your Honor, I apologize.

9              MR. FEINBERG:  Can you give me the numbers,

10   please.

11             THE COURT:  2, juror 7, 8, 9, 10, juror 14, juror

12   18, juror 20, juror 25 and juror 41.  Okay.

13             MR. OPPENHEIM:  What about 38?  I'm sorry.

14             THE COURT:  38 had been struck.  Okay.

15             MR. OPPENHEIM:  I didn't keep up.

16             THE COURT:  Are you with me now?

17             MR. OPPENHEIM:  Yes.

18             THE COURT:  Okay.  Go back to your seats.

19   Counsel, I actually think that I'm going to give

20   instructions in the morning.  What we'll do now is go and

21   have the jury go and look at the jury room and tell them

22   where they are going to go, swear them in and that's it.

23             MR. OPPENHEIM:  Can we raise a few procedural

24   matters afterwards?

25             THE COURT:  After.

1          (SIDEBAR CONFERENCE WAS CONCLUDED)

2          THE COURT:   Okay.   The jury in the case of

3    Sony Music, et cetera vs. Tenenbaum consists of the

4    following:  Melanie Demoranville -- please stand when I give

5    your name and remain standing -- Kimberly Chandler, Donald

6    Moran, Gail Russell, Margaret Rice, Eileen Turnbull, David

7    Malliaros, Patrick Ryan, Patrick Conlon and Ryan Welch.

8    Everyone else is excused and you can go down to the second

9    floor at this point with Mr. McAlear.   The jury in this

10   case, please remain standing.   Everybody else is excused.

11   Thank you very, very much for your patience.   Ms. Molloy

12   will seat you in the same way that you used to be seated

13   when you're kindergarten and you have to remember your

14   seats.

15          I can't imagine how tired you all must be,

16   however, I can imagine how tired you all must be because we

17   also are tired.   We're going to do only do the following:  I

18   will swear you in as jurors in this case, and then

19   Ms. Molloy will take you to the area, the particular jury

20   room associated with this room, so if you would stand for a

21   moment.

22          (Jurors were sworn)

23          THE COURT:   You can be seated.   On the theory that

24   everyone is so tired I won't give you my general

25   instructions until tomorrow, but I do want to say one thing

1    particularly given the nature of this case.  Don't talk to

2    anyone about the case when you go home tonight, don't watch

3    television about the case if there's anything on television,

4    radio and in a series of instructions that we have to give

5    now, don't make any investigation on your own, don't go

6    online, don't use Twitter, don't go to blogs, don't look for

7    information about this case at all, and the reason is we

8    took a long time to pick you, and if someone goes off and

9    does an investigation of their own or has a conversation

10   with their husband or wife or meaningful other that isn't

11   tested by the rules of evidence as information that no else

12   has, all of this effort will be for not, so don't do

13   anything to find out about what this case is, go home and

14   relax.

15          Don't even discuss the case amongst yourselves

16   because you don't know anything about the case to a large

17   degree, and we'll begin tomorrow morning at 9:00.  I urge

18   you to come at 9:00 so we can begin promptly.  Just to let

19   you know what the schedule is, as I said, we'll go 9 to 5,

20   but we don't go straight through because it is a difficult

21   process to just sit there and just listen.

22          Ms. Molloy makes sure that you have, and she

23   describes this way at snacks at 11:00.  Most grownups have

24   coffee breaks, but in this session you have a snack at

25   11:00.  We'll also make sure that there are "snacks" in the

1    afternoon given the length of time that we're going.

2         We're doing this intensely because we understand

3    people have other commitments, and we want to make sure that

4    the case is finished during the time we said it was

5    finished.  So, Ms. Molloy, who is your director, camp

6    director -- Maryellen, I have to say it that way.

7              THE CLERK:  Okay.

8              THE COURT:  -- will take you upstairs to the jury

9    room.  Tomorrow you report to the second floor.  Actually,

10   what will happen, you go towards the second floor where the

11   jury room is, but the court officer there will show up to

12   the jury room which Ms. Molloy will show to you now.

13        So one more note.  When you come into the

14   courtroom, we all stand.  They're not standing for me,

15   they're standing because of your very central role in this

16   process, so all rise for the jury now.

17             (JURORS EXITED THE COURTROOM.)

18             THE COURT:  Okay.  You can be seated.  Let's deal

19   with anything I need to deal with.  Let's say, by the way,

20   that I will be in my office at 8:30.  If there are any

21   issues on any given day that you think, any jury issues, any

22   evidence questions, let's deal with them before the jury

23   begins at 9:00 so we can convene at 8:30, if necessary, to

24   deal with that or at 1:30 to deal with anything in the

25   afternoon.  Mr. Oppenheim, you had something to raise?

1          MR. OPPENHEIM:  I'll give it to my co-counsel, if

2     that's okay.

3          MR. REYNOLDS:  With respect to opening statements,

4     is there any time limits?

5          THE COURT:  What time do you want?

6          MR. REYNOLDS:  20 to 30 minutes is what I

7     anticipate.

8          THE COURT:  Mr. Nesson, what time do you want?

9          MR. NESSON:  That seems -- I'd say 40 minutes.

10         THE COURT:  If he has 40, you have 40 minutes.  40

11    minutes.  What else?

12         MR. REYNOLDS:  Your Honor, with respect to some of

13    the issues that we resolved today during the voir dire, I'm

14    not certain we resolved them, but we had a number of issues

15    come up, and we'd like to address them in terms of what is

16    permissible in opening statement and what is not.  In our

17    view issues such as Mr. Nesson's pro bono representation,

18    his analogy of this case to a criminal case, commenting on

19    his wardrobe, issues making statements of Joel's right to a

20    jury trial and those things, in our view, those are not

21    appropriate and some of them are misleading and should not

22    be -- they should not be part of an opening statement.  An

23    opening statement should be about the facts Mr. Nesson

24    intends to prove to this jury.

25         THE COURT:  I agree.  Next.

1          MR. REYNOLDS:  With respect to demonstratives,

2     your Honor, I'm not sure that we have shown the

3     demonstratives that we intend to use.  I'm sure we will

4     develop others as trial goes on.  I do intend to use a

5     demonstrative during opening, but I'm not sure if the

6     defendant has.  I did not have time to bring that up with

7     defendant today, so I apologize for raising it in court.

8          THE COURT:  Will the defendant use any

9     demonstrative evidence in opening?

10         MR. NESSON:  Yes, I am.

11         THE COURT:  What are you using?

12         MR. NESSON:  I'm using an image of the necker

13    cube, your Honor.  That's one, then I have a second

14    demonstrative that I have in my bag which is actually this

15    is a bit of styrofoam that starts out solid but breaks into

16    many pieces, and I am intending to offer this as an image of

17    an album.  I may even have something on the front of it, and

18    then imagine what happened when the Internet came in and it

19    all broke up into bits.  The difference between atoms and

20    bits is central to my opening and to our case.

21         MR. REYNOLDS:  Your Honor, a couple of issues, if

22    I may.  No. 1, neither one of these have been disclosed to

23    us prior to now.  No. 2, I'm not sure this seems like

24    argument to me more than it does like a presentation of

25    facts, and we would object.  I'm not sure what the cube is

1    for, but we would object to the exploding styrofoam as an

2    example of how things have changed.  I don't think it's

3    representative.  I think it's argument rather than opening

4    statement.

5           THE COURT:  If the issue is how the Internet is

6    now a series of bits flying through space, do you have a

7    meaningful objection to that?  Why isn't your objection

8    essentially your case is going to be so what, we own a

9    couple of them?

10           MR. REYNOLDS:  That's right.  But I'm not sure --

11   that's right, your Honor, in part, but I'm not sure what

12   witness is going to be testifying about this for the

13   defendant, this is the bits in space and that these are

14   albums that are somehow exploding, I'm not sure where this

15   is coming from, and, again, it seems to me like it's not an

16   opening statement, that's all.

17           THE COURT:  Mr. Nesson as a law professor knows

18   the difference between an opening statement and a closing

19   argument and knows that whatever he presents tomorrow has to

20   be keyed to what a witness will testify to.  I assume he

21   knows that, and I assume that this will be keyed to the

22   statements of witnesses because the worst thing that anyone

23   would want to do is to wind up starting this trial and

24   ending up in a mistrial after this.  This would not be a

25   pleasant alternative.

1        So, with that admonition, I'm going to assume good

2    faith on the part of Mr. Nesson.  This is going to be keyed

3    to the witnesses statement.

4        MR. NESSON:  My understanding is not totally

5    different, but I base an opening statement to be an

6    opportunity to explain to the jury the trajectory, the art,

7    the narrative of the defense.

8        THE COURT:  Yes.

9        MR. NESSON:  That is not simply facts, there is

10   some architecture.

11       THE COURT:  There is some architecture, but it has

12   to be certainly keyed to what witnesses are going to say.

13   You can't have an ark that would essentially be, you know,

14   devoid of any reference to the facts of this case, but

15   obviously you organize the facts in a way that winds up

16   being some kind of narrative.  I haven't the foggiest idea

17   until I hear it, I only chide you that if it is

18   inappropriate and objected to, you will be stopped midway

19   and we risk undoing whatever we have done today.  Since I

20   don't know what you're going to say, I can't say anything

21   more than that.

22       I do want to say with respect to the Feltner

23   issue, which you wanted me to decide, I agree with the

24   plaintiff here that the jury will be instructed about the

25   range of statutory damages that when the Feltner Court was

1    talking about the issue of a jury trial, that a jury had to

2    decide what was just, they were talking about it in

3    connection with the issue of whether damages would be

4    decided by a jury.  They were not talking about the

5    particular instructions.

6          Every Court that has looked at this has given

7    language in the language of the statute, and so that's the

8    language of my instructions.  The jury will be told what the

9    statutory range is.  The only issue which I actually don't

10   know the answer to and counsel has really not addressed in

11   their papers is the question of the innocent infringer.

12         Now, it may be that the facts here don't even

13   address the innocent infringer, don't apply in this case,

14   but what I don't know is whether that's an issue for the

15   Judge or an issue for the jury.  It may not be based on your

16   summary judgment papers even in play here, but it does seem

17   to me that it might be an issue.

18         MR. OPPENHEIM:  I think that's right, your Honor,

19   it was not in play.  Innocent infringement is an affirmative

20   defense, it was not pled, and so it is not in play.  Even if

21   it had been plead, however, your Honor, it still wouldn't be

22   in play because all of the works at issue have been

23   registered with the copyright office and have been

24   distributed widely, as defendant knows, with copyright

25   notices on them which takes it out of the orbit of being

1    subject to a potential innocent infringement defense because

2    they are distributed with the copyright notices, so, again,

3    that's a factual issue.  We don't need to get there.

4    Innocent infringement has never been pled, there's been no

5    discovery on it, and so it's not in the case.

6            THE COURT:  With respect to Mr. Pouwelse --

7            MR. NESSON:  Am I not to be heard at all?  He says

8    what it is and that's it, okay?

9            THE COURT:  You're not to be heard unless you

10   interrupt, and you have interrupted.  Did you wish to

11   address this question?

12           MR. NESSON:  Well, yes.

13           THE COURT:  Because this is an issue that I came

14   up with, not an issue that you mentioned, so I was

15   satisfying myself in talking to counsel that the issues that

16   I had raised were appropriate.  Do you have something to

17   address on that?

18           MR. NESSON:  Well, I have been worried about just

19   this issue myself, and it's true, I haven't raised it.

20           THE COURT:  It would have been helpful to share.

21           MR. NESSON:  Well, I share this.  The innocent

22   infringer is an infringer who has no reason to know that his

23   conduct was illegal, no reason to know.  If you put that

24   together with the fact that the defendant is being made to

25   face statutory damage where there's no proof of actual

1  damage, then you have the situation in which a defendant who

2  has theoretically caused no damage and had no reason to know

3  is somehow being found justly to pay a penalty and to have

4  his honor besmirched by a finding of infringement, and so

5  it --

6  THE COURT:  What about the point that if this was

7  a defense that had to have been affirmatively pled so it

8  could have been briefed and dealt with in an orderly

9  fashion?

10  MR. NESSON:  Well, I have been thinking of it

11  myself in connection with what is just, and the idea of

12  talking to a jury notwithstanding statutory damage limits

13  about what is just and in the context of looking for justice

14  in this statute in terms of any kind of structure, I'm

15  seeing 504 as having these three steps.  One of this

16  innocent, one of someone who's somehow knowing in the

17  middle, and then this top category of willful where at least

18  by my rights in the willful category, we're talking about

19  really serious copyright infringers, and if I'm to able to

20  speak to the jury about the range of damage and what is just

21  under this statute, I want to be able to talk about the

22  structure of that statute.

23  THE COURT:  If innocent infringer is an

24  affirmative defense, you cannot then make the argument

25  without having pled it.  If the issue comes to the question

1    of damages, we agree if infringement has been found, the

2    question of where to go between $750,000 and $30,000 you can

3    make broader arguments.  30,000, what did I say?

4              MR. OPPENHEIM:  150,000.

5              THE COURT:  Or 150,000, if it's willful, there, it

6    seems to me, that the case law is ambiguous as to how to

7    argue $750,000 versus $30,000, but what you cannot do is

8    argue innocent infringer in those terms and in the terms of

9    the defense because that has never been pled, and right or

10   wrong, we have to follow notice rules, so with that caveat

11   going back onto Pouwelse, I have an endorsement which I'm

12   working on, but it seems to me just generally that Pouwelse

13   could testify about the time frame here, which is the

14   chronology of when Napster was developed, when Napster was

15   found to be problematic, when iTunes was available.  That's

16   in his report.  That it seems to me is contextural testimony

17   for which he does have the expertise.

18             Some part of his testimony also, it seems to me,

19   is going to be essentially a challenge to Dr. Jacobson, and

20   I write this in my endorsement.  Some of it is really the

21   product for cross-examination, it's not appropriate for a

22   witness to say Dr. Jacobson has been inconsistent in the

23   following way.  I assume that the cross-examination will

24   deal with that.

25             Some part of Pouwelse's presentation seems to be

1    about methodology, an alternative methodology or appropriate

2    methodology for getting IP addresses, and it seems to me he

3    has the expertise to testify about that.

4          He can testify about fair use, and he does not

5    have the expertise to testify about the market, and to some

6    degree with fair use out of the case that testimony is no

7    longer meaningful.

8          I think that is all I have.  Having looked over

9    the plaintiffs' motion for summary judgment and particularly

10   the admissions in Mr. Tenenbaum's depositions, how do the

11   plaintiffs intend to deal with that?  Would you be simply

12   introducing the depositions as admissions?

13         MR. REYNOLDS:  Your Honor, we plan to call

14   Mr. Tenenbaum as a witness in our case.

15         THE COURT:  Okay.  But in the face of some of the

16   admissions, just an open question, why do you need

17   MediaSentry if he's admitted that he had that IP address?

18   In other words, if the MediaSentry testimony is for the

19   purpose of saying here's how he got to him and he has

20   admitted that they got to the right person, why do you need

21   the MediaSentry and that whole sideshow?

22         MR. REYNOLDS:  Well, I don't think it's a sideshow

23   at all, your Honor.  MediaSentry evidence is critical to the

24   jury's understanding of not only how -- how he got to

25   Mr. Tenenbaum is only one issue.  There are significant

1    issues with respect to the uploading and downloading that

2    MediaSentry will talk about, specifically the songs that

3    were specifically distributed by the defendant to

4    MediaSentry, and we need MediaSentry to discuss that.

5         THE COURT:  I'd have to look at that more

6    carefully.  Don't you have admissions to that effect from

7    his deposition?

8         MR. REYNOLDS:  I would say they are admissions,

9    but I'm not sure the defendant would agree with that, and we

10   certainly have no stipulation, and I would not want to go to

11   a jury based on reliance what Mr. Tenenbaum was going to

12   state on the stand.

13        THE COURT:  What I've said to you though is that I

14   won't put time limits on people.  I was a litigator for too

15   long not to understand that sometimes you're in the middle

16   of an examination and it goes off in a direction no one ever

17   anticipated, but bear in mind that I will have read

18   everything, and if there is an objection, an asked and

19   answered objection or if you're really going through an area

20   that really doesn't make any sense to, I will call you to

21   the sidebar or wait at the appropriate time to point that

22   out because it does seem to me that this case has to move,

23   particularly in the light of what we've spent today.

24        So, if there are any other issues, you can file

25   motions in the evening, I'll look at ECF all night.  And

1    that would be wrong, Mr. Feinberg.

2            MR. FEINBERG:  Sorry about that.

3            THE COURT:  If we need to address issues at 8:30

4    in the morning, we'll do it at that point, otherwise it will

5    be at 1:30 in the afternoon.  Barring substantial problems,

6    my preference would be not to interrupt testimony with

7    objections, but, again, I understand sometimes you can't

8    anticipate everything.  Mr. Nesson.

9            MR. NESSON:  Could I ask what the procedure is if

10   at 8:30 in the morning, if they have something, do I find

11   out about it by e-mail or something?  How do I know to come

12   in at 8:30?

13           THE COURT:  Well, I think everyone should be here

14   at 8:30 as a general matter.  If there are issues you wish

15   to canvass, that would be the time.  If no one has anything

16   to say, you will just have an extended coffee break.  If it

17   were an ordinary trial, you wouldn't have notice of an

18   objection, but my hope would be that if you have some sense

19   of what's going to go on in the morning, you'll let me know

20   in advance and let the other side know in advance at 8:30

21   what that objection might be so we can address it without

22   whispering it in front of the jury.  That would be the best

23   situation.  If someone wants to address something by filing

24   a motion tonight, I will check ECF tonight and see if

25   there's an issue.

1          MR. FEINBERG:  I'd like to know who the first

2    three witnesses are from the plaintiffs' side.

3          THE COURT:  That's fair.  Who are your first three

4    witnesses?

5          MR. REYNOLDS:  Absolutely, your Honor, and

6    certainly to the extent we will file anything, we will let

7    opposing counsel know.  Our first three witnesses are

8    Wade Leak from Sony BMG Music Entertainment and then

9    Mr. Connelly from MediaSentry, then Mr. Matteo from

10   Cox Communications, your Honor.

11         MR. FEINBERG:  That should take up the morning?

12         MR. REYNOLDS:  Yes, I believe so.

13         MR. FEINBERG:  Then I hope some time in the

14   morning Mr. Reynolds will tell us who his afternoon

15   witnesses are.

16         THE COURT:  That will be the rule, he will tell

17   you by the 11:00 break who's in the afternoon.

18         MR. REYNOLDS:  Absolutely.  I had one other

19   clarification with respect to Dr. Pouwelse, there was one

20   other issue, and I believe it was related to market issues,

21   and that was business methodologies.  I differentiate from

22   that just about the mere facts about when Napster came

23   along, are business methodologies, I'm sorry, business --

24         THE COURT:  Business models was the way he talked

25   about it.

1           MR. REYNOLDS:  Yes.

2           THE COURT:  Yes.  It seems to me that that's not

3      in place having admitted to absolutely no expertise with

4      respect to economics, so he can speak about the two issues I

5      described.

6           MR. REYNOLDS:  Thank you, your Honor.

7           THE COURT:  Thank you.

8           (Whereupon, the hearing was suspended at

9      4:53 p.m.)

10              C E R T I F I C A T E

11     UNITED STATES DISTRICT COURT )

12     DISTRICT OF MASSACHUSETTS    )

13     CITY OF BOSTON               )

14          I, Valerie A. O'Hara, Registered Professional

15     Reporter, do hereby certify that the foregoing transcript

16     was recorded by me stenographically at the time and place

17     aforesaid in Nos. 03-11661-NG, 07-11446-NG, Sony BMG Music

18     Entertainment, et al. vs. Joel Tenenbaum and thereafter by

19     me reduced to typewriting and is a true and accurate record

20     of the proceedings.

21                         _____

22                         /S/ VALERIE A. O'HARA

23                         VALERIE A. O'HARA

24                         REGISTERED PROFESSIONAL REPORTER

25                         DATED AUGUST 26, 2010