UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -
                            )
SONY BMG MUSIC              )
ENTERTAINMENT, ET AL.,      )    CV. NO. 03-11661-NG
                            )    CV. NO. 07-11446-NG
                            )
        PLAINTIFFS          )
                            )
VS.                         )    COURTROOM NO. 2
                            )
JOEL TENENBAUM,             )    1 COURTHOUSE WAY
                            )
        DEFENDANTS          )    BOSTON, MA  02210
                            )
- - - - - - - - - - - - - - - - -


JURY TRIAL DAY 2

JULY 28, 2009



9:10 A.M.

BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE




VALERIE A. O'HARA

OFFICIAL COURT REPORTER

A P P E A R A N C E S:

    For The Plaintiffs:

    Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ.,
600 Atlantic Avenue, Boston, Massachusetts  02210-2211;

    The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ.,
7304 River Falls Drive, Potomac, Maryland  20854;

    Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ.,
1801 13th Street, Suite 300, Boulder, Colorado  80302

    For the Defendant:

    Harvard Law School, by CHARLES NESSON, ESQ.,
    1525 Massachusetts Avenue, Cambridge, Massachusetts
02138;

    Feinberg & Kamholtz, by MATTHEW H. FEINBERG, ESQ. and
MATTHEW A. KAMHOLTZ, ESQ., 125 Summer Street, Boston,
Massachusetts  02110.

## INDEX

OPENING STATEMENT BY MR. OPPENHEIM                    17
OPENING STATEMENT BY MR. NESSON                       31

**EXAMINATION**

| Witness Name | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| WADE LEAK | | | | |
|   By Mr. Oppenheim | 46 | | 130 | |
|   By Mr. Nesson | | 88 | | |
| CHRIS CONNELLY | | | | |
|   By Mr. Oppenheim | 137 | | | |
|   By Mr. Nesson | | 179 | | |
| MARK MATTEO | 190 | | | |
|   By Mr. Oppenheim | | | | |
|   By Mr. Nesson | | 200 | | |
| JAMES CHAPPEL | 206 | 209 | 218 | |
| ARTHUR TENENBAUM | 220 | 233 | | |

**EXHIBITS**

| Exhibit | Description | Identification | Evidence |
|---|---|---|---|
| Nos. 1 through 56 | Admitted | | 46 |
| No. 57 | Copy of letter from James Chappel | | 220 |

<u>PROCEEDINGS</u>

1

2     THE CLERK:  All rise.  United States District

3 Court is now in session.

4     THE COURT:  Good morning, everyone can be seated.

5 The jury is assembling.  I just wanted to lay out what we

6 will be doing this morning.  I will give very brief

7 preliminary instructions to the jury mostly on the order of

8 proof and burden of proof and issues like that.  They are

9 innocuous.  I ordinarily would give instructions about

10 preliminary instructions on the merits just so they could

11 frame what the jury hears.

12     I want to avoid any early controversy on that, and

13 so what I plan to do with respect to teeing up the law on

14 this is to say the following, which is to say the plaintiffs

15 are claiming infringement of their copyrights.  To prevail,

16 the plaintiffs must prove -- this is really pretty

17 uncontestable -- the plaintiffs are the owners protected by

18 the copyright act.  The defendant infringed one or more

19 acts.  I would not go into detail but just to tee this up.

20     I will then say in the language of the statute the

21 claim is that the defendant violated plaintiff's exclusive

22 rights to reproduce and distribute copyrighted works.  One

23 who reproduces or distributes a copyrighted work during the

24 term of the copyright infringes the copyright unless

25 licensed by the owner.  I will say to prove infringement

1    plaintiffs do not have to prove the defendant intended to

2    infringe.  The defendant's intent is not relative to

3    infringement.  I won't go on any more what peer-to-peer

4    comprises.  Because I know this is contested territory,

5    although I've ruled it's not for the jury, just in general I

6    will only say with respect to damages that if you find

7    infringement, then you must turn to the question of damages

8    which I'll instruct them on about later.

9          One level of damages, that there's one level of

10   damages for essentially a case of ordinary infringement.

11   Willful infringement finding requires a different kind of

12   analysis.  Willful infringement is that which is committed

13   with reckless disregard for plaintiff's copyrights,

14   knowledge may be inferred, et cetera, et cetera.  In other

15   words, I will not get into the details of No. 750 to 30,000,

16   I will say that if infringement is found, then the jury will

17   turn to damages.

18         Typically I don't talk about damages at the

19   outset, which is why I'm speaking very generally about it.

20   I only want to suggest to the jury that if we get to

21   willfulness, on the one hand intent doesn't matter for

22   infringement; on the other hand, there will be knowledge and

23   intent with respect to damages, so I want to let them know

24   where that fits in the framework, but I won't go any further

25   than talking generally about if there's infringement then

1    they get to damages.  One level in the ordinary case, one

2    level, in the intent of a finding of willfulness.  Yes,

3    Mr. Nesson.

4         MR. NESSON:  Is your Honor completely settled on

5    your definition of willfulness?  We've maintained that

6    within this statute the elements of willfulness require

7    doing for profit or doing in a way that is hostile to the

8    industry?  The reckless disregard language comes from other

9    contexts.  If you apply it here, the three levels of the

10   statute just can't make any sense.

11        THE COURT:  You know, I will simply describe it,

12   willful infringement and describe it later.  In other words,

13   one of the difficulties of doing instructions at the

14   beginning, you never know how the case will play out, but I

15   do want to tee up the order with intent doesn't fit within

16   infringement but intent could fit within the damages, so I

17   want to let them know there will be some evidence about

18   that.  Mr. Oppenheim.

19        MR. OPPENHEIM:  Your Honor, we're fine with the

20   approach on damages.  Do you intend to inform the jury in

21   advance of the burden of proof regarding preponderance of

22   the evidence?

23        THE COURT:  Yes.  I'm assuming that I don't have

24   to go over all of that with you.  It's the whole, the usual

25   routine here.

1        MR. OPPENHEIM:  And that circumstantial evidence?

2        THE COURT:  Yes.

3        MR. OPPENHEIM:  Thank you.

4        THE COURT:  I give an instruction that trashes my

5   sons, use this as an example, you'll see an example of

6   direct and circumstantial evidence which specifically

7   trashes my sons not with respect to file sharing at all.

8        MR. OPPENHEIM:  We object to the trashing of your

9   sons, your Honor.

10       THE COURT:  Again, I appreciate everyone

11  cooperating with the schedule which we all agreed upon which

12  has led to marathon day of jury selection yesterday, led to

13  rulings that seem last minute but since the briefing on fair

14  use was only completed last Monday, all last minute.  We'll

15  call down the jury.  Is the jury outside?  Can you line up

16  the jury now, please.

17       THE CLERK:  All rise for the jury.

18       THE COURT:  Good morning, everyone.  You can be

19  seated.  So we'll begin today with just preliminary

20  instructions from me, and then we'll proceed to the opening

21  statements of the lawyers.  I will from time to time address

22  you giving instructions in general about what's going on and

23  then I will also address you at the end of the case after

24  the lawyers have spoken to give you more full instructions

25  about what the law is.

1          It seems like an odd procedure that you instruct

2     on the law more fully at the end, but part of that is

3     because the case proceeds in ways that are sometimes not

4     anticipated, and so the instructions that I need to give are

5     determined by how the case is proceeding.

6          First, let me say that this is, as you heard

7     yesterday, a civil case.  In a civil case, the burden is on

8     the plaintiff to prove every essential element of the claim

9     by, and the law describes it as a fair preponderance of the

10    evidence.  To establish something by a fair preponderance of

11    the evidence means to prove to your satisfaction that

12    something is more likely so than not so.

13         It's as if you had scales, the scales tipped in

14    favor of the plaintiff's case, if that occurs, if there's

15    tipping in favor of the plaintiff' case, then the plaintiff

16    has made out its case by a fair preponderance of the

17    evidence.

18         It doesn't mean that the plaintiff has to call

19    more witnesses, it doesn't mean that, you know, the numbers

20    of exhibits have to be more.  What it is is in the final

21    analysis you look at the quality of the evidence, the weight

22    of the evidence, the relevant evidence regardless of who has

23    called the witnesses, regardless of who has produced the

24    exhibits and determined, as you're obliged to do, whether

25    the plaintiff has made out the claim by a fair preponderance

1    of the evidence.

2            This is distinguished, this came up yesterday in

3    jury selection, this is distinguished from a situation in a

4    criminal case where the burden is far more substantial which

5    is beyond a reasonable doubt.  In this case it is more

6    probable than not fair preponderance of the evidence.

7            Now, as I said yesterday, we stand when you come

8    into the room, and the reason is that as fact finders you

9    really have the most important role in this courtroom.  Your

10   job as jurors is to determine the credibility of the

11   witnesses and to determine essentially the credibility, to

12   evaluate the weight of the exhibits that you'll be shown as

13   well.

14           Credibility really just means believability, and

15   in determining the credibility of the witnesses, you are

16   obliged to consider all aspects of their testimony.  While

17   you are permitted to take notes, which is ironically a

18   recent phenomenon in the American jury system, relatively

19   recent, you can take notes, but we want you to be focused on

20   the witnesses, not on the paper in front of you.  You want

21   to look at the witnesses, how they appear, whether their

22   testimony is worthy of believability, whether it is

23   consistent, consistent especially with other evidence in the

24   case, whether they have a motive to testify as they're

25   testifying, whether they have an interest in the outcome of

1   the case, really common sense notions of what comprises

2   believability, and that's part of your obligation as a

3   juror.

4         You are also obliged to draw inferences from the

5   testimony.  Typically we describe inferences in two ways.

6   There's direct evidence and there is circumstantial

7   evidence.  Direct evidence is evidence that you see with

8   your eyes and hear with your ears from which you draw

9   certain conclusions.  Circumstantial evidence is evidence

10  which you initially evaluate what the testimony is, what the

11  witness has said and then you draw certain inferences from

12  that testimony.

13        Let me be more precise, and in being more precise,

14  I tell a story in which I love to trash my sons.  It happens

15  to be the example that comes to mind.  So let's say there is

16  a cookie jar in my kitchen and my older son testifies.  This

17  is what happens when your mother is a Judge.  My older son

18  testifies, "Ma," he says, "at 10:00, the cookie jar was

19  full, I saw my brother go into the kitchen and eat all the

20  cookies in the cookie jar."

21        So I would ask my older son, I would make the kind

22  of credibility determinations that we ask you to make.  Did

23  he have an interest in the outcome?  Did he see what he said

24  he saw?  Was his testimony consistent?  Was he in a position

25  to see what he said he saw?  What were the lighting

1    conditions?  Et cetera.  From that I would make a

2    determination about whether or not he is credible in his

3    testimony about what my younger son was doing.

4         In that respect he would be offering direct

5    evidence.  Circumstantial evidence would be the following

6    where my older son would testify again, ridiculous, of

7    course, your mother is a Judge and so you testify.  My older

8    son would testify, "At 10:00, the cookie jar was full, at

9    10:15, the cookie jar was empty."  The only other person in

10   the house was my younger son.

11        So essentially that's a two-step analysis.  I

12   would be asked, he would be asking me to believe his

13   observations, the cookie jar full at 10:00, empty at 10:15.

14   The only other person in the house was my younger son, and

15   he would be asking me to draw certain inferences from that,

16   steps in logic, reasonable inferences, maybe inferences in

17   this case that are consistent with the plaintiff's case.

18   There may be inferences that are consistent with the

19   defendant's case.  Circumstantial evidence, if you believe

20   it, if you evaluate it as credible, if you think it is

21   reasonable, can serve to support the plaintiff's case just

22   as direct evidence would support it.

23        I try not to share my observations trashing my

24   sons with anyone else.  I try not to let them know because

25   that, of course, would provide for psychiatric bills if they

1    knew I did that in every case, but, in any event, your

2    obligations, as I said, as jurors are to evaluate the

3    credibility of witnesses and evaluate the exhibits you'll

4    receive.

5           As I said, no information from this case comes

6    outside from this courtroom.  We lose all control over the

7    formality of the process and the legitimacy of the process

8    if you talk to anyone about the case outside this courtroom

9    or do your own investigation or in any way sort of betray

10   the four corners of this room.

11          Your responsibility is to evaluate that evidence

12   without bias.  We took a long time, it was a long day to

13   select you.  We want you to look at the evidence without

14   fear or favor, without prejudice to either side as much as

15   can be accomplished as fair and impartial jurors.

16          The notes, as I said, will be an aid to your

17   memory, but your memory is what controls in this situation.

18   The lawyers will speak to you in various ways.  They will

19   address you at the beginning of the case in an opening

20   statement.  The opening statement is a road map.  It is

21   essentially the lawyers saying to you this is what we

22   believe the evidence will show.

23          Then they'll address you at the end of the case in

24   what we describe as a closing argument, and the difference

25   between the opening statement and the closing argument

1    should be clear.  The opening statement is a road map.  The

2    closing argument is we believe, we try to persuade you that

3    we have in fact proved what we set out to prove or

4    disapproved what we said would be disapproved.

5           In between the lawyers try to address you in their

6    questions, but the questions of the lawyers and their

7    opening statements and closing arguments are not evidence.

8    You have to be careful to distinguish that.  The evidence is

9    what comes out of the mouths of the witnesses and what comes

10   before you in terms of the data and the exhibits that you

11   get.

12          That's the only evidence in this case.  We'll ask

13   you not to talk about the case even amongst yourselves until

14   it's over.  The reason for that is there's an order of

15   presentation here.  One side goes first, another side goes

16   second.  You don't know the whole picture until you have

17   heard the whole case.  The feeling is if you go upstairs and

18   coffee, during the snacks, as Maryellen would describe it,

19   and you talk about the case, you will be focusing only on

20   what you have just heard and you won't see the big

21   picture.

22          So we ask you not even to talk about the case

23   really until you get it for your deliberation, which is at

24   the end of the evidence when the evidence is concluded.  The

25   lawyers have addressed you, and I as well have addressed you

1   in my instructions.

2           Now, I'm going to give you just very preliminary

3   legal instructions, and part of the reason for that is that

4   it's really -- it's a lot to hear at the beginning, and so

5   I'm only going to give you the very most general outline of

6   what this case is about.

7           The plaintiffs here claim copyright infringement,

8   and in order to prevail on their claim of copyright

9   infringement, they have to prove two things.  First, they

10  have to prove that they are owners of works protected by the

11  copyright act, and, second, that the defendant infringed one

12  or more of the rights granted by the act, and I will explain

13  them in more detail as we go on.

14          Suffice it to say that in this case the claim is

15  that the defendant violated the plaintiff's exclusive rights

16  to reproduce, on the one hand, and distribute, on the other

17  hand, their copyrighted works.

18          One who reproduces or distributes a copyrighted

19  work during the term of the copyright infringes that

20  copyright unless licensed by the copyright owner.  To prove

21  infringement, the plaintiffs need not prove that the

22  defendant intended to infringe.  The defendant's intent is

23  not relevant to prove infringement, and the parties will

24  offer you evidence as to what comprised infringement, one

25  side will, one will defend.

1          If you concluded that there is infringement here,

2     then and only then do you proceed to the question of

3     damages, and damages are provided for in the copyright

4     statute, and the lawyers will talk about that.  There is one

5     level of damages, for want of a better word, the ordinary

6     case, and there's another level of damages if you find

7     willful infringement.

8          So while intent to violate the copyright laws is

9     not a relevant infringement, intent-like issues come with

10    respect to damages.  There may be some evidence about that.

11    With respect to intent, willfulness, circumstantial evidence

12    and direct evidence can both apply, each are equally, if you

13    believe it, if you find the evidence credible, if you find

14    it reasonable, each kind of evidence could sustain the

15    plaintiff's burden in that regard.

16         The lawyers will address you now, and the order of

17    their presentation reflects who has the burden of proof, so

18    the plaintiffs start first, which is sort of the privileged

19    position because they have the burden of proof in this case,

20    and the defendant follows, and at the end of the case, the

21    situation is reversed.  The defendant goes first and the

22    plaintiff has the last word.

23         Again, it's not because we think one side is

24    different or better, it is simply a reflection of who has

25    the burden of proof in this situation, so with that,

1     counsel, would you begin.

2          MR. REYNOLDS:  Your Honor, could we have one

3     moment to address something at sidebar?

4          THE COURT:  Sure.

5          (THE FOLLOWING OCCURRED AT SIDEBAR:)

6          MR. REYNOLDS:  Your Honor, at counsel table during

7     your Honor's remarks to the jury, Mr. Tenenbaum was flipping

8     through a book of CDs that is currently sitting right in

9     front of the computer.  Those CDs are not in evidence.

10    We've never seen them before.  It is highly improper to be

11    flipping through the CDs to pretend those are in evidence.

12    We have no idea what they are.  We certainly didn't have any

13    discussion of them in the presence of the jury during

14    opening statement, and we'd ask that Mr. Tenenbaum go back

15    to his seat and not touch that book during opening

16    statements, then we can deal with this later, but the book

17    cannot be such.

18          MR. NESSON:  These are CDs he produced to him.

19          MR. REYNOLDS:  They're not --

20          MR. OPPENHEIM:  No CDs were ever produced.

21          MR. NESSON:  No CDs were ever produced.

22          MR. REYNOLDS:  We have the originals.  We have

23    those CDs that were used.  We have those.  I don't know what

24    those are.

25          DEFENDANT JOEL TENENBAUM:  The other contents of

1    the book, the book had original CDs, they took the CDRs and

2    I have the original CDs in the book.

3           THE COURT:  Well, for the purpose, until we sort

4    this out, don't refer to or touch that, those exhibits until

5    we sort it out.  This is noted.

6           MR. REYNOLDS:  Thank you, your Honor.

7           (SIDEBAR CONFERENCE WAS CONCLUDED)

8           THE COURT:  Ladies and gentlemen, this is an

9    electronic courtroom.  You have screens in front of you

10   which have an on-off switch.  I have to say that, not rocket

11   science, and from time to time exhibits may be seen through

12   those screens.  Proceed.

13                        OPENING STATEMENT

14          MR. REYNOLDS:  Good morning, your Honor, counsel,

15   good morning.  Ladies and gentlemen, the plaintiffs in this

16   case are record companies that record and distribute music.

17   These record companies are made up of real people, people

18   who go out and find new activities, people who help develop,

19   artists, sound engineers, backup singers and people who

20   deliver my clients' music around the world so that we all

21   can enjoy it.  These people face a significant threat to

22   their livelihoods on a daily basis, and that threat is due

23   in large part to illegal file sharing of copyrighted songs

24   on the Internet.

25          In this case we will prove to you that the

1    Defendant, Joel Tenenbaum, distributed thousands of sound

2    recordings on the Internet through peer-to-peer networks all

3    without the permission of the copyright holders and all for

4    free.  Even though the infringement was massive, my clients

5    have chosen to focus on 30 of the sound recordings.

6    Specifically, my clients claim that the Defendant, Joel

7    Tenenbaum, downloaded and distributed 30 songs made famous

8    by artists such as Green Day, Aerosmith, Eminem, Outkast,

9    Lincoln Park and the Ramones, and he did so by downloading

10   these songs over the Internet and distributing them to

11   millions of other people on the KazaA network all without my

12   client's permission.  We're here to ask you to hold the

13   defendant responsible for his actions.

14         So, this case begins, ladies and gentlemen, with

15   what's known as the KazaA file sharing program.  Well, what

16   is KazaA?  Now, first we should talk about what is file

17   sharing?  File sharing isn't like sharing that we teach our

18   children.  This isn't sharing with your friends.  It's

19   nothing like that.  Programs like KazaA are designed so that

20   people who use them can swap files with millions of other

21   people, strangers that they do not know.  These strangers

22   connect to one another over the Internet using chosen

23   Internet names, but they do so unanimously.

24         So, how does KazaA work?  Well, first, you go out

25   and you download and you install the program.  KazaA isn't a

1    program that comes with a computer, it's not a computer that

2    gets installed by some malicious code or by accident, but

3    it's not hard to get, just like any program, you can go out

4    on the Internet and you can download it and install it on

5    your computer.  Once the software is installed, the user is

6    instantly connected to millions of other people on the file

7    sharing network.

8         Also, when the software is installed, the user

9    creates what's called a shared folder.  Now, a shareholder

10   folder is just like any other folder on your computer with

11   one major difference.  That difference is that everything in

12   that shared folder is available for distribution to everyone

13   else on the network, and everyone else on the network also

14   has a shared folder, and everything in their shared folder

15   is available for you to download.

16        Once the shared folder has been created, when a

17   user downloads a song or movie file or whatever they

18   download, that file, that song is then transferred to their

19   computer and is automatically stored in the shared folder,

20   and when it's in their shared folder, it's instantly

21   available for everyone else for distribution.

22        How do you download on KazaA?  Search process is

23   much the same you use for Google, you simply type what you

24   want such as 40, and instantly you get available songs that

25   you can download over the intent.

1          For example, if you wanted to search for a

2     Springstein song, you type in the word Springstein and hit

3     return, and instantly you get a list of songs that you can

4     download from other users on the Internet.  Once you click

5     on the song you like or you want to download, you are then

6     connected with the person who has that song so-called peer,

7     your peer on the network.

8          You're connected directly to that peer.  The song

9     is distributed from that peer to your computer, and it's now

10    on your computer and you have it on your computer so you can

11    listen to it any time you want.

12         Just as important, as I said, once you download

13    this song, it goes into your shared folder, and it's

14    immediately available for distribution to everyone else, and

15    the person from whom you downloaded this song still has this

16    song in their share folder, so at the end of the process,

17    each person has the same song in the shared folder.  This

18    goes on in a mulitplying of downloaded distribution over the

19    Internet.

20         In this case, my clients will prove that the

21    defendant infringed their copyrights by using KazaA to

22    download and distribute at least 30 songs belonging to my

23    clients.  In fact, as I've said, the evidence will show that

24    the defendants' infringement was significantly larger than

25    that.

1          So, what evidence will you see?  Well, this begins

2     with how my clients caught the defendant infringing.  In the

3     early morning hours of August 10th, 2004, a company that my

4     clients ran called MediaSentry was searching on the KazaA

5     network for copyrighted music.  You will hear from Mr. Chris

6     Connelly a representative of MediaSentry, and he will tell

7     you that in performing this search, he simply went out and

8     did what any other user on KazaA can do, they typed in some

9     names of some songs and a return came back and they were

10    able to download songs.

11         Well, in the course of this particular search,

12    MediaSentry found a computer that was distributing the

13    plaintiff's copyrighted songs under the user name

14    sublimeguy14KazaA.  You'll hear that name many times through

15    this case, sublimeguy14KazaA.  MediaSentry took screen shots

16    of what this person was distributing.

17         Now screen shots are imagine if you are sitting at

18    your computer and you see what sublimeguy14 is distributing.

19    You can actually print screen shots, everything of that

20    shared folder, and we will show you that screen shot.  You

21    will also see that this user, sublineguy14 distributed --

22    let me back up one second.

23         When MediaSentry first caught sublimeguy14 this

24    user had over 800 song files on his computer, 800 song

25    files, and that's what in those screen shots, and we will

1    show those to you.  You will also see that this user,

2    sublimeguy14 distributed songs to MediaSentry, specifically

3    MediaSentry downloaded a sample of the many songs that were

4    in this shared folder.  These songs were distributed from

5    sublimeguy14 to MediaSentry, and my clients later listened

6    to those songs and verified that they are the copyrighted

7    recordings, and we will play some of those songs for you

8    today.

9         Now, you will not see evidence of every

10   distribution that sublimeguy14 made on KazaA, and you won't

11   see that for two reasons, two primary reasons:  One, KazaA

12   is designed so that it doesn't keep log files what's being

13   distributed.  Once a distribution goes out, there's no log,

14   so you can't keep track of it that way.  And, two, when two

15   peers are connected and this peer is distributing files to

16   this peer, no one else on the network can see what is being

17   distributed, so the only time you see what's being

18   distributed is when you download the song yourself.

19        We know, however, and we will prove to you that

20   there were many more than the handful distributions that

21   MediaSentry was able to make on August 10th, 2004.  The

22   reason we know that is because all 30, in fact all 800 of

23   the song files were in this shared folder.  The shared

24   folder was configured to distribute all of them to everyone

25   else on the network, and the whole purpose of KazaA is to

1   distribute files.  If no one on the network is distributing

2   files, then the network doesn't work.  Nobody can get

3   anything for free.

4           So, and we also know that MediaSentry was easily

5   able to get those song files from the defendant's computer.

6   As part of the downloading process, MediaSentry also

7   received what's called metadata.  Each file that's in a

8   shared folder that is transferred to another user, whether

9   it's transferred or not, each file has what's called

10  Metadata.  Metadata is simply data about the file, the size

11  of the file, the artist's name, things like that.  We will

12  show you this Metadata, and the Metadata is important for at

13  least two primary reasons in this case.

14          First, the Metadata in this case shows that many

15  of the songs, including the 30 songs that are at issue, were

16  downloaded to this computer from the Internet.  They weren't

17  ripped from CDs or anything like that, they were downloaded

18  off KazaA.  The other thing that's important about the

19  Metadata is that within the packets of information that when

20  you download something from another user, those packets

21  contain what's called an Internet protocol address, an IP

22  address, and the IP address, which is part of the Metadata,

23  allows you to identify the device or the computer from which

24  you downloaded.

25          Well, in this case, the Internet protocol address,

1   and I'll read to you was 68.287185.38.  You will see that,

2   that's in evidence as well.  It's important just briefly to

3   understand what an IP address is.  You will hear from

4   plaintiff's expert, Doug Jacobson, a professor at Iowa State

5   University, what an IP address is.  It's much like a

6   telephone number or an address.  If you call a certain

7   telephone number, you expect to get a certain phone.

8        Well, in rough terms, this is similar to the way

9   an IP address works.  The Internet is designed so that every

10  computer on the public internet is supposed to have a unique

11  IP address, and that's how you can identify what computers

12  are communicating with what computers.

13       At this point, ladies and gentlemen, MediaSentry

14  had found significant infringement on KazaA happening from a

15  particular IP address under the name sublimeguy14@KazaA.

16  File sharing is unanimous, so my clients didn't know who was

17  responsible.  How did they find out?  Well, using public

18  information, it was part of a block of IP addresses that was

19  assigned to Cox Communications.  With that information, they

20  used a federal court process to serve a subpoena on Cox

21  Communications seeking information about who to identify the

22  infringer.

23       You will hear from a witness from Cox,

24  Mark Matteo.  He will tell you that Cox searched his record

25  and that the individual responsible for this specific IP

1  address at the time of infringement was named, this is

2  THE WITNESS:  "J. Tenenbaum."  Cox identified through

3  e-mails was Sublimeguy14@cox.net, a match to KazaA at the

4  user name.  You will hear that the defendant, the

5  sublimeguy14@cox was his Internet address.  You will also

6  see that the Sublime was used for many purposes.  It was an

7  e-mail address.  He used it to create an online address with

8  Amazon, he used it to post photos online.  The defendant

9  himself will tell you also that the shared folder identified

10  by MediaSentry on August 10th, 2004 was his KazaA shared

11  folder.  He will tell you that he set up the KazaA program

12  on the computer in the bedroom of his' parents house in

13  Providence, Rhode Island and that he created the

14  sublime14@KazaA user name.

15       Now, the defendant's computer at his parents'

16  house has been called different names, it's been called a no

17  name computer, it's been called a Gateway computer by some.

18  Regardless, it was a desktop.  It was in the defendant's

19  bedroom at his parents' home in Rhode Island, and it was the

20  only computer that was there on August 10th, 2004.

21       The defendant will tell you he used the desktop on

22  a regular basis to download music.  He also will tell you he

23  knew others were downloading from him because he saw it on

24  what's called a KazaA traffic tab, in other words, there's a

25  traffic tab that you can see that indicates to other people

1    when your computer is distributing music to other people on

2    the Internet.

3          But, ladies and gentlemen, that's not the end of

4    the story, nor is it the end of the infringement in this

5    case.  The evidence will show you not only that the

6    defendant was responsible for the infringement that the

7    record companies claim but also that he tried to blame

8    others for his conduct and that he continued to infringe

9    long after he was caught and even during the course of this

10   lawsuit.

11         After Cox identified the defendant with the

12   Internet account through which the infringement occurred,

13   the record companies sent the defendant a letter seeking a

14   dialogue, as part of this record, advised the defendant of

15   the duty to preserve all evidence relating to any

16   infringement.  The defendant did communicate with the record

17   companies, but he didn't take responsibility.  He sent a

18   letter which we will show you stating that he would look on

19   his computer for any infringing activity and he would

20   destroy any infringing files.

21         After the lawsuit was filed, however, the

22   defendant claimed that the computer was gone and he didn't

23   know what happened to it.  Also, after the lawsuit was

24   filed, the defendant denied plaintiff's allegations and said

25   under oath that he believed others may have done this.  He

1    blamed his friends.  He blamed his sisters.  He blamed the

2    foster child that used to live in the house.  He even blamed

3    burglars who at one point burglarized his house.  You will

4    hear including his own sisters, all of them, they will tell

5    you they hardly used the computer and they did not use

6    KazaA.  You will hear he had posters of some of these

7    artists, more than 50 of the artists of the 800 sound

8    recordings, more than 50 of the artists match the

9    defendant's music taste.

10           You will see all the evidence regarding who used

11   the KazaA program and the sublime14 user name to download

12   and distribute copyrighted song.  All of it points to the

13   defendant, but, as I said, that's not the end of the

14   infringement.  During the course of this lawsuit and over

15   the defendant's objection, plaintiffs obtained a Court Order

16   to inspect the defendant's computer he used at school for

17   evidence of infringement.

18           The computer in the defendant's bedroom at his

19   parents' address in Providence was destroyed.  Before it

20   disappeared, the defendant took some of the music from his

21   KazaA shared folder, burned it to CDs and took that music to

22   school, to college with him to put on a computer there which

23   was a Gateway computer.

24           So with that evidence and based on some other

25   things, plaintiffs were able to obtain an order to inspect

1    the computer for evidence of infringement, the Gateway

2    computer.  You will hear from plaintiff's expert,

3    Dr. Doug Jacobson, that the Gateway computer had more than

4    2,000 music files on it including many of the exact same

5    songs that MediaSentry found on the computer in Providence,

6    Rhode Island.

7        We will show you a list of those exact matches.

8    You will also hear from Dr. Jacobson that the Gateway

9    computer that the defendant used at college -- by the way,

10   the defendant attended Goucher College in Baltimore,

11   Maryland.

12       You will also hear from Dr. Jacobson that this

13   Gateway computer had another file sharing program.  This was

14   the LimeWire file sharing program.  Now, LimeWire is much

15   like KazaA, different program, same idea, connect millions

16   of strangers on the Internet to swap files for free without

17   the permission of the copyright.  Just like KazaA, when you

18   install LimeWire, you create what's called a shared folder,

19   and that shared folder, just like KazaA, everything is being

20   distributed to everyone else on the network.

21       Dr. Jacobson will tell you that the LimeWire on

22   the defendant's Gateway computer that he used in Baltimore,

23   Maryland was configured to share these thousands of sound

24   recordings with everyone else on LimeWire, and these songs

25   were being distributed to other LimeWire users long after

1    this lawsuit was filed.

2         Now, some of the evidence on the defendant's

3    Gateway computer is no longer available, and that's before

4    the defendant had the operating system reinstalled which

5    wipes out some of the information that was formerly on the

6    drive.  He also removed some of the registry from the files

7    to determine when exactly certain things happened on the

8    computer.  You will hear from Dr. Jacobson about that.

9         Notwithstanding this, at the end of the day, you

10   will see that in addition to using KazaA on the computer in

11   his bedroom in Providence, Rhode Island to download and

12   distribute plaintiff's songs, defendant also used the

13   LimeWire file sharing program on his Gateway computer to

14   download and distribute plaintiff's songs and that he

15   continued to do so long after he had notice of plaintiff's

16   claims against him in this case.

17        Finally, ladies and gentlemen, the evidence will

18   show that the defendants' infringement did not stop with

19   LimeWire and KazaA.  The defendant used many file sharing

20   programs.  He started a long time ago with a program called

21   Napster, then when Napster was shut down by a Court Order,

22   an order that the defendant will tell you he knew about, the

23   defendant turned to KazaA to get his music for free, then he

24   turned to LimeWire to get his music for free.  All along the

25   way, the defendant used Audio Galaxy, Morpheus, iMesh, all

1    of them similar in nature to peer-to-peer networks.  They

2    allow you to get music without paying for it.

3         This is not a matter of perception.  This is not a

4    matter of how you look at things.  The defendant knew what

5    he was doing was wrong at each step of the way, and we will

6    prove that to you but he did it anyhow.  In fact, you will

7    hear from the defendant he used these various programs at

8    various times so he could achieve music downloading and

9    uploading with the minimal amount of evidence.

10        As I said at the outset, ladies and gentlemen,

11   unlike copyright infringement, illegal downloading of music

12   has real and significant impact on the record companies.

13   Free, illegal downloads have resulted in not only

14   significant lost sales of legitimate albums but also

15   anything new for their works on the Internet.

16        It's hard to compete for free.  The loss of sales

17   impacts not only the bottom line but also impacts the people

18   in the industry, the people who find new artists, the people

19   who derive income, studio engineers, backup engineers,

20   everyone.

21        Now, the exact amount of harm is incapable of

22   being determined in this type of case where the infringement

23   was so massive, but make no mistake about it, the defendant

24   and others like him have caused significant harm, and we're

25   going to ask you to award damages as permitted by the

1   copyright act.  At the end of this trial, the evidence will

2   show you that the record company plaintiffs own or

3   controlled the copyrights in the 30 songs at issue in this

4   case, that the defendant without the plaintiff's permission

5   downloaded those songs and distributed them on the Internet

6   both to MediaSentry and to other people on KazaA, that the

7   defendant knew what he was doing was wrong and that the

8   defendant continued to infringe long after he was put on

9   notice of the claims against him.  At the end of this trial,

10  we ask you to hold this defendant responsible for his

11  actions.  Thank you.

12          THE COURT:  Counsel.

13                    OPENING STATEMENT

14          MR. NESSON:  Good morning.  This story, and I

15  think it is a story starts really in 1999 with Napster.

16  Leading up to Napster, these plaintiff record companies, the

17  largest record companies there are had had a wonderful two

18  decades of business success.  If you recall some of you back

19  in the era of the 78 record and then the 45 and then the LP

20  and then into the CD era, the CD was fantastic success for

21  this business.  They made huge revenues from it all during

22  the '80s and the '90s.

23          Along at that very same time, however, the

24  Internet was developing.  The Internet, and it's hard to say

25  when it started, it was an invention within universities

1    back in the '60s, and it slowly rose through the invention

2    of e-mail and other forms of sharing.  That's what Internet

3    is.  Internet is peer-to-peer sharing.

4         The whole idea of the Internet is that you connect

5    computers all around the world through a network, and it's

6    possible to share, and out of that sharing comes potentially

7    great things.  I'm sure you've all used Wikipedia at some

8    point.  You know in this Internet structure, there is the

9    capacity for people of good will to share and produce

10   amazing things.

11        Well, these two strands Internet and the success

12   of the recording industry came into conflict in 1999 when a

13   young man named Shawn Fanning, when he was a sophomore at

14   Northeastern University, he wrote a little piece of software

15   that enabled people to share files on the net.  That's

16   literally what it did, it created a structure in which if

17   you wanted to share a file, you listed it and anybody that

18   wanted to share it with you would click on your listing and

19   that connected their computer to your computer and you could

20   share files.

21        All right.  Well, up to the point of Napster, the

22   main object of the project of the recording industry was the

23   album, the album on a CD.  Now, it had quality to it in that

24   it was physical.  It was actually a thing you held in your

25   hand.  You put it in a store.  You put it behind security.

1    If some kid wanted to lift the CD from the store, he had to

2    sneak into the store, lift the CD and push out past

3    security.  I mean, a real theft.  You understand theft of

4    physical objects is a trespass.  It's actually an intrusion

5    on someone else's physical space and a violation of it.

6           Well, so here this CD, this physical object, this

7    thing, which was their product which they sold in the form

8    of albums, not songs.  The CD was 18 songs, and you go to

9    the store and you'd pay, I don't know, $18 for the CD.  That

10   was their product.

11          All of a sudden Napster came along and kids around

12   the world who loved music and loved technology suddenly had

13   an instrument that they could download for free.  Napster

14   was a free program, distributed, easy to download onto your

15   machine, bingo, you have the ability to share in what

16   everyone else around the world has been sharing and this

17   physical object.

18          This physical object suddenly broke into a million

19   bits.  Here it is, bits, bits.  Now I want to talk to you

20   about bits.  What is a bit?  What's the size of the bit?

21   Can you hold a bit in your hand?  Can you see it?  Can you

22   feel it?  Can you touch it?  You can't.  It's an electron.

23   It's different from an atom, it's different from the

24   physical object.  Suddenly you had songs being shared by

25   every kid in the world, not quite every but millions all

1     around the world, these bits.

2          What happened was the Internet washed across the

3     recording industry, and in one swoop in 1999 washed their

4     entire catalogue of copyrighted music out into the public

5     onto the frontiers of the Internet.  You recall the talk of

6     the Internet being the new frontier, it's like a beach and

7     kids could go on it and walk on it and along the beach

8     strewn were these songs completely free.

9          Now, what were they in fact?  They weren't the

10    song, as they put it out in the CD physical, they were

11    what's called an MP3 file, a file that's an open format that

12    when you click on it on KazaA, you don't see any copyright

13    notice, there's no copyright notice on the file.  The bits

14    don't come with copyright in some way physically attached,

15    and so the record companies had a huge problem.  There was

16    their catalogue completely open, anyone can download it for

17    free, and millions upon millions of people did.

18         Joel was one of those.  He was a kid who did what

19    kids do that loved technology and loved music.  He did what

20    he, and this is back we're starting 1999, Joel is 15, 15

21    years old.  He's not a kid with a credit card typically at

22    that point.  He's not a kid with lots of money.

23         Let me tell you who Joel is.  Joel -- well, in

24    this way he's like every other kid.  There's nothing that is

25    distinctive about Joel.  He went to high school in

1    Providence, he had friends, he skateboarded, he did the

2    stuff that high school kids did.  He went on from there to

3    go to Goucher College.  He now is a graduate student at

4    Boston University in physics.  He just delivered a

5    distinguished paper at a conference in Venice working

6    towards his doctorate.

7         He's a good kid.  His mother, Judie, would you

8    just stand up.  His mother, you'll meet his mother.  She'll

9    testify.  Thank you.  You'll meet his father.  I believe the

10   plaintiffs are expecting to call him as a witness.  You'll

11   get a sense of this family and this family situation.

12        So, all right, carry this story forward.  The

13   record company's are first confronted with this threat,

14   immediately turned to their lawyers.  I mean, basically

15   what's happened is the record companies are in a physical

16   market where they sell CDs and they see the digital market

17   suddenly open.  As of 1999, they don't have any digital

18   product out there.  If a kid wants to listen to a song in

19   1999, the following choice is available.

20        He can basically do the new form of what has been

21   done for decades, kids listen to music on the radio, in the

22   '80s, they listen on the FM, they record their songs on a

23   tape, they make mixed tapes, they listen to music with the

24   technology that's available and enjoy it with the technology

25   that's available.

1          Come 1999 a new technology is available, and the

2     kids use it to listen and share music, just what you'd

3     expect.  If they wanted to listen to a song in some other

4     way, they'd have to go to the record store, buy the CD for

5     18 bucks with 17 songs on the CD that they weren't

6     interested in listening in order to listen to the one they

7     wanted to listen to and to buy it in advance, period,

8     whereas the alternative is it's on your computer, in your

9     bedroom, I mean, we're not going out to stores and breaking

10     through security and stealing things, we're in a bedroom.

11     He goes and he clicks and he listens, and that's it.

12          That's how easy it is, and so the record companies

13     have a huge problem at that point, just as Mr. Reynolds

14     said, they see it.  Free is tough to compete with, but it's

15     also true, the Internet was not Joel's fault.  Joel didn't

16     make the Internet.  The Internet sweeps in the way the

17     automobile swept in to the buggy industry.  If you're in the

18     desert selling water and it starts to rain, you need a new

19     business.

20          The record companies needed a new business.  They

21     needed to transition from the physical business of selling

22     atoms to the digital business of selling bits.  Now, they

23     may have done that at this point.  We're now in 2009, and

24     many of you I know have been to iTunes and you carry an iPOD

25     and you listen to music.  You are enjoying the fruits of the

1    industry having developed digital products that were

2    compelling and compelling enough so that people were willing

3    to pay the dollar for the song.

4            You'll hear that Joel now uses iTunes.  In fact,

5    let's just be clear about one thing about Joel from the

6    start.  Mr. Reynolds portrays him as if somehow he's trying

7    to duck away here.  Joel's not trying to duck away here.

8            It may be true that when these recording company

9    giants came after him with huge threats and depositions

10   under pains of penalty and perjury which basically amount to

11   forced interrogation that went on with Joel I think for a

12   total of somewhere over 14 hours of interrogation because he

13   clicked and downloaded some songs, in that environment in

14   which these people are threatening him with bankrupting

15   judgments, he was a little cautious about what he remembered

16   and what he was going to say yes, and so what in fact

17   transpires in the deposition that they're referring to is

18   Joel's being asked questions, and he says I don't remember

19   whether I downloaded that particular song.

20           There were lots of other kids in the house, there

21   were lots of other people in the house, it could have been,

22   and, all right, they have now gone out and they've run to

23   various plays and take depositions of Joel's friends saying

24   did you download any songs on KazaA?  Low and behold, the

25   friend says no, not I, it wouldn't have been me, but right

1    now here before you Joel's not trying to hide anything, and

2    he has not been for, I don't know, so when they quote you

3    his depositions, be asking yourself whether what he

4    responded to is technically true but cautious and understand

5    that right here and now Joel says, look, it may be that

6    others in my house did various things, but the fact is this

7    is my computer now, my responsibility, and I'm here to stand

8    and tell you just what I believe and not in a way that I'm

9    ashamed of at all.  In fact, Joel's got nothing to be

10   ashamed of.

11          All right.  So, I show you this object.  You can

12   see it's just a flat thing.  It's just, you know,.

13   a three-dimensional object, but if you look at it, you can

14   with your imagination see a three-dimensional object, a

15   cube, can you?  Can you all see a cube?  Can you see the

16   cube in two different ways?  Can you all see a cube in two

17   different ways?  If you can't, just keep staring at it and

18   it will pop into your head.  You can't resist it.

19          In fact, the interesting thing is once you see the

20   cube one way, you keep staring at it, you can't hold onto

21   it, it will eventually jump on you and you will see it the

22   other way.  Well, this is called the Necker Cube.  It's a

23   curious object.  Necker was a psychologist that explored it,

24   but it's a wonderful metaphor for truth, the idea that truth

25   can vary typically, be seen from two different points of

1    view.

2           The plaintiffs here will do an excellent job, I

3    have no doubt, they're extraordinarily professional in

4    demonstrating to you a point of view from the industry, and

5    you've heard it already.  They're losing jobs, they're doing

6    this, it's a tragedy, the Internet has caused them

7    tremendous grief and so forth, but the other way to see this

8    Necker Cube is from the vantage point of Joel, the

9    defendant, the person who does not have the burden of proof,

10   the person who comes into court as someone who is not here

11   voluntarily, I promise you.  He has been brought here by

12   force.

13          He's been subjected to pretrial proceedings which

14   have been extraordinary, and he's had to bear the burden

15   of -- he's actually gone through a tremendous amount

16   impediment in order to reach you, in order to present his

17   case to you, and what we're interested in having you do is

18   at the end of this case be able to see the two points of

19   view in the case.  You'll see the plaintiff's picture, and

20   it will be very compelling as you look at it, but there's a

21   defendant's picture over here.  That's a kid, basically a

22   kid who starts into a pattern of using music through the

23   technology at the age of 15 and continues.  He's with a

24   friendship group.  His purpose, let's be clear, his purpose

25   was to enjoy the music and share it with friends.

1          He was never in this for profit.  He's not a

2    commercial copyright infringer.  He's not part of any

3    criminal syndicate that's doing copyright violation.  He's

4    just a kid, and once he's into using and sharing music that

5    way with the friendship group, then let's turn the clock

6    forward and see what happens after 1999.

7          Well, first the industry goes after Napster, that

8    is, take down the company that's spread all these bits out

9    there, and they do succeed in taking down Napster.  I

10   believe that somebody here actually takes personal credit

11   for it, took down Napster, but once Napster is down, that

12   doesn't mean that any of these bits are down.  They're all

13   still out there, and they're still out there today, free

14   floating music in MP3 files that anyone with a net

15   connection can get to and download for free, just strewn on

16   the beach, strewn on the frontier of the Internet.

17         All right.  So first they go after Napster and

18   they take Napster down, and just as they said, just as they

19   said, after Napster comes others.  I mean, if Shawn Fanning

20   could do it in his dorm room, then along comes these other

21   programs that you all saw in the jury questionnaire that you

22   had to fill out.

23         The next big that really caused trouble was a

24   company called Grokster.  Grokster was a very tough company.

25   When Napster went down, Grokster wanted to get all the

1   millions of kids who had been on Napster to come to them and

2   so they advertised like aggressively, come, use Grokster,

3   get all your free music there.  They were really out there

4   in terms of in your face, and the plaintiffs tried to stop

5   them.  They went to court, first in the District Court, this

6   level and lost.  The Court said no, you can't take down

7   Grokster.  The reasons are very briefly, the way the law

8   works --

9            MR. REYNOLDS:  Your Honor, we object, this is

10  argument and not in evidence and completely irrelevant.

11           THE COURT:  The objection is sustained.

12           MR. NESSON:  All right.  So it comes to a point

13  then where they are truly afraid that they can't take down

14  the intermediaries, they can't stop the livings that you

15  see, they're still there, they're still functioning, and, in

16  fact, the companies on that list improve on that technology.

17  This is technology we're talking about, so Napster was one

18  kind of technology, a subsequent technology was an

19  improvement.

20           Bit Torrent, which you'll see on the list, is an

21  extreme improvement on the peer technology, advance in the

22  field of technology, and at that point the plaintiffs

23  decide, whoa, although it's going to be tough, we need to go

24  after our music fans, we need to sue people like Joel as

25  opposed to the companies like Napster and Grokster.

1          That's where this lawsuit has its origins.  So

2     what is this lawsuit about?  What is the actual issues that

3     we have here?  The Judge has told you it's about 30 songs.

4     Well, in fact, there are two categories of songs that you

5     will hear about.  The complaint when it's first filed on

6     Joel, which takes place in August, 2007 puts focus initially

7     on seven songs.  That's what they list in the complaints in

8     Exhibit A.  There's another exhibit that has 30 songs in it,

9     and eventually they come forward with the 30, but you will

10    in the evidence, as you hear it, have the opportunity

11    opportunity to distinguish at least two groupings of songs,

12    one, the original seven, now reduced to five, and the extra

13    25, and you'll be asked whether Joel infringed on each one,

14    and I'm simply at this point signaling to you to be really

15    attentive to any nuance difference in proof between these

16    two categories.

17         Then, as the Judge says, if you are to find

18    infringement, if you do find infringement, and that depends

19    on their good, solid technical proof if they can make it

20    that they owned a copyright; 2, the thing that was

21    downloaded, that it was registered appropriately, that the

22    thing that was downloaded really was the thing that was

23    copyrighted, not just speculation but really was, proof, all

24    right, then you may get to the point where you say, all

25    right, infringement, now we have to come to damage.

1          Joel's position with respect to damage is really

2     to rely on you, your judgment of what is just as the

3     appropriate response to what Joel did, and in coming to that

4     conclusion about what is just, as the Judge indicated, you

5     will have a range, and there will be two features of that

6     range that will be significant to you.  One will be the

7     question of whether you should treat Joel as in the highest

8     category of copyright offender and so be into the range of

9     maximum damage against him which in the statute is described

10    as category of willfulness, and the evidence will show that

11    there are others contending for that category.

12          Also in that category, at least as they would have

13    it, would be the criminal copyright syndicates.

14          MR. REYNOLDS:  Objection, your Honor.

15          THE COURT:  Sustained.

16          MR. NESSON:  Argument, I'm sorry, I need to tell

17    you just what the facts will show.  So, let me do it this

18    way.  We ask you to consider the case from Joel's point of

19    view, and when you come to make your judgment, it's our hope

20    that you will find the most minimal number of infringements

21    that you can find, not the maximum, and that you will apply

22    your ability to assess damage in a minimum way that relates

23    to what Joel's behavior actually has been here, so when you

24    come to thinking about the Necker Cube, again, I'd like you

25    to see what what we have here at issue in the case.

1          MR. REYNOLDS:  Your Honor, again, this is

2     argument.

3          THE COURT:  He is about to conclude, I take it?

4          MR. NESSON:  Yes.

5          THE COURT:  I can see that.

6          MR. NESSON:  A contest between points of view,

7     between two points of view, and you will decide whether Joel

8     violated this statute because he's a bad person, but I think

9     that you will find that, I hope you will find that although

10    he may have violated this statute, this is a minor kind of

11    violation, not a major violation, not a moral violation, not

12    something which is hugely blameworthy but rather a situation

13    in which when the Internet came in, there were many

14    including Joel who saw in it the aspiration of better

15    things, a sharing environment and looked to an optimistic

16    future with respect to engagement with the Internet.

17          And if you consider that he was one, if he

18    violated the statute, did so really as part of a generation

19    acting in a way that represents a generational divide, then

20    I'm hoping that you will in fact see his violation if you

21    think a violation at all as one course of conduct which a

22    kid gets into in '99 with his friends which continues over

23    time and which is not immediately displaced as a behavior

24    pattern just because other forms of digital download come

25    into the picture, and you will hear evidence of by the time

1   that Joel downloaded songs, August, 2004, there were at that

2   time instead of no digital alternatives a plethora of

3   digital alternatives, 230 some odd, names you've never heard

4   of now, Pressplay, Rapsody.

5         THE COURT:  You're about out of time,

6   Mr. Nesson.

7         MR. NESSON:  Companies coming and going, and the

8   question of justice that's really at the core here is

9   whether a kid like Joel who doesn't immediately change his

10   behavior pattern and that will mean changing the behavior

11   pattern not only themselves but his whole friendship group

12   to shift over from a workable, free, good system, all be it

13   one which the companies are interested in putting out

14   messages of illegal alternatives about him, you've heard

15   them in the movie theaters and all over the place, they're

16   very good about getting their message out.

17         THE COURT:  Mr. Nesson, you're about out of time.

18   We're looking for a concluding sentence.

19         MR. NESSON:  Then I will conclude.  Thank you very

20   much for your time.

21         THE COURT:  Proceed with your first witness,

22   counsel.

23         MR. OPPENHEIM:  Thank you, your Honor.  The

24   plaintiffs will call Mr. Wade Leak.

25         WADE LEAK, having been duly sworn by the Clerk,

1    testified as follows:

2            THE CLERK:  Could you state your name and spell it

3    for the record.

4            THE WITNESS:  Wade Leak, W-a-d-e, L-e-a-k.

5            THE WITNESS:  May I sit down?

6            THE COURT:  Yes, you may proceed.

7            MR. OPPENHEIM:  One preliminary matter before we

8    proceed.  Plaintiffs would move into evidence at this time

9    Exhibits 1 through 56 which I believe we've stipulated to

10   with the defendants.

11           THE COURT:  No objection, I take it?

12           MR. NESSON:  No, your Honor.

13           THE COURT:  All right.  It may be admitted 1

14   through 56.

15           ( Exhibit Nos. 1 through 56 were admitted into

16   evidence.)

17           MR. OPPENHEIM:  Thank you, your Honor.

18           THE COURT:  Ladies and gentlemen, the exhibits

19   will be shown to witnesses as we go along, and, in addition,

20   you'll have them in the jury room.  This is simply a quick

21   way of getting them into evidence.  Go on.

22           MR. OPPENHEIM:  Thank you, your Honor.

23                        DIRECT EXAMINATION

24   BY MR. OPPENHEIM:

25   Q.  Good morning, Mr. Leak.

1   A.   Good morning.

2   Q.   Could you explain your job title?

3   A.   I am deputy general counsel at Sony Music

4   Entertainment.

5   Q.   And what is Sony Music Entertainment?

6   A.   Sony Music Entertainment is the second largest record

7   company in the world, I'm proud to say.  It is a

8   conglomeration of record labels that produce various types

9   of music.  Some of the major ones are Columbia, Epic, RCA,

10  Jive, which do a range of pop music, rock music, urban

11  music, then we also have record labels that produce

12  Christian music, gospel music and country music.

13  Q.   Is Arista Music among the labels that are part of --

14  A.   Arista is a label group within that Sony music family.

15  Q.   And how long have you worked in the music industry?

16  A.   I began working at Sony Music or one of its predecessors

17  in January, 1999.

18  Q.   So over ten years ago?

19  A.   Over ten years.

20  Q.   What is the relationship between Sony Music, where you

21  work now, and Sony BMG Music Entertainment, which is one of

22  the plaintiffs?

23  A.   Sony BMG Music Entertainment changed its name I think

24  about six months ago to Sony Music Entertainment.  It was in

25  connection with a corporate change.

1    Q.  And are any of the Sony Music entities plaintiffs in

2    this case beyond Sony BMG Music Entertainment?

3    A.  Yes, Arista Records, LLC.

4    Q.  As a way of background, could you provide to the jury a

5    sense of what a record company does?

6    A.  Certainly.  I think people get confused, and they think

7    all we do is put out a disc or an online track or album, but

8    the fact is we have departments within our company that run

9    the entire range creating we hope good music.  It starts

10   with what's called artists and repertoire referred to as

11   A and R Group.

12        Their job is to find artists.  They literally go

13   to clubs, listen out in the marketplace to try and find new

14   artists who we think we could market to the public and

15   create good music with them.  Their job is also once we find

16   those artists to work with them to refine their sound to

17   have them work with the appropriate songwriters and/or

18   producers to create the right sound that we hope the public

19   will like and buy.

20        Once we have found the artists through the A and R

21   Group, we then have groups that are totally devoted to

22   marketing that music to try to figure out which, you know,

23   demographic of listeners and buyers will want to get that

24   music, how to get that message to the MVTV, do you do it in

25   ads, how do you do it online, which is, of course, a major

1    focus of us now, and then in addition you have a radio

2    promotions group whose job is to, you know, work with radio

3    to introduce them to the music, to get them excited about

4    the music, hopefully play the music so that we can get it

5    out there to the public for purchase.

6    Q.  Does a record company also typically work with artists

7    to match them with producers and songwriters?

8    A.  Absolutely.  That's an important --

9    Q.  Could you explain that a little bit?

10   A.  That's an important part of what we do.  We, you know,

11   oftentimes there are different types of artists obviously,

12   there are artists who are singer/songwriters who have

13   already refined their sound and have a specific voice.

14          There are other artists who we work with who have

15   the talent, don't necessarily know what their sound is going

16   to be.  We know three of the American idol winners, and

17   they're in varying degrees of what their sound is going to

18   be like, what's the right market for them, so we work with

19   artists across the range to hook them up with the producers

20   to create the right music.

21   Q.  Can you walk us through an example of an artist that you

22   have some exposure and how they go through the process with

23   the record companies?

24   A.  Sure.  I was working, at the time I worked at a company

25   called Zomba Recording, which was Jive Records, and I was

1    there in early 2000, I believe, when we signed 'N Sync.

2    'N Sync was a boy band, a very pop sound, very good, really

3    worked well together, but they had a certain sound.

4            Early on in the process of working with Insync

5    A and R executives in our company were focusing on

6    Justin Timberlake and realized that he had a special talent,

7    and they wanted to help him develop that talent, and so the

8    process continued from Justin from the 'N Sync to moving to

9    Justin Timberlake.  We had him in studios, we had him

10   working with certain producers to certain songwriters to

11   help him.  Just to say, Justin Timberlake is an incredible

12   musician, but it took nurturing at the record company to

13   help create what he's become today.

14   Q.  And when you say to help him?

15   A.  I think he's one of the biggest super stars, music super

16   stars.

17   Q.  How does a company only make money?

18   A.  We've only made money from record sales, music sales.

19   We do not participate in concert revenue, we don't

20   participate in merchandise revenue, we don't even

21   participate in radio revenue, in other words, music

22   publishers, which is different from the record company, when

23   a song is played on the road, they always get a revenue for

24   that.  At Arista Radio, we don't participate in anything

25   like that so it's really music sales.

1    Q.  That's the focus of the company is to sell records

2    whether online or in physical form?

3    A.  Absolutely the focus of the company is to sell our music

4    in physical form and in digital form online.

5    Q.  Very well.  I want to turn for a moment to the specifics

6    of this case.  Are you aware of the sound recordings that

7    Sony Music and Arista are suing on in this case?

8    A.  Yes.

9    Q.  Can you please turn to Exhibit 55.

10   A.  Exhibit 55.

11   Q.  It should be in one of the binders.

12   A.  I have 1 through 12 and 35 through 54.  Is it on the

13   side here?  Sorry.

14   Q.  That's all right.

15   A.  Is it okay for me to look at the screen?

16   Q.  It's fine with me if it's fine with the Court.

17          THE COURT:  We will fix these at the break.  The

18   jurors can share.  You can share.  We'll fix these at the

19   break.  Go on.

20   Q.  Mr. Leak, can you please identify what this document is

21   described?

22   A.  This is what is attached to the complaint, which is five

23   of the works at issue in this case, and these are the five

24   works.  Originally the service we hired in connection with

25   this case, MediaSentry, downloaded seven songs from

1  Mr. Tenenbaum's file share directory.  These are five of

2  those songs.

3  Q.  Okay.  And are some of these works works that are owned

4  by Sony or Arista?

5  A.  Three of them.

6  Q.  Which ones are those?

7  A.  The first one, "Incubus;" Nu-Skin from the album

8  "Science;" the third one, "Wheelz of Steel" by Outkast from

9  ATLiens; and the fourth one, pardon me, Incubus by the album

10  "Make Yourself."

11  Q.  And the information contained on the exhibit associated

12  with each of those tracks is correct including the sound

13  recording number in the final column?

14  A.  Yes.

15  Q.  Okay.  Would you please turn to Exhibit 56.  Could you

16  please describe this exhibit for the jurors?

17  A.  Sure, this is the additional recording, the 25 other

18  recordings that are at issue in this lawsuit.

19  Q.  And do you see any recordings on this exhibit that

20  Sony Music or Arista own exclusive rights to?

21  A.  I do.  The first is The Fugees, "Killing Me So Softly"

22  from The Score.  The second, "The Pink" from the album Nine

23  Lives, the next is recording out "Aquemini" and the last,

24  "Apocalyptica" from the album Battle of Los Angeles.

25  Q.  And you understand that these are additional four works

1  that Sony Music and Arista are asserting claims in this

2  case?

3  A.  Absolutely.

4  Q.  And the information contained on this exhibit is

5  correct?

6  A.  Yes.

7  Q.  Including the sound recording information?

8  A.  Yes.

9  Q.  Does Sony and Arista generally register sound

10 recordings?

11 A.  Yes, we register all of our copyrights.

12 Q.  And are you personally familiar with that process?

13 A.  Yes.

14 Q.  Do you know whether Sony Music and Arista have

15 copyrighted registers for the seven sound recordings that

16 you're suing on?

17 A.  We do.

18 Q.  Please turn to Exhibit 1, if you would, please.  This is

19 a multi-page exhibit.

20 A.  Okay.  Are these the originals of Exhibit 1?

21 Q.  Yes.  I believe they should be in a redwell there.

22 A.  No.  Sorry.  I'll get this together quickly.  There's a

23 lot of material there.  Okay, I'm there.

24 Q.  Do you recognize these documents?

25 A.  I do.  These are the certified original copyright

1    certificates for the seven albums that we're claiming from

2    this lawsuit.

3    Q.  When you say certified original documents, certified by

4    whom?

5    A.  By the copyright office of the United States.

6    Q.  I'm sorry.

7    A.  Of the United States.

8    Q.  And does Sony Music and Arista own the copyrights and

9    exclusive rights as registered in those sound recording

10   registrations?

11   A.  Let me quickly look at these.  We do.

12   Q.  Are those copyrights still in force and effect?

13   A.  Yes.

14   Q.  Some of the registrations are not in the name Sony BMG

15   Music Entertainment or Arista, I see.  I'd like to go

16   through them, if we can, to understand how it is that

17   Sony Music and Arista claim ownership in them.  Let's start

18   with five of them, the Incubus "Science" album, the Incubus

19   "Make Yourself," Aerosmith, "Nine Lives," "Rage Against The

20   Machine" and the Fugees album, do you have all those five?

21   A.  I do.

22   Q.  I believe all of them are registered in the name Sony

23   Music Entertainment, and I'm going to put one of the five on

24   the screen here since we can't put multiple.

25   A.  They're all registered in the same of Sony Music, Inc.

1   Q.  And how does Sony BMG Music Entertainment assert claims

2   on this based on the fact that it's in the name of Sony BMG

3   Music Entertainment?

4   A.  Sony BMG Music Entertainment was formed in the summer of

5   2004 when Bertelsmann and Sony joined their recorded music

6   business partially in light of what we're here about today,

7   but, anyway, it was the merger of the two recorded music

8   entities and in connection with that merger, these

9   copyrights, in addition to thousands of others, were

10  assigned to Sony BMG Music Entertainment by Sony Music

11  Entertainment, Inc.

12  Q.  Very well.  Let's turn to the next copyright certificate

13  for the Outkast album "Aquemini."  Do you have that one?

14  A.  I do.

15  Q.  And who is that registered in the name of?

16  A.  Arista Records, which is Arista Records, LLC.

17  Q.  Which is?

18  A.  A plaintiff in this case.

19  Q.  Okay.  So that's the plaintiff in this case.  Let's turn

20  to the last of the seven which is the Outkast album

21  "ATLiens," and that's registered in the name of the Sony BMG

22  Music Entertainment; is that right?

23  A.  That's right.

24       MR. FEINBERG:  Your Honor, we're still having

25  trouble here.

1          THE COURT:  We can use the physical evidence

2    initially, and at the break we'll make sure that that's

3    fixed.

4    Q.  And, just briefly, Mr. Leak, how is it that Sony BMG

5    Music Entertainment or Arista own the rights to this sound

6    recording?

7    A.  Arista Records is a wholly-owned subsidary of Sony BMG

8    Music Entertainment.

9    Q.  Very well.  Let's turn to Exhibit 2.

10   A.  Yes.

11   Q.  It's a fairly voluminous document, right?

12   A.  It is.

13   Q.  It's actually multiple documents?

14   A.  It is.

15   Q.  Can you just describe what these documents are?

16   A.  Sure, this is a series of corporate documents from our

17   files that support the testimony I just gave about the

18   ownership.

19   Q.  And these demonstrate various corporate mergers and

20   acquisitions as you just described?

21   A.  Yes.

22   Q.  With respect to the copyright certificates in Exhibit 1,

23   is there anything on those copyright registrations that's

24   inaccurate as far as you know?

25   A.  I've obviously seen these before, and there's nothing

1    inaccurate in these certificates.

2    Q.  Do you see the "work for hire" box is checked on the

3    certificates?

4    A.  Yes.

5    Q.  Do you have any reason to believe that was checked

6    erroneously?

7    A.  No.

8    Q.  Does Sony Music, do Sony Music and Arista sell the

9    recordings for the albums in those copyright

10   registrations?

11   A.  Yes, we try.

12   Q.  Could you please turn to Exhibit 3 which I don't believe

13   is in the books.

14   A.  Yes, I have them, the CDs.

15   Q.  Can you describe what those CDs are?

16   A.  Sure, these are the physical CDs of the seven works that

17   are at issue for Sony BMG Music Entertainment or Arista.

18   We've got the two Incubus, Outkast, ATLiens, Fugees, The

19   Score, Aerosmith, Nine Lives, "Rage Against The Machine" and

20   "The Battle of Los Angeles" and Outkast "Aquemini."

21   Q.  And these are legitimate CDs that Sony Music and Arista

22   produce and sell?

23   A.  Yes.

24   Q.  And do these CDs contain the sound recordings that

25   you've asserted claims on in this case?

1    A.  Yes.

2    Q.  And do these CDs contain the same sound recordings as

3    what was registered with the copyright office?

4    A.  Yes, the way we register with the copyright office is we

5    provide two copies of the CD to the copyright office.

6    Q.  And when you say you provide two copies of the CD, is

7    that the very same CD you sell in the store?

8    A.  Yes, this CD that's for sale in the marketplace, we

9    provide two copies of each, the copies we're registering to

10   the copyright office.

11   Q.  Where does Sony Music sell those CDs in the

12   marketplace?

13   A.  We still sell them at retailers like a Target or a

14   Wal-Mart or a Virgin in New York City, but there are stores

15   like that still around as well as all the smaller stores, of

16   course, and we sell the physical CDs online through

17   Amazon.com, other retailers like that.

18   Q.  When you sell them, do they have copyright notices on

19   them?

20   A.  Yes.

21   Q.  Can you -- I don't know if it's going to be hard for the

22   jury to see them.  Can you show the jury where on a typical

23   CD?

24   A.  Generally, the copyright notice is on the back of the

25   CD, and it tells you who the copyright owner is.  Sometimes

1    in small print it's hard to get all the work on there, but

2    each of these has a copyright notice on the back of the

3    CD.

4    Q.  Do the copyright notices appear anywhere else other than

5    the back of the CD?  Are they also on the physical CD?

6    A.  Yes, I believe so.  I don't think any of these are

7    open.

8    Q.  I think we tried --

9    A.  Traditionally they do.  I think we could in advance so

10   it is our practice --

11   Q.  It is your practice to put the actual copyright notices

12   on the CDs?

13   A.  Yes.

14   Q.  Why is it that you put the copyright notices?

15   A.  I know you can't see this, but there you go.

16   Q.  We'll let the jury.

17   A.  Absolutely, they'll get to see these later.  I'll assume

18   they'll have access to them.

19   Q.  Why is it that you put the copyright notices both on the

20   outside of the packaging and on the actual discs?

21   A.  It's to alert the public that these are our copyrighted

22   sound recordings, we have the exclusive right to reproduce

23   and/or distribute them.

24   Q.  Does Sony Music sell the sound recordings at issue in

25   this case in places, in forums other than the physical CD?

1    A.   Again, we try to, but they are available online for

2    sale, both as albums and/or individual tracks.

3    Q.   Digitally?

4    A.   Digitally, uh-hum.

5    Q.   Could you please turn to Exhibit 4.  Can you please

6    describe -- I'm sorry, do you have it yet?

7    A.   Yes.

8    Q.   Can you please describe for the jury what this exhibit

9    is.

10   A.   These are screen shots of these albums being available

11   on iTunes.

12   Q.   So just to leaf through them, the first page here is of

13   which album?

14   A.   Incubus "Science."

15   Q.   And this is the album that you have in physical form

16   there?

17   A.   Right.

18   Q.   And this is the screen shot of the digital sale?

19   A.   This is the screen shot of the digital offering for

20   sale.

21   Q.   Right.

22   A.   Right.

23   Q.   And the next album?

24   A.   Is Incubus "Make Yourself."

25   Q.   Okay.  The next one?

1  A.  Fugee, "The Score."

2  Q.  Next one?

3  A.  Aerosmith, "Nine Lives."

4  Q.  Next one?

5  A.  "Rage Against The Machine."

6  Q.  The next one?

7  A.  Outkast, "ATLiens."

8  Q.  Okay.  Then one last one, right?

9  A.  Outkast, "Aquemini."

10  Q.  Just looking, for instance, at the first sheet, does

11  Sony Music do anything with respect to its online sales to

12  provide notice about its copyright?

13  A.  Yes, there's a copyright notice in the top part of the

14  page.

15  Q.  It's a little hard to see --

16  A.  It's a little hard to see.

17  Q.  -- with our technology here.  You're looking right

18  underneath?

19  A.  That's right, "1987, Sony Music Entertainment, Inc.

20  Warning:  All rights reserved unless --" I can't read it.

21  Q.  It's not a particularly good copy, but hopefully you'll

22  have a higher resolution on your computer screen.

23  A.  Hopefully.

24  Q.  When did Sony Music and Arista begin to sell music

25  through iTunes such as this?

1    A.  We started to explore the digital marketplace as early

2    as 1999 working with companies at Liquid Audio.  We then

3    moved into -- I think around 2001 more robust with the

4    services like MusicNet and Pressplay and then continuing as

5    the marketplace evolved into 2003 when iTunes became

6    available.

7    Q.  And when iTunes became available in 2003, were you

8    selling the seven albums that we just went through?

9    A.  Yes.

10   Q.  I want to turn now to talk a little bit about the

11   evidence collected in this case.  Can you describe for the

12   jury how Sony Music and Arista found the defendant

13   infringing in this case?

14   A.  Yes, we hired MediaSentry, a computer company, to

15   develop evidence for us of online infringement.  They would

16   go onto a peer-to-peer network just the way anyone else in

17   this audience could do.  They would look for people offering

18   infringing files and usually a number of infringing files.

19   They would then download a representative of tracks from

20   that user, and they would then take a screen shot of the

21   users, whether it was KazaA and other, service the

22   directory, the file share directory for that user.  Here

23   they did it for sublime14@kazaa.

24   Q.  Let's stop there for a moment.

25   A.  Okay.

1    Q.  You describe the screen shot.  Have you seen that

2    evidence previously?

3    A.  I have.

4    Q.  Would you please turn to Exhibit 13, and let's

5    specifically turn to page 407, a somewhat lengthy document;

6    is that correct?

7    A.  It is.

8    Q.  Roughly 40 pages or so?

9    A.  Right.  Okay.

10   Q.  So this is just one of the 40 some pages of this

11   exhibit?

12   A.  That's right.

13   Q.  Can you briefly describe for the jury what it is that

14   you see here on this exhibit?

15   A.  This is the list of songs, I call them tracks, but the

16   list of tracks that sublimeguy14 was offering on his KazaA

17   directory for people to download.

18   Q.  So, in the left-hand column, you see that it was being

19   distributed by sublimeguy14@kazaa, right?

20   A.  Yes.

21   Q.  And then when you say it's the list of tracks, are you

22   looking at that middle column then?

23   A.  Yes, file name.

24   Q.  Was MediaSentry instructed to download any of the

25   recordings that were in this shared directory?

1    A.   Yes, MediaSentry was directed to download a

2    representative sample of the files in this directory.

3    Q.   And why?  Why did you instruct them to do that?

4    A.   To ensure that it was our music that was being offered

5    on the networks and obviously to develop authentic evidence

6    for where we are today.

7    Q.   Could you please turn to Exhibit 17.  I believe it's a

8    CDR --

9    A.   Here it is.

10   Q.   Can you open up and take a look at that exhibit.  Do you

11   recognize that?

12   A.   I do.

13   Q.   And could you describe what that is?

14   A.   This is a CDR of the five songs that are on I can't

15   remember the number of the exhibit, Exhibit 55, on

16   Exhibit 55, got it.  So these are the copies of those songs

17   that were downloaded from KazaA, the sublimeguy14 file

18   directory.

19   Q.   By?

20   A.   By MediaSentry.

21   Q.   MediaSentry download?

22   A.   Yes.

23   Q.   And what format are those recordings in?

24   A.   In MP3 format.

25   Q.   Once MediaSentry downloaded those recordings, what did

1    they do with them or what did you do with them?

2    A.  Well, they then confirmed -- our representative then

3    confirmed that they were in fact the copies of these sound

4    recordings, and that's what they did.

5    Q.  Okay.  And did Sony Music or did you do anything with

6    respect to those downloads?

7    A.  With respect to the three we're claiming from

8    Exhibit 55?

9    Q.  The three out of the five.

10   A.  I have listened to them more than once, listening to

11   this version and then this version to confirm it's a copy of

12   our recordings.

13   Q.  So you compared what was downloaded?

14   A.  A, B comparison.

15   Q.  With what Sony sells legitimately?

16   A.  Absolutely.

17   Q.  Why don't we for the benefit of the jury walk through

18   the process.  We won't do it with respect to all of them but

19   at least one of the tracks to understand what you did.

20   A.  Sure.

21           MR. OPPENHEIM:  Your Honor, may I approach?

22           THE COURT:  Yes.

23   A.  I think you wanted the Incubus track.

24   Q.  Yes, why don't we try to Incubus track.

25   A.  Here you go.

1  Q.  Thank you.  Incubus?

2       THE COURT:  Your Honor, I think they need to rely

3  on your expertise.

4       MR. OPPENHEIM:  I'm using the CD player, and I

5  need track 4.  Can I do it?

6       THE COURT:  It's in your hands.

7       MR. OPPENHEIM:  Then we're in trouble.

8       (CD playing)

9       MR. OPPENHEIM:  Okay.  I don't think we need to go

10  through the whole thing.  I think you actually handed me the

11  wrong CD.

12       THE WITNESS:  I apologize.  Right band.  I gave

13  you the right band.

14  Q.  So that one we were just listening to was the CDR of the

15  downloads that MediaSentry did?

16  A.  That's right.

17  Q.  This is the process that you went through?

18  A.  Yes.

19  Q.  Hopefully more efficiently.

20  A.  It was a little easier in my own home.

21       (CD playing).

22  Q.  And the one we just listened to?

23  A.  Was the recording we owned and released into the

24  marketplace.

25  Q.  And when you did this comparison, what was your

1    conclusion?

2    A.  That they were exact copies of our recording.

3    Q.  So what MediaSentry had downloaded?

4    A.  Was an exact copy of the recording that we registered

5    with the copyright office.

6    Q.  And what you sold?

7    A.  And what we sold.

8    Q.  Both in physical format and in digital format?

9    A.  Yes.

10   Q.  And that just as a matter of the record, what we just

11   played was the track, pardon me, from Incubus?

12   A.  That's right.

13   Q.  For each of the three recordings on Exhibit A, did you

14   go through that same process?

15   A.  I did.

16   Q.  And what conclusion did you come to?

17   A.  That the copy being offered from the KazaA file share

18   directory that was downloaded by MediaSentry is a copy of

19   the recording that we own and sell in the marketplace.

20   Q.  Earlier you described that Sony Music and Arista were

21   actually asserting claims of seven sound recordings, not

22   just three.  Did you make any effort in your role at

23   Sony Music to confirm that the other four tracks that you

24   had evidence of being distributed by sublimeguy14 were in

25   fact Sony and Arista's copyrighted works?

1   A.  I reviewed the Metadata to compare them and make sure I

2   felt comfortable.

3   Q.  Can you explain that in a little more detail?

4   A.  There's Metadata about the track, the song, the length

5   that you can review.

6   Q.  By length, you're talking about the size of the file?

7   A.  Yes, sorry, right.

8   Q.  And what was the conclusion you came to?

9   A.  That those, the other four are also copies of the

10  recordings that we own and are exploiting in the

11  marketplace.

12  Q.  So once you finished going through this process, finding

13  MediaSentry identifying an infringer, sublimeguy14,

14  confirming the sound recordings are yours, what did you do

15  next to initiate your enforcement efforts?

16  A.  We filed a John Doe lawsuit.  We have no idea who

17  sublimeguy14 is, then we have to file a John Doe lawsuit,

18  then we issue a subpoena with the ISP provider associated

19  with that account, which we did, we issued a subpoena to Cox

20  Communication.

21  Q.  And did you get a response to that subpoena?

22  A.  We did.

23  Q.  What did --

24  A.  They sent a response indicating that the account was

25  owned by J. Tenenbaum and that one of the user names

1   associated with that account was sublimeguy14@cox.net as

2   well as an address and I think a phone number.

3   Q.  You just said that the user names associated with that

4   account.  Did you mean e-mail addresses?

5   A.  Sorry, absolutely.

6   Q.  So you got the name J. Tenenbaum from Cox.  What did you

7   do with it?

8   A.  We then, we sent a letter to Mr. Tenenbaum advising him

9   that we were aware that he was infringing our copyrights.

10  Q.  Okay.  Could you please turn to Exhibit 22.

11  A.  I'm there.

12  Q.  Is this a copy of the letter you just described?

13  A.  It is.

14  Q.  And is this an accurate copy of what it is that was sent

15  to J. Tenenbaum?

16  A.  It is.

17  Q.  What was the purpose of this letter, Mr. Leak?

18  A.  The purpose of this letter was to put Mr. Tenenbaum on

19  notice that we were aware that he was sharing songs

20  illegally online and that we were reserving our rights but

21  that we were willing to speak to him about resolving the

22  matter.

23  Q.  In that respect, Mr. Leak, could you read for us the

24  last sentence of that first paragraph?

25  A.  "We are writing in advance of filing suit against you in

1    the event that you have an interest in resolving these

2    claims."

3    Q.   What else does the letter describe?

4    A.   The letter describes the potential exposure that's

5    involved.  The letter lets Mr. Tenenbaum know that if he

6    feels inclined, he should retain a lawyer.

7    Q.   Let's stop there for a moment.  Could you turn to page 2

8    of the letter?

9    A.   Sure.

10   Q.   You see the bolded language?

11   A.   I do.

12   Q.   Could you read that bolded language, please?

13   A.   "We are not your lawyers, nor are we giving you legal

14   advice.  We urge you to consult with an attorney immediately

15   to advise you on your rights and responsibilities."

16   Q.   Does the letter describe in any way why the record

17   companies were asserting claims?

18   A.   Yeah, I think it's very clear in the next paragraph.

19   Q.   Why don't we go ahead and read that next paragraph.

20   A.   "The record companies take copyright infringement very

21   seriously, and for good reason.  Copyright theft is not a

22   victimless crime.  People spend countless hours working hard

23   to create music -- not just recording artists and

24   songwriters, but also session players, backup singers, sound

25   engineers and other technicians.  In addition, the music

1    industry employ thousands of other people, such at CD-plant

2    workers, warehouse personnel, record store clerks and

3    developers of legitimate online music services. They all

4    depend on sale of recordings to earn a living. So do record

5    companies, which routinely invest millions of dollars to

6    discover and sign promising artists, and then to produce and

7    market their recordings. In addition, piracy eats away at

8    the investment dollars available to fund new music and, in

9    effect, erodes the future of music. That means that a

10   creatively gifted, but commercially risky, artist may not be

11   signed. A talented songwriter may be forced to make

12   songwriting a hobby instead of a career. In the end, the

13   music sufers, along with everyone who cares about it -- from

14   the people who make it to the consumers who enjoy it."

15   Q. Mr. Leak, in the letter, did you instruct Mr. Tenenbaum

16   at all about any issues regarding evidence?

17   A. Yes, the letter clearly advises him of his obligations

18   on that front.

19   Q. In that respect, can you turn to the last bullet point

20   on page 1?

21   A. Sure.

22   Q. Give me a moment to see if I can adjust this. Could you

23   go ahead, Mr. Leak, and read the first couple sentences of

24   that bullet point?

25   A. "Now that you are aware that a lawsuit may be filed

1    against you, there is an obligation for you to preserve

2    evidence that relates to the claims against you.  In this

3    case, that means, at a minimum, the entire library of

4    recordings that you have made available for distribution as

5    well as any recordings you have downloaded need to be

6    maintained as evidence."

7    Q.  Okay.  Very well, Mr. Leak.  Did J. Tenenbaum respond to

8    this letter?

9    A.  I understand that he made a call to our lawyers in

10   response to the letter.

11   Q.  And what happened as a result of his phone call?

12   A.  I understand that there was some settlement discussions

13   but that they were unable to resolve the matter.

14   Q.  And so then what did Sony Music and Arista do next?

15   A.  So we then filed this action.

16   Q.  At any time prior to your filing this lawsuit, did you

17   take into consideration the individual characteristics of

18   Mr. Tenenbaum?

19   A.  Absolutely not.

20   Q.  Why not?

21   A.  Well, first of all, you have to remember when we start

22   this process, we have no idea who they are, then when we

23   find out who they are, we may or may not speak to them, and

24   we don't know anything about them when we file the action.

25   Q.  Mr. Leak, I want to turn back to the screen shots for a

1    moment that we discussed earlier.

2         THE COURT:  Why don't we take our morning break so

3    don't turn to anything.  Okay.

4         MR. OPPENHEIM:  That's fine, your Honor.

5         THE COURT:  All rise for the jury, please.

6         (JURORS EXITED THE COURTROOM.)

7         THE COURT:  Just one other thing.  I will never

8    interfere with a lawyer's presentation unless there's an

9    objection, and there were certainly things that Mr. Nesson

10   said in his opening which I will not, would not correct

11   because there was no objection to it, the notion that

12   Mr. Tenenbaum was brought here by force, the notion that one

13   of the casting aspersions that one of the lawyers who took

14   personal credit for taking down Napster, the notion that a

15   deposition is a forced interview, characterizations as to

16   which there would be some dispute.  Because you didn't

17   object, I won't correct, and that will be the rule going

18   forward, unless there's an objection, I'm not intervening

19   here.  We'll have a 15-minute coffee break.

20        (A recess was taken.)

21        THE CLERK:  All rise for the jury.

22        THE COURT:  You can all be seated.  Proceed.

23        MR. OPPENHEIM:  Thank you, your Honor.

24   Q.  Mr. Leak, just before the break, I think I had asked you

25   to please turn to Exhibit 13.  Could you do that now.  These

1   are the screen shots earlier that MediaSentry captured?

2   A.  Yes.

3   Q.  Looking through those screen shots, Mr. Leak, do you see

4   other sound recordings that are owned or controlled by

5   Sony Music that are not among the 30 that you're actually

6   suing on in this case?

7   A.  Yes.  If you start at --

8   Q.  Could you describe it?

9   A.  If you start, my numbers say 13-007.

10  A.  About two-thirds of the way down, there's Ace of Base,

11  "Beautiful Life."

12  Q.  That's owned by one of Sony's labels?

13  A.  Yes.

14  Q.  Any others?

15  A.  I'm moving now to page 9, there's a Fifth Dimension

16  track, "Age of Aquarius," which is a long-standing track

17  that we own.

18  Q.  An older one?

19  A.  An older one.

20  Q.  Okay.

21  A.  If you go to 11.

22  Q.  Page 11.

23  A.  There's Ozzy Osborne on this page who's been a Sony

24  artist for a long time.

25  Q.  At the bottom of the page?

1    A.  At the bottom of the page.  I'm just continuing to look.

2    Q.  I don't think we want to go through all 40 pages.  Maybe

3    just one more page.

4    A.  Yes, if you go to page 13, there's a Cypress Hill track

5    that is owned by Track, and there is a Wyclef track owned by

6    Sony.

7    Q.  And all of those tracks that you gave us are examples of

8    tracks or sound recordings or one of its own labels?

9    A.  Yes.

10   Q.  Let's turn now to Exhibit 43.  Have you seen this

11   exhibit before?

12   A.  I have.

13   Q.  I'll represent to you that this is a printout of the

14   files that were found on Mr. Tenenbaum's current computer

15   that was obtained during the course of this litigation.

16   Looking at that printout, Mr. Leak, do you see any songs or

17   sound recordings that are owned by Sony Music or one of its

18   label?

19   A.  I do, I see an Alicia Keys track.

20   Q.  Hold on a minute.  I'd like the jury to see it.

21           THE COURT:  It is not on the screen.

22           MR. OPPENHEIM:  He's about to tell us.

23   Q.  If you could tell us the page, Mr. Leak.

24   A.  Page 2.

25   Q.  Hold on.  Let me try to zoom in here because this is a

1    smaller print.

2    A.  There is on the bottom of the screen, Alicia Keys,

3    "Fall In."

4    Q.  And Alicia Keys is a track for one of its labels?

5    A.  Yes.

6    Q.  And is a track that Sony Music owns?

7    A.  Yes.

8    Q.  The next is page 3.  Could you go near the top of the

9    page.  There are several Britney, two Britney Spears tracks

10   that are called, "One Slime," "I'm a slave for you."

11   Q.  And Britney Spears?

12   A.  There is a Cypress Hill track right below that that is

13   owned by Sony, Cypress Hill.  Cypress Hill is no longer

14   recording, but they were a Sony artist.  If you move down

15   the page.

16   Q.  On the same page?

17   A.  Yes.

18   Q.  There are two "Destiny Child" tracks?

19   A.  "Survivors" and "Leave Your Ladies Home," those are all

20   Sony, and we continue to have two members of "Destiny's

21   Child."

22   Q.  Okay.  One more page maybe.  I recall seeing Yo-Yo Man.

23          MR. NESSON.  Objection.  Objection.  Judge, the

24   only issue is an owner of Yo-Yo Man had a long-standing

25   relationship with Sony.

1        MR. OPPENHEIM:  Do you want me to search for it?

2        THE COURT:  Do you want counsel to search for the

3    Yo-Yo Man entry?

4        MR. OPPENHEIM:  It's not necessary.  I take your

5    word, Mr. Leak, that it's there.

6    Q.  Just moving along, the document we're looking at now is

7    the shared, what was on the defendant's shared directory for

8    his LimeWire, on his computer and in his shared folder for

9    LimeWire and that these that are works, the works you just

10   described are owned by Sony Music?

11   A.  Yes.

12   Q.  So you've identified that there are a whole bunch of

13   works in the KazaA share directory and a whole bunch of

14   works in the LimeWire share directory.  Why isn't Sony Music

15   suing on all those works?

16       MR. NESSON:  Objection.

17       THE COURT:  Sustained.

18   Q.  Mr. Leak, the works you described earlier aren't among

19   the works that you're suing on in this case; is that

20   correct?

21   A.  They're not.

22   Q.  Why not?

23       MR. NESSON:  Objection.

24       THE COURT:  Sustained.

25   Q.  Mr. Leak, why is it that you're asserting claims on the

1    30 works you're asserting claims on?

2              MR. NESSON:  Objection.

3              THE COURT:  Overruled.

4    A.  Because we chose from the wide range of tracks that

5    Mr. Tenenbaum was sharing, we chose a representative sample

6    which we felt reflected the scope of the recordings at

7    issue, and we thought that was a reasonable number.

8              MR. FEINBERG:  Objection, motion to strike.

9              THE COURT:  Overruled.

10   Q.  Mr. Leak, did Sony Music or its affiliates ever give

11   Mr. Tenenbaum a license or any kind of authorization to

12   download any of the seven tracks that Sony Music has

13   asserted claims on in this case?

14   A.  No.

15   Q.  And did Sony Music or any of its affiliates ever give

16   Mr. Tenenbaum a license or authorization to distribute any

17   of those seven recordings to others?

18   A.  No.

19   Q.  Does Sony Music or any of its affiliates ever license

20   individuals to download or to upload Sony Music's sound

21   recordings to peer-to-peer networks?

22   A.  No.

23   Q.  Why not?

24   A.  Because if we did, it would basically be preventing us

25   from ever making money or selling the track most likely

1  because you're then making it available to millions and

2  millions of people on these p2p networks with no one paying

3  a cent for it.

4  Q.  If you were to enter into a license, what would the

5  value of it be?

6  A.  I think the only way to answer that question is we would

7  have to basically sell the company, or, you know, because WE

8  wouldn't be able to keep the company going if things were

9  just being given away for free online, so I can't even tell

10 you what the number would be.

11 Q.  Does the Sony Music believe that because somebody's a

12 fan of a particular artist that that individual should be

13 able to download that artist's music for free and then

14 distribute it to others for free?

15         MR. FEINBERG:  Objection.

16         THE COURT:  Sustained.  What Sony believes is not

17 at issue here, the issue here is what the law requires.

18 Q.  Mr. Leak, in Sony's determination as to whether to

19 enforce as against individuals to infringe their copyrights,

20 do they consider whether or not somebody is a fan and

21 consider allowing somebody to engage in the conduct because

22 they're a fan of a particular artist?

23         MR. FEINBERG:  Objection.

24         THE COURT:  Overruled.

25 A.  I need to have it read back.

1   Q.  I'll rephrase it.

2       THE COURT:  Yes, rephrase it.

3   Q.  Does Sony Music decide whether to enforce as against a

4   particular individual based on whether that individual is a

5   fan of the music that they've chosen to download and upload

6   without authorization?

7   A.  No, the fans of our artists are obviously very important

8   to us, and we want to cultivate that relationship, but we

9   want to cultivate that relationship so that the fans

10  purchase the music.

11  Q.  Does the copyright protection that Sony has in its sound

12  recordings vary from artist to artist or album to album

13  based on popularity?

14      THE COURT:  Objection.

15      THE COURT:  Overruled.

16  A.  Of course not.

17  Q.  Why not?

18  A.  Because all of our recordings are valuable, and, you

19  know, there may be larger markets for some than others, but

20  we want to find the market for all of them, and lots of

21  people have different tastes in music, and we like to make

22  our music available to all sorts of group for purchase.

23  Q.  And copyright protection is an important part of that?

24  A.  Of course.  It's an instrumental part of it.

25  Q.  Why do Sony Music and Arista file lawsuits like this

1    one?

2              MR. NESSON:  Objection.

3              THE COURT:  I think it has been put in issue in

4    Mr. Nesson's opening.  Go right ahead.

5    A.  When you look at the situation, you have to look at the

6    trajectory of this process.  As I testified earlier, I began

7    in this business in January of 1999, so I was there when

8    piracy started to become a problem.

9              We initially did try to stem piracy by going after

10   the services.  We also, and I was involved in this, we tried

11   very hard to come up with a public education campaign that

12   would educate the public that taking the recording online is

13   no different from taking it in the store from shoplifting,

14   and we did a series of public service announcements in that

15   regard.

16             I remember working very hard to try to get Mary J.

17   Blige, Britney Spears, others involved to try to get that

18   message to their fans that when you're taking the music

19   online, it's no difference from taking it in the record

20   store.

21             That clearly didn't have the impact we wanted it

22   to have, and after some legal setbacks in the litigation

23   against the services, we, you know, we struggled with the

24   decision of whether or not to go after individual users the

25   way we are in this lawsuit, but we decided we had no choice

1    because the public, it was as much a part of the public

2    education campaign as it was finding individual file

3    sharers.  It was an important effort to get the message out

4    there that we want you to love the music but we want you to

5    pay for it.

6    Q.  A moment ago you said legal setbacks in going after the

7    networks.  Can you describe that a little bit?  What do you

8    mean by that?

9    A.  Well, I heard Mr. Nesson's opening statement, and it is

10   true that we had success in the Napster case, but in the

11   Grokster case, it took years after the district court ruling

12   to get through the appellate court and to the United States

13   Supreme Court to make law that said if the service is

14   facilitating the infringement, it's still violating the

15   copyright law, but that took years, and we were aware of

16   what was happening online, and we were trying to do whatever

17   we could to stem piracy.

18   Q.  But you're not suggesting that the courts ultimately

19   ruled against the record companies?

20   A.  No, no, no, the United States Supreme Court issued a

21   decision that we rely on all the time.

22   Q.  You also mentioned a moment ago shoplifting as did

23   Mr. Nesson in his opening.  Is this case just like a

24   shoplifting case only in the digital world?

25   A.  Well, it's interesting.  As I say, I've been thinking

1  about this for a long time, and, you know, and I've tried to

2  explain to my neices and nephews the issues surrounding this

3  matter, and one thing I've told them is if I'm selling

4  televisions in my shop --

5          MR. FEINBERG:  I object to this, your Honor.

6          THE COURT:  Nieces and nephews, I can understand

7  being responsive to the breadth of the arguments that were

8  made at the beginning, but if this could be more pointed, it

9  would be helpful.  The objection is sustained.

10  Q.  Mr. Leak, if you could describe how it is that this case

11  differs from the type of shoplifting case that Mr. Nesson

12  described earlier.

13  A.  The difference is --

14          THE COURT:  Well, actually it seems to me that

15  that's counsel's argument.  You can counter that with

16  counsel's argument.  This isn't for a witness to entone

17  about.  Go on.  Objection is sustained.

18  Q.  Mr. Leak, does Sony Music make money from cases like

19  this?

20  A.  No.

21  Q.  Why not?

22  A.  Because our expenses associated with these cases are

23  much higher than any money we've made on the cases.

24  Q.  What impact does peer-to-peer infringement have on your

25  record company's effort to sell music?

1  A.  Having watched the last several years, you know, piracy

2  has significantly reduced our revenues, which, of course,

3  has impacted our ability to nuture new artists and have the

4  money available to create the music that we wanted to market

5  to the public, and, unfortunately, one thing I've seen, as I

6  see, it's a major consequence of the piracy is job losses,

7  and since I've been with the company since '99, since 2000,

8  I've seen the company decrease by half.

9  Q.  Half of its employees?

10  A.  Half of its employees have lost their jobs since 2000.

11  Q.  Well, how is it that revenues have gone down so

12  dramatically as a result of this peer-to-peer infringement?

13  Aren't you selling music?

14  A.  We still sell some music, but we certainly don't sell

15  the way we did, and we're just aware that so much online

16  piracy is going on, we wish there were a way to harness

17  those users and get them to pay for the music.

18  Q.  Why is the selling of music so much more difficult

19  now?

20  A.  Well, back to --

21          MR. FEINBERG:  Objection, Judge.

22          THE COURT:  You're looking to me to object?

23          THE WITNESS:  I don't want to object, no, I want

24  to talk about the television.

25          MR. OPPENHEIM:  Your Honor, this is directly the

1   issue Mr. Nesson has raised.

2          THE WITNESS:  I'll keep it simple.

3          MR. OPPENHEIM:  Has raised in its opening.  During

4   his voir dire, he raised issues regarding this.

5          THE COURT:  Okay, you can have it.  Go on.

6   A.  If I'm selling televisions --

7          MR. FEINBERG:  Please note my objection on the

8   grounds of this is expert testimony.

9          THE COURT:  Okay.  That's a different objection,

10  it seems to me, and that's a fair objection.  The objection

11  is sustained.  Go on, next question.

12  Q.  As a factual matter, not as your opinion, why is it that

13  Sony Music --

14  A.  Because we can't --

15         THE COURT:  Wait, finish the question.  Why is it

16  that Sony Music what?

17  Q.  Is having difficulty selling music?

18         MR. FEINBERG:  Objection.

19         THE COURT:  That is an issue of expertise.  The

20  question of the market is an issue of expertise, and unless

21  you qualify this witness, it seems to me he can't have the

22  testimony.  Objection sustained.

23  Q.  Some people, Mr. Leak, have suggested that downloading

24  music, copyrighted music, from the Internet without

25  authorization is a victimless offense.  Is that correct?

1    A.  Absolutely not.

2    Q.  Why not?

3          MR. FEINBERG:  Objection.  Same objection.

4    A.  But I know that --

5          THE COURT:  When someone objects, you don't

6    answer.

7          THE WITNESS:  I apologize, your Honor.

8          MR. OPPENHEIM:  Your Honor, this is --

9          THE COURT:  Again, this is a characterization, and

10   this is argument, this is not facts.  This is a

11   philosophical discussion which you can have with the jury at

12   the appropriate time.  The objection is sustained.

13   Q.  Mr. Leak, you heard Mr. Nesson indicate in his opening

14   that the plaintiffs are seeking to hold the defendant liable

15   in the highest category of damages like a criminal

16   syndicate.  Is that what the plaintiffs are seeking to do

17   with respect to Mr. Tenenbaum?

18   A.  Absolutely not.

19         MR. FEINBERG:  Objection again.

20         MR. OPPENHEIM:  Your Honor, this goes directly to

21   what it is that plaintiff is seeking to do in this case.

22         THE COURT:  The objection is sustained.  You

23   objected to that, and I sustained the objection, to then

24   respond to it with a witness makes no sense.  The objection

25   is sustained.  Next.

1  Q.  In its enforcement efforts as against others, Mr. Leak,

2  does Sony Music ever pursue people in different -- at

3  different levels?

4  A.  Certainly.

5       MR. FEINBERG:  Objection.

6  Q.  Could you describe that, please?

7       MR. FEINBERG:  Objection to the meaning of the

8  question.

9       THE COURT:  Since I don't understand the question

10  either, I'll let it go.  Go on.  You can have it.

11  A.  When we are seeking to enforce our copyrights, we at

12  times choose civil remedies such as this and at times choose

13  criminal remedies which are a very different set of

14  remedies.

15  Q.  When you choose criminal remedies, do you work with law

16  enforcement?

17  A.  Yes.

18  Q.  But you're not doing that in this case?

19  A.  No.

20  Q.  What are the damages that the plaintiffs are seeking in

21  this case as against Mr. Tenenbaum?

22  A.  We are seeking statutory damages which we are entitled

23  to do under the copyright law.  There's a range available

24  under the copyright law, and I fully expect that your Honor

25  will instruct the jury on what they should take into

1    consideration in making that award.

2    Q.  And is there a particular number of damages that you're

3    seeking to obtain in this case?

4           MR. FEINBERG:  Objection.

5    A.  No, we --

6           THE COURT:  Sustained.

7           MR. OPPENHEIM:  No further questions.

8           THE COURT:  Cross-examination.

9                  CROSS-EXAMINATION

10   BY MR. NESSON:

11   Q.  Mr. Leak, when you say we hired MediaSentry, are you

12   speaking for all of the plaintiff companies here?

13   A.  I'm speaking personally for the Sony Companies, but we

14   hired them together with the other plaintiffs in this

15   case.

16   Q.  That is all four of you got together and hired them?

17   A.  Yes.

18   Q.  In what way did you get together?

19   A.  We worked together and hired them as a working group.

20   Q.  So all the four record companies working together.  Are

21   you working through any entity?

22   A.  Yes, we coordinate certain anti-piracy efforts through

23   the Recording Industry Association of America.

24   Q.  The RIAA?

25   A.  Yes.

1  Q.  And it's the RIAA that hired MediaSentry?

2  A.  No, that's not true.

3  Q.  Your contract was directly with MediaSentry?

4  A.  I have not seen the contract, but I certainly have paid

5  for MediaSentry.

6  Q.  Oh, I recognize that it's not RIAA that will do the

7  paying, that will be the corporate companies, but the actual

8  strategic management of your litigation campaign was the

9  work of the RIAA; was that not correct?

10  A.  Our litigation campaign was done with the company's very

11  direct involvement working with the RIAA.

12  Q.  And who is it that sought out MediaSentry in the first

13  place?

14  A.  I don't recall.

15  Q.  It wouldn't be the RIAA?

16  A.  I don't recall.

17  Q.  And do you recall where the decision was made to

18  initiate all this litigation campaign?

19  A.  I recall -- I don't recall specifics, I recall being on

20  phone calls at various times about doing this.

21  Q.  And that was the RIAA that coordinated the

22  decision-making amongst the recording industry to initiate

23  the lawsuit campaign against music fans?

24  A.  I apologize.

25  Q.  Yes, I apologize.

1    A.   Again, I would say it was the companies working with the

2    RIAA to come up with the appropriate anti-piracy strategy.

3    Q.   Was there a budget established at the beginning of this

4    litigation campaign for undertaking it?

5         MR. OPPENHEIM:  Objection, your Honor.

6         THE COURT:  Sustained.

7    Q.   You say that these lawsuits are not to make money?

8    A.   That's correct.

9    Q.   That is none of the money that comes out of these

10   lawsuits goes back to the artists?

11   A.   None of the money -- there's no money being made out of

12   these lawsuits.

13   Q.   There's no money?

14   A.   The costs exceed any amounts that we make from the

15   lawsuits.

16   Q.   And the costs that you're talking about are the cost of

17   lawyers?

18   A.   The cost of lawyers, the cost to have documents, the

19   cost of MediaSentry, the costs of all the pieces of work

20   that we need to bring these lawsuits.

21   Q.   So you're not in this litigation for the money, the

22   money is not the purpose of this litigation?

23   A.   I think, as I testified, these lawsuits were initiated

24   in part as a public education campaign and a last ditch

25   effort to try and get the message out there.

1  Q.  So, a public education campaign, it's like the purpose

2  of these lawsuits is to teach people a lesson?

3  A.  The purpose of these lawsuits is to educate the public

4  about copyright and about the fact that peer-to-peer

5  networks are unauthorized.

6  Q.  And by education, you mean by teaching the public a

7  lesson by holding up defendants in lawsuits and getting huge

8  bankrupting damage awards against them which the public

9  finds out about, and, therefore, they are deterred; is that

10  not the purpose?

11  A.  Well, I have to say that, you know, the vast majority of

12  these matters are resolved long before litigation, and the

13  letter that I testified about that was sent to

14  Mr. Tenenbaum, most of the actions are settled at that stage

15  for amounts that are less than the minimum statutory

16  damages.

17  Q.  And, in other words, either when a punitive defendant

18  receives a letter or subsequently when they're sued with an

19  actionable complaint, at some point it settles before they

20  get to a jury?

21  A.  Yes.  It settles, most of them are settled before you

22  ever actually sue the individual.

23  Q.  And when we're talking about most, what's the total

24  figure that we're talking about?

25  A.  I don't know the exact percentage, but I know it's the

1    vast majority.

2    Q.  I'm looking actually for total numbers, we're talking

3    about 40,000 lawsuits?

4    A.  I really don't know.  I wouldn't want to give incorrect

5    information on that.

6    Q.  But you recognize this is a huge campaign that the

7    Recording Industry of America has launched against music

8    fans in order to teach the public a lesson?

9    A.  No, I don't recognize that.  I recognize that we

10   initiated this program and these actions as an effort to

11   hopefully keep our business alive by educating the public

12   that online piracy is illegal.

13   Q.  It sounds to me like we're saying the same thing, but

14   just to be clear on it, your method for doing it is to bring

15   claims, exact settlements from people, and anyone who

16   doesn't settle, you carry through with a lawsuit --

17          MR. OPPENHEIM:  Objection.

18   Q.   -- and ask for extremely large damages?

19          MR. OPPENHEIM:  Objection.

20          THE COURT:  That was a multiple part question.

21          MR. NESSON:  Yes, it's true.

22          THE COURT:  The objection was sustained, and that

23   was only the beginning of the objection, but let's start

24   there.  Go on.

25   Q.  You went through the screen shots of Joel Tenenbaum from

his computers, and you chose 30 songs, well, I guess you

didn't do all the choosing, you chose only for the Sony

Music; is that right?

A.  That's right.  I wasn't personally involved in that

decision, but other people who worked at Sony were.

Q.  And so the totality of Sony's songs that Joel is being

sued for is what, it's not all 30, it's something less than

that?

A.  No, I'm sorry, I don't understand that question.

Q.  To be clear, you are the copyright holder, you say, of

some of these songs but not all?

A.  I'm the copyright holder for three of the songs on the

exhibit, I can't remember the number, the exhibit with five

on it, and then the other exhibit with 25, I am the

copyright owner of four of those.

Q.  And then there's another 851?

A.  Well, there are an additional 18 at issue, 18, is my

math right, there are an additional 21 in this lawsuit, then

those are owned by the other plaintiffs in this case.

Q.  But there were many other songs that we've heard about

that were in Joel's share folder?

A.  Yeah, I believe there are about 800 in his KazaA share

directory and many more in the gateway directory as it's

been referred to.

Q.  And when we get up to modern times, we're talking first

1    2004, when we get to his current collection, it's got 2,000

2    songs in it?

3    A.   I didn't count them, but, yes, many more than 800.

4    Q.   You're saying many of those are Sony's songs?

5    A.   Yes.

6    Q.   But you're only suing on some of them?

7    A.   Right.

8    Q.   And the number you chose to sue on you chose because you

9    wanted to be reasonable?

10   A.   That's right.

11   Q.   You could have sued on all of them?

12   A.   Yes.

13   Q.   And we recognize that each one on which you're suing

14   you're claiming is an infringement?

15   A.   Yes.

16   Q.   And a willful infringement?

17   A.   Yes.

18   Q.   And, therefore, the jury is to award a mandatory minimum

19   and a maximum that goes up to $150,000 per infringement?

20   A.   We are, as I explained, we've elected statutory damages,

21   and we are leaving that determination to the jury's

22   discretion.

23   Q.   But the discretion that you're asking for and the form

24   it takes when a defendant is sued with a complaint so that

25   he faces the threat of damage is in this case 30 times

1  $150,000 he is subject to liability in this case with this

2  jury of $4,500,000?

3          MR. OPPENHEIM:  Objection to many parts of it.

4          THE COURT:  Sustained.

5          MR. NESSON:  I'm unclear what the nature of the

6  objection is.

7          THE COURT:  His answer had been that he was

8  leaving to the jury where in the range they would find, and

9  you're asking him questions about the maximum range of that,

10  is that your point, subject to liability should the jury

11  find the maximum, is that your point?

12          MR. NESSON:  No, actually I was trying to make a

13  point about what he considers to be reasonable.

14          THE COURT:  What he considers to be reasonable

15  within that range is not for him to decide, it's for the

16  jury to decide.

17          MR. NESSON:  No, I grant you, your Honor --

18          THE COURT:  Thank you.

19          MR. NESSON:  -- but, actually let me clarify.

20  Q.  I'm going back to the choice that was made as to how

21  many songs you would include in suing Joel, and as far as I

22  could tell --

23          THE COURT:  This being a question that counsel had

24  objected to a moment ago?

25          MR. OPPENHEIM:  Yes, your Honor.

1           THE COURT:  All right.  I just wanted to keep
2     track here.  Go on.
3           MR. NESSON:  Yes, yes.
4           THE COURT:  You do talk to one another, I take it?
5           MR. NESSON:  We did actually exchange here, but I
6     won't go into that.
7           THE COURT:  Okay, go on.
8     Q.  You could, had you chosen, been reasonable and sued only
9     for one song?
10    A.  We could have.
11    Q.  Or five songs?
12    A.  We could have.
13    Q.  Or seven?
14    A.  We could have.
15    Q.  Or 30?
16    A.  Which we did.
17    Q.  Or 100?
18    A.  We could have.
19    Q.  Completely up to you just how huge the threat is that
20    you embody in a complaint that you deliver to the defendant
21    and then ask him to settle?
22    A.  We chose a representative sample of the works that were
23    available on the KazaA share directory.  We feel that it's
24    an appropriate representative sample and that as the
25    exclusive copyright owner, that's our decision.

1  Q.  And completely up to you?  I'm just wanting to emphasize

2  how arbitrary that choice is.

3          MR. OPPENHEIM:  Your Honor, asked and answered.

4          THE COURT:  Sustained.

5  Q.  Who made the choice?

6  A.  We did.

7  Q.  No, you, I want a person.  Who?  Was it you?

8  A.  I believe it was Ms. Pariser sitting at counsel table.

9  Q.  Part of their litigation team?

10  A.  No, no, no, at the time she was employed at Sony BMG

11  Music Entertainment.

12  Q.  Had she -- well, I don't know, we'll hear from her.  Was

13  she any connection with RIAA?

14  A.  She is now but only very recently.

15  Q.  And what's her present position now?

16          MR. OPPENHEIM:  Objection, your Honor.

17          THE COURT:  Sustained.  Sustained.

18  Q.  You say Sony's a very large company.  How big is it?

19  A.  Do you mean how many employees?

20  Q.  Gross revenue annually?

21  A.  I do not know the exact gross revenues number.

22  Q.  Are we talking about like a billion dollar company?

23  A.  The gross revenues are definitely in the billions

24  worldwide.

25  Q.  Would you remind me again what the Sony's songs are on

1   the list of five?

2   A.  On the list of five, we have two Incubus tracks and the

3   Outkast track, I think it's "Wheels of Steels" or "Wheels

4   Steels," something like that, from the ATLiens album.

5   Q.  Nu-Skin?

6   A.  Yes.

7   Q.  Is it a fact that in 1999 you made $8 million on the CD

8   sales of "Nu-Skin," album sales of "Nu-Skin"?

9   A.  I think I know what you're referring to, which is, we

10   were ordered to turn over certain gross revenue numbers in

11   connection with this action.  I don't have the document in

12   front of me, but I have no reason to doubt that it's true.

13   I mean, that's gross revenue on the album.

14   Q.  $8 million in 1999, $850,000 in 2000?

15        THE COURT:  Mr. Nesson, are you asking questions

16   or testifying?

17   Q.  I want to know how much money you had made off

18   "Nu-Skin" by August 10, 2004, the time when Joel is stream

19   shot downward?

20        THE COURT:  Do you know the answer to that

21   question?

22        THE WITNESS:  I don't.

23   Q.  I can supply the revenue figures if you would like.

24   A.  But those are gross revenues.  That has nothing to do

25   with what we made.

1    Q.  So I'll change my question to the gross earnings.

2    A.  Okay.  But I think it's important to note that --

3            THE COURT:  Does the witness know the answer to

4    the question?

5            THE WITNESS:  All I know --

6            THE COURT:  Yes or no, do you know the answer to

7    the question?

8            THE WITNESS:  I know information was turned over,

9    that's all.

10           THE COURT:  And was that information that you

11   prepared?

12           THE WITNESS:  No.

13           THE COURT:  Next question.  This is not the

14   witness to ask the questions that you're going after.

15   Q.  This is the witness that represents the plaintiffs, do

16   you not?  You represent the plaintiff.  I'm speaking to the

17   plaintiff here when I speak to you, you're the person who

18   brought the suit personified in a real person here?

19           THE COURT:  We're talking about the rules of

20   evidence.  Are you saying that what's in front of you is an

21   admission under the rules of evidence, and if that's an

22   admission, you can cross-examine him about it.  Is that what

23   you're saying because I'm just trying to translate this into

24   the Federal Rules of Evidence?

25           MR. NESSON:  Yes, thank you, your Honor.

1           THE COURT:  Okay.

2           MR. OPPENHEIM:  I'm not sure where we are on this,

3    I'm not sure what it is that we've now qualified as an

4    admission.

5           THE COURT:  Presumably -- just a second.  If there

6    is a document which the plaintiffs prepared as part of the

7    discovery and which, therefore, counts as admissions as a

8    party in this case, and if it's a relevant document, that's

9    a second question, is it a relevant document, and your

10   objections were not to the relevance of it initially, then

11   he can examine him, examine based on it.  What's the nature

12   of your objection?

13          MR. OPPENHEIM:  If he wants to put the document in

14   front of Mr. Leak and ask him questions about it, your

15   Honor, we're happy to have him do it.

16          THE COURT:  Okay, then that's the way he'll do it.

17   Go right ahead.

18          MR. NESSON:  May I approach the witness?

19          THE COURT:  Yes, you may.

20   Q.  Nu-Skin is page 11 of this document?

21   A.  The pages are all out of order.

22          THE WITNESS:  Can I take a second to reorder?

23          THE COURT:  Yes, of course you can.

24          MR. OPPENHEIM:  Can I just ask, is this an exhibit

25   that's in evidence, if so, what exhibit is it just so we

1     have a record, and I know what we're asking the witness to

2     look at?

3               THE COURT:  Is it an exhibit?

4               MR. NESSON:  There were actually two of these

5     documents, one was initially sent to us, that is an exhibit,

6     one that was recently supplemented as an amendment which

7     apparently has not been marked an exhibit.

8               THE COURT:  Is there an objection to this being an

9     exhibit?

10              MR. OPPENHEIM:  Obviously one is already an

11    exhibit, and that's fine.  We updated the numbers, and we're

12    happy to substitute it out with the updated numbers, or if

13    he wants to use the older exhibit and just explain what it

14    is, that's fine as well.

15              THE COURT:  What exhibit number is it?

16              MR. OPPENHEIM:  It is existing No. 54.

17              THE COURT:  Mr. Nesson is cross-examining this

18    witness on existing Exhibit 54.  If he has updated figures,

19    he can substitute it, we'll make it 54A, so we'll proceed.

20              THE WITNESS:  Is this 54 or the new one?  I'm not

21    sure.

22              THE COURT:  Do we know what the witness has in his

23    hand?

24              MR. NESSON:  He has the updated one, your Honor.

25              THE COURT:  He has what will become 54A?

1          MR. NESSON:  Yes.

2          THE COURT:  Go on, proceed.

3          ( Updated responses to interrogatories regarding

4   revenue was admitted into evidence as Exhibit No. 54A.)

5   Q.  I'm just interested in your reviewing the revenue

6   figures for the Sony songs with particular focus on how much

7   money Sony had made on the songs as of August 10, 2004?

8   A.  Well, I can't answer that from this document.

9   Q.  In terms of the gross revenues.

10          MR. OPPENHEIM:  Objection.  Objection, your Honor.

11   Now we're asking gross revenues or what they made, but I

12   don't think you can ask him --

13          THE COURT:  All right, that's sustained.

14   Q.  Would you please state the gross revenues on Incubus

15   "Nu-Skin" up through 2004 for physical album revenues?

16   A.  I don't recall the release date of this album, but this

17   document starts in 1999, just to be clear.

18   Q.  Yes.

19   A.  So I can just add these numbers.  Well, maybe I can add

20   these numbers.  Can I have a calculator or some paper?

21   Q.  I'd be happy to just have you read the separate figures.

22   A.  I can read them separately.

23          THE COURT:  Ballpark is fine, go on.

24   A.  In 1999, again, this is gross revenue, this is not in

25   any way reflect profit or there are no charges against this

1    number --
2            MR. FEINBERG:  Objection, your Honor.
3            THE COURT:  Overruled.  He's being asked about a
4    number on a page, and he can explain it.  Go on.
5    A.  In 1999, the number is $8 million; in 2000, it's
6    $850,000; in 2001, it's $1.3 million; in 2002, it's
7    $1 million; in 2003, it's $300,000; and in 2004, it's
8    $600,000.
9    Q.  And just by comparison, digital track sales?
10   A.  For this Incubus "Nu-Skin" title?
11   Q.  Yes.
12   A.  Digital track sales, which were only available
13   apparently from 2003, in 2003, $750; in 2004, $3,500; in
14   2005 -- oh, stop at 2004?
15   Q.  Yes.
16   A.  Okay.
17   Q.  Now, would you do the same for the other Sony songs?
18   A.  Do you want me to start on page 10 with Aerosmith,
19   "Pink"?
20   Q.  Yes, that would be good.
21   A.  For Aerosmith, "Pink," the physical album revenue,
22   again, gross million, in 1999, it was $1 million; in 2000,
23   it was $300,000; in 2001, it was $500,000; in 2002, it was
24   $13 million; in 2003, it was $3.2 million; and in 2004, it
25   was $3.3 million.

1   Q.  And the digital sales?

2   A.  The digital track sales?

3   Q.  Digital track.

4   A.  In 2002, $1,000; in 2003, $650,000; and in 2004,

5   $25,000.

6   Q.  And it sounds like you're selling a lot of CDs and not

7   very much digital?

8   A.  That's what it certainly appears from this document.  I

9   wouldn't say a lot of CDs, but we're selling CDs.

10  Q.  Would you go to the next?

11  A.  The next one is Fugees, "Killing Me Softly," physical

12  album revenue in 1999, $2 million; in 2000, $800,000; in

13  2001, $700,000; in 2002, $600,000; 2003, $1,300,000; and

14  2004, $850,000.

15  Q.  And the digital track?

16  A.  In 2003, $14,000; in 2004, $100,000.

17  Q.  Again, okay.  So would you do "Dream Day Minority,"

18  that's one of yours, right?

19  A.  No, it's not mine.  That's the one that we were playing

20  before that I said I wish it were mine.  It's not mine.

21  Incubus --

22          THE COURT:  Is there some reason why we have to do

23  this in front of the jury now, why can't we just do a chart

24  per songs you're interested in and submit that to the jury

25  at a later time?

1          MR. NESSON:  If you'd like, your Honor, I'd be

2     happy to do that.

3          THE COURT:  That would be fine.

4     Q.  Would you just look over the document as you have it and

5     tell me if this pattern that we see with these that we've

6     gone through so far continue, that is, a very substantial CD

7     sales before 2004 but very few digital track sales

8     relatively speaking in terms of gross revenue, that that's

9     generally speaking the pattern?

10    A.  That's generally speaking true because the digital

11    market was just beginning.

12    Q.  Just beginning?

13    A.  Yes.  In 2000 --

14         THE COURT:  Can you wait for a question?

15         THE WITNESS:  I'm sorry.

16         THE COURT:  Yes.

17    Q.  In fact, would you describe what the digital market was

18    generally speaking in 2004, just beginning?

19    A.  Well, no, in 2004, it wasn't just beginning.

20    Q.  Well, tell us about what it was.

21    A.  In 2000, I think, as I testified, we, as early as 1999,

22    were exploring digital platforms to sell our music on.  I

23    know that in 2001, we had actually started with two

24    services, MusicNet and Pressplay, probably others, but those

25    are the two that come to mind, and then by 2003, iTunes had

1   launched, and basically we were making our catalogues

2   available online for sale.

3   Q.  Pressplay Press, and what was the second one?

4   A.  MusicNet.

5   Q.  MusicNet.  Pressplay, if I recall, was a subscription

6   arrangement where you paid $15 a month, you listened to 500

7   low quality audio streams, you could download two tracks but

8   not more than two from the same artist; is that right?

9           MR. OPPENHEIM:  Objection, your Honor.

10           THE COURT:  If the witness knows.

11   A.  I don't recall how the MusicNet or Pressplay services

12   worked.

13   Q.  And MusicNet, you don't recall either?

14   A.  I don't recall.

15   Q.  If you were to compare those digital options with what

16   is currently offered by Sony digitally, what differences

17   would there be?

18           THE COURT:  You mean the digital options with

19   which he was not familiar?

20           MR. NESSON:  Yes, I guess so.

21           THE COURT:  That is a problem.  Next question.

22   Q.  You described the process that MediaSentry went through

23   with the five songs, initially seven songs, yes?

24   A.  I described it, I gave an overview of it.

25   Q.  Can you tell us why it went from seven to five?

1    A.  I do not know the reason for that.  Those two tracks are

2    not Sony-owned tracks, and I understand that other witnesses

3    are prepared to talk about that.

4    Q.  But the process not only went through with those five

5    tracks is that MediaSentry downloaded them, made an actual

6    recording of what they downloaded, right, they actually

7    downloaded the file, and then you described yourself

8    comparing them to the original and saying, yes, what was

9    downloaded was the same as in your opinion your copyrighted

10   work?

11   A.  That's correct.

12   Q.  And that was not the same procedure that was followed

13   with the other 25 out of the total of 30 songs; am I right

14   about that?

15   A.  MediaSentry did not download full copies of the other

16   25.

17   Q.  Now, why would they sample?  What were they sampling

18   for?  What were they checking?

19   A.  You know, I really, I don't think I -- because

20   MediaSentry has a witness, I think I'm probably the wrong

21   person to ask that.

22   Q.  But you are clear though that the five songs were

23   treated differently, that all we have with the 25 songs is

24   what we see in print on the screen?

25           MR. OPPENHEIM:  Objection.

1    Q.  The screen shot?

2         MR. OPPENHEIM:  Objection.

3         THE COURT:  If the witness knows.

4         MR. OPPENHEIM:  Which of the questions --

5         THE COURT:  All we have, that is to say, all that

6    is available in evidence --

7         MR. OPPENHEIM:  I think there were two questions,

8    too, so I just want to make sure we're answering one of them

9    and I know which one, that's all.

10   Q.  Are you familiar with KazaA yourself?

11   A.  I know what it is.

12   Q.  Did you ever use it?

13   A.  I did not.

14   Q.  Have you ever tried to download from any of the

15   peer-to-peer networks?

16   A.  I have not.

17   Q.  So you have no experience what this is to actually go to

18   the net and download a free song?

19   A.  I've not done it myself.  I have, in other words, I've

20   been with certain anti-piracy teams and seen it working, but

21   I've never done it.

22   Q.  So, are you then not familiar with the problem of

23   downloading a song and it turning out not to be what you

24   thought it was even though the title seemed to indicate

25   it?

1    A.  I've never had that experience.

2    Q.  Not personally?

3    A.  Not personally.

4    Q.  And are you part of an anti-piracy group yourself?

5    A.  I work on anti-piracy issues as part of my job.

6    Q.  Is it part of your anti-piracy work in protecting songs

7    from your point of view on the peer-to-peer networks to put

8    out what's called spoofs of the song?

9              MR. OPPENHEIM:  Objection, your Honor.

10             THE COURT:  Overruled.

11   A.  I have not been involved in any -- I know it's called

12   spoofing, but I am somewhat familiar with what our company

13   did in that regard.

14   Q.  Would you explain to the jury what spoofing is?

15             MR. OPPENHEIM:  Objection, your Honor.  We've now

16   clearly exceeded the scope of his direct examination.

17             THE COURT:  Overruled.

18   A.  Frankly, it's hard for me to exactly describe.  I don't

19   have a technical background, but it's intended to create a

20   file that is not actually what it appears to be or it's a

21   snippet of it, and then you don't get the whole file.

22   Q.  And the reason for that is to make it frustrating for

23   people who are using the peer-to-peer networks and looking

24   for your song, they go and they take the trouble of finding

25   and downloading and waiting and all of that, and it turns

1   out to be something completely different, maybe even an

2   offensive bit of dialogue?

3          MR. OPPENHEIM:  Objection to the question.

4          THE COURT:  Sustained.  Sustained.

5   Q.  At any rate, what you're saying though is because of

6   spoofs, you simply can't tell from the title of something

7   listed in KazaA what the actual underlying file is?

8   A.  No, that's not my understanding, but I can also tell you

9   that what I do know is that any spoofing activity on the

10  part of our company was directed at front line releases,

11  meaning things that had just been released into the

12  marketplace, and none of the tracks that we have sued on in

13  this action fall into that category.

14  Q.  But you have no idea whether there are spoofs generally

15  speaking with respect to, first of all, your own songs that

16  someone else has put up or other plaintiffs' songs?

17  A.  Well, I think I answered that.  I think I know that

18  the -- I know that our company did do some spoofing on front

19  line, we call them front line releases, usually it's a

20  prerelease track, meaning we haven't offered it for sale yet

21  and we want to make sure we can control that, but I know we

22  didn't do it for catalogue works which are at issue here.

23  Q.  Now, these songs that you say are catalogue, they're

24  very popular songs, yes?

25  A.  We hope to think our catalogue can maintain value and

1    maintain popularity.

2    Q.  Well, I'm thinking of August 10, 2004.  They were at

3    that time very popular songs, they had been around, they

4    made huge money, they were definitely part of the ocean of

5    songs that were washed out into the public arena by

6    Napster?

7              MR. OPPENHEIM:  Objection, your Honor.

8    Argumentative and multi-part.

9              THE COURT:  Sustained.

10   Q.  When a user goes to KazaA looking for a song, if it's a

11   very popular song and there are a great many of the copies

12   of the song that are being shared on the peer-to-peer

13   network, it becomes a matter of indifference whether there

14   is one more or one less; is that right?

15   A.  I completely disagree with that.  Each one of those is a

16   displaced sale.  Each one of those is a consumer who likes

17   the song enough to take it and would presumably be willing

18   to pay something for that song.

19   Q.  So is that the only actual damage -- is that what you're

20   saying that the damage here that Joel caused, according to

21   your allegation, is that he didn't pay for the songs that he

22   had?

23   A.  I didn't say that.

24   Q.  Well, I'm asking are you saying that?

25   A.  No, I'm saying that Mr. Tenenbaum's file share directory

1    was offering these songs, I call them tracks is what I call

2    them, offering these tracks for free to millions of users on

3    the p2p network.  That's millions of potential sales that we

4    lost.

5    Q.  Hold on.  Well, let's just take it a step at a time.

6    MediaSentry downloads songs from Joel's share folder,

7    correct?

8    A.  Yes.

9    Q.  Are they doing that with permission of the copywright

10   holder?

11   A.  Certainly they have my permission.

12   Q.  So there's no violation of what they're doing?

13        MR. OPPENHEIM:  Objection, they get ambiguous.

14   Q.  There is no copyright violation that MediaSentry is

15   guilty of since they are downloading from Joel your songs

16   with your permission?  There's no violation, MediaSentry

17   hasn't --

18   A.  MediaSentry is authorized to download that copy.

19   Q.  Right.  Do we have any specific evidence of anyone who

20   is not authorized downloading Joel's songs from Joel's share

21   folder?

22   A.  I think we have a lot of evidence that suggests that

23   millions of people were downloading from Mr. Tenenbaum's

24   directory a variety of songs.

25   Q.  Millions of people from Joel's computer?

1  A.  On the KazaA file share alone, he was offering 800

2  tracks to millions of users.  The system is designed to

3  allow people to take those tracks from those directories for

4  free without paying for them.  I think in my view we have

5  plenty of evidence of people downloading from

6  Joel Tenenbaum.

7  Q.  But here's the question.  Just let's imagine August 9,

8  2004.  Let's just imagine that Joel's songs aren't there yet

9  on KazaA.  These are extremely popular songs.  Any idea how

10  many available copies of these songs were within the world

11  of shared music on KazaA that anyone who went to KazaA and

12  plugged in a name would get to?

13  A.  I would have no way of knowing that, but it doesn't

14  really matter that they're out there.  It doesn't mean that

15  it's okay to do it.

16  Q.  I didn't say that.  What I said was --

17       THE COURT:  You're not supposed to be saying

18  anything, you're supposed to be asking the questions.

19  Q.  All right.  I'm asking you a question.

20       THE COURT:  That's the way it works.

21  Q.  Would you -- do you understand that when supply

22  radically exceeds demand that the addition of one more

23  element on the supply side isn't going to change demand?

24       THE COURT:  Objection sustained.

25       MR. OPPENHEIM:  I'd rather not object, your Honor,

1   and now I'll ask the witness the questions I wanted to ask.

2   He's opened the door.

3          THE COURT:  Okay.  The objection is withdrawn.

4   You can have the question.

5   A.  This is what I was referring to before, if I own my

6   television store --

7          MR. OPPENHEIM:  He can't objection now.

8          THE COURT:  I know.

9   A.  -- and I'm offering televisions for sale, and, you know,

10  they're good TVs, I offer a nice service program, and I have

11  some loyal customers, and someone comes up the street with a

12  big truck with a lot of televisions that they stole and are

13  offering those to the people walking on Main Street that

14  day, will I have a few customers who come to me because,

15  first of all, they suspect there's an issue with the TV

16  and/or they like my service program or they're loyal

17  customers, yes, but will most of the customers go and get a

18  free TV, probably, and the point is I can't compete with

19  that.

20  Q.  Let me come at it this way, Mr. Leak.  The peer-to-peer

21  network, the shared environment has to start with an initial

22  seed, is that correct, that is, if -- let me be more

23  careful.  Let's take a specific song.  Let's imagine it's

24  Incubus "Nu-Skin."

25  A.  Okay.

1    Q.  There is a time when there are no copies available on

2    KazaA, that is, at some point when from the point of origin

3    of KazaA being out there as a product, there is a starting

4    time when no one has yet ripped a copy of "Nu-Skin" and

5    shared it to KazaA?

6            MR. OPPENHEIM:  Your Honor, we would object.

7            MR. NESSON:  A starting place.

8            THE COURT:  I'm not sure I understand where this

9    is going, but you can have that question.  There was a time

10   that there were no copies, you agree, on KazaA?

11           THE WITNESS:  Of a particular track?

12   Q.  Yes, let's take "Nu-Skin."

13   A.  Somewhere the copy got onto the system.

14   Q.  Somebody had to do that, somebody had to rip the first

15   one and put it in their share folder and make it

16   available?

17   A.  Somebody had to.

18   Q.  Okay.  And when that happens, that copy is now available

19   to millions?

20   A.  Yes.

21   Q.  And then the second one that shares and puts it in his

22   shared folder, that makes two?

23   A.  I don't disagree with you, but that's why we're here.

24   Q.  I appreciate that, but, first of all, let's be clear on

25   one thing, you're not saying Joel is the person who first

1    ripped this, are you?

2    A.  I don't know that.

3    Q.  Yes, but you're not asserting it, are you?

4         THE COURT:  He's already answered the question.

5    He doesn't know.  Next question.

6    Q.  Am I right that part of the problem that you face in

7    your business was groups of let's call them hackers, let's

8    call them people who were really antagonistic to your

9    business, to the records industry, who almost made it like a

10   competition to put out new releases as fast as they could be

11   up on the peer-to-peer networks, to rip them and put them up

12   as fast as possible, was that not the case?

13   A.  I really don't know that for sure.  I understand there

14   are groups like that, but I don't know anything specifically

15   about them.

16   Q.  You've been in anti-piracy at Sony, and you're not

17   familiar with groups that in a quite organized fashion,

18   especially when you're worried about new releases are in

19   fact competing out there to see how fast they can get their

20   new releases on the peer-to-peer networks?

21   A.  As I said, I'm aware of those type of groups.

22   Q.  Do you know the names of any of those groups?

23   A.  I think I've heard them before, but none that I recall

24   at the moment.

25   Q.  You can't recall any of the names of those groups?

1    A.  No.

2    Q.  You're not suggesting though that Joel is any part of

3    any group like that?

4         THE COURT:  Asked and answered.  He said he didn't

5    know.  Go on.

6    Q.  Would you agree that in terms of relative culpability

7    even, from your point of view, the initial rippers and

8    seeders are in a very different category than someone who

9    comes along years later when there are millions of available

10   copies available on KazaA and one more is just like a bit of

11   dust in the wind?

12   A.  I wouldn't necessarily agree with that.  You know, the

13   damage continues to affect our industry, and I have to

14   disagree with your characterization of Mr. Tenenbaum.  He's

15   testified that he started with Napster, he then moves to

16   several other services, he then goes to KazaA, and after we

17   bring this action, he moves to LimeWire, so in essence he is

18   one of these people.

19   Q.  Well, the jury has the answer to the question.  In

20   calculating your sense of damage to the industry, if I

21   understand you right, tell me whether this is so, you

22   basically take all of the possible -- you take all of the

23   free downloads that people have done, and you imagine that

24   those were paid sales, and you estimate how much money

25   you've lost by the free sales not having been paid; is that

1    a line of thinking that you follow?

2    A.  I don't think I've done it that way.  In my mind, what

3    I've considered is that given the number of users on these

4    services and the fact that, you know, before these services

5    existed, many of those people would be paying customers, I

6    think you can't argue with the fact that there's significant

7    damage there.

8    Q.  We're looking for significant damage that Joel caused.

9    Do you distinguish Joel from the rest, or do you just lump

10   in Joel with the totality, it's the totality you're talking

11   about?

12   A.  Joel is a flagrant infringer of copyright who, as I

13   testified before, moves from platform to platform to

14   platform, and so I don't think he -- I think -- I don't know

15   how to answer that question.

16   Q.  Sony owns a lot of the music of Michael Jackson; am I

17   right?

18   A.  Yes, we had an exclusive recording agreement with

19   Michael Jackson for many years and own many of those

20   recordings, or at least have an exclusive license to those

21   recordings.

22   Q.  So you must feel that in the last few months, weeks

23   following Michael Jackson's death, Sony lost a huge amount

24   of money?

25            MR. OPPENHEIM:  Well, I --

1          THE COURT:  Sustained.

2    Q.  Isn't it a fact, Mr. Leak, that Sony broke records

3    making money in the aftermath of Michael Jackson's death?

4          MR. OPPENHEIM:  Your Honor.

5          THE COURT:  Sustained.

6    Q.  Isn't it a fact that Michael Jackson's death --

7          MR. OPPENHEIM:  Your Honor, he's asking the

8    questions in order to try to testify himself.

9          THE COURT:  Sustained.

10         MR. OPPENHEIM:  I'd ask that the questions be

11   stricken from the record, too.

12         THE COURT:  Sustained.

13   Q.  Mr. Leak, you testified that the copyright registration

14   here to each of the songs is in the name of Sony and that

15   these tracks are registered, that's your testimony?

16   A.  My testimony is that, yes, that they're owned by Sony

17   BMG Music Entertainment or Arista Records, LLC and that

18   they're all registered.

19   Q.  Now, isn't it a fact that the tracks themselves are not

20   individually registered, what's registered is the album?

21   A.  The album is registered, and the tracks per advice from

22   the copyright office are given copyright protection through

23   the registration of the album.

24   Q.  And listed as works for hire?

25   A.  The album is listed as a work for hire.

1  Q.  And the work underneath, that is, the individual artists

2  then are not the copyright holders at any point, they are

3  simply hired like studio musicians by the company?

4  A.  Well, they're not hired like studio musicians, but we

5  have contracts with these artists where we pay them in most

6  cases millions of dollars to make these recordings, but

7  to -- sorry, I got lost in your question.

8         THE COURT:  Individual artists don't hold the

9  copyrights is the question.

10  A.  In these instances, they do not.  They're owned by Sony

11  or Arista.

12  Q.  So the project that you register is the album, yes?

13  A.  We register the album, and as I testified, the copyright

14  office has advised and the law provides that we get

15  protection for the individual tracks.

16  Q.  And in terms of this argument that violating the

17  copyright hurts the artists, it's not the case that the

18  artists hold the copyright?

19  A.  Are you done?

20  Q.  At least that far, yes or no.

21  A.  I didn't mean.  Yes, what it means is that the artist

22  does not own the copyright, however, we pay royalties on

23  every sale to artists, to songwriters, in some cases,

24  producers, so there are lots of people who get a piece of

25  the money that comes in for the sale of one of these tracks,

1   including the artist, and oftentimes depending on the level

2   of the artist, that can be a very significant royalty.

3   Q.  But let's just be clear on the fact that I want to

4   establish.  We're not talking in any of these cases about

5   the artists, the musicians actually owning the copyright,

6   they're not the copyright holder and they never will be?

7   A.  They're not the copyright owner, but they, as I just

8   explained, they benefit from any exploitation of the

9   copyright through royalties, so any of these sales that we

10  lost on KazaA artists would have made lots of money from

11  that, including songwriters.

12  Q.  When you played the CD here, as you did when it was just

13  played just earlier, was that a violation of the performance

14  rights?

15  A.  I don't have a view on that.

16  Q.  Was anybody given permission to play that in a public

17  place?

18  A.  I only recorded it.

19       MR. OPPENHEIM:  Objection, your Honor.

20       THE COURT:  Sustained.  This is a legal question

21  which is beyond the scope of his testimony.  Go on.

22  Q.  Do I understand correctly that the RIAA or you as

23  plaintiff for Sony has effectively called off this

24  litigation campaign now, that is, you're not suing new

25  people somehow?

1            MR. OPPENHEIM:  Objection, your Honor.  I'm not

2     sure that this witness can testify to this.

3            THE COURT:  Actually I thought that that came out

4     in his direct examination, which was the litigation strategy

5     is what you were bringing out.

6            MR. OPPENHEIM:  I was objecting to the form of the

7     question.

8            THE COURT:  Okay.  Then the objection is sustained

9     as to the form of the question, not the context.  That was

10    opened up in the direct examination.

11    Q.  Has this RIAA litigation campaign against music fans

12    ended now?

13    A.  We are no longer initiating new cases, we are continuing

14    to prosecute the cases that exist, and we obviously reserve

15    the right to initiate new cases at any time.

16    Q.  And the reason you called off the campaign was what?

17    A.  I wasn't really involved in that decision so I can't

18    speak to it.

19    Q.  But the reason that you're pursuing this case is to

20    educate the public?

21    A.  It's part of the campaign to educate the public and to

22    pursue our rights.

23    Q.  And you're calling off that campaign now because why?

24            THE COURT:  Asked and answered.  He said he didn't

25    know.  He wasn't a participant.  Next question.

1    Q.  But you're continuing this lawsuit.  Why?

2    A.  As I said, we are continuing all the existing

3    lawsuits.

4    Q.  Why?

5    A.  Because we believe our rights have been violated and

6    because we were unable to settle the case.

7    Q.  Why would you want to settle the case?

8            THE COURT:  Why was he unable to settle the case?

9            MR. NESSON:  Yes.

10            THE COURT:  The objection is sustained.  Go on.

11            MR. NESSON:  He actually opened settlement in his

12    opening, your Honor.

13            THE COURT:  The fact that settlements were offered

14    it seems to me you didn't object, but we oughtn't be getting

15    into that part of the case at all.  The objection not -- I

16    am objecting.  It is sustained.  There are all sorts of

17    reasons why settlements don't take place that have nothing

18    to do with the four corners of this case, that have nothing

19    to do with what you're litigating.  Go on, Mr. Nesson.

20            MR. NESSON:  May I have a moment, your Honor, to

21    consult with others?

22            THE COURT:  Yes.

23    Q.  You testified in other lawsuits like this?

24    A.  I have.

25    Q.  Describe your experience.

1  A.  I testified in a trial I think it was about a month

2  ago.

3  Q.  And this is the trial of Jammie Thomas-Rasset?

4  A.  Yes.

5  Q.  In Minnesota?

6  A.  It was in Minneapolis.

7  Q.  It was in Minneapolis, Minnesota?

8  A.  Yes.

9  Q.  And that was also to educate the public?

10  A.  As I said, to pursue our rights and as part of the

11  campaign to deter others and get the message out.

12  Q.  Deterrence, that is your purpose?

13  A.  It's certainly part of the purpose.

14  Q.  The idea is to get a result that is frightening to

15  people so that they are deterred?

16      MR. OPPENHEIM:  Objection, your Honor.

17      THE COURT:  Overruled.  Go on.

18  A.  I wouldn't say frightening, it's to, again, to inform

19  people that we have exclusive rights on these recordings and

20  that online file sharing networks are illegal and that they

21  should not use them.

22  Q.  And that if they do use them, they may be subject to

23  bankrupting liability; is that right?

24  A.  That's certainly not our intention.  As I had testified

25  before, you know, the vast majority of these cases are

1    settled in the very early stages, really before they're

2    cases, they're settled when they're claims, so, again, I

3    guess I would say we took the Jammie Thomas case to trial

4    because we were pursuing our rights and because we were

5    unable to settle the case, and we left it to the jury to

6    determine what the appropriate measure of damages were.

7    Q.  And you're asking the jury for damages in a range that

8    includes up to $150,000 per infringement?

9    A.  The copyright statute provides that for willful

10   infringement, the range of damages is $750 per work

11   infringed to $150,000 per work infringed.  It's the jury's

12   role if they find infringement to determine what the

13   appropriate number is, and there are a variety of factors,

14   which I'm sure the Judge will instruct them on.

15   Q.  In your work in anti-piracy with Sony, have you dealt

16   with situations other than music fans downloading music,

17   other forms of piracy?

18   A.  Certainly.

19   Q.  Have you ever dealt with commercial infringement?

20   A.  I have dealt with all sorts of infringement actions from

21   sample claims to someone saying I wrote the song, so this is

22   copyright infringement, we have dealt with people in, you

23   know, bazaars on the street selling illegal CDs, we've dealt

24   with various forms of infringement and/or piracy through the

25   course of my career.

1    Q.  So you have at times dealt with criminal copyright

2    infringers?

3    A.  Yes.

4    Q.  And as you've suggested in your testimony, there is a

5    separate section of the statute that applies to criminal

6    copyright infringers?

7    A.  That's right.

8    Q.  But a criminal copyright infringer when you prosecute

9    him, that's going to prison and paying a fine, that's not

10   actually paying money to you?

11   A.  Right, because this is --

12         MR. OPPENHEIM:  Objection, your Honor.  It

13   misstates the law.

14         THE COURT:  Sustained.

15   Q.  Could you give us just an example, please, of an example

16   of a criminal copyright syndicate, a committed commercial

17   copyright infringing syndicate?

18         MR. OPPENHEIM:  Objection.

19         THE COURT:  Sustained.

20   Q.  Would you say that a criminal infringer was acting

21   willfully?

22         MR. OPPENHEIM:  Objection.

23         THE COURT:  Sustained.

24   Q.  Would you say that you would be entitled to statutory

25   damages against a criminal infringer?

1   A.  It is possible that a criminal infringement action could

2   also have a civil component, but so there could be a

3   situation, but it's important to note the difference.  This

4   is not a criminal case.

5   Q.  Yes, I understand.

6   A.  Okay.

7   Q.  If it was a criminal case, things would be quite

8   different in fact.

9   A.  That's right.

10  Q.  But as a civil case, it falls into this category where

11  if the infringement is willful, then a higher category of

12  punishment can be inflicted?

13          MR. OPPENHEIM:  Objection.  It's both

14  argumentative and asked and answered.

15          THE COURT:  It's asked and answered, sustained.

16  Q.  Relative to Joel's culpability in your mind, would you

17  consider him to be less culpable than a criminal infringer?

18          THE COURT:  If the plaintiff isn't objecting, I'm

19  not saying anything.  Go on.  This witness is being asked

20  for his determination of the relative culpability of the

21  defendant.  Is that your question?

22          MR. NESSON:  Your Honor, I'm trying to

23  establish --

24          THE COURT:  No, no, tell me if that's your

25  question.

1          MR. NESSON:  Yes.

2          THE COURT:  Okay.

3    A.   Okay.  It's the relative culpability of a criminal

4    infringer and Mr. Tenenbaum?

5    Q.   Yes.

6    A.   First of all, it's very difficult to answer.  It's a

7    hypothetical question, so a lot would depend on what exactly

8    the criminal infringer was doing obviously, but, you know, I

9    personally think Mr. Tenenbaum's behavior of moving from

10   file sharing platform to platform to platform just shows a

11   blatant -- even after we sued him and even after as I

12   understand it his father told him to stop doing it, is

13   blatant copyright infringement, but we are pursuing a civil

14   case against him.

15   Q.   You haven't answered my question.

16   A.   I guess I'm telling you I can't answer your question

17   because the criminal -- I don't know who this criminal

18   defendant is.  All I know is what we have in this case.

19   Q.   And would you consider the original ripper, somebody

20   let's hypothetically say part of a gang of rippers who want

21   to get back at the industry for all the evil they've done in

22   the past and they're doing it by ripping their stuff and

23   putting it up on KazaA, would you consider that kind of

24   person more culpable or less culpable than Joel?

25          MR. OPPENHEIM:  Objection.

1          THE COURT:  Sustained.

2    Q.  Were each of the CDs of the five songs that -- well,

3    let's make them the three of the five that Sony was involved

4    in, were they put out onto the market with any kind of

5    digital protection, any kind of encryption?

6    A.  I don't believe so.

7    Q.  So it was just possible to take your product just as you

8    put it out on the market and put it into the slot on a

9    computer such as are sitting around here on the desks --

10          MR. OPPENHEIM:  Objection.

11   Q.  -- hit the button and the digital copy would be

12   transferred to the machine?

13          MR. OPPENHEIM:  Objection, your Honor.  It exceeds

14   the scope.  There will be a witness later that he can easily

15   ask questions to.

16          THE COURT:  You can have it.  Go on, you can have

17   it.

18   A.  I'm not familiar with the technology surrounding DRM

19   protection, so I really can't speak to that.

20   Q.  But you didn't have any on these CDs?

21   A.  I do not believe we did.

22   Q.  None.  So that might one suggest that in the environment

23   where the industry is now complaining that its work has been

24   widely distributed that the industry is at least partly

25   responsible for the situation?

1        MR. OPPENHEIM:  Objection.

2        THE COURT:  Sustained.

3   Q.  If one is considering the justness of the damage that

4   Joel should pay to you, would it not be appropriate to

5   consider whether you were in some way responsible for the

6   situation that Joel now finds himself in?

7        MR. OPPENHEIM:  Objection.

8        THE COURT:  Sustained.

9        MR. NESSON:  No further questions.

10       THE COURT:  Counsel, any questions?

11       MR. OPPENHEIM:  Just a few, your Honor.

12                 REDIRECT EXAMINATION

13   BY MR. OPPENHEIM:

14   Q.  Mr. Leak, do you have an exhibit I think it was

15   Exhibit 54A in front of you with the revenue figures?

16   A.  I do.

17   Q.  Mr. Leak, you were asked -- sorry about that.  I just

18   want to get it up on the screen so the jury can see it.  You

19   were asked, for instance, the revenues of one particular

20   track here, one particular track at issue here, and one of

21   them was the Aerosmith "Pink" track; were you not?

22   A.  Yes.

23   Q.  And you walked through that these revenue figures

24   increased from '99 to 2002 then down to 2003.  Can you

25   describe why it is that with respect to physical album

1    revenues that they would have gone up in the middle of the

2    life cycle of a track?

3    A.  Well, I believe in this example --

4            MR. FEINBERG:  Objection to the life cycle

5    portion, Judge, I don't know what the life cycle of a track

6    is.

7            THE COURT:  Can you clarify?

8    Q.  Would you like to describe generally how the life cycle

9    of a track works?

10   A.  Yes, a track, usually a track is contained on the

11   initial release, and it may or may not be a single, it may

12   or may not be a hit, one can never predict that going into

13   the release of an album, and then once a track takes off

14   with the public, it may have extra, you know, moments in

15   time.  It could be that that the track was used in a sound

16   track or on a television show and so people are interested

17   in that.

18   Q.  When you say a sound track, you mean like a movie?

19   A.  I'm sorry, a movie, so the track is used in a movie or a

20   television show, and people remember it or like it and would

21   like to buy it, new people as opposed to the people who

22   bought the original album.  The other thing that could

23   happen is you could release a greatest hits album, and if

24   that track is included on that album, you may see a bump in

25   revenues.

1   Q.  So, revenues that otherwise would normally decline over

2   time as an album was initially released and went to

3   catalogue, you might see a bump in that?

4   A.  You might see a bump for one of those reasons.

5   Q.  Now, looking at Aerosmith "Pink," for instance, do you

6   see such a bump?

7   A.  Yes, in 2001 the album's gross revenues were $500,000,

8   in 2002, and I should be careful here because what I just

9   said -- I'll give those numbers, then I'll explain.  In

10  2002, the gross album revenue numbers for this track for

11  2001 were 500,000; in 2002, they jumped to $13 million.  I

12  happen to know, I don't know exactly what's attributable to

13  it, but that's when an Aerosmith greatest hits release

14  containing this track was released, so in addition to the

15  intial album, there was a new album of greatest hits that

16  included this track.

17  Q.  That would kind of revive the lifecycle?

18  A.  It could, hopefully, that's the hope.  That's why we are

19  in this business.

20  Q.  Now, a moment ago you were going to explain something

21  about these physical album revenue figures.  Are these album

22  revenue figures specific to just that track so as I look

23  at --

24  A.  No, in other words, is it allocated to the track, no,

25  whatever album at issue, this is the entire album.

1    Q.   So this is the entirety of every album?

2    A.   That contained that track.

3    Q.   That ever contained Aerosmith's "Pink" track is included

4    in this list?

5    A.   That's right.

6    Q.   And for all the revenue figures, that's how they were

7    contemplated?

8    A.   Except for the track sales.

9    Q.   Now you've gone down lower in the page now?

10   A.   Right, you'll see on digital track sales, those are

11   solely for the particular track at issue as opposed to

12   digital album sales that are once again talking about an

13   online sale of an album and then above any albums that

14   contain that track.

15   Q.   We'll get down to that digital track sales for a minute,

16   I just want to ask you a question here.  Of the albums that

17   Sony and its entities released, do most of them make

18   revenues such as that described on this page?

19   A.   No.  Part of what we do is we sort of gamble on artists,

20   we sign a lot of artists, many of whom you would have never

21   heard of who we work with, pay the money, we work with them,

22   we make an album, and unfortunately the public doesn't

23   appreciate all of the artists that we work with, so a lot of

24   albums we make, we lose money from the outset because it

25   doesn't sell, and, therefore, any money we invested in it,

1    we never make back.

2    Q.  And how do you stay in business if you're losing money

3    on all of those albums?

4    A.  Well, you hopefully offset those loses that the public

5    likes and is willing to pay for.

6    Q.  And would you include the seven tracks that are at issue

7    in this case by Sony Music and Arista among those that you

8    try to make money back on?

9    A.  Absolutely.

10   Q.  Because these were bigger hits?

11   A.  They were hits, and hopefully you can offset some of

12   your other loses with the sales of the hits.

13   Q.  And if you don't make money on your hits, what happens

14   to the rest of your business and your efforts to release the

15   other artists?

16   A.  Well, it's definitely impacted.  It's impacted our

17   ability in the last several years to have the money

18   available to nuture new talent.  They're used to be a

19   concept of something called a sophomore album because you

20   signed the artist, you worked with them, maybe the first

21   album didn't work, but the second album did, and they called

22   it the sophomore album.  A perfect example of that from the

23   Sony perspective is Bruce Springstein.  His initial releases

24   no one really liked, and suddenly he found the sound.  We

25   don't have the resources anymore or the employees to do

1    that.

2    Q.   To do what?

3    A.   To nuture artists.

4         MR. FEINBERG:  Objection, your Honor.

5         THE COURT:  Overruled.

6    A.   To nuture artists so that we can have the time span to

7    find that track that will sell and that album that will

8    sell.

9    Q.   I want to turn now down to the digital track sales at

10   the lower part of the page.  Mr. Nesson was asking you

11   questions and pointing out that the digital track sales were

12   dramatically lower than the physical sales; is that right?

13   A.   Yes.

14   Q.   Why is that?

15   A.   Well, I think part of that reason is why we're here

16   today, which is online piracy, part of it is you're selling

17   tracks as opposed to albums, so you're selling one track,

18   not twelve tracks.  That's my understanding.

19   Q.   Is the market for selling digital tracks different?

20   A.   Yeah, we're still -- it's a developing market, so we're

21   continuing to explore how we can get our music online for

22   people to buy.

23        THE COURT:  Why don't we stop at this point.

24   We'll see you all at two o'clock.  My suggestion is that the

25   jury, it would be easier to eat in our fabulous cafeteria

1    that's right in the building.  I also want to caution you

2    that if you run into the witnesses or the parties in this

3    case, they won't talk to you.  There are different rules

4    here.  Nobody is to talk to you or address you in any way,

5    so it would be impolite, but I'm sure you can understand

6    why.  All rise for the jury.  Please leave your notebooks on

7    your chair.

8              ( JURORS EXITED THE COURTROOM.)

9                 (A RECESS WAS TAKEN.)

10             THE CLERK:  All rise for the jury.

11             (JURORS ENTERED THE COURTROOM.)

12             THE COURT:  You can be seated.  Proceed,

13   Mr. Oppenheim.

14             MR. OPPENHEIM:  Thank you, your Honor.

15   Q.  Mr. Leak, before lunch when Mr. Nesson was

16   cross-examining you, he asked you questions about the

17   purpose of this suit being deterrence and vindication.  Were

18   there other purposes behind your filing this lawsuit?

19   A.  Absolutely, we've been damaged, and we're seeking

20   redress for those damages.

21   Q.  Thank you, Mr. Leak.

22             MR. OPPENHEIM:  No further questions, your

23   Honor.

24             THE COURT:  Recross, redirect rather.

25             MR. NESSON:  No questions, your Honor.

1          THE COURT:  Next witness.  Thank you.

2          MR. OPPENHEIM:  Your Honor, plaintiffs will call

3  Mr. Chris Connelly.

4          CHRIS CONNELLY, having been duly sworn by the

5  Clerk, testified as follows:

6                    DIRECT EXAMINATION

7  BY MR. OPPENHEIM:

8  Q.  Good afternoon, Mr. Connelly.

9  A.  Good afternoon.

10  Q.  Could you please describe for the jury what you do for a

11  living.

12  A.  I work for MediaDefender.

13  Q.  Can you describe the relationship between MediaDefender

14  and MediaSentry, the other entity that's been described in

15  this courtroom?

16  A.  MediaDefender had acquired a company that I worked for

17  which was MediaSentry.

18          THE COURT:  You're going to have to talk more

19  slowly before the court reporter has a coronary.

20          MR. NESSON:  Could I just ask that he repeat that

21  answer.  I couldn't hear it at all.

22          THE COURT:  There you go, talk slowly and more

23  loud.

24  A.  I work for MediaDefender which had acquired MediaSentry,

25  which I used to work for MediaSentry.

1    Q.   That's a recent acquisition?

2    A.   Yes.

3    Q.   If it's all right with you and the Court, for simplicity

4    sake, I'll just refer to the entity as MediaSentry which are

5    the operations that you work for.

6    A.   That's fine.

7    Q.   Is that all right?

8    A.   Yes.

9    Q.   Can you tell us in general terms what it is that

10   MediaSentry does?

11   A.   We protect the copyrights of our clients from

12   infringement on the Internet.

13   Q.   And how long have you worked for MediaSentry?

14   A.   Since June of 2004.

15   Q.   What specifically do you do for MediaSentry?

16   A.   Protect the copyrights of our clients from infringement

17   on the Internet, on peer-to-peer programs.

18   Q.   And you're directly involved in that?

19   A.   Yes.

20   Q.   While you were at MediaSentry in 2004, did you do work

21   for the record company plaintiffs in this case?

22   A.   Yes.

23   Q.   Can you explain in general terms at a high level what it

24   is that MediaSentry was doing for the plaintiffs in this

25   case?

1    A.  We were searching for copyright infringement on the

2    KazaA or the FastTrack network, which is predominantly used

3    by the KazaA location.

4    Q.  I'm told it's still a little difficult to hear you.

5    Maybe you could pull that microphone closer to you and that

6    will help.  Give that a shot.  Okay.  So, I think you just

7    mentioned that you did work for the plaintiffs in this case

8    collecting evidence of infringement; is that correct?

9    A.  Yes.

10   Q.  And was it specific to any type of Internet

11   infringement?

12   A.  Music tracks on the KazaA network.

13   Q.  On the KazaA network.  And KazaA is a peer-to-peer

14   network?

15   A.  Yes.

16   Q.  Can you explain at a high level what a peer-to-peer

17   network is?

18   A.  It is a software application that users download and

19   install and run on their local machine, and it allows them

20   to join this virtual network of users that are sharing,

21   distributing digital files so that the users can download

22   them and join the network and distribute them as well.

23   Q.  And is peer-to-peer frequently referred in the shorthand

24   as p2p?

25   A.  Yes, it is.

1   Q.  Are you personally familiar with KazaA?

2   A.  I am.

3   Q.  And in the course of your work, have you used KazaA?

4   A.  Yes, I have.

5   Q.  And does MediaSentry actually use the KazaA application

6   as part of its evidence collection process?

7   A.  It does.

8   Q.  When you used KazaA, where did you obtain the software

9   from?

10  A.  From the Internet going to KazaA.com, you can download

11  it.

12          MR. NESSON:  Your Honor, I didn't hear a word of

13  that.

14          THE COURT:  You need to repeat what you just

15  said.

16  A.  Just like a typical user would, MediaSentry goes to

17  website KazaA.com and downloads the software application.

18  Q.  After you've downloaded the software application, what

19  do you have to do with it to use it?

20  A.  Just like any other software, you have to install it on

21  your computer.

22  Q.  And after you install it, what do you do next to use

23  it?

24  A.  You then run the software, and upon running it for the

25  first time, the KazaA application prompts you for some

1   information.  It requires you to enter a user name.

2   Q.  A what, I'm sorry?

3   A.  A user name.

4   Q.  A user name.  Is this what would be referred to as the

5   configuration process?

6   A.  Yes.

7   Q.  And who gives out user names?

8   A.  Nobody.  It's a blank field that somebody has to make up

9   something and put something in.

10  Q.  So, it's a user-generated user name?

11  A.  Yes, it's self-selected.

12  Q.  Self-selected.  And does the configuration process, do

13  you have to identify specific folders for the system to

14  use?

15  A.  Yes, you have to set up what is known as the shared

16  folder, and this is the library in which your files will be

17  downloaded to and shared from.

18  Q.  So you establish a shared folder on the computer?

19  A.  Yes.

20  Q.  And how is it that files get put in music files, for

21  instance, get put into a shared directory or a shared

22  folder?

23  A.  By using the KazaA application, the KazaA application

24  itself downloads files into this directory, and it's a

25  folder just like any other on your computer where you can

1    copy and paste files from any other source into that

2    folder.

3    Q.  Once the software is on your computer, you configured it

4    by picking a user name and identified a shared directory,

5    what can you do with it?

6    A.  You can then use the application to search the network

7    for files that you want to obtain, download those files and

8    then distribute them back to users just like you that you

9    downloaded it from.

10   Q.  Okay.  Well, let's take that a step at a time.  How do

11   you go about searching for a file?

12   A.  There is a feature that's entitled search.  Once you

13   click on that, you're given a prompt where you can type in

14   free form, whatever it is you want to search the network

15   for.

16   Q.  What does that prompt look like?

17   A.  It looks very similar to a global search.

18   Q.  After you type in search request, what do the results

19   look like?

20   A.  The results come back in a form of files that you could

21   select to obtain.

22   Q.  Okay.  And if you see a file that you want to select to

23   obtain, as you said, what do you do?

24   A.  You then either double click it or right click it and

25   use the menu options to download that file from the

1   network.

2   Q.   And so you click that file, and what happens?

3   A.   And the file is distributed from the network to you and

4   stored in your shared folder.

5   Q.   Okay.  What's it's in the shared folder, what happens to

6   the file then?

7   A.   It is distributed back onto the network.

8   Q.   If you wanted to move it out of the shared folder, could

9   you do that?

10   A.   Yes.

11   Q.   And how would you go about doing that?

12   A.   Just as you would move the file around on the computer

13   in any other folder, you could drag it and drop it into

14   another directory, you could delete it, you could do

15   whatever it is you wanted to do with it.

16   Q.   If you moved a file out of the shared directory, in

17   either of the ways you describe, would it continue to be

18   distributed back onto the network?

19   A.   No.

20   Q.   Let me turn now to specifically what MediaSentry did in

21   collecting evidence in this case.  Are you personally

22   familiar with the evidence that was collected in this

23   case?

24   A.   Yes.

25   Q.   And how are you personally familiar?

1    A.   I support and maintain the applications that automate

2    the process of collecting evidence.

3    Q.   Can you describe, and let's keep it a a high level for a

4    moment, how MediaSentry used the KazaA application to

5    collect evidence in this case?

6    A.   It uses it just like any other user.  What it does, it

7    uses the search feature to find files that are being

8    distributed on the network, specifically music files, and

9    then it looks for the results, and each one of those results

10   uses a feature in the application to see the other files

11   that the user is using as well, and it uses that feature.

12   Q.   Let's talk about that feature for a second.  How does

13   that work?  You want to see other files that a person is

14   distributing.  How do you do that?

15   A.   What you do is you select the feature of the application

16   that says directory or browse, and what it does is it shows

17   you the full library of files that are being distributed by

18   the user, and this feature is available in the application

19   so that typically if there is a file that you're searching

20   for, chances are, and the user has it, chances are that user

21   also has other files that you may be interested in as well

22   because you probably share the same tastes.

23   Q.   And then you can see everything that that other user has

24   in their shared directory so you can download more if you

25   want to?

1   A.   That's correct.

2   Q.   I interrupted you as you were going through at a high

3   level what MediaSentry did to collect evidence here.  You

4   got to the directory browse step.  What do you do after the

5   directory browse step?

6   A.   We record the results of this directory browse in the

7   form of screen shots.  We then select all the files that are

8   being distributed to be downloaded, and we download a

9   portion of all those files.

10  Q.   A portion of every file?

11  A.   Yes.

12  Q.   Okay.  What do you do next?

13  A.   We then select a few of those files to be downloaded in

14  their entirety.

15  Q.   Okay.  Is that the end of the process?

16  A.   No.

17  Q.   What do you do next?

18  A.   During the download, we record the data package that

19  were sent and received from our computers to illustrate the

20  download, and then we log this information in additional log

21  files.

22  Q.   Are we done now?

23  A.   Not completely.

24  Q.   Okay.  What do you do next?

25  A.   We then use a feature within our functionality within

1  the Windows operating system known as a tracer which shows

2  the path on the Internet between the two computers, and

3  that's it.

4  Q.  And now we're done?

5  A.  Yeah.

6  Q.  Okay.  In this process, is MediaSentry doing anything

7  that a normal user couldn't do?

8  A.  Other than recording this activity, no.

9  Q.  Has MediaSentry ever tested its software to make sure

10 it's accurate?

11 A.  Yes, it has.

12 Q.  And what have the results of those tests shown?

13 A.  That there's been a zero error rate.

14 Q.  What does zero error rate mean?

15 A.  That we've never collected data from an IP address and

16 found that it to be wrong or that it's ever been wrong.

17 Q.  Were you involved in the collection of evidence in this

18 case, collection and review of evidence in this case?

19 A.  Yes.

20 Q.  When was the evidence collected in this case?

21 A.  On August 10th, 2004.

22 Q.  If I could ask you to please turn to Exhibit 13.  Let's

23 turn to page 3.  Let's try page 4.

24        THE COURT:  Everyone's screen is on and yours is

25 working?

1    MR. REYNOLDS:  Yes, your Honor, plaintiffs' is

2  working.

3  Q.  Good enough for our purposes, I think.  Can you describe

4  what this document is?

5  A.  This document is one of the screen capture images that

6  were recorded showing the contents of a user shared

7  directory.

8  Q.  So when you talked about doing a directory browse, is

9  this a directory browse?

10  A.  Yes.

11  Q.  And who is it a directory browse of?

12  A.  You can see here on the left that it shows this is a

13  directory browser of a user by the name of sublimeguy14.

14  Q.  So you're looking right here?

15  A.  Yes.

16  Q.  Okay.  Can you describe how it is before we talk about

17  what this is, this is evidence that was collected by

18  MediaSentry?

19  A.  Yes.

20  Q.  After MediaSentry collects the evidence, what does it do

21  to preserve the evidence it collects?

22  A.  It transfers it and stores it on a secured data

23  repository.

24  Q.  And how does it make sure that the data repository is

25  secure?

1   A.  It has limited access, and it is also stored in a

2   read-only format, so once the files are copied onto this

3   repository, they cannot be modified.

4   Q.  I'm going to ask you to slow down in your answers

5   because I'm having trouble keeping up with you.

6   A.  Sorry.

7   Q.  You said it's limited access, what does that mean?

8   A.  It means that only select users in the applications have

9   permission to even view the material that's on this

10  repository.

11  Q.  You said something about read only?

12  A.  Yes.

13  Q.  Can you describe also?

14  A.  That the security system on the server protects the

15  files, that they cannot be modified once they're created.

16  Q.  So once this evidence is collected, nobody can mess with

17  it?

18  A.  Yes.

19  Q.  Let's now, if you would, could you walk us through this

20  document and explain to us what it shows column by column

21  from left to right please.

22  A.  This page is just one of many that show the full

23  contents of this user shared directory, but this page shows

24  a few of the files that are being distributed.  Each line is

25  one of the files that are being distributed.  It shows the

1    user name, the file name and some other information such as

2    the artist, the file size and what it's classified as the

3    media type.

4    Q.   So left-hand side, user name, middle is the name of the

5    file, so, for instance, I see some Nine Inch Nails files,

6    some Outkast files; is that right?

7    A.   Yes.

8    Q.   Next column shows the artist name, sometimes it's Nine

9    Inch Nails, sometimes Outkast, sometimes Nirvana; is that

10   right?

11   A.   Yes.

12   Q.   And what does size reference?

13   A.   The actual size of the file.

14   Q.   The bits?

15   A.   Yes.

16   Q.   And the media type?

17   A.   The media type is classified by the file extension.

18   Q.   Okay.  Can you describe for us what, and I'm going to

19   move this a little bit so everybody can see.  There is a

20   status bar at the bottom of the document.  Do you see

21   that?

22   A.   Yes.

23   Q.   Can you starting on the left-hand side and going across

24   describe for us what that status bar says?

25   A.   On the left, it says, "Found 1153 files," and this is

1    account of the total number of files that were in this user

2    shared directory.

3    Q.  The number of files being distributed?

4    A.  Yes.

5    Q.  Okay.

6    A.  The next group of numbers is count of the numbers of

7    users online.  This is showing over 91,000 users.

8    Q.  At this one point in time?

9    A.  Yes.

10   Q.  Next?

11   A.  It's then showing that of those users, they are sharing

12   or distributing onto the network collectively over 91

13   million files.

14   Q.  Okay.

15   A.  Then finally at the end, it says, "Not sharing any

16   files," and as these images are recorded on the MediaSentry

17   computer, this is indicating that the MediaSentry computer

18   is not sharing any files onto the network.

19   Q.  Is it indicating that sublimeguy14 wasn't sharing any

20   files?

21   A.  No, it's not.

22   Q.  I want to turn for a moment to the 91,848 users online

23   at the moment, that number in the middle.  Is that a typical

24   number for what you would see in evidence you collected at

25   this point in time on KazaA?

1    A.   No, it's not typical.

2    Q.   What would be more typical?

3    A.   Somewhere between two and a half and three million

4    users.

5    Q.   After MediaSentry captured this evidence, the screen

6    shots, what did it do next in its evidence collection

7    process?

8    A.   It then selected every one of these files to be

9    downloaded.

10   Q.   And could you please turn to Exhibit 16.

11   A.   Okay.

12   Q.   This is before I put this on here, this is a lengthy

13   document, right?

14   A.   Yes.

15   Q.   240 some pages, roughly something like that?

16   A.   Yeah.

17   Q.   We're not going to go through every page.  Let's just

18   hit a few.  Can you describe what this document is, please?

19   A.   This is the user log as it shows on the top, and what

20   this is, this is a recording of all the files that were

21   being distributed which show some additional information

22   that's not shown in the KazaA application.

23   Q.   Okay.  So can you describe for us how it is that you

24   capture this user log?

25   A.   Upon the download of all the files in the shared

1    directory, the information that's received from that partial

2    download gives us this information that we record and show

3    in this log file.

4    Q.  Okay.  Can you describe for us the very beginning of the

5    top of this document, the information that it's providing

6    here?

7    A.  It says that this log was created to show the contents

8    of sublimeguy14 shared directory, it was created on

9    August 10, 2004 at 12:46 a.m. eastern time, it shows that

10   the user name was sublimeguy14, and it shows the IP address

11   of that user, which is 68.227.185.38.

12   Q.  Then below it it indicates total number of files,

13   right?

14   A.  Yes.

15   Q.  And this is the number of the files of the document has

16   information on?

17   A.  That's correct.

18   Q.  And what's the number there?

19   A.  1148.

20   Q.  Now, that's different than the 1153 that we saw in the

21   last exhibit in the lower left-hand corner; is that

22   correct?

23   A.  It is.

24   Q.  Why is it different?

25   A.  This document contains all the information for each one

1    of the files that it was able to download a portion of the

2    file, so the MediaSentry computer selects all the files to

3    download, it then waits some amount of time, and it then

4    stops the KazaA application and records what it has

5    received, and at that point it had received information on

6    1148 of those files.

7    Q.  So MediaSentry never received information on five of the

8    files that were listed on the screen shots?

9    A.  At the time that it decided to stop recording the

10   information, yes.

11   Q.  Does that mean that there were only 1148 files in the

12   share directory?

13   A.  No.

14   Q.  What does it mean?

15   A.  It just means that MediaSentry obtained a portion of a

16   download for 1184 of those files, 1148, sorry.

17   Q.  And the data that's in this document, where did it come

18   from?

19   A.  It came from the files themselves from sublimeguy14's

20   computer.

21   Q.  From the user's computer that was distributing?

22   A.  Yes.

23   Q.  Why is it that MediaSentry goes through the process of

24   downloading the beginning of each one of these files?

25   A.  It selects all these files for download to actually

1   receive them from the user so that they were distributed to

2   MediaSentry, a portion of the files, and it does it to

3   ensure that they are being distributed, and it does it to

4   obtain additional information that's shown here on this

5   log.

6   Q.  Why don't we turn to page 350.  It's just one page and

7   walk through one of the data sets here.  There are 1148, but

8   let's just focus on one here, and I've selected the one

9   associated with the Green Day track, "When I Come Around,"

10  which is in this case.

11          THE COURT:  What is the page?

12          MR. OPPENHEIM:  I'm sorry, the page numbers you

13  have would be 16-236, your Honor.  Sorry, we have two sets

14  of these.

15          THE COURT:  Does defense counsel have this page as

16  well?  Are you on the right page, 16-236?

17          MR. OPPENHEIM:  You may have 350 or 16-236,

18  depending which version you're looking at.

19          MR. FEINBERG:  What line are you looking at on

20  350?

21          MR. OPPENHEIM:  The Green Day track.

22          MR. FEINBERG:  I got it.  Thank you.

23          MR. OPPENHEIM:  Certainly.

24  Q.  Mr. Connelly can you walk through the information the

25  information MediaSentry collected with respect to each of

1   the 1148 tracks using this as an example?

2   A.   It shows the track title is "When I Come Around," and

3   the file name is Green Day - When I Come Around.mp3, MP3

4   showing it's a music file.  The file size is over two

5   megabytes, the artist is Green Day.  The play length of the

6   file is 2 minutes, 58 seconds, it came off the album Dookie,

7   it is in the English language, and a search key word for

8   this file would be "When I Come Around."  The resolution

9   isn't filled out, gendre' is listed under other, and the

10  quality is 128 bit rate, and the description field says

11  Robot Music.

12  Q.   And, Mr. Connelly with similar data collected with

13  respect to each of the files, 1148 files that was

14  distributed by sublimeguy14?

15  A.   Yes.

16  Q.   And that's what's in this document?

17  A.   Yes.

18  Q.   Now, you mention that this file in particular, you

19  mentioned dot MP3.  Can you explain what that is?

20  A.   MP3 is a very common music or audio file format, and

21  it's the predominant file that's shared on the KazaA

22  application or FastTrack network.

23  Q.   Okay.  Could you please turn to page 312 to 313 which

24  would be, your Honor, according to your page numbers 16-198

25  to 199.  Now, we were just talking about MP3 files, but I

1    also see in this document there are files called .kpl files.

2    Can you describe what files those are?

3    A.   The kpl stands for KazaA playlist, and what it is is the

4    KazaA application in addition to allowing you to obtain and

5    distribute files, it also is a media player, and what these

6    kpl files are just contain a list of the files that the user

7    can select very quickly to play as a playlist, so if user

8    wants to say, well, okay, I want to put a bunch of files in

9    a category and I want to listen to them all without having

10   to select each one and play each one individually, they can

11   create this file called a kpl file.

12   Q.   So here I see a kpl file, Funk, "Emerging Artists," or

13   the next one down, HipHop, "Emerging Artists," this may be a

14   whole playlist of Funk, "Emerging Artists" all in a row so

15   the user could line it up and listen to the entire

16   playlist?

17   A.   Yes.

18   Q.   After you capture the information, the user log, what

19   does MediaSentry do next in its evidence collection

20   process?

21   A.   It then selects select number of files to be downloaded

22   in their entirety.

23   Q.   Okay.  Can you please turn to Exhibit 15.  Do you

24   recognize this document?

25   A.   Yes.

1  Q.  Could you describe what it is, please.

2  A.  This document is titled or known as the download data

3  log, and what this document shows are the data packets that

4  were sent and received from the MediaSentry computer and

5  from sublimeguy14's computer in order to transfer the

6  content of these files.

7  Q.  And this describes some of the process of downloading?

8  A.  Yes.

9  Q.  It doesn't actually show every bit of traveling, does

10  it?

11  A.  No.

12          THE COURT:  Was it your intention to have

13  Exhibit 50 on the screen?

14          MR. OPPENHEIM:  Yes.  15.

15          THE COURT:  15.  15, okay.  Go on.

16          MR. OPPENHEIM:  I'm sorry, I meant to say 15, your

17  Honor.

18          THE COURT:  Okay.

19          MR. OPPENHEIM:  My apologies.

20  Q.  Why is it you don't any of this document every single

21  bit that was transferred?

22  A.  It just doesn't appear to be necessary.  All we need to

23  really show is to illustrate that the download took place

24  and to illustrate that it came from the IP in question.

25  Q.  And this document is showing the download, the

1   downloading that MediaSentry did on August 10th, 2004 from

2   sublimeguy14@kazaa?

3   A.  Yes.

4   Q.  Okay.  I'd like to walk through each of the downloads

5   here quickly if we can starting at the first one at the top

6   of the page here, can you describe the first block and

7   second block of information?

8   A.  The first block, as you see, after it says, "download

9   info for file," the first block says sent packet, and this

10  is the request that the KazaA application running on the

11  MediaSentry computer made to sublimeguy14's computer

12  requesting to download the file Incubus "New Skin."

13  Q.  I'm looking at this first block, it says sent packet, it

14  says August 10, 2004, 12:49 a.m.

15  A.  Yeah.

16  Q.  Is that right?

17  A.  Yes.

18  Q.  And then it shows that the destination address is

19  68.227.185.38; is that right?

20  A.  Yes.

21  Q.  And that's the same IP address that you had for

22  sublimeguy14@kazaa earlier?

23  A.  Yes.

24  Q.  And then what does the next block of information show?

25  A.  The next block is title of received packet, and this is

1   the response that the MediaSentry computer received from

2   sublimeguy14's computer containing a portion of that file.

3   Q.  Okay.  This shows that you received a response, what is

4   that, two seconds later from the original request?

5   A.  Yes.

6   Q.  And how do you know that it's coming from

7   sublimeguy14?

8   A.  From the source IP address, which is the same, and also

9   you also see the user name in here, sublimeguy14.

10  Q.  Okay.  And this is showing a download of some of the

11  file for Incubus, "New Skin;" is that right?

12  A.  Yes.

13  Q.  And then at the very bottom of the page there's some,

14  and I'll use a technical term here, gobbledygook.  What is

15  this?

16  A.  This is the actual MP3 file or the beginning portion of

17  it, so if you were to open the MP3 file in notepad or any

18  type of text editor, this is exactly what you would see.

19  Q.  So this is the digital zeros and ones translated somehow

20  into readable format?

21  A.  Yes.

22  Q.  Let's turn to the next track that you downloaded which I

23  believe is Green Day, "Minority"?

24  A.  Yes.

25  Q.  Can you describe the process here?

1  A.  It's very similar to the first one, although here you'll

2  see that there were two sent packets.  The first one was

3  sent on August 10th, 2004 at 12:49 and 15 seconds a.m., and

4  then the second one was sent at 12:53 and 17 seconds.

5  Q.  Why would you have sent the packet, sent the sent packet

6  twice?

7  A.  The KazaA application does this, that's just the nature

8  of the way it works, it sends a request out, and if it

9  doesn't receive a response within a certain amount of time,

10  it then sends that request again.

11  Q.  They send a request, they don't get a response, they

12  send it again automatically?

13  A.  Yes.

14  Q.  Why would it not receive a response?

15  A.  Because possibly that computer that was being questioned

16  for the data didn't respond because it was probably busy

17  doing other things and it has some kind of rate limiting

18  features in it that say that, you know, it will only respond

19  to users if it's not busy or if it has the ability to do

20  so.

21  Q.  And so you sent two sent packets here.  Then what

22  happened?

23  A.  Then a response was received on August 10th, 2004 at

24  12:53 and 19 seconds a.m. eastern time, and this contained

25  very similar to the first one, it contained a portion of

1    that track.

2    Q.  And you ultimately received the information from

3    sublimeguy14?

4    A.  Yes.

5    Q.  From the same IP address that we described earlier?

6    A.  Correct.

7    Q.  Rather than go through each one of these, let me try to

8    save some time.  Let me skip to No. 7, which is on page 100

9    by one set of Bates numbers and page 15021 by the other set

10   of Bates numbers.  This is for the track Nirvana, "Come As

11   You Are."  Can you describe the process with respect to the

12   download of the Nirvana track from sublimeguy14?

13   A.  The KazaA application running on MediaSentry's computer

14   had made numerous requests or sent packets to

15   sublimeguy14.

16   Q.  Let's walk through that.  I see one sent packet at the

17   beginning here at 12:49.15, and then I see a second sent

18   packet, second sent packet here at 12:53.18 so there was

19   still no response; is that right?

20   A.  Correct.

21   Q.  Okay.  Then I see another sent packet and then another

22   one and then finally at the bottom of that next page, I see

23   a received packet; is that right?

24   A.  That's correct.

25   Q.  And who responded to this received, to this request?

1   A.  A different user on the network.

2   Q.  But not sublimeguy14?

3   A.  No.

4   Q.  Why is that?

5   A.  Because the KazaA application has a feature called a

6   multi-source capability, and what it does is it makes

7   attempts to the IP address that it originally obtained this

8   information from to download the file, but upon not

9   receiving it, the KazaA application tries to obtain that

10  file elsewhere from other users on the network.

11  Q.  So KazaA does it automatically, if it can't get it one

12  place it goes to another?

13  A.  Yes.

14  Q.  Did MediaSentry ultimately seek the information from

15  sublimeguy14?

16  A.  Yes.

17  Q.  So it continued in the process?

18  A.  Yes.

19  Q.  And which page do you see that on?

20  A.  Starting on page 105 or 1500_026.

21          THE COURT:  15 what?

22          THE WITNESS:  026.

23  A.  This is the response from the IP address 68.227.185.38

24  and from the user name you see on the next page, the user

25  name sublimeguy14, and this packet contains --

1  Q.  Wait a minute, hold on.  I'm on the wrong page.  My

2  apologies.  Sorry.  So this came from sublimeguy14?

3  A.  Yeah.  So this is the response for this file, Nirvana,

4  "Come As You Are" from sublimeguy14 containing a portion of

5  the data from that file.

6  Q.  And ultimately sublimeguy14 distributed a portion of the

7  file to MediaSentry?

8  A.  Yes.

9  Q.  Did MediaSentry do any other logging while it was

10 downloading the seven tracks it downloaded?

11 A.  Yes.

12 Q.  Can you please turn to Exhibit 14.  Can you describe

13 what this is, Mr. Connelly?

14 A.  This log file is known as the system log, and what this

15 log shows is the process that the MediaSentry computer took

16 in order to obtain the evidence in the download of these

17 files.

18 Q.  Okay.  And when did MediaSentry download these files?

19 A.  On August 10th, 2004 at 12:46 a.m.

20 Q.  And this is part of the download process that we were

21 just looking at a moment ago?

22 A.  Yes.

23 Q.  How do you know that this is -- this document relates to

24 sublimeguy14?

25 A.  The very first line shows that it was created from

1    analysis of user sublimeguy14.

2    Q.   Again, I don't want to go through everything MediaSentry

3    did on this document, but let's just look at one download

4    here, Incubus, "New Skin," let's take that as an example.

5    Can you describe for us what the document shows with respect

6    to that track?

7    A.   Under "Downloads completed," you'll see that it has a

8    time stamp here of August 10th, 2004, 12:53:18 a.m., that it

9    successfully downloaded the entire track for Incubus, "New

10   Skin," and then it shows that for all of the files that were

11   downloaded.  The second block where it says, "Handshake

12   acknowledgements," this is the time stamps that for each one

13   of these files that a data package was received from

14   sublimeguy14.

15   Q.   Why does MediaSentry create this log?

16   A.   Just so as a matter of process to show the time stamps

17   and when the events took place.

18   Q.   To make certain it knows when it had completed the

19   downloading process?

20   A.   Correct.

21   Q.   Could you please turn to Exhibit 17, which I believe is

22   a CDR that may be up there somewhere.  I think it's on the

23   other side of the legitimate CDs right next to the

24   microphone.

25   A.   Sorry.

1    Q.   Have you seen that CDR before?

2    A.   Yes.

3    Q.   What is it?

4    A.   This is a CDR that contains the files that were

5    downloaded by MediaSentry.

6    Q.   How do you know that that contains the files that

7    MediaSentry downloaded?

8    A.   Because I created the CD by burning them from the

9    repository.

10   Q.   A secure data repository you described earlier?

11   A.   Correct.

12   Q.   And they came from where?

13   A.   Sublimeguy14.

14   Q.   You also mentioned that you described the evidence

15   process something about a tracer; is that right?

16   A.   Yes.

17   Q.   What does a tracer show?

18   A.   It shows the path that data packets would have taken

19   across the Internet from one computer to another,

20   specifically from the MediaSentry computer to the

21   sublimeguy14's computer, and it demonstrates that the IP

22   address was live and active on the Internet at that time.

23   Q.   Let's look at Exhibit 18 now, please.  Is this the

24   tracer you were just describing?

25   A.   Yes.

1   Q.   And this is the log that MediaSentry creates?

2   A.   Correct.

3   Q.   And how does it create this?  How does MediaSentry

4   obtain this information?

5   A.   It uses a utility or functionality built into the

6   Microsoft Windows operating system, and that utility itself

7   is named the tracer, and it basically just tells the utility

8   I want to trace the route between the MediaSentry computer

9   and a specific IP address.

10  Q.   Okay.  Could you, I don't want to go through each of

11  these lines, but at a high level explain to us what this

12  shows?

13  A.   It shows the path that data packets were taken from

14  router to router across the Internet, and then finally it

15  shows for the destination, which is the IP address of

16  68.227.185.38, it shows that the IP address was live, it was

17  on the network and that it is on the Cox network in

18  Rhode Island.

19  Q.   Could you please, Mr. Connelly, look at Exhibit 55.

20  A.   Okay.

21  Q.   Have you seen this document before, Mr. Connelly?

22  A.   Yes.

23  Q.   You see that there are five sound recordings listed

24  here?

25  A.   Yes.

1  Q.  Did MediaSentry capture copies of each of these sound

2  recordings from sublimeguy14@Kazaa?

3  A.  Yes, it did.

4  Q.  Could you please turn to Exhibit 56.  Have you seen this

5  document before, Mr. Connelly?

6  A.  Yes.

7  Q.  You see that this lists 25 different sound recordings;

8  is that right?

9  A.  Yes.

10  Q.  Is each of these sound recordings also listed in the

11  share directory of sublimeguy14@kazaa?

12  A.  They are.

13  Q.  And did MediaSentry initiate the download of each and

14  every one of these files?

15  A.  Yes, it did.

16  Q.  And obtained data associated with that file from

17  sublimeguy14?

18  A.  Yes.

19  Q.  And MediaSentry confirmed that there was in fact an MP3

20  file being distributed by sublimeguy14 as described in the

21  shared directory?

22  A.  That's correct.

23  Q.  If MediaSentry had chosen to do so, could MediaSentry

24  have downloaded the entirety of each one of these 25 tracks

25  or even the 1148 files in the shared directory?

1   A.  Yes, it could have.

2   Q.  Why didn't it?

3   A.  Just as a matter of time and resources and bandwidth

4   that would have taken to have done that.

5   Q.  And so it was really a matter of efficiency?

6   A.  Yes.

7   Q.  I want turn for a moment to the issue we've talked about

8   the distribution from sublimeguy14.  I want to turn to the

9   issue of the downloading by sublimeguy14.  Did MediaSentry

10  collect evidence of sublimeguy14@kazaa actually in the

11  process of downloading the files in the shared directory

12  from other users?

13  A.  No.

14  Q.  Why not?

15  A.  It's impossible.  The nature of the peer-to-peer network

16  is that data transfer takes place between users or between

17  peers to peers, and in order for someone to download it,

18  they just download it from a specific person, and another

19  entity or another user cannot watch that process as it takes

20  place.

21  Q.  So there's no way MediaSentry or anybody else could have

22  observed the downloading process?

23  A.  Observed, no.

24  Q.  Is that true also with respect to the distribution from

25  sublimeguy14 to other users?

1    A.  Yes.

2    Q.  Is there any way legally that anybody could have

3    observed those transactions?

4         THE COURT:  Observe them as they were going on?

5         MR. OPPENHEIM:  Thank you, your Honor, as they

6    were occurring.

7    A.  Well, other than the Cox Network could have all the logs

8    of all the data packets that were sent and received from

9    that computer, so, other than that, it would have to be at

10   the ISP or the network level.  It couldn't be any user like

11   MediaSentry wouldn't have been able to have done it.

12   Q.  So the IP could have captured it as it was occurring?

13   A.  Yes.

14   Q.  But other than that, nobody could have done it?

15   A.  Correct.

16   Q.  And it's not as though the ISP retains that data, do

17   they?

18   A.  No.

19   Q.  Did MediaSentry capture any information that would be

20   indicative of the fact that sublimeguy14 had downloaded

21   these files from other users?

22   A.  Yes, it did.

23   Q.  And what information would that be?

24   A.  In the user log, you can see that there is this

25   additional information that we have about each one of the

1    files shows that they contain very similar attributes that

2    the files that were shared on the network commonly

3    contained, such as release group information, how to priate

4    release group information and other Metadata.

5    Q.   Okay.  Let's look at the user logs so you can explain

6    that to us.  I believe that it's Exhibit 16.  Let's go

7    through some of the 30 tracks that are being sued on in this

8    case and look at that.  Let's start with page 172 with the

9    Aerosmith track at issue for the track "Pink."

10                  MR. OPPENHEIM:  16-058, your Honor.

11                  THE COURT:  Okay.

12   Q.   We can zoom in on that.  Using this as an example,

13   Mr. Connelly, can you explain to us what you just said about

14   description information?

15   A.   The description field here says from, "Adrenalin Rush."

16   Q.   So you're looking at this right here?

17   A.   Yes.

18   Q.   What does that mean to you?

19   A.   That means me to that the release group, the pirate

20   release group, that initially created this file and put it

21   onto the network or the release group that initially created

22   the file and somehow got onto the network was "Adrenalin

23   Rush."

24   Q.   So it doesn't indicate that it necessarily from

25   Mr. Tenenbaum, or I should say, excuse me, from

1    sublimeguy14?

2    A.  Correct.

3    Q.  Can we turn to page 198, please.

4         MR. OPPENHEIM:  16-084, your Honor.

5    Q.  Let's look at the Eminem track, "My Name Is" which is

6    also at issue in this case.

7    A.  The description field here says, "Ripped by Really Doe,

8    APC."

9    Q.  So, no more "Adrenalin Rush," this one is ripped by

10   somebody else?

11   A.  Correct.

12   Q.  Really Doe.  What is APC?

13   A.  It's another known piracy release group.

14   Q.  That's a known piracy release group?

15   A.  Yes.

16   Q.  While we're on that page, though it's not an issue in

17   this case, I look just down at the next one, another Eminem

18   track, "Role Model," but that seems to have an entirely

19   different descriptive field?

20   A.  Correct.  It says here that the release group that's

21   claiming credit for this one is RNS.  It's created by a

22   person for that group by the name of Havock.

23   Q.  That's not his real name, I presume?

24   A.  That's his alias.

25   Q.  Let's turn to page 280, please.

1        MR. OPPENHEIM:  16-166, your Honor.

2   Q.  Let's look at the Limp Bizkit track?

3        THE COURT:  16 what?

4        MR. OPPENHEIM:  166, your Honor.

5        THE COURT:  Okay.

6   Q.  There's a Limp Bizkit track by the name of Leach.

7   A.  Okay.

8   Q.  Can you describe what you see there?

9   A.  The description here says "AG#190CEAAF."

10  Q.  What is that a reference to?

11  A.  This is a reference to an Audio Galaxy number.

12  Q.  What is that?

13  A.  Audio Galaxy is another filing sharing network, and in

14  order for files to be distributed on the Audio Galaxy

15  network, this information was imbedded in each one of the

16  files as a catalogue number, a unique identifyer number for

17  each one of those files for that network.

18  Q.  Just so I understand on the Audio Galaxy network, every

19  song had not this same number but had a unique identifier?

20  A.  Correct.

21  Q.  And so here it's got a unique identifier for this track

22  "Leach" by Limp Bizkit?

23  A.  Correct.

24  Q.  This isn't on Audio Galaxy, so why is it here in this

25  shared directory?

1    A.  The file at one point in time was transmitted over the

2    Audio Galaxy network, and this files means imbedded in the

3    file, and it can be shared and distributed any other

4    means.

5    Q.  Let's turn to page 342.  Let's do one more of these.  We

6    can keep on going and look at the Death Tones track, "Be

7    Quiet And Drive."  Is that right?

8          MR. OPPENHEIM:  Your Honor, at the top of the

9    page, 16-228.

10   A.  The description field here says, "Ripped by Axle of

11   WSA," so just like we saw the other one, WSA is another

12   release group, and it was created by the member with the

13   alias of Axle.

14   Q.  So what we're seeing is a lot of different descriptions,

15   different people claiming credit?

16   A.  Correct.

17   Q.  Have you looked at the Metadata for the 30 tracks at

18   issue in this case?

19   A.  Yes.

20   Q.  How many of those 30 contained distinguishing Metadata

21   like what we just described?

22   A.  Eighteen of them.

23   Q.  What does it mean if there's no distinguishing

24   Metadata?

25   A.  It just means that the person that originally created

1  that MP3 file didn't add in that extra information.

2  Q.  Doesn't mean it was necessarily ripped by

3  sublimeguy14?

4  A.  No.

5  Q.  In looking at the shared directory or the user log,

6  either one, apart from single tracks, do you see entire

7  albums present at all?

8  A.  Yes.

9  Q.  Can you determine based on looking at the information

10  there were those albums were ripped from CDs or

11  downloaded?

12  A.  You could tell that if they vary in the format and the

13  type of information that's listed that they probably didn't

14  all come from the same source.

15  Q.  Well, let's look at, for example, a Sublime album, it

16  starts on page 162 of the user log which, your Honor, starts

17  on 16-048, and it continues for I believe four or five

18  pages.  Mr. Connelly, will you look through the different

19  tracks listed.  This has just got one track.  Let's take the

20  next page, 16-049.  Is there information looking at this,

21  the Metadata here, that's indicative to you as to whether or

22  not this album was ripped?

23  A.  Yes, in that there's differences between the information

24  that's available for each one of these files.

25  Q.  So, for each of the songs, the information is

1    different?

2    A.  Yes.

3    Q.  Give us some examples of the kinds of different

4    information you're seeing?

5    A.  For the very first one, you'll see that the gendre' here

6    is listed as other.

7    Q.  It would help, Mr. Connelly, if you could tell us which

8    song you're looking at so that I can point it out to the

9    jury.

10    A.  Sublime, "Caress Me Down."

11    Q.  I'm sorry, Sublime what?

12    A.  "Caress me down."

13    Q.  The top of the page?

14    A.  The first thing you see here is the artist is listed as

15    D.

16    Q.  Artist, D, okay.

17    A.  Gendre' is other, and quality is 128 bit rate.

18    Q.  Okay.

19    A.  You'll see that the next song, "Jailhouse," the artist

20    is listed as Sublime.

21    Q.  So it's not D as it is above, it's now Sublime, okay.

22    A.  Correct.  And the album is not blank, it says,

23    "Sublime."

24    Q.  The one above is blank, this one says, "Sublime."  Okay.

25    A.  The gendre' here is listed as Alternative.

1  Q.  It was other, okay.

2  A.  Keep going?

3  Q.  You said something about the quality as well?

4  A.  Yeah.  Some of them vary.  Some of them are 128 and some

5  of them are something different.

6  Q.  Okay.  So based on this, do you believe, based on this,

7  does this show whether the album was ripped or downloaded?

8  A.  It leads us to believe that the files were -- no, it

9  doesn't say whether they're ripped or downloaded, it just

10  says that they probably weren't ripped because they're

11  different, however, the next one down, we didn't mention the

12  next one down does have something in the description field,

13  SM, and some of the other ones have information about if you

14  look on page 165.

15  Q.  Hold on one minute.

16        MR. OPPENHEIM:  Which is 051, your Honor.

17  Q.  Yes.

18  A.  The one the same in the end close to the bottom of the

19  page, this one has a description field here with an Fp field

20  address.

21  Q.  And the others don't have that?

22  A.  Correct.

23  Q.  If you were to rip the album, would you expect all of

24  the data to be the same?

25  A.  Yes.

1   Q.   Other than obviously the song?

2   A.   Correct.

3   Q.   Let's turn to page 172 and look at a Perfect Circle

4   album.   Let's just looking at this, do you see, and it

5   obviously continues beyond page 172, but do you see

6   information indicating whether this album was ripped or

7   downloaded?

8   A.   It appears that it was downloaded because a number of

9   these files here have release group tags in the description

10  fields.

11  Q.   Okay.   What page are you looking at?

12  A.   On page 173, the first one there, "Judith."

13  Q.   Okay.

14  A.   The description here says, "RUV, hot release."

15  Q.   Here at the top of the page, okay.

16  A.   The one below it, Arista says, "Description, DTK, Team

17  DTK."

18  Q.   What else do you see other than the description fields

19  being different?

20  A.   Here we see that the bit rates vary.   The first one is

21  160, the next one is 128.

22  Q.   160 on this first page and then 128.   Okay.   Other than

23  the bit rates and the descriptions, anything else?

24  A.   Some of them have artists listed as a Perfect Circle.   I

25  see some that are blank.

1  Q.  Let's turn to another album, just one more.  Let's look

2  at Limp Bizkit hit album on page 251, the album,

3  "Significant Other."

4  A.  Okay.

5  Q.  What do you see here?

6  A.  A number of songs by Limp Bizkit.

7  Q.  Any indication of whether or not this was ripped or

8  downloaded?

9  A.  The album, some of them say "Significant Other" and some

10  of them are blank.

11  Q.  Okay.  In terms of the album name.  Okay.  Anything

12  else?

13  A.  On page 254 or 16-140, you see Limp Bizkit's own here,

14  "Don't Go Off Wondering," on the same album, "Significant

15  Other," description here says

16  "www.greeniell82.freeservers.com."

17  Q.  Okay.  Let's put that aside for a moment.  Mr. Connelly,

18  given all of the evidence that you've gone through that

19  MediaSentry collected, do you have any reason to doubt that

20  sublimeguy14@kazaa had downloaded the files that are in the

21  shared directory?

22  A.  No.

23  Q.  Okay.  And given the evidence that MediaSentry

24  collected, do you have any reason to doubt that

25  sublimeguy14@kazaa was distributing the files in the shared

1   directory up to the KazaA p2p network on August 10, 2004?

2   A.  I'm not sure the way the question was phrased.  We have

3   reason to believe that he was.

4          MR. OPPENHEIM:  No further questions.

5                      CROSS-EXAMINATION

6   BY MR. NESSON:

7   Q.  I have just a few points.  You've been with MediaSentry

8   since 2004?

9   A.  Correct.

10  Q.  What was the date in 2004?

11  A.  When I started?

12  Q.  Yes.

13  A.  June 25th.

14  Q.  So before August, that is the whole -- you've been there

15  the whole span after this case at least came into focus?

16  A.  Correct.

17  Q.  And had MediaSentry been doing business before that to

18  some extent with the recording industry?

19  A.  Before I was hired, yes.

20  Q.  Could you give us an estimate of how many investigations

21  MediaSentry has done over the entire course of its span of

22  work for the recording industry?

23  A.  I don't know the exact number.

24  Q.  Would it be more than a thousand?

25  A.  It may be.  I support the applications, and the

1   applications go out and collect the data and I don't

2   personally review each and every case that was recorded so I

3   don't know the exact number.

4   Q.  But as far as you know is MediaSentry the only

5   investigator who has done the work for the many cases that

6   the recording industry has initiated?

7            MR. OPPENHEIM:  Objection.  Relevance, your

8   Honor.

9            THE COURT:  Overruled.

10  A.  I don't really know.  I just know that we collected,

11  MediaSentry collected evidence of infringement.  I don't

12  know who else did, what other companies may have.

13  Q.  Could you give me an estimate of the number of cases

14  that you yourself have worked on over the course of your

15  employment there?

16  A.  As I said, I'm a computer programer.  I support the

17  applications, so they brought on in data centers and they

18  collect a number of cases of information, so my personal

19  involvement with the case is only when a specific case is

20  brought to my attention that I've been asked to look at the

21  specific details for that case, so I've looked, you know,

22  several of them but not every one that we've collected

23  information on.

24  Q.  So, there may in fact be thousands of investigations of

25  MediaSentry, but you only get personally involved in the way

1    you've exhibited it here with the very select number of

2    cases that have actually come to litigation?

3    A.  Sure, correct.

4    Q.  You have described the idea of the release group that is

5    the information in the Metadata that shows where the file

6    that Joel downloaded came from?

7    A.  The original source, yes.

8    Q.  The original source.  In all of the investigations that

9    MediaSentry has done, not just in this case but in every

10   case, have you ever seen sublimeguy14 come up as a release

11   group name?

12   A.  I personally haven't, but that's not to say that it

13   didn't happen.

14   Q.  If it were to have come up, then that would be evidence

15   that someone actually downloaded a file from Joel other than

16   MediaSentry?

17          MR. OPPENHEIM:  Objection.  Objection.

18          THE COURT:  I'm not sure I understand the

19   question.  Can you repeat the question?

20   Q.  Had sublimeguy come up as a release group and that

21   release group line in Metadata in any investigation that you

22   had done of anyone else that would indicate that that person

23   had gotten a file from Joel?

24   A.  Well,  --

25          MR. OPPENHEIM:  Objection, your Honor.  It's a

1   hypothetical.

2           THE COURT:  No, the objection is overruled.

3   You're saying had sublimeguy ever come up in the description

4   line in the other cases?

5           MR. OPPENHEIM:  He already testified he hadn't.

6           THE COURT:  I understand.  He's exploring that.

7   The objection is overruled.

8   A.  Even in the files that are in the shared directory, none

9   of these contain that information, so it's not likely that

10  had he ripped the files and had he created these files that

11  he even put that information in himself.

12          THE COURT:  It's not likely that he would put it

13  in himself?

14          THE WITNESS:  Yes, because there's no evidence.

15  You're saying that that was something that he did, so even

16  if he had ripped it and had put it on the Internet, it

17  likely would have been blank or would have contained

18  something else.

19  Q.  Well, let me just illustrate.  You reviewed a file in

20  which the release name was Havock?

21  A.  Okay.

22  Q.  Could we imagine that there's some person out there

23  who's adopted the name Havock in the way that Joel adopted

24  the name Sublimeguy?

25  A.  Correct.

1   Q.   And Joel downloaded something from Havock?

2   A.   Yes.

3   Q.   So, if one were trying to prove a case that Havock had

4   distributed files, the fact that his name shows up in the

5   release line when someone else like Joel downloads it would

6   prove it?

7   A.   Yes, but that's not a requirement.  The person who

8   creates the file --

9   Q.   Yes or no, you've just done fine.

10   A.   All right.

11   Q.   And the fact is that there is no file that you're aware

12   of in which Sublimeguy comes up in the address line?

13   A.   That's correct.

14   Q.   So, do you have any proof that Joel distributed files in

15   the sense that you have actual proof that someone other than

16   Joel downloaded a file from his shared folder other than

17   you?

18        MR. OPPENHEIM:  Objection, your Honor.  I don't

19   know what he means by actual proof, but the witness has

20   already testified as to this.

21        THE COURT:  I think I understand the question.

22   You can have an answer.

23   A.   Yes.  Sorry, can you rephrase the question?

24   Q.   Do you have any proof that any person downloaded a file

25   from Joel other than the proof that MediaSentry itself did

1   so?

2   A.  No.  MediaSentry downloaded a file from this IP address,

3   and MediaSentry does not know the identity of that user,

4   just the IP address.

5   Q.  And doesn't know whether anyone else downloaded from

6   Joel?

7   A.  It doesn't know it, but that's the purpose of the KazaA

8   application and the FastTrack network to have users have the

9   ability to have files in their shared folder and have users

10  be able to download those just as MediaSentry did.

11  Q.  My question is do you have any proof that anyone ever

12  downloaded a file from Joel other than MediaSentry?

13  A.  No.

14  Q.  You said that on a typical day there might be between

15  two and a half million and three million active online users

16  of KazaA?

17  A.  Correct.

18  Q.  That means that when Joel goes online, there are two and

19  a half to three million computers he's connected with around

20  the world?

21  A.  Correct.

22  Q.  And when he looks for a song to download, he has then

23  access to whatever is in those two and a half to three

24  million computers?

25  A.  Correct.

1    Q.   All those shared folders?

2    A.   Correct.

3    Q.   Now, I'm going to ask you to imagine a person looking

4    for one of these five songs that's on the Exhibit A list on

5    KazaA?

6    A.   Okay.

7    Q.   On August 11, 2004.

8    A.   Okay.

9    Q.   When that person goes on, if Joel is online along with

10   two and a half to three million others, then that person

11   looking for that file might come across in Joel's shared

12   folder?

13   A.   Yes.

14   Q.   But if he didn't come across it in Joel's shared folder,

15   he might come across it in one of the other three million

16   computers?

17   A.   That's possible, yes.

18   Q.   And if he were to come across it in Joel's folder but

19   couldn't for some reason because Joel's computer was busy

20   actually actually succeeding in getting it, then what KazaA

21   would do is use its multi-source capability and the person

22   would download it from somebody else?

23   A.   That's correct.

24   Q.   So that if Joel's file wasn't there or if Joel's machine

25   was turned off, it wouldn't in any significant way that you

1    could possibly imagine impede someone else somewhere in the

2    world using KazaA trying to get one of those five songs?

3    A.  We don't know how many copies there were of each one of

4    these files.  If he was the only one on the network that had

5    the file, then maybe it's possible that someone else

6    wouldn't have been able to obtain it, but we don't know how

7    many copies were being made available of each one of these

8    tracks on the network at that time.

9    Q.  Now, you don't know for sure, that's true.  Could you

10   give me an estimate?  You're someone who's very familiar

11   with KazaA, and you're quite familiar with these songs.

12   These are exceedingly popular songs.  How many would you

13   estimate might be available on KazaA?

14   A.  These vary so much, and we find the nature of -- you

15   know, it depends on how popular something is.  There's over

16   a thousand files here, so some of them may be more popular

17   than others.

18   Q.  I'm talking about the five.  These are exceedingly

19   popular.

20   A.  These are popular tracks, yes.

21   Q.  Very popular.  So there would be many, many available on

22   KazaA?

23   A.  That's likely to assume, yes.

24   Q.  That's very likely.  That means the fact that Joel

25   shares one of them that's there and that his file then joins

1    the pool of those being shared doesn't really change the

2    picture much at all with respect to popular songs?

3    A.  Yes, he's distributing the files just like other users

4    are.  Users may obtain it from him, and they may obtain it

5    from other users on the network.

6    Q.  Let's focus on the word "distribute" for a moment.

7    Distribute has the kind of active quality to it, it's like

8    distribute, it's like you go out, you're a distributor, but

9    the kind of distribution you're talking about with Joel

10   seems very passive, he doesn't do anything except download

11   the file, and if I'm hearing you right, when he downloads

12   it, he downloads it, it comes into his KazaA environment, in

13   his shared folder, and then with no more action on Joel's

14   part at all it is available for sharing, that's what you'd

15   say?

16           MR. OPPENHEIM:  Your Honor, can we get a question,

17   not a speech with a statement at the end, is that right?

18   There's too much there for me to digest exactly what he's

19   asking.  Objection.

20           THE COURT:  Are you asking for the witness to

21   adopt your characterization as passive?  This is passive?

22           MR. NESSON:  Allow me to rephrase it.

23           THE COURT:  Okay.  Please.

24   Q.  Would you tell me if you can what Joel did actively to,

25   as you say, distribute?

1    A.  He ran the KazaA application.  Well, he downloaded the

2    files from the network, and he left them in the shared

3    folder where they were distributed onto the KazaA network.

4    Q.  He left them there.  That doesn't sound very active to

5    me.

6              MR. OPPENHEIM:  Objection, your Honor.  Is he

7    testifying?

8              THE COURT:  Sustained.  Sustained.

9    Q.  Is "left them there" what you would consider to be

10   active distribution?

11             THE COURT:  The witness doesn't have to adopt your

12   language.  The jury can hear from you at the time of

13   argument.  The issue are just what the acts are.

14             THE WITNESS:  The acts are --

15             THE COURT:  No, no, sustained means you don't have

16   to answer.  I'll be more clear.

17   Q.  On Exhibit 17, you have the recorded downloads of the

18   five songs?

19   A.  Correct.

20   Q.  And is there an equivalent CD for the 25 other songs?

21   A.  No.

22   Q.  So you just didn't do the recording of the -- the full

23   download of the other songs?

24   A.  Correct.

25   Q.  And the reason why you did the five was what?

1   A.  As a requirement of our evidence collection process, we

2   were required to download a certain number of the files that

3   were being distributed, not every one of them in their

4   entirety.

5   Q.  And having done that, that then enabled someone to

6   actually make a comparison to see whether what was

7   downloaded was actually the copyrighted work at least as

8   they're describing the copyrighted work; is that correct?

9   A.  Yes, allow someone to review the file and listen to

10  it.

11  Q.  And that's not possible with the other 25?

12  A.  No, it's not possible.

13          MR. NESSON:  Thank you.  No further questions.

14          MR. FEINBERG:  May we have a moment, your Honor,

15  before he finishes?

16          MR. NESSON:  Yes, excuse me, allow me to

17  consult.

18          THE COURT:  That's okay.

19          MR. FEINBERG:  Thank you, Judge.

20          MR. NESSON:  One more question on the distribution

21  issue.

22  Q.  After Joel downloads the song and leaves them in his

23  shared folder, in order for a distribution to take place,

24  someone else has to do something active; is that correct?

25  A.  Correct.

1      MR. NESSON:  Thank you.

2      THE COURT:  Anything further?

3      MR. OPPENHEIM:  No, your Honor.

4      THE COURT:  Okay.  The witness is excused.  Call

5  your next witness, please.

6      MR. OPPENHEIM:  Your Honor, we would call

7  Mr. Mark Matteo.

8      MARK MATTEO, having been duly sworn by the Clerk,

9  testified as follows:

10                    DIRECT EXAMINATION

11  BY MR. OPPENHEIM:

12  Q.  Good afternoon, Mr. Matteo.

13  A.  Good afternoon.

14  Q.  Can you please describe who you work for?

15  A.  I work for Cox Communications.

16  Q.  And what is your -- what is Cox Communications?

17  A.  We're a provider of high speed Internet telephone and

18  video services.

19  Q.  And does Cox Communications have any relationship with

20  any of the plaintiffs in this case?

21  A.  No, we don't.

22  Q.  And what is your job title?

23  A.  I'm the security manager for the New England

24  Properties.

25  Q.  You might want to pull that mic. a little bit closer to

1   you.  I'm not sure everyone can hear you.  Can you please

2   describe your responsibilities with Cox Communications?

3   A.  I oversee a team whose primary responsibilities are to

4   investigate the service issues, protect the company assets,

5   and we also act as liaison to law enforcement prosecutors

6   updating them on our technology and our processes.

7   Q.  Could you please, I'm sorry, are you involved in that

8   capacity in responding to subpoenaes to identify users on

9   your network?

10  A.  We are indirectly involved in that, yes.

11  Q.  Can you please turn to Exhibit 19.  Do you recognize

12  this document, Mr. Matteo?

13  A.  Yes, I do.

14  Q.  Is this a copy of a subpoena that Cox received on or

15  around November 3rd, 2004?

16  A.  Yes, it is.

17  Q.  And can you describe the document for the jury,

18  please.

19  A.  It is a request to Cox Communications to identify

20  subscriber, actually to identify multiple subscribers based

21  upon IP addresses and dates and times that were given to

22  us.

23  Q.  And that's on the second and third, on the attachment

24  are the IP addresses?

25  A.  Yes, it is.

1  Q.  Let's focus on the first page first and let me focus

2  your attention for a moment to the language, "You are

3  commanded."  Do you see that there?

4  A.  Yes, I do.

5  Q.  Can you describe what information the subpoena was

6  seeking from Cox Communications?

7  A.  They're requesting information containing name, address,

8  telephone number, e-mail address, media access control

9  addresses, which are the alleged sound recordings, listed by

10  IP addresses and the attachments that are provided.

11  Q.  Okay.

12      MR. FEINBERG:  Your Honor, we can stipulate to

13  what's in the subpoena.  It's in evidence.  I don't know why

14  we have to read it.

15      THE COURT:  Stipulate to the subpoena, stipulate

16  to the witness?  What exactly would you be stipulating to?

17      MR. FEINBERG:  Stipulating to the contents of the

18  subpoena.  It's already in evidence.  There's no need for

19  him to read it.

20      THE COURT:  To the contents of the subpoena,

21  that's fine.  That would hasten this.  Go on.

22      MR. OPPENHEIM:  This would be very quick.  I just

23  want the jury to understand the process here.  I don't plan

24  on taking very long at all.

25  Q.  Could you please describe what an IP address is,

1    Mr. Matteo, since that was one of the things your subpoena,

2    one of the things referenced in the subpoena.

3    A.   An IP address is issued to a customer to allow him to

4    get online, to access the Internet.  Basically you could

5    relate it to a telephone number.

6    Q.   So when you say it's issued to a customer, one of Cox'

7    customers?

8    A.   Yes.

9    Q.   So, a user who subscribes to Cox, wants to get onto the

10   Internet, Cox issues them an IP address?

11   A.   Correct.

12   Q.   And there's also a reference in here in terms of

13   information to something called a media access control

14   address.  Could you describe what that is, please?

15   A.   Yes, it's a Mac address when a manufacturer makes a

16   product that's going to be used online, they imbed a Mac

17   address onto that device, and we record the Mac addresses of

18   those devices for our paying subscribers, and that actually

19   allows us to understand when they send a request to us to

20   get online that we can correlate that to their billing

21   information and say this is a paying subscriber, and then we

22   actually issue them an IP address to get online.

23   Q.   So you issue Mac addresses for them to get online?

24   A.   Correct.

25   Q.   I'd like to draw your attention to page 2 of the

1  attachment and in particular counting up from the bottom of

2  the page ask you to read the IP address that you were asked

3  for information with respect to for the one that I guess is

4  sixth from the bottom.  Do you see that?

5  A.  IP address 68.227.185.38.  Is that correct?

6  Q.  I was pointing to the wrong one.  You got it right,

7  thank you.  This was one of the IP addresses that Cox was

8  asked to provide information with respect to?

9  A.  Yes, it was.

10  Q.  Was this the kind of subpoena that Cox Communications

11  receives in other contexts, for instance, in law enforcement

12  proceedings?

13  A.  Yes.

14  Q.  And is the information that you would provide, that you

15  provided ultimately in this case similar to the information

16  that you would have provided to law enforcement?

17  A.  Yes, it is.

18  Q.  And is the process that you went through to respond to

19  this subpoena similar to the process that you would have

20  gone through in responding to a request from law

21  enforcement?

22  A.  Yes, it's the same.

23  Q.  Okay.  And ultimately when Cox received the subpoena,

24  what did it do next?

25  A.  Once we received the subpoena, we will check our

1  database to verify that we actually hold that particular IP

2  address.

3  Q.  68.227.185.38?

4  A.  Yes.  Then we will use the date requested and the time

5  requested, and we'll look and see which subscriber that IP

6  address was assigned to at that time and date.

7  Q.  How does Cox go about confirming the accuracy of its

8  searches?

9  A.  The system that we obtain the information from is the

10  same system that actually distributes that information to

11  the customer, so we will take that information and then

12  we'll actually compare that information to information in

13  our billing system and then be able to identify the

14  particular subscriber at that point.

15  Q.  Is there any process that Cox goes through to double

16  check?

17  A.  We will run that process twice.

18  Q.  You run the whole process twice?

19  A.  Yes, and we will compare the billing system each has

20  correlating information based upon the modem on the serial

21  number on the modem.

22  Q.  When you did that analysis for IP address 68.227.185.38

23  for August 10, 2004 at roughly 12 a.m., did Cox determine

24  that there were any other accounts associated with that IP

25  address?

1    A.  No, sir.

2    Q.  And so what was the conclusion that Cox came to in terms

3    of who was responsible for that IP address?

4    A.  The information came back to a J. Tenenbaum in

5    Providence, Rhode Island.

6    Q.  And before Cox sent that identifying information to the

7    plaintiffs in this case, what did Cox do?

8    A.  We prepared another document.  We put all the

9    information together in a document, we verify the

10   information, and we send it out in accordance with the

11   request of the subpoena.

12        MR. NESSON:  I'm sorry, I can't hear over here.

13   A.  I apologize.  We prepare the information onto a

14   document, verify all the information is accurate, and then

15   we send it according to the request of the subpoena by

16   either fax or e-mail.

17   Q.  And does Cox at any time in this process communicate

18   with the user, excuse me, the account holder?

19   A.  Yes, we do.

20   Q.  And what does Cox do in that respect?

21   A.  We sent a notification to the user letting them know

22   that someone had requested information regarding their

23   account.

24   Q.  Okay.  Could you please turn to Exhibit 20.  Are you

25   familiar with this document, Mr. Matteo?

1    A.  Yes, I am.

2    Q.  Is this a copy of a letter that you would have sent out

3    to J. Tenenbaum?

4    A.  Yes, it is.

5    Q.  Is it Cox's policy and practice to send these kinds of

6    letters to its subscribers before responding to

7    subpoenaes?

8    A.  In civil matters, yes.

9    Q.  In civil matters.  In criminal matters your process is

10   different?

11   A.  Correct.

12   Q.  That's because there's an ongoing criminal

13   investigation?

14   A.  Yes.

15   Q.  Could you please look at paragraph 1 of this letter and

16   read the first sentence.

17   A.  "Members of the Recording Industry Association of

18   America, RIAA, filed a lawsuit against customers of Cox

19   Communications.  The lawsuit was filed in the Northern

20   District of Georgia and alleged that the unnamed Doe

21   defendants have each infringed music copyrights owned by

22   RIAA members through use of peer-to-peer Internet services."

23   Q.  And this was Cox's way of allowing its subscribers to

24   know that there was a John Doe proceeding ongoing in which a

25   subpoena had been issued to Cox?

1    A.  Yes.

2    Q.  What was the purpose of -- I'm sorry, in paragraph 6, of

3    this letter, there's a reference to a website.  Do you see

4    that?

5    A.  Yes, I do.

6    Q.  What's the purpose of referring the defendant to a

7    website?

8    A.  To educate on the rules and regulations of file sharing

9    and the risks that are involved with it.

10   Q.  After sending this letter, did Cox ultimately -- did Cox

11   ever get a response from J. Tenenbaum?

12   A.  In this instance, I don't know.

13   Q.  Did Cox ultimately respond to the subpoena that was

14   issued to him?

15   A.  Yes, we did.

16   Q.  Could you please turn to Exhibit 21.  Is this a copy of

17   Cox's response with respect to the IP address 68.227.185.38

18   at the date and time we described earlier?

19   A.  Yes, it is.

20   Q.  Could you walk us through what the response indicated.

21   A.  It shows here the two e-mail addresses that were

22   assigned to the subscriber.

23   Q.  One of which was sublimeguy14@cox?

24   A.  One of which, yes, was sublimeguy14@cox.net, the name of

25   the subscriber, which was J. Tenenbaum, the address of the

1    account, which was 20 Upton Avenue, Providence,

2    Rhode Island, the associated telephone number and the modem

3    Mac address that was held by the subscriber.

4    Q.  Does Cox have an acceptable use policy for its

5    customers?

6    A.  Yes, we do.

7    Q.  Could you please turn to Exhibit 24.  Is this a copy of

8    Cox's acceptable use policy?

9    A.  Yes, it is.

10   Q.  Could you please turn to page 2, paragraph 3 of this

11   policy.

12   A.  Intellectual property infringement?

13   Q.  Yes, can you go ahead and read that, please.

14   A.  "You may not use a service to post, copy, transmit or

15   disseminate any content that infringes the patents,

16   copyrights, trade secrets, trademarks or proprietary rights

17   of any party.  Cox assumes no responsibility, and you assume

18   all risks regarding the determination of whether material is

19   in the public domain or may otherwise be used by you for

20   such purposes."

21   Q.  Is this the same policy with respect to intellectual

22   property infringement that's been in place since at least

23   the year 2003 with Cox?

24   A.  Yes, it is.

25   Q.  Could you please turn to page 3, paragraph 7.

1    A.  Misuse of service?

2    Q.  Yes, could you read that provision, please.

3    A.  "You're responsible for any misuse of service that

4    occurs through your account or IP address.  You must,

5    therefore, take steps to ensure that others do not gain

6    unauthorized access or misuse the service."

7    Q.  Mr. Matteo, do you have any doubt that Cox identified

8    the right subscriber in response to the subpoena it

9    received?

10   A.  No, I have no doubt.

11        MR. OPPENHEIM:  No further questions, your Honor.

12                     CROSS-EXAMINATION

13   BY MR. NESSON:

14   Q.  Mr. Cox, excuse me, tell me your name.

15   A.  Mark Matteo.

16   Q.  Mr. Matteo, forgive me.  Would you tell me what it means

17   CENVEO, Inc. et al vs. Does 1 through 76.  I'm referring to

18   Exhibit Tenenbaum No. 9.

19        MR. OPPENHEIM:  Are you referring to Fonovisa?

20        MR. NESSON:  Fonovisa, yes, Inc. et al vs. Does 1

21   through 76.

22   Q.  What does that mean?

23   A.  To me it's a title of a lawsuit.

24   Q.  So it's a lawsuit against Does 1 through 76?

25   A.  Correct.

1   Q.  And what their inquiry to you determined was that one of

2   those Does that is sued in this lawsuit is your subscriber

3   J. Tenenbaum?

4   A.  From what I understand, they identified all the IP

5   addresses on that subpoena as belonging to Cox

6   Communications, sent the subpoena with all those IP

7   addresses, and we responded to each one of those IP

8   addresses to the subpoena.

9   Q.  And for No. 45, the right answer was J. Tenenbaum?

10  A.  If it is No. 45, yes.

11  Q.  So, excuse me, I'm looking for the letter that was sent.

12  Excuse me, I've got the wrong.  Hold on.  So, again looking

13  at Exhibit 11, which is it's Exhibit 20, I believe.  19,

14  excuse me, 19.  It begins, "Dear J. Tennebaum, we are

15  counsel to a group of companies that intend to file a

16  lawsuit against you," but if I understand it right, you've

17  just been served with a subpoena relating to a lawsuit

18  that's already been filed, albeit against 1 through 76 Does,

19  but one of them is J. Tenenbaum.  Is that correct?

20          MR. OPPENHEIM:  Objection.  The foundation, he's

21  asking this witness about a document that he's never seen

22  before.  It's not addressed to Cox.  He's talking about

23  Exhibit 22, your Honor, just so you know.  That was a letter

24  that was sent to J. Tenenbaum.

25          THE COURT:  He's referring to a document that is

1  in evidence, and he wants to root the question, he wants to

2  refer to documents in evidence.  It doesn't matter that this

3  witness hasn't seen it, he wants to say, he wants to put

4  before the jury the date of this letter, Exhibit 22, as

5  compared to the date of the subpoena; is that fair to say?

6          MR. NESSON:  Yes, it is, your Honor.

7          THE COURT:  So it doesn't really matter whether

8  the witness saw Exhibit 22, what matters is just the jux of

9  the position of the two, then he'll make some arguments from

10  them, I assume.

11          MR. OPPENHEIM:  I'll withdraw my objection, your

12  Honor.

13          THE COURT:  Okay.  What's the exhibit number of

14  the subpoena?

15          MR. OPPENHEIM:  It is Exhibit 19, your Honor.

16          THE COURT:  Okay.

17  Q.  So that the question is, according to the subpoena,

18  there is a lawsuit, the subpoena dated 11-3-04, there is

19  already a lawsuit filed against John Doe No. 45, which is

20  J. Tenenbaum once they've determined the name through you;

21  is that correct?

22  A.  All I can see is the request that comes to Cox states

23  the subpoena requires Cox to produce and permit inspection

24  and copying of November, 2009 of documents which contain

25  information including, so whether or not this is actually a

1    filed lawsuit, I can't stipulate to that.

2            THE COURT:  You're talking about Exhibit 19 which

3    is the John Doe lawsuit, right?

4            MR. NESSON:  Correct.

5            THE COURT:  Okay.  And Exhibit 22 is the demand

6    letter after Mr. Tenenbaum was allegedly identified; is that

7    fair to say?

8            MR. NESSON:  Yes.  And the demand letter I'm

9    suggesting refers in the future, threatens to file a

10   lawsuit, and I'm simply asking isn't it the case that the

11   lawsuit has already been filed?

12           THE COURT:  Well, he doesn't know that.

13   A.  I'm not qualified to answer that.

14           THE COURT:  Next question.  He only knows that he

15   received a subpoena addressed to a John Doe.  He doesn't

16   know anything else.  Next question.

17   Q.  Exhibit 22, I believe, the letter to Cox, Exhibit 20.

18   Thank you.

19           MR. OPPENHEIM:  You mean, Mr. Nesson, do you mean

20   the letter sent to J. Tenenbaum?

21           MR. NESSON:  Yes, I do.

22   Q.  Yes, excuse me, December 3, 2004, a letter, "Dear Cox

23   High Speed Customer, on blank, members of the Recording

24   Industry Association of America filed a lawsuit against

25   customers of Cox Communications."  So your understanding in

1    sending this letter is that indeed there was a lawsuit filed

2    by the RIAA initialed by RIAA against Does 1 through 76,

3    No. 45 of which turns out to be Joel Tenenbaum?

4            MR. OPPENHEIM:  Objection, your Honor.  That's not

5    what it says, it says members of the RIAA, not the RIAA

6    itself, and as you indicated -- I just object on that basis,

7    your Honor.

8            THE COURT:  I'm still mystified as to why this

9    is -- as to the issue here, the first, Exhibit 19 pertains

10   to the John Doe lawsuit, the letter pertains to a letter

11   that was included in one of the John Does, and then the

12   particular John Doe is added as a named party on the 22d,

13   I'm sorry, for Exhibit 22.  I'm not sure I understand the

14   significance, but go on.

15   Q.  And you're completely confident that you have the right

16   person with the J. Tenenbaum?

17   A.  Yes, I am.

18   Q.  And you would assume that's Joel Tenenbaum?

19   A.  I have never met Mr. Tenenbaum.  I can make that

20   assumption.

21   Q.  May I introduce you to Joel's mother who is Judie

22   Tenenbaum, J. Tenenbaum, so that this letter that you send,

23   who did it get sent to?

24   A.  It got sent to the account holder at that particular

25   address.

1    Q.  And was that account holder Judie Tenenbaum, or was it

2    Joel Tenenbaum?

3    A.  I do not have the other identifying on this sheet, so I

4    can't tell you at the moment.

5    Q.  Do you have any indication that Joel Tenenbaum ever

6    received this letter?

7    A.  I have no information that they received it, but I can

8    tell you it was sent.

9    Q.  Thank you very much.

10            THE COURT:  Anything further, counselor?

11            MR. OPPENHEIM:  No further questions, your

12   Honor.

13            THE COURT:  Thank you very much.  Why don't we

14   take a brief break now so we can find out what is left for

15   today if anything is left for today.  All rise for the jury.

16            (JURORS EXITED THE COURTROOM.)

17            THE COURT:  You can all be seated.  Do you have

18   any other witnesses?

19            MR. OPPENHEIM:  Yes, we do, your Honor.  We had

20   given the defense a witness list in the morning, but we're

21   going to need to switch it up a little bit because of timing

22   because of two witnesses who have to get on today because of

23   their schedules, if that's okay with the Court.

24            THE COURT:  Let's take a ten-minute break so

25   people can refresh yourselves.

1        MR. OPPENHEIM:  Sure.

2        (A recess was taken.)

3        THE CLERK:  All rise for the jury.

4        THE COURT:  You can all be seated.

5        MR. REYNOLDS:  Your Honor, the plaintiffs call

6   Jimmy Chappel.

7        JAMES CHAPPEL, having been duly sworn by the

8   Clerk, testified as follows:

9        THE COURT:  Is this individual simply reading a

10  deposition or --

11        MR. REYNOLDS:  No, we have two live witnesses,

12  then we will follow it up with some depositions that will be

13  read.

14        THE COURT:  Okay.  The oath stands.  I was

15  wondering why we were swearing in someone who was going to

16  read.

17                    DIRECT EXAMINATION

18  BY MR. REYNOLDS:

19  Q.  Good afternoon.  Could you take the microphone and drop

20  it down.  That would be great.  Could you tell the jury your

21  name, please.

22  A.  James Chappel.

23  Q.  Mr. Chappel, where do you live?

24  A.  North Providence, Rhode Island.

25  Q.  Do you know the defendant, Joel Tenenbaum?

1    A.  Yes.

2    Q.  How do you know the defendant?

3    A.  Through high school, we went to high school together.

4    Q.  When was the last time you saw Joel Tenenbaum?

5    A.  A couple years ago.  He had a party at his house in

6    Boston, and he invited me so I went for a little while.

7    Q.  Was that Commonwealth Avenue?

8    A.  Yes.

9    Q.  That was a condominium?

10   A.  Yes.

11   Q.  And prior to that, when was the last time you had seen

12   the defendant Joel Tenenbaum?

13   A.  Probably when we graduated high school in 2002.

14   Q.  In 2002?

15   A.  Yeah.

16   Q.  Do you recall that Mr. Tenenbaum had a computer and

17   stereo equipment in his bedroom in Providence,

18   Rhode Island?

19   A.  Yes.

20   Q.  And did you ever use the computer in Joel Tenenbaum's

21   bedroom?

22   A.  To check e-mail a couple times.

23   Q.  Did you use it for anything else that you recall?

24   A.  No, no.

25   Q.  How would you describe Mr. Tenenbaum's attitude towards

1  allowing other people to use his computer?

2  A.  He allowed people to use it.  Anyone could use it.  His

3  friends, whatever, they could use it.

4  Q.  Did you see other people using Joel's computer very

5  frequently?

6  A.  I saw him use it and probably a couple other people

7  while I was over.

8  Q.  Joel has said that he believes that you used his KazaA

9  account on his computer in Providence, in the bedroom in

10  Providence, Rhode Island.  Have you used KazaA on any

11  computer in the Tenenbaum house in Providence,

12  Rhode Island?

13  A.  No.

14  Q.  Have you ever used any computer in the Tenenbaum house

15  to download music off the Internet?

16  A.  No.

17  Q.  Have you used the sublimeguy14 user name?

18  A.  No.

19  Q.  At the time you knew Joel back in 2002, did you know

20  what file sharing was?

21  A.  Yeah, just sharing files over computers, I assumed.

22  Q.  And did you ever use any of those programs at

23  Joel Tenenbaum's house?

24  A.  No.

25  Q.  When you knew Joel, do you recall anything about Joel's

1   music collection?

2   A.  Yeah, he had a lot of CDs that he would listen to.

3   Q.  When you say he had a lot of CDs, do you recall whether

4   Joel had any home-made CDs?

5   A.  I knew he had some real CDs, he had some blank CDs.  I

6   don't know what was on them.

7   Q.  When you say you saw some blank CDs, where did you see

8   those?

9   A.  In his room.

10  Q.  And how could you tell, you mean they didn't have music

11  on them?

12  A.  No, they just had no writing or anything, just ones used

13  for putting files onto.

14  Q.  Did you ever rip any music to the computer in

15  Joel Tenenbaum's house?

16  A.  No.

17  Q.  Tell me, did you ever hear about Joel bragging about

18  music that he downloaded off the Internet?

19  A.  Just a couple times, yeah, he'd say he got a song from

20  the Internet.

21  Q.  And did he say anything about being free?

22  A.  I can't really recall just him saying that he got it on

23  the Internet.

24          MR. REYNOLDS:  No further questions.  Thank you.

25          THE COURT:  Mr. Nesson.

CROSS-EXAMINATION

BY MR. NESSON:

Q.  Jimmy, you're a friend of Joel's?

A.  Yeah.

Q.  Skateboard friend?

A.  Yeah, we used to skateboard.

Q.  I understand that you got the best dolly in the group?

A.  I guess, yeah.  Not anymore, but...

Q.  And you were deposed in this case?

A.  Say that again.

Q.  You were deposed in this case?

A.  I signed something.  I didn't actually go anywhere in
person, I just signed a letter.

Q.  So you were contacted by the plaintiffs in this case?

A.  Yes.

Q.  Tell me about that experience.

A.  I think the month was October, last October I got a call
just asking me if I had known Joel in high school, and I
said yes, and then they kind of told me about what was going
on, about the trial and everything.  I was a little
confused.

Q.  And then they've asked you to come here and testify?

A.  Yeah.

Q.  Well, thank you very much.

        MR. FEINBERG:  May we have a moment, Judge?  May I

1    approach the sidebar?

2         (THE FOLLOWING OCCURRED AT SIDEBAR:)

3         MR. FEINBERG:  This witness that just testified

4    that he signed a letter provided to them by the plaintiffs

5    and we've never seen it.

6         THE COURT:  Keep your voice down.

7         MR. FEINBERG:  We've never seen it.  I asked it

8    from Mr. Reynolds, and he hasn't produced it.

9         MR. REYNOLDS:  They never asked us.  HE just asked

10   us two seconds ago he brought us the letter in the middle of

11   the case.  They never asked for this in discovery.  This

12   wasn't a requested document.

13        MR. FEINBERG:  I didn't know it was going to be a

14   letter, I didn't know it was going to be a letter.

15        MR. REYNOLDS:  He's been listed on our witness

16   list eight or nine months we discovered the witness.

17        THE COURT:  It's not a criminal case,

18   Mr. Feinberg.

19        MR. FEINBERG:  I'm calling for the letter.  I

20   think it's relevant for me to look at the letter.

21        THE COURT:  There's an obligation, I mean, you can

22   subpoena them, I suppose.  You want to turn over the letter

23   voluntarily?

24        MR. REYNOLDS:  No, not now.  I have no interest in

25   that.  They could have asked for it.

1          THE COURT:  He was on your witness list eight

2     months ago.

3          MR. REYNOLDS:  He was on the disclosures eight

4     months or more, and he was on even our witness list I

5     believe the November trial schedule.

6          THE COURT:  And was there ever an effort to ask,

7     did they file any discovery motions with respect to?

8          MR. REYNOLDS:  No, no, nothing.  They never

9     requested the letter.

10          THE COURT:  I don't see where you're entitled to

11     the letter unless you want to subpoena him right now.

12          MR. FEINBERG:  Well, I'd like to subpoena it, I'd

13     like to see it in the morning.

14          THE COURT:  He can certainly do it.  You might as

15     well turn it over.

16          MR. FEINBERG:  Will you agree to turn it over the

17     letter?

18          MR. REYNOLDS:  Subpoena.

19          THE COURT:  Discovery request.

20          MR. FEINBERG:  I'll hold the witness.

21          THE COURT:  In other words, he can get access even

22     mid-trial discovery doesn't control that.  He could subpoena

23     the witness.

24          MR. REYNOLDS:  Let him subpoena the witness

25     then.

1          THE COURT:  Come now.

2          MR. REYNOLDS:  So we're going to recall this

3    witness for something they could have done in discovery,

4    your Honor, instead of who knows what they were doing during

5    discovery.  I mean, this man, this man, he's a single father

6    with one child.  He took off work to be here today.

7          THE COURT:  The question is do you have the letter

8    with you now?

9          MR. REYNOLDS:  I do.

10          THE COURT:  Would you turn it over voluntarily?

11          MR. REYNOLDS:  I see no reason to.  Do you want to

12    do that?

13          THE COURT:  It makes no sense.  One can always

14    subpoena at trial anything that in a civil case the

15    difference between discovery and a subpoena is whether you

16    have to pay to subpoena or you get it in advance.  They've

17    lost the opportunity to see it in advance, but they could

18    always do a trial subpoena now.

19          MR. OPPENHEIM:  Your Honor, in this case we've

20    been fighting tooth and nail with discovery from defendants.

21    You can laugh if you want.  We got the computer specialist a

22    week before the trial began instead of spending all their

23    time fighting us on discovery.  They could have provided

24    discovery voluntarily.

25          THE COURT:  I understand that.

1          MR. OPPENHEIM:  Engage in a process.

2          THE COURT:  I'm dealing with a very practical

3   problem, and the practical problem, he could ask the

4   witnessfor his address, and he could tomorrow issue a trial

5   subpoena to get this letter.  He could do that tomorrow.

6          MR. OPPENHEIM:  But this witness --

7          THE COURT:  Or he could call his office and

8   subpoena the guy now.  The letter will come in some way, and

9   the question is whether you wish to discomfort the witnessor

10  not.

11         MR. OPPENHEIM:  The witness should be excused now

12  unless they have further questions, and the witness

13  shouldn't be called back.  They should have done this

14  before.  They didn't do their homework.  We shouldn't have

15  to -- we've put up with a rather unconventional approach

16  already.  How far are we going to go to make their case for

17  them?  I think we've gone far enough.

18         MR. FEINBERG:  All I want, to see the letter.  If

19  it's a one-page letter, it may take me a minute.  There may

20  or may not be cross-examination.  I don't see what the

21  resistance is here.

22         MR. REYNOLDS:  This reason, it should have been

23  done a long time ago.  It's not fair to this witness.

24         THE COURT:  I can't order them to turn it over.

25  If you want to do the subpoena, that's the way to go.  It

1  seems silly to me, too, but I can't order you to turn it

2  over under these circumstances.

3          MR. FEINBERG:  I'll go down and issue a subpoena

4  and bring him back tomorrow.

5          (SIDEBAR CONFERENCE WAS CONCLUDED)

6  Q.  Jimmy, would you tell me your address?

7  A.  My current address?

8  Q.  Yes.

9  A.  1776 Bicentennial Way in North Providence, Rhode Island,

10  Apartment C7.

11  Q.  And, Jimmy, when you were contacted by these folks, were

12  you a little pissed off at Joel for having gotten involved

13  in this?

14  A.  At first a little bit, yeah.  You know, I have to be

15  here so what am I going to do?

16  Q.  You figured as a friend he should have kept you out of

17  it?

18  A.  I don't know.  I mean, I kind of just was annoyed at the

19  situation.

20  Q.  Well, I don't mean to quibble, but perfectly sensible.

21          MR. NESSON:  One moment.

22          MR. OPPENHEIM:  Your Honor, we're going to provide

23  it.

24          THE COURT:  Okay.  You can take a moment to look

25  at it.

1   Q.  Jimmy, I've just been handed a letter that I believe you

2   wrote.

3          MR. REYNOLDS:  Your Honor, the letter is not in

4   evidence.  He cannot question the witness.

5          MR. NESSON:  May I offer this to the witness and

6   have him identify it, your Honor?

7          THE COURT:  Identify it, yes, and then you move to

8   introduce it.  Show him the letter, if he identifies the

9   letter as his, then if it's relevant, it can be admitted.

10  Actually, if he identifies it, it's only relevant, as you

11  know, if it's inconsistent with something he said or if it

12  fits under another aspect of the rules of evidence.  You can

13  question him about it and he'll either adopt it or not, but

14  the physical letter doesn't come in.  This is your letter.

15  Mr. Nesson, do you want to take the letter?

16  Q.  So, Jimmy, you wrote this letter after you had been

17  contacted?

18  A.  Yes.

19  Q.  By the plaintiffs?

20  A.  Yes.

21  Q.  And would you describe that contact to me in sufficient

22  detail so that I understand what exactly the background was

23  for you writing this letter?

24  A.  Well, I had just gotten a call on the phone.  I don't

25  know how they found my phone number, but they called me on

1  the phone one night and told me that I would most likely

2  have to go to court as a witness for this trial and just

3  they told me the background of the trial that he was in

4  trouble for downloading music, and I guess he had said I had

5  used his computer along with other of his friends and I

6  would have to go as a witness based on that pretty much.  So

7  I had written that letter just to kind of, you know, say my

8  side basically to them.

9  Q.  So you thought perhaps that you were in a little trouble

10  yourself?

11  A.  I think I was more like just confused about the whole

12  situation.  I didn't really know, to be honest.

13  Q.  You were worried that they were going to accuse you of

14  stealing music?

15  A.  I wasn't really sure.  I just wanted to clear it up.

16  They had actually given me something to sign that was in

17  their words, and I felt it was better to write something in

18  my own words as a letter instead of signing something they

19  had written, so that's why I wrote that as well to say it in

20  my own words.

21  Q.  They gave you something in their words.  Do you still

22  have that?

23  A.  No, I don't.  I signed it and sent it to them.

24  Q.  Excuse me, I didn't hear it.

25  A.  I signed it and sent it to them.

1  Q.  In other words, you signed something and sent it back to

2  them that was in their words?

3  A.  Yes, and I don't know.  I wrote that just to clarify a

4  few things that weren't in that letter.

5  Q.  When was it that you wrote in Facebook that Joel had

6  thrown you under the wheels of the bus?

7  A.  I think that was probably the day after I got contacted,

8  I think.

9  Q.  So that was your immediate reaction?  Can I have a

10  moment, please.

11         MR. NESSON:  No further questions.

12                   REDIRECT EXAMINATION

13  BY MR. REYNOLDS:

14  Q.  Mr. Chappel, you were handed a letter a moment ago dated

15  November 3rd, 2008, right, this is a letter you wrote?

16  A.  Yes.

17  Q.  I want to just confirm that with you.

18         MR. REYNOLDS:  May I approach, your Honor?

19         THE COURT:  Yes.

20  Q.  Is that a copy of the letter you wrote?

21  A.  Yes.

22         MR. REYNOLDS:  Your Honor, we'd move to introduce

23  this as Exhibit 57.

24         THE COURT:  What's the basis, not a statement of a

25  party, inconsistent with his testimony, no, in what respect

1   is this independently admissible?  Maybe interesting, but

2   it's not independently admissible on any ground that I can

3   think of.

4          MR. REYNOLDS:  I would say THAT I don't think it's

5   mildly inconsistent with one point that Mr. Chappel made.

6          THE COURT:  Examine him on the inconsistency.  The

7   letter still doesn't come in.

8          MR. REYNOLDS:  Understood, your Honor.

9   Q.  Mr. Chappel, did you write in this letter, did you say

10  in this letter your contact with Joel was infrequent but you

11  do recall that Joel always had the latest music tracks, and

12  he often bragged about that he "downloaded" it off the

13  Internet.  I even recall that he may have said something

14  about it free.  Do you remember that?

15         MR. FEINBERG:  This is back dooring it, Judge.

16         THE COURT:  He can ask about a question.  He can

17  use anything to refresh the witness' recollection, but the

18  letter doesn't come in unless it's adopted by the witness on

19  the stand.

20         MR. NESSON:  He just read it allowed.

21         THE COURT:  He's asking him -- he could read from

22  a piece of paper and he could say did you say X, Y and Z.

23         MR. NESSON:  We have no objection to the admission

24  of this letter.

25  Q.  Are those your words, Mr. Chappel?

1          THE COURT:  Are you still offering the letter, or

2     does the fact they have no objection scotch that?

3          MR. REYNOLDS:  We would offer the letter, your

4     Honor.

5          THE COURT:  All right.  Then the letter can come

6     in.

7          ( Copy of letter from James Chappel was marked

8     and admitted into evidence as Exhibit No. 57.)

9     Q.  Mr. Chappel, is this a copy of the letter you wrote?

10    A.  Yes.

11    Q.  And in the second paragraph, it has the language I just

12    read regarding Mr. Tenenbaum bragging that he downloaded it

13    off the Internet?

14    A.  Yes.

15         MR. REYNOLDS:  No further questions, your Honor.

16         THE COURT:  Anything further?  All right.  You're

17    excused.  Thank you very much.

18         MR. REYNOLDS:  Your Honor, the plaintiffs call

19    Arthur Tenenbaum.

20         ARTHUR TENENBAUM, having been duly sworn by the

21    Clerk, testified as follows:

22                    DIRECT EXAMINATION

23    BY MR. REYNOLDS:

24    Q.  Good afternoon, Mr. Tenenbaum.  I'm sorry,

25    Dr. Tenenbaum.  You're Joel's father, correct?

1    A.  Yes.

2    Q.  And what do you do for a living?

3    A.  I'm a psychiatrist.

4    Q.  And where do you work?

5    A.  At the, let's see, currently I'm in Palmer, at Wing

6    Memorial Hospital in Palmer.

7    Q.  Dr. Tenenbaum, could you move the microphone towards

8    you.  It actually moves on the table.  You can pull it

9    towards you.  The whole base moves.  Yes.  And,

10   Dr. Tenenbaum, your home address is in Providence

11   Rhode Island currently?

12   A.  Yes.

13   Q.  And you lived at the same address in Providence since

14   about 1999?

15   A.  Yes.

16   Q.  Now, in addition to Joel, you have two daughters,

17   correct?

18   A.  Yes.

19   Q.  One is Abigail, and one is Tova?

20   A.  Yes.

21   Q.  And you're oldest daughter Abigail, she was already in

22   college when you moved into the Providence house in 1999; is

23   that correct?

24   A.  Yes.

25   Q.  And she's older than Joel?

1    A.  Yes.

2    Q.  And you have another daughter named Tova, she's younger

3    than Joel?

4    A.  Yes.

5    Q.  She would have been something in junior high and high

6    school during the time frame of 1999 through 2004?

7    A.  Yes.

8    Q.  Dr. Tenenbaum, Joel started college in the fall of 2002,

9    correct?

10   A.  Yes.

11   Q.  And that was Goucher College in Maryland?

12   A.  Yes.

13        MR. FEINBERG:  Your Honor, I know it's getting

14   late, but this is leading, and I hope we're not going to

15   have to keep going over that.

16        THE COURT:  I think leading is exactly what he

17   needs to do because it's late and because of the

18   relationship of the witness to your client.  Go on,

19   counsel.

20   Q.  Your Honor, with respect to -- I'm sorry, Dr. Tenenbaum,

21   with respect to Joel Tenenbaum, Joel's music taste, Joel

22   went through a heavy metal phase at one point, correct?

23   A.  I'm not sure about the gendre of music and what it's

24   called.

25   Q.  He liked the artist Romstein, do you remember that?

1   A.  I remember that one.

2   Q.  He liked to listen to that very loud?

3   A.  Well, it is loud music.  I don't know that he listened

4   to it at a high volume.

5   Q.  And Joel also liked Nine Inch Nails?

6   A.  Yes.

7   Q.  He liked Nirvana?

8   A.  Yes.

9   Q.  He liked The Red Hot Chilly Peppers?

10  A.  I don't recall that one.

11  Q.  He liked Blink 182?

12  A.  That sounds familiar.

13  Q.  He liked Sticks?

14  A.  I'm not sure at this point.

15          MR. REYNOLDS:  Your Honor, I have the sealed

16  deposition of Dr. Tenenbaum.  May I open it?

17          THE COURT:  Yes, you may.

18          MR. REYNOLDS:  May I approach?

19          THE COURT:  Yes.

20  Q.  Dr. Tenenbaum, do you recall you were deposed in this

21  case?

22  A.  Yes, I do.

23  Q.  And you were under oath, correct?

24  A.  Yes.

25  Q.  Could you you turn to page 42 of your deposition

1    transcript, specifically lines 2 through 11, I'm sorry,

2    through 10, I'll read to you, Question:  "Nirvana?"  Answer:

3    "Yes, that was one he liked."  Question:  "Joel liked them?"

4    Answer:  "Yes."  Question:  "What about Rage Against The

5    Machine?"  Answer:  "I have heard the title, but I don't

6    know if Joel was into that."  Question:  "Red Hot Chilly

7    peppers?"  Answer:  "I think -- I think that is one he

8    likes."  Was that the testimony you gave during your

9    deposition?

10   A.  Yes.

11   Q.  And with respect to Sticks, do you see on page 43, lines

12   5 and 6, it says question:  "Sticks?"  Answer:  "I think

13   that is one Joel is partial to."  Is that your testimony?

14   A.  Yes.

15   Q.  "Joel also liked Beck?"  And, Dr. Tenenbaum, if you

16   could put that aside for a moment.  I need you to testify

17   from memory, if you would.  Do you recall that Joel liked

18   the artist Beck as well?

19   A.  At this time I cannot recall that.

20   Q.  Could you turn back to page 43, Dr. Tenenbaum.

21   A.  Yes.

22   Q.  Specifically line 7 through 10.  Question:  "Beck?"

23   Answer:  "I think that is one he has."

24   A.  Yes.

25   Q.  Question:  "That Joel has?"  Answer:  "Yes."  Was that

1    your testimony?

2    A.  Yes.

3    Q.  And, Dr. Tenenbaum, Joel also likes the Fugees,

4    correct?

5    A.  I remember that, yes.

6    Q.  And, in fact, you and Joel listened to the song "Killing

7    Me Softly" together on one occasion, did you not?

8    A.  Yes.

9    Q.  And that song was not a version, the song that you

10   listened to by the Fugees of Killing Me Softly, that was not

11   the version you were familiar with?

12   A.  Yes.

13   Q.  The version you were familiar with was sort of less up

14   tempo than that song?

15   A.  Yes.

16   Q.  And Joel preferred the Fugees version?

17   A.  Yes, I believe so.

18   Q.  Sublime is also a group?

19   A.  Yes.

20   Q.  Bob Marley?

21   A.  Yes.

22   Q.  Smashing Pumpkins?

23   A.  Yes.

24   Q.  Eminem?

25   A.  Yes.

1    Q.   And the artist Limp Bizkit?

2    A.   Yes.

3    Q.   Now, Joel also liked classical music, didn't he?

4    A.   Yes.

5    Q.   And, in fact, he played a recital at Goucher College

6    for, and I believe it included works by Choppa?

7    A.   Yes.

8    Q.   And also Beethoven, "The Moonlight Sonatas"?

9    A.   Yes.

10   Q.   I'd like to shift gears and talk about the computers

11   that were at your residence in Providence, Rhode Island.

12   Now, currently there's what's referred to as an eMachine

13   desktop.  Is that computer still there?

14   A.   Yes.

15   Q.   And that computer was in Joel's bedroom, correct?

16   A.   Yes.

17   Q.   And prior to that, before the eMeMachine, you had

18   another machine, it was a desktop PC that was in Joel's

19   bedroom?

20   A.   Yes.

21   Q.   And since you moved into the residence at Providence,

22   Rhode Island, since you've been at that address, there's

23   been a PC desktop in Joel's bedroom the entire time; is that

24   accurate?

25   A.   Yes.

1   Q.   And Joel's bedroom is on the second floor of the

2   house?

3   A.   Yes.

4   Q.   And is it fair to say that Joel generally took charge of

5   setting up the computers in the house?

6   A.   Yes.

7   Q.   And it's also fair to say that the computer in Joel's

8   bedroom is typically left on because you had heard that it

9   was better to leave a computer on rather than stop and start

10  it all the time?

11  A.   Yes.

12  Q.   Joel also had a stereo system in his bedroom, did he

13  not?

14  A.   Yes.

15  Q.   And the desktop computer that was in Joel's bedroom was

16  hooked up to the stereo system, right?

17  A.   I'm not sure.  It probably was.

18  Q.   So that someone sitting at the computer could listen to

19  music on the stereo system?

20  A.   Yes, I believe so.

21  Q.   And Joel also hooked up his own stereo system,

22  correct?

23  A.   Yes.

24  Q.   Now, separate from the desktop computer that was in

25  Joel's bedroom in Providence, Rhode Island, was there also a

1   time when you bought Joel a computer to take to college with

2   him?

3   A.  Yes.

4   Q.  And that was a Gateway computer, correct?

5   A.  Yes, that sounds familiar.

6   Q.  And that was in 2002?

7   A.  Yes.

8   Q.  And, Dr. Tenenbaum, you had your own laptop computer?

9   A.  Yes, I do.

10  Q.  And you've used the PC, the desktop computer in Joel's

11  bedroom on occasion, correct?

12  A.  Yes.

13  Q.  Fair to say have you ever used KazaA on that computer,

14  Dr. Tenenbaum?

15  A.  I have never downloaded anything from KazaA, but Joel

16  showed me KazaA's library on that machine.

17  Q.  And with respect to Joel showing you that library, he

18  showed you this on the computer in his bedroom, correct?

19  A.  Yes.

20  Q.  And he showed you a system for downloading music on the

21  Internet, that's what he was showing you?

22  A.  Yes.

23  Q.  And he showed you specifically, you looked with him to

24  see what music was available?

25  A.  Yes.

1   Q.  You saw a list of files that could be downloaded from
2   other users on the network?
3   A.  I did see that.
4   Q.  And he explained to you that the people that had this
5   music on their computers, the people that you were looking
6   at, this list of files, that music was on other people's
7   computers that you could get from them, correct?
8   A.  That was my understanding.
9   Q.  And this is before Joel went to college, right?
10  A.  Yes, I believe it was.
11  Q.  Now, when Joel showed you this program, you and he
12  looked on the network for songs that you might like, artists
13  that you might like, right?
14  A.  Yes.
15  Q.  And is it fair to say that the program you looked at did
16  not have the music you liked?
17  A.  That is correct.
18  Q.  Now, you know what a blank CD is, right?
19  A.  Yes.
20  Q.  And it's a CD that you can use to record music on?
21  A.  Yes.
22  Q.  And you purchased blank CDs from the store, right?
23  A.  Yes.
24  Q.  And you bought them in stacks of 50?
25  A.  Either 50 or 100.

1  Q.  And you know that Joel was using them because the stacks

2  kept going down, right?

3  A.  Yes.

4  Q.  Yes?

5  A.  Yes.

6  Q.  And you had to buy more?

7  A.  Yes.  I also used some, too.

8  Q.  Certainly.  Dr. Tenenbaum, you're aware that Napster was

9  shut down, right?

10  A.  Yes.  I've heard that today, yes.

11  Q.  Okay.  Well, let me back up.  You were aware long before

12  today of the Napster file sharing program, correct?

13  A.  I believe so.  The name I remember is KazaA, but I knew

14  what Napster was, yes.

15  Q.  Okay.  Well, isn't it true that you knew before Joel

16  went to college that Napster had been shut down?

17  A.  I'm not sure if I knew that.

18  Q.  Could you turn to page 11, please, of your deposition.

19  It's actually page 10.  It begins on page 10, line 17 and

20  goes through line 9 of page 11.  Question:  "Dr. Tenenbaum,

21  have you ever heard of Napster before?"  Answer:  "Napster,

22  yes."  Question:  "When did you hear of Napster?"  Answer:

23  "It was in the newspapers.  I know that, and Joel told me

24  about it, too."  Question:  "When did you read about it in

25  the newspapers?"  Answer:  "That people were being sued for

1    it.  I remember that, that it was a file sharing program."

2    Question:  "And how long was ago was that?"  Answer:  "I

3    mean, I can only estimate that some time when Joel was in

4    high school, but I don't know."  Question:  "Is that when

5    Joel talked to you about it as well about the same time?"

6    Answer:  "Yes."

7         Is that the testimony that you gave at your

8    deposition, Dr. Tenenbaum?

9    A.  Yes.

10   Q.  And you heard that Napster was shut down either from

11   Joel or from reading it in newspapers; is that a fair

12   statement?

13   A.  I'm not sure.  This doesn't say that I knew that it was

14   shut down.  Oh, then you were aware, yes, I was aware.

15   Q.  Thank you, Dr. Tenenbaum.  Now, Dr. Tenenbaum I'd like

16   to shift gears again and talk about a time you had a phone

17   call with Joel after he went to Goucher College, okay?

18   A.  Yes.

19   Q.  After Joel went to college, you read in the newspaper

20   about lawsuits like this one, did you not?

21   A.  Yes.

22   Q.  And when you did that, you read that these lawsuits were

23   against people using the file sharing programs to download

24   and distribute music?  Yes?

25   A.  Yes, either I read it or I heard it on the radio, I'm

1  not sure which.

2  Q.  Well, after you read about it or you heard about these

3  lawsuits, you called Joel while he was at Goucher?

4  A.  That is my recollection, yes.

5  Q.  And that would have been some time during his first or

6  second year at Goucher College, right?

7  A.  Probably the first year.

8  Q.  And you told him not to engage in this type of

9  activity?

10  A.  Yes.

11  Q.  And his response to you was you only get sued if you do

12  it a lot; isn't that right?

13  A.  Yes.

14  Q.  He was not concerned?

15  A.  He was not.

16  Q.  He did not tell you that he was not doing it, did he?

17  A.  No.

18  Q.  Just they only sue people who do it a lot?

19  A.  Yes.

20  Q.  Now, you didn't call either of your other children about

21  what you read in the newspaper about what you heard on

22  television?

23  A.  No.

24  Q.  You called Joel?

25  A.  Yes.

1    Q.  And Joel was the only person you called?

2    A.  Yes.

3    Q.  Dr. Tenenbaum, at least at the time of your deposition,

4    you had never asked Joel whether he did this, did you?

5    A.  I don't recall ever asking him.

6    Q.  And aside from the fact that Joel showed you one of

7    these programs on his computer, the KazaA program and how to

8    use it, you don't have any other information regarding who's

9    responsible for the infringement in this case, do you?

10   A.  I don't.

11               MR. REYNOLDS:  Nothing further.  Thank you.

12                    CROSS-EXAMINATION

13   BY MR. NESSON:

14   Q.  Doctor, this book that you're reading from, what is

15   that?

16   A.  That's the deposition.

17   Q.  That's the transcript of the deposition?

18   A.  Transcript of the deposition, yes.

19   Q.  This is an event that took place when?

20   A.  I see a date on it October 13th, 2008.

21   Q.  And what did you have to do in order to have that book

22   created?

23   A.  Went down to the law office and talked to the

24   attorney.

25   Q.  This was where?

1    A.   I believe it was in Providence.

2    Q.   So you received a subpoena?

3    A.   Probably.

4    Q.   Which ordered you to appear at a date and time

5    certain?

6    A.   Yes, yes.

7    Q.   An official document?

8    A.   Yes.

9    Q.   And then you were brought into a lawyer's office?

10   A.   Yes.

11   Q.   Were you represented in this proceeding?

12   A.   No.

13   Q.   It was just you?

14   A.   Yes.

15   Q.   And who was there to interrogate you?

16   A.   The same attorney who just asked me.

17        MR. REYNOLDS:   Objection to the word, it wasn't an

18   interrogation.

19   Q.   Who was there to ask you --

20        MR. REYNOLDS:   We have an objection.

21        THE COURT:   Wait, wait.

22   Q.   -- to ask questions?

23        THE COURT:   Who was there to ask questions?   The

24   objection is sustained.

25   A.   I believe is that Mr. Reynolds?   I don't recall the

1   name.

2   Q.  And this was under oath?  You were put under oath?

3   A.  Yes.

4   Q.  And you were told to answer the truth?

5   A.  Yes.

6   Q.  Under pain and penalty of perjury?

7   A.  Yes.

8   Q.  Which, of course, you did?

9   A.  Yes.

10  Q.  Absolutely.  Would you describe for the jury what the

11  impact of this litigation against your son has been on your

12  family?

13          MR. REYNOLDS:  Objection, your Honor.

14          THE COURT:  Sustained.

15  A.  Well, I would say --

16          THE COURT:  No, no, sustained means you don't

17  answer.  Go on.  Next question, Mr. Nesson.

18          MR. FEINBERG:  Could we have a sidebar?

19          THE COURT:  No, go on.

20  Q.  Would you describe what the impact of this experience

21  has been on you personally?

22          MR. REYNOLDS:  Objection, your Honor.  Same

23  objection.

24          THE COURT:  Objection is sustained.

25          MR. NESSON:  No further questions.

1          THE COURT:  Anything further, counsel?

2          MR. NESSON:  One further question, sorry.

3     Q.  At what age this interaction that was described when

4     Joel was in high school, at what age was he then?

5     A.  Well, somewhere between 16 and 18.

6     Q.  And are you proud of your son?

7     A.  Yes.

8     Q.  Did you teach him to live by principle?

9     A.  Yes.

10    Q.  Do you believe he lives by principle?

11         MR. REYNOLDS:  Objection, your Honor.  Relevance

12    and what the foundation is.

13         THE COURT:  Well, I think there's a foundation.

14    Relevance is a little spongy but I'll allow it.

15    A.  Yes, I hope so to the best of my ability.

16    Q.  Thank you.

17         THE COURT:  Anything further?

18         MR. REYNOLDS:  Nothing, your Honor.

19         THE COURT:  Thank you very much.  Next witness.

20         MR. REYNOLDS:  Your Honor, we have several

21    witnesses that we would call by deposition testimony.  They

22    are beyond the subpoena power of the court.  We have

23    witnesses here who will read from them in open court.

24         THE COURT:  Okay.  Ladies and gentlemen, this is a

25    procedure by which a deposition, which is testimony that

1  someone has given under oath prior to trial, the testimony

2  is read to you.  There are wonderful stories about how in

3  California they have actors read the testimony to try to

4  persuade the jury that, you know, this very handsome or very

5  attractive person is really the witness.  They're not doing

6  it, although there may be a perfectly attractive person,

7  essentially it's the word that matters.

8           MR. OPPENHEIM:  One of your former clerks.

9           MR. REYNOLDS:  Justin Seminski.  This is

10  Ms. Seminski.

11           THE COURT:  Yes.

12           MR. REYNOLDS:  Your Honor, the plaintiffs call

13  Tova Tenenbaum.

14           ( The deposition testimony of Tova Tenenbaum was

15  read as follows:)

16  Q.  Good afternoon.  My name is Tim Reynolds.  I'm an

17  attorney representing the plaintiffs in a case that is

18  pending in federal court.  We're here today for a

19  deposition.  Could you please spell your name.

20  A.  T-o-v-a T-e-n-e-n-b-a-u-m.

21  Q.  You understand you're testifying under oath today?

22  A.  Yes.

23  Q.  And you understand that it's the same oath that would

24  apply in a court of law?

25  A.  Yes.

1    Q.   Ms. Tenenbaum, where do you live?

2    A.   I live in Pittsburgh.

3    Q.   You are currently in school?

4    A.   That's right.

5    Q.   What are you studying?

6    A.   Social work.

7    Q.   Have you ever had any computer-related jobs?

8    A.   No, I'm not very good at computers.

9    Q.   Well, speaking of the computer, was there a computer in

10   the house at Upton Avenue when you were in high school from,

11   you know, before high school from 2000 to 2004?

12   A.   Yes, there was.

13   Q.   Just so I understand, we're talking about a desktop

14   computer?

15   A.   That's correct.

16   Q.   It was a Gateway?

17   A.   I believe so.

18   Q.   And it was located in your brother's room at the

19   Upton Avenue address, and you moved there in 1999?

20   A.   Right.

21   Q.   What about Joel, what were his music tastes during that

22   time from 1999 to 2006?

23   A.   They changed a lot.  I think earlier he liked more like

24   metal, I think, then at some point he started to sort of not

25   listen to that, he started to listen to classical music

1  right around when he went to college.

2  Q.  Any particular artists that Joel liked that you

3  recall?

4  A.  I know he liked Nine Inch Nail, he liked Death Tones.

5  This was like towards the beginning of that time frame.

6  After a while, he didn't really like them any more, No

7  Effects.

8  Q.  Let me just read off some artists, you can tell me

9  whether you are familiar with these first?

10  A.  Whether I'm familiar with or like know them?

11  Q.  Whether these are artists that you are familiar with and

12  like, do you like these artists?

13  A.  Okay.

14  Q.  Green Day?

15  A.  I think my brother used to listen to Green Day more or

16  less, I guess.

17  Q.  Nirvana?

18  A.  Yeah, my brother liked Nirvana.

19  Q.  How about Sublime, do you like Sublime?

20  A.  I liked Sublime, my brother liked Sublime, probably not

21  my parents.

22  Q.  Rammstein?

23  A.  He did like them at some point.

24  Q.  Your brother Joel?

25  A.  Yeah, Joel did, he did at some point like that band.

1    Q.   Limp Bizkit?

2    A.   He liked that band at some point, I think.

3    Q.   I think I asked you this one, Green Day?

4    A.   Yeah, I think my brother liked Lincoln Park.

5    Q.   Lincoln Park?

6    A.   I think he liked Lincoln Park.

7    Q.   When you went to use the Gateway computer, was the

8    computer usually on, or did you shut it off?

9    A.   We usually just left it on.  I just remembered

10   something, which is it wasn't always in my brother's room.

11   There was a point at which it was on the third floor because

12   I remember checking my e-mail on the third floor, so that

13   computer was at some point on the third floor.

14   Q.   Would that have been when you first moved in?

15   A.   Possibly.

16   Q.   How long was it up there?

17   A.   I don't remember.

18   Q.   But it was the same computer, the Gateway?

19   A.   Right.

20   Q.   Was it the eMachine that was on the third floor or the

21   Gateway?

22   A.   The Gateway.

23   Q.   Tell me, during this time frame 1999 until you went to

24   college in 2006, what did you use the Gateway for?

25   A.   Checking my e-mail, word processing, looking things up

1   online.  That's really it.

2   Q.  You said you'd listen to music, you would click an icon

3   sometimes and music would come up?

4   A.  Uh-hum.

5   Q.  Yes?

6   A.  Right.

7   Q.  Do you remember what songs or artists those were you

8   were clicking on?

9   A.  I don't remember.  Actually, come to think of it, I

10  think they may -- I don't think that they were on the

11  desktop.  I think they were in files or like in a folder.

12  You open the folder, then there were icons.

13  Q.  How many songs were in the folder?

14  A.  Not a lot, maybe a few dozen.

15  Q.  Do you remember what songs those were?

16  A.  I don't know.

17  Q.  Do you know the artists?

18  A.  It was nothing I ever listened to like on purpose or

19  consciously, it was just like if I had sat down at the

20  computer, I would just like click a random song.  It was

21  always the same song, but I don't remember what they were.

22  Like maybe there was like a Beatles song or something.  I

23  guess my brother put his Beatles CDs, yeah, I guess Beatles

24  is one thing that I can remember listening to.  My brother

25  uploaded his Beatles CDs so I could listen to them.

1   Q.  Do you remember what program that was, what folder they

2   were in?

3   A.  Songs, I don't know.  There was Winamp.  Winamp was the

4   program that played them.  I think it was just like in a

5   folder that said like music or something.

6   Q.  There were only a couple dozen?

7   A.  Yeah, there weren't a lot of songs in there.

8   Q.  Do you know how those songs got there?

9   A.  I don't know how they got there.

10  Q.  Did you put them there?

11  A.  No, I didn't know how to do it.  I didn't know how to do

12  anything except put a CD in to listen to it.  I didn't even

13  know how to keep a CD in the computer.

14  Q.  Other than putting a CD into the computer and going to

15  this folder that had a couple dozen songs in it, did you

16  listen to the computer in any other way?

17  A.  No.

18  Q.  And did you ever use KazaA?

19  A.  No, I never used KazaA.  I never used LimeWire.  I

20  never -- the first thing I ever did to download my own music

21  was iToons.  Before then I didn't have my own computer.  I

22  didn't listen to -- I didn't actively seek out music to

23  listen to.

24  Q.  Are you familiar with the user name sublimeguy14?

25  A.  Yeah, I guess my brother likes Sublime.

1  Q.  Did you ever use the user name sublimeguy14?

2  A.  No.

3  Q.  I will represent to you that these are screen shots

4  showing the contents of a KazaA shared folder with the user

5  name sublimeguy14@kazaa.  It was observed being distributed

6  to other users on the KazAa network on August 10th, 2004

7  from the Upton Avenue address and through the Internet

8  account with KazaA.  My question to you is do you have any

9  information as to how these files would have gotten onto a

10  computer at the Upton Avenue address?

11  A.  I don't know.  It would all be speculation.  I never saw

12  anybody download music.  I didn't know there was a KazaA

13  account.  I wasn't home that summer.

14  Q.  In 2004?

15  A.  Yeah, I wasn't home.

16  Q.  Where were you during the summer of 2004?

17  A.  I was backpacking in Colorado.

18  Q.  So tell me what information you have, if any, about how

19  these songs might have come to be on the computer at the

20  Upton Avenue address that was connected to the KazaA

21  Internet account on August 10th, 2004?

22  A.  I guess that would all be speculation.  I never

23  personally saw anyone download music.  I never downloaded

24  music myself.  I didn't know anything about a KazaA account.

25  I've never seen those icons before.  I don't know.

1   Q.  Did you see anybody download music?

2   A.  No, I didn't.

3   Q.  Do you have any information at all regarding anyone

4   downloading music to the computer at the Upton Avenue

5   address from 1999 to 2006?

6   A.  No, I never saw anybody downloading.  I know there was

7   music on the computer.

8   Q.  When you say music on the computer, what music are you

9   referring to?

10  A.  The music that I would listen to like the music in the

11  files, that's all I knew like that there was.

12  Q.  A couple dozen songs in that one folder?

13  A.  Yeah.

14  Q.  Other than that, do you have any other information about

15  any other music being on the computer?

16  A.  No, I mean, people listened to music in that room other

17  than that music, but the door was often closed, so I

18  wouldn't have known if it was from the computer or from the

19  stereo.  If my brother was using the computer, I was not in

20  the room.  I was only allowed to use it/I only dared to use

21  it when my brother wasn't home so I wouldn't have been using

22  the computer or anything else for that matter.

23  Q.  So, in other words, you used the computer at a time when

24  your brother wasn't around?

25  A.  Right.

1  Q.  When your brother was around, you didn't use the

2  computer?

3  A.  Right.

4  Q.  Did you ever see anyone downloading any music onto any

5  computer at the Upton Avenue address?

6  A.  No.

7  Q.  Your brother testified that he believed you used his

8  KazaA account on the Gateway computer at the Upton Avenue

9  address.  I will ask you again, is your brother's belief

10  accurate?

11  A.  No.

12  Q.  Do you know whether your brother ever burned CDs, music

13  CDs?

14  A.  Whether he --

15  Q.  Whether he ever created music CDs from the Gateway

16  computer at the Upton Avenue address?

17  A.  Not specifically.  He definitely has burned CDs at

18  times.  I don't know whether he made those in the last few

19  years or previous to that.

20  Q.  How do you know that he has burned CDs?

21  A.  Because like I drive his car now, and he left all of his

22  CDs in my car, his car, my car.  They are all like

23  handwritten on like, you know, this mix or that mix or

24  something, so I assume that like music companies don't sent

25  out like Sharpie CDs.

1    Q.   When did you first get that car?

2    A.   January of this year.

3    Q.   January, 2008?

4    A.   Yes.

5    Q.   And you say there's about five or ten burned CDs in the

6    car right now?

7    A.   Yeah, roughly.

8    Q.   And those were in the car and they were your brother's

9    CDs or they still are?

10   A.   Right, they are my brother's CDs.  He has had that car

11   for a number of years, but I don't know how recent the CDs

12   are.

13   Q.   Would you be willing to provide those CDs to plaintiffs

14   to determine whether they are any of the same music that's

15   on this Exhibit No. 16 that's in front of you?

16   A.   I can provide them.

17            MR. REYNOLDS:  No further questions, your Honor.

18   Your Honor, I see we have about seven minutes.  I think I

19   can finish one more very quick deposition testimony.

20            THE COURT:  That's fine.

21            MR. NESSON:  I take it I can't cross-examine this

22   witness?

23            THE COURT:  You had your chance.  Go on.

24            MR. REYNOLDS:  Your Honor, the plaintiffs call

25   Abigail Nathan by deposition.

1          THE COURT:  And, of course, the defendants had an

2     opportunity to counterdesignate in the same deposition if it

3     chose.  Go on.

4          (Deposition of Abigail Nathan was read in as

5     follows:)

6     Q.  Good morning.  My name is Tim Reynolds.  I'm an attorney

7     representing the plaintiffs in a case pending against your

8     brother in the District of Massachusetts in federal court.

9     We're here this morning for your deposition.  Could you

10    please spell your name for me?

11    A.  Sure.  My name is Abigail Nathan, A-b-i-g-a-i-l, Nathan,

12    N-a-t-h-a-n.

13    Q.  For how long have you gone by Nathan?

14    A.  For two years.

15    Q.  Okay.  Prior to that, what was your last name?

16    A.  Tenenbaum, T-e-n-e-n-b-a-u-m.

17    Q.  Do you understand you're testifying under oath today?

18    A.  Yes.

19    Q.  And you understand that's the same oath that you would

20    take in a court of law?

21    A.  Yes.

22    Q.  If you need to take a break at any time, please let me

23    know, and I'll be glad to accommodate you.

24    A.  Okay.

25    Q.  Is there anything impacting you today that would affect

1   your ability to give your best and most accurate

2   testimony?

3   A.  I can't think of anything.

4   Q.  Okay.  Can you tell me what your address is and just

5   give me not the numbers?

6   A.  My current address is Philadelphia.

7   Q.  And prior to August of 2002, where were you living?

8   A.  My permanent address was listed as 20 Upton Avenue in

9   Providence, but I have not lived at that address full time

10  ever because I was in college.

11  Q.  When did you go to college?

12  A.  I was in college from August of '99 until May of 2002.

13  Q.  So just to recap, to make sure, during the summer of

14  2000, you lived at the Upton Avenue address for six to eight

15  weeks?

16  A.  Approximately.

17  Q.  And during the summer of 2001, you lived at the

18  Upton Avenue address for the whole summer?

19  A.  That's correct.

20  Q.  In 2002, you were there for about a month or six

21  weeks?

22  A.  Yes.

23  Q.  Okay.  Could you tell me what type of music you listen

24  to?

25  A.  I listen to a wide variety of music including classical

1   music, alternative rock, folk, early gamelan, g-a-m-e-l-a-n.

2   Q.   And what is gamelan?

3   A.   Gamelan is an Indonesian percussion music.

4   Q.   You said in addition to that, you said early rock?

5   A.   Early music.

6   Q.   Early music?

7   A.   Or alternative rock.

8   Q.   Folk or classical?

9   A.   Uh-huh.

10   Q.   Any other gendres?

11   A.   I can't think of any.

12   Q.   Okay.  So you got a Gateway computer -- okay.  So you

13   got a Gateway 2000 in 1996, or was there a time when you

14   didn't have a computer?

15   A.   No, we always had a family computer.  I believe we got

16   the Gateway in 1996.  It might have been 1995, and I believe

17   my family had that computer until probably 2005.

18   Q.   How much music was on the computer at Upton Avenue?

19   A.   A lot of music.

20   Q.   Do you have any knowledge of where the music on the

21   Gateway computer came from?

22   A.   No.

23   Q.   Do you have any information about who used KazaA at the

24   Upton Avenue address on the Gateway computer?

25   A.   No.

1    Q.  Did you ever use the screen name sublimeguy14?

2    A.  No.

3    Q.  Did you ever use the user name sublimeguy14?

4    A.  No.

5    Q.  Who installed the KazaA program on the computer, on the

6    Gateway computer, at the Upton Avenue address?

7    A.  I don't know.

8    Q.  I'd like you to take a look at what's been marked as

9    Deposition Exhibit 1.  I submit to you this is a working

10   copy, and so if you could just ignore some of the notations

11   there, but this is a series of screen shots showing the

12   shared folder, showing a shared folder on the KazaA system,

13   if you could take a look at that and tell me if you

14   downloaded any of these files that are on this Exhibit 1?

15   A.  No.

16   Q.  Do you know who downloaded the files that are

17   represented here on Exhibit 1?

18   A.  No.

19        MR. REYNOLDS:  No further questions, thank you,

20   your Honor.

21        MR. NESSON:  Could I ask that the jury be informed

22   the location, the physical location at which these two

23   depositions were taken?

24        THE COURT:  Where were they taken?

25        MR. REYNOLDS:  They were taken at or near where

1   these individuals live, Tova's, the younger daughter, Ms.

2   Tenenbaum, Tova Tenenbaum, was taken in Pittsburgh, and the

3   other was taken I believe near Ms. Nathan's home in

4   Philadelphia.

5           THE COURT:  Okay.  The witness is excused.

6           THE WITNESS:  Thank you, Judge.

7           THE COURT:  We will see you all then tomorrow

8   morning.  Once again, leave your notes on the chair.  Don't

9   read anything about this case, heaven forbid you go on the

10  computer with respect to this case, Twitter, Internet of any

11  kind, don't talk to anyone about it.  Save your energies and

12  your information for the morning.  Have a wonderful evening.

13  All rise for the jury.

14          (JURORS EXITED THE COURTROOM.)

15          THE COURT:  You can all be seated.  I want a sense

16  of the schedule, whether anyone's awake.

17          MR. OPPENHEIM:  Yes, as to the last question.

18          THE COURT:  Oh, great.  What's on tap for

19  tomorrow?

20          MR. REYNOLDS:  We need to regroup, your Honor.

21  I've talked to defense counsel about this already given the

22  time.  I believe we will start, we still have two more

23  witnesses that we can call by deposition.  They'll be very

24  quick.  We may start with those just for continuity sake.  I

25  anticipate that the witnesses tomorrow will be in addition

1    to those, Dr. Jacobson, possibly JoAn Cho, most likely

2    JoAn Cho who will testify on behalf of BMG Recordings, then

3    the defendant.  The two witnesses we will read are

4    Dr. Sam Volchenboum and then Jonathan Velazquez, then the

5    defendant Joel Tenenbaum.

6            THE COURT:  And will you end with that?

7            MR. REYNOLDS:  No, we have a few more witnesses.

8    We also have one more individual similar to Mr. Chappel, his

9    name is Antonio Franco.  He will be called in the morning.

10   He's a very short witness as well.

11           THE COURT:  Again, how many more witnesses will

12   you have, and when do you think you'll finish your case?

13           MR. REYNOLDS:  We will come close to finishing, I

14   believe we will certainly get all of that in, your Honor.

15   Again, the cross and Mr. Tenenbaum I'm not sure.

16           THE COURT:  I understand.

17           MR. REYNOLDS:  But then we would hope to finish

18   probably Thursday, tomorrow is Wednesday, Thursday

19   morning.

20           THE COURT:  Okay.

21           MR. FEINBERG:  May we ask, your Honor, who their

22   other witnesses are that they intend to call now?  I'm not

23   holding them to it.

24           MR. REYNOLDS:  Certainly they're listed on the

25   witness list.  They are Ron Wilcox, Stanley Woods and

1    Silva Palermo.

2           THE COURT:  All right.  We'll see all of you in

3    the morning.  Again, the rules are that if anyone has any

4    pretrial motions, they can either file them this evening, or

5    I'll be in the office at 8:30 in the morning, and if anyone

6    has anything to address, I'll address it before the jury

7    comes down.  Thank you, your Honor.

8           (Whereupon, the hearing was suspended at

9    5:40 p.m.)

10                  C E R T I F I C A T E

11   UNITED STATES DISTRICT COURT )

12   DISTRICT OF MASSACHUSETTS    )

13   CITY OF BOSTON               )

14           I, Valerie A. O'Hara, Registered Professional

15   Reporter, do hereby certify that the foregoing transcript

16   was recorded by me stenographically at the time and place

17   aforesaid in Nos. 03-11661-NG, 07-11446-NG, Sony BMG Music

18   Entertainment, et al. vs. Joel Tenenbaum and thereafter by

19   me reduced to typewriting and is a true and accurate record

20   of the proceedings.

21                         _____

22                         /S/ VALERIE A. O'HARA

23                         VALERIE A. O'HARA

24                         REGISTERED PROFESSIONAL REPORTER

25                         DATED AUGUST 26, 2010