UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -
                          )
SONY BMG MUSIC            )
ENTERTAINMENT, ET AL.,    )     CV. NO. 03-11661-NG
                          )     CV. NO. 07-11446-NG
                          )
          PLAINTIFFS      )
                          )
VS.                       )     COURTROOM NO. 2
                          )
JOEL TENENBAUM,           )     1 COURTHOUSE WAY
                          )
          DEFENDANTS      )     BOSTON, MA  02210
                          )
- - - - - - - - - - - - - - - - - -


JURY TRIAL DAY 3

JULY 29, 2009



9:10 A.M.

BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE





VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1

2     A P P E A R A N C E S:

3          For The Plaintiffs:

4          Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ.,
       600 Atlantic Avenue, Boston, Massachusetts  02210-2211;

5
           The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ.,
6      7304 River Falls Drive, Potomac, Maryland  20854;

7          Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ.,
       1801 13th Street, Suite 300, Boulder, Colorado  80302

8
           For the Defendant:
9
           Harvard Law School, by CHARLES NESSON, ESQ.,
10         1525 Massachusetts Avenue, Cambridge, Massachusetts
       02138;

11
           Feinberg & Kamholtz, by MATTHEW H. FEINBERG, ESQ. and
12     MATTHEW A. KAMHOLTZ, ESQ., 125 Summer Street, Boston,
       Massachusetts  02110.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **INDEX**
     **EXAMINATION**
2    **Witness Name          Direct Cross Re-Direct Re-Cross Voir Dire**

3    ANTONIO FRANCO
         By Mr. Reynolds  4
4        By Mr. Nesson             7

5    DOUGLAS JACOBSON
         By Mr. Reynolds  9             151
6        By Mr. Nesson            117             153

7    JoAN CHO
         By Mr. Oppenheim 155           195
8        By Mr. Feinberg          174             197

9    STANLEY LIEBOWITZ
         By Mr. Oppenheim 198
10       By Mr. Nesson            225

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          THE CLERK:  All rise for the jury.  United States

3   District Court is now in session.

4          THE COURT:  You can be seated.  Good morning,

5   everyone.  I just want to start.

6          MR. REYNOLDS:  Good morning, your Honor.  The

7   plaintiffs call Antonio Franco.

8          THE COURT:  Over here, please.

9          ANTONIO FRANCO, having been duly sworn by the

10  Clerk, testified as follows:

11                    DIRECT EXAMINATION

12  BY MR. REYNOLDS:

13  Q.  Good morning.  Could you tell us who you are, please.

14  A.  Antonio Franco.

15  Q.  Mr. Franco, could you pull the Mike a little bit closer

16  to you.  Thank you.  Do you know Joel Tenenbaum,

17  Mr. Franco?

18  A.  Yes.

19  Q.  How do you know Joel Tenenbaum?

20  A.  High school.

21  Q.  I'm sorry?

22  A.  From high school.

23  Q.  When was the last time you saw Joel Tenenbaum?

24  A.  Probably seven, eight years ago.

25  Q.  So, some time 2001, 2002?

1    A.   Yeah.

2    Q.   Do you recall that Joel Tenenbaum had a computer and

3    stereo equipment in his bedroom in Providence,

4    Rhode Island?

5    A.   Yeah.

6    Q.   Did you ever use the computer in Mr. Tenenbaum's

7    bedroom?

8    A.   Yeah, I did.

9    Q.   What did you use it for?

10   A.   We made a skateboard video for high school.  It was a

11   project.

12   Q.   And how long did that take making that video?

13   A.   Maybe ten minutes.

14   Q.   How would you describe Mr. Tenenbaum's attitude towards

15   letting other people use his computer and stereo computer?

16   A.   I guess he was kind of stubborn about it, didn't really

17   like people touching his computer because he kind of knew a

18   little bit more about it.

19   Q.   And did you see other people using Mr. Tenenbaum's

20   computer frequently?

21   A.   No.

22   Q.   Joel said that he believes, I'm sorry, Mr. Tenenbaum

23   said that he believes you used his KazaA account at the

24   Providence, Rhode Island address in his bedroom.  Have you

25   ever used KazaA on any computer in the Tenenbaum house?

1   A.   No.

2   Q.   Have you ever used any computer in the Tenenbaum house

3   to download music off the Internet?

4   A.   No.

5   Q.   Have you ever used the sublimeguy14 user name?

6   A.   No.

7   Q.   At the time you knew Mr. Tenenbaum, did you know what

8   file sharing is?

9   A.   No, I don't.

10  Q.   When you knew Mr. Tenenbaum, do you recall what kind of

11  music he liked?

12  A.   It was kind of a weird mix.  It was -- I remember the

13  Matrix coming out around that time, and it was like -- it

14  was kind of like that type of music where you could kind of

15  categorize that as.

16  Q.   Did you say the Matrix?

17  A.   Yeah.

18  Q.   Are you referring to the sound track for the Matrix?

19  A.   Like songs, yeah.

20  Q.   So the movie sound track?

21  A.   Yeah.

22  Q.   What do you recall, if anything, about Mr. Tenenbaum's

23  CD collection?

24  A.   It was a good amount of CDs.

25  Q.   Do you remember whether Mr. Tenenbaum had any home-made

1    CDs?

2    A.  I believe there were a few.  There were definitely a

3    few.

4         MR. REYNOLDS:  I have no further questions.  Thank

5    you very much, Mr. Franco.

6         THE COURT:  Any questions?

7                    CROSS-EXAMINATION

8    BY MR. NESSON:

9    Q.  You're a skateboarder?

10   A.  Used to be.

11   Q.  Used to be?

12   A.  Yeah.

13   Q.  An excellent 360 flip?

14   A.  Yeah.

15   Q.  That was what you were known for?

16   A.  Yeah.

17   Q.  And you were friends with Joel?

18   A.  Yes, I was.

19   Q.  And hung out?

20   A.  Yes.

21   Q.  And what year did you meet him, do you recall?

22   A.  I would say freshman year of high school.

23   Q.  What year would that have been?

24   A.  Oh, God, I don't remember, let's see it's 2009 now, I'm

25   25.

1   Q.  Think of what class you were in.  Classical High School,

2   class of what?

3   A.  I didn't graduate so I was 14, 15 years old.

4   Q.  Something like that?

5   A.  Yeah.

6   Q.  So --

7   A.  Maybe actually because I stayed back, so it was probably

8   like 16, freshman year.

9   Q.  Napster, do you have any -- did you ever even hear about

10  Napster?

11  A.  No, not at that point, no.

12  Q.  And when Napster came in, did you hear about it?

13  A.  I remember they had -- there was a think about

14  Metallica, I remember hearing about that in the news, about

15  people downloading music.

16  Q.  But you, yourself, were just not at all into that

17  scene?

18  A.  No.  I spent a lot of time outdoors skateboarding.

19  Q.  Thank you very much.

20  A.  Thank you.

21  Q.  It's?

22  A.  Antonio.

23  Q.  Mr. T?

24  A.  Yeah, Tino, people call me Tino.

25  Q.  Thank you.

1    A.   Thank you.

2          THE COURT:  Anything further?

3          MR. REYNOLDS:  Nothing further, your Honor.

4          THE COURT:  Next witness.  Your Honor, the

5    plaintiffs call Dr. Doug Jacobson.

6          MR. REYNOLDS:  Your Honor, could you change to

7    podium 2 when you have a moment, please?

8          THE COURT:  Sure.

9          MR. REYNOLDS:  Thank you.

10          DOUGLAS JACOBSON, having been duly sworn by the

11   Clerk, testified as follows:

12                        DIRECT EXAMINATION

13   BY MR. REYNOLDS:

14   Q.   Good morning, Dr. Jacobson.

15   A.   Good morning.

16   Q.   Could you tell the jury what your current employment

17   title is?

18   A.   I'm employed as a professor of electrical and computer

19   engineering at Iowa State University.

20   Q.   In addition to being a full professor, do you have any

21   other job functions at Iowa State University?

22   A.   I serve as director of undergraduate education for the

23   Department of Electrical and Computer Engineering.  I serve

24   as director of graduate education for our information

25   assurance graduate program, computer assurance graduate

1    program.  I also am the director of the computer security

2    center at Iowa State University.

3    Q.  Dr. Jacobson, what does computer security mean?

4    A.  Computer security is a broad topic.  Basically it deals

5    with aspects of keeping a computer secure, aspects of

6    computer forensics, which is trying to figure out what

7    happened to a computer, so basically it's all aspects of

8    computer and network security.

9    Q.  Dr. Jacobson, you're a Ph.D?

10   A.  Yes.

11   Q.  And what's your Ph.D. in?

12   A.  My Ph.D. is in computer engineering with a focus on

13   networking.

14   Q.  Do you have any other degrees?

15   A.  I hold a master's degree and a bachelor's degree.

16   Q.  Could you please take a look at Exhibit C.  It's in the

17   thinner book, I think it's on your right there.

18   A.  Yes.

19   Q.  Could you tell the jury what this is?

20   A.  This is my curriculum vitae.

21   Q.  Could you tell the jury what a curriculum vitae is,

22   please.

23   A.  Basically it's a resume', faculty members basically keep

24   a resume' of everything that's happened since they became a

25   faculty member, so they become thick documents as time goes

1    along.

2    Q.  Is this an accurate representation of your current

3    curriculum vitae as it exists?

4    A.  Yes.

5           MR. REYNOLDS:  Your Honor, I move for the

6    admission of Exhibit C on the grounds that I don't want to

7    go in with the jury orally with all of Dr. Jacob's

8    qualifications.

9           THE COURT:  Is there an objection?

10          MR. FEINBERG:  Yes.

11          THE COURT:  There is an objection to the C.V.

12   going in?

13          MR. FEINBERG:  Yes, your Honor.

14          THE COURT:  Then go through it.

15          MR. REYNOLDS:  Thank you, your Honor.

16   Q.  Dr. Jacobson, could you please tell the jury, I want to

17   go over some of the substantial academic experience that you

18   have that relates to this lawsuit.

19   A.  Yeah, I've had experience both in the classroom, I teach

20   in the area of network security, area of information

21   warfare.  I actually developed those course at Iowa State

22   over ten years.  I also have funded research in the area of

23   computer and network security, both from the National

24   Science Foundation and from the Department of Justice.  The

25   Department of Justice funding is actually multi-million

1    dollar funding to create a virtual Internet.

2         Basically we're recreating the Internet at Iowa

3    State in order for us to study cyber attacks.  It's

4    basically a playground that lets us try out all sorts of

5    nasty things that you wouldn't try out on the Internet.

6    Q.  Dr. Jacobson, that is funding for this program, is that

7    referred to as ISEAGE?

8    A.  Yes.

9    Q.  And that's spelled I-S-E-A-G-E?

10   A.  Yes.

11   Q.  What does that stand for?

12   A.  Internet Scale Attack and Event Generation

13   Environment.

14   Q.  And that's funded by the United States Department of

15   Justice?

16   A.  Yes.

17   Q.  You said you also receive funding for your research from

18   the National Science Foundation?

19   A.  Correct.

20   Q.  And what type of research did you do in regard with the

21   National Science Foundation funding?

22   A.  I've had funding from the National Science Foundation

23   basically since I started as a faculty member for various

24   projects ranging from computer security projects, computer

25   education, security education.  We have a funded project to

1    train the next round of cyber warriors for the government,

2    so it's been a wide range of computer and network

3    projects.

4    Q.  And you said you also receive funding, maybe you hadn't

5    said this yet, but have you received funding from the

6    National Security Administration and the Department of

7    Defense?

8    A.  Yes, National Security Agency and the Department of

9    Defense, we've referred funding for research projects from

10   both of those agencies.

11   Q.  In the area of computer security?

12   A.  In the area of computer security, yes.

13   Q.  You also have nonacademic experience that's pertinent to

14   this case?

15   A.  Yes.  In 1996, I founded a company called Palisade

16   Systems.  Palisade Systems primary focus is in the area of

17   protecting people on the network, and in 2000, we released a

18   product whose primary focus at that time was to detect and

19   be able to block or monitor control of traffic on

20   peer-to-peer networks.

21   Q.  And that was a product that was sold in the public?

22   A.  Yes, it still is being sold today.

23   Q.  And who is it sold to typically?

24   A.  Our market is anywhere from schools, hospitals, banks,

25   businesses of various types.  We don't have a particular

1    vertical market that we're focused on.

2    Q.  And why would these companies need to block peer-to-peer

3    services?

4    A.  Especially in today's environment of all the data loss

5    prevention issues, the idea of data leaking out of an

6    organization, whether it be credit cards, social security

7    numbers and so on, companies are very concerned about what

8    leaves their organization, and peer-to-peer networks are

9    often thought as a potential avenue for unwanted data to

10   leave an organization, plus it eats up the network

11   bandwidth, so companies are also concerned about they're

12   paying a lot of money for their Internet connections, and

13   they don't want it being consumed by things they feel are

14   not business critical or business-related.

15   Q.  Dr. Jacobson, your C.V. lists a number of honors and

16   awards.  Could you just tell us about a few of those that

17   are relevant to this case?

18   A.  Yeah.  I've received several education awards, Educator

19   of the Year from the state of Iowa for my work in the area

20   of computer security education.  I've received an award from

21   Infragard, which is a national organization run by the FBI,

22   and that award again was for work in my area of computer

23   security.  I've received a couple of what they call

24   R & D 100 awards from R & D Magazine for basically one of

25   the top 100 technologies developed in a particular year, and

1    those technologies were developed through my company,

2    Palisade Systems, so those products are related to

3    peer-to-peer protection, peer-to-peer blocking.

4    Q.   Dr. Jacobson, you said R & D?

5    A.   It's a magazine, research and development magazine puts

6    on these awards every year.

7    Q.   And you mentioned Infragard.  Could you tell the jury

8    what that is?

9    A.   Infragard is a partnership between the FBI and private

10   sector and academia.  We meet once a month in sort of closed

11   session, which allows us to talk about security issues in a

12   forum where we can share what we're seeing, what's going on

13   without fear of it being released, and so it really provides

14   a mechanism to help fight cyber issues.

15   Q.   Dr. Jacobson, you also supervise graduate students?

16   A.   Yes, I supervise a number of graduate students.

17   Q.   Have you supervised graduate students in areas that are

18   relevant to this case?

19   A.   Yes, in particular, I supervised a graduate student who

20   developed a technology that scanned through peer-to-peer

21   networks and specifically looking for instances of child

22   pornography and then would produce reports that were

23   presented to law enforcement, so myself and the grad student

24   worked very closely with Iowa State Police, the State of

25   Iowa, the Department of Criminal Investigation and with the

1    City of Ames Police Department in developing this

2    technology.

3    Q.  And the work that you did with law enforcement in this

4    regard, that was specifically related to KazaA?

5    A.  It was related to both KazaA and the Gnutella, the

6    LimeWire, BearShare type of protocols.

7    Q.  And those LimeWire BearShare operate on a different

8    platform, but they're still file sharing?

9    A.  Yes, they're still peer-to-peer networks.

10   Q.  You're also an inventor, Dr. Jacobson?

11   A.  Yes, I hold two patents in the area of computer and

12   network security.  My second patent is actually the core

13   technology behind the creation of the company Palisade

14   Systems, so the company's core or the company's entire

15   business rests on this patent.

16   Q.  Dr. Jacobson, how long have you been teaching at Iowa

17   State University?

18   A.  I joined the faculty in January of 1986.

19   Q.  How long have you been a full professor?

20   A.  I've been a full professor for almost three years, and I

21   was recently awarded the title of university professor,

22   which is a title that's only handed out to two or three

23   faculty a year, and it's more service and work at the

24   university.

25   Q.  Dr. Jacobson, are you a member of any professional

1    societies?

2    A.  Yes, I'm a member of several professional societies, I'm

3    a member of IEEE, which is the professional society for

4    electrical engineers, electrical computer engineers, I'm a

5    member of ACM, which is a professional society for computing

6    professionals, computer science, computer engineers, I'm a

7    member of the International Association of Computer

8    Investigative Specialists, which is an organization made up

9    of people with in law enforcement or with affiliation with

10   law enforcement in the area of computer forensics, I'm a

11   member of ASEE, which is a society of engineering

12   educators.

13   Q.  Do you hold any certifications, Dr. Jacobson?

14   A.  Yes, I'm a certified as a forensic examiner by the

15   International Association of Computer Investigative

16   Specialists.

17   Q.  Have you performed computer or Internet forensic

18   examinations?

19   A.  Yes, I've performed numerous examinations.

20   Q.  For whom have you performed those?

21   A.  I've performed several investigations for law

22   enforcement, both computer and network examinations, dealing

23   everything from child porn to bomb threats to threats, child

24   threats against children.  I've also done work in the area

25   of computer network forensics for local businesses.

1   Q.  And you've also done forensics for the plaintiffs in

2   this case?

3   A.  Yes, I've also done work for the plaintiffs.

4   Q.  Dr. Jacobson, have you ever given any testimony to any

5   governmental body concerning peer-to-peer networks?

6   A.  Yes.  In September, 2003, I testified in front of the

7   U.S. Judiciary Committee on the use of peer-to-peer

8   networks, and my primary focus at that time was use of

9   peer-to-peer networks in distribution of child

10  pornography.

11          MR. REYNOLDS:  Your Honor, I would move for the

12  admission of Dr. Jacobson as an expert in computer network

13  and computer security and computer forensics.

14          MR. NESSON:  No objection.

15          THE COURT:  He may be so certified.  Go on.

16  Q.  Dr. Jacobson, I'd like to ask you what you were asked to

17  do this case.  I know there were two parts to your

18  assignment.  Could you break it down for the jury talking

19  about those two parts, please.

20  A.  Yes.  I was first asked to review information.  I was

21  provided a CD with data from MediaSentry, which you heard

22  discussed yesterday, information from the Internet service

23  provider, which, again, you heard discussed yesterday, and

24  so I provided that information, and I'm asked to produce a

25  report, basically three parts to the report.  One is to

1    explain how Internet addressing is used and how Internet

2    addressing can be tied back to it to a device.

3            I also am asked to explain how peer-to-peer

4    networking works and in particular with respect to the

5    particular peer-to-peer networking protocol or program

6    that's of interest in that particular case, and then I'm

7    asked to evaluate the MediaSentry evidence, the evidence

8    from the Internet service provider and any other evidence

9    that comes along in a CD and draw a conclusion as to who was

10   involved in the file sharing activity.

11   Q.  So that's the first part of what you did?

12   A.  Yes.

13   Q.  Talk about now the second part of what you did, just

14   summarize what you were asked to do.

15   A.  In the second part, I received a forensics copy of a

16   hard drive, and I was examined to that hard drive, and I was

17   asked to look for evidence of peer-to-peer software, I was

18   asked to look for any evidence of music files on the hard

19   drive, and I was asked to look for any evidence of data

20   deletion or data wiping on the hard drive.

21   Q.  And did you do all the work, Dr. Jacobson, that you just

22   described?

23   A.  Yes.

24   Q.  And did you issue a report?

25   A.  Yes.  I issued a report with the first, with respect to

1   the first part, and then I later issued a supplemental

2   report after reviewing the hard drive which contained all of

3   the information in the first report.

4   Q.  And your supplemental report also had exhibits attached

5   to it?

6   A.  Yes.

7   Q.  And the exhibits I think were Exhibits A through L?

8   A.  That's correct.

9   Q.  And we'll get into those in a moment later, but you've

10  also seen that those are now exhibits in this case?

11  A.  Yes.

12  Q.  Dr. Jacobson, with respect to your initial analysis,

13  again, this is prior to the forensic examination, the

14  analysis of the MediaSentry data, what did you review?

15  A.  Again, as I said, what I get is a CD-rom of information

16  on it.  It contains all of the data that MediaSentry

17  collect, which, again, some of that you saw yesterday.  I

18  received information in the subpoena, the subpoena response

19  from the Internet service provider, in this case, Cox

20  Communication.  I received copies of the initial complaint

21  and a few other documents that go along with that.  I then

22  also receive copies of the songs that were downloaded by

23  MediaSentry, and all that comes on a CD.

24  Q.  And this is all in connection with identifying who's

25  responsible for the IP address at the time of

1    infringement?

2    A.  That's correct.

3    Q.  And did you do that work in this case?

4    A.  Yes.

5    Q.  And are the methods that you relied on, are those

6    methods that are reasonably relied on by other experts in

7    your field?

8    A.  Yes.

9    Q.  Including law enforcement?

10   A.  Yes.

11   Q.  Dr. Jacobson, could you tell the jury briefly, I don't

12   think we need to go into this too much, but just briefly

13   what an Internet protocol address is?

14   A.  Basically Internet protocol address is the address that

15   is given to a device that has to be connected with the

16   Internet.  In order to get information to something in a

17   large network like the Internet, it needs to have a unique

18   identifier so that you are talking to it just like the phone

19   system has unique identifiers for all the individuals or the

20   post office has a unique identifier to identify the home or

21   the individuals.

22         So, it's basically a way in order for us to

23   communicate across the Internet, we need to know, we need to

24   have an address of where to send the information, and,

25   likewise, if I'm sending the information to you, I need to

1   have an address so you can talk back to me so we both would
2   have Internet addresses that would allow us to talk back and
3   forth.
4   Q.  Dr. Jacobson, is it fair to say that based on what you
5   just said that on the public Internet, an IP address is
6   designed to be unique at any given moment in time for each
7   device?
8   A.  That's correct.
9   Q.  Now, could you briefly describe what DHCP is?
10  A.  Yeah, DHCP is a mechanism to hand out these IP
11  addresses.  As you may have heard yesterday, IP addresses
12  are these sets of numbers, you know, people say
13  68.something.something.  They're not something you remember,
14  they're not something that most people want to deal with,
15  and so they've developed a system that allows the computer
16  to ask for an Internet address.  When it wants to be part of
17  the Internet it goes out and say, hey, I want to be part of
18  Internet.
19      You heard the people from Cox Communication
20  yesterday talk about his cable modem and the cable modem
21  connecting a user to the Internet.  When that user turns on
22  their computer and wants to be part of the Internet, they
23  talk through the cable modem to get that IP address, and
24  that IP address is what they say leased, so you get an IP
25  address for a period of time, and then that IP address is

1    unique, and it was handed out to you for that period of time

2    in the lease.

3    Q.  And during that period of time, it's yours and yours

4    alone?

5    A.  Yes.

6    Q.  That's the way it's designed?

7    A.  That's the way it's designed to work, yes.

8    Q.  Dr. Jacobson, I'd like to shift gears now and talk just

9    briefly about peer-to-peer file sharing that's relevant to

10   this case.

11   A.  Yes.

12   Q.  Have you created a demonstrative that would help you

13   explain that to the jury?

14   A.  Yes, I have.

15   Q.  Dr. Jacobson, this is a chart that you created?

16   A.  Yes, it is.

17   Q.  Could you please describe for the jury what a

18   peer-to-peer network is?

19   A.  A peer-to-peer network is a network of computers or

20   devices that are designed to talk to each other on an equal

21   footing and maybe to just kind of put it in a context, when

22   you use the Internet to go to Google or Yahoo or go to

23   Amazon, whatever, that's not a peer-to-peer, you're talking

24   to a server, and everybody wants to go to Amazon goes to the

25   Amazon server.

1          You know who the Amazon server is, they want you

2     to know who it is, and you transfer information to and from

3     the Amazon server.  In a peer-to-peer network, the goal of

4     the peer-to-peer network is to let individuals sort of act

5     like little servers and share information among anybody else

6     that's part of this network.

7          And the goal is that you don't need to know who

8     you're talking to, you don't need to know the individual

9     that you're talking to, you just join this network of

10    potentially millions of people and everything that you have

11    in your hard drive that you want to offer to be shared is

12    presented to this network of millions of people, likewise

13    everybody else indicates what they want to share, and then

14    anybody on this network can get information from anybody

15    else on this network, so they're designed to share digital

16    files among arbitrary people who have joined this network.

17    Q.   Dr. Jacobson, your demonstrative here has some of the

18    computer terminals are labeled supernode and some are not.

19    Could you explain that to the jury, please?

20    A.   Yeah.  One of the issues as you might imagine in a

21    peer-to-peer type of network, you start to get millions of

22    users on this network, how do you know who has what?  You

23    know, you're looking for something, and so some of the

24    peer-to-peer networks, and this one in this example here,

25    have nodes that are sort of have been designated as nodes

1    that are repositories of sort of the directory of who has

2    what, so instead of asking everybody, do you have something

3    sort of like walking around a room asking everybody, you

4    know, who you are, do you have something that I want, you go

5    to a place and it's written down, it says, oh, this is what

6    I want, and this is who has it, and so these supernodes are

7    that repository of that information.

8    Q.  Dr. Jacobson, based on your experience, what are

9    peer-to-peer networks primarily used for?

10   A.  They're used to share data files, primarily music files,

11   but they're meant to share files among users.

12   Q.  Video files as well?

13   A.  Video files, basically any type of file, but music tends

14   to be a predominant.

15   Q.  Dr. Jacobson, you're aware that one of the file sharing

16   services at issue in this case is KazaA?

17   A.  Yes.

18   Q.  Have you created a demonstrative that would help you

19   explain how KazaA works to the jury?

20   A.  Yes.

21   Q.  Dr. Jacobson, is this the demonstrative that you've

22   created?

23   A.  Yes.

24   Q.  Using this, could you tell the jury, walk them through,

25   you've listed steps 1 through 6 below?

1    A.  Yes.

2    Q.  And those steps 1 through 6, they are represented above

3    with the arrows going from computer to computer?

4    A.  That's correct.

5    Q.  Could you describe then for the jury using this

6    demonstrative how KazaA works?

7    A.  Yes.  So as was stated, the arrows indicate basically

8    the communication, and what we have here is a supernode,

9    which is user 2, we have user 3, which is assumed to have

10   already joined or been part of the KazaA network, and we

11   have user 1, who is just now wanting to join the KazaA

12   network, and so user 1 will log into the KazaA network, and

13   as part of that process, what happens is that everything

14   user 1 is offering to be shared is then sent, the name of

15   everything that the user wants to share is sent to the

16   supernode, so it's sort of an analogy, you know, if you go

17   to a grocery store, and you see a little board as you walk

18   in of so-and-so has puppies and kittens and all those sorts

19   of things, then it has a phone number or an address of where

20   to get the puppies or the kittens, sort of the same thing,

21   so user 1 is in step 1 uploading their index of the files

22   that they are offering to be shared.

23   Q.  So, Dr. Jacobson, just so I want to make sure, at step

24   No. 1, you have upload user's index, correct?

25   A.  That's correct.

1   Q.  And that's this User 1 computer telling the supernode

2   what files user 1 is distributing, correct?

3   A.  That's correct, and that happens when you connect to the

4   KazaA network automatically.

5   Q.  Could you go to step 2?

6   A.  Yes, in step 2 now user 3 is looking for something, so

7   user 3 will enter a search term, much like you do in a

8   Google search box, so you enter John Doe artist or whatever

9   you want to enter, and that is sent to the supernode, so

10  that's step 2.

11      Then the supernode will return a list of the

12  matches, and that list of the matches will show up on your

13  screen sort of like a list of files, and that happens in

14  step 3.  Then what happens is you decide what you want, and

15  so you double click on the file that you want to get, and

16  when you do that, and that's shown in step 4, user 3 talks

17  to the person as the file, the supernode is no longer

18  involved, the supernode didn't have the file, the supernode

19  just informed user 3 of who has the file of interest, and so

20  user 3, as we see in step 4, sends a request for the file.

21      So it sends out a message, hey, I want this file.

22  User 1 will get that request.  The KazaA application will

23  get that request, and it will take that file, find it in the

24  shared folder and make a copy of it so it actually copies

25  that file from the shared folder out onto the network.  That

1    copy goes back to user 3, as we see in step 5, so at the end

2    of step 5, user 3 has an exact copy of what user 1 has so

3    now we have two copies of that file existing in this

4    picture.

5    Q.  Let me just stop you right there, Dr. Jacobson.  These

6    lines 4 and 5 at the bottom, just so we're clear, those are

7    the two peers connected directly, user 1 and 3?

8    A.  That's correct.

9    Q.  And user 3 sends a request to user 1 saying, "I want

10   this file"?

11   A.  That's correct.

12   Q.  And user 1 makes a copy and distributes that file to

13   user 3?

14   A.  That's correct.

15   Q.  Could you proceed to step 6, please.

16   A.  Now user 3 has the file in its shared directory, so it's

17   shared directory is now changed, and so it needs to tell the

18   supernode that now it has the file so that if user 4 were to

19   come along and search for that same file and ask that

20   supernode who has those files, it would get user 1 and 3 as

21   an answer.

22   Q.  And at this point user 1 and 3 are now both distributing

23   that file to everyone else on KazaA?

24   A.  That's correct.

25   Q.  Dr. Jacobson, when user 1 and 3 are connected and that

1    file transfer is occurring, can other users on the public

2    Internet see what is being shared?

3    A.  No.

4    Q.  Can you explain that?

5    A.  The traffic goes between the two users across the public

6    Internet, and there's no legal way for anyone to monitor the

7    traffic on the public Internet, and so nobody can see that

8    communication between user 1 and user 3, nor does it report,

9    KazaA doesn't report back that the exchange took place,

10   there's no logging information that the exchange even took

11   place.

12   Q.  So to know the exchange took place, you have to be one

13   of those peers?

14   A.  Yes.

15   Q.  Now, you heard Mr. Connelly testify yesterday that the

16   file transfer happens in what are called data packets?

17   A.  That's correct.

18   Q.  Are there any IP addresses, Internet protocol addresses,

19   associated with the data packets that go back and forth?

20   A.  Yes, every data packet has to have an IP address.  What

21   happens in the Internet is there's a limit as to how much

22   you can send in a data packet, somewhere around 1,000

23   characters, and so you have to take it, you know, the file

24   we saw was a typical song, maybe 3 million characters in

25   length, 3 million bytes in length, so it's going to be

1    broken up into lots of pieces.

2           Each one of those pieces has to be transported

3    across the Internet, so each one of those pieces has to have

4    two IP addresses, the IP address of where it was going and

5    the IP address of where it was coming from.

6    Q.  So, do users in this demonstrative you have, do users 1

7    and 3 know each other typically?

8    A.  No.

9    Q.  Now, although file sharing like this is unanimous, can

10   user No. 1 be identified in distributing this file to

11   user 3?

12   A.  Yes.  User 3 would know the IP address of the user 1.

13   Q.  And that comes in the data packets?

14   A.  That comes in the data packets and actually in part of

15   payload of the data packet in addition.

16   Q.  In 2002 or 2004, in that time frame, how did one go

17   about getting the KazaA program?

18   A.  You went online and you go to KazaA.com or you go to

19   lots of places and, you know, type in the search engine that

20   says download KazaA, and you'll gets pages and pages of

21   places to get it.

22   Q.  Does KazaA get downloaded by accident?

23   A.  No.

24   Q.  Does it come with the computer?

25   A.  No.

1  Q.  In your experience, have you ever seen a situation where

2  KazaA is installed and launched by some malicious code out

3  on the Internet?

4  A.  No.

5  Q.  There have been several versions of KazaA over the

6  years, correct?

7  A.  Yes.

8  Q.  In the version KazaA 2.0, did that version have any

9  option to look for files on the user's computer to add to

10  the shared folder?

11  A.  Yeah, it had an option that you had to actually invoke,

12  you had to take a proactive step to do that, but, yes, you

13  could instruct KazaA through a series of key strokes to go

14  out and look for files that you may want to share and that

15  would bring up a list of the directories where those files

16  were.

17  Q.  So, for Version 2.0, if you wanted KazaA to go out and

18  look for other files on your computer to distribute out to

19  people, you'd actually have to take steps to do that?

20  A.  Yes.

21  Q.  It doesn't happen automatically?

22  A.  No.

23  Q.  Can a user on KazaA listen to music that is stored on

24  another computer on the network?

25  A.  Only after they've downloaded it.

1  Q.  In the 2004 time frame, based on your experience with

2  KazaA, how many users were sharing files on the KazaA

3  network on a given moment in time?

4  A.  Usually on the order of two and a half to three million,

5  somewhere in that ballpark.

6  Q.  Dr. Jacobson, you've indicated that you've reviewed data

7  provided by MediaSentry concerning its identification of the

8  user sublimeguy14 on August 10th, 2004.  That was part of

9  the data you reviewed?

10  A.  That's correct.

11  Q.  Based on your education, training and experience, do you

12  have an opinions as to whether the computer with the

13  specific IP address we've been talking about, 68.227.185.38

14  on August 10, 2004 at about 1 a.m. was used by the

15  defendant, Joel Tenenbaum?

16  A.  Yes, I do.

17  Q.  And what is your opinion?

18  A.  That the computer with that IP address was used by the

19  defendant to download and distribute copyrighted works on

20  that date.

21  Q.  And does the user name play any role in your analysis?

22  A.  In this case, the user name does play a role.  The user

23  name matches the user name provided by the Internet service

24  provider.  Both of them are sublimeguy14.

25  Q.  Dr. Jacobson, based on your education, training and

1    experience, do you have any opinions as to whether that same

2    computer that we just talked about that was identified on

3    August 10, 2004 was used to copy or distribute any of the

4    plaintiff's copyrighted songs in this case?

5    A.  Yes, it was.

6    Q.  And what is your opinion?

7    A.  That it was used to copy and distribute the plaintiff's

8    works.

9    Q.  I'd like to break that down, your opinion into two

10   sections.  We'll talk about distribution first and copying

11   next, okay?

12   A.  Yes.

13   Q.  First, with respect to distribution, what is the basis

14   for your opinion that this particular computer with the

15   sublimeguy14 user name was used to distribute plaintiff's

16   copyrighted songs?

17   A.  First of all, MediaSentry was able to connect to the

18   user as any other KazaA user.  As you heard yesterday, they

19   were able to successfully download, start the download of

20   over a thousand files.  They were able to then -- they chose

21   a subset of those files and were able to successfully

22   download a subset of those files in their entirety.

23   Q.  So, you've looked at -- could you pull up Exhibit 15,

24   page 3, please.  Now, Dr. Jacobson, this is a 40-page

25   exhibit?

1    A.   Yes.

2    Q.   Could you scroll down just a few pages for the jury.

3    And this is part of what you reviewed?

4    A.   Yes.

5    Q.   And part of your basis for your opinion that these files

6    were distributed is that all of these files were in the

7    sublimeguy14 shared folder on August 10, 2004?

8    A.   Yes.

9    Q.   And all of them were available for distribution to

10   MediaSentry and to other users on KazaA?

11   A.   Yes.

12   Q.   And MediaSentry downloaded a sample of these, correct?

13   A.   MediaSentry initiated the download of all of them and

14   then completed the download of a sample.

15   Q.   Why is the initiation of the download significant?

16   A.   A couple things.  It proves the file does exist on the

17   shared folder, and it also gathers the metadata that's

18   associated with each of the files, and the metadata has

19   things like the gendre and the file size, artist and so on,

20   and so by doing that, MediaSentry is able to capture that

21   metadata.

22   Q.   Dr. Jacobson, I'd like to talk about the songs

23   MediaSentry downloaded.  Could you turn to Exhibit 15,

24   please.  Could you pull out the very top box there.  Now,

25   Dr. Jacobson, Mr. Connelly talked about this yesterday, and

1  I don't want to spend much time on it, but could you just

2  tell the jury very briefly what this shows, this first

3  packet?

4  A.  This is the initial request packet from MediaSentry to

5  the computer.  You see the fourth line down, the destination

6  IP address, so this is a request, if you see about the sixth

7  or seventh line, you see the word "get" and then this long

8  number.  That long number is the internal identification for

9  that file that KazaA uses, so it's saying get me this file,

10  so this is MediaSentry saying get me this file.

11  Q.  Let me stop you right there.  When you say the long

12  number, are you referring to this about the sixth or seventh

13  line down where it says hash?

14  A.  Yes, hash equals A5, yeah, that number.

15  Q.  Could you tell the jury what that is, that hash?

16  A.  They don't want to rely on the actual file names as a

17  way to get it, so when you get the listing of potential

18  files, each of those has a hash number associated with it,

19  so when you turn around and request that file, the actual

20  request is a request for that hash number, so it's sort of

21  like a unique identifier for each of the files that are

22  being shared.

23         MR. REYNOLDS:  Okay.  Ms. Burton, would you scroll

24  down, please.

25  Q.  Dr. Jacobson, now this is the next packet on that page.

1    It says "received packet."  Could you tell the jury what

2    this is?

3    A.  Yes, this is the response from the computer with the IP

4    address listed as the source address, which is the IP

5    address in question, and so this is what's coming back from

6    the computer that has the file, and as we see farther down,

7    what we see is inside of the what we call the payload,

8    inside the packet, and so things of interest is you see the

9    KazaA user name, sublimeguy14, which is a little bit below

10   midway.

11        Another piece of interest of information I rely on

12   is the KazaA IP address.  The way KazaA works is not only do

13   you have the IP address, which is the actual packets in

14   transit that's put on by the computer, but KazaA itself puts

15   in the payload inside of the first packet the IP address

16   that KazaA gets from the computer it's running on, so this

17   is the IP address of the computer that is running the KazaA

18   application, and we see that that IP address matches the IP

19   address of the actual packet in transit, so it's very

20   similar to when you ship a package, you put your return

21   address on the outside and you also stuff a copy of it

22   inside the package, so there's a copy of your return address

23   inside and one on the outside.

24   Q.  Dr. Jacobson, you're referring to the source IP address;

25   is that right?

1    A.  That's correct.

2    Q.  So that's the IP address that's on the outside of the

3    envelope?

4    A.  Yes.

5    Q.  And then the IP address below is on the inside of the

6    envelope?

7    A.  That's correct.

8    Q.  Now, before we move on, Ms. Burton, could you scroll

9    back to the top.  So, this is the download information for

10   the file.  At the very top line, it says for the song

11   Incubus "Nu-Skin," correct?

12   A.  That's correct.

13   Q.  And the same information is contained or similar

14   information is contained for every one of the five songs

15   that are listed on I believe it's Exhibit 56.  Dr. Jacobson,

16   the same is true for all five of the songs that are listed

17   on this exhibit, this is shown as Exhibit A, but it's

18   actually Exhibit 55 in the jury notebooks?

19   A.  Yes.

20   Q.  So the download information that we just looked at,

21   there is similar information demonstrating downloads or I

22   should say distributions from sublimeguy14 to MediaSentry on

23   August 10, 2004?

24   A.  Yes.

25   Q.  I'd like you to turn back to Exhibit 15, page 21.  We're

1  going to pull out this is the download file for Nirvana

2  "Come As You Are"?

3  A.  Yes.

4  Q.  And, again, here could you tell the jury what we see in

5  terms of this packet?

6  A.  Again, this is the request from MediaSentry to the

7  sublimeguy14 computer asking for the song Nirvana "Come As

8  You Are" as represented again by that long hash number.

9  Q.  Dr. Jacobson, I don't want to go over the testimony that

10 was put into evidence by Mr. Connelly yesterday, but yet the

11 testimony was that Mr. Connelly pointed out that there were

12 several sent packets from MediaSentry before there was a

13 response, and that response came from another person on the

14 KazaA network called Nick_Seed; do you recall that?

15 A.  Yes, I do.

16 Q.  And that's accurate based on what you've seen in these

17 papers?

18 A.  Yes.

19 Q.  And then later on a portion of the file was distributed

20 from sublimeguy14 to MediaSentry; is that accurate?

21 A.  That's correct.

22 Q.  Could you tell the jury what happened in your opinion?

23 A.  Yeah.  KazaA is designed to first and foremost get the

24 file that you want.  That's its primary focus in life as a

25 peer-to-peer piece of software is to get files you want.

1    Sometimes where you're getting the files from, the computer

2    may be slow, their Internet connection may get slow, and so

3    for some reason, the file doesn't come as quickly as KazaA

4    would like it to come, and so KazaA will then go out and ask

5    for the file from somebody else, and this is the natural

6    behavior of KazaA.

7            In this case, again, what MediaSentry does, and I

8    don't know if Mr. Connelly explained this, but they initiate

9    the download of everything they're going to actually

10   complete the download they start at once, so if they're

11   asking for five, six, seven songs at once, those are

12   simultaneous requests to your computer, and depending what

13   else you may be doing on the computer, what else the

14   computer may be doing, that's a lot of things to ask for

15   from this computer one moment in time.

16           You all know that if you're running word

17   processing, playing a game and surfing the Internet that

18   things get a little slow, and so more than likely what

19   happened is that this request got lower priority and KazaA

20   kind of got fed up waiting and went out and tried to get

21   pieces of the file from somebody else.

22   Q.  But ultimately KazaA came back and got pieces of the

23   file from sublimeguy14?

24   A.  That's right, ultimately KazaA did get a piece of the

25   file from sublimeguy14.

Q.  Now, you said the network being slow.  Can the fact that cable modem was in use cause slowness from your perspective if you were a user using a cable modem?

A.  Yeah.  Again, I don't know how many of you have had cable modems, but, you know, the sort of joke is you tell everybody else cable modems are awful so nobody else uses it because cable modems are a shared resource, so everybody on that cable resource shares a certain amount of what they call bandwidth, and if you get a whole bunch of users sharing that network at the same time, you each get a smaller piece of it, and so it's conceivable that at that time the four or five people on the block were heavily using the network, and the cable modem would have been slow or the cable network would have been slow.

Q.  Dr. Jacobson, do you have any reason to doubt the integrity of the data that we see here in terms of this file, portions of this file being distributed from sublimeguy14 to MediaSentry?

A.  No.

Q.  Do you have any question regarding the validity of the connection to the sublimeguy14 KazaA account on August 10th, 2004?

A.  No.

Q.  Did sublimeguy14 distribute a portion of this particular file Nirvana, "Come As You Are" to MediaSentry?

1    A.   Yes.

2    Q.   Can you tell what portion?

3    A.   Somewhere between a third and two-thirds of the file

4    came from the defendant's computer.

5    Q.   In your opinion, is there any reason to question whether

6    sublimeguy14 was distributing this whole song Nirvana, "Come

7    As You Are" to MediaSentry and to other users on the

8    network?

9    A.   No.  As a matter of fact, the one-third to two-thirds

10   was actually part way into the file, so it was the tail end

11   as opposed to the beginning, which implies that in order to

12   get the tail end of something, you've got to have the first

13   part of it.

14   Q.   And does the hash code analysis play any role in your

15   opinion in that regard?

16   A.   Yes, the hash code is the hash code that matches the

17   request.  That's the file that we were asking for, so, yes,

18   the hash code further reinforces that that file was on that

19   computer.

20   Q.   Dr. Jacobson, I'd like to shift gears now and take about

21   the downloading, the evidence of downloading that you used

22   to form your opinion in this case.

23   A.   Okay.

24   Q.   What is the basis for your opinion that this particular

25   computer with the sublimeguy14 user name was used to

1  download plaintiff's copyrighted song recordings from other

2  KazaA users?

3  A.  It's based on the metadata that was collected by

4  MediaSentry.  As I said earlier, MediaSentry initiates a

5  download of every file and captures the metadata associated

6  with every file on that computer.

7  Q.  And what about the metadata leads you to believe these

8  files were downloaded?

9  A.  If you look at the metadata, the metadata has in some

10  cases instances of names of ripping groups which were

11  discussed a little bit yesterday.  The other thing is that

12  there's an inconsistency in the metadata, so if somebody

13  were to sit down and rip their entire album collection using

14  a particular piece of software to put it in digital format,

15  you would expect all the metadata to have the same type of

16  format because the same program would have produced it, so

17  it would all look the same, it would be there's a concept of

18  bit rate, which is basically the quality of the music as far

19  as sound quality, and you'd expect that would be the same,

20  especially across a particular album.

21  Q.  Dr. Jacobson, could you look at Exhibit 16, page 57, and

22  that's Bates No. 171.

23  A.  Which exhibit, I'm sorry, 16?

24  Q.  16, yes.  I'd like to look at the song, "The Wretched"

25  all the way through the bottom there.

1   A.  Okay.

2   Q.  This is the song, it says the artist is Nine-Inch Nails;

3   do you see that?

4   A.  Yes, I do.

5   Q.  And the first line is the title, "The Wretched"?

6   A.  Yes.

7   Q.  And down at the bottom of that particular file, the

8   metadata has a description, correct?

9   A.  Yes, ripped by Winsol APC.

10  Q.  That's one of the ripping groups you're talking about?

11  A.  Yes.

12  Q.  And also look at the quality of the file, that's right

13  above the description?

14  A.  Right.  That's an indication, that's what I was talking

15  about, this sort of quality, how good it is.  The bigger the

16  number, the better the sound quality is.

17  Q.  If you go to the next page there.  Pull out the top two

18  songs.  There are two song files here, Dr. Jacobson, the

19  first is entitled "No, You Don't," and the second title is

20  "Aerosmith," do you see that?

21  A.  Yes.

22  Q.  And these have a different quality from what we were

23  just looking at?

24  A.  Yes.

25  Q.  This is 128, what we were looking at before was 192?

1    A.   That's correct.

2    Q.   And also we have, we saw this yesterday, this Aerosmith

3    song has a different ripping tag, correct?

4    A.   Yes, "Adrenalin Rush."

5    Q.   Could you turn to page 77, and that's Bates No. 191.  If

6    you could pull out the song that is Aerosmith, "Walk This

7    Way."  Dr. Jacobson, could you tell us what you see here in

8    terms of quality and description?

9    A.   Again, we see an actually low quality, a 64, description

10   field is some sort of marker indicating that a group, some

11   of them have cute little symbols they use to mark

12   themselves.

13   Q.   And could you turn to page, and again, different from

14   what we saw a moment ago, correct?

15   A.   Yes.

16   Q.   Could you turn to page 90.  This is Bates page 204.

17   Ms. Burton, could you put out the first song there, drug

18   ballad.  Again, Dr. Jacobson, could you take a look at this

19   file and tell us what you see in regards to quality and

20   description?

21   A.   Quality is 192 in this case, and the description is

22   another group description, KSI 2000.

23   Q.   Dr. Jacobson, could you turn to Exhibit 13, page 3,

24   please.  Dr. Jacobson, you've read the defendant's

25   deposition transcript in this case?

1    A.  Yes.

2    Q.  And are you aware that the defendant has claimed that he

3    ripped the certain songs on this page from a Nine-Inch Nail

4    album called The Downward Spiral, the songs that begin

5    "Eraser" through "Heresy."  Ms. Burton, could you pull that

6    out.  You're aware of that?

7    A.  Yes.

8    Q.  Again, the first song there is "Eraser.MP3," and the

9    last one is "Heresy.MP3"?

10   A.  Yes.

11   Q.  Do you have an opinion that these were ripped or

12   downloaded from the Internet?

13   A.  Yes, they appear to be downloaded from the Internet.

14   Q.  And, again, this is a whole album?

15   A.  Yes.

16   Q.  Could you take a look at Exhibit 16, please, and

17   specifically pages 14 to 16.  Ms. Burton, if you could pull

18   out the first two titles there "Eraser" and "March of the

19   Pigs."  Dr. Jacobson, looking at this, and if we could

20   scroll down, this particular album covers actually a number

21   of pages.  We're now looking at the metadata, correct?

22   A.  Correct.

23   Q.  For that same album?

24   A.  Yes.

25   Q.  A moment ago we were looking at the screen shots that

1  MediaSentry had, now we're looking at the metadata for the

2  same songs?

3  A.  Yes.

4  Q.  Now, looking at the metadata for the same songs, the

5  metadata actually run pages 14 to 16?

6  A.  Correct.

7  Q.  Okay.  Well let's look at the metadata.  This is the

8  first song here, the first song file is "Eraser," and the

9  next file is "March of the Pigs."  Looking at this, tell me

10  what indications you have that this song was downloaded

11  compared to what we'll look at as we go through the whole

12  album?

13  A.  Again, we want to focus on the quality, the gendre and

14  description fields and the title fields.  So here we see

15  there's no title field, artist of D, gendre in this case is

16  listed as Blues, quality is 128.  We want to focus on those

17  fields as we move through.

18  Q.  Ms. Burton, could you go to the next page, please, and

19  pull out the top two files, "I Do Not Want This" and "Big

20  Man With A Gun."  Now, looking at these files and comparing

21  them to what we just looked at, could you tell us what, if

22  anything, forms your opinion that these were downloaded and

23  not ripped?

24  A.  Again, if you look at the second song down, "Big Man

25  With A Gun," there's now a title field and the genre has now

1    changed from blues to other.

2    Q.  So let's take this one at a time.  The top file here,

3    there's nothing in the title field, correct?

4    A.  That's correct.

5    Q.  And in the next title, the title, "Has Big Man With A

6    Gun"?

7    A.  That's correct.

8    Q.  Now, also the artist is listed as D --

9    A.  Yes.

10   Q.  -- instead of Nine-Inch Nails?

11   A.  Yes.   All of them have D listed as the artist, yes.

12   Q.  And then the top file, the genre, which is towards the

13   bottom of that file, the third from the bottom, the genre is

14   listed as "Blues"?

15   A.  That's correct.

16   Q.  And then for the bottom file, the genre is listed to

17   other?

18   A.  Yes.

19   Q.  Dr. Jacobson, would an ordinary ripping program put in

20   the artist of D as opposed to Nine-Inch Nails?

21   A.  No.

22   Q.  Would an ordinary ripping program put in different

23   genres for files like this?

24   A.  No.

25   Q.  Would an ordinary ripping program put in title for some

1    files and no title for other files?

2    A.  No.

3    Q.  Dr. Jacobson, if you could turn back to Exhibit 13, page

4    28.  This is Bates page 413.  Beginning at the bottom with

5    the song "Mutt," Ms. Burton if you could pull that out

6    through the bottom.  Dr. Jacobson, this album actually runs

7    onto the next page.  Are you aware that the defendant has

8    claimed that he ripped these songs that we're looking at

9    from the Limp Bizkit album, "Three Dollar Bill Y'All"?

10   A.  Yes.

11   Q.  Do you have an opinion as to whether these songs were

12   ripped by the defendant or whether they were downloaded from

13   the Internet?

14   A.  These songs were downloaded from the Internet.

15   Q.  And what is the basis for that opinion?

16   A.  Well, if we look at just this page, we see again

17   actually an inconsistency in the title or the author field,

18   artist field, we see "A+ and 1, Blink-182, Blink 182," and

19   so they're not the same.  If you were to stick a CD in and

20   fire up a ripping program and say I want to rip this album,

21   those would all be the same.

22   Q.  And, Dr. Jacobson, so this is metadata that actually

23   appears on the screen shots?

24   A.  Right.

25   Q.  And we're going to look at the same metadata now in the

1    download data log on Exhibit 16.

2         MR. REYNOLDS:  Could you turn to Bates page 166 to

3    168 for Exhibit 16.  I'm sorry, it's pages 166 to 168 of the

4    exhibit, the Bates number is 280 to 282.  Ms. Burton, could

5    you pull out the first two files here.  I believe it's Stuck

6    and Clunk.  Let's go out and pull out the bottom.

7    Q.  Again, Dr. Jacobson, in looking at this, can you tell us

8    what indications you have that this album was downloaded,

9    and, again, we're talking about a whole album, correct?

10   A.  Uh-hum.

11   Q.  Is that yes?

12   A.  I'm sorry, yes.

13   Q.  Looking at these two song files, "Counterfeit" and

14   "Leech," could you tell us your opinion as to how you formed

15   your opinion as to why these are downloaded?

16   A.  Again, one has an album listed, one does not, and both

17   have descriptions, but, A, they both have descriptions, and,

18   B, the two descriptions are different.

19   Q.  And, Dr. Jacobson, looking at these again, let's take

20   them one at a time.  The top file is Counterfeit?

21   A.  Yes.

22   Q.  And there there's no album listed at all?

23   A.  That's correct, no album and no genre.

24   Q.  And down below we have an album and a genre, correct?

25   A.  That's correct.

1   Q.  And also these description fields, in each field they

2   are different?

3   A.  Yes, they're different.

4   Q.  You heard Mr. Connelly yesterday talk about the

5   description field for the song file "Leech"?

6   A.  Yes, the Audiogalaxy number, yes.

7   Q.  And you'd agree with his testimony that that's from the

8   Audiogalaxy network?

9   A.  Yes.

10  Q.  And this is one of the song files that's at issue in

11  this case; is it not?

12  A.  Yes.

13  Q.  Again, Dr. Jacobson, would an ordinary ripping program

14  put in different information like this?

15  A.  No.

16  Q.  Dr. Jacobson, could you turn to Exhibit 13, page 28.

17  A.  Okay.

18  Q.  And, Dr. Jacobson, with respect to this, you're aware

19  that the defendant has claimed that he ripped certain songs

20  from an album by Blink-182, "Enema of the State"?  I'm

21  sorry, I got the album wrong.

22  A.  Yes.

23  Q.  I apologize.  Let's back up.  My mistake, on this page

24  we're looking at page 28 of Exhibit 13, this is the shared

25  folder?

1  A.  Yes.

2  Q.  Okay.

3  A.  This matches the ones we just looked at.

4  Q.  Okay.  So I had them backwards, I apologize.

5  A.  Yes.

6  Q.  So with respect to this album by Blink-182, we have the

7  songs "Mutt" through on the next page, if you can scroll to

8  the next page through "Dysentary Gary" at the top.  Could

9  you pull out those first two songs.  Again, this is an album

10  by Blink-182, "Enema of the State"?

11  A.  Yes.

12  Q.  These are the last few songs on the album, at least on

13  the shared folder?

14  A.  Correct.

15  Q.  Again, the artists are different?

16  A.  Yes, the artists are different.

17  Q.  What does that metadata indicate to you?

18  A.  Again, that metadata indicates that these were

19  downloaded and not ripped off of a single album.

20  Q.  So, Dr. Jacobson, for the albums that we just looked at,

21  again, these are whole albums, one by Nine-Inch Nails,

22  "Downward Spiral," one by Limp Bizkit and one by Blink-182,

23  "Enemy of the State"?

24  A.  Yes, we just looked at those albums, yes.

25  Q.  And based on your computer, those were downloaded from

1   the Internet and not ripped to this computer, to the

2   defendant's computer?

3   A.  That's correct.

4   Q.  Now, Dr. Jacobson, I notice that some of the files in

5   the shared folder in the user log MediaSentry provided they

6   don't have things in the description field all the time?

7   A.  That's correct.

8   Q.  In other words, it doesn't always say it's ripped by a

9   ripping group, correct?

10  A.  No.

11  Q.  Does the fact that a file doesn't have information in

12  the description field, does that mean it wasn't

13  downloaded?

14  A.  No.

15  Q.  Why is that?

16  A.  Well, you have to go in and manually put that stuff in

17  so it actually takes effort to add the description fields,

18  and so a lot of people who would put music on these networks

19  don't bother to fill in those fields.

20  Q.  And especially somebody that just doesn't care whether

21  they claim credit?

22  A.  Yeah, yeah, as was testified, we talked about it

23  yesterday a little bit that these people sometimes like to

24  be the first to do something, or, you know, bragging rights,

25  and so on, and so you get a set of people who like to prove

1   that they've done something.

2   Q.  Dr. Jacobson, based on I want to shift gears now and

3   talk about another issue, and that is the possibility of a

4   wireless router?

5   A.  Okay.

6   Q.  Based on your review of the data in this case, can you

7   tell whether a wireless router was being used by the

8   defendant at the time MediaSentry downloaded files from his

9   sublimeguy14 shared folder on August 10, 2004?

10  A.  There was not a wireless router.

11  Q.  What forms your opinion of that?

12  A.  As we saw a little bit earlier, we saw that KazaA puts

13  the IP address of the computer that is running KazaA inside

14  the payload and on the outside, of course, is the real IP

15  address, the public IP address.  If we were just to have a

16  wireless router or something they call a network address

17  translation device between the computer and the public

18  Internet, then we would see those addresses not matching.

19  As a matter of fact, the Nick-C packets that MediaSentry

20  captures shows Nick-C behind some type of network address

21  translation device.

22  Q.  Now, Dr. Jacobson using -- I've asked Ms. Burton to pull

23  up this is Exhibit 15, page 1.  Again, this is the received

24  packet from sublimeguy14 for the song "Nu-Skin"?

25  A.  That's correct.

1  Q.  And could you using this and the two highlighters, could

2  you explain what you would expect to see if there are

3  wireless routers in use at this time?

4  A.  You would expect to see the source address at the very

5  beginning, the very first highlighted.  That would match the

6  source address in the sent packet, it would match the

7  destination address, so that's the address that MediaSentry,

8  the public address.  What you would expect to see in the

9  KazaA IP address, the last highlighted line, is you'd expect

10  to see a number typically starting with 192 or 172 are

11  common.

12        There's actually three sets of numbers that are

13  reserved as "private IP addresses" and private addresses are

14  what wireless routers hand out on a DHCP basis to people

15  using a wireless router.  So if you go to Starbucks, your IP

16  address you're probably given starts with a 192, so that's

17  what you'd expect to see.

18  Q.  And the fact that these two IP addresses match, in your

19  opinion that means there's no wireless router in use?

20  A.  That's correct.

21  Q.  Dr. Jacobson, this user log also contains indications

22  that not all the files are in the MP3 format, correct?

23  A.  That's correct.

24  Q.  There are many other formats including the WMA format?

25  A.  That's correct.

1    Q.  What is WMA?

2    A.  WMA is a format that Microsoft uses in their Windows

3    media player, so that's a Microsoft way to compress or store

4    audio files.

5    Q.  Dr. Jacobson, could you turn to Exhibit 16, page 244.

6    So, Dr. Jacobson, is this an example of a WMA file?

7    A.  Yes.

8    Q.  So, and how can you tell?

9    A.  The second line down at the very end, the extension is

10   .wma.

11   Q.  Now, does the fact that a file is in the .wma format and

12   can be ripped using a Windows media player, as you just

13   said, does that mean it wasn't downloaded?

14   A.  No.

15   Q.  Why is that?

16   A.  The .wma is a format that is -- it's a universal format,

17   so people can put files in .wma, and other people can use

18   them, so it's not as popular as the MP3 format, but it's

19   still a valid format to share.  Any player that plays music

20   will play the .wma format.

21   Q.  Dr. Jacobson, does this file have an indications to you,

22   this .wma file, to you whether it was downloaded?

23   A.  Yeah, the key word, "Blink-182, Awesome Track,"

24   obviously a commentary description, "guitar."  Again, those

25   all would have had to have been filled in by somebody.

1   Q.  Dr. Jacobson, you've reviewed the MediaSentry data in

2   this case, the screen shots, correct?

3   A.  Yes.

4   Q.  The user log, we're looking at one file of it right

5   now?

6   A.  Correct.

7   Q.  And the user log, by the way, the user log is several

8   hundred pages; is that correct?

9   A.  Yes, it appears to be about 250 pages or so.

10  Q.  And you've also reviewed the download data that we

11  looked at earlier that showed the download logs for each of

12  the files?

13  A.  That's correct.

14  Q.  It was distributed from sublimeguy14 to MediaSentry?

15  A.  That's correct.

16  Q.  Based on your experience with KazaA and the KazaA file

17  sharing protocols, can you tell us whether the information

18  in the documents we've been looking at is consistent with

19  the way that KazaA functions?

20  A.  Yes, it's consistent.

21  Q.  And how is it consistent?

22  A.  There's nothing in any of these files that represent

23  anomalies beyond the way that KazaA operates.  These are

24  standard files that I've seen actually hundreds of these

25  types of files.  In the KazaA protocol, everything in here

1  is completely consistent with the way KazaA operates.

2  Q.  Dr. Jacobson, do you have any concerns regarding the

3  accuracy or the integrity of MediaSentry information?

4  A.  None.

5  Q.  Do you have any concerns regarding the methodologies

6  that MediaSentry used to collect this information on

7  August 10, 2004?

8  A.  No.

9  Q.  Now, you've also reviewed information that you received

10  from Cox Communications?

11  A.  That's correct.

12  Q.  And did you hear the testimony yesterday from

13  Mr. Matteo?

14  A.  Yes, I did.

15  Q.  Do you have any concerns regarding the accuracy of the

16  information Cox provided in this case?

17  A.  I do not.

18  Q.  Dr. Jacobson, do you know what pollution is on the

19  Internet, or let's focus on peer-to-peer networks?

20  A.  Yes, I guess it was touched on a little bit yesterday,

21  but pollution is basically putting a file out there whose

22  name does not match its contents, so putting a song out and

23  it's not a song or it's the wrong song.

24  Q.  Is there any evidence of pollution in this case with

25  respect to the 30 songs that are at issue?

1    A.   No.

2    Q.   And what's the basis for that opinion?

3    A.   Well, in the five songs, clearly the five that

4    MediaSentry downloaded with respect to this case are indeed

5    the songs.   The other 25, the data links are consistent with

6    songs in the MP3 format at that data rate.

7    Q.   Do you have any reason to doubt that the song files, the

8    30 song files that are at issue in terms of the names of the

9    songs are what they purport to be?

10   A.   I have no concerns.

11   Q.   Dr. Jacobson, do you know what IP address spoofing is?

12   A.   Yes.   IP address spoofing is basically pretending to be

13   somebody else, somebody else's IP address on the Internet,

14   the public Internet.   It's one of those things that you hear

15   people talk about a lot.   It's extremely difficult to carry

16   out on the public Internet to in essence steal somebody

17   else's IP address on the public Internet.   It's something

18   that academicians sort of talk about, and there are cases in

19   wireless private networks and so where it's carried out, but

20   in the public Internet, IP spoofing is a very difficult

21   thing to carry out.

22   Q.   Is there any evidence of IP address spoofing in this

23   case?

24   A.   No.

25   Q.   Do you believe there's any likelihood that IP spoofing

1   existed or played any role in this case?

2   A.   None, especially with the evidence from Cox

3   Communications with the cable modem, no.

4        MR. REYNOLDS:  Your Honor, I was about to shift

5   gears and go into the forensic examination.  Perhaps this

6   would be a good time for a break.

7        THE COURT:  Okay.  We'll take our morning break at

8   this time.  All rise for the jury.

9        (JURORS EXITED THE COURTROOM.)

10       THE COURT:  The witness is excused.  I understand

11  counsel had an issue to raise with me?

12       MR. OPPENHEIM:  Yes, your Honor.  I think we have

13  two issues, your Honor.  One issue I think that the

14  defendants will raise one issue and we'll raise one.  I'll

15  let Mr. Reynolds deal with the first one, your Honor.

16       THE COURT:  Okay.

17       MR. REYNOLDS:  Your Honor, there's an exhibit that

18  is Exhibit 23 that has not been -- it's been introduced, but

19  it hasn't been published to the jury, and your Honor ruled

20  yesterday that there should be no discussion of settlement

21  in this case.  I believe you instructed the jury or at least

22  the parties the issue was not relevant and we were not to

23  get into it.

24       This particular document has, the first two

25  paragraphs had information regarding a settlement offer that

1     the defendant made.  We did not intend to introduce the

2     letter for that purpose.  We intended to introduce the

3     letter for the last paragraph, which we talked about to the

4     jury in opening, which has to do with the computer and what

5     happened to the computer, and so we believe that information

6     is obviously relevant to the defendant's willfulness.

7          In light of the Court's order that there should be

8     no discussion of settlement, we wanted to redact the first

9     two paragraphs of that letter in order before we publish it

10    to the jury.

11         THE COURT:  What's the position of the defendant?

12         MR. FEINBERG:  We strongly object, your Honor, on

13    several grounds.  First of all, I'm not clear that the Court

14    issued any kind of a ruling.  I think it ruled on an

15    evidentiary objection.  More important than that, Judge, in

16    not only Mr. Reynolds's opening, but in his examination of

17    Mr. Leak, the issue of settlement came up, and, more,

18    importantly, in Mr. Reynolds's opening, he talked about the

19    fact that a letter was sent to Mr. Tenenbaum and

20    Mr. Tenenbaum took no responsibility for this and that later

21    on, he blamed others, he claimed that the computer was gone,

22    a number of other excuses, if you will, as to why this

23    happened other than him taking personal responsibility.

24         Rule 408 is very clear, Judge, in two respects:

25    No. 1, Section B addresses the fact just because settlement

1    discussions may be excluded for that purpose, they are

2    admissible or can be admissible for other purposes, and, in

3    fact, even gives a couple of examples in Rule 408.

4         I would submit very strenuously that in this case

5    those settlement discussions and not just this letter,

6    Judge, but further settlement discussions are highly

7    relevant to rebut the plaintiff's position that

8    Mr. Tenenbaum took no responsibility for this downloading of

9    copyrighted materials.

10        THE COURT:  Well, let me interrupt you.  The scope

11   of both sides' position was not immediately clear to me

12   until we began with the testimony, that is to say, the

13   defendant here was trying to talk about -- the plaintiff was

14   outlining a litigation strategy which typically one doesn't

15   get into, not that I have sued you but why, and the

16   defendant was questioning the motives of that litigation

17   strategy, an area which typically one doesn't get into at

18   all but both sides seems to have engaged in.

19        Likewise with the offers of settlement, you

20   typically don't get into it, but that was the part of the

21   plaintiff's description of its litigation strategy, we're

22   bringing these claims and get most of them settled, but if

23   neither side disagrees, then I'm certainly not going to

24   press the point, and the only question I would ask is how

25   far you're going to get into it.

1          I hate to describe a ruling as a knee-jerk ruling,

2     but to some degree, when I heard someone talking about

3     settlement, I rose to the 408 concern.  If neither side

4     objects, and if it's coming in really as part of both the

5     plaintiff's position that in response to the defendant's

6     suggestion that you're out to break and bankrupt people,

7     then I can understand why you want to have it in, and I can

8     understand the defendant's position to suggest that

9     Mr. Tenenbaum was taking responsibility.

10         So with that, if both sides agree, I don't have

11    any problem with this, I just want to understand how far

12    you're going to go.

13         MR. REYNOLDS:  I think that's our concern.  From

14    our perspective, we did not plan on getting into settlement

15    discussions typically with this case.  The question had to

16    do with, you know, why are we here.

17         THE COURT:  Right.

18         MR. REYNOLDS:  Well, because we didn't get it

19    resolved, I think that's a very innocuous, very fleeting

20    statement.  I think the defendant can say the same thing, he

21    didn't get it resolved.

22         THE COURT:  No, but your opening was all about we

23    had a protection strategy to protect our interest, we

24    brought these lawsuits.  I don't remember if this was in the

25    opening or in testimony, most people settle, so really the

1    "why we're here" both sides are dealing with, and I just

2    want to understand the limits of it.  If the limits of it

3    consistent of this letter and its content, you had

4    originally proposed it as an exhibit.  Do you have any

5    problem with its admissibility now assuming it's not my

6    objection anymore?

7           MR. REYNOLDS:  My concern are not within the

8    limits.  I don't think the defendant has any intention of

9    limiting it there, and, in fact, where these settlement

10   discussions ended up, your Honor, the last offer from the

11   defendant was that we pay the defendant $12,000, and to tell

12   that whole story will be a very, very, very long story.

13          THE COURT:  Okay.  Let's look at the letter.  Do

14   you have any objection to this letter going in as is?

15          MR. REYNOLDS:  We do.

16          MR. FEINBERG:  That was his original position,

17   that's what Mr. Reynolds was arguing.

18          THE COURT:  No, I understand that, but this was an

19   agreed upon exhibit?

20          MR. FEINBERG:  Exactly.

21          MR. REYNOLDS:  That's correct.  I never intended

22   to introduce it as evidence of settlement discussions and in

23   hindsight certainly should have redacted that, but in light

24   of your Honor's order, while Mr. Leak was on the stand, the

25   Court ruled that settlement discussions should stay out of

1    it, so I think at this point the settlement discussions stay

2    out, that portion of the letter is easily redacted, and we

3    avoid what I think will be a side show on back and forth

4    settlement discussions that frankly could take half a day.

5         THE COURT:  Let's find out.  Is the defendant

6    interested in producing other than Exhibit 23?

7         MR. FEINBERG:  Yes, we're interested in

8    introducing Mr. Tenenbaum's testimony with regard to

9    subsequent discussions about settlement that took place

10   after this.  By the way, Judge, the exhibit before you,

11   No. 25, is it?

12        THE COURT:  23.

13        MR. FEINBERG:  23, I'm sorry, is not just a letter

14   to the settling attorneys, it's also a bank money order that

15   was returned to Mr. Tenenbaum, and this is -- I think it's

16   important that we understand this, plaintiffs propose this

17   exhibit.  We had no objection to it.  It's been admitted in

18   evidence.  I know it hasn't been published to the jury, but

19   plaintiffs have been through this kind of case many, many

20   times, and they are the ones who want this evidence in, and

21   now they're asking to redact it.  They then in their opening

22   not just talked about the settlement kinds of stuff, but

23   they talked about Mr. Tenenbaum not taking responsibility

24   for what he did.

25        This letter in its entirety clearly says that he

1    is taking responsibility and that he's paying, he's sending

2    a check for $500 in order to take responsibility and end

3    this lawsuit.  That's back in 2005.

4         THE COURT:  The rule prohibits offers in

5    compromise insofar as their use to establish liability, and

6    that's --

7         MR. FEINBERG:  We're admitting liability.

8         THE COURT:  You're virtually admitting liability?

9         MR. REYNOLDS:  Whoa, is that on the record?  Let's

10   move on then.

11        MR. FEINBERG:  For purposes of this situation, of

12   course we are, we're admitting -- we're willing to take that

13   evidence and put it before the jury that to that extent, we

14   are willing to accept responsibility.  That's the whole

15   point of the opening here was to say that he's not willing

16   to take responsibility, that's part of their willfulness

17   argument.

18        Their willfulness argument here is that

19   Mr. Tenenbaum is willfully ignoring warnings by the

20   plaintiffs to get rid of this stuff on his net, and, in

21   fact, I'm sure that Mr. Reynolds will point out vociferously

22   the last line of this letter which says, "While I do not --"

23   this is Mr. Tenenbaum speaking, "While I do not have access

24   to the computer at college, I will be home on November 22d.

25   If there are any files existing in violation of copyrights,

1    I will destroy them at that time," and I'm sure Mr. Reynolds

2    is going to cross-examine Mr. Tenenbaum that he didn't

3    destroy those files, and he left those on his computer.  Not

4    only did he leave them on his computer, but he continued to

5    download, and that's exactly what the plaintiffs want to do

6    here.

7           MR. REYNOLDS:  That's exactly right, and that has

8    nothing to do with the offer of settlement, nothing

9    whatsoever.

10          MR. FEINBERG:  I think it has everything to do

11   with it, Judge.

12          THE COURT:  The question is -- okay.  So it's

13   clear then, the rule says that it can't come in to prove

14   liability for invalidity of or the amount of claim that was

15   disputed, so you can't -- I mean, putting aside your

16   admission now, but it can't typically come in to say offer

17   to settle, and, therefore, I must be guilty.  It also can't

18   come in to suggest the range of damages in the settlement,

19   that's off the table, but it can come in for other purposes.

20   The question is whether you need the money in the middle

21   paragraphs to have it come in for other purposes, whether

22   you need the paragraph 1, paragraph 2 and 3 for the purposes

23   that you need to indicate that he accepted responsibility.

24          So, let me do this.  If at all possible I'd like

25   some sense of how far you're going to go into this.  I can

1     see the letter coming in with a limiting instruction under

2     the terms of 408.  It can come in for some purposes, not for

3     others, we can craft that, but I'd like to know how far

4     beyond this you would be going.

5          MR. FEINBERG:  We would be asking Mr. Tenenbaum

6     about his further contacts and the contacts of his mother

7     with the representatives of the record companies in which a

8     further offer was made of I believe it was $3,000, a $3,000

9     proposal which was rejected and then a $5,250 proposed

10    settlement, which was also rejected.  I think that's about

11    the end of it.

12         MR. OPPENHEIM:  You don't intend to introduce the

13    fact that he insisted on being paid $12,000 to settle the

14    claim?

15         MR. FEINBERG:  If you want to cross-examine

16    Mr. Tenenbaum on that, you can.  I think it's fair to say at

17    the time it was a facetious comment that was made --

18         MR. NESSON:  By counsel --

19         MR. FEINBERG:  -- by counsel.

20         MR. NESSON:  To his $12,000 offer.

21         MR. FEINBERG:  Exactly.  And it was made in

22    response to --

23         THE COURT:  The question is why does the money

24    give and take, why is that necessary to show that he

25    accepted responsibility for this, and why doesn't that veer

1  directly in to see how reasonable we are, which it seems to

2  me exactly what you're not supposed to be getting into in an

3  offer of compromise.

4        MR. FEINBERG:  First of all, Judge, I think I need

5  to remind the Court that the standard for this penalty, it's

6  not really a claim, it's in the form of a fine under the

7  statute is a standardless one, and I think --

8        THE COURT:  You don't have to remind me, but

9  what's in a settlement negotiation doesn't create the

10  standards for that.  That's a separate issue.  If your

11  purpose of this is to say to the jury see how reasonable we

12  are, we're going to give them, you know, five cents on the

13  dollar, we were perfectly reasonable, these people wanted to

14  take us down, which is to some degree the gist of

15  Mr. Nesson's opening, these are exactly what offers of

16  compromise are not in for, which is the give and take.

17        MR. FEINBERG:  But this letter, Judge, talks

18  specifically about the fact he's a college student, he's on

19  scholarship, he makes six dollars an hour.  He's scraped

20  together, you know, the number, if the number is taken out

21  in this letter, I can talk to Mr. Nesson about this, in my

22  own mind if we can get the letter in without a number to

23  indicate that there was such settlement discussions.

24        THE COURT:  Right.  There's a difference between

25  the fact of settlement negotiations, the fact of trying to

1    come up with a compromise and taking responsibility and a

2    number that you then want to show to the jury as being the

3    measure for, what, the damages in this case.  It seems to me

4    exactly what you're not supposed to do.  Let me take it

5    under advisement.  When will the issue come up,

6    Mr. Tenenbaum would be --

7              MR. REYNOLDS:  This afternoon, your Honor.

8              THE COURT:  -- this afternoon.  Anything else?

9    Let me take a break.  What's the issue, Mr. Feinberg, do you

10   have an issue as well?

11             MR. OPPENHEIM:  The other one, your Honor, is we

12   attempted this morning to confer with defendant about how to

13   try to move things along a little more quickly, and one of

14   the things we suggested was that since we have these in

15   evidence already the certified sound recording registrations

16   and the chain of title for all of the 30 works that if they

17   stipulate to ownership, we can cut maybe 15 minutes off each

18   of the upcoming witnesses.

19             Now, we thought that this was a reasonable way to

20   proceed.  They don't want to stipulate to it.  Your Honor,

21   we're trying to move it along, I don't understand,

22   especially in light of the fact they just basically said,

23   though maybe it was in jest --

24             MR. FEINBERG:  I'm sorry, I may have misunderstood

25   what Mr. Oppenheim said.  You're still going to present the

1    witnesses?

2              THE COURT:  Yes.

3              MR. OPPENHEIM:  Of course.

4              MR. FEINBERG:  I didn't understand that, I thought

5    he wanted a stipulation in lieu of the witnesses.

6              THE COURT:  You want a crack at the witnesses?

7              MR. FEINBERG:  Exactly.

8              THE COURT:  I understand.  The stipulation with

9    ownership, you have no problem with?

10             MR. FEINBERG:  No, I'd like to talk to them a

11   little bit more before we agree, but I misunderstood, that's

12   my fault.

13             THE COURT:  Okay.  Why don't you have a discussion

14   again.  I'll look at this issue.

15             MR. FEINBERG:  There is one last issue, Judge.

16             MR. OPPENHEIM:  One last issue.

17             THE COURT:  Two last issues.  Yes, Mr. Oppenheim.

18             MR. OPPENHEIM:  I think it's your issue to

19   raise.

20             MR. FEINBERG:  Yes.  In a number of the exhibits,

21   there are references to -- may we go to sidebar?

22             THE COURT:  I'd love to go to sidebar.  I know

23   what you're about to say.

24             (THE FOLLOWING OCCURRED AT SIDEBAR:)

25             MR. FEINBERG:  In a number of the exhibits, there

1    are a number of references to obvious pornography material

2    in the form of either video, it's unclear to me whether some

3    of it may even be audio, but the titles are clearly one can

4    make more than an inference that it's A pornography site or

5    pornography download.

6              THE COURT:  Right.  What do you want to do?

7              MR. FEINBERG:  I want to delete.  I don't have any

8    problem with the exhibits as they exist with that

9    redaction.

10             MR. OPPENHEIM:  I assume this is a prejudice

11   argument?

12             THE COURT:  You bet.  Actually these were attached

13   to your complaint.

14             MR. OPPENHEIM:  One of them was.  There are many,

15   many exhibits, thousand that contain the information he's

16   referring to.  There are, your Honor, three different

17   reasons that this information is relevant.  The first is

18   these files are very large files as compared to the audio

19   files, and so they demonstrate the extent of the usage of

20   the p2p system by the defendant, how long the system was up,

21   how extensively it was used.  That's No. 1.

22             THE COURT:  So you can take out the titles and

23   keep the size of the file.

24             MR. OPPENHEIM:  Let me keep going.  The defendant

25   has claimed that he ripped CDs.  These video and image files

1    are very clearly downloaded and not ripped, and this goes

2    directly to put into doubt his claim that he ripped these

3    CDs into the shared directory because he was downloading

4    files from the p2p network.

5         THE COURT:  Why couldn't he have ripped the CDs

6    and downloaded the video?

7         MR. OPPENHEIM:  I suppose I only downloaded the

8    CDs.  That is a question that the jury should get.  I find

9    that to be an incredible suggestion.

10        THE COURT:  That's something that we can deal with

11   depending upon the scope of his cross-examination in the

12   light of Mr. Feinberg said it may be that, you know, the

13   ground is shifting and now you're talking about the amount

14   of damages and willfulness rather than the fact of the

15   downloading.  We don't know that, but go on.

16        MR. OPPENHEIM:  The third reason is the defense

17   has put character at issue here.  They have.

18        THE COURT:  Oh, no.  Oh, no, I know where you're

19   going on that.  I will not allow this to come in terms of

20   character at all, at all.  No, character for downloading and

21   an adolescent boy downloading pornography it seems to me a

22   horse of a different color.  No.  I propose that if there

23   are portions of the size of the file that you want that you

24   delete the title.

25        If Mr. Tenenbaum opens the door on his testimony

1    in any other way that you're describing, we can return to

2    this, but right now when I saw it on the screen, I didn't

3    know how far radical transparency went, and --

4         MR. OPPENHEIM:  Your Honor, we've gone out of our

5    way to skip the pages as much as possible and not to put it

6    directly at issue.  We've exercised discretion

7    notwithstanding they had these exhibits for well over a

8    month, didn't do anything, they stipulated to them as they

9    were.  They've had these documents for over a year.

10        THE COURT:  I understand.  This is something that

11   can be easily addressed at this point and doesn't have to

12   take Mr. Tenenbaum down.

13        MR. OPPENHEIM:  I'm not so sure it's easily

14   addressed, your Honor, we're talking about many, many

15   exhibits that are hundreds of pages, and we're going to put

16   Mr. Tenenbaum on the stand after lunch.

17        THE COURT:  I think that counsel should try to

18   exercise with a blank line the mostly offending ones, I

19   think.  You can agree to that, I think if you need the size

20   of the file, you can keep the size of the file.  I think if

21   the issue comes up in Mr. Tenenbaum's examination, you can

22   address it, and if he opens the door, obviously he opens the

23   door, but I have no problem with this request.

24        MR. OPPENHEIM:  So when he is asked whether he

25   ripped CDs in that the files contained in the shared

1    directory are ripped CDs, if he testifies as he did in his

2    deposition, then the door is open because clearly these were

3    downloading files, and these were downloading files.

4         THE COURT:  But you can put the excised file, but

5    you downloaded this one, I'm not still clear to me you need

6    the title to make that point.  In other words, if you have

7    the pages, and this is clearly a video and this is the size

8    of the video, the content of the video doesn't matter, it is

9    the fact of the video, and it's the size of the file, and

10   then you use it to cross-examine.  They do not have to see

11   these titles.

12        MR. OPPENHEIM:  How do you ask that so that the

13   jury has any idea what you're talking about?  This file

14   right here, which is a black line?

15        THE COURT:  Because Mr. Tenenbaum will admit that

16   as a video as a condition of this excising, you can be sure

17   of that, and I think that we can figure out a way to do

18   that, if it comes to that.

19        MR. OPPENHEIM:  This is contrary to the position

20   you've taken previously.

21        THE COURT:  That's the position I'm taking now,

22   and if Mr. Feinberg hadn't raised it, I was consider raising

23   it on my own, so I think you can manage this.

24        MR. NESSON:  We're talking about showing them an

25   exhibit with a black line through it and then Joel is asked,

1    is this a video, that that leaves a question in the jury's

2    mind.

3            THE COURT:  I'm sure.

4            MR. NESSON:  That's only answered by one answer,

5    why is there a black line?

6            THE COURT:  The one other possibility, you put a

7    line through everything, and that's goes to the jury.  In

8    his cross-examination, however, if he does not admit then

9    included in this list were videos of a certain size, then we

10   can go to sidebar and see where we are.  Do you know what

11   I'm saying?  In other words, the issue only comes up --

12           MR. NESSON:  I just want to, if I understand his

13   position, your Honor, he's trying to use this to show that

14   Joel downloaded from KazaA; is that right?

15           THE COURT:  Yes.

16           MR. NESSON:  Here.  Joel's not disputing that he

17   downloaded stuff from KazaA.  He's suggesting, he's not

18   suggesting, you see that somehow because this video was

19   downloaded that Joel couldn't have bought CDs, I'm not aware

20   that you can go out, buy pornography CDs, but you can buy CD

21   music put it in your computer put it in your shared

22   folder.

23           MR. OPPENHEIM:  As you're well aware, he didn't

24   write any files in his directory.

25           MR. NESSON:  I think he ripped some.

1          MR. OPPENHEIM:  You can't have it both ways.

2          MR. NESSON:  Why not?  I don't see why not.

3          THE COURT:  I think right now the presumption is

4     that we'll put a line through the offending titles and the

5     size.  I appreciate what Mr. Nesson just said, it doesn't

6     make a line through the titles.  Depending on the scope of

7     his answers and his testimony, you may or may not be able --

8     he may or may not open that door right now.

9          MR. OPPENHEIM:  We can't have Dr. Jacobson testify

10     that there were very large files and show how large they

11     were?

12          THE COURT:  Sure, he can testify they were very

13     large files, yes.

14          MR. REYNOLDS:  May I have it logically, your

15     Honor?

16          THE COURT:  Why can't you just stipulate that

17     there were video downloads and very large files?

18          MR. OPPENHEIM:  Well, because I think we want to

19     show how many, we want to --

20          THE COURT:  Why can't you estimate to the numbers

21     of how many?  Next.

22          MR. REYNOLDS:  Logically, your Honor, first of

23     all, I want to make it very clear the burden is on them the

24     files they wanted deleted.

25          THE COURT:  Sure.

1          MR. REYNOLDS:  Second of all, after the break, I

2     intend to show Dr. Jacobson certain files just like we've

3     been doing all along.

4          THE COURT:  As an expert, you can show this

5     without not necessarily showing them to the jury.

6          MR. REYNOLDS:  I don't intend to show any of

7     those, but we're not getting this deleting down.

8          THE COURT:  Absolutely.  You can show it without

9     putting it on the screen.  There is oftentimes an expert

10    will be able to testify that are not things independently

11    shown to the jury.  He can certainly testify, and it seems

12    to me you can get a stipulation there were video downloads,

13    the size of the video downloads, the numbers of it; the

14    content is another question.

15         MR. REYNOLDS:  I understand.  I want to make it

16    very clear.  There are a number of exhibits that have

17    multiple files on them, I want to show one of the files is a

18    song file that went from this computer to this computer.

19         THE COURT:  Sure.

20         MR. REYNOLDS:  Download here, below that there is

21    a file.  It's there.  I need to be able to show that page to

22    the jury after the break.

23         MR. FEINBERG:  Cross it out.

24         MR. REYNOLDS:  I can't cross it.  It is totally

25    unfair for us to do it in the middle.

1          MR. OPPENHEIM:  On the computerized, you can't

2     start --

3          MR. FEINBERG:  It's on the computer.

4          THE COURT:  It's also possible to just show it to

5     the witness and show it to the jury later.  In other words,

6     that's possible to do.

7          MR. REYNOLDS:  Your Honor, that is completely --

8     that would take -- it will ruin.  I have my whole

9     presentation.

10          THE COURT:  Your know what, the question ought to

11     have been raised earlier and the issue ought to have been

12     raised when this stuff was in the complaint, but it's not

13     been raised, and right now I'm taking a 403 background that

14     is hugely prejudicial to the defendant.  I won't get into it

15     by stipulation.

16          MR. OPPENHEIM:  Can the Court order that we have

17     the redaction by the time the lunch break ends so that when

18     Mr. Tenenbaum takes the stand that we have exhibits that we

19     can use?

20          THE COURT:  If they can do that, sure.

21          MR. FEINBERG:  If you tell me which they are.

22          MR. OPPENHEIM:  It's your objection.

23          MR. FEINBERG:  Come on.

24          THE COURT:  You tell them which pages you wish to

25     use.  You must have that already and then look and see if

1    there are redactions.  It seems to me this isn't rocket

2    science.  We'll deal with that after the break.

3              MR. FEINBERG:  Thank you, Judge.

4              (SIDEBAR CONFERENCE WAS CONCLUDED)

5              (A recess was taken.)

6              THE CLERK:  All rise.

7              THE COURT:  You can all can seated.  Counsel at

8    sidebar.

9              (THE FOLLOWING OCCURRED AT SIDEBAR:)

10             THE COURT:  Here's the ruling on Exhibit 23.  This

11   can be admitted except for paragraphs 1, 2 and 3, I will

12   excise paragraphs 1, 2 and 3, then the last sentence could

13   come in and not the attached money order because the amount

14   of money is precisely the give and take negotiations.  The

15   amount of money is exactly what the problem is.  That's the

16   end of the discussion.

17             Mr. Tenenbaum can be examined on the fact of

18   settlement negotiations but not the content, not the give

19   and take and not the money, if people choose.  With respect

20   to Dr. Jacobson, have you involved any of the issues?

21             MR. REYNOLDS:  We have given the defendant a list

22   of all the pages and page numbers I intend to use with

23   Dr. Jacobson.  We have not received back yet.  That took a

24   while, to be honest with you.

25             THE COURT:  What we can do, he can be

1    cross-examined and shown only to him and not the jury.  I

2    have the ability to allow something to go to the witness and

3    not the jury, I can keep it from the jury.  So his

4    conclusions can be based on data that the jury doesn't see,

5    that's classically in the rules.

6         MR. REYNOLDS:  Your Honor, the presentation is

7    very technical and very difficult.

8         THE COURT:  So it will be to him and not to the

9    jury.  The jury would be another question.

10        MR. REYNOLDS:  But the jury needs to see what's in

11   these files, your Honor, that's the whole point.

12        THE COURT:  The jury doesn't need to see what's in

13   these files.

14        MR. OPPENHEIM:  I have on their website this very

15   exhibit that they're distributing to the world without any

16   redaction.

17        THE COURT:  Because it's my courtroom and it is

18   prejudicial, I don't have any problem with this.  We'll see

19   where the examination goes, but when this page comes up, I

20   will press a button and it will only be counsel and the

21   witness and not the jury.

22        MR. REYNOLDS:  Can we try another way, your Honor?

23   There's a hundred files on a page.  I want to show the file

24   that is here.  We can with our computer highlight that file

25   and blow it up to show the jury what they're looking at,

1    what Dr. Jacobson is talking about.  We won't show anything

2    else on the page.

3          THE COURT:  And that file will not be one of the

4    pornography?

5          MR. REYNOLDS:  No, I don't intend, we never did.

6    I don't have a problem.  May I make a comment just to

7    protect the record on the first issue that you made the

8    ruling on?  I want the Court to be aware that I object on

9    the basis in addition to what I said earlier that the fact

10   that the rule talks about claims.  This is a statutory

11   damage penalty, and damages in this context is really not --

12   it's a misnomer, really what we're talking about is the

13   statutory penalty.

14         THE COURT:  I understand.

15         MR. FEINBERG:  In that sense, I read it much more

16   narrower than the Court.

17         THE COURT:  My ruling stands.

18         (SIDEBAR CONFERENCE WAS CONCLUDED)

19         THE COURT:  Sorry, ladies and gentlemen, there are

20   legal issues that we have to hash out.  We try to do them

21   not whispering at sidebar, but sometimes it spills over.  We

22   try to have you have your snacks whenever we have these

23   discussions, and given the way the morning is going, you

24   would be snacking most of the morning, so go on, counsel.

25   Mr. Jacobson, Dr. Jacobson, excuse me.

1      THE WITNESS:  Thank you, your Honor.

2      THE COURT:  Proceed.

3  Q.  Dr. Jacobson, you did a forensic inspection in this

4  case, correct?

5  A.  That's correct.

6  Q.  I want to shift to that aspect of it.  We've talked

7  about the MediaSentry capture on August 10, 2004 and your

8  analysis of the MediaSentry data.  I want to now shift and

9  talk about your forensic examination of the defendant's hard

10 drive?

11 A.  Okay.

12 Q.  Now, first thing, was that the same computer hard drive

13 that was connected to the Internet at the Providence,

14 Rhode Island address in 2004?

15 A.  No.

16 Q.  It was a different computer?

17 A.  Yes.

18 Q.  Could you explain that?

19 A.  This was what people can refer to as the Gateway

20 computer hard drive, and so I received a forensic copy of

21 the hard drive.

22 Q.  And is it your understanding that that's the Gateway

23 computer that the defendant had at college with him in

24 Maryland and then at graduate school in Boston?

25 A.  That's my understanding.

1  Q.  And when did you do an inspection of this Gateway

2  computer hard drive?

3  A.  About the week of June 22d of this year.

4  Q.  So, just over a month ago?

5  A.  About a month ago, yes.

6  Q.  Prior to that time had you done any computer forensic

7  examination of any computer in relation to this case?

8  A.  No.

9  Q.  Did you ever do a computer forensic examination of the

10  computer that was connected to the Internet in the

11  Providence, Rhode Island house on August 10, 2004?

12  A.  No.

13  Q.  So, focusing on the computer and inspection that you did

14  just a month ago, can you describe what's involved in a

15  forensic examination?

16  A.  Yeah, there's several steps.  The first step is the

17  actual collection of the data, and in this case a third

18  party and a certified third party went out and made what

19  they call a forensic copy.  A forensic copy is a copy that

20  is designed so that a forensic examiner can't modify it, as

21  you might imagine digital bits are modifiable, and so a

22  forensic copy is one that as we continue to use it, its

23  contents can't be changed, so I was handed a forensic copy

24  of the hard drive in question, and then I carry out an

25  examination based on --

1  Q.  Sure.  Let me stop you right there, Dr. Jacobson.  Do

2  you have a copy of that forensic image of that hard drive

3  with you?  I believe it's up there and marked Exhibit 51.

4  It's in evidence already.  Is that a copy of the hard drive

5  you examined?

6  A.  Yes, it is.

7  Q.  Could you just show that to the jury what that looks

8  like.  Now, again that's a forensic image, correct?

9  A.  That's correct.

10 Q.  It's not the actual hard drive that's in the computer,

11 it's an exact copy of it?

12 A.  Yes, it's a copy.

13 Q.  Now, you were going to describe some of the protocols

14 that you have to follow in order to do this forensic exam?

15 A.  Yes.  So when I receive a forensics copy of a hard

16 drive, it's in a special file format program called Encase,

17 which is a program used extensively by law enforcement, and

18 this is a program that lets me open up the hard drive image

19 and examine it.  I not only get to look at files like you

20 normally would see files on your computer, but I get to look

21 at all of the data on the hard drive.

22      What happens is as a hard drive, there's, of

23 course, the space where the files live, and then there's

24 space called unallocated space where files that have been

25 deleted or files that have been moved around and are no

1    longer on the system, remnants of those files live in that

2    unallocated space, and so the software allows me to, in

3    essence, search and look through all of the data on a hard

4    drive.  It lets me extract files to another drive so I can

5    examine the files as they are in their native form, so if I

6    find a music file, for example, in the forensic copy, I

7    could extract that to my forensic computer and then play the

8    music file.

9    Q.  Dr. Jacobson, are the methods which you relied on to do

10   this forensic examination, are they the methods that would

11   be used by any expert in your field?

12   A.  Yes.

13   Q.  I want to go back to something that you said about

14   allocated space or unallocated space.  Could you describe

15   that for the jury, please, again?

16   A.  Yeah.  Most people's view of a computer's hard drive are

17   all the files.  They live in folders, and they're all, they

18   all live on the hard drive organized by these folders.  What

19   the folders really are a way for you to find this data.

20   When you delete a file, the contents of the file doesn't go

21   away, just the index and the file folder goes away, so it

22   would be very similar if you had a filing system and you

23   wanted to delete a file out of this big filing cabinet, you

24   take the file out of the filing cabinet, you take the

25   papers, you throw them on the floor, you take the label off

1   the filing, maybe you throw that away, too.  So you have all

2   these deleted files that still exist on the computer.  If

3   you create a new file, it may overwrite bits and pieces of

4   some of the deleted files, so as time goes on, there are

5   still remnants of deleted files existing on a hard drive,

6   and we call that the unallocated space.

7   Q.  Now, that you've described the methodology of what you

8   did, could you tell the jury what you were asked to look for

9   in this case?

10  A.  Yes.  I was asked to look for three things in this case.

11  I was asked to look for evidence of music files, I was asked

12  to look for evidence of any peer-to-peer software, and I was

13  asked to look for any evidence of data removal or data

14  cleaning of the hard drive.

15  Q.  Did you find any evidence of music files on

16  Mr. Tenenbaum's Gateway computer?

17  A.  Yes, I did.

18  Q.  Did you find any evidence of file sharing on defendant's

19  Gateway computer?

20  A.  Yes, I did.

21  Q.  Did you find any evidence of files being erased on the

22  defendant's Gateway computer?

23  A.  Yes.

24  Q.  I'd like to talk about each one of those three things in

25  order.  First, with regard to evidence of files being erased

1    from the defendant's computer, could you tell us about

2    that?

3    A.  Yeah, there was a couple of things I noted on

4    defendant's computer.  First of all, the Windows operating

5    system was rebuilt or reinstalled on that computer, and what

6    happens there is when that reinstallation happens, there's a

7    lot of the log files will get wiped out and other files that

8    a forensic examiner may use will get rewritten or destroyed,

9    and so it makes it difficult to do a forensic, complete a

10   forensic examination when the operating system has been

11   reinstalled or installed.

12   Q.  Does an operating system reinstall, does that happen by

13   accident?

14   A.  No, that's a process that you have to take steps to make

15   that happen.

16   Q.  And in relation to what you did in this case, did that

17   cause anything to be missing that would be relevant to your

18   analysis?

19   A.  I'm sure it did.  There are certain log files that keep

20   a history of events that occur on a computer.  Those all get

21   reset when the operating system is reinstalled.  The

22   question I can't answer is what was in those log files when

23   they were reset, so I don't know what information I couldn't

24   see because the operating system was installed.

25   Q.  Dr. Jacobson, separate from the reinstallation of the

1    operating system, was there any other indications to you of

2    files being erased from this computer?

3    A.  Yes.  Windows has files they call registry files.

4    Registry files are used by programs when they install and

5    run, they have a place to write information that they need,

6    so a program may write down what user name is associated

7    with that program or what directories the program does, and

8    it writes that information in these registry files, and in a

9    Windows operating system, there's several registry files put

10   in various places on the hard drive, and in this

11   examination, there were two registry files that were no

12   longer present in the operating system.

13   Q.  Dr. Jacobson, could you turn to Exhibit 37.

14          THE COURT:  The image is not yet on the juror's

15   computer.  I want to see what the image is first.

16          MR. REYNOLDS:  Okay.

17   Q.  Dr. Jacobson, could you, using this, could you show what

18   you were talking about in relation to the registry files

19   being missed?

20   A.  Yes, midway down, you see failure opening, and there's

21   two files that there's a failure opening, one in the

22   document setting all users and one in the Windows System 32

23   config. system profile.

24   Q.  And ordinarily would you expect to see these system

25   files on the computer?

1  A.  Ordinarily this report comes from a piece of software

2  that examines registry files.  That's its purpose issued by

3  law enforcement, and in a system where they're all intact,

4  you see no failures, so you would see success opening in

5  every one of these cases.

6  Q.  Does the deletion of registry files like this happen by

7  accident?

8  A.  Typically, no.  They are somewhat protected by the

9  computer.  In a normal operation, they actually hide the

10  registry files from the user because they don't want the

11  user to delete the registry files.

12  Q.  So, the programs or the operating systems are designed

13  so that you shouldn't be able to remove it or it shouldn't

14  happen by accident?

15  A.  That's correct.

16  Q.  With respect to the registry files having been deleted,

17  what impact did that have on your ability to examine the

18  computer for evidence of file sharing?

19  A.  Again, it's hard to tell what was -- what's present in

20  something that's missing, but typically what you find, what

21  a forensic examiner uses the registry files for is settings

22  for programs, so a program like KazaA or LimeWire typically

23  puts the name of their shared directory in the registry

24  file, so you'd see information about certain programs,

25  there's also date stamps with every entry in the registry

1  file, so a forensic examiner uses those date and time stamps

2  to see when software was installed, when it was modified, so

3  the registry is actually a very key piece of forensic

4  evidence whenever you're doing an exam with a case involving

5  the Windows operating system.

6  Q.  And is it fair to say that because that Registry file is

7  gone, it's difficult to tell exactly what's missing?

8  A.  Yeah, I can't tell what's missing.

9  Q.  Now, despite the erasure of some of these files and the

10  reinstallation of the operating system, did you find any

11  evidence in terms of file sharing?

12  A.  Yes, I found evidence of file sharing software on this

13  computer.

14  Q.  What software was that?

15  A.  The predominant piece of software was a software called

16  LimeWire.

17  Q.  Could you tell the jury what LimeWire is?

18  A.  LimeWire is a -- actually has become a more popular

19  peer-to-peer network protocol.  It's based on something they

20  call the Gnutella protocol.  It's different than KazaA in

21  that in KazaA we remember had the supernodes which contain

22  the indexes of what everybody was sharing.

23        In LimeWire, the Gnutella network, there are no

24  indexes, there are no supernodes, so everybody has an index

25  of what they're sharing, and what you do is if you want to

1    search for a file, you're connected to typically four

2    neighbors, and so you ask the four neighbors, hey, do you

3    have this song, and the four neighbors each go to their four

4    neighbors and say, hey, somebody is looking for this song,

5    and then those four times four times four, and this

6    propagates out through the network, and whoever has the song

7    and says -- or the file they're interested in, says, yeah, I

8    got it, and so you still get a list, so from a user's

9    standpoint, from somebody sitting there who doesn't know

10   networking, it looks a lot like KazaA, you type in a search

11   string, and you get back a list of files that you can go

12   get, but the underlying mechanism is a little different.

13   Q.  Dr. Jacobson did you find any evidence, well, let me

14   back up.  Was KazaA functioning on this computer when you

15   looked at it?

16   A.  No.

17   Q.  Was there evidence that LimeWire was used on this

18   computer?

19   A.  Yes.

20   Q.  I'm sorry, I'm sorry, was LimeWire functioning on this

21   computer when you used it?

22   A.  Okay.  I couldn't tell if it was actually, if I could go

23   in and actually execute it again with some of the registry

24   issues.  I would have had to have created a live what they

25   call a live image of the hard drive and try to run it, but

1    there was all the installation files for LimeWire, the

2    executable for LimeWire was on this computer.

3    Q.  So, is it fair to say then that but for the deletion of

4    the Registry files, you might have been able to go in and

5    tell whether this software was still functioning on the

6    computer?

7    A.  That's correct.

8    Q.  But you weren't able to do that because of the registry

9    files?

10   A.  That would, yes, that made a difference, difficult for

11   me to know whether this was actually a functioning program

12   at the time of the examination.

13   Q.  Now, was there any evidence on the hard drive about

14   whether any files were being distributed from this Gateway

15   computer through the LimeWire program at any time?

16   A.  Yes.  As I said, the way LimeWire works is that every

17   individual keeps their directory listing of what they are

18   sharing, so unlike KazaA, which just has a shared folder,

19   and if you just draw or erase the KazaA program, there's no

20   more evidence of what that shared folder was, LimeWire keeps

21   a little file that says here, at this moment in time, here's

22   what I'm sharing, and that makes searching easier, so when

23   somebody comes to you and says hey, do you have this

24   Aerosmith song, you just look in this single file and say,

25   yeah, I've got this Aerosmith song, and you respond yes I

1    have this.

2          So on this computer I found that particular file

3    which had a list of what was being offered, what was being

4    shared via LimeWire.

5    Q.  Okay.  Could you turn to Exhibit 43, please.

6    A.  Yes.

7    Q.  If you wouldn't mind, Dr. Jacobson, would you unhook

8    that three-ring binder and pull out Exhibit 43, the whole

9    thing.

10   A.  This is 43.  It's double-sided.

11   Q.  It should be Exhibit I to your report.  Is that it?

12   A.  Yes.  It's printed double-sided.

13   Q.  That's approximately 80 pages; is that correct?

14   A.  Yes, that's about 80 pages.

15   Q.  And could you tell the jury what is on those 80 pages?

16   A.  Those 80 pages consist of the files that are in the or

17   referred to in what they call the "C:  My music folder," so

18   these are the files that LimeWire was configured to share.

19   Q.  Okay.  Dr. Jacobson, I'd like to pull out the page 1 of

20   this exhibit.

21         MR. REYNOLDS:  Your Honor, if I may, could you

22   pull it up?

23         THE COURT:  That's fine, all monitors are on.

24   Q.  Dr. Jacobson, if you could pull up the first third of

25   the page roughly.  Now, Dr. Jacobson, could you just

1    describe what this shows?

2    A.  Yeah.  This is again the files that came out of this

3    LimeWire configure file and so we see, for example, it was

4    sharing a song in "C:  My music, One All Other Rap, R & B

5    1-12-anywhere.mp3."

6    Q.  You were looking at the fifth line down?

7    A.  Yeah, the fifth line down.

8    Q.  And so now the first thing that describes the C:  My

9    music, that's a folder, correct?

10   A.  Yes, that's reference to the folder on the computer.

11   Q.  What folder is that?

12   A.  That's the folder that LimeWire was configured to share

13   onto the Internet, onto the Gnutella peer-to-peer network.

14   Q.  Then there's a back slash, then it says, what is that,

15   One All Other Rap, R & B?

16   A.  Yeah.

17   Q.  What is that?

18   A.  That's a subfolder within the my music folder.

19   Q.  So you have the big folder and then a smaller subfolder,

20   then what's behind that?

21   A.  Then there are a series of MP3 files, so that's the

22   actual file, so, for example, in the third line down, it's

23   112-cupid.mp3, so that's the actual reference to the file

24   that would have been shared out of the C: my music folder.

25   Q.  Okay.  If we were to look through this whole exhibit of,

1    what did we say, 80 pages single-spaced?

2    A.  Yes.

3    Q.  There are over 3700 total files in this LimeWire shared

4    folder?

5    A.  Yes.

6    Q.  And approximately how many of those are music files?

7    A.  About 2700 or so.

8    Q.  So, 2700 music files in this LimeWire shared folder on

9    the defendant's computer?

10   A.  Approximately, yes.

11   Q.  And what is your opinion as to when these files were

12   being shared from the defendant's LimeWire account and

13   specifically from this shared folder?

14   A.  The dates from the forensic exam show that February 27th

15   was a date of, I'm sorry, of 2007, February 28th was the

16   date that this file was last modified, so that's an

17   indication of the date at which this file was being used by

18   a LimeWire program to share data on the KazaA, or, I'm

19   sorry, on the Gnutella network.

20   Q.  So just so I'm clear, the file sharing program, the

21   LimeWire file sharing program, the my music folder that

22   we're looking at was configured to share these files on

23   Exhibit 43, 2,700 music files as late as February of 2007?

24   A.  Yes, and possibly as late as May of 2008.  Again, with

25   the registry, it's difficult for me to tell a final last

1    date, the February date is one at which this file was last

2    shown was last modified.

3    Q.  And not only last modified but the settings on the

4    computer were set so that it was configured to distribute

5    these files; is that accurate?

6    A.  That's correct, these are the list of files that were

7    being distributed by the LimeWire program in February of

8    2007.

9    Q.  Okay.  Now, you mentioned the date of May of 2008, that

10   it may be that this was configured to share as late as that

11   date based on the evidence, could you explain that?

12   A.  Yes.  There were some references in some registry files

13   to LimeWire still being used as late as May of 2008.  Again,

14   because of some of the missing registry files, it was very

15   difficult to pinpoint the exact ending date.

16   Q.  And, Dr. Jacobson, I'd like to walk through some of the

17   files that were being distributed, specifically if you could

18   turn to page 12.

19           MR. REYNOLDS:  Your Honor --

20           THE COURT:  Page 12 of exhibit?

21           MR. REYNOLDS:  Same exhibit, your Honor, 43.

22           THE COURT:  Okay.

23           MR. REYNOLDS:  I would like to pull out the top

24   third.

25           THE COURT:  All right.

1       MR. REYNOLDS:  Through all the Aerosmith tracks

2  that are here.

3          THE COURT:  Okay.

4       MR. REYNOLDS:  I believe we can pull out this

5  whole page, your Honor, if that's okay.

6          THE COURT:  Yes, you can.

7       MR. REYNOLDS:  Ms. Burton, would you pull out page

8  12, please.  Could you pull out it was the first say the top

9  third through "Elevator" by Aerosmith, through "Pink"

10 actually, if you would.

11 Q.  Dr. Jacobson, this is another page in the same exhibit

12 we were looking at of the files that were being distributed

13 from Mr. Tenenbaum's Gateway computer on February 27, 2007

14 and possibly as late as May, 2008.

15 A.  That's correct.

16 Q.  And do you see the files, there are a number of files in

17 here, one of them, four from the bottom is it says "C:  My

18 music, Aerosmith, Janie's Got a Gun?

19 A.  Yes.

20 Q.  That's one of the songs that's at issue in this case?

21 A.  Yes.

22 Q.  And, Dr. Jacobson, tell us what you see here, we were

23 talking about subfolders earlier.  Is this the same

24 subfolder the other songs were in?

25 A.  No, this is a subfolder called Aerosmith.

1  Q.  How do you get a subfolder on your computer?

2  A.  You end up creating the subfolders on the computer.  The

3  computer, the Windows configuration doesn't come with all

4  those subfolders built in.

5        MR. REYNOLDS:  I'd like to publish page 28 to the

6  jury, your Honor.

7        THE COURT:  Okay.

8        MR. REYNOLDS:  Ms. Burton, would you please pull

9  out the very middle of this exhibit, the Green Day

10  recordings up right in the middle of this exhibit.

11  Q.  Dr. Jacobson, of what we pulled out from this one page,

12  there's a track, it's "Minority."

13        MR. REYNOLDS:  Ms. Burton, could you highlight

14  that one, please.  Do you see that?  Never mind.  Never

15  mind.

16  Q.  Do you see that, Dr. Jacobson?

17  A.  Yes.

18        MR. REYNOLDS:  Ms. Burton, could you put your

19  cursor by that.  Thank you.

20  Q.  That is a song that is also at issue in this case,

21  correct?

22  A.  Correct.

23  Q.  And it was also being distributed from the defendant's

24  LimeWire shared folder?

25  A.  Correct.

1    Q.  Dr. Jacobson --

2            MR. REYNOLDS:  -- or, your Honor, I would like to

3    next publish to the jury page 32.

4            THE COURT:  Okay.

5            MR. REYNOLDS:  Ms. Burton, if you would pull out

6    the top third of this page.

7    Q.  Now, Dr. Jacobson we have on this page at the top we

8    have another subfolder that's called Limp Bizkit?

9    A.  Correct.

10   Q.  And that's a user generated subfolder on the defendant's

11   computer?

12   A.  Yes.

13   Q.  And down below if you move down about eight lines, we

14   begin with another subfolder, that's Lincoln Park; do you

15   see that?

16   A.  Yes.

17   Q.  And then the fourth song in Lincoln Park is a track

18   called Crawling; do you see that?

19   A.  Yes.

20   Q.  That's a song that was being distributed from the

21   defendant's LimeWire shared folder as possibly as late as

22   May of 2008?

23   A.  Yes.

24   Q.  And that, again, is a song that's at issue in this case,

25   correct?

1    A.  Correct.

2    Q.  Dr. Jacobson, could you turn to page 39, please.

3         MR. REYNOLDS:  Your Honor, is this published to

4    the jury?  Can we now pull it up again?

5         THE COURT:  What page are you looking at?

6         MR. REYNOLDS:  Page 39.

7         THE COURT:  Yes, you can have it.

8         MR. REYNOLDS:  Ms. Burton, can you please pull up

9    under page 39, there's one song, another track of Eminem,

10   another is "Drug Ballard."  Dr. Jacobson, do you see this

11   song here, the C:  My music folder?

12   A.  Yes.

13   Q.  This is another folder called miscellaneous files?

14   A.  Yes.

15   Q.  And this song by Eminem, "Drug Ballard" is again in the

16   LimeWire shared folder?

17   A.  Correct.

18   Q.  And, Dr. Jacobson, that's another song that's at issue

19   in this case?

20   A.  Correct.

21   Q.  Dr. Jacobson, we've just looked at a number of song

22   files that are at issue in this case that were being

23   distributed from the LimeWire shared folder.  Did you do a

24   comparison of the files that were in this C:  My music

25   folder on the Gateway computer that the defendant had in

1    college and in graduate school vs. the files that were on

2    the KazaA shared folder at the defendant's parents' house in

3    Providence, Rhode Island?

4    A.  Yes.

5    Q.  And what did you find?

6    A.  That there were some matches.

7    Q.  And could you tell the jury approximately how many exact

8    matches that you found?

9    A.  In the order of a couple hundred, I think 250, 251,

10   something like that.

11   Q.  And could you turn to Exhibit -- actually turn to

12   Exhibit 35 for a moment.  Before we get to those exact

13   matches, Dr. Jacobson, could you tell the jury what

14   Exhibit 35 is?

15   A.  Yeah, 35 is basically a listing of all of the files

16   associated with the C:  My music directory that I found on

17   the computer.

18   Q.  So the files that we just looking at in the previous

19   exhibit, Exhibit 43, those were the files that were being

20   distributed on at least as late as February of 2007 and

21   possibly as late as May of 2008?

22   A.  Right.  Those came from that LimeWire configuration

23   file.

24   Q.  So this exhibit, if you wouldn't mind taking it out and

25   just holding it up for the jury showing the jury the lines,

1    this is now an exhibit of all of the files you found

2    evidence of in this LimeWire shared folder at one point or

3    another?

4    A.  Yes, so this included the unallocated space files that I

5    would have found listed in the unallocated space.

6    Q.  So this list is slightly larger than the ones that were

7    being distributed as late as 2007, 2008?

8    A.  Yes.

9    Q.  Now, did you do a comparison of all of these files

10   compared to what was on the KazaA shared folder in the

11   defendant's KazaA account in Providence?

12   A.  Yes.

13   Q.  And could you turn to Exhibit 36, please.

14   A.  Yes.

15   Q.  And, again, you said you found several hundred or I

16   believe on the order of 250 exact matches?

17   A.  Yeah.

18   Q.  And so just so I'm clear on this, that you found the

19   exact same files, sound recordings on the LimeWire computer

20   that the defendant had at graduate school, you also, you

21   found evidence of those same files, those were the same

22   files that were on the KazaA, on the defendant's KazaA

23   shared folder in Providence?

24   A.  The file names were the same between the two, yes,

25   between the KazaA and what was on the C:  My music at his

1    college, yes.

2    Q.  And I want to just look at page 1, if we can here.  I

3    won't go through all these because we've actually looked at

4    a few of them, have we not?

5    A.  Yes.

6            MR. REYNOLDS:  Could you pull up page 1,

7    Ms. Burton.

8            THE COURT:  1 of which exhibit?

9            MR. REYNOLDS:  Exhibit 36, your Honor.

10           THE COURT:  Okay.

11   Q.  Dr. Jacobson, could you --

12           MR. REYNOLDS:  This I don't believe is published

13   yet to the jury, your Honor.

14           THE COURT:  It may be.  It may be published to the

15   jury.  We're looking at Exhibit 1?

16           MR. REYNOLDS:  Page 1 of Exhibit 36.

17           THE COURT:  Okay.

18           MR. REYNOLDS:  Ms. Burton, would you just pull out

19   the top two columns there, just the headers so the jury can

20   see those on a few files.  Thank you.

21   Q.  So this just shows the two columns you've got on this

22   exhibit, correct?

23   A.  Yes.

24   Q.  And could you tell the jury what they're looking at when

25   they look at each column on this page?

1    A.  Yeah, I believe you're seeing the file names in the

2    first column labeled Exhibit A, C:  My music, those are the

3    file names that were referenced with the C:  My music

4    directory, which is on the Gateway computer, and then this

5    MediaSentry music log is the actual log all of the file

6    names that MediaSentry saw on the date of capture, so we

7    have the list from MediaSentry on the right-hand side and we

8    have the list of song titles on the left-hand side from the

9    computer.

10            MR. REYNOLDS:  Ms. Burton, would you just scroll

11   down on this all the way until you get to the "Look to Your

12   Orb For The Warning" and "Leech."

13   Q.  So here we have a couple of files, the bottom one there

14   is "Leech.MP3"?

15   A.  Yes.

16   Q.  That's also one of the recordings at issue in this

17   case?

18   A.  Correct.

19   Q.  And, in fact, if we were to look at these, a number of

20   recordings that are issue in this case were both on the

21   defendant's KazaA folder and later on the defendant's

22   LimeWire shared folder while he was in graduate school?

23   A.  Correct.

24   Q.  And, in fact, they were in the shared folder of the

25   computer that were distributing as late as February 27th of

1   2007?

2   A.  Correct.

3   Q.  Now, we've been looking at these file names and these

4   various folders and subfolders.  Were these files still on

5   the computer when you examined it?

6   A.  The C:  My music directory was no longer on the computer

7   nor any of the files that were in the C.  My music were

8   still in the C:  My music.

9   Q.  Did you find evidence of those files still on the

10  computer?

11  A.  Some of them those files were in another folder on that

12  computer in their actual real form.

13  Q.  Okay.  So just so I'm clear, the C:  My music folder,

14  the LimeWire shared folder, that had been destroyed before

15  the computer was provided to you?

16  A.  That's correct.

17  Q.  Could you turn to Exhibit 38, please.  Before we look at

18  Exhibit 38, so what we've been looking at then, that was all

19  in the unallocated space on the hard drive?

20  A.  Both the unallocated space and in this configuration

21  file.

22  Q.  That you were able to open?

23  A.  That I was able to open, yes.

24  Q.  Could you tell the jury if you wouldn't mind if you

25  could pull out Exhibit 38.  Just hold that up for the jury

1    and thumb through it so the jury has a sense of how many

2    pages are there.

3    A.   It's all double-sided.

4    Q.   And could you tell the jury what this is?

5    A.   This is what's called an MP3 report.  This is some of

6    the metadata associated with the actual MP3 files that I

7    found on that Gateway computer, so this is metadata from

8    real files, the MP3 files, that existed on that computer.

9    Q.   So unlike the files we were just looking at where we

10   just had the names of the files, you could actually play

11   these files --

12   A.   Yes.

13   Q.   -- if you converted your forensic image back to an image

14   of the hard drive that a user could use?

15   A.   Yes, actually I extracted as part of my forensic exam, I

16   did extract all of these to a Windows native format.

17   Q.   And you could play them?

18   A.   I played a few of them, yes.

19   Q.   To verify they are what they say they are?

20   A.   Yes, and that I could play them.

21   Q.   Now, tell the jury what folder these were found in on

22   the hard drive.

23   A.   These were found in a folder called

24   documentsettings/Joel/mydocuments/mymusic, then they were in

25   various subfolders under that so they weren't all in that

1    single folder just like the C:  My music had subfolders that

2    categorized them by artist or genre or whatever, the

3    Joel/mydocuments/mymusic folder had subfolders in it.

4    Q.  And so could you tell the jury when these files that

5    we're looking at, this is an MP3 report, this is just MP3

6    files, correct?

7    A.  That's correct.

8    Q.  Music files, sound recordings?

9    A.  Yes, in the MP3 format, yes.

10   Q.  Approximately how many are here?

11   A.  I don't quite remember exactly.  Probably well over a

12   thousand.  I don't remember the exact number.

13   Q.  Okay.  Now, when were these files, these MP3 files put

14   into the C:  Documents and settings/Joel/mymusic/mydocuments

15   folder?

16   A.  Well, this folder was created on March 31st 2009, which

17   is the date of reinstallation of the Windows operating

18   system.

19   Q.  That was done earlier this year?

20   A.  Yes, a few months ago, yes.

21   Q.  Did you compare these files with the files that were at

22   one time being distributed in the LimeWire shared folder?

23   A.  Yes, I compared the list of this to the list what was

24   shared in the LimeWire shared folder.

25   Q.  And what did you find?

1   A.   That there were quite a few matches between the two

2   lists so that there were -- and the MP3 files that really

3   existed were also referenced in the C:  My music.

4   Q.   Do you have an opinion as to what happened between the

5   LimeWire shared folder existing at one point in 2007 and

6   2008 and now this folder documents and settings of Joel with

7   the name of Joel on it existing just being created in March

8   of 2009?

9   A.   Yeah, that a lot of the files that were in the C:  My

10  music folder were copied into the

11  mydocumentssettings/Joel/my documents/mymusicfolder along

12  with the subsequent directory structure that goes along with

13  it.

14  Q.   So, in other words, all the subfolders were copied into

15  there as well?

16  A.   Quite a few of the subfolders matched, yes.

17  Q.   Did you looking at these MP3 files and this MP3 report,

18  which is Exhibit 38, the live files that are still on the

19  defendant's computer, did you do a comparison of those to

20  what was in the KazaA shared folder?

21  A.   Yes, I did.

22  Q.   And could you take a look at Exhibit 39.

23  A.   Yes.

24  Q.   And could you tell the jury what this shows?

25  A.   This is that comparison of the files that whose files

1   name matched between the user log, which is the log that

2   MediaSentry creates of a list of the names and of the MP3

3   songs that were actually found on the hard drive.

4   Q.  Dr. Jacobson, I'd like to --

5          MR. REYNOLDS:  Your Honor, I'd like to publish

6   this to the jury, if I may?

7          THE COURT:  This is 39?

8          MR. REYNOLDS:  39, yes.

9          THE COURT:  You may.  Yes, you may.

10         MR. REYNOLDS:  And, Ms. Burton, if you pull out

11  maybe the first quarter of this, go ahead, to the file

12  created date, if you would.

13  Q.  Dr. Jacobson, there are two columns here, one says,

14  "user log compressed" and one says, "MP3 songs on the

15  drive."  Do you see that?

16  A.  Yes.

17  Q.  Could you tell the jury what that means?

18  A.  Again, the user log compressed, that is the list of

19  files that MediaSentry found in the KazaA network, and the

20  compressed format is just one file per line, so you don't

21  see all the metadata associated with it.  The second column

22  over MP3 songs in the drive, that's the file names of the

23  MP3 songs that actually physically existed on the hard drive

24  that I examined, then the file created is the creation date

25  that's associated with each of the MP3 songs found on the

1    hard drive, so the last two columns, the right most two

2    columns go together.

3    Q.  So we've just looked at a little over two pages of files

4    that are exact matches to the music files that existed on

5    the defendant's computer on his KazaA shared folder?

6    A.  Yes.

7    Q.  And you agree with me, Dr. Jacobson, that there are

8    between 40 and 50 artists on these two pages that match

9    exactly with what was in the KazaA folder?

10   A.  Correct.

11   Q.  Now, aside from just these MP3 files that we're looking

12   at on Exhibit 38, did you prepare a list of all of the files

13   that were found in the

14   documentsandsettings/Joel/mydocuments/my music folder?

15   A.  Yes, I did.

16   Q.  And could you take a look at Exhibit 42.  Could you pull

17   that out, if you would, and show the jury that.

18   A.  That's 230 pages.

19   Q.  And, Dr. Jacobson, if you would, if we could look at the

20   first page of this.

21        MR. REYNOLDS:  Your Honor, I'd like to publish the

22   first page to the jury.

23        THE COURT:  You may.

24   Q.  Exhibit 42, please.  Could you explain to the jury what

25   these columns show, Dr. Jacobson.

1  A.  The first column is the name of the file.  The second

2  column is the file extension, so you see this file extension

3  also showing its name, but it's also easier if you have it

4  in a separate column.  The next two columns over are both

5  labeled file created.  One is the date and the other is the

6  time stamp.  The right most two columns are when the file

7  was last written to, and, again, both a date column and a

8  time stamp column.

9  Q.  And that file created date, what does that mean?

10 A.  That's the date that that file was originally put on the

11 computer, so that was its date that it first existed on that

12 computer.

13 Q.  So many of these files were at one point in the LimeWire

14 shared folder on the Gateway computer that the defendant had

15 in grad. school, and now they're in this folder, right?

16 A.  Yes.

17 Q.  But even though they're in this folder and no longer in

18 the LimeWire shared folder, this file creation date has the

19 date that they were first put on the computer; is that

20 correct?

21 A.  That's correct.

22 Q.  If you could turn to page I believe it's 98.

23       THE COURT:  98 of this exhibit?

24       MR. REYNOLDS:  Yes, your Honor, Exhibit 42.  May I

25 publish that to the jury, your Honor?

1          THE COURT:  Yes, you may.

2     Q.  Dr. Jacobson, do you find evidence that some of these

3     files were downloaded from the Internet, the files that are

4     in this C:  My documents/documentsandsettings/Joel/mymusic

5     folder?

6     A.  Yes.

7     Q.  And there's a song here about one-third of the way down.

8          MR. REYNOLDS:  Ms. Burton, could you pull out the

9     Ozzy Osbourne track.

10    Q.  Do you have an opinion as to whether that song by Ozzy

11    Osbourne, "Crazy Train" was downloaded to this computer?

12    A.  Yes, I believe it was.

13    Q.  And or at least came from the Internet?

14    A.  Right, it came from the Internet, yes.

15    Q.  When was it added to this computer?

16    A.  The creation date is 4-12-2006.

17    Q.  And what's that based on your opinion that this

18    Ozzy Osbourne was downloaded as opposed to ripped?

19    A.  If we look at the subsequent metadata that was

20    associated with that file, we'll see that the metadata had

21    some of the same type of metadata you'd find from music you

22    got off the Internet.

23    Q.  And we'll just go over a few more of these.

24         MR. REYNOLDS:  Ms. Burton, could you turn to page

25    128.  Your Honor, I'd like to publish 128 to the jury.

1          THE COURT:  Exhibit 128?

2          MR. REYNOLDS:  I'm sorry, your Honor, page 42,

3  page 128.

4          THE COURT:  Just a second.  Okay.

5          MR. REYNOLDS:  Ms. Burton, could you turn to page

6  128.  Ms. Burton, would you please pull out the Aerosmith

7  song, "Cryin'."

8  Q.  Dr. Jacobson, do you see the track here by Aerosmith,

9  "Cryin'.MP3"?

10  A.  Yes.

11  Q.  And, again, this is a song that you could record or

12  listen to on the computer today?

13  A.  Correct.

14  Q.  Do you have an opinion as to whether this song was

15  downloaded from the Internet?

16  A.  I believe this song was downloaded from the Internet.

17  Q.  And what's that opinion based on?

18  A.  Again, by looking at the metadata associated with this

19  file, it has indications that it was the same type of

20  metadata you'd find from music downloaded off the

21  Internet.

22  Q.  And what's the date that this song was added to this

23  computer?

24  A.  9-12 of 2007.

25  Q.  Dr. Jacobson, would you turn to page 141, please.

1         MR. REYNOLDS:  Your Honor, I'd like to publish

2    page 141.

3         THE COURT:  Just a second.  Okay.  No, just a

4    second.

5         MR. REYNOLDS:  I believe these are all MP3 files,

6    your Honor.

7         THE COURT:  Okay, yes.

8         MR. REYNOLDS:  Ms. Burton, would you pull out the

9    Gwen Stefani song that is about two-thirds of the way down.

10   Q.  Dr. Jacobson, do you have an opinion as to whether this

11   song by Gwen Stefani, "Cool" was downloaded from the

12   Internet?

13   A.  Yes, I believe it was.

14   Q.  What is that opinion based on?

15   A.  Again, looking at the metadata associated with that

16   particular song, it has the same type of metadata that you

17   would find in songs downloaded from the Internet.

18   Q.  And when was this song added to this computer hard

19   drive, the Gateway computer hard drive that the defendant

20   had at graduate school?

21   A.  10-13 of 2007.

22   Q.  Dr. Jacobson, do you see from this exhibit how many

23   songs were added to this hard drive on October 13 of 2007?

24   A.  Yeah, there's approximately about 700 of them.

25   Q.  And these are all MP3 files?

1    A.   Yes.

2    Q.   Now, you said 700.  Is that accurate?  If you could, why

3    don't you take a look at the pages.

4    A.   14 pages, I believe, so, yeah, probably about closer to

5    500, I believe, 14 pages at about 37 per page, 34 per

6    page.

7    Q.   And if we looked at these, those are pages it begins on

8    page 131 and goes all the way through page 144?

9    A.   Right.

10   Q.   And those are all MP3 files that were added to this

11   computer on October 13th of 2007?

12   A.   Correct.

13   Q.   Dr. Jacobson, there's evidence of video files in this

14   case, I think in both folders there's evidence of video

15   files.  How long does it take to download a video file, say

16   a movie as opposed to a music file?

17   A.   It depends on the quality of both, but a typical video

18   file is going to be on the order of probably 100 times

19   larger than an audio file at least, so at least 100 to maybe

20   1,000 times bigger depending, of course, on the length of

21   the video and things like that, but it's significant time

22   difference between the two.

23          MR. REYNOLDS:  Your Honor, if I may have one

24   moment?

25          THE COURT:  Yes.

1   Q.  Dr. Jacobson, in comparing the files that were on the

2   defendant's Gateway computer in the LimeWire shared folder

3   to the files that were in the shared folder in the

4   defendant's KazaA account, you identified a number of exact

5   matches, correct?

6   A.  Correct.

7   Q.  Were there other matches aside from the exact matches?

8   A.  Yes, there were matches basically the same file names

9   maybe slightly different metadata or file names that one was

10  maybe capital, a word was capitalized and the other word

11  wasn't, and so there were others that appeared to be the

12  exact same song, but the match was not -- I was looking for

13  things where all the metadata song titles, everything was

14  100 percent identical, but there were a lot that were, like

15  I said, metadata one had it and one didn't, a word was

16  capitalized, there was an extra space, a period.  You know,

17  it took a long time to make that comparison, but there were

18  a lot of them that were very similar that were the same, I

19  would draw the conclusion were the same songs but not the

20  identical physical copy of each other, but they were the

21  same sound recording.

22  Q.  Just to confirm, Dr. Jacobson, it's your opinion that

23  the 30 songs that are at issue in this case were both

24  downloaded from the Internet to the defendant's KazaA

25  account and distributed to other KazaA users; is that

1  accurate?

2  A.  That is correct.

3        MR. REYNOLDS:  No further questions, your Honor.

4        THE COURT:  Mr. Nesson.

5                    CROSS-EXAMINATION

6  BY MR. NESSON:

7  Q.  Hello, Dr. Jacobson.

8  A.  Good afternoon.

9  Q.  Good afternoon.  Are you being paid for your testimony

10  here?

11  A.  Yes, I am.

12  Q.  Could you tell us what?

13  A.  $200 an hour.

14  Q.  How many hours have you put in?

15  A.  On the stand this morning it's been since, when, ten

16  o'clock, so...

17  Q.  And are you paid for all of the work that you've done in

18  compiling these reports?

19  A.  Yes.

20  Q.  And could you tell us about that?

21  A.  I am paid $200 an hour for the work I do for the law

22  firm.

23  Q.  So what's your bill so far?

24  A.  For this case?

25  Q.  For this case.

1   A.  I haven't billed this case.  If I were to guess, I'd say

2   probably to date I've probably put in 20 to 30 hours on this

3   case, maybe more.  It's been over a lengthy time.  My first

4   report was over a year ago, so...

5   Q.  All this in 20 or 30 hours?

6   A.  Well, that's probably a little on the light side.  The

7   forensic exam took, you know, that itself probably took a

8   good 10, 15 hours to do the forensic exam, so, yeah, it's

9   probably closer to 40, 50 hours over the entire duration

10  that I've been involved in this case, yes.

11  Q.  And have you been involved in other cases for the

12  recording industry?

13  A.  Yes.

14  Q.  Would you tell us about those?

15  A.  I have prepared probably on the order of 300 expert

16  reports for the recording industry.

17  Q.  And each of those you're getting paid $200 an hour?

18  A.  My time is billed at $200 an hour, that's correct.

19  Q.  So, how far back did your relationship with the

20  recording industry go?

21  A.  Late 2005, early 2006 time frame.

22  Q.  And could you tell us how it was initiated, who

23  connected with you?  Who was the first client?

24  A.  A law firm out of Kansas City contacted me, I can't

25  remember whether it was e-mail or phone call, asking me if I

1    would come down and talk to them about providing an

2    expert -- being an expert witness for them, so I went down

3    and met with the attorneys at that law firm.  I don't

4    remember their names.  I was only involved with that firm

5    for a short period of time before the current firm took

6    over, I ended up working for the current firm.

7    Q.  So, 300 expert reports.  Are those all law cases?  Are

8    those all in connection with cases like this against Joel?

9    A.  Well, they're all reports that I produce when I get a

10   CD, as I described earlier, I receive a CD with the

11   MediaSentry information, the ISP information and the songs,

12   and I prepare a report describing how the Internet works,

13   describing how peer-to-peer networks work and drawing a

14   conclusion about the MediaSentry data.

15   Q.  So what would you say had been your total revenue from

16   the recording industry since the time you became associated

17   with them?

18   A.  Probably on the order of I'd say maybe $100,000 to

19   $120,000.

20   Q.  And have you actually testified in court on occasions

21   before for the recording industry?

22   A.  Yes.

23   Q.  Could you tell us about those?

24   A.  I have been involved in two court proceedings for the

25   recording industry both against the same defendant.

1    Q.   This is the case against Jamie Thomas-Rasset in

2    Minnesota?

3    A.   Yes, Minnesota, yes.

4    Q.   And have you been involved with the recording industry

5    in any other fashion besides making reports and

6    testifying?

7    A.   No.

8    Q.   You haven't been at meetings?

9    A.   No.

10   Q.   You haven't consulted on how MediaSentry was doing its

11   work?

12   A.   I have had discussions with MediaSentry on how

13   MediaSentry conducts its investigation and how they handle

14   and store the data that they've collected.

15   Q.   So, were you in some way an architect of the MediaSentry

16   protocols for doing their investigations?

17   A.   No.

18   Q.   No.  So when did your connection with MediaSentry begin

19   as a face-to-face consultation process?

20   A.   I had discussions with MediaSentry as part of the first

21   two proceedings in Minnesota, I've also had a phone

22   conversation with MediaSentry primarily focused on their

23   data handling protocols, how they deal with the data they've

24   collected.

25   Q.   Have you ever visited MediaSentry?

1    A.  No.

2    Q.  Have you ever examined MediaSentry software?

3    A.  No.

4    Q.  Have you -- well, if you've not examined it, you've

5    never tested it?

6    A.  I've never tested their actual software, no.

7    Q.  You, yourself, are a software expert of sorts?

8    A.  I have a degree in computer engineering, yes.

9    Q.  Does it strike you as unusual that software operates

10   perfectly?

11   A.  Software will operate within the bounds of what your

12   requirements are.  Perfect is a difficult thing to define.

13   Q.  Well, when we heard testimony here yesterday from the

14   MediaSentry witness who toward the end of his testimony said

15   "MediaSentry software never makes mistakes," did that strike

16   you as plausible?

17   A.  I can't remember his exact wording.  I believe he said

18   that there was a zero error rate.

19   Q.  Zero error rate?

20   A.  In their process, I think he said, I'm not sure he said

21   their software.

22   Q.  So, MediaSentry, that you're taking their data as the

23   basis for your work says that it has a zero error rate in

24   investigating and connecting to the Joels of this world

25   whatever the downloading is that they're investigating?

1  A.  That's what I believe he testified to yesterday, that's

2  correct.

3  Q.  And do you believe that to be true?

4  A.  I cross-reference all the data I receive from

5  MediaSentry to make sure that I'm satisfied with the data

6  that they've collected and that what they've collected is

7  consistent and makes sense, so the data that I have seen

8  from MediaSentry, I have found there are no inconsistencies

9  in what I have seen from MediaSentry, but I don't know how

10 much MediaSentry collects I actually see.

11 Q.  Now, MediaSentry took complete copies of five, actually

12 seven, but two of them are out, five still of the songs

13 involved here, that is, delivered you a CD and delivered

14 apparently to the plaintiffs a CD with full copies of what

15 they had downloaded from Joel's shared folder for five

16 songs; am I correct in that?

17 A.  That's correct.  The CD I received contains copies of

18 the MP3 files that were downloaded by MediaSentry.

19 Q.  And why did they do that?

20 A.  Why did they do --

21 Q.  Why did they bother to record those five songs?

22 A.  They download the complete -- a set of complete songs to

23 show that there are songs there, that those are the

24 copyrighted works.  It's really infeasible to download all

25 800 or 900, however many songs an individual may be sharing,

1    it's really infeasible to download all of that in their

2    entirety, so they pick a sample set.

3    Q. So let me just be clear. In order to make sure that the

4    file that they're looking at is a match to the copyrighted

5    work, they download the whole file and then somebody makes a

6    comparison?

7    A. That's correct.

8    Q. But with respect to all the rest of the files where they

9    just download this metadata at the top --

10   A. That's correct.

11   Q. -- we have no underlining file?

12   A. You do not have the audio portion of that file, that's

13   correct.

14   Q. And so there is no way to compare as you could with the

15   five that you really have what the plaintiffs say you

16   have?

17   A. You cannot make an audio comparison, right, because they

18   do not collect the audio portion of the file.

19   Q. And you say it would be impossible to download more or,

20   what, inefficient?

21   A. Well --

22   Q. What stops MediaSentry from doing a grade A job on the

23   whole thing, if you want to go on 851, let's download 851,

24   Joel did it, let's do it here?

25   A. You technically could do that.

1    Q.  What are you worried that it would take up too much

2    space on a hard drive?

3    A.  It would take a lot of space on the hard drive.  There's

4    probably -- I haven't seen the internal workings of the

5    KazaA code, but typically they rate limit, most software

6    limits how much they'll do simultaneously, so if you were to

7    say I want all 800, all 800 at once, the KazaA software may

8    not even let you do that all at once.

9    Q.  You don't know that for a fact, you're just

10   speculating?

11   A.  Yes.

12   Q.  And even if it required you to do it not all at once,

13   MediaSentry could have done whatever it would have allowed

14   and then done the next batch?

15   A.  Yes.  The time -- it would have taken quite a large

16   amount of time to download 800 songs at three megabytes per

17   song would have taken significant amount of time, so that

18   could be another factor involved.

19   Q.  And you did describe that the way apparently the

20   MediaSentry software works is that they do simultaneous

21   downloads like they're asking for everything all at once

22   whatever they're asking for and you were suggesting that

23   might overload?

24   A.  If you were to let that complete, that's correct, they

25   initiate a download of everything which pulls the first step

1   in that initiation of the download are those two packets we

2   saw, the send and the receive which has the metadata in

3   them.  What then follows the music, so they initiate that

4   initial download.  They terminate the initial download in of

5   the 800, in this case actually the 1100 files and then they

6   resume with the ones they're interested in.

7   Q.  But you're confident, in fact, you have no doubt that

8   all those files beyond the five are in fact just what the

9   plaintiffs say they are, they are their copyrighted material

10  even though you can't check?

11  A.  That's my opinion, yes.

12  Q.  And it's your opinion because the metadata gives you

13  some indication?

14  A.  That's correct.

15  Q.  Now, let me just ask you, we heard from Mr. Leak

16  yesterday that the industry engages in a practice called

17  spoofing.  I think you had a little different word for it?

18  A.  The term that was used earlier today was pollution.

19  Q.  Pollution.  Pollution.  And when the industry engages in

20  pollution, they hire a company that's really good at it to

21  do it; am I not right?

22  A.  I'm not aware of how the industry engages in activities

23  in pollution.

24  Q.  Well, let me ask you this.  Assuming competence in

25  whatever company it is that is taking money from the

1    recording industry in order to pollute the peer-to-peer

2    environment with spoofs, would you not expect the spoofs to

3    look like the real thing in terms of the metadata?

4              MR. REYNOLDS:  Objection.  Foundation, your

5    Honor.

6              THE COURT:  Sustained.

7    Q.  Is it the ordinary experience so far as you know among

8    users of KazaA in particular, peer-to-peer networks, the

9    early ones, in general that there were a lot of spoofs?

10   A.  I have not seen any reports on the exact amounts of

11   spoofs.

12   Q.  Have you ever used KazaA yourself to download music?

13   A.  I have used KazaA myself.  I've used most of the

14   peer-to-peer software myself in an academic setting.  In my

15   company setting, we, of course, have to test that software

16   to prove our software can block the transfer of music.

17   Q.  And you have never gotten a spoof?

18   A.  Not that I recall.  A spoof of a file that isn't, right,

19   that it says it's something and it's something else, a music

20   file, yes.

21   Q.  So when you say that you have no evidence that the files

22   in addition to those five were not what the plaintiffs

23   purport them to be, you also have no evidence the other way

24   either; am I not right?

25             MR. REYNOLDS:  Objection, your Honor, compound and

1    misstates the testimony.  It's confusing.  I don't

2    understand the question.

3         THE COURT:  I don't understand the question

4    either, you can have it again.  Do you want to rephrase the

5    question?

6    Q.  What's your evidence that the files beyond the five were

7    really the files that were the copyrighted work?

8    A.  Again, based on the metadata that was downloaded by

9    MediaSentry indicating -- looking at that metadata, that's

10   how I draw my conclusion that those are also the copyrighted

11   works.

12   Q.  So you're now a person clearly expert enough to explain

13   this to me.  If I or if someone, if you were to undertake

14   the task of putting up a spoof of a song, could you do it?

15   A.  Yes.

16   Q.  And how would you go about doing it?

17   A.  I would create a file that would contain what I wanted

18   it to contain and I would name it something that would be

19   different than what it is, whatever I wanted it to pretend

20   to be.

21   Q.  So, suppose you wanted to pretend it to be one of the 25

22   songs, just to take it random, you would put up a file and

23   you'd put a title in it that would indicate what the song

24   was?

25   A.  Correct.

1    Q.   Only it wasn't really that song, it's a spoof?

2    A.   The contents would not be what the name reports them to

3    be, that's correct.

4    Q.   And you'd make the file length the same length as the

5    real file so that you couldn't tell from the metadata that

6    this is not real?

7    A.   That would be a logical thing to do, yes.

8    Q.   And, in fact, you'd put as much into the metadata as you

9    could that would make it look like for someone using KazaA

10   and looking at a list of possible files to download all with

11   title name of the song, this one looks good?

12   A.   Yeah, you would see the metadata to get, if you want

13   somebody to grab yours over somebody else, you might try to

14   put something in the metadata to make that happen.

15   Q.   And let's understand the purpose of the spoof, the

16   purpose of the spoof is to frustrate the KazaA user who's

17   looking for the real thing because you only find out it's a

18   spoof after you've gone through the whole process of

19   downloading it, which takes some time, as you indicated, and

20   then playing it and finding out you've downloaded something

21   that looked like it was going to be what you wanted but it

22   turns out not to be?

23           MR. REYNOLDS:  Objection.  Foundation, your

24   Honor.

25           THE COURT:  Overruled.

1    A.  Could you read that back, I'm sorry?

2    Q.  The whole purpose of the spoof, is it not, is to

3    frustrate the downloader from KazaA who's looking for the

4    real thing if they have to put time and effort into it and

5    it turns out when they play the song it's not there?

6    A.  I guess I don't know the motive of somebody who would

7    put up a spoof file.  I can't speculate.

8    Q.  You can't imagine what the record companies would be

9    doing that for?

10          MR. REYNOLDS:  Objection.  It calls for

11   speculation.

12          THE COURT:  Sustained.

13   Q.  Would it seem reasonable to you from the vantage point

14   of a recording company which had the attitude that

15   peer-to-peer file sharing was the enemy, this is

16   competition, we want to make it --

17          MR. REYNOLDS:  Objection.  We want foundation,

18   your Honor.

19          MR. NESSON:  I have a right to finish the

20   question, at least.

21          THE COURT:  Finish the question.

22   Q.  Your company, Palisade is in the peer-to-peer network

23   control business, did I understand?

24   A.  That was our primary market in the 2000 to 2005 time

25   frame.  Our current market is classified as what they call

1  data loss prevention, which is a broader market looking at

2  basically keeping your information secret inside an

3  organization.

4  Q.  So let's stick with the early period of Palisade here

5  where you're selling a product that has as its design to

6  help the people you sell it to control peer-to-peer

7  traffic?

8  A.  That was one of its functions, yes.

9  Q.  And your customer included, did I hear you say, schools

10  and universities?

11  A.  Schools primarily, schools, banks, businesses were our

12  primary, a few universities.

13  Q.  And the idea is that for people who don't want to impede

14  the openness of the net, the peer-to-peer file sharing

15  openness of the net, your company offers a product that can

16  control it?

17  A.  Our company's product can detect and mitigate the

18  peer-to-peer traffic on a network.

19  Q.  So, suppose I'm a university.  What would your product

20  do for me?

21  A.  If your goal was to stop peer-to-peer traffic on your

22  network from leaving your network, our product could do

23  that.

24  Q.  So it's basically a product for customers who you would

25  say were opposed to peer-to-peer?

A.  It was a product designed for customers who want to have

control over the traffic on their network.  Peer-to-peer

protocols are typically designed to circumvent standard

control mechanisms.

Q.  And so in your business both at Palisade and in your

business as a consultant, your focus is on helping those

people who want to frustrate peer-to-peer traffic?

A.  As I said, Palisade Systems, products are focused on

helping somebody manage and control all traffic on their

networks, not just peer-to-peer.  My involvement in this, in

these proceedings or with this law firm, has been to help

explain what the network is, help explain what peer-to-peer

software is and to draw conclusions from the MediaSentry

data.

Q.  You mentioned that you participate in something called

Infoguard?

A.  Infragard, yes.

Q.  Infraguard?

A.  Yes.

Q.  Tell us again who the participants are in Infragard?

A.  Well, sort of the primary -- it's sort of a

self-standing organization, but the FBI is a partner in the

Infragard organization.  States or cities will have

chapters, and those chapters will hold regular meetings.  In

order to be a member, you have to be vetted to be a member

1  of Infragard and sign confidentiality agreements about the

2  contents of the various meetings.

3  Q.  And you also mentioned that academics were part of

4  Infragard?

5  A.  There are some academics that are part of that, that's

6  correct.

7  Q.  And what are the academics doing there?

8  A.  I can't testify to what all the academics do there.  My

9  role in Infragard has been both from a training standpoint,

10  I offer training sessions for Infragard members at my

11  research facility, I also work with the members when they

12  have computer security problems that are beyond the scope of

13  our capability, I give lectures and talks at the Infragard

14  meetings, I've written a couple of papers in the general

15  Infragard publications, so I view my role as sort of

16  somebody who can help the members of the IO chapter of

17  Infragard.

18  Q.  Do I understand that in some way Infragard has anything

19  to do with academia or is it just that academics participate

20  in the meetings?

21  A.  Academics participate in the meetings.

22  Q.  There's no involvement with universities or schools

23  together with law enforcement somehow thinking through what

24  the implications are for them collectively of peer-to-peer

25  networks?

1   A.   No, Infragard's primary goal is information sharing

2   among the parties involved.  One of the concerns in the

3   computer security world is that we don't talk to each other

4   because you don't want -- you never want to let somebody

5   know that you have a problem, and so Infragard provides a

6   forum for people to get together in a closed session to

7   discuss current security threats, to discuss things that

8   have happened against a particular organization and to plan

9   strategies to help mitigate those threats.

10  Q.   And is copyright enforcement any part of Infragard?

11  A.   Our chapter -- I don't remember ever having a meeting at

12  our chapter discussing copyright infringement.  Again, each

13  chapter is free to do and take in whatever direction they

14  want to.

15  Q.   Now, Doctor, you explained in exquisite detail the way

16  in which, excuse me, KazaA works, and it sounded quite

17  complicated, that is, one has to follow IPs and this and

18  that and the other thing, but what I'd like you to do is

19  explain how KazaA works from the user's point of view, and

20  what I'm looking for is the user friendly aspects of using

21  KazaA.  How easy is it to use KazaA?

22       THE COURT:  Let Dr. Jacobson have that question in

23  mind while he's at lunch.  Okay.  We'll take our lunch

24  break.  Come back at two.  All rise for the jury.

25       (A recess was taken.)

1          THE CLERK:  All rise for the jury.

2          THE COURT:  You can all be seated.  Proceed,

3     Mr. Nesson.

4     Q.  Now, Dr. Jacobson, I'd like you to describe the

5     experience of using KazaA from the user's point of view with

6     a focus on the user friendliness of the enterprise.  What

7     does the user actually do to use KazaA?

8     A.  Okay.  I mentioned this a little bit earlier, too,

9     basically KazaA has two parts to its use from a user's

10    standpoint.  There's the searching part which has a little

11    dialogue box like you find in Google where you type in your

12    search parameters, so you free form type in something and

13    hit search and then a list shows up, just a list of files

14    that match your search parameters, then you double click on

15    the one you want and then you have it.

16    Q.  That's it?

17    A.  That's basically it.

18    Q.  And it comes down to your machine?

19    A.  Yes, it's downloaded to your shared folder on your hard

20    drive.

21    Q.  And that happens just automatically?

22    A.  When you double click on it, it happens, yes.

23    Q.  Does the user then do anything else actively to

24    distribute that file?

25    A.  The file is placed in the shared folder which makes it

1    available for distribution.

2    Q.  So the very act of downloading the file is not a

3    separate act in your mind from the distribution since it

4    goes into the shared folder?

5    A.  As I showed in the picture with KazaA, when you, after

6    you've downloaded the file, it is now in your shared folder

7    and your computer reports back to the supernode that it now

8    has another file and so that is now available for

9    distribution to any of the other three million plus users on

10   KazaA.

11   Q.  Yes.  That was not exactly the point that I was focusing

12   on, that explanation that you gave where you had the three

13   boxes and the arrows going, there were six different actions

14   that were taking place, but when these actions are taking

15   place, it's actually the machine that's doing all of that,

16   it's not Joel who's doing now I got to do step 1, now I got

17   to do step 2, now I got to do step 3, now 4, now 5, now 6?

18   A.  Those actions don't happen without a user initiating

19   those actions.

20   Q.  And the initiation that you're speaking of is double

21   click, that's it?

22   A.  That initiates the last, the two arks at the very bottom

23   of that diagram.

24   Q.  So when you say distribute, distribute, at least to me,

25   has a kind of active quality, we're distributing, we're

1    dealing things out, we're actually, we're taking an action?

2              MR. REYNOLDS:  Objection, your Honor.

3    Q.   The only action we have here is just the double click?

4              MR. REYNOLDS:  Objection.

5              THE COURT:  Objection is overruled.  Go on.

6    A.   The user in downloading a file on KazaA has placed the

7    file in their shared folder, and the action of double

8    clicking has made that file available for distribution to

9    the other KazaA users.

10   Q.   You focused on some of the metadata and in particular

11   the line that had bit rates 128 in one example, 192 in

12   another.  What is bit rate?

13   A.   The file that is an MP3 file is not a -- it's a format

14   that can be sampled at different rates or converted at

15   different rates, so the lower the bit rate, the less quality

16   that that has.

17   Q.   Kind of like the resolution of a photograph, high res.

18   photograph, it's really got every detail, you could blow it

19   up and every detail would be there, and you got a low res.

20   photograph and you blow it up and it all pixelates?

21   A.   That's a reasonable analogy.

22   Q.   Is a CD the equivalent of a high res. audio file?

23   What's CD quality in an audio file?

24   A.   Well, it's the quality at which it was produced by if

25   you're talking about a CD that you purchased from a physical

1   CD you purchase from a recording company --

2   Q.  Yes.

3   A.  -- that would be in the quality that was produced which

4   is, you know, they're high quality, you know, so that's you

5   can't say the highest quality because audio you can produce,

6   you know, very high quality just like pictures.  There's

7   almost no limit to the resolution of a picture given

8   technology.

9   Q.  How would you compare CD quality the typical of the kind

10  that's involved here with 128 bits?

11  A.  It's going to have slightly lower quality, your ear

12  typically, most people can't tell the difference.

13  Q.  But if you were a music aficionado who had wonderful

14  equipment in his car and wonderful speakers in his house and

15  really enjoyed music, indeed was a musician listening to

16  music, you think it might make a difference listening to a

17  low res. 128 bit as compared to having the crisp CD that you

18  just bought from the store?

19  A.  I guess I can't comment on a particular individual and

20  how they can discern one quality level over another.  I'm

21  sure that some people are able to discern differences in

22  audio quality better than others.

23  Q.  And it would make sense then for a person who could

24  appreciate the high resolution to listen to a low res.

25  version before they went out and invested in the high res.

1    CD?

2              MR. REYNOLDS:  Objection, your Honor.

3    Foundation.

4              THE COURT:  Sustained.

5    Q.  If one were interested in deciding whether to purchase

6    music and one hadn't yet had the opportunity to listen to

7    the song, perhaps a friend tells you such-and-such is a

8    really good song, would it make sense to listen to a freely

9    available low res. version to decide whether you wanted to

10   go to the store and pay your $18?

11             MR. REYNOLDS:  Objection, your Honor, foundation,

12   and outside the scope of direct.

13             THE COURT:  It's argument in addition.  The

14   objection is sustained.

15   Q.  Now, you mentioned adrenaline rush?

16   A.  Yes.

17   Q.  And described a kind of genre of uploaders who are proud

18   of what they're doing and say, yes, I'm the one who put this

19   up there?

20   A.  Yes.

21   Q.  Would you identify that sort of uploader as having a

22   sort of malicious quality as far as the industry was

23   concerned?

24             MR. REYNOLDS:  Objection, foundation, your

25   Honor.

1          THE COURT:  You can have it.

2     A.   I can't get into the intent of individuals, whether

3     their intent is malicious harm or their intent is some other

4     intent.

5     Q.   What are they bragging about?

6     A.   Generally they're bragging about the fact that they're

7     the ones that put it up there.

8     Q.   Why would they be bragging about that?

9          MR. REYNOLDS:  Objection.  Foundation,

10    speculation, your Honor.

11         THE COURT:  Sustained.

12    Q.   You have no indication from anything you saw that Joel

13    was one of those people who were putting up music and

14    bragging about it?

15    A.   I have no indication that he put up music that he

16    bragged about, correct.

17    Q.   If there are two categories that one can imagine, that

18    is, people who upload and brag about it, adrenalin rush,

19    havock and then others who just download and the stuff goes

20    into the shared folder and they're not really into the

21    upload side of it, but it all happens automatically with the

22    software, you would put Joel in that second category, would

23    you not?

24         MR. REYNOLDS:  Objection.  Foundation, your

25    Honor.

1          THE COURT:  Sustained.

2          MR. NESSON:  May I know the basis of the

3     objection, your Honor?

4          THE COURT:  It's argument.  It's not a subject of

5     his expertise, it's a characterization.

6     Q.  Dr. Jacobson, your testimony about your forensic

7     examination, what was the point of that testimony?

8          MR. REYNOLDS:  Objection, your Honor.

9     Foundation.

10         THE COURT:  Sustained.

11    Q.  Were you trying to suggest that Joel somehow was trying

12    to obscure evidence?

13    A.  As I said, I was asked to look at three things when I

14    looked at the forensic image.  I was asked to look for

15    evidence of file sharing software, I was asked to look for

16    any evidence of music files, and I was asked to look for any

17    evidence that files were deleted or the disk was wiped.

18    Q.  So if I've understood you right, your testimony comes

19    down to two registry files which failed to open when you did

20    your Encase examination?

21    A.  And the reinstallation of the Windows operating

22    system.

23    Q.  Yes.  Is there anything that you came across that's

24    inconsistent with Joel having a computer that more or less

25    crashes, taking it to Best Buy and saying fix it and then

1    saying reinstall the operating system and Joel saying, yes,

2    but be very sure to save my music files and Best Buy making

3    a copy of his music files, clearing out the system with the

4    new operating system and then putting the music files back

5    up?

6              MR. REYNOLDS:  Your Honor, can I object to the

7    testimony from counsel?

8              THE COURT:  No, I think he's describing a

9    hypothetical and asking the expert whether or not what he

10   saw was consistent with it.  You can have it.

11   A.  That is hypothetically possible that a Best Buy

12   technician would have reinstalled the operating system.

13   Q.  And that would have happened on March 31st, when they

14   did the reinstall?

15   A.  The reinstallation was on March 31st.

16   Q.  So do you have any evidence that somehow music files,

17   unique music files were somehow removed in this process,

18   that there were fewer music files when this process finished

19   than when it started?

20   A.  Are you talking about the reinstallation process?

21   Q.  Yes.

22   A.  I don't have any evidence that the number of music files

23   on his computer changed between March 29th or March 30th and

24   March 31st.

25   Q.  So no evidence that you can see that Joel was somehow

1  trying to get rid of his music files, hide his music

2  files?

3  A.  Right.  Like I said, I see no evidence of any music

4  files that were deleted between those two dates, however

5  typically when files are deleted, you don't know the date in

6  which they were deleted.

7  Q.  And these two registry files, what normally goes on in

8  those registry files?  What was in those files that could

9  possibly have had anything to do with this?

10  A.  Well, I guess it's hard to say what was in -- what was

11  physically in something that doesn't exist.

12  Q.  What was the name of those files?

13  A.  The names of the registry files are ntuser.dat, which is

14  a Windows terminology.

15  Q.  NT meaning Windows NT, New Technology and refers to

16  Windows 2000?

17  A.  Yes, that's a throwback to that.

18  Q.  And user, what is that?

19  A.  Well, it's a name that Windows has picked to call their

20  registry files.  They could have just as easily called them

21  Registry 1.  That's a name they picked.

22  Q.  A name they picked, but typically a file in which

23  default user data is stored, that's why they named it

24  that?

25          MR. REYNOLDS:  Objection.  Foundation, your

1    Honor.

2              THE COURT:  Overruled.

3    A.   It's a file that is -- the registry files are used by

4    the applications to store information necessary for an

5    application.  When you bring an application back up or when

6    you first install an application, you tell it things, you

7    configure it.  That's typically where it puts its

8    configuration information is in the registry.  In

9    Windows XP, there are numerous registry files, registry

10   files associated with users, registry files associated with

11   the system, and all those registry files together create the

12   set of registry files that are part of a Windows operating

13   system.

14   Q.   But the registry files that deal with applications, such

15   as KazaA, such as LimeWire, that registry file is still

16   there?

17   A.   There's a registry file for all -- there's one under the

18   all users which, again, if a software package was installed

19   and available for all users, it would want to use that

20   registry file.

21             THE COURT:  Just put it on.  What exhibit is this,

22   what are you putting on there?

23             MR. NESSON:  My answer 41, but I'm not sure.

24             THE COURT:  But it is an admitted exhibit, okay.

25   Trusty assistant is coming to help.

1      MR. REYNOLDS:  It's Exhibit 37, your Honor.

2      THE COURT:  Close.  I don't have it on document

3  camera.  It's my fault.  We're an all purpose courtroom, we

4  provide you your own assistant.

5  Q.  So you have this in front of you, do you not?

6  A.  Yes.

7  Q.  So if you go down this list, you come to a registry file

8  third down the list, that is Windows System 32

9  configure/software, and the one right below that, Windows

10  System 32 configure/system?

11  A.  Correct.

12  Q.  Those are two registry files that typically would be

13  used by applications?

14  A.  That's correct.

15  Q.  Are they not?

16  A.  Yes.

17  Q.  Then you go down to failure in opening up all the users,

18  ntuser.dat.  That's typically the user for all user's

19  information?

20  A.  Correct.

21  Q.  And you go down below to one you had success opening,

22  documentsandsettings/joel/ntuser?

23  A.  Correct.

24  Q.  And that's perfectly good, that file is fine?

25  A.  That file opened, yes.

1   Q.   So that what we have is a registry file that has

2   background information unless we have more specific

3   information on a user like Joel, but if Joel is the user

4   this one down here is the file where we're going to get the

5   user data relating to Joel; isn't that correct?

6   A.   Different programs write in different registries, so a

7   program would be available to all users would oftentimes

8   write into the all users registry.   That way if there were

9   multiple users on the machine, then every user would have

10  that software configured in that manner.

11  Q.   I see.   And describe the function then of the system

12  profile/NT user file.

13  A.   Again, that's a registry used by the base Windows

14  operating system.   Any of the registry files that are in the

15  Windows 32 configure directory are registry files used by

16  the Windows operating system itself to operate.

17  Q.   I take it it takes some measure of sophistication to

18  imagine penetrating to the registry files, those are usually

19  hidden files, are they not?

20  A.   The default configuration Windows is to not show those

21  files to a user.

22  Q.   And you have to use a special program to get to them?

23  A.   You can enable your Windows operating system to show all

24  system files.

25  Q.   Now, isn't it the case if the hypothesis is that somehow

1   this is evidence of Joel somehow trying to spoliate

2   evidence, trying somehow to oppress evidence, if someone

3   were sophisticated enough to know how to get to registry

4   files, would they not likely be sophisticated enough to be

5   able to know how to erase things completely?

6   A.   If somebody was intentioned on destroying all the

7   evidence, there are techniques to erase all the unallocated

8   space and to clean a drive.

9   Q.   In fact, there's freely available software, you go to

10  Nearsoft and you can download it, you go to WipeOut, Norton

11  Utilities, and it's like another set of programs, how to

12  clean your computer if you want to clean?

13  A.   Yes, those are available.

14  Q.   And there's no indication that any of that was done

15  here?

16  A.   No.

17  Q.   So that what we have as a bottom line, am I right, we

18  have a suspicion that you're putting forward, we have

19  evidence on which you suggest suspicion?

20       MR. REYNOLDS:  Objection, your Honor.  That

21  misstates the testimony of the witness.

22       THE COURT:  Overruled.

23  A.   What we have shown on this document is we have the

24  evidence that two registry files are not present on that

25  computer.

1  Q.  And these are, by the way, files that are continually in

2  use apparently with different forms of software so that any

3  number of things might have happened to them?

4  A.  These files were missing from this computer.  I cannot

5  say how they were --

6  Q.  At least they failed to open?

7  A.  They -- I further examined those directories, and those

8  files did not exist in those directories, so this software

9  says "failure to open," but they did not exist on this

10  computer.

11  Q.  And do you offer any conclusion which you would draw

12  from that evidence?

13  A.  The files do not exist on the computer.

14  Q.  But that's as far as you would go?

15  A.  They were somehow deleted from the computer.

16  Q.  And we do not know why or know not who and know not

17  exactly when?

18  A.  That's correct.

19  Q.  You mentioned that there was a lot of activity in

20  October, 2007, 750 songs somehow, tracks somehow showing up

21  on the same date.  Am I correct in recollecting that?

22  A.  Yeah, I think I corrected myself and said it was closer

23  to 500 and something, but, yes, 500 MP3s were placed on the

24  computer at that point in time.

25  Q.  Would that be consistent with the user starting to use

1    iTunes and taking his music library as it exists or at least

2    significant parts of it and adding it to the iTunes

3    library?

4    A.  I guess I'm not sure what you're asking.  Consistent

5    with -- where do you say the files are now and where do you

6    say iTunes are?

7    Q.  Is it a fact when you add a file to your iTunes library

8    that iTunes actually makes a copy of it?

9    A.  These are MP3 files --

10   Q.  Yes, MP3 files.

11   A.  -- and placed on the hard drive.

12   Q.  So, if you have a store of MP3 files but you haven't yet

13   got iTunes and now you start to use iTunes and iTunes has

14   these nice features being able to arrange this, that and the

15   other, but in order to get stuff into the iTunes world,

16   which is not an open world, you have to add to library?

17   A.  Right, that's my understanding, yes.

18   Q.  And if you took your 500 songs or whatever number of

19   existing MP3s and you wanted to play them in your iTunes,

20   you need to add them to your iTunes library?

21   A.  Okay.

22   Q.  And in that process, is it not the fact that a copy is

23   made?

24   A.  In the Windows operating system if you copy a file that

25   already exists, just copy it somewhere else, it maintains

1    its original creation date.

2    Q.  Are you sure of that?

3    A.  If it stays on the operating system --

4    Q.  We were just talking about copy function, now we're

5    talking about iTunes copying.

6              MR. REYNOLDS:  Your Honor, can we have the witness

7    finish his answer?

8              THE COURT:  Yes, please, finish your answer.

9    A.  If it's from one place in the Windows operating system

10   to another, the creation date indicates the date on which

11   the file was originally created, you would see changes in

12   modification date, access date if you start to copy that

13   around.

14   Q.  That's when you use the regular copy function --

15   A.  That's correct.

16   Q.  -- but the iTunes add to library function you say does

17   not create a new file with a new date?

18   A.  I do not know exactly how the Apple's iTunes function

19   makes that copy.

20   Q.  Come back with me, if you would, to the 300 reports that

21   you have done.  Your report in this case, how many pages was

22   it?

23   A.  10, maybe 12 pages.

24   Q.  And that's typical of these reports?

25   A.  A report with a forensic examination involved, it's

1   typical length.

2   Q.  So these 300 reports, is the report that you did in this

3   case somehow much bigger than the reports you did in other

4   cases?

5   A.  This case had a forensic examination, therefore, it was

6   a longer report.

7   Q.  So if it was just without the forensic examination, that

8   would be more like the rest of your 300?

9   A.  A majority of the cases do not have a forensic

10  examination involved.

11  Q.  And so the typical report that you do is the 10-hour

12  report that you were talking about at the beginning, perhaps

13  it's more than that.  Let me rephrase.  What would you say

14  is the average amount of time you put into one of your

15  reports?

16  A.  A nonforensics report, for a standard report, probably

17  45 minutes to an hour.

18  Q.  That's it for the whole thing?

19  A.  To examine the MediaSentry data, yes.

20  Q.  And write out the report?

21  A.  Yes.  I remember two-thirds of my report is how the

22  Internet works and how the peer-to-peer software works, and

23  that does not change from report to report.  The Internet

24  still works the same, IP addressing works the same from one

25  report to the other, and the peer-to-peer networks work from

1    one report to another.

2              MR. NESSON:  Hang on one moment.  Thank you,

3    Dr. Jacobson.  I have no further questions.

4              THE COURT:  Go on.

5                     REDIRECT EXAMINATION

6    BY MR. REYNOLDS:

7    Q.  Dr. Jacobson, your report in this case you say was how

8    many pages?

9    A.  I believe 12 pages.

10   Q.  And how many pages of attachments did you have in your

11   report in this case?

12   A.  Oh, four or five hundred probably.  We've seen -- I've

13   held most of them up today, and I kind of lost track but

14   well over 500.

15   Q.  And those are Exhibits A through L?

16   A.  A through L, yes.

17   Q.  And how would you compare your work in this case and

18   especially in regards to preparing that report and the

19   forensic examination compared to your work in other cases?

20   A.  This case was -- the forensic examination and preparing

21   the reports was an extremely lengthy process for this

22   case.

23   Q.  And that involved the forensic examination of the

24   Gateway computer?

25   A.  Correct.

1   Q.  Dr. Jacobson, you also testified that you had never

2   tested the MediaSentry software, their software.  Have you

3   tested the software that MediaSentry uses, and could you

4   explain that to the jury, please?

5   A.  Yeah.  I mean, MediaSentry, first of all, uses the KazaA

6   application, as any user, and I have used the KazaA

7   application.  As a matter of fact, I still have the KazaA

8   application running in my lab.  In addition to that,

9   MediaSentry uses software to capture the data that is going

10  across the network.  We saw that in the download log where

11  it prints the source and destination IP addresses and so on.

12          That type of software is well known, well used

13  type of data collection software.  I actually assign that as

14  an assignment in my networking class.  They actually have to

15  write software that does that, and so that's well-known

16  technology to be able to take the packets as they come

17  across your network and present them out in formats that we

18  saw today.

19  Q.  Dr. Jacobson, you were asked a question about the 25

20  files that were not completely downloaded by MediaSentry.

21  Do you recall that?

22  A.  Yes.

23  Q.  And you gave testimony that I think you said you

24  couldn't make an audio comparison of the two files,

25  correct?

1    A.   That's correct.

2    Q.   Because you don't have one to listen to compare it to

3    the original sound recording, correct?

4    A.   That's correct.

5    Q.   Dr. Jacobson, are there other ways to know, other

6    evidence of whether that file is what it purports to be?

7    A.   Again, based on the file length of the metadata

8    associated with that file, its file name is an indication

9    that that file is indeed what it reports to be.

10   Q.   Any other evidence in this case that the files are what

11   they purport to be aside from simply the metadata?

12   A.   Again, the files are all consistent with everything

13   we've seen.  We've actually seen some of those files show up

14   in the Gateway computer, for example, and so it all is

15   consistent.

16   Q.   And the other files, the ones we downloaded, the five,

17   those are what they purport to be, correct?

18   A.   Those are exactly what they purport to be, yes.

19           MR. REYNOLDS:  Nothing further, your Honor.  Thank

20   you.

21           MR. NESSON:  Recross?

22           THE COURT:  Yes.

23                   RECROSS-EXAMINATION

24   BY MR. NESSON:

25   Q.   Dr. Jacobson, it's well known, do you agree, that KazaA

1    often carried malware of one kind or another?

2    A.  Are you talking about the applications KazaA or are you

3    talking about the files being shared by KazaA?

4    Q.  I'm talking about the application.

5    A.  The application KazaA contained it probably would be

6    better known as Adware type of software that installed

7    itself onto the computer.

8    Q.  Was KazaA ever determined to have carried surreptitious

9    software named Bonzi Buddy?

10   A.  That I would classify as a piece of Adware, yes.

11   Q.  Do you have any information yourself that the KazaA that

12   MediaSentry was using was not infected with malware?

13   A.  Only my discussions with MediaSentry and the fact that

14   they maintain clean or cleansed computers.

15   Q.  You just take their word for it?

16   A.  I have no reason to doubt them.

17          MR. NESSON:  Thank you.

18          THE COURT:  Thank you very much, Dr. Jacobson.

19   Next witness.

20          MR. OPPENHEIM:  Your Honor, the plaintiffs would

21   call JoAn Cho.

22          JoAN CHO, having been duly sworn by the Clerk,

23   testified as follows:

24          THE COURT:  Proceed.

25

DIRECT EXAMINATION

BY MR. OPPENHEIM:

Q.  Good afternoon, Ms. Cho.

A.  Good afternoon.

Q.  Could you please explain what it is you do for a living?

A.  I'm an attorney with the Universal Music Group.

Q.  And what is Universal Music Group?

A.  Universal Music Group is a term that refers to a number of associated record and music publishing companies, are record companies, we make music, we look for artists, we try to develop them and sort of sell that music.

Q.  Can you give us some examples of some of the record labels that are in the Universal Music Group family?

A.  Sure.  There's Interscope Records, Def Jam Records, Island Records, Lost Highway, MCA Nashville, Mercury National, we have a large number, Mowtown Records.

Q.  How long have you personally worked in the music industry?

A.  I started with Universal in 2000, so nine years.

Q.  Are any of the Universal Music Group companies plaintiffs in this case?

A.  Yes, UMG Recordings, Inc.

        MR. FEINBERG:  I'm sorry.

        THE WITNESS:  UMG Recordings, Inc.

1   Q.  Are you aware of the sound recordings that UMG

2   Recordings, Inc. is suing on in this case?

3   A.  Yes.

4   Q.  Can we please pull up Exhibit 55, if you would please

5   turn to Exhibit 55.  Maybe the book will work better.  Do

6   you see on this list any recordings that UMG Recordings is

7   suing under?

8   A.  Yes, "Come As You Are" by the artist Nirvana.

9   Q.  And this is a work that UMG owns?

10  A.  Yes.

11  Q.  Can we now turn to Exhibit 56.  Do you see recordings on

12  this exhibit that UMG is suing on in this case?

13  A.  Yes, there a number of them.  Should I read them out?

14  There's "Heart-Shaped Box" by Nirvana, "The Perfect Drug" by

15  Nine-Inch Nails, "Adam's Song" by Blink-182, two Limp Bizkit

16  tracks, "Rearranged" and "Leech," "Loser" by the artist

17  Beck, three Eminem tracks, "My Name Is," "Drug Ballard," and

18  "Cleaning Out My Closet," the Beastie Boys, "You've Got To

19  Fight For Your Right To Party," "Monster Magnet," "Look To

20  The Orb For Your Warning," and Aerosmith's "Water Song,"

21  "Janie's Got A Gun."

22  Q.  You just listed 12 sound recordings; is that right?

23  A.  Yes.

24  Q.  So all tolled along with the one sound recording you

25  identified on Exhibit 55, the Universal Group or UMG

1    Recordings, Inc. is pursuing 13 sound recordings in this

2    case?

3    A.   That's correct, 13.

4    Q.   Does UMG Recordings generally register copyrights and

5    the sound recordings it owns?

6    A.   Yes, on a regular basis.

7    Q.   And do you know whether or not UMG Recordings registered

8    copyrights for the 13 sound recordings we just went

9    through?

10   A.   Yes, UMG Recordings or one of its predecessors did

11   record those.

12   Q.   Very well.  I think there should be a redwell up there

13   with Exhibit 5 or yellow envelope.  Take a look in it.

14   Hopefully it's a copyright register.  Do you recognize these

15   documents?

16   A.   One second.  Sorry.  Yes, these are certified copies of

17   the copyrights for the 13 songs that UMG is proceeding.

18   Q.   Just for the benefit of the jury, could you hold up,

19   there are I think two different versions of those

20   certifications there so they can see the different

21   versions?

22   A.   Sure, there's the one with the gold seal on the front

23   and then one that's the registration itself, but it has the

24   certification across the top.

25   Q.   And why is it that one is, I'll use the technical, legal

1    term "fancy schmancy" and the other not so much?

2    A.   The older form did not include certain language that

3    when the copyright office adds, when they certify, they add

4    that to the cover page.  It's this language, "This is to

5    certify that the statements set forth in the attached have

6    been made part of the records of the copyright office," the

7    claim of copyright registered under number, and then it

8    lists the number, so because it's not here on the form, they

9    had to put it on the outside, and they put a nice seal to

10   make sure we know which it is.

11        The newer ones have that language or something

12   very similar to it right here already, so that certification

13   language there, and they can simply put the blue

14   certification designation on top.

15   Q.   But they're all valid copyright registrations even

16   though they're slightly different?

17   A.   Yes, they're all certified copies of valid

18   registrations.

19   Q.   And UMG Recordings, Inc. owns the rights with respect to

20   the sound recordings in those copyright registrations?

21   A.   Yes, absolutely.

22   Q.   You can go ahead and put those away, and if you can find

23   up there, there should be a stack of CDs marked in the

24   exhibit set.  I think you could pull those out.

25   A.   The box?

1  Q.  Yes, there should be 13 of them which correlate to the

2  13 sound recordings you just went through.

3  A.  These.

4  Q.  Take a look at them and make sure you got the right

5  ones.

6  A.  Yes.

7  Q.  Maybe after looking at them, describe for the jury what

8  you're looking at.

9  A.  These are the CDs that we actually manufacture and

10  distribute legitimate copies, this is the Nirvana's "Never

11  Mind" CD.

12  Q.  Can we go through a few of them so we can make sure what

13  they are?

14  A.  Sure.  There's Nirvana.  This is their Nirvana, "In

15  Utero" album, this is the Nine-Inch Nails version and the

16  paper, "Eco Back," Blink-182, "Enema of the State,"

17  Limp Bizkit, "Significant Other."

18          Shall I keep going?  Limp Bizkit, "Three Dollar

19  Bill Y'all," "Mello Gold" by artist Beck.

20  Q.  We can probably stop there.  The jury will have these in

21  their room later if they want to look.  Are these CDs the

22  same CDs that Universal Music Group sells to the public?

23  A.  Yes.

24  Q.  And in the years 2003 and 2004, was Universal Music

25  Group selling these CDs to the public in those forms?

1    A.   Yes.  Well, the only one that's different is this:  We

2    were selling it, the same artwork, but it would have been in

3    one of these jewel cases.  This is the ecologically, we try

4    to package it in cardboard, but it's exactly the same.

5    Q.   Delighted to hear it.  And does UMG include copyright

6    notices on its albums when it releases them?

7    A.   Absolutely.

8    Q.   I'd like to just look at a few of them.  Could you pull

9    out, for instance, the Beck album.  I don't think we looked

10   at that one yet.  Can you locate the copyright notice on

11   that and maybe show the jury as best you can where it is.

12   A.   It's a little small, but right back here on the back

13   cover there is a P and a C circle designation which followed

14   by the year and the copyright owner.  In this case, the P

15   which designates the sound recording has 1994 and 1993, so

16   the tracks must have been on this album, there are 12, must

17   have been released some in 1994, some in 1993, then it has

18   Geffen Records, which is one of our divisions.

19   Q.   If you were to open up that jewel case, there's a CD in

20   there, good.  Do you put the copyright notice on the CD as

21   well?

22   A.   We do.  It's right around the same designation, 1993,

23   1994 Geffen Records Inc., but now it's part of UMG

24   Recordings.

25   Q.   If we were to go through all 13 of those disks, could we

1    find the same kind copyright notices on all of the jewel

2    cases and all of the CDs?

3    A.  Yes.

4    Q.  Is that part of UMG's regular practice to include those

5    type of notices?

6    A.  It is our regular practice, yes.

7    Q.  You indicated that UMG Recordings sell those CDs in

8    stores.  What kind of stores does UMG sell those CDs in?

9    A.  They are sold through Best Buy, Wal-Mart, used to be

10   Tower Records, Target, you know, anyplace you will see a CD

11   retailer, we will sell to them.

12   Q.  And record companies, record stores as well?

13   A.  Amoeba Records or I guess I'm dating myself with the

14   warehouse, but those records stores, yes.

15   Q.  What about selling physical versions online, does UMG

16   Recordings do that?

17   A.  Absolutely.  You can order one of these off of Amazon,

18   Best Buy, Wal-Mart and they'll ship to you.

19   Q.  Let's turn for a moment then to the concept of selling

20   digital.  Does UMG Recordings sell the tracks on those

21   albums digitally?

22   A.  Yes.

23   Q.  And specifically the 13 tracks you went through earlier,

24   does UMG Recordings sell all those tracks digitally?

25   A.  Yes, we do.  Apple, iTunes is the best known, but there

1    are many services.

2    Q.  Could you please open the notebook and look at

3    Exhibit 6.  You can pull up the first page of that,

4    I'm sorry, Exhibit 8.  Can we maybe blow that up a little

5    bit.  You mentioned iTunes a moment ago.  Do you recognize

6    these documents?

7    A.  Yes, these are screen shots from iTunes, the iTunes

8    store showing information of these albums and how you can

9    download the albums or the individual tracks.

10   Q.  And this is one of the ways you sell these tracks

11   individually?

12   A.  Yes, this is one way.

13   Q.  And do you have the copyright notice associated with the

14   digital track here?

15   A.  Yes, it has the, P I guess I can't do a circle because

16   it has the parenthesis, 1991 DGC Records.  DGC Records is a

17   name used by Geffen Records.

18   Q.  When did UMG begin to sell the 13 tracks we described

19   earlier through iTunes?

20   A.  I believe they were all available in 2003.

21   Q.  And do you know when Universal Music Group started to

22   sell its music digitally before iTunes?

23   A.  In the 2001-2002 range, it was made available through

24   services such as MusicNet or Press Play.  There may have

25   been some others, but those are the two that come to mind.

1    Q.  Do you know when UMG began to track revenue for digital

2    distribution?

3    A.  In the 2003 range.

4    Q.  So not for the first few years it was distributing

5    digitally?

6    A.  Not to my knowledge.

7    Q.  I'd like to shift gears for a moment here and talk about

8    the evidence in this case.  Have you previously looked at

9    the screen shots from sublimeguy14@KazaA?

10   A.  Yes, I have.

11   Q.  I'd like to pull it up as page 3.

12          THE COURT:  Of which exhibit?

13          MR. OPPENHEIM:  Of Exhibit 13.

14          MR. FEINBERG:  Can we just have a moment, Judge?

15          THE COURT:  Page 13-003.  That's fine.

16   Q.  Ms. Cho, this is the exhibit that you described a moment

17   ago that you have previously seen?

18   A.  Yes.

19   Q.  And earlier you testified that one of the tracks that

20   you're proceeding on is a Nirvana track; is that correct?

21   A.  Yes, "Heart-Shaped Box."

22   Q.  And do you see that here in the defendant's share

23   directory?

24   A.  Yes, about three-quarters of the way down.

25   Q.  And are you aware of the fact that a copy of this track

1    was downloaded from sublimeguy14@KazaA's share directory?

2    A.  I know a Nirvana track was downloaded, I can't remember

3    if it was this one or "Come As You Are."

4    Q.  My apologies, "Come As You Are."  "Come As You Are" was

5    downloaded?

6    A.  Yes.

7    Q.  And have you had an opportunity to learn whether or not

8    the version that was downloaded was the same as the version

9    you sell?

10   A.  Yes, I compared against the legitimate copy.

11   Q.  And you did that by listening to them back to back?

12   A.  Yes.

13          MR. OPPENHEIM:  With your permission, your Honor,

14   I'd like to approach and get the exhibits.

15          THE COURT:  Yes.

16          MR. OPPENHEIM:  Can I get Exhibit 17 which is the

17   CDR and the legitimate CD as well?

18          THE COURT:  Are you going to be playing it?

19          MR. OPPENHEIM:  Yes, your Honor, if we could

20   switch over.

21          THE COURT:  You've turned yours on?

22          MR. OPPENHEIM:  I think so, your Honor.

23   Q.  While they're working on this, Ms. Cho, can you explain

24   to the jury what it is you're about to do so they

25   understand, they may already, so they understand the process

1    you went through?

2    A.  I believe we're going to listen to first the CD of "Come

3    As You Are" that was downloaded from the defendant's

4    computer or at least a healthy portion of it and then listen

5    to the version that is actually on the commercial CD, the

6    one that we actually released and we seem to be getting bits

7    of it.

8              (CD playing)

9              THE COURT:  Okay.

10             MR. OPPENHEIM:  We're now going to turn and listen

11   to the legitimate version.

12             THE COURT:  Okay.

13             (CD playing)

14   Q.  When you did your comparison, Ms. Cho, did you listen to

15   the entire track?

16   A.  Yes, I listened to the full tracks of both of the

17   tracks.

18   Q.  Both the downloaded one?

19   A.  And the legitimate CD, yes.

20   Q.  And when you did that, what was your conclusion?

21   A.  They are the same.

22   Q.  So that addresses the one track that we identified on

23   Exhibit 55.  Did you do anything to determine whether or not

24   the tracks that are described on Exhibit 56, the twelve

25   other tracks, are in fact works owned by UMG Recordings?

1   A.  I did confirm the ownership of it, however, we do not

2   have inside it audio tracks from the defendant's computer.

3   Q.  How do you know that the files as they're listed aren't

4   spoofs or pollution?

5   A.  Well, I think there are a number of issues, facts that

6   lead into that.  First of all, the tracks to be downloaded

7   turn out to be exactly what they said they were.  First,

8   this is the nature of the KazaA system.  This is the

9   description how you search, you look for something specific,

10  that's not what you want, why would people want to be on

11  KazaA?  And on top of that, I understand from the case that

12  Mr. Tenenbaum is actually a very sophisticated user.  If he

13  downloaded --

14           MR. FEINBERG:  Objection, your Honor.

15           THE COURT:  Sustained.

16  Q.  Did MediaSentry download any tracks that UMG or one of

17  its affiliates owned but is not suing on in this case?

18  A.  Yes, there was a track by Sublime.

19  Q.  Is that the Sublime track April 29th, 1992?

20  A.  Yes.

21  Q.  And does UMG Recordings own that track?

22  A.  Universal owns that track.

23  Q.  Universal owns that track.  And does Universal sell that

24  track to the public?

25  A.  Yes.

1   Q.  Have you listened to the version that MediaSentry
2   downloaded?
3   A.  Yes, I have.
4   Q.  Did you compare it to the version that Universal owns
5   themselves?
6   A.  Yes, I compared it against the Sublime CD.
7   Q.  And what was your conclusion?
8   A.  It is the same track.
9   Q.  And could you please turn to Exhibit 19 in your exhibit
10  book.  You can go ahead and pull that out.
11          THE COURT:  Back on the computer?
12          MR. OPPENHEIM:  Yes.  Thank you, your Honor.
13  Q.  Are you familiar with this document, Ms. Cho?
14  A.  Yes, I've reviewed it.
15  Q.  And can you explain --
16          MR. FEINBERG:  I'm sorry, I didn't hear her
17  answer.
18          THE COURT:  Yes, she reviewed it.
19  Q.  Can you just briefly describe for the jury what this
20  document is?
21  A.  This is a letter from Troutman Sanders, attorneys to Cox
22  Communications enclosing a subpoena from a number of record
23  company plaintiffs in a case, the short title is Fonovisa,
24  Inc. vs. Does 1 through 76, and this is a subpoena directed
25  to Cox Communications asking them for information to

1    identify users associated with certain IP addresses.

2    Q.  You mentioned that the law firm was Troutman Sanders.

3    Who are they?

4    A.  They are plaintiffs attorneys in Georgia where this

5    action had been filed.

6    Q.  And you indicated that there was an action Fonovisa,

7    Inc. vs. Does 1 through 76.  Can you describe what that

8    action was?

9    A.   In these type of suits, given the nature of KazaA, it's

10   not possible for us to determine right away who the

11   defendant would be, so what we have to do is file a lawsuit

12   against certain Doe defendants.  We can identify them as

13   best by the IP addresses, but we need to get information

14   about who they are.  The only way we can do is that first

15   issue a lawsuit to issue a course of that lawsuit asking the

16   Internet service provider to identify who those people are.

17   At that point, we try to contact those people.

18   Q.  And so this is a subpoena in one of those kind of Doe

19   suits, John Doe suits you just described?

20   A.   That's correct.

21   Q.  Can you please turn to Exhibit 22.  Do you recognize

22   this document, Ms. Cho?

23   A.   This is a letter from plaintiffs attorneys at Shook,

24   Hardy & Bacon who are in Kansas City, and they directed a

25   letter to J. Tenenbaum based on the information provided by

1    Cox in response to the subpoena.

2    Q.  We've enlarged here the first couple sentences of this

3    letter.  It says, "We are counsel to a group of companies

4    that intend to a file a lawsuit against you for copyright."

5    Do you see that?

6    A.  Yes, I see that.

7    Q.  Can you explain why it is that letter says that we

8    intend to file a lawsuit whereas the last subpoena that we

9    just looked at indicated there was already a lawsuit

10   pending?

11           MR. FEINBERG:  Objection.

12           THE COURT:  Overruled.

13   A.  As I indicated, we don't have enough information about

14   who these users are at the time that we may be prepared to

15   file a lawsuit, so we have to file the John Doe lawsuit.

16   When we get information to contact them, we do try to

17   contact the users, see if we can work something out with

18   them, and if we can't, for whatever reason, then we will

19   file a lawsuit against that person individually.

20   Q.  So not as a John Doe at that point?

21   A.  At that point we will know who the person is.

22   Q.  So you file it against them in their name?

23   A.  Right.

24   Q.  And that's what this letter is referring to?

25   A.  Yes, this refers to the upcoming, the potential lawsuit

1    that would happen if we couldn't otherwise resolve it.

2    Q.   Okay.  Let's turn to a different issue.  Has UMG

3    Recordings ever given Mr. Tenenbaum license or authorization

4    to copy any of their sound recordings?

5    A.   No.

6    Q.   Has UMG Recordings ever given Mr. Tenenbaum a license or

7    authorization to distribute any of their sound recordings?

8    A.   No.

9    Q.   Does UMG ever license individuals to download or upload

10   to peer-to-peer networks?

11   A.   Absolutely not.

12   Q.   Why not?

13   A.   If we did that, it would be basically giving away the

14   source.  This is what the record companies do, these are

15   assets, this is what --

16            MR. FEINBERG:  Objection.

17            THE COURT:  Overruled.

18   A.   This is what record companies do.  If the suggestion is

19   that we could somehow give these to people and tell them, do

20   with them what you will, we lose complete control over our

21   assets, we cannot make money off those assets, and that

22   defeats the whole purpose of our existence.

23   Q.   What are UMG's assets?

24   A.   UMG's assets are our sound recordings, the music it

25   makes, the contracts with the artists that lead to our

1    making music with them.  That's a primary asset.  There are

2    music videos and some other associated assets, but sound

3    recordings are the predominant asset.

4    Q.  Intellectual property?

5    A.  The copyright and the ownership of the sound recordings,

6    not simply the physical but the right to exploit them,

7    yes.

8    Q.  Does UMG permit fans to download and distribute music

9    for free because they're fans?

10   A.  No.  If they're fans, we would hope they would do the

11   right thing and purchase the music and compensate not only

12   the record company but allow us to go ahead and use that

13   money to compensate the artists and the producers and the

14   writers and everybody else associated with making that

15   music.

16   Q.  Are you aware of other infringements by defendants in

17   this case?

18   A.  The one defendant, yes, Mr. Tenenbaum.

19           MR. FEINBERG:  Objection.

20           THE COURT:  Wait.  Sustained.

21           MR. FEINBERG:  Thank you.

22           MR. OPPENHEIM:  I'm sorry.  Can I be told the

23   nature of the objection?

24           THE COURT:  Other infringements by this defendant

25   is a rather broad question.

1    Q.   Ms. Cho, can I ask you to please look at Exhibit 13?

2    A.   The screen shots from the defendant's computer?

3    Q.   Yes.

4    A.   Yes, I know that.

5    Q.   Looking at that Exhibit, Ms. Cho, do you see other sound

6    recordings that UMG or its affiliates own or control?

7    A.   Yes.

8    Q.   If you could, tell us the page number so that we can

9    pull it up and the jury can look at the same page you're

10   looking at.

11   A.   There are quite a few.  I think we indicated a number of

12   Nirvana tracks on page 3.

13   Q.   We've looked at that.  Let's look at another one.

14   A.   Page 4, there's a large number of Nine-Inch Nail tracks

15   and NIN but Nine-Inch Nails, the next page as well, but that

16   also has "Garbage" on I think this is page 5, 13 of 5.

17   Q.   You said garbage?

18   A.   Garbage.

19   Q.   It's not trashy?

20   A.   No, it's an artist.

21   Q.   It's an artist?

22   A.   Yes.

23   Q.   I just presumed people knew.

24   A.   There's a number of Sublime tracks on page 8 and 9.

25   Q.   These are, what you're listing now are works that

1  Universal owns?

2  A.  Yes, I'm just looking for the Universal ones.

3  Q.  Okay.

4  A.  Diana Ross and the Supremes, Blink-182, we've already

5  identified that one, page 13 has that number of tracks from

6  Chris Rock, not musical tracks, audio tracks.

7  Q.  Chris Rock?

8  A.  Chris Rock, the Comedian, yes, he did a couple of

9  albums, clips from his standup, and that was also something

10  that we own and distribute, quite popular actually.  Page 14

11  has a number of Eminem tracks, the next page also has a

12  large number of Eminem tracks.  We have some of the Bone

13  Thugs-N-Harmony, I'm not sure about these tracks

14  specifically, Soft Sell.

15  Q.  I'm sorry, I couldn't hear.

16  A.  Soft Cell.

17  Q.  Soft Cell?

18  A.  I'm pretty sure we own "Tainted Love," a track from

19  "History," I guess.  That sounds really bad, I just

20  remembered from high school.  "No Doubt," that's ours.

21  Q.  Why don't we stop there.  "No Doubt," then you could

22  keep going.

23  A.  That's not that typical to find a number of others,

24  yes.

25  Q.  Can you turn to Exhibit 43, please.  This is a copy of a

1    shared directory from the defendant's Gateway computer.

2    A.  Yes.

3    Q.  Similarly, can you go through this exhibit and identify

4    whether there are works that UMG owns that it's not

5    asserting claims on in this case?

6    A.  Lots of Sublime, Rob Zombie, Rammstein, Nine-Inch Nails,

7    No Doubt, Nirvana.  There's a lot of classical music, we had

8    to have an extensive classical music catalogue.  I can't

9    confirm which ones are ours, Godsmack, Garbage again,

10   Eminem, Bob Marley, Blink-182.  There are multiple tracks

11   for each of these artists.

12   Q.  I think that's enough.  Thank you.  Can you describe why

13   UMG, Universal, has decided not to pursue claims for the

14   infringements you just identified in those two exhibits?

15   A.  We could have, but under the circumstances, we picked a

16   sample of the works at issue, and we opted to proceed on

17   that as a way of picking a reasonable number for us to

18   proceed on and to show, give an idea what's at issue,

19   without, for instance, needing to prove chain of title and

20   holding up 800 CDs to show every single one that we own.

21        MR. OPPENHEIM:  Thank you.  No further questions,

22   your Honor.

23                    CROSS-EXAMINATION

24   BY MR. FEINBERG:

25   Q.  Good afternoon, Ms. Cho.  My name is Matthew Feinberg.

1    I'm one of the attorneys representing Mr. Tenenbaum.

2    A.  Good afternoon.

3    Q.  You say you started working in 2000 for UMG?

4    A.  For Universal.

5    Q.  Was it called Universal then or UMG?

6    A.  Universal Music Group is a sort of colloquial term that

7    refers to a group of affiliated music companies, so I'm not

8    sure what you're asking, I'm sorry.

9    Q.  Is the corporation called Universal Recordings,

10   Incorporated?

11   A.  No, I don't think there is a Universal Recording.

12   Q.  Who is your former employer?

13   A.  UMG Recordings, Inc.

14   Q.  So it's called UMG Recordings, Inc.?

15   A.  My employer is UMG Recordings.

16   Q.  You're what?

17   A.  Employer.

18   Q.  You're an attorney?

19   A.  That's correct.

20   Q.  And have you always worked in the attorney's office at

21   UMG?

22   A.  Yes, I've always acted as an attorney with them.

23   Q.  Have you been involved with these lawsuits since your

24   arrival at UMG?

25   A.  I suppose it depends what you mean involved.  I have

1   been asked to provide information and on occasion to sign

2   declarations or to provide testimony.  I have not, however,

3   been involved, I'm not sure if this is what you're asking,

4   in the preparation of the decision-making process.

5   Q.  But you have another attorney for that, that's these

6   folks, correct?

7   A.  No, we have attorneys in our office.  These are outside

8   counsel.

9   Q.  Right.  You have outside counsel and inside counsel?

10  A.  That's right, we have other lawyers at the company that

11  deal with this.

12  Q.  In the course of your employment, have you participated

13  in meetings with other recording companies regarding these

14  kind of lawsuits?

15  A.  No, unless you mean I had dinner with my outside counsel

16  last night and there was a representative from Warner

17  there.

18  Q.  Does your organization, your corporation, belong to an

19  entity called RIAA?

20  A.  That is the trade association for the music, the record

21  industry.

22  Q.  Have you ever attended a meeting where RIAA

23  representatives were there and other representatives of

24  other recording companies were present when you discussed

25  peer-to-peer downloading as a problem in the industry?

1   A.  Me personally, no.

2   Q.  Never?

3   A.  This hasn't been something that I do.

4   Q.  Are you aware of the number of lawsuits that have been

5   filed by the recording companies in this area of

6   peer-to-peer downloading?

7   A.  Not with any specificity.

8   Q.  Well, how about generally?

9   A.  I wouldn't want to guess.

10  Q.  Would it be fair to say that it's something in the

11  neighborhood of 35,000 lawsuits?

12  A.  I honestly couldn't give you a number.

13  Q.  Well, was it more than two?

14  A.  I'm sure it was more than two.

15  Q.  Is it more than 10,000?

16  A.  I don't know.

17  Q.  Would it be in a range of 10,000 to 100,000?

18          MR. OPPENHEIM:  Your Honor, I think we've

19  established that she doesn't have knowledge of this.

20          THE COURT:  Sustained.

21          MR. FEINBERG:  I'm trying to get a range, Judge.

22  I think I'm entitled to get a range.

23          THE COURT:  I understand.  I sustain the question.

24  I think differently.

25  Q.  Is it fair to say that there are a large number of

1    lawsuits throughout the country that deal with this issue;

2    would you agree with that statement?

3    A.  It depends what you mean by large, but there are

4    certainly lawsuits across the country that deal with this.

5    Q.  And would it be fair to say that every state in the

6    country has lawsuits dealing with this issue?

7    A.  I don't know.  I have never seen a list of the states.

8           MR. OPPENHEIM:  Your Honor, let's allow her to

9    finish answering the question.

10          MR. FEINBERG:  I'm sorry, I thought she

11   finished.

12          THE COURT:  Have you finished?

13          THE WITNESS:  We may have crisscrossed a little

14   bit.  I don't know all the states where we filed lawsuits, I

15   can't answer that, I'm sorry.

16   Q.  Okay.  Do you have outside counsel in other states

17   besides Georgia where Sanders is your outside counsel?

18   A.  Do we have outside counsel in other states, yes, we

19   do.

20   Q.  You have one in Colorado, these folks are all from

21   Colorado?

22   A.  No, I don't think they're all from Colorado.

23   Q.  Isn't Mr. Reynolds and Mr. Oppenheim, I'm sorry,

24   Mr. Oppenheim is from Maryland, I apologize?

25          MR. OPPENHEIM:  No apology necessary.

1    Q.  Mr. Oppenheim, outside counsel, is in Maryland; am I

2    correct?

3    A.  Maryland, D.C., I have to look at his address, but that

4    area, yes.

5            MR. OPPENHEIM:  I'll stipulate to it.

6    Q.  Mr. Reynolds is with a law firm called what?

7    A.  Holme Roberts & Owen.

8    Q.  And where is Holme Roberts & Owen?

9    A.  I don't know where all their offices are.  He is in

10   Colorado.

11   Q.  And do you have other outside law firms in other states

12   that are dealing with peer-to-peer cases?

13   A.  I would assume yes.

14   Q.  Now, you testified that do you know when the first one

15   of these lawsuits was filed?

16   A.  I don't.  I'm sorry.

17   Q.  And do you know it's fair to say that the description

18   that you gave of the process by which these lawsuits begin

19   is the standard procedure that's been used by your

20   company?

21           MR. OPPENHEIM:  Objection, your Honor.  I've

22   trying to be patient with the scope.  We're far exceeding

23   the scope.  All she was doing was trying to clear up some

24   misconceptions that had been drawn by the other counsel.

25           MR. FEINBERG:  I object to his speech, your Honor,

1    and I would ask that the witness answer my question.  It's a

2    perfectly reasonable question.

3          THE COURT:  I'm going to allow this question, but,

4    Mr. Feinberg, I agree with Mr. Oppenheim, I'm not sure where

5    this is going.  His examination was directed to the door

6    that had been opened in a previous examination.  I'm not

7    sure where this is going, so you can have this question.

8    Q.  In this case, Mr. Tenenbaum was originally sued as a

9    John Doe; am I correct?

10   A.  In this case, yes, Mr. Tenenbaum through his IP address

11   was sued as a John Doe.

12   Q.  And that suit was filed in Georgia?

13   A.  That's correct.

14   Q.  And it was filed as a John Doe with another, with 76

15   John Does?  I can show it to you on the screen.

16   A.  I'll take your word for it.  I don't have the number,

17   but I don't doubt that you counted them.

18   Q.  I think we all agree it was 76.

19   A.  That's fine.

20   Q.  And after the suit was filed, the reason for the suit

21   was to get the identity of the person who's connected with

22   the IP address; am I correct?

23   A.  Yes.  We needed to file a suit so that we could issue a

24   subpoena in the confines of that suit to Cox who was in the

25   area so that we could determine who the appropriate

1    defendants or who the appropriate people were that we wanted

2    to contact.

3    Q.  And in order to get the power to do that, you had to

4    file the suit because without the suit, you couldn't file a

5    subpoena; am I correct?

6            MR. OPPENHEIM:  Objection.  You don't file a

7    subpoena.

8            THE COURT:  The objection is overruled, but I

9    don't understand where this is going, Mr. Feinberg.  Go on.

10   In order to get the subpoena, you had to file the suit, yes

11   or no.

12   A.  Yes, we filed a lawsuit so we could issue the

13   subpoena.

14   Q.  And then the subpoena went to Cox Communications,

15   correct?

16   A.  Yes.

17   Q.  And that happened because Cox Communications wouldn't

18   voluntarily provide the information; isn't that true?

19   A.  I don't know not having talked to them, but, however, I

20   assume that they wanted to protect the identities of their

21   user, as I would hope my ISP would not simply divulge it,

22   but this is an appropriate legal means to get information

23   from Cox.

24   Q.  Wouldn't you agree that Cox have challenged the

25   procedures before these lawsuits were filed?

1   A.  I don't believe -- I don't know.

2           THE COURT:  Wait a second.  Are you showing

3   something that's admitted into evidence?

4           MR. FEINBERG:  Yes, Exhibit 20, your Honor.

5   A.  If this helps, I don't know if Cox did or did not.

6   Q.  Once the subpoena --

7           THE COURT:  What are you showing the witness?

8           MR. FEINBERG:  I'm showing the subpoena to the

9   witness, Exhibit No. 20, your Honor.

10          THE COURT:  Which is?

11          MR. FEINBERG:  Which is a letter dated December 3,

12  2004 sent out to Dear Cox High Speed Internet User.

13          THE COURT:  Is this a letter that this witness is

14  familiar with?

15          MR. FEINBERG:  I don't know.

16          THE COURT:  Have you ever seen this letter before?

17          THE WITNESS:  No.

18          THE COURT:  Next question.

19  Q.  Have you seen a letter like it?

20  A.  I don't know.  I don't believe so.

21  Q.  Are you familiar with the fact that Cox Communication

22  challenged the procedure that RIAA has used in bringing the

23  lawsuit?  Do you see the bracketed paragraph?  That's what I

24  just read from.

25  A.  Are you asking me if you read from the paragraph, yes, I

1    believe you read from the paragraph.

2    Q. No, I'm asking you whether or not you're aware of that

3    procedure, are you aware of a procedure by which Cox

4    challenged the RIAA procedure?

5            MR. OPPENHEIM:  Objection, your Honor.

6            THE COURT:  Sustained.

7            MR. OPPENHEIM:  There was a Cox witness.

8            THE COURT:  Sustained.  Go on.

9    Q. Are you aware that in the usual course of these John Doe

10   cases at or after the time that the subpoena goes out, the

11   usual provider sends out letters like this Cox Communication

12   letter?

13   A. I don't know about the usual provider.  I am aware, and

14   this is why I hadn't seen something like this before, my

15   understanding is that providers do send out letters to their

16   customers.  The precise nature of what they say, I don't

17   know, I never had one sent to me.

18   Q. Now, let me go to what Mr. Oppenheim showed you earlier,

19   which was Exhibit 22, which is a letter to J. Tenenbaum.

20   The first sentence says, "We are counsel to a group of

21   companies that intend to file a lawsuit against you."  Do

22   you see that?

23   A. Yes, I see that language.

24   Q. Did you or members of your office participate in the

25   drafting of this letter or letters like it?

1    A.  I did not.  I don't know if anyone else in my office

2    did.

3    Q.  Do you think that it's a fair representation to say in

4    this opening sentence that there's an intent to file a

5    lawsuit when in fact a lawsuit against a John Doe has

6    already been filed?

7         MR. OPPENHEIM:  Objection.

8         THE COURT:  Sustained.

9    Q.  When was this -- are you aware of when this letter was

10   sent out?  It says September 16th, 2005?

11   A.  Yes, it does say September 16th, 2005.

12   Q.  Do you have any knowledge of that, of the sending out of

13   this letter?

14   A.  I did not send out this letter, so if you're asking me

15   how it was sent, I don't know.  I do see the letter.  I do

16   see the envelope.  I presume it was sent out on or about the

17   date it indicates on the letter.

18   Q.  Do you know who did send the letter?

19   A.  I would assume it was Therese P. Miller, the signatory

20   on the letter.

21   Q.  The person from the law firm in Kansas City?

22   A.  That does appear to be someone from Shook, Hardy & Bacon

23   in Kansas City.

24   Q.  Have you been involved at all in any of the settlements

25   of these lawsuits?

1    A.  No, I have not.

2    Q.  What do you do as counsel at UMG?  What's your usual

3    function?

4    A.  My usual function, I provide legal counsel, legal advice

5    and counsel to the various business units of the Universal

6    Music Group, I manage litigation.  I also provide support

7    for anti-piracy efforts in the sense of gathering evidence,

8    putting together documents, when necessary, testifying.

9    There's some other things that go with it, but those are

10   the --

11   Q.  When you say support litigation, what do you mean?

12   A.  I don't believe I said I support litigation, but do you

13   mean what do I do --

14   Q.  I'm sorry, what was the phrase you used for purposes of

15   how you function in terms of litigation, I thought that's

16   what you said?

17   A.  I don't recall.  I said I support anti-piracy efforts, I

18   do manage and supervise litigation.

19   Q.  Let's take those one at a time.  What do.  You do as far

20   as anti-piracy was concerned?

21   A.  My role with respect to anti-piracy is, again, like I

22   said, primarily in the sense of providing evidence,

23   providing testimony, declarations when that becomes

24   necessary, coming here to testify to be questioned by you

25   when appropriate, but mostly my role is, you know,

1    confirming chain of title, making comparisons, doing sort of

2    a lot of the fact-finding, I guess.

3    Q.  You're not involved in the strategies behind these

4    lawsuits?

5    A.  Lawsuits like these specifically?

6    Q.  Yes.

7    A.  No, I'm not.

8    Q.  You're not involved in the settlement discussions around

9    these lawsuits?

10            MR. OPPENHEIM:  Asked and answered, your Honor.

11            THE COURT:  Sustained.

12   Q.  When did UMG, if ever, start using MP3?

13            MR. OPPENHEIM:  Objection.  If we can just clarify

14   the question.

15            MR. FEINBERG:  I think it was pretty clear.

16            THE COURT:  You can clarify it, go on.

17   Q.  Do you need some clarification?

18   A.  When did anyone at UMG ever use the --

19   Q.  When did UMG, when did your corporation start using MP3

20   as a platform?

21            MR. OPPENHEIM:  Objection.  It's not a platform

22   foundation, misleading.

23            THE COURT:  If she knows when they moved to MP3 as

24   a recording technology.

25            MR. FEINBERG:  Thank you, sorry.

1           THE COURT:  Okay.  Do you know the answer to that?

2           THE WITNESS:  I don't.  I think I'm a little

3   confused by the question to the extent that you're

4   suggesting we moved to it as a technology that we, for

5   instance, put our recordings on on a regular basis.

6   Q.  Have you ever put anything on MP3 as a recording

7   technology?

8   A.  I believe the music files that are being offered through

9   Amazon, for instance, are MP3, but you probably shouldn't

10  quote me on that, but I believe that's what they are.

11  Q.  Do you know when that began?

12  A.  I wouldn't want to guess.

13  Q.  Can you give me your best estimate?

14  A.  Last few years.

15  Q.  Last what?

16  A.  Few years.

17  Q.  Some time after 2006?  Do you feel comfortable with

18  that?

19  A.  Somewhere around that time frame.

20  Q.  Fine.  Any other use of MP3 before 2006, to your

21  knowledge?

22  A.  I'm not in a position to answer that, I'm sorry.

23  Q.  Are you involved at all in lawsuits against people who

24  actually counterfeit and sell CDs?

25  A.  I have been somewhat involved.  I've been asked by U.S.

1   attorneys, for instance -- well, U.S. attorneys have asked

2   our company to provide a witness to do very similar things

3   to what I'm doing now, which is to confirm our chain of

4   title that we own and control the exclusive rights on these

5   recordings and that we didn't license them, so on a couple

6   of occasions, a few occasions I was asked to go testify in

7   conjunction with those types of proceedings.

8          As it turns out, once all the witnesses got down

9   there, the defendants all pled out so I didn't actually

10  testify in one of those.

11  Q.  In this case, you testified that there were a large

12  number of recordings that you haven't sued on; am I

13  correct?

14  A.  There are a large number of recordings we have not sued

15  on.

16  Q.  You only sued on a sampling?

17  A.  Yes, a less than the whole.

18  Q.  You could have made a decision or your company could

19  have made a decision to sue on one recording; am I

20  correct?

21  A.  Could have, but I imagine we probably would not have

22  been proceeding simply on one.

23  Q.  And you could have made a decision to sue on 150?

24  A.  Could have made that decision.  That doesn't seem to be

25  an efficient use of the court's time however.

1    Q.  Well, you didn't know it was going to go to court at the

2    time, did you?

3    A.  Well, I don't think you file lawsuits without

4    anticipating what could happen, but I think we tried to make

5    a reasonable, choose a reasonable number to save -- save

6    honestly a lot of work and effort, I think a chain of title

7    for 150 recordings could have been boxes.

8    Q.  That's okay, we could handle that.  Let me ask you that.

9    Is 10 a reasonable number?

10   A.  It might be.

11   Q.  Is 100 a reasonable number?

12   A.  It might be.  I do think this is probably a decision

13   that's made on a case-by-case basis, so it's hard for me to

14   answer that in the abstract.

15   Q.  And do you know what the standard for the reasons for

16   picking this number in your case 13?

17   A.  Other than what I've said, no.

18   Q.  What you said was it's a sample and it's a reasonable

19   number, and I'm trying to get at what the reasons for the

20   number are?

21   A.  And you're correct that's what I've testified to, and

22   other than that I don't know.  My understanding is we wanted

23   to pick a reasonable number.  I wasn't involved specifically

24   in that decision.

25   Q.  And is the reasonable number to make it look like you're

1   being a reasonable company?

2           THE COURT:  Sustained.

3   Q.  Is that what you're trying to tell us that this

4   company --

5           THE COURT:  You may be too tired to stand.

6   Objection sustained.  Go on, Mr. Feinberg.

7   Q.  Who makes the decision?

8   A.  I don't know specifically.

9   Q.  Do you know generally?

10  A.  I don't.  I'd be guessing a little bit.  There was an

11  attorney in my department, Harvey Geller who's more involved

12  in that than I am.

13  Q.  How do you know if it's reasonable if you don't know

14  who's making the decision?

15  A.  Well, I've seen a lot of litigation, and I've seen, you

16  know, and I understand generally what the purpose and the

17  intent of these lawsuits are.  I don't think anyone's

18  intention is to burden people with hundreds and hundreds of

19  recordings to go in and ask the jury to weigh all the facts

20  and information.

21          As I said, we have 13 CDs.  That's manageable.  If

22  you want us to bring in boxes and boxes and boxes of

23  documents.  I understand you or your co-counsel insisted

24  that we turn over a lot of documentation supporting

25  ownership, although apparently you've conceded we owned it

1   this morning, but that would have been a much more time

2   consuming process.  That's the one that springs to my mind,

3   but that's just from a practical basis from someone who is

4   not involved.

5          THE COURT:  I think this area is at its end,

6   Mr. Feinberg.

7          MR. FEINBERG:  May I ask this question, your

8   Honor?

9          THE COURT:  If it's a question concerning this,

10  the inquiry is at an end.  Move on.

11  Q.  Isn't the reason for these lawsuits to teach people a

12  lesson?

13  A.  That is part of the lawsuit, part of the reasons for the

14  lawsuit.

15  Q.  And it's to get publicity out there to stop piracy, at

16  least what you consider to be piracy?

17  A.  We do want word to get out there that this is wrong, but

18  there are other reasons including compensation for us to

19  turn in general and with respect to what seems to be an

20  unrepentant user of p2p networks.

21  Q.  And so you want to make Mr. Tenenbaum repentant by him

22  having to pay you money; am I correct?  Yes or no, please.

23  A.  The problem with saying yes or no is that you've built

24  in something else there.  We are asking Mr. Tenenbaum to pay

25  us the money, yes.

1    Q.  And maybe a lot of money; am I correct?

2    A.  That is ultimately up to the jury after they've

3    heard --

4    Q.  I understand.  You're asking through your counsel to ask

5    this jury to give you an award of lots of money --

6            THE COURT:  Mr. Oppenheim and Mr. Feinberg, this

7    is argument.  You'll have a lot of time to deal with that.

8    The objection is sustained.

9    Q.  Is it fair to say that you are suing Mr. Tenenbaum, and

10   one of the purposes is to obtain money from him?  Yes or no.

11   I think that calls for a yes or no.

12           MR. OPPENHEIM:  I think I object.

13           THE COURT:  Objection sustained.

14   Q.  Are you involved at all in the marketing of your

15   music?

16   A.  On a day-to-day level, no.

17   Q.  How about in a nonday-to-day level?

18   A.  I do field inquiries from our marketing groups, our

19   marketing folks.

20   Q.  When you say marketing folks, can you tell us a little

21   bit what's involved in marketing an album?

22   A.  Well, I wouldn't propose, presume to be an expert in the

23   area, but certainly, you know, with an artist, say a new

24   artist, the A & R people will work with them, they'll try to

25   come up with some great tracks, as I understand it; the

1  marketing people, as I understand it, do a whole variety of

2  things designed to try to get the music out there to make

3  people aware what it is, whether it's the radio stations,

4  the critics through word of mouth, encouraging the artist to

5  go tour.  There's a lot of things that the marketing people

6  can do.  I understand the market changes and they try to

7  adapt and do what's best to try to get the music out there

8  so people can hear it and hopefully like it.

9  Q.  Before your music was put on iTunes, you said that it

10 was put on other forms of digital programs that can be --

11 where music can be bought and paid for?

12 A.  I understand the music was made available, as I said,

13 the two services I can think of are Press Play and MusicNet

14 at the time.

15 Q.  And on Press Play could you buy a song for 99 cents?

16 A.  I would assume no, but I don't really know.  I didn't go

17 on Press Play.  I'm still buying CDs.

18 Q.  Has the price of a single track of music on iTunes or

19 any other program where you can buy digital music changed

20 since its inception in 2003?

21           THE COURT:  Sustained.

22 Q.  Do you know what the price of an iTunes song is now?

23 A.  ITunes has variable pricing.

24 Q.  Single track?

25 A.  Yes, I understand they have variable pricing for single

1   tracks.

2   Q.  What's the range?

3   A.  I think it's between 69 cents and $1.29.

4   Q.  Back in 2003, do you know what it was?

5   A.  I believe it's 99 cents.

6   Q.  That's for a single track?

7   A.  Yes.  I'm not sure if all the music was available on

8   single tracks at that point, but 99 cents is what sticks in

9   my mind when you say iTunes.

10  Q.  It's true, is it not, prior to 2003 it was much more

11  difficult to purchase single track, am I correct, of digital

12  music?

13  A.  You mean to go online and to purchase?

14  Q.  Yes.

15  A.  I would assume so.  I don't recall ever trying to do

16  it.

17  Q.  Do you have any knowledge about whether or not prior to

18  iTunes there was an ability for someone to go online and

19  purchase a single track of digital music?

20  A.  I don't know about single tracks.  I know music was

21  available I believe to be sold digitally.  There was Liquid

22  Audio, I believe, that was working with a number of

23  retailers to provide music.  If this is what you're trying

24  to get at, I will acknowledge that iTunes has been very,

25  very successful in what they do.

1    Q.  And, in fact, once iTunes was up, you allowed iTunes,

2    you licensed your music to iTunes?

3    A.  We sell to iTunes and they resell.

4            MR. FEINBERG:  Thank you.  I have nothing else.

5            MR. OPPENHEIM:  Just a few, your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. OPPENHEIM:

8    Q.  Just a few questions, Ms. Cho.  A moment ago

9    Mr. Feinberg was asking you about the purpose of the Doe

10   suit, in this case the one down in Georgia.  Was the purpose

11   of that Doe suit exclusively to obtain the power to send a

12   subpoena, or were there other purposes as well?

13   A.  I wasn't counsel, but I presume the purpose we would be

14   able to proceed in that forum, if appropriate, but under the

15   circumstances, we got certain information and tried to

16   contact people and see if we could work something out before

17   we proceeded.

18   Q.  And then you also during questioning, you referred to

19   the issue of chain of title.  I don't know that that's an

20   issue that we'VE yet described for the jury.  I just would

21   like you to try to explain what it is you were saying about

22   the need to prove chain of title and lots of documents and

23   why we didn't do it here today.

24   A.  By chain of title, I mean just the documents or the

25   information necessary to prove that UMG does in fact hold

1    the rights that it's suing on.  There's a presumption in the

2    copyright law that we can rely, it's a prima facie case on

3    the copyright registrations, the documents that we saw with

4    the gold seal, some without, and that's frequently

5    sufficient, however, Mr. Tenenbaum's attorneys insisted that

6    we turn over a lot of other documents.

7            MR. FEINBERG:  Objection.

8            THE COURT:  Sustained.

9    A.  I'm sorry, that the chain of title could consist of, for

10   instance, if we wanted to prove each and every step in the

11   chain, the agreement between the artists and the record

12   company, you know, that's the easiest one.  Say Nirvana

13   signed Interscope records, and then we look and Interscope

14   Records is in fact the name on the copyright certificate,

15   then we made it very simple, we've seen the documents, it's

16   all straight forward.

17           In our case, it becomes a little more difficult,

18   there have been some mergers, some companies in and out.  We

19   had talked about Geffen Records a little bit earlier.  It's

20   not particularly complicated, but you have to produce a lot

21   of documents.

22           It was originally started as the David Geffen

23   Company.  They changed their name to Geffen Records, Inc.

24   Geffen Records, Inc. was subsequently merged into UMG

25   Recordings, Inc., so when we are asked to produce documents

1  showing each step along the way, you're talking about artist

2  agreements, you're talking about, you know, the original

3  David Geffen Company which the name changed to Geffen

4  Records, the Geffen Records Merger into UMG Recordings,

5  Inc., and some of these things have a couple more wrinkles

6  in and out, things get moved around, or, you know, DJC

7  Records is the name that Geffen Record uses now, we could

8  have to turn over all of those documents.

9          It actually can be a time consuming and very

10  voluminous process, so that's what I was referring to when I

11  talked about not the difficulties, we can certainly prove

12  that we own that but the burdens that that sort of procedure

13  entails.

14          MR. OPPENHEIM:  Thank you, Ms. Cho, no further

15  questions.

16                      RECROSS-EXAMINATION

17  BY MR. FEINBERG:

18  Q.  That burden is the burden of producing a pile of

19  paper?

20  A.  We do need to go through it and be subject to

21  questioning.  It's easier to produce this big of a pile of

22  paper than a jury box full of paper.

23  Q.  Are you aware of the fact that we've stipulated and

24  agreed that you own the copyright to these 13 songs?

25  A.  Yes, I understand you stipulated this morning.

1    Q.  Thank you.

2           MR. OPPENHEIM:  I'm sorry, could she finish her

3    answer?

4           THE COURT:  She stipulated this morning.  That's

5    what she said.  Thank you very much.  The witness is

6    excused.  Next witness.

7           MR. OPPENHEIM:  Do you want to go into the next

8    witness or take our afternoon break?  Can we go onto the

9    next witness?

10          THE COURT:  The jury is with me?  Can we go onto

11   the next witness?  Okay.

12          MR. OPPENHEIM:  Great, your Honor, we'll call

13   Dr. Stanley Liebowitz.

14          STANLEY LIEBOWITZ, having been duly sworn by the

15   Clerk, testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. OPPENHEIM:

18   Q.  Good afternoon, Professor Liebowitz.

19   A.  Good afternoon.

20   Q.  Could you please describe what it is you do for a

21   living?

22   A.  I'm an economist, I'm a professor of economics.

23   Q.  And where are you a professor of economics?

24   A.  University of Texas at Dallas.

25   Q.  And what position do you hold there?

1    A.   I'm an Ashbel Smith Professor of Managerial Economics.

2    Q.   Is that a tenured position?

3    A.   Yes, it's a tenured full professor.

4    Q.   And you said it's the Ashbel Smith?

5    A.   Yes, it's what's called a chaired professorship.

6    Q.   What exactly does that mean?

7    A.   It means there's a name on your position, it usually

8    goes to the more senior and better established faculty

9    members.

10   Q.   And how long have you been a professor in economics?

11   A.   Approximately 30 years.

12   Q.   Can you tell me a little bit about your educational

13   background?

14   A.   Yes.  I did my undergraduate degree at Johns Hopkins,

15   and I did my graduate work, my masters and doctoral degrees

16   at UCLA.

17   Q.   And you completed all three of those degrees?

18   A.   Yes.

19   Q.   And can you describe the different schools at which

20   you've been a faculty member?

21   A.   Yes, I started at the University of Western Ontario, I

22   moved to the University of Rochester, then the University of

23   Chicago, North Carolina State and University of Texas.

24   Q.   And you've been a professor there at all of these

25   universities?

1  A.  Yes, at Chicago I was the visiting Olin faculty

2  fellow.

3  Q.  Have you won any awards in this context?

4  A.  Yes.  When I was at North Carolina State, I won a

5  distinguished research award.  I have an article in a less

6  academic place that won a top article of the decade award,

7  and I have a book that was considered one of the top 30

8  business books of the year by Soundview Executive Books.

9  Q.  What book is that?

10  A.  Rethinking The Network Economy.

11  Q.  Have you -- you're currently at the University of Texas;

12  is that what you said?

13  A.  Yes.

14  Q.  Have you had any roles at the University of Texas other

15  than professor?

16  A.  Yes.  I was the academic associate dean for three

17  years.

18  Q.  And what exactly does that entail?

19  A.  That basically meant that I was supposed to control the

20  faculty.

21  Q.  And have you had any roles or do you sit on any

22  editorial boards?

23  A.  Yes.  I currently sit on the board for the Journal of

24  Media Economics and the Journal of, let's see, Economic

25  Research on -- Research On Economics Of Copyright Issues.

1  Q.  And have you had any role with either with either of

2  those organizations other than on the editorial board?

3  A.  Yes.  The Society for Economic Research on Copyright

4  Issues, when it was first formed asked me to be the keynote

5  speaker that original first year, and then a few years after

6  that I became president of the organization.

7  Q.  And have you been associated with any other journals in

8  the past, academic journals other than the two you just

9  described?

10  A.  Yes, I was on the editorial board for the Journal of

11  Network Industries and a special issue of MIS, which stands

12  for Management Information Systems Quarterly.

13  Q.  And could you describe for the jury what a think tank

14  is?

15  A.  Yes.  It's an organization that does more applied work,

16  often having to do with issues that are political

17  interests.

18  Q.  And have you been associated with any think tanks in the

19  past?

20  A.  Yes, I have.

21  Q.  Could you describe for us those think tanks?

22  A.  Yes.  Without a full list, I don't know, I'm not going

23  to be able to remember them all, but there's the Cato

24  Institute, there's the Competitive Enterprise Institute,

25  there's the Independent Institute, there's the Media

1    Institute.  Without the resume', it's hard to tell, but

2    there are at least five or six more.

3    Q.  And have you received any grants to conduct research?

4    A.  Yes.

5    Q.  Could you describe who you've received grants from?

6    A.  The earliest grants are from the Canadian government.

7    They had something called the Bureau of Intellectual

8    Property and part of the government called Consumer

9    Corporate Affairs.  I received two grants for contracts from

10   them.

11         I also received a grant from the Department of

12   Communications in the Canadian government, then I received

13   several grants from the Office of Technology Assessment,

14   which is part of the U.S. Congress.  It was at the time.

15   It's about the only government organization that you'll ever

16   hear of that disappeared, then I did some work for McKenzie.

17   That was more in the nature of academic work, so I have that

18   listed as also a contract.

19   Q.  And through the course of the last 30 years, have you

20   had an area of specialization in economics?

21   A.  Yes.  Generally the field that I work in is known as

22   industrial organization.  Sometimes it's also related,

23   there's another field called law of economics, and the two

24   are not necessarily much different from another, and I'm

25   sort of between the two somewhere.

1   Q.  And in those fields have you published any books?

2   A.  Yes.

3   Q.  Can you describe what books you've published in those

4   fields?

5   A.  I'm sure I have four monographs which are sort of

6   somewhat shorter books and then two books.  Earlier -- we've

7   sort of gone chronologically.  I have a monograph on the

8   impact of photocopying on publishers, I have one on the

9   impact of cable retransmission of television broadcasts, the

10  impact on the broadcasters, I have one on the impact of the

11  efficiency, in this case of Canada of the government-owned

12  broadcaster, and the two that are more obvious books, one of

13  them is called Winners and Losers of Microsoft, and it was

14  basically about my research with a coauthor in that case,

15  Steve Margolis, called Network Effects which turned out to

16  be a theory that played a large role, at least early on in

17  the Microsoft case, so we put some of our early writings

18  together and talked about some current events that were

19  going on related to the case, and that was that book, and

20  then finally the Rethinking of the Network Economy book -- I

21  don't get to choose the title of these things because I

22  didn't like that title much -- was about the impact that the

23  Internet was going to have on business and in particular

24  there was a section that talked about the impact it was

25  going to have on businesses that relied on copyrights.

1   Q.  And have you published any articles, not books, but

2   articles in the area of specialization you described

3   earlier?

4   A.  Yes, quite a few articles.

5   Q.  I'm sorry.  Roughly how many?

6   A.  It would be rough because I actually didn't do a count,

7   I thought I would have the resume'.

8   Q.  Well, if it would assist you, I believe that there

9   should be a notebook there with an Exhibit C, excuse me,

10  F?

11  A.  There's four notebooks here.

12  Q.  The small notebook, that one right there which I believe

13  will have your resume'.

14  A.  Okay.  Thank you.  So the question was how many articles

15  have I written?  Are we including books or not?

16  Q.  Roughly how many articles?

17  A.  Fourteen or so.

18  Q.  Specifically with respect to the area of specialization

19  that you described?

20  A.  That's right, that are related to the economics of the

21  copying and copyright.

22  Q.  Can you give us, can you describe for us some of the

23  more substantial ones of those articles when they were

24  released and where or when they were published and where?

25  A.  Sure.  There was a paper that I wrote in a journal

1    called The Journal of Political Economy that talked about

2    the impact of photocopying of publishers.  That was in 1985.

3    There was another one in a journal called Research in Law &

4    Economics that was talking about the impact of photocopying

5    and price discrimination.  There is the book, the rethinking

6    book, which I've already mentioned.

7         There's an article in a book which is called,

8    Back to the Future, Copyright Owners Appropriate Revenues in

9    the Face of New Copying Technologies.  That was in 2003.

10   There's an article, Will MP3 Downloads Annihilate The Record

11   Industry?  The Evidence So Far, which was advances in the

12   study of entrepreneurship, innovation and economic growth in

13   2004, we have Pitfalls in Measuring the Impact of

14   File-Sharing on the Sound Recording Market in CESifo

15   Economic Studies in 2005.

16         THE COURT:  How many is there to read?

17         MR. OPPENHEIM:  How about if I make it easy, we

18   would offer Dr. Liebowitz as an expert as an economist with

19   respect to intellectual property industries and new

20   technologies.

21         THE COURT:  Is there an objection?

22         MR. NESSON:  No objection.

23         MR. OPPENHEIM:  We can then skip the rest of the

24   articles.

25         THE COURT:  Right.

1    Q.  Dr. Liebowitz, are you generally familiar at a high

2    level with how KazaA, the KazaA, how KazaA operates and the

3    fast track network operates?

4    A.  In a general way, yes.

5    Q.  Using a peer-to-peer network is often described as file

6    sharing.  Can you describing from an economist perspective

7    why it's called file sharing?

8    A.  Well, economist didn't get to name the process, so I

9    don't know that.  I can tell you why an economist would call

10   it that.  It got that name on its own for whatever reason.

11   I don't think that that's the term that would necessarily

12   describe what's going on typically accurately.  When I think

13   of sharing, I think of some product that is being used by

14   several people together one way or another, maybe you lend

15   somebody a book that you're reading or something like that.

16        In the case of file sharing, the individuals who

17   are participating aren't really sharing it in a sense of

18   engaging it in any way together or even knowing one another.

19   The things about these networks is that they're anonymous.

20   People who are taking files from your machine don't know who

21   you are, and you don't know who they are.  You're not

22   listening to the music together.  You're not enjoying it at

23   all together.  You're not really sharing, you're just making

24   it available for someone else to take.

25   Q.  In this case the defendants claim that their activities

1   are noncommercial.  Does the downloading of a copyrighted

2   sound recording from a p2p network have an impact on

3   commerce?

4   A.  Yes.  There is and has been a well-established industry

5   in selling music, and file sharing has an impact on that

6   industry, so the activity of file sharing certainly has a

7   large and in this case a very large impact on the industry

8   revenues, and, therefore, the commerce that's going on in

9   the markets where the songs are being normally sold and

10  purchased.

11  Q.  Let's focus for a moment, I want to break down the two

12  events that occur in file sharing.  Let's focus for a moment

13  on the downloading.  Is there an impact on commerce by

14  virtue of the downloading of sound recordings on a

15  peer-to-peer network?

16  A.  Yes, the people who download songs may have purchased

17  the songs if they didn't do the downloading, so that would

18  remove the sale on the part of the customer.

19  Q.  All right.  So now let's turn our attention to the

20  uploading, the distribution.  Does the uploading or

21  distribution have an impact on commerce?

22  A.  Well, it's like the left and the right-hand clapping,

23  you can't really say which one is responsible for the sound.

24  So, yes, the uploading is required in order for someone to

25  be able to download the music, and by making it available

1   for people to basically take at will, that makes it

2   obviously much more difficult for the sellers of legitimate

3   versions of the music to be able to compete with them

4   effectively to continue to sell their product.

5   Q.  So, is it your opinion that file sharing copyrighted

6   works has a commercial impact?

7   A.  Oh, yes.

8   Q.  Defendants also argue that people use peer-to-peer to

9   sample music which they ultimately buy, so peer-to-peer

10  doesn't diminish sales.  Have you heard this argument

11  before?

12  A.  Yes.  In fact, I was the one who first brought that

13  argument before economists.  The term that I was using is in

14  the 1985 paper was the exposure effect.

15  Q.  Okay.  Now, you said you were the one who first brought

16  that to economists.  Can you describe how you first brought

17  that up in 1985?

18  A.  Yes.  I was talking about people who were photocopying

19  articles and what the impact was on publishers, and the

20  point that I was making was that when you photocopy an

21  article, and the photocopiers were in the libraries, that

22  was before people had photocopiers at home, that people

23  would then get to read articles that they might not

24  otherwise have come across because their neighbors may -- in

25  this case I'm talking about academic neighbors.

1        Somebody in the office next to you says look at

2   this really interesting article, and if you get a few

3   articles from a particular journal that you hadn't

4   previously read, you might say, gee, I like this journal,

5   maybe I'll subscribe to this journal so I can get other

6   articles that I like, so it might be a way of getting you to

7   decide that there's something that you like and maybe buy it

8   when you otherwise might not have.

9        In the case of journals, I concluded it wasn't

10  harmful because what the producers were able to do, the

11  journal producers, was they knew where the copying was

12  occurring, it was occurring in the libraries, which is where

13  the photocopying machines were.

14       That was when you had to put a quarter in to make

15  your copy, and so what the journals then did was they

16  started charging higher prices to libraries than they were

17  charging for individual subscriptions, and they made that

18  difference bigger and bigger, and if you took a look at the

19  financial implications on the publishers, they didn't appear

20  to be harmed, and more people were switching from reading

21  books to reading articles because nobody wanted to photocopy

22  books, but articles were very convenient, so it wound up

23  being good for the publishers of the journals.

24  Q.  So you've described in the context of journals.  Can you

25  give us your view on the impact in the context of

1    peer-to-peer and record companies?

2    A.   Yes.   The theory of what peer-to-peer would do seemed to

3    me to be fairly clear.   There was the substitution effect

4    where people go and use the copy instead of the original.

5    That seemed like it would be very strong, certainly far

6    stronger say than it was in the photocopy case, because in

7    the photocopy case the copy is not as good as the original.

8             If you make a copy of a copy, then a copy of a

9    copy of a copy, it becomes almost impossible to read, but in

10   music, when you make a copy, it's virtually

11   indistinguishable from the original, and a copy of a copy is

12   almost indistinguishable and a copy of a copy, so it's a

13   much stronger substitution effect, much more likely to be

14   considered a substitute for the original, and you're

15   perfectly happy to keep it once you have it and not buy the

16   original.

17            This effect that I was talking about before where

18   the publishers were able to charge a higher price and

19   therefore get some of the money back, that won't work for

20   the record companies because they can't identify which of

21   the original CDs that they're selling are being used to make

22   the copies, so, therefore, they can't charge a higher price

23   for those particular CDs, and even if they could identify

24   them, it would be hard to figure out how to charge a higher

25   price at retail, so they can't generate any additional

1    revenue from the people who are making the copies.

2         The other aspect of the exposure effect is that

3    the people get to try something out in advance, but that by

4    itself is likely to hurt revenues as it is to help revenues.

5         This effect of trying in advance means you'll do a

6    better job if you actually do just download the music to see

7    what you like and you wind up buying the music you like and

8    not making a mistake and buying some music that you turn out

9    not to like that much, you'll be more efficient at buying

10   music, but it doesn't mean you buy more music, it may even

11   mean you buy less music because you don't buy the mistakes

12   that you then sort of regret having made, so it's likely to

13   only have a small impact on sales, so you have the

14   substitution which looks like it should have a very large

15   impact.

16        This is all theoretical, and there's nothing there

17   that looks like it could possibly overcome it, so the theory

18   tells me, at least, that file sharing should have a strong

19   negative impact on record sales.

20   Q.  I want to back up for a minute and see if we can

21   define -- you were talking about sampling, see if we can

22   define what sampling is compared to the term used earlier,

23   "substitution"?

24   A.  Right.  Sampling is, you know, trying out the music in

25   principle and then even though you have a perfect copy, for

1   whatever reason, perhaps you feel guilty about having

2   downloaded it, you go to the store and you buy it because

3   you now know you like it, that would be sampling.

4   Q.  If a user downloads a copy of a sound recording in order

5   to see whether they like something, they don't go out and

6   purchase the track and they keep the track in their shared

7   directory, is that sampling as you described it?

8   A.  No.  In order for sampling to really be sampling, you

9   are going to purchase the songs that you like.  Now, it

10  could be the case that you sampled a song and decided you

11  don't like it and you never listen to it again, and that

12  could be considered part of sampling, and maybe it stays on

13  your hard drive, but if you're going to be listening to it

14  in the future, then it's not sampling, not unless you go out

15  and buy it at that point.

16  Q.  I want to shift gears for a moment and talk kind of

17  broadly about the record industry over the last 20 or so

18  years.  Are you familiar with revenues and sales for the

19  record industry at a high level over the last 20 or so

20  years?

21  A.  Yes, that's something that I've studied to some

22  extent.

23  Q.  And can you describe what's happened to record company

24  revenues over the last 20 or so years?

25  A.  Yes, it's actually more like the last 35 years or so.

1    When you look at the history of sound recording sales since

2    '73, which is when the data that I'm looking at happens to

3    begin, what you find is that there are ups and downs in

4    individual years, but there's a trend upward, and the trend

5    continues to approximately 1999 or exactly 1999, and then

6    after 1999, there's this very sharp drop, and it's continued

7    ever since then straight down.

8    Q.  All right.  So you said 35 years, so if I'm counting

9    right, so let's say roughly 1976 through '99, it was an

10   upward trend?

11   A.  Well, '73 to '99 was basically, yes, an upward trend

12   with bumps.

13   Q.  It wasn't constant?

14   A.  Yes.

15   Q.  Always upward?

16   A.  Right.

17   Q.  But over time upward?

18   A.  Yes.

19   Q.  And then what happened in 1999?

20   A.  It turned around and went down very steeply.

21   Q.  And before we get to the turnaround, so in 1999, what

22   were the annual revenues, annual revenues for the record

23   industry in the United States?

24   A.  In the United States the revenues in current dollars, so

25   correcting for inflation, would be eighteen and a half

1    billion dollars.

2    Q.  Okay.  So that's in 1999.  You said there was a downward

3    turn at '99?

4    A.  Yes.

5    Q.  And what is the most recent data you have?

6    A.  2008.

7    Q.  Okay.  So, what were record company revenues in 2008

8    compared to the eighteen and a half billion inflation

9    adjusted dollars in '99?

10   A.  The number in 2008 was 8.5 billion.

11   Q.  More than a 50 percent drop in revenues in the last nine

12   years?

13   A.  Yes.

14   Q.  In looking at this, have you seen the same kind of

15   percipitous decline in sales as you just described with

16   revenues?

17   A.  Yes, you have virtually the same percentage change, and

18   I might mention at the risk of boring you too much that the

19   quantity, the units are actually better measured than the

20   sales, that what's actually measured are the quantities, and

21   then to get the revenues, they apply a price, which is the

22   list price, but they don't actually know the dollar value in

23   these figures of what the actual transaction price is at the

24   cash register.

25   Q.  So let's turn for a minute then to the sales figures

1    since you say they're slightly more accurate.  Do you have

2    an explanation as an economist who studies this area

3    theoretically as to why there's been this decline in

4    sales?

5    A.  Well, there are various hypotheses that you can tell,

6    but the one that jumps out right away is file sharing.

7    First of all, before there were any of these numbers, when

8    you just looked at what impact you would expect file sharing

9    to have, you would expect it to have a negative impact, and

10   then when you see how popular file sharing became and how

11   much it was being used and the various estimates of the

12   magnitude of file sharing, you have to say that if it was

13   going to have a predicted impact, it would be a big impact

14   because it was so popular, so that's sort of the prime

15   candidate, and then if you look at the timing, the timing is

16   virtually perfect.

17          The peak year in sales was 1999.  The second half

18   of '99 is when Napster comes into existence, but it's very,

19   very small at that stage, then it grows during the year

20   2000, and it becomes full blown, and, you know, the cover of

21   Time Magazine has the inventor of Napster on there, and

22   everyone is talking about it, and that's the year that

23   record sales start to fall and they've never stopped falling

24   ever since then.

25   Q.  When you were considering as a theoretical economic

1    matter why there was this decline, what kind of factors were

2    you looking at?

3    A.  Well, in the theory, it was the substitution effect and

4    what I call the exposure effect and what is called sampling

5    and possibility of what I called indirect appropriability,

6    which is somehow changing the price of the original to

7    capture the value that people are getting from copies, so

8    those are the factors I was looking at theoretically.

9    Q.  Okay.  And did you ever write up this analysis that you

10   just described as theoretical analysis?

11   A.  Yes, I wrote it up in several places initially, and I

12   tend to keep repeating it in every article afterwards to

13   some extent but in a shorter version.

14   Q.  And where did you first publish this analysis?

15   A.  It first appeared in a policy analysis for the

16   Cato Institute, and that would have been in I think it was

17   2001.  I'd have to double check.  I guess I have it here,

18   but it's close, then in the book, Re-Thinking The Network

19   Economy, which was published in 2002 but written in the year

20   or two prior to that, I also had virtually, I tried to

21   change enough words so that it wasn't exactly the same but a

22   similar set of ideas in the book.

23   Q.  Okay.  So this was your consideration from a theoretical

24   perspective.  Did there come a point in time where you've

25   actually looked at this not from a theoretical economic

1    perspective but actually looked at data to analyze whether

2    or not your theory or your hypothesis is right?

3    A.  Yes, I mean, theory is fine, and it's always nice to

4    know what it's going to predict, but sometimes it's wrong,

5    and so the question is was the world going to work the way

6    the theory sort of predicted it was going to work, so I

7    started to gather data on what was happening to record

8    sales.

9    Q.  And what kind of data did you gather?

10   A.  Okay.  The most important data in this case to start out

11   was data on the number of full length albums that had been

12   sold regardless of format, so whether it was a cassette or

13   an LP, because I'm going back in time, in the '70s, they're

14   all long-playing vinyl records and then they become

15   cassettes, and then they start turning into CDs, so I go

16   look for the full length albums and see what the sales of

17   those are over time, and then I also take a look at the list

18   price, which you can get out of the data, which I have,

19   which is a revenue figure, but it's based on the list price,

20   and then I start looking at other possible explanations and

21   other markets that might be thought to impact what's going

22   on in the recording market.

23   Q.  Let's stop there for a moment.  You looked at this data

24   which includes all of this sales data and you compared it to

25   file sharing data?

1  A.  Well, yes.  I have papers where I have put together

2  various estimates of file sharing, but what most of the

3  estimates show is that except for some small six-month

4  period in 2003 or so that file sharing seems to have gone up

5  almost continuously.

6  Q.  Okay.  Have you prepared a demonstrative that will help

7  you to explain the conclusion that you just provided?

8  A.  Yes.

9  Q.  Is this it?

10  A.  Yes.

11  Q.  I'll put this up.  Dr. Liebowitz, could you describe the

12  conclusion you came to after looking at this data using this

13  demonstrative which I believe the jury can now see on their

14  screens?

15  A.  Yeah, the hypothesis that file sharing might be harmful

16  to record sales was certainly consistent with the data.  You

17  can see here it starts in '73.  Now I only have it only

18  going through 2007 on this chart, but if I had 2008 because

19  I have the data, and I actually just printed off a slightly

20  wrong version of the chart, it would show that there was

21  another big drop in 2008, even though part of that may be

22  due to the economy in 2008.

23        But you see this, it goes up from '73, and it's

24  got its ups and downs, then 1999 comes along.  That's the

25  peak year.  Then I have the arrow saying Napster begins

1   because that's when Napster began, in 2000 is when it sort

2   of it bloomed and record sales started going down in 2000

3   and they just kept going down.

4   Q.  Let me ask a question about the point right where

5   Napster begins.  It appears as though the record company

6   sales actually started to decline before Napster began; is

7   that accurate?

8   A.  No.  What you have here is one number for 1999, and

9   that's the highest number on there, then another number for

10  2000.  The 2000 number is lower.  It's not like when you go

11  between the two, it gives you what the sales are in the

12  middle of the intervening months between some point.  The

13  point represents the whole year, and all this is saying is

14  that 2000 had lower sales than 1999 did.

15  Q.  So if you had actually analyzed this on a month-by-month

16  basis, you may have seen continued growth up until Napster

17  began and then the decline; is that what you're saying?

18  A.  Well, you may have.  As a matter of fact, in one of my

19  papers, I take a look at six-month intervals of sales

20  because these actually do appear in the more recent years in

21  six-month intervals as I had actually measurements of the

22  size of Napster and then some of the replacements.

23        The linkage was pretty good.  There was one

24  six-month interval out of I think eight that I had that

25  didn't quite fit, but other than that everything else was

1   fitting pretty well with the bigger the increase in filing

2   sharing, the bigger the decrease in record sales.

3   Q.  So your conclusion was that the precipitous decline in

4   sales was as a result of file sharing?

5   A.  Well, not just from this chart.  From this chart I say

6   it's very consistent with the theory.  I then have to take a

7   look at alternatives to see if maybe something else is going

8   on that also happened between 1999 and 2000.

9   Q.  What alternatives did you consider?

10  A.  Okay.  There are the obvious ones that occur to

11  economists right away is maybe something is happening with

12  the economy, particularly early on where there wasn't that

13  many years intervening, but it turns out if you take a look

14  at the impact of the economy on record sales and the period

15  prior to 1999, there is a linkage.  When the economy does

16  better, record sales up; and when the economy does worse,

17  record sales go down.  It's not a terribly strong linkage.

18  It would take a tremendous change in the economy to lead to

19  a substantial change in record sales.

20       There was a recession in 2001, but it wasn't

21  anywhere strong enough to be able to cause the type of

22  decline that you see by 2001, then the economy did fine

23  after that, and yet the record sales continued to go down,

24  so basically ruled out the economy as the cause of the

25  decline.

1  Q.  Okay.  What other factors did you consider as possible

2  reasons for the decline?

3  A.  Okay.  Well, since these are quantities that are being

4  measured here, another possibility would be if the price

5  went up.  There's an inverse relationship between price and

6  quantity.

7  Q.  Price of sound recordings?

8  A.  The price of the sound recordings.  It's known as law of

9  demand in economics, the higher the price you charge, the

10  less you sell, and so if suddenly prices had gone up, and

11  then they kept going up, that could explain this decline in

12  quantity, but when you looked at what the price was, at

13  least the list price, there was no increase that occurred

14  after 1999.

15        Not only that, there was a shift from record

16  stores to big box retailers to some extent, to the Wal-Marts

17  and the Targets of the world, and they tend to have lower

18  prices and lower markups than the record stores did so that

19  the list price could be constant but the transaction price

20  was probably going down, so price going up also would not

21  seem to be a reasonable explanation for this.

22  Q.  Not economic recession, not pricing, what else could it

23  have been?

24  A.  Okay.  Took a look to see if the possibility of

25  prerecorded movies could be doing it.  DVDs were becoming

1  popular in the early 2000s, and what I did was took a look

2  at the market for both sales and rentals of VHS tapes first

3  and then DVDs after and combined them altogether to see how

4  much people were spending on movies, and if it was going to

5  explain what's going on here, what we should have expected

6  would be all of a sudden in 2000, there should have been a

7  big bump-up in the expenditures that people were making for

8  prerecorded movies.

9         In around 2000, 2001 there was a small bump-up in

10  prerecording movies but it had sort of peaked in 2004 and

11  starting going down after that, so it's inconsistent with

12  this continuous decline that we see in record sales or CD

13  sales since 2000.

14  Q.  Okay.  Let me cut you off and try to move this along for

15  the Court and everybody.  What other factors did you look

16  at?

17  A.  Okay.  I looked at video games, same type of story, was

18  there an increase suddenly in video game sales in around in

19  2000, and the answer is no.  There was an increase in video

20  games, but it started in early to mid-1990s, well before the

21  decline here.  It didn't stop until 2003 or so, then it

22  started going down, so, again, it's inconsistent with what

23  we see happening to record sales as an explanation of an

24  alternative usage of people's money and time.

25  Q.  So you looked at all these alternatives, it wasn't any

1    of these other factors, and did you ultimately then come to

2    the conclusion that file sharing was the reason for the

3    precipitous decline of record company sales?

4    A.  Yes.

5    Q.  And have you ever tried to confirm that conclusion by

6    analyzing the issue in any other way?

7    A.  Yes.  I took one more stab that was different.  I took a

8    look at essentially the hundred largest cities in the U.S,

9    and I took a look at the record sales in the hundred largest

10   cities to see how sales had changed over time starting just

11   before file sharing and going to in this case 2003, which

12   was the last year I could go to given the data that I was

13   using, and I had several other variables that I was

14   controlling for, and the variable that I was most interested

15   in was the incident penetration in the city, which I was

16   assuming that the more people that had the Internet, the

17   more file sharing was likely to be going on in the city, and

18   I took a look using econometric techniques, which is what

19   economists use when they use statistics.

20   Q.  What was your conclusion when you looked at that?

21   A.  The conclusion was that file sharing was responsible for

22   all of the decline in record sales.

23   Q.  Can you identify the particular harm that Mr. Tenenbaum

24   has caused as a result of his activities in this case --

25   A.  No.

Q.  -- with respect to file sharing, I should say?

A.  No.

Q.  Why not?

A.  Because it's impossible to know what any particular set

of files that are sitting out there in the file sharing

system has had, who exactly is using them and then the

people that are downloading them, which of those people

would have purchased a sound recording in lieu of having

those files available.

Q.  Does that mean that Mr. Tenenbaum didn't necessarily

cause harm?

A.  No.

Q.  If file sharing were dramatically reduced, what would

you expect the economic impact would be on the record

companies' sales?

A.  I think there would be a very large increase in their

sales.

        MR. OPPENHEIM:  Thank you.  No further questions,

your Honor.

        THE COURT:  Why don't we take a brief break before

everyone explodes.  All rise for the jury.

        (A recess was taken.)

        THE CLERK:  All rise for the jury.

        THE COURT:  You can be seated.  We'll go to five.

Go on, counsel.  You can proceed.

CROSS-EXAMINATION

BY MR. NESSON:

Q.  Hello, Stan.

A.  Good afternoon, Mr. Nesson.

Q.  Stan, your fundamental opinion is one about property, the weakness of property law enforcement as the source of the problem; am I not quoting you correctly?

A.  I think that that's probably fair.

Q.  I meant to be beginning from the first paragraph of your report, the first paragraph, "The decline in sound recording revenues is due to a weakening in the property rights on the sound recordings which is brought about by file sharing." That's like the basic opinion?

A.  Whether that's the basic opinion, it's certainly an opinion that I have, and if you want to call it the basic opinion, I don't have a problem characterizing it that way.

Q.  Well, now, as I licensed to your testimony, I would have said that the issue to which you were testifying was the question whether file sharing caused the recording industry to lose money.  Did I misapprehend you?

A.  I'm trying to exactly figure out what the question is, if you'll forgive me, try it one more time.

Q.  I listened to your testimony, and I was asking myself, well, what's the point, and the point seemed to me to be

1    that you were attempting to advance the proposition that

2    file sharing caused the recording industry to lose money

3    precipitously?

4    A.  Yes, that's correct.

5    Q.  That's basically it?

6    A.  That was what the testimony was about to a large

7    extent.

8    Q.  Right.  But that's not the issue in this case, the issue

9    in this case is whether Joel Tenenbaum infringed copyright,

10   and if he did, what would be the just damages to award?

11           MR. OPPENHEIM:  Objection, your Honor.

12           THE COURT:  What the issue in this case will be

13   will be framed by the jury instructions and closing

14   argument.  If you have a question to the witness, you should

15   put it to him.

16   Q.  Would you connect your testimony, the point of your

17   testimony, to that issue?  How do you see it connecting?

18   A.  I'm an economist.  I was asked to come here and discuss

19   what the economic impact of file sharing was on sound

20   recording sales.  That's what I was asked to do, and that's

21   what I've done.  My report covers that.  It also covers some

22   material about the nature of the markets that you might

23   expect to come to grow after the Internet becomes powerful,

24   whether or not there were mistakes made in that market, and

25   that's what I talked about in the report.  The testimony

1    didn't cover all of that, but what you're asking me sort of

2    outside my area of expertise as far as I can tell.

3    Q. Well, it's apparently within your expertise to lead with

4    in your report, "The decline in sound recording revenues is

5    due to a weakening in the property rights on sound

6    recordings, which is brought by file sharing"?

7    A. Right.

8    Q. And I would like to explore that.

9    A. Go right ahead. That's fine.

10   Q. Good. Let's start with property. What is property?

11          MR. OPPENHEIM: Oh, sorry, objection.

12          THE COURT: Mr. Nesson, have a more pointed

13   question.

14   Q. Do you see a distinction between stealing a CD from a

15   record store and clicking on a computer screen to download a

16   free floating MP3 file?

17          MR. OPPENHEIM: Objection.

18          THE COURT: Sustained. See a distinction in

19   general? In the abstract? Do you see a distinction in

20   terms of the impact on the market? That might be an

21   interesting question.

22          MR. NESSON: Well, if I may, your Honor, I'm

23   asking what's the relevance of impact on market. I see that

24   as a fair use issue, but I don't see that --

25          THE COURT: All right. Then you ought to have

1    moved against this witness before he began to testify.  Ask

2    a question.

3    Q.  Well, let me preface the question by saying at least to

4    me it seems that the heart of the case lies in the

5    difference between atoms, which were the product of the

6    record industry up until 1999, and bits which became the --

7           MR. OPPENHEIM:  Objection.  We're at testimony

8    here, not a question.

9           THE COURT:  Sustained.

10   Q.  Stan, you -- excuse me, Dr. Liebowitz.

11   A.  Stan is fine.

12          THE COURT:  Actually Dr. Liebowitz works in this

13   court.  Go on.

14   Q.  Dr. Liebowitz, you look at the recording industry as a

15   money-making machine from a period that starts in 1973

16   through, if you add what the data you now have, 2008?

17          MR. OPPENHEIM:  Objection.  It misstates his

18   testimony.

19          THE COURT:  You can have it, go on.

20   Q.  I'm interested in looking at what the property actually

21   is.  We're talking about songs.  Start with me with the idea

22   of relating the song as an idea of property to property

23   rights and the strength of their enforcement.  Start with me

24   in the days of sheet music.  Was property law enforcement

25   strong when there was no technology other than printed on a

1    piece of paper and put it out?

2    A.  Well, I haven't investigated the sheet music era.

3    People would be able to hand copy obviously, but that would

4    be hard and laborious, and, presumably, and it's only a

5    presumption, there might not have been that much copying

6    going on because of the costs of taking sheet music, which

7    is a difficult type of a thing to make a copy of by hand,

8    it's not like we're just talking about transcribing words,

9    so it might have been reasonably well protected in that even

10   though back in the days of sheet music you could still get a

11   printing press and make copies if you wanted the way

12   commercial pirates can make copies of CDs and whether or not

13   there was a lot of that going on in the sort of the

14   pre-electronics era, so to speak, I don't know, so maybe

15   they were shown property rights, maybe not.  I'm not in a

16   position to really say.

17   Q.  Well, so what you're suggesting though is that there's a

18   relationship between the strength of the property right and

19   the surrounding technological environment, am I correct, if

20   it's the case that it's hard to copy, then it's like having

21   your property locked up in a safe, it's like, okay, it's not

22   that hard then for the law to come in and protect it when

23   it's inside a safe; am I getting you right?

24          MR. OPPENHEIM:  Too many parts, I can't follow

25   what he's asking.

1          THE COURT:  I think I followed it, yes, you can

2     have that question.  Go on.  You got a real question.  Go

3     on.

4     A.   I believe there's a relationship between property rights

5     and technology and the law, but it's very general, so it

6     would be true for physical property, and it would be true

7     for more ephemeral property like ideas and music and

8     whatnot, books and words, but in order to have effective

9     property rights, you normally have to because people will

10     often take things that are freely available if they don't

11     see any penalty to doing so, you need to have some sort of

12     legal regimen that basically says don't do it, and then you

13     also have to have some mechanism of enforcement, and when

14     you have the two, then the property rights tend to be well

15     defined and reasonably strong.

16          When there's a problem with either one of those,

17     if a farmer can't keep people from going on his field and

18     taking his corn, then he has weak property rights, and he's

19     going to stop growing corn, and that's --

20     Q.   That's an excellent example, the frontier, the notion

21     that in the frontier, you take care of yourself, you're

22     lucky if there's a sheriff somewhere in the area, and you

23     build fences, and you basically are strong in your own

24     property, and the law backs you up, you got fences, but the

25     law is out there somewhere.  That's the real picture.

1   Now --

2   A.   It's not just --

3           MR. OPPENHEIM:  Objection.

4           THE COURT:  Sustained.  Objection is sustained.

5           MR. OPPENHEIM:  Can we strike that, please?

6           THE COURT:  That may be struck.  Mr. Nesson is not

7   testifying, and there's also a question about whether the

8   philosophical discussion is beyond the expertise of this

9   witness and whether the philosophical discussion is indeed,

10  if it's not beyond the expertise, even if the witness

11  engages in it, beyond the scope of his direct examination.

12  Next question, Mr. Nesson.

13  Q.   When did the music business start to make money?  When

14  in history did it start to make money?

15  A.   I can't answer that question.  I don't know.  I haven't

16  examined the beginnings and the definition of the music

17  market, music industry.  I'm not sure.  Music has been

18  around a long time, and I have not discovered or examined

19  what was going on in the middle ages, if money was being

20  generated.  I presumed somebody was in fact generating

21  revenues from music.

22          THE COURT:  This is going to be a very long trial

23  if we're going back to the middle ages.  Go on, Mr. Nesson.

24  I'm waiting for a question.

25  Q.   I'd like to start with the music business based on sound

1    recordings.  When did that business start?

2    A.  Well, that's a lot easier, sound recordings got invented

3    in the late 1800s, and the business started to grow in the

4    early 1900s.

5    Q.  When they could take a sound recording and put it in the

6    form of atoms that they could sell as a product, right?

7            MR. OPPENHEIM:  Objection, your Honor.  This

8    clearly exceeds the scope.  It's not relevant.

9            THE COURT:  Sustained.

10   Q.  The music business, am I right, starts I believe you had

11   it starting with vinyl and then going to cassette?

12           MR. OPPENHEIM:  Your Honor, I don't believe he's

13   an expert in the history.

14           THE COURT:  Let me turn this into a question.  The

15   chart that you produced, was that a chart that included

16   vinyl and cassettes, or was it something less than that, the

17   chart that you put on the screen?

18           THE WITNESS:  It included vinyl and cassettes.

19           THE COURT:  Okay.  Next.

20   Q.  And this upward trajectory in the music business is one

21   that follows the progression from vinyl as a product to

22   cassette to CD and peaks in 1999, that's the picture of your

23   chart?

24   A.  Yes.

25   Q.  All right.  Paragraph 31 of your expert report, you say

1   sound recording firms as a group should not have been harmed

2   by the Internet?

3   A.  I can find it, but that sounds about right, yes.  I'm

4   sure you're reading it correctly.

5   Q.  Why should it be that when the Internet happens, a

6   business that's had a wonderful trajectory based on atoms

7   but now finds itself in a digital marketplace starts to go

8   in decline?  Is there any surprise in that?

9   A.  Yes, there is.  The Internet is a great innovation, it

10   lowers cost.  Normally when there's an innovation that

11   lowers cost in an industry, it allows the industry as a

12   whole, both consumers and producers, to benefit.  That's the

13   reason that innovation is good because it makes society

14   wealthier, and some of that wealth goes to both parties.  I

15   talk about this in my Internet book, the Rethinking The

16   Economy book, and what I say there is when the new

17   innovation comes along, the old players may change.

18        You may very well have the companies that were

19   doing business the old fashioned way not be able to catch on

20   to what works in the new technology, but the industry which

21   will consist of both the old players and whoever then

22   perhaps replaces them should do fine.

23        This is a type of technology where if you just

24   look at the cost savings the Internet entails, people can

25   get their music faster than they could ever get it before,

1   they could check out what it sounds like in the snippets as

2   they could never before, you don't have a retailer keeping

3   it in stock, which is costly.  There's all these great

4   advantages.  That should have lead to the industry being

5   better off, which includes both the producers and the

6   consumers.

7          What was the fly in the ointment in that story was

8   that there was this other component that is not a necessary

9   part of the Internet but is something that the Internet

10  helped in this case to create, which was file sharing, which

11  sort of said yes, everyone be better off by the innovation,

12  but now we're going to have this other change, which is

13  we're going to allow people because of the Internet they're

14  going to be able to make copies of music that they otherwise

15  would have been able to buy and at a lower price because of

16  the Internet, but now they're going to get it for free, and

17  that's going to wind up taking money away from the

18  producers, and that what's changed the story from one where

19  both parties were benefiting.

20  Q.  I would like to read from your book, if I may.  This is

21  Rethinking The Network Economy, the book for which you won a

22  prize.  This is a paragraph at the top of which the heading

23  is, "The Bottom Line.  The impact of pirating has often been

24  misunderstood, and copyright owners have frequently -- "

25          MR. OPPENHEIM:  Objection.  I think this is

1    hearsay.  If he has a question, ask the question.  I'm sure

2    Dr. Liebowitz is happy --

3           THE COURT:  Is this an inconsistent statement,

4    Mr. Nesson?

5           MR. NESSON:  Yes, I'd be delighted to have

6    Dr. Liebowitz read it.

7           THE COURT:  Treat it as an inconsistent statement.

8    If you believe you have a statement that you believe is

9    inconsistent on the stand, you can have it and read it just

10   as you are so he can have an opportunity to explain it,

11   which is what you're doing, which is a fair question.

12   Q.  Yes.  "The Bottom Line.  The impact of pirating has

13   often been misunderstood, and copyright owners have

14   frequently claimed harm when little or none was occurring.

15   This was true for many copying technologies, nevertheless

16   record companies and copyright owners are right to fear

17   Internet-based copying of digitized products.  It is a

18   potentially serious threat to their well-being.  Still the

19   arguments against Napster and its relatives remain basically

20   theoretical.  As strong as they appear to be, it is somewhat

21   premature to say we know what will happen one way or another

22   since there is yet no compelling and empirical support.  The

23   evidence that has been put forward up to this time doesn't

24   clearly point even to the direction of the impact, let alone

25   the magnitude."

1    A.  I agree with every word.

2    Q.  You stand by it?

3    A.  When I wrote it, remember, I wrote it in 2001.  It takes

4    a while for data to come out.  I was referring to the

5    Napster case where I was saying the evidence that was being

6    put forward to claim that Napster was harmful to the

7    recording industry was insufficient and didn't make that

8    point, but I also say that I think the Judge came to the

9    right decision but for the wrong reason, she didn't have

10   enough evidence to come to the right decision but that

11   ex-post we would discover it was the right decision because

12   file sharing was likely to be harmful, but at that point in

13   time we didn't have the information to know whether it was

14   harmful or not from an empirical point of view.

15        THE COURT:  We're going to stop here.  Ladies and

16   gentlemen, please don't read about the case, don't talk to

17   anyone about the case.

18        MR. OPPENHEIM:  I'm sorry, your Honor, if

19   Mr. Nesson has only a few more questions, Dr. Liebowitz is

20   supposed to return home to Texas tonight.  If he's going on

21   for a while, he'll have to stay over.

22        THE COURT:  Mr. Nesson, how much more do you have?

23   That's only part of the inquiry, my inquiry is my poor

24   jury.

25        MR. OPPENHEIM:  Of course, your Honor.

1          THE COURT:  How much longer would you have?

2          MR. NESSON:  I have quite a bit.

3          THE COURT:  I imagine you would, and looking at my

4     poor jury, I can imagine we ought to stop now.

5          MR. OPPENHEIM:  Fair enough, your Honor.

6          THE COURT:  I'll talk to the lawyers to make sure

7     we're on schedule.  Don't about the case to anyone, don't

8     research the case.  God knows, don't go online about the

9     case, and we'll see you first thing tomorrow morning.  All

10    rise for the jury.  Please leave your books on the chair.

11          (JURORS EXITED THE COURTROOM.)

12          THE COURT:  The witness is excused.  Where are you

13    in your case, counsel?  Everyone can be seated.  Where are

14    you in your case?

15          MR. OPPENHEIM:  Your Honor, I have I believe three

16    more witnesses not counting two very short meeting

17    witnesses.

18          THE COURT:  And Mr. Tenenbaum would be the major

19    witness tomorrow; is that right?

20          MR. OPPENHEIM:  Yes, that's correct.

21          THE COURT:  Let me say something generally, I was

22    surprised, I have to admit, that the plaintiff both opened

23    and put on testimony with respect to market.  This was

24    something that Mr. Nesson had said a moment ago that I

25    thought that the market issues were fair use issues which I

1    indicated were out of the case.  In any event, having opened

2    with that issue and having put on a witness, then the

3    defendant is certainly entitled to cross-examine.

4         If the defendant thought that the market issues

5    were beyond the scope of the case since this was a witness

6    that was listed on the plaintiff's list for some time, then

7    we would have expected a motion in limine.  So we're in an

8    area which I never expected the case to be about, for

9    whatever set of reasons, but certainly you having put it on,

10   the defendant has a right to cross-examine.

11        The cross-examination has to be more pointed.  You

12   are sliding into argument.  I understand your argument, the

13   jury understands the argument, you don't need to have that

14   argument come out of the mouth of this witness, so we'll

15   start with this witness tomorrow, but I anticipate that the

16   plaintiff's case will be over tomorrow.

17        Okay.  Then my office is preparing jury

18   instructions, which we'll e-mail to you, which are draft

19   jury instructions so that everyone can have them as sort of

20   a discussion draft so that as soon as the evidence is

21   completed, we can go immediately into arguments and

22   closings.  How many witnesses?  Will you be able to put your

23   case all on Friday?

24        MR. NESSON:  Yes.

25        THE COURT:  All right.  Then that would be fine.

1    I think that's all that we need to address.  Again, I'll be

2    in at 8:30 if anyone has any issues that they want to

3    address in advance.  Mr. Oppenheim, are you standing to

4    stretch, or do you have something to say?

5            MR. OPPENHEIM:  That as well as asking you a

6    question.  When would the Court like to hear argument with

7    respect to the issue in the order last night regarding --

8            THE COURT:  Oh, we can do that, why don't we do

9    that at the break tomorrow.  That would be helpful.  I have

10   drafted a willfulness instruction based on what I thought

11   the law was.  I understand the language that has been

12   recited by Judges in these kinds of cases, but I also think

13   Mr. Nesson has a very interesting point about the structure

14   of the statute and how willfulness has to be more than just

15   knowledge.

16           Mr. Nesson's point was that this was a

17   three-tiered statute request with sort of an innocent

18   infringer who doesn't know anything, then the willful

19   infringer in between is the person with knowledge, and

20   willfulness should be a higher standard.  We have drafted

21   proposed instructions which we'll send to you should be

22   momentarily, and then we can talk about that at the break

23   tomorrow.

24           MR. OPPENHEIM:  Okay.  Your Honor, we would

25   frankly like to address for the Court and would suggest in

1    te proposed instructions something different than what we

2    think a clear legislature, leave aside the abundance of case

3    law, including some very well esteemed judges but also very

4    clear legislative history with it.

5         THE COURT:  Well, if you can provide me with the

6    legislative history.  As I said, I'm open to it.  Mr. Nesson

7    was making a logical argument which actually struck me as a

8    very interesting argument, it can't be you create a special

9    category which you then define to be simply with knowledge,

10   doing, infringing, violating someone's copyright with

11   knowledge of the infringement seems to me to define the $750

12   to $30,000 group and that willfulness is arguably more.

13   We've crafted instructions I think which we borrowed from

14   patent law or from other sources.  We'll provide them to

15   you.  If you think I'm off base, show me the legislative

16   history.  That's why I drafted an order because it's an open

17   question.

18        MR. OPPENHEIM:  We are prepared, your Honor, to

19   discuss case law, the legislative history and the structure

20   of the statute which we believe absolutely demonstrates that

21   this concept in defense counsel's mind just simply isn't

22   present.

23        THE COURT:  As I said, I'm open to discussion.

24   I'll do it at the break tomorrow.  I don't think it affects

25   your presentation.  You're going to present what you're

1    going to present regardless, so we can make that as a

2    discussion later on.  We'll send you the draft instructions

3    by e-mail.  Thank you.

4              THE CLERK:  All rise.

5              (Whereupon, the hearing was suspended at

6    5:08 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2      UNITED STATES DISTRICT COURT )

 3      DISTRICT OF MASSACHUSETTS    )

 4      CITY OF BOSTON               )

 5                  I, Valerie A. O'Hara, Registered Professional

 6      Reporter, do hereby certify that the foregoing transcript

 7      was recorded by me stenographically at the time and place

 8      aforesaid in Nos. 03-11661-NG, 07-11446-NG, Sony BMG Music

 9      Entertainment, et al. vs. Joel Tenenbaum and thereafter by

10      me reduced to typewriting and is a true and accurate record

11      of the proceedings.

12                        _____

13                        /S/ VALERIE A. O'HARA

14                        _____

15                        VALERIE A. O'HARA

16                        REGISTERED PROFESSIONAL REPORTER

17                        DATED AUGUST 26, 2010

18

19

20

21

22

23

24

25
```