1          UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3    – – – – – – – – – – – – – – – – – –
                                      )
4    SONY BMG MUSIC                   )
     ENTERTAINMENT, ET AL.,           )    CV. NO. 03–11661–NG
5                                     )    CV. NO. 07–11446–NG
                                      )
6              PLAINTIFFS             )
                                      )
7    VS.                              )    COURTROOM NO. 2
                                      )
8    JOEL TENENBAUM,                  )    1 COURTHOUSE WAY
                                      )
9              DEFENDANTS             )    BOSTON, MA  02210
                                      )
10   – – – – – – – – – – – – – – – – – –

11

12

13              JURY TRIAL DAY 4

14              JULY 30, 2009

15

16

17                9:10 A.M.

18      BEFORE THE HONORABLE NANCY GERTNER

19      UNITED STATES DISTRICT COURT JUDGE

20

21

22

23

24           VALERIE A. O'HARA

25          OFFICIAL COURT REPORTER

1  A P P E A R A N C E S:

2      For The Plaintiffs:

3      Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ.,
    600 Atlantic Avenue, Boston, Massachusetts  02210-2211;
4
5      The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ.,
    7304 River Falls Drive, Potomac, Maryland  20854;

6      Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ.,
    1801 13th Street, Suite 300, Boulder, Colorado  80302
7
8      For the Defendant:

9      Harvard Law School, by CHARLES NESSON, ESQ.,
       1525 Massachusetts Avenue, Cambridge, Massachusetts
10  02138;

11      Feinberg & Kamholtz, by MATTHEW H. FEINBERG, ESQ. and
    MATTHEW A. KAMHOLTZ, ESQ., 125 Summer Street, Boston,
12  Massachusetts  02110.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **INDEX**
**EXAMINATION**
2    **Witness Name**                **Direct Cross Re-Direct Re-Cross**

3    STANLEY LIEBOWITZ
         By Mr. Nesson                       9                    47
4        By Mr. Oppenheim                          44

5    JOEL TENENBAUM
         By Mr. Reynolds            50             143
6        By Mr. Nesson                    104                    149

7    RON WILCOX
         By Mr. Oppenheim           154            175
8        By Mr. Nesson                    165

9    SILDA PALERM
         By Mr. Oppenheim           176
10       By Mr. Feinberg                  181

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1          THE CLERK:  All rise.  United States District

2  Court is now in session.

3          THE COURT:  Good morning, even.  There was an

4  issue people wanted to address?

5          MR. NESSON:  Yes, your Honor.  I had several

6  concerns.  I've been thinking very hard about the

7  distinction between these five songs and the 25 songs, and

8  the situation at this point seems to be, at least to me,

9  that they've done a very substantial job of proving the five

10  jobs and a less complete job with respect to the other 25.

11          It's now their intention to call Joel to the stand

12  and basically convict him out of his mouth.  Now, I

13  understand this is a civil case, and it's apparantly being

14  accepted practice in civil cases that the plaintiffs

15  prosecuting their claim can call the defendant and convict

16  the defendant out of his own mouth.

17          Given the fact that the penalty that is sought

18  here is actually a punitive penalty, there's no issue of

19  compensatory damage in the case.  I assert that the

20  structure that should prevail here is that they should not

21  be permitted to prove their case, meet their burden of proof

22  by calling my client to the stand being the first to be able

23  to introduce him to the witness, to the jury and then prove

24  the case out of his mouth.

1          So I want to ask your Honor to either exclude

2     those kinds of questions or permit me to instruct the

3     witness not to answer or to say to them they can't call Joel

4     at all, they'll have to wait for the defense, and the

5     defense can call Joel, and they can do what they want, but

6     that would permit me at the end of their case to make a

7     motion for directed verdict on the inadequacy of their proof

8     with respect to the 25 and not have it foreclosed by the

9     fact that they've called Joel and he's testified yes, I

10    downloaded, yes, I listened to the songs.

11          THE COURT:  Mr. Nesson, well, unless, do the

12    plaintiffs agree?

13          MR. REYNOLDS:  We do not agree, your Honor.

14          THE COURT:  I guess we have to start there.  The

15    time to claim Joel's rights with respect to the songs, if he

16    had any rights, not his rights with respect to the songs but

17    his rights to deny or not to answer would have been at his

18    deposition, and I have read his deposition, and there were

19    no limits placed on the questions that could be asked, and

20    he answered them.

21          The issue of -- I mean, the defendants in a civil

22    case have a right to call the -- I'm sorry, the plaintiffs

23    in a civil case have a right to call the defendant, have the

24    right to put his on his deposition, have a right to claim

25    admissions.  That's under the rules.

1          The statements out of his mouth at the depositions

2    comprise his admissions.  You have put a criminal gloss over

3    this, punitive gloss over this, which I plan to deal with at

4    the end of the case should the damages be substantial, but

5    in terms of the structure of the proceeding, nothing that

6    you're raising now suggests that this should change.

7          The issue, if anything, ought to have been raised

8    at the outset.  If you were concerned about protecting your

9    client, you ought to have protected him at the deposition

10   and not now.  Now the plaintiffs are doing exactly what they

11   have a right to do.

12        MR. NESSON:  I have no objection to them using his

13   deposition.  What I'm objecting to is him being forced to

14   take the stand and be convicted out of his own mouth.  I'm

15   not objecting to the deposition.

16        THE COURT:  Mr. Nesson, but you know in a civil

17   proceeding this is not improper, this is completely proper,

18   and the only question is whether or not the nature of the

19   damages here somehow transformed this structurally, and the

20   answer is that it seems to me at this moment, one doesn't

21   know that, and if there's an issue with respect to that, we

22   can deal with the damages, that's what we've talked about,

23   otherwise there's no such thing in the law as we know

24   between criminal, civil and almost criminal, which is what

25   you're suggesting.  It seems to me that the plaintiffs are

1    entitled to call Mr. Tenenbaum.

2            MR. NESSON:  So follow me one step further.  Given

3    your Honor's ruling, if I instruct my witness not to

4    answer --

5            THE COURT:  You would be in contempt.

6            MR. NESSON:  -- I will be in contempt.  Then what

7    happens?

8            THE COURT:  He will be in contempt if he doesn't

9    answer.

10           MR. NESSON:  Then what happens?

11           THE COURT:  Then whatever inferences -- well,

12   several things, there can be sanctions, there can be

13   contempt sanctions, which can be monetary sanctions against

14   you, monetary sanctions against your client, and there could

15   be evidentiary sanctions.  It also could result in a

16   mistrial of the entire proceeding which would have been a

17   mistrial that you created which has certain consequences.

18   It would essentially mean that your case would be over and

19   you would have lost.  Do I make myself clear?   Assemble the

20   jury now.

21           MR. NESSON:  Your Honor, I had at least one other

22   matter I want to bring up.

23           THE COURT:  All right.

24           MR. NESSON:  It has to do with Wayne Marshall.

25   I'll defer that.

1          MR. OPPENHEIM:  No, your Honor, we absolutely,

2    this issue needs to be raised.

3          THE COURT:  Wayne Marshall?

4          MR. OPPENHEIM:  Yes, because, your Honor, we were

5    provided this morning by Mr. Nesson a two-page, I'm not sure

6    what you call it, it looks like it's formerly an expert

7    report converted into a document putting us on notice of

8    what he intends to have Wayne Marshall testify to, and as an

9    initial matter, I note that the URLs that are listed here

10   are dated that they were added on 6-30, over a month ago,

11   and we're now getting the notice the morning before

12   Mr. Marshall's going to take the stand what it is that he as

13   a fact witness is going to show the jury.

14         THE COURT:  What's he going to show?  Is he going

15   to show how to use KazaA, is that what he's going to show?

16         MR. OPPENHEIM:  No, it has nothing to do with

17   KazaA, your Honor.  He apparently intends to use

18   Mr. Marshall to go on the Internet and show that certain U2

19   videos, all of the seven recordings that MediaSentry

20   downloaded, are available.  The reason that this is entirely

21   improper is, first of all, there are two reasons:  It's

22   entirely irrelevant.  These are streaming videos, your

23   Honor, that with respect to, for instance, the witnesses who

24   were already now on the stand are now gone, the universal

25   witness and the Sony witness are licensed.

1          Those companies get paid by U2 for having those

2     videos on the system, and they're streaming videos which are

3     entirely different than MP3 downloads.  We, of course -- our

4     witnesses are gone.

5          THE COURT:  You know what, first we have to finish

6     with Dr. Liebowitz, then you're going to have Tenenbaum, and

7     it seems to me we can address this at the break and not have

8     the jury wait.  Is the jury outside?  All rise for the jury,

9     please.  You can all be seated.  Is Dr. Liebowitz here?

10    Would you please take the stand.

11                    STANLEY LIEBOWITZ, RESUMED

12                    CONTINUED CROSS-EXAMINATION

13    BY MR. NESSON:

14    Q.  Good morning again.

15    A.  Good morning again.

16    Q.  Professor Liebowitz, I'd like to start from a place of

17    agreement with you.  Let us take as a point of departure for

18    our examination that I credit your point that you made

19    yesterday, that is, that the industry, this industry

20    represented by these particular companies lost money and

21    started losing money at the point where Napster made

22    peer-to-peer file sharing ubiquitous.  That was your

23    essential point.  We could contest, we could go over

24    different disputes, but let's just take that as a point of

25    departure.  And do we agree also, you certainly agree that

1   the reason for that has to do with a weakening of property

2   rights, we're together on that as well, are we not?

3   A.  Yes.

4   Q.  And we agree also, do we not, that the industry as

5   represented by these particular companies as a change takes

6   place in the industry from their focus on their CD business

7   to transitioning to a digital environment is, in fact, a

8   transition that will take place over time.  Do we agree on

9   that?

10  A.  Yes, we do.

11  Q.  That effectively started with Napster, that's when the

12  industry felt challenged?

13  A.  That's when file sharing began, so, yes.

14  Q.  And when the industry started to really respond say,

15  whoa, we've got to do something about this, this is a new

16  environment?

17      MR. OPPENHEIM:  Objection, foundation, your Honor.

18  He's not an expert on what the industry did.

19      THE COURT:  I don't know.  I think he spoke with

20  that breadth.  Go on.

21  A.  There are aspects that the industry took to try to

22  prevent the damage from file sharing, and I'm not sure if

23  you're talking about that alone or if you're also talking

24  about the emergence of the Internet as a form of

25  distribution of songs that also occurs legally.  Are we

1    talking about both of them or just the file sharing aspect?

2    Q.   Definitely both, the whole environment.

3    A.   The industry has a response to both, and they're

4    separate responses, so I just want to make sure when I'm

5    talking about what it is they're responding to, I may give

6    two answers because there may be a response to one and a

7    response to the other, and the two are quite different.

8    Q.   Let's work into it and see where it goes.  I also heard

9    you to say that as this transition takes place, it may be

10   that the market leaders in the original situation may not

11   turn out to be the same companies that emerge with the

12   successful business plan that will lead into the future?

13   A.   Correct.

14   Q.   That is when you're saying that the music business has

15   been injured or the business of dealing in sound recordings

16   has been injured in a way that causes loss, you're not

17   limiting your notion of that business to these particular

18   companies?

19   A.   No, but the statement that I made about how you might

20   expect after the event of the Internet occurs that the

21   people that become the dominent players may not be the ones

22   who are originally the dominant players was meant in a more

23   general sense of we have this new innovation, which is the

24   Internet, and even excluding the possibly of file sharing,

25   there's a new way to do business, there's a new way to

1   distribute your music, and the people who are successful at

2   selling the physical copies may turn out not to be those who

3   are most successful at selling the digital copies online.

4   That's really what I was talking about.

5        The file sharing is this other issue which

6   basically says everyone who's trying to sell music is likely

7   to be harmed because there are these other people making it

8   available for free, and that's -- I'm not drawing a

9   particular distinction.  It's some -- it's possibly an

10  interesting question, but it wasn't really what I was

11  referring to when I was saying that some firms may do better

12  than others.  It certainly is possible that some firms may

13  be able to find a way to make money outside of the normal

14  business, and, therefore, not be harmed as much by the file

15  sharing as other forms.

16       That's not really what I was implying when I was

17  talking about how the Internet might change, who the

18  industry leaders were.

19  Q.  Fine.  I'm eager to have you be as clear as possible and

20  for both of us to be as clear as possible with the jury.

21  What you're doing, and let me just say everything you're

22  saying is consistent up to this point, but what we're

23  focusing then on is different components of business model

24  that has allowed and will allow, will allow people in the

25  business of sound recording in some way to generate

1    successful business models that move into the future?

2    A.  Well,  --

3         MR. OPPENHEIM:  Objection.  That wasn't a

4    question.

5         MR. NESSON:  That is, that's a question.

6    Q.  Are we agreed that's what we're talking about?

7    A.  Well, it's always possible for any firm to develop the

8    successful business model in some other business, so there's

9    nothing unique about this particular business that would

10   have you believe that they're going to develop new business

11   models doing something else that would be profitable.

12   That's always possible.

13   Q.  And so just so we have end points, we have the beginning

14   point, 1999, napster, we have the end point pretty much

15   where we are today, that is, do you agree that at this point

16   you've seen change in the business model of the recording

17   company in the direction of now learning how to make money

18   in a digital environment?

19   A.  Well, from 1999, yes, certainly there are changes.  The

20   biggest change would be the rise of iTunes, and that's a

21   case of a company that was basically a computer company that

22   came up with a new business model to come up with a new

23   project, which was the iPod, which is very much successful,

24   made a lot of money on the hardware, then they came out with

25   iTunes, and it was very successful, and they made a lot of

1    money on that distribution.

2         That's the type of thing I had in mind when I said

3    we may have changes, we may find out some day that Apple

4    goes into the production of music and becomes vertically

5    integrated.  It's not impossible, I'm not saying it will,

6    but that's the type of thing that could happen when you have

7    a new innovation, in this case a distribution.

8    Q.  Yes, I'm totally with you.  So now just talk a bit about

9    the iPod and the innovation that that --

10        THE COURT:  Can you dispose of your editorial

11   comments?

12        MR. NESSON:  Yes, forgive me.

13        THE COURT:  It's totally inappropriate in front of

14   the jury.

15        MR. NESSON:  Forgive me.

16   Q.  Begin with the iPod, the iPod actually is a form, do I

17   have mine here, is actually a form of portable digital media

18   player, correct?

19   A.  Correct.

20   Q.  The current iPod, what would be the capacity if one goes

21   out and buys the best iPod you get, what would be the

22   capacity of the number of songs that one could be carrying

23   around now in a little pocket?

24   A.  I don't know the current number, but it was in the tens

25   of thousands, so it's very large.

1    Q.  Almost infinite music in your pocket.  That started, am

2    I right, with a media player called the Rio?

3    A.  That may well be right.  I don't off the top of my head

4    remember the exact sequences of MP3 players, but that was an

5    early one.

6    Q.  Now, I'll put it in the form of a leading question, but

7    isn't a fact that the Rio came on the market in 1999, '98,

8    '99, as an MP3 player that really appealed to the whole

9    market of those who had been downloading the free MP3s so

10   that they could move them from their computer into a player

11   and carry it around so they could listen to it?

12   A.  Well, I don't know the year that the Rio came out.  MP3s

13   had a value both for people who were ripping them from their

14   CDs, which prior to 1999 was mainly how many people were

15   getting them, and even afterwards it was a large form of

16   getting MP3s, and it would appeal to those people because it

17   allowed them to listen to music not just walking around but

18   perhaps by hooking it up to their stereo system as opposed

19   to being tethered to their computer.

20   Q.  Yes.  In fact, the thing that made that possible, is it

21   not the fact, was the format MP3 because it was not limited

22   by any kind of digital rights management that constrained it

23   to one particular machine, in fact, it was the essence of

24   the freedom of the MP3 that one could move it from one

25   device to another without constraint?

1          MR. OPPENHEIM:  Objection.  Foundation, misleading

2     and inaccurate.

3          THE COURT:  Sustained.

4     Q.  It is a fact, is it not, that the Recording Industry of

5     America sought to prevent the Rio from coming onto the

6     market claiming that it was just like Napster, another

7     technology for distributing free music?

8          MR. OPPENHEIM:  Objection.  Foundation,

9     misleading.

10          MR. NESSON:  Your Honor, we have --

11          THE COURT:  Sustained.  Go on, next question.

12     Q.  Is it not a fact then, Professor Liebowitz, that the

13     product they were competing with, and you say it's hard to

14     compete with free, the product that they were potentially

15     having to compete with was the free MP3 that was available

16     free on the net?

17     A.  Are you talking about the players or the MP3 files?

18     Q.  I'm talking about the product -- well, just answer my

19     question as best you can, then we'll work from there.

20     A.  Okay.  Because I thought we were talking about the Rio,

21     and now you're talking about MP3, and the Rio played MP3s.

22     Q.  Yes.

23     A.  The industry has had to compete with people making MP3s

24     available on file sharing networks, and even before file

25     sharing networks, there could be networks that were smaller

1   than file sharing networks of a group of people.  As far as

2   the -- I don't think that the industry was competing with

3   Rio and MP3 players, players were just a form of people

4   listening to the music by itself.

5   Q.  Yes.

6   A.  That might be something that was beneficial to the

7   industry.

8   Q.  But nonetheless the product -- well, I'll discontinue

9   it.  When was it that the industry first started offering a

10  directly competitive product to the free MP3 that is an MP3

11  product that the industry was actually putting out?

12  A.  I believe it would be about 2001, I think there was

13  something called Press Play, and there was some other

14  website.  Each one had a few of the majors backing it.

15  There were antitrust issues, but it's not something I've

16  written about in a lot of detail, it's something I've

17  mentioned from time to time, but I haven't looked at it

18  recently.

19  Q.  But when you wrote in your book in 2001 published in

20  2002, it was, was it not, your thought at that time that the

21  future evolution of the music business would be one that was

22  built on digital rights management, actually controlling

23  their product?

24  A.  Well, what I was saying was eventually the industry

25  should be based on digital distribution, but that was more

1   efficient than physical distribution, and I did put forward

2   DRM as a possibility of perhaps restricting the copying,

3   and, therefore, allowing the industry to be able to grow

4   without having to compete with people who were making files

5   available for free.

6   Q.  Yes.  And that was really your leading thought as to the

7   direction it would go, your money, in a sense, was on DRM as

8   the method by which the industry would succeed in

9   controlling its product in a way that it could charge a fee

10  for passing it out?

11  A.  I was hoping DRM would be successful in being able to

12  restrict copying and activities like file sharing.  I don't

13  remember thinking that I was saying that this is going to

14  happen.

15  Q.  No, I don't mean to put words in your mouth.

16  A.  It seemed to me that the best alternative I saw out

17  there for the industry to keep a business model where

18  they're still selling music, and, therefore, not having to

19  compete with what we can call piracy, which would weaken the

20  property rights, as we both agree.

21  Q.  Yes.  So when we talk about Press Play or the early

22  forms of distribution, digital distribution that the

23  industry engaged in, including iTunes, we're talking about

24  putting out a project that is encased in encryption so

25  unless that the industry gives its permission to someone in

1    the form of the passkey to get through the encryption, it

2    doesn't float free?

3           MR. OPPENHEIM:  Objection, your Honor.  Foundation

4    and it misstates the facts.

5           THE COURT:  If the witness can answer, can the

6    witness answer?

7           THE WITNESS:  Yes, I can answer.

8           THE COURT:  Go on.

9    A.  It is true that there was encryption on iTunes, and I

10   believe that there was encryption, even though I'm somewhat

11   vague in my memory now on Press Play, Press Play was more of

12   something I kept reading about, but I never actually

13   experienced it, so I don't remember what they were using.  I

14   didn't remember if Microsoft had created their management,

15   digital rights management at that point.

16           It never won.  It does provide some limited amount

17   of protection, but it's very easy to defeat, and so it

18   really wouldn't stop anybody who really wanted to take those

19   files and make them available to others.  On iTunes, for

20   example, even when it had the fair play on it, all you had

21   to do was say that you wanted to make it a CD, which you

22   were allowed to do by hitting a little button on the screen,

23   and then you take the CD and you rip it, as you would do

24   with any other CD, and you had the MP3 files.

25           So there was a little bit protection, and if you

1   followed the protection and you didn't make a CD out of it,

2   then I think you were limited to five machines, but it

3   wasn't a very strong form of protection and it wasn't going

4   to stop file sharing in any serious way.

5   Q.  In fact, that very process that you're describing, that

6   is, the fact that you can put some form of digital rights

7   management, but if you put too much, you can't really sell

8   the product very well?

9   A.  I didn't say that.

10  Q.  It's true.  So when then was the first time that the

11  industry actually put out the recording not in a digitally

12  rights confined format, even though kids could break through

13  it if they worked at it, but in open MP3, playing open MP3

14  so when you bought for 99 cents on Amazon, you could put it

15  on your MP3 player, you could move it around, you could do

16  whatever you want with it, when did that start happening?

17  A.  I don't remember the exact date.  I think it was Amazon.

18  I don't know.  We're in 2009, time goes so fast, maybe 2007,

19  I don't really remember exactly.

20  Q.  Well, we can agree 2007 is just fine.

21       MR. OPPENHEIM:  Objection, your Honor.  He said he

22  didn't know.

23       THE COURT:  Sustained, sustained.  As I mentioned

24  to you, what the lawyers say is not evidence.  I need to say

25  that again.  Go on.

1   Q.  In your report, you offer a very compelling analogy to a

2   jewelry store.  Do you recall that?

3   A.  Yes.

4   Q.  Would you describe to the jury your jewelry analogy?

5   A.  I remember that I had one.  Give me a second.  What's

6   the paragraph number?

7   Q.  Here, I'll give it to you.

8   A.  What did we say the tab was?  Looks to me, okay, I found

9   it.

10          MR. OPPENHEIM:  I think it's F.  Try G.  I'm

11  sorry, try Exhibit G.

12  A.  I have the exhibit.  I just need the paragraph number.

13  Q.  37.

14  A.  Okay.  Okay.  Yes, now I remember.  The example I gave,

15  there was someone who was trying to run a jewelry store, the

16  jewelry store kept getting robbed, therefore, the owner was

17  unable to make a profit, went out of business and goes to

18  work as a salesman in someone else's jewelry store, and I

19  give that as an example of someone essentially changing

20  business models, if you will, okay, that there's this set of

21  events, in this case the robberies that make it impossible

22  for that person to make money in their current business,

23  and, therefore, they go and they do something else where

24  they can be more successful, in this case, whatever the

25  salesman makes in the jewelry store.

1       My point was to show that the fact that you can go

2   and do something else that you might be relatively

3   successful at or not by itself doesn't show that there was

4   no harm caused by the robberies.  This person wanted to own

5   a jewelry store, and they take the entrepreneurial risks,

6   maybe it will make money, maybe it won't.  They're their own

7   boss, and then they see what happens, and it turns out it

8   went bad because of the robberies.  The robberies didn't

9   necessarily do him a favor.  Normally we think that they

10  made him more soft and he was forced into not doing what his

11  preferred job was and instead doing something that was not

12  his first choice.

13      Now, it may turn out he's very successful as a

14  salesman, but that's not what he wanted to do and that was

15  not his first choice, and so the point was the robberies did

16  cause harm to the owner of the jewelry store.  That was what

17  the point of those paragraphs was.

18  Q.  That the vandals who are robbing the jewelry store and

19  not being prevented from doing so by the law?

20  A.  Right, it was a weak property rights.

21  Q.  Weak property right because the law wasn't there to stop

22  him and the vandals then drive the jewelry store owner out

23  of that particular business into another business, that's

24  your example?

25  A.  That's correct.

1  Q.  I ask you to imagine the following that what happens is

2  not that vandals rob the store but that the environment

3  changes in some magical way so that the product that he's

4  selling, jewels, atoms, actually turn to bits in A way to

5  make it possible -- not possible for the locks on the store

6  to work anymore so he gets the same result, jewels are out

7  there and he can't protect himself, but instead of imagining

8  that it's vandals who are coming and stealing out of his

9  store and the law just isn't there to back up the store

10  owner, we're imagining that --

11      MR. OPPENHEIM:  Objection, your Honor.  We've gone

12  beyond the question to argument.

13  Q.  Would it make a difference to you, Mr. Liebowitz, if the

14  jewels became bits in a way that was far more difficult for

15  the law to protect and enforce just as a matter of physical

16  change of the environment?

17  A.  No, the issue was one, and I was trying to make the

18  point that it was weak property rights.  If the property

19  rights became weak because they couldn't prevent people from

20  stealing, that would be one example.  If the property rights

21  became weak because all of a sudden all the locks on that

22  store stopped working, that would be another reason their

23  property rights would be weak.

24      If Captain Kirk flew by in his ship and Said,

25  "Beam me up those jewels, Scotty," that would be a weaker

form of property rights as well.  Any of those make it more

difficult for the owner of the jewelry story to have a

succesful business.

Q.  And we recognize then that there are two components to

the weakness of the law, one is, is it not the case, one is

the effectiveness of the locks on the product, the DRM, the

lock on the front door, the lock on the safe, the fence on

the yard, that's one.  How strong are the real world

impediments to somebody coming in and taking your property?

That's one.

The second is how strong is law enforcement in

terms of the number of police, the number of prosecutors,

the willingness of courts to come in and impose large

penalties, the ability of the system to train a large

audience of people that even though there are no locks still

they shouldn't pick up those jewels?

A.  There's also a third one.  It is true that --

Q.  Can we agree on those two?

A.  Those two affect property rights, but an important third

one that you left off was the people who were the potential

criminals, how many of them there are and how much effort

they're willing to put into stealing the jewels so that if

everybody happened to be very honest and the door to the

jewelry store was open because the lock had like stopped

functioning, if everyone walks by it, they may not know,

1    even though they know the lock is not functioning, they may

2    say it's his jewelry store and they're his jewels, I'm not

3    going to take them.

4         So that's the final part that's required for

5    property rights, and this may be a bit out of my field of

6    expertise, but if people have strong enough desires to break

7    property rights, then it's not clear that you can come up

8    with an enforcement mechanism that might be strong enough.

9    That's part of the equation as well.

10   Q.  So then three components, one is the strength of the

11   locks on the doors, the second is the amount of resources

12   that the government is willing to put into law enforcement

13   in order to stand behind the locks on the doors, if there

14   are, any and if there are not, just stand there all by

15   itself, and the third component that you identify is the

16   attitude of the populous with respect to the interest that

17   the property owners assert?

18   A.  On your second point, it's not just the government

19   providing protection, it's also a lot of self-protection.

20   People put a lot of effort into putting their own locks onto

21   doors, a lot of firms have their own security guards, and I

22   actually think I've read somewhere in the literature where

23   they were talking about the private enforcement is bigger in

24   terms of total expenditure than government enforcement of

25   rights.

1           THE COURT:  Counsel at sidebar, everyone, please.

2           (THE FOLLOWING OCCURRED AT SIDEBAR:)

3           THE COURT:  This was a witness who testified about

4    the potential impact on the market.  He's being

5    cross-examined about the legitimacy of the regulation to

6    begin with, the legitimacy of the copyright framework

7    entirely.  It's not an issue of foundation, it's an issue of

8    whether that has been put at issue in the case, put at issue

9    by your direct examination.  How much more do you have of

10   this?  I'm given you an enormous amount of leeway, but

11   you've not been cross-examining this witness on his

12   testimony.

13          MR. NESSON:  I will move on.

14          THE COURT:  In other words, you can't -- I know

15   what you're trying to do, and it's an interesting

16   discussion, but it's not appropriate here, so you will move

17   on.  Thank you.

18          MR. NESSON:  I will move on.

19          (SIDEBAR CONFERENCE WAS CONCLUDED)

20   Q.  You have your report there?

21   A.  Yes.

22   Q.  Would you turn to your paragraph No. 45 which is another

23   extremely interesting example you offer.  This has to do --

24          MR. OPPENHEIM:  Objection, your Honor.  What I

25   believe Mr. Nesson is about to address exceeds the scope of

1    the testimony that he was providing earlier and the fact

2    that it's in his expert report, which is not in evidence,

3    but doesn't suddenly put it at issue in this case.

4               THE COURT:  Can I see 45?

5               MR. NESSON:  It has directly to do with --

6               THE COURT:  Let me look at 45.

7               MR. OPPENHEIM:  May I approach, your Honor?

8               THE COURT:  Yes.  Actually I think that was in the

9    scope of direct examination.  That was concerning the

10   relationship between this proceeding and the fees that

11   artists and musicians get.  You can have it.

12   Q.  So, correct me if I'm wrong, the burden of your argument

13   here is that we need to keep the existing structure in order

14   to have the same level of perfect -- well, I don't mean to

15   put words in your mouth.  Here, you said it, please.

16              MR. OPPENHEIM:  Objection.  Foundation.  Can you

17   explain what here is because he's now raising an issue of

18   the evidence coming in.

19              THE COURT:  Why don't you ask a pointed question,

20   noncompound, simple question.

21   Q.  Do you assert as part of your opinion that in the

22   absence of strong property enforcement, the result would be

23   a decrease in the amount of music produced?

24   A.  I assert in general that weak property rights leads to a

25   reduction in the production of goods.  Music is one

1    particular industry, and I would assert that without

2    property rights of music that we'll have less music being

3    produced, so the answer is generally yes.

4    Q.  Now, you're familiar with the work of Professor Felix

5    Oberholzer-Gee of the Harvard Business School?

6    A.  Yes, I'm very familiar with him.

7    Q.  Very familiar.  In fact, he took the position that you

8    have opposed in some of your articles with respect to effect

9    on market?

10   A.  I have written very detailed critique of a paper that he

11   wrote with Professor Strumpf.  This is not the 2009 paper,

12   this is the 2007 paper.

13   Q.  Right.  Your critique of him was on what proposition?

14   A.  It was criticism of his analysis of the impact of file

15   sharing, and it was an examination or a re-examination, if

16   you will, of many of the statements and conclusions that

17   they reached, and I concluded that the data that they had

18   that they were willing to make public or that could

19   be -- they actually didn't make it public but that could be

20   examined by looking at outside data sources to get the same

21   data they had, that the results they were putting in their

22   paper were not the actual results that existed.  I was, in

23   other words, saying it was a dishonest piece of work.

24   Q.  But the proposition that you were disagreeing with them

25   on --

1          MR. OPPENHEIM:  Objection, your Honor.  The

2     Oberholzer-Gee report was excluded from this case, and

3     counsel is now trying to back door it through this witness.

4     It's not in.  It's not in this case at all.  If he had

5     wanted to call Professor Oberholzer-Gee, he could have.

6          THE COURT:  No, but you could examine an expert

7     witness on contrary positions and bring it to his attention

8     and see what he says about them.  The jury understands that

9     the person who's testifying is the person on the stand, and

10    this cross-examination is only insofar as it bears on this

11    witness', the weight you want to give to this witness'

12    testimony.

13          Mr. Nesson could refer to any other expert that is

14    in this witness' articles or that he deals with.  It has

15    nothing to do with it being produced, but, again, it only

16    bears of the weight of this witness' testimony.  Go on,

17    Mr. Nesson.

18    Q.  In fact, it was Professor Oberholzer-Gee and

19    Professor Strumpf who asserted the proposition that you

20    basically addressed in your 2007 article asserting that file

21    sharing had not damaged the financial, that it was not

22    responsible for the big dip that you have testified to?

23    A.  Well, they wouldn't want to have it considered an

24    assertion.  They claim that they had empirical evidence that

25    that statement was correct, and when I went through it to

1    the extent that I could, I said that in fact the evidence

2    that they were using to support that assertion in fact was

3    incorrect.

4    Q.  And, in fact, it's your response to that assertion that

5    was really the essence of your excellent testimony

6    yesterday?

7    A.  No, the testimony I gave yesterday was largely of

8    research that I had done that had nothing do with their

9    research, per se.  There are eight or ten papers that have

10   examined the impact of file sharing on record sales.  The

11   great majority find some degree of harm.  Minor among those

12   papers, there is this paper by Oberholzer-Gee and Strumpf

13   where their conclusion was that there was no harm being

14   caused.

15          That's the one that we were talking about the last

16   few questions, but the research I was talking about

17   yesterday really had very little to do with the

18   Oberholzer-Gee/Strumpf paper.  I had talked about everything

19   I believe that was discussed yesterday in papers prior to

20   and independent of Oberholzer-Gee's and Strumpf's work.

21   Q.  But the assertion that you were speaking to was counter

22   to the assertion that they made, it may be that you weren't

23   addressing the underlying --

24   A.  They have a different conclusion than I do.

25   Q.  Correct.  Are you familiar now with the Oberholzer-Gee

1    working paper that's just been recently circulated?

2    A.  Yes.

3    Q.  And are you then in agreement or disagreement with their

4    conclusion in that paper that since 2000, the annual release

5    of new music albums has more than doubled and worldwide

6    feature film production is up by more than 30 percent since

7    2003?

8    A.  I've learned not to trust what they say when they give

9    you usually unreferenced numbers like that, which is what

10   they have historically done.  They do give a reference this

11   time where they say that the number of albums is coming from

12   Nielsen Sound Scan.  They don't say who in Nielsen Sound

13   Scan, they don't say where you'll find that number.  The

14   problem is that Nielsen Sound Scan is a company, part of

15   A.C. Nielsen, it's related to them, they go around measuring

16   what's being sold in stores.

17          Anybody can register an album or CD with Nielsen

18   Sound Scan.  It costs $15 to get a bar code and send it to

19   Nielsen Sound Scan and then it shows up as an album.  That's

20   not the same thing as an album that one of the major studios

21   produces where they have professional musicians sitting in,

22   they have professional producers who are helping to produce

23   the record, they have professional equipment.

24          In the old days, people would have tapes, and they

25   would mail them in to as far as I can record companies, I

1    certainly see stories about that in movies and whatnot, and

2    they want to get a record contract.

3         Now instead of having a tape of your, you know,

4    band where you're trying to make it, you go and you put your

5    music online and you spend the $15 and you get the bar code.

6    What I'm pretty sure Oberholzer-Gee and Strumpf have in that

7    statistic are the total number of albums registered with

8    Nielsen Sound Scan, not the number of releases of

9    professionally-produced CDs.

10        I'd be very surprised, I don't know the number,

11   but given the decline in the revenues in the industry, I'd

12   be shocked if the number of CDs that were being produced by

13   professional musicians had gone up, so I think the number

14   that they're putting forward, which is very consistent with

15   the type of numbers they put forward in the past, are

16   extremely misleading.

17   Q.  So, their statement then, "While file sharing disrupted

18   some traditional business models in the creative industries

19   foremost in music, in our reading of the evidence, there is

20   little to suggest that the new technology has discouraged

21   artistic production.  Weaker copyright protection, it seems,

22   has benefited society."  You disagree with that?

23   A.  They do not give me any evidence that would lead me to

24   conclude that that was necessarily correct.  I haven't

25   studied the total number of productions of professional CDs,

1    and you could argue that there's both the nonprofessional

2    and the professional world, and there is the professional

3    and the nonprofessional world.

4         The paragraphs you tried to bring into evidence

5    before had to do with that.  Whether or not the number of

6    people trying to create their own bands has gone up or down,

7    I don't know, and they don't know that either, all they have

8    is this measure of bar codes, people who have bar codes on

9    their music, which has apparently gone up, but since we

10   didn't have it so easy to put your music online with bar

11   codes in the past, we're comparing apples and oranges.

12        We had a professional and an amateur world in the

13   past; we have a professional and amateur world now.  We have

14   some idea, there are some statistics in the past on the

15   number of professional CDs made.  We don't have any measures

16   that I've seen that indicate how many amateur groups are out

17   there putting out there their albums or the demo tapes.

18        Now the amateurs are being mixed in with the

19   professionals, and we have a new statistic, and the total of

20   the amateurs and professionals now is greater than just the

21   professionals before, but that doesn't mean whether the

22   total is bigger or smaller than it used to be.  They're not

23   giving us sufficient information.  If they got a measure of

24   all the old demo tapes, which, of course, would be

25   impossible to do, then they might be able to say we're

1   comparing apples and apples, but they don't do that.

2   Q.  So to come back to your report, on paragraph 43, you

3   move right on saying, "The true social harm caused by file

4   sharing is the reduced production of professional quality

5   music."

6   A.  That's right, because I'm talking about the market.

7   Q.  "The true social harm is the decrease in professional

8   quality music?"

9   A.  Right, the music that's being produced by the record

10  companies who are being harmed in terms of their revenues

11  going down, they'll produce less of the music.  That's a

12  natural implication from the reduced revenues, and,

13  therefore, we'll have fewer of those albums being produced,

14  and those happen to be called, I'm calling them

15  professionally produced music.

16  Q.  And would you then carry on with the jury and tell them

17  your Red Sox analogy that appears in I believe paragraph 45

18  which illustrates exactly your point as best you can do

19  it?

20  A.  My point merely was that you have amateurs and you have

21  professionals, and in many instances, the amateurs would

22  like to be professionals, and that's illustrated very well

23  in sports.  We have high school and college, football high

24  school and college, baseball, but we also have professional

25  baseball and professional football.

1           The argument that is sometimes made is that you

2    really don't need payment to get the product produced of in

3    this case say sports or music because there are lots of

4    people who are willing to engage in it for free, and there

5    are lots of people who are willing to engage in it for free,

6    but your local high school baseball game is not the same

7    thing as the baseball being played by the Boston Red Sox.

8           And if there's a difference between the product,

9    the quality of the product at the amateur level and at the

10   professional level, and if you don't allow the professional

11   level to exist, which means they have to have a form of

12   payment, if baseball had weak property rights and there was

13   no way to get anybody to agree to pay to go into the stadium

14   because everybody could get in for free, the turnstylists,

15   the locks didn't work, and so anybody who wanted could go in

16   for free, and the Red Sox wouldn't get any money.

17          And let's say anybody could watch it for free over

18   television, so they can't get any money from broadcasts, so

19   the Red Sox get no money, and they professionally disappear,

20   and your minor leagues disappear as well because they're

21   professional as well.

22          Then all we're left with is high school baseball

23   and college baseball, which may be very good entertainment,

24   but most people have a choice, they can go see the local

25   college games or they can go see the Red Sox.  They're

1    willing to spend a lot of money to see the Red Sox, they

2    seem to prefer the professional game to the local high

3    school game.

4          So, in my view, if the professional leagues

5    disappear, that's a loss to society because society had a

6    choice, there are amateurs out there, there are plenty of

7    them, they are professionals, people are willing to pay to

8    see the professionals, they prefer the professionals, even

9    with the payment because their behaviors are revealing that.

10   In a world where you don't allow any money to be collected

11   because the property rights are weak, the professionals

12   disappear.

13         Now, they'll still be plenty of baseball games,

14   but the Red Sox are gone, and when you apply that to music,

15   they'll still be people playing music, it's just the CDs

16   that are professionally made, which most of you when you

17   listen to music listen to one of those CDs, will disappear

18   and you'll a different type of music, which is more amateur

19   and it won't be as good.

20   Q.  So, you would agree that the Red Sox make money by

21   charging money at the gate just a way a performer who puts

22   on a performance charges money at the gate?

23   A.  When a performer holds a concert.

24   Q.  Yes, exactly.

25   A.  Yes.

1    Q.  So the performance business associated with music is,

2    what, one you're considering or not considering?

3            MR. OPPENHEIM:  Objection, your Honor.  I'm

4    concerned we're exceeding the scope.  I'm concerned about

5    time.

6            THE COURT:  Sustained, sustained.

7    Q.  The true social harm -- by the way, would your analogy

8    hold as well for basketball?

9    A.  No, basketball shouldn't be any different.

10   Q.  Just the same, just the same, March Madness.  The true

11   social harm caused by file sharing is the reduced production

12   of professional quality music.  Do you see other social

13   harms caused by the enforcement of this rule?

14           MR. OPPENHEIM:  Objection, your Honor.

15   Foundation, relevance, scope.

16           THE COURT:  His testimony was about economic

17   harms.  Objection is sustained.  Go on.

18   Q.  Does an economist consider economic harm to be only

19   measured by dollars?  Let me put it slightly differently.

20   In order to obtain a situation, preserve a situation of

21   strong property enforcement that would preserve your

22   business model even though they're now bits for the

23   recording industry, does an economist in considering the

24   pros and cons of doing that consider the costs of having

25   that rule?

1  A.  In general, we take a look at costs and benefits when we

2  take a look at the net value of any particular economic

3  item, so there is not a lot of work generally looking at the

4  costs of various institutional mechanisms because in part

5  it's hard to get those numbers, but as a general rule, we

6  want to look at costs and benefits.

7  Q.  Yes.  So if we start in 1999, Napster, at that point

8  would you agree that millions of people use Napster in an

9  environment in which they really didn't have any clear idea

10  whether it was right or wrong?

11          MR. OPPENHEIM:  Objection, your Honor.

12          THE COURT:  Sustained.

13  Q.  Do you agree that the recording industry reacted to the

14  Napster situation by engaging in what they call an education

15  campaign --

16          MR. OPPENHEIM:  Objection, your Honor.

17  Q.  -- in order to make people aware of their vision that

18  copying was wrong?

19          THE COURT:  Objection is sustained.  It was not

20  just their vision.  Go on.

21  Q.  Would you agree that the industry had what it saw as a

22  problem in the post-Napster environment of somehow

23  convincing a growing generation of youth that it was not

24  okay to download the free music?

25          THE COURT:  The objection is sustained.

1    Q.  Would you as an economist not take into account the

2    costs involved in the very rule that you project?

3         MR. OPPENHEIM:  Objection.  I don't even know what

4    the question means.

5         THE COURT:  Sustained.

6    Q.  Starting from your situation of weak enforcement, if one

7    were to move from the situation of weak enforcement to a

8    situation of strong enforcement, would an economist not

9    consider what the price to be paid is in terms of resource

10   expenditure, pain and suffering for people involved,

11   whatever your elements of value are in moving from the weak

12   to the strong?

13        MR. OPPENHEIM:  Objection.  Your Honor, can we

14   have a sidebar?

15        THE COURT:  Yes.

16        (THE FOLLOWING OCCURRED AT SIDEBAR:)

17        MR. OPPENHEIM:  Your Honor, while I'm finding this

18   personally interesting, love to have a beer with two of

19   these guys, we're far outside the scope.

20        THE COURT:  I agree.

21        MR. OPPENHEIM:  Professor Nesson has now gone

22   twice as long on cross-examination.

23        THE COURT:  That's not the point.  The examination

24   was about the economics of file sharing.  Mr. Nesson gone

25   out into bore aside to the structure of copyright law as

1    applied to online material, which is nullification, which

2    has nothing to do with his testimony and which is over.

3            MR. NESSON:  He says social cost, the primary

4    one.

5            THE COURT:  You've had an opportunity.

6            MR. NESSON:  I'll move again.

7            THE COURT:  I'm going to give you five minutes to

8    conclude, that's it.

9            MR. OPPENHEIM:  Thank you, your Honor.

10           (SIDEBAR CONFERENCE WAS CONCLUDED)

11   Q.  Professor Liebowitz, you speak in your report of a

12   network effect.  Would you explain to the jury what a

13   network effect is?

14   A.  Yes.  A network effect is a term we use to describe

15   products where the value of a product goes up, the more

16   other people there are who use the product.

17   Q.  All right.

18   A.  Let me just if you want the jury to understand,

19   telephone would be a product with network effects because if

20   there was nobody else who had a telephone, your phone

21   wouldn't be of any use to you because you couldn't call

22   anyone, but the more other people there are who have phones,

23   the more valuable your phone becomes because now you can

24   communicate with more and more people, so that's the network

25   effect.

1   Q.  With respect to network effect, would it be the case

2   that it would be a network effect if your product was being

3   widely talked about on the network, that that would actually

4   increase the value of your product?

5   A.  It really depends on what the product is.  People who

6   have -- who are selling advertising like to have as many

7   people as possible who then are going to be exposed to the

8   advertising, so they like very big audiences.

9           For products as a whole, having people talk about

10  it is usually of some benefit because it means that there's

11  a greater likelihood that they'll be knowledge about it and

12  people then may buy it, but if we're just saying people are

13  just talking about it but everything else is being held

14  constant, then for most products, that would be highly

15  irrelevant.  What the producers want is to sell more of

16  their product, and talk is fine, but it doesn't help you if

17  it's not translating into sales.

18  Q.  And you concluded the network effect here is not going

19  to affect, offset the potential damage to market that you

20  are seeing here in file sharing?

21  A.  I concluded that it was unlikely.  I may mention it

22  here, but I discuss it in much greater length in some of my

23  papers, and as you probably know, my secondary, which is

24  actually my bigger area of research than copying and

25  copyright is network effects, and what I suggest is that

1    there aren't likely to be strong network effects for music,

2    and the conditions that would be required for file sharing

3    to somehow increase network effects, and, therefore, lead to

4    a feedback mechanism that would lead to increased sales are

5    very unlikely to occur.

6    Q.  Do you revise your opinion in light of the very recent

7    experience that we've all been through following the death

8    of Michael Jackson?

9            MR. OPPENHEIM:  Objection, your Honor.

10           THE COURT:  Sustained.

11           MR. NESSON:  May I approach sidebar?

12           THE COURT:  No, sustained.  Go on.

13   Q.  Are you aware of any counterexamples to your suggestion

14   that network effect isn't likely to help music sales?

15   A.  I am certainly not aware of any examples that indicate

16   your point particularly strongly.  What happens when people

17   talk about one particular piece of music is that its share

18   of the pie may go up, so Michael Jackson's share of the pie

19   of all the albums that were being sold in the weeks around

20   his funeral went up, but that doesn't mean that the sale of

21   all albums went up.

22           And the network effect story in order to work has

23   to say all album sales go up, but when people talk about one

24   song, it means they're not talking about another, and what

25   that tends to do is to focus attention on particular songs,

1    and those songs have an increase in sales, but other songs

2    tend to have a decrease in sales, and so it's important to

3    be aware that network effects can help and talk can help and

4    attention can help drive purchase of music towards

5    particular albums, but that doesn't mean that the sales of

6    all albums went up.

7           It's something known as the fallacy of

8    composition, and I've written about that in several of my

9    papers.

10   Q.  And this will be my last subject, so your Honor needn't

11   be too concerned.  Your contention in your report is that

12   the decline is no way attributable to a stodginess on the

13   part of record companies.  Let's not use the word

14   "stodginess," let's use the failure of the industry to react

15   with alacrity in changing their business model, your

16   contention is that the whole question of business model and

17   change of it and who's responsible for changing it has

18   nothing to do with the issue of whether Internet has damaged

19   this industry?

20           MR. OPPENHEIM:  Objection.

21           THE COURT:  Sustained.

22   Q.  Would you explain to the jury why a business model makes

23   no difference to your conclusion?

24           MR. OPPENHEIM:  Objection, your Honor.

25           THE COURT:  Sustained.

1          THE WITNESS:  I actually want to answer that one.

2          THE COURT:  You can't.

3    Q.  So then the last question, why on the basis of your

4    conclusion that the graph has turned down and it's because

5    of file sharing?  Why on the basis of that premise does it

6    follow that it's just to punish a single individual who

7    began file sharing at a time when there was no competing

8    product from the industry and continued his file sharing up

9    to but not until the point at which the industry made

10   available an MP3 product?

11         MR. OPPENHEIM:  Objection, objection, objection.

12         THE COURT:  Objection sustained.

13         MR. NESSON:  Thank you very much, Dr. Liebowitz.

14         THE COURT:  Is there a redirect?

15         MR. OPPENHEIM:  Just a very few scant questions,

16   your Honor.

17                  REDIRECT EXAMINATION

18   BY MR. OPPENHEIM:

19   Q.  Good morning, Dr. Liebowitz.  If I may, a few questions

20   and we'll let you go.  You were asked earlier about a number

21   of papers by an economist by the name of Oberholzer-Gee.

22   Those papers are in evidence, but is there any doubt in your

23   mind that those conclusions are unfounded by the evidence

24   cited in those papers?

25   A.  I'm an economist, and I've seen plenty of economic

1    studies and I know enough that there's always doubt in my

2    mind.

3    Q.  Do you agree with the conclusions in those papers?

4    A.  No.

5    Q.  Do you have any opinion -- earlier you were asked about

6    two different responses by the recording industry to file

7    sharing, but you weren't asked what those two responses

8    were.  Could you describe very briefly what the two

9    responses were that you were referring to?

10   A.  Well, I'm not sure I actually remember what you're

11   referring to.  I don't remember the question where there

12   were two responses.

13   Q.  Fine.  I'll move on.  You were also asked by

14   Professor Nesson about changes in the marketplace and

15   revenues starting in '99 and going to an end point, and the

16   inference was that there's been a turnaround now.  Based on

17   the data you've looked at, are record companies still losing

18   sales?

19   A.  Oh, yes.  2008, which didn't show up on that chart, was

20   one of the biggest drops of any year.  Now, it is probably

21   the case that the economy caused some of that, so it may not

22   be that it would be the biggest or almost the biggest only

23   because of file sharing.  We do have this other factor in

24   2008, but there is not really much evidence of a let-up.

25   Q.  And you also were asked about the opinion that you

1    couldn't opine on whether any particular company would

2    succeed when new technologies developed only with respect to

3    an industry.  Do you have an opinion on whether, one way or

4    the other, on whether or not these particular plaintiffs in

5    this case should or should not succeed in the marketplace?

6    A.  Oh, the Internet should have allowed the industry to do

7    fine, not the current players necessarily, but because there

8    was a great improvement in the manner of distribution, that

9    lowered the cost tremendously and made it much faster for

10   consumers to get what they wanted, I would have thought that

11   that would have led to a growth in the industry.

12   Q.  You have no reason to believe that these record

13   companies would fail?

14   A.  That's right.  When you have a major change like that,

15   it disrupts things, and when things are disruptive, you

16   often have new players emerge and some of the old players

17   may disappear, but there's no reason to think that you can

18   say who's going to be successful and who's not.

19   Q.  And you have no evidence to suggest that these record

20   companies should fail?

21   A.  No.

22        MR. OPPENHEIM:  No further questions.

23        MR. NESSON:  I try your patience with more

24   questions.

25

RECROSS-EXAMINATION

BY MR. NESSON:

Q.  Dr. Liebowitz, do you agree that the proceeds from
digital sales by this industry have been steadily growing
since 2003?

A.  Yes.

Q.  And for every appearance will continue to grow?

A.  Yes, and I predicted in the 2002 book that eventually we
should see all sales, virtually all sales being conducted
over the Internet.

Q.  Do you agree that other scholars have recognized that
file sharing allows users to learn about music they would
not otherwise be exposed to and that that promotes new
sales?

A.  Other scholars have said that from time to time.  They
usually just say it, there's not much analysis where they
demonstrate it, but there are some surveys where people say
that.

Q.  Do you agree that other scholars have identified the
maturing of the CD market and consumer perception of the
high cost of CDs as a possible contributing explanation for
the decline?

A.  Read that again.

Q.  The maturing of the CD market and consumer perception of
the high cost of CDs contributes to the explanation of the

1    decline in the CD business?

2    A.   No, because since prices have not gone up, the only way

3    you might claim that prices have gone up is merely that

4    there's an alternative that's free, and compared to that,

5    prices may look like they've gone up, but they haven't gone

6    up, so that clause is actually wrong except for file

7    sharing.  As far as the maturing of the market, it's not

8    even if the market has become mature, you don't necessarily

9    expect a decline, and it's not clear when you would have

10   thought the market was mature.  It would seem to be mature

11   in some sense, I'm sure, if you looked at it in the 1970s,

12   and it would seem to be mature to some extent in the 1990s.

13   The fact that we're undergoing such rapid change indicates

14   it's not really fully mature yet, it's still changing a

15   lot.

16   Q.   The CD market?

17   A.   CDs are declining because there's in large part due to

18   digital distribution, and some of that's the legitimate

19   kind, and I would have expected the decline in CDs.  Yeah, I

20   didn't catch that we were only talking about CDs.

21   Q.   Would you agree other scholars have identified the

22   continuing corporate concentration of the music industry

23   leading to reliance on formulas and reluctance to invest in

24   new artists as possible --

25          MR. OPPENHEIM:  Objection.

1          THE COURT:  The objection is sustained.

2    Q.  Have you, yourself, ever conducted a study imploring

3    data of actual downloads of music files?

4          THE COURT:  The objection is sustained.  This is

5    beyond the scope of redirect.

6          MR. NESSON:  Thank you very much.

7          THE COURT:  Thank you.  The witness is excused.

8    Call your next witness, please.

9          MR. OPPENHEIM:  Your Honor, the plaintiffs call

10   Joel Tenenbaum.

11         THE COURT:  Mr. Tenenbaum.

12         MR. NESSON:  Your Honor, I object to this witness

13   being called by the plaintiffs.

14         THE COURT:  Your objection is overruled.

15         MR. NESSON:  Is it possible that we can take a

16   bathroom break?

17         THE COURT:  We can take a short break.  All rise

18   for the jury.

19         (JURORS EXITED THE COURTROOM.)

20         THE COURT:  Five minutes.

21         (A recess was taken.)

22         THE CLERK:  All rise for the jury.

23         THE COURT:  You can be seated.  Proceed.

24         JOEL TENENBAUM, having been duly sworn by the

25   Clerk, testified as follows:

```
 1                    DIRECT EXAMINATION
 2    BY MR. REYNOLDS:
 3    Q.  Good morning, Mr. Tenenbaum.  Would you please state
 4    your name for the jury.
 5    A.  My name is Joel Tenenbaum.
 6    Q.  Do you currently live at Commonwealth Avenue in
 7    Boston?
 8    A.  I do.
 9    Q.  And you own your condominium there with your mother?
10    A.  Could you clarify that?
11    Q.  You own your own condominium with your mother?
12    A.  I don't think with my mother.
13    Q.  Your name is on the deed with your mother, is it not?
14    Can I have an answer to that question?
15    A.  I don't know.  I'd have to look.
16            MR. REYNOLDS:  Your Honor, may I approach the
17    witness?
18            THE COURT:  Yes, you may.
19    Q.  Mr. Tenenbaum, have you had an opportunity to look at
20    the deed that I've just handed you?
21    A.  Yes.
22    Q.  And that's a deed for your condominium on Commonwealth
23    Avenue?
24    A.  Yes.
25    Q.  And you are listed as a co-owner with your mother,
```

1    correct?

2    A.  Yes.

3    Q.  You're a full-time graduate student at Boston

4    University?

5    A.  That's right.

6    Q.  You're in the physics department?

7    A.  Yes.

8    Q.  Is it a bachelor of science from Goucher College?

9    A.  It's a bachelor of arts from Goucher College.

10   Q.  And Goucher is in Baltimore, Maryland?

11   A.  Yes, it is.

12   Q.  It's a four-year program?

13   A.  It's in a suburb of Goucher.

14   Q.  You went to Goucher from 2002 to 2006?

15   A.  Yes.

16   Q.  And while you were at Goucher, you spent the majority of

17   your time during the summer at your home in Providence,

18   Rhode Island, correct?

19   A.  Yes.

20   Q.  I want to go over some of the computers you've used

21   during the relevant time period.  There was a computer in

22   your bedroom in Providence, Rhode Island, correct?

23   A.  Yes.

24   Q.  It was a PC desktop?

25   A.  Yes.

1  Q.  It was purchased in approximately 1999?

2  A.  That doesn't sound off.

3  Q.  And that computer had access to the Internet through Cox

4  Communications?

5  A.  Yes.

6  Q.  While you were at school in Maryland or in a suburb in

7  Maryland, as you pointed out, you had a Gateway computer

8  that your mother had purchased for you?

9  A.  Yes.

10  Q.  And you got that computer in about 2002?

11  A.  I think it was late 2002.

12  Q.  Your freshman year when you went to school?

13  A.  Yes.

14  Q.  And while you were at Goucher, that Gateway computer had

15  access to the Internet?

16  A.  Yes.

17  Q.  Now, at school in Boston here when you're at grad.

18  school, you still had the Gateway computer, correct?

19  A.  Yes.

20  Q.  And while you were at grad. school, that Gateway

21  computer had access to the Internet at your condo on

22  Commercial Avenue?

23  A.  On Commonwealth Avenue, yes.

24  Q.  I'm sorry, Commonwealth Avenue, thank you.  Your Gateway

25  computer was password protected?

1    A.  Yes, it's password protected to start the computer up,

2    yes.

3    Q.  And you still have that Gateway?

4    A.  Yes, I do.

5    Q.  Now, in your first year of grad. school, you also had a

6    Toshiba laptop?

7    A.  I continued to have that laptop, yes.

8    Q.  But you got it in your first year of graduate school

9    A.  Yes.

10   Q.  You've used the the sublimeguy14 user name, have you

11   not?

12   A.  Yes, I have.

13   Q.  And you used it for multiple purposes?

14   A.  Yes.

15   Q.  You created an Amazon.com profile with it?

16   A.  Yes.

17   Q.  You posted photos of your Honda Prelude online at I

18   think it was a webiste Angelfire under the sublimeguy14 user

19   name?

20   A.  Yes.

21   Q.  And from 2002 to 2007, you had an e-mail address,

22   sublimeguy14@cox.net?

23   A.  Yes.

24   Q.  You also created the sublimeguy14@username?

25   A.  Yes.

1    Q.  And you created the KazaA account on the computer in

2    your bedroom in Providence?

3    A.  Yes.

4    Q.  Take a look at Exhibit 13, please.  I'd like to publish

5    page 3 to the jury.

6              THE COURT:  Is this on the computer or is it on

7    the document camera?

8              MR. REYNOLDS:  Computer, your Honor.

9    Q.  Now, Mr. Tenenbaum we're just looking at one page here,

10   but you can scroll through all the pages in front of you.

11   There are I believe 40 pages.  I'm sorry, it would be in the

12   book, I believe it's volume II of the exhibit notebook.

13   There are three volumes there.

14   A.  Where does it start?

15   Q.  Exhibit 13, pages 1 through 41.

16   A.  Yes.

17   Q.  These are screen shots of a KazaA shared folder as seen

18   by MediaSentry on August 10, 2004.  They're in evidence, and

19   you recognize the sublimeguy14@KazaA user name?

20   A.  Yes.

21   Q.  That's the user name that you created?

22   A.  Yes.

23   Q.  And you'd agree with me that these screen shots show the

24   contents of your KazaA shared folder as it existed at one

25   point in time?

1    A.  Yes.

2    Q.  And this is a collection of the files that were in your

3    KazaA shared folder?

4    A.  Yes.

5    Q.  And you used the KazaA account in your bedroom in

6    Providence, Rhode Island?

7    A.  Yes.

8    Q.  And you listened to music regularly at your residence in

9    Providence, Rhode Island?

10   A.  Yes, whenever I was home.

11   Q.  Now, when you search for a particular song on KazaA, you

12   went out and you did a search like you'd do a Google

13   search?

14   A.  Yes.

15   Q.  And you typed in the words of the artist and song and

16   you get a list back?

17   A.  Yes, that's how you do it.

18   Q.  And KazaA would give you multiple sources from which to

19   download files?

20   A.  Yeah.

21   Q.  And these sources were other computers on the network?

22   A.  Yes.

23   Q.  And computers just like yours?

24   A.  Yes.

25   Q.  When you downloaded songs on KazaA, you downloaded whole

1    songs most of the time?

2    A.  Yes.

3    Q.  And you intended to download whole songs all the time?

4    A.  Yes.

5    Q.  And when you used KazaA in Providence on the computer

6    that was in your bedroom, you would spend several hours a

7    week on KazaA?

8    A.  Yeah, that sound rights.

9    Q.  And most of those days you used KazaA, you used it to

10   download music?

11   A.  Yes.

12   Q.  You also knew when KazaA was running on the computer in

13   your bedroom in Providence, Rhode Island that others were

14   downloading music for you?

15   A.  Yes.

16   Q.  And, in fact, you saw a traffic tab on KazaA?

17   A.  Yes, it's actually in the screen shot right now.

18   Q.  The traffic tab.  Does it show files being downloaded?

19   A.  Well, the tab isn't open.

20   Q.  I see.  I see.  Point out the tab for me, if you would.

21   A.  It's just to the right of the selected tab that says

22   search.

23   Q.  I see.  So when you're looking at the top where it's

24   sort of right below the file, there's some icons where it

25   says "KazaA," then it says "my account," what is that,

1   "theater?"  Is that right?

2   A.  Yeah, yeah, "web, KazaA, theater, search," then

3   "traffic."

4   Q.  And that's a traffic tab and you saw evidence from that

5   traffic tab that other people were uploading songs or you

6   were uploading songs to other people?

7   A.  Yes, absolutely.

8   Q.  And you looked at the traffic tab on your computer on a

9   more or less regular basis?

10  A.  I don't know about half the time.  You're not always

11  interested in who's downloading from you.

12  Q.  About half the time when you look at your traffic tab,

13  you saw other people were in fact downloading from you?

14  A.  Yeah, yeah, it definitely wasn't uncommon for people to

15  be downloading, yes.

16  Q.  Now, I'd like to shift gears for a second and talk about

17  when you first became aware of this lawsuit or the fact that

18  there might be claims against you.  You first found out

19  about this from your parents; is that correct?

20  A.  That's correct.

21  Q.  And you discussed this case with your mother over the

22  phone?

23  A.  I did.

24  Q.  And you discussed who might be responsible?

25  A.  Yes.

1    Q.  And that was in September of 2005, correct?

2    A.  That sounds right.

3    Q.  And it was in connection with the letter that the

4    plaintiffs sent to J. Tenenbaum at the Providence address,

5    correct?

6    A.  I'm sorry, could you repeat that?

7    Q.  The discussion that you had with your mother stemmed

8    from the letter that was sent by my clients to J. Tenenbaum

9    at the Providence, Rhode Island address?

10   A.  Yes.

11   Q.  And during this conversation you told your mother that

12   "it was impossible for you to know" who was responsible for

13   the infringement at issue?  Didn't you say that?

14   A.  Yes.

15   Q.  And in the course of this case, you testified under oath

16   that it was impossible for you to know because "it exceeded

17   your capabilities as a human being"?  Do you remember

18   that?

19   A.  Yes, I did say.

20   Q.  And you also stated that "you didn't think any human

21   being would have been smart enough to be capable of knowing

22   who was responsible"?

23   A.  Yes.

24   Q.  And after the case was filed, you put in an affidavit

25   with the Court, did you not, regarding other people who

1    might have used your computer?

2    A.   If you have it.  I don't remember exactly.

3    Q.   Mr. Tenenbaum, did you not state in an affidavit that

4    you believe that people from California, Ohio and Japan

5    might have used your computer?

6    A.   Yes.

7    Q.   And did you also state in this affidavit that a foster

8    child might have used your computer, foster child who was

9    living in the home?

10   A.   Yeah.

11   Q.   And you also said in this affidavit that it is not known

12   whether burglars who had broken into your parents' house

13   might have accessed your computer?

14   A.   Yes.

15   Q.   Now, after this affidavit was filed with the Court, you

16   also responded to some written discovery that the plaintiffs

17   had sent you.  Do you recall that?

18   A.   I don't know what you mean by written discovery.

19   Q.   Some written questions that the plaintiff had sent you

20   that you responded to in writing?

21   A.   Again, I'd have to see it to refresh my memory.

22   Q.   Ms. Burton, could you pull up Exhibit 34, please, and

23   could you go to page 4.  Mr. Tenenbaum, you can turn to

24   Exhibit 34, too.  It's in the book in front of you, and it's

25   also on the screen.  Ms. Burton, could you pull out

1    interrogatory 10.  Mr. Tenenbaum, this is a document that's

2    in evidence.  Interrogatory No. 10 asks you to identify all

3    persons who utilized an online media distribution system on

4    the computer during the three years prior to the date the

5    complaint in this case was filed including, but not limited

6    to, any person who downloaded music to the computer.

7            Ms. Burton, could you scroll down to 17, it's at

8    the bottom.  No. 17 asks you, "State all users or screen

9    names you have ever used in connection with each online

10   media distribution system you utilized."  Do you see

11   those?

12   A.  I do.

13   Q.  Do you remember responding to those two questions?

14   A.  Well, I must have responded to them, but I don't

15   remember the specifics.

16   Q.  Could you take a look at Exhibit 33, please,

17   specifically page 4.  This document is also in evidence.

18   A.  Yes.

19   Q.  In response to, Ms. Burton, could you pull out the

20   responses to 9 and 10.  In response to interrogatory No. 10,

21   that asks you to identify all persons who had used an online

22   media distribution system on the computer.  You stated, "See

23   answer to interrogatory No. 9."  Do you see that?

24   A.  Yes.

25   Q.  And interrogatory No. 9, you stated, "I have no

1   knowledge who downloaded an online media distribution system

2   on the computer during the three years prior to the date the

3   complaint in this action was filed."  That was your

4   answer?

5   A.  Yes.

6   Q.  And this is the answer you gave to plaintiffs?

7   A.  Yes.

8   Q.  Could you then scroll down, Ms. Burton, to the responses

9   to 16 and 17.  And, again, Mr. Tenenbaum, you recall that

10  interrogatory No. 17 asks you to identify all screen names

11  you had used in connection with an online media distribution

12  system, and your answer you wrote here was, "Same as

13  interrogatory No. 16."  Do you see that?

14  A.  Yes.

15  Q.  And your answer to interrogatory No. 16, "I have no

16  knowledge or recollection of online media distribution

17  systems used or any dates."  That's your answer?

18  A.  Yes.

19  Q.  That's the answer you gave to the plaintiffs in the

20  course of the lawsuit?

21  A.  Yes.

22  Q.  Ms. Burton, could you go back to Exhibit 34.

23  Mr. Tenenbaum, could you turn to Exhibit 34, please, page 5.

24  Ms. Burton, if you could pull out 18 and 19, please, those

25  interrogatories.  Mr. Tenenbaum, you were provided two

1  questions, two additional questions from the plaintiffs that

2  asks you to identify who, all persons who have used the

3  screen name sublimeguy14@KazaA while connected to an online

4  media distribution system on the computer, and then No. 19

5  asks if you have recorded or burned CDs of any sound

6  recordings that you have downloaded using an online media

7  distribution system.  Do you recall providing responses to

8  these two questions to the plaintiff?

9  A.  Yes, I imagine they're similar.

10  Q.  Similar in the sense that you stated that you didn't

11  have any idea who had used sublimeguy14@KazaA?

12  A.  Yes.

13  Q.  And similar in the sense that you stated that you didn't

14  have any idea of downloading or using an online media

15  distribution system such that you might have burned CDs from

16  it?

17  A.  Yes.

18  Q.  And those are again the answers you provided to

19  plaintiffs?

20  A.  Yes.

21  Q.  Could you take a look Exhibit 34, page 18.  Ms. Burton,

22  could you pull out the top three numbers, 6, 7 and 8.

23  Mr. Tenenbaum, do you recall that these requests for

24  admissions were sent to you in connection with this lawsuit

25  asking you in No. 6 to admit that an online media

1    distribution system was downloaded to the computer, in 7

2    that you knew an online media distribution system was

3    downloaded to the computer and No. 8 admit that you have

4    used the screen name sublimeguy14@KazaA while connected to

5    an online media distribution system.  Do you recall that?

6    A.  Yes.

7    Q.  And you provided responses to these, correct?

8    A.  Yes.

9    Q.  Would you take a look at Exhibit 33, page 7.

10   Ms. Burton, could you pull out the responses for No. 6, 7

11   and 8, please.  Mr. Tenenbaum, you provided the following

12   responses, correct, to No. 6, you stated, "I have no

13   knowledge of whether or not an online media distribution

14   system was downloaded to the computer," correct?

15   A.  Yes.

16   Q.  For No. 7, you provided the same answer as No. 6,

17   correct?

18   A.  Yes.

19   Q.  And for No. 8, which asks you to admit that you had used

20   the sublimeguy14@KazaA user name, you in this answer you

21   denied that, didn't you?

22   A.  Yes, Mr. Reynolds.

23   Q.  Ms. Burton, could you turn to Exhibit 33, page 4, and

24   Mr. Tenenbaum, would you please do the same.  In fact, I

25   think you may have already been there, Mr. Tenenbaum.  You

1    see the response to interrogatory No. 16?  Ms. Burton, could

2    you pull that out.

3    A.  Yes, I do.

4    Q.  Again, you wrote, "I have no knowledge or recollection

5    of online media distribution systems used or any dates,"

6    correct?

7    A.  Yes.

8    Q.  And that statement is not accurate, is it?

9    A.  I do have knowledge or recollection of online media

10   distribution systems.

11   Q.  Okay.  So this statement that you gave here is not

12   accurate, is it?

13   A.  No.

14   Q.  That is no, it's not accurate?

15   A.  No, it's not accurate.

16   Q.  You also gave testimony in this case that "More people

17   than you can remember used your sublimeguy14@KazaA user

18   account."  Do you recall that testimony?

19   A.  Vaguely.

20   Q.  Do you recall stating that you believed your older

21   sister Abbey Tenenbaum, who's now Abbey Nathan, used your

22   KazaA account?

23   A.  I'm sorry, what's the start of that?

24   Q.  Do you recall testifying that you believed that your

25   older sister, Abbey Nathan, Abbey Tenenbaum used your KazaA

1   account?

2   A.  I remember saying something like that it was possible.

3   I don't know if I said that I believed she had.  We could

4   look.

5   Q.  Ms. Burton, could you hand me --

6        MR. REYNOLDS:  Your Honor, may I open the sealed

7   deposition transcript?

8        MR. FEINBERG:  I'll allow him to use the copy.

9        THE COURT:  You can use the copy if you want.

10       MR. REYNOLDS:  I don't have an extra copy, I

11  apologize.

12       THE COURT:  Okay.

13       MR. REYNOLDS:  May I approach the witness?

14       THE COURT:  Yes, you may.

15  Q.  Mr. Tenenbaum, do you recall giving a deposition in this

16  case on September 24th, 2008?

17  A.  Yes.

18  Q.  And you were represented by Mr. Nesson at that

19  deposition?

20  A.  I was.

21  Q.  And my colleague, Ms. Burton, took that deposition?

22  A.  Yes, she did.

23  Q.  And you were under oath?

24  A.  Yes.

25  Q.  And you agreed to provide full and truthful statements

1   under oath?

2   A.  Yes.

3   Q.  Could you turn to page 63, please, specifically starting

4   at line 17, question:  "Okay.  Who else do you believe used

5   your KazaA account at your house?"  Answer:  "Abbey

6   Tenenbaum."  Question:  "Who is Abbey Tenenbaum?"  Answer:

7   "My sister."  Do you recall giving that testimony under

8   oath, Mr. Tenenbaum?

9   A.  Yes.

10  Q.  You also stated under oath that you believe your younger

11  sister, Tova Tenenbaum, had used your KazaA account?

12  A.  Yes.

13  Q.  You said you believed a house guest, Dr. Sam Volchenbaum

14  used your KazaA account while he was visiting looking for a

15  home in the area for his family?

16  A.  Yes.

17  Q.  You said you believed the foster child, also a house

18  guest known as Jonathan Valesquez used the KazaA account?

19  A.  Yes.

20  Q.  You said that Jimmy Chappel used your KazaA account?

21  A.  Yes.

22  Q.  You said that Richard Barth used your KazaA account?

23  A.  Yes.

24  Q.  You said that you believed Robert Barth used your KazaA

25  account?

1    A.  Yes.

2    Q.  You said that you believed Antonio Franco used your

3    KazaA account?

4    A.  Yes.

5    Q.  And you said all of that in September of 2008?

6    A.  Yes.

7    Q.  Now, you've heard the testimony of your sister, both

8    your sisters, Abbey Tenenbaum and Tova Tenenbaum, all of

9    whom deny, both of whom deny using KazaA on your account?

10   A.  Yes.

11   Q.  And you also heard the testimony of Jimmy Chappel and

12   Antonio Franco denying that they ever used KazaA on your

13   account, right?

14   A.  Yes.

15   Q.  And, in fact, you never saw your older sister Abbey

16   Nathan use KazaA on your account?

17   A.  I did not.

18   Q.  You never saw Tova Tenenbaum use KazaA on your

19   account?

20   A.  No.

21   Q.  You never saw Dr. Volchenbaum use KazaA on your account,

22   did you?

23   A.  No.

24   Q.  You never saw Richard Barth use KazaA on your account,

25   did you?

1   A.  I don't recall any specific observation of it, no.

2   These are events taking place over a big period of time.

3   Q.  In fact, when you were asked for the basis for your

4   belief that Richard Barth had used your account, you said

5   that you had seen Mr. Barth listening to recordable CDs and

6   "your general knowledge of him."  Do you recall that

7   testimony?

8   A.  Yes.

9   Q.  And when you asked to explain what you mean by your

10  "general knowledge of Mr. Barth," you said juno se qua?

11  A.  I do recall that.

12  Q.  Could you explain what means?

13  A.  It's a certain I don't know what.

14  Q.  And you don't know whether you ever saw Robert Barth use

15  your KazaA account?

16  A.  Again, I don't have specific recollection of him doing

17  it.

18  Q.  Now, with respect to music tastes, you're someone who

19  has a wide range of music tastes?

20  A.  I don't know if that's a little proud.  I listen to a

21  number of different artists.  I don't know if mine are any

22  wider than anybody else's.

23  Q.  More than a number of different artists, you listen to

24  more than a number of different artists, more than a

25  handful?

1   A.  Yes.

2   Q.  You listen to probably a hundred different artists, at

3   least?

4   A.  Yeah, there are a lot of songs that have, you know, one

5   artist.

6   Q.  Certainly.  Some of the artists you like, you've heard

7   testimony from your father and from other people, you've

8   heard testimony, for example, you like Nirvanas?

9   A.  Yes.

10   Q.  You like the Fugees?

11   A.  I like a little bit of them, yeah.

12   Q.  You like Green Day?

13   A.  Oh, yeah.

14   Q.  You like Lincoln Park?

15   A.  Uh-hum.

16   Q.  You listen to some Red Hot Chili Peppers?

17   A.  Yes.

18   Q.  You like Beethoven?

19   A.  I do.

20   Q.  You like Sticks, at least a few songs?

21   A.  I like Mr. Roboto.

22   Q.  And that song is in your shared folder?

23   A.  Yes, it is.

24   Q.  And all the artists I just listed are on the shared

25   folder?

```
1    A.  Yes.

2    Q.  Rommstein?

3    A.  Yes.

4    Q.  Shamming Pumpkins, both artists that you like?

5    A.  I liked them more at one point, yeah.

6    Q.  Outkast is an artist you like?

7    A.  Yes.

8    Q.  Sublime is an artist you like?

9    A.  Absolutely.

10   Q.  Nine Inch Nails?

11   A.  Yes.

12   Q.  Blink 182?

13   A.  Yes.

14   Q.  Limp Biskit?

15   A.  Yes.

16   Q.  Death Tones?

17   A.  Yeah, these are good artists.

18   Q.  Bob Marley?

19   A.  Oh, yeah.

20   Q.  No Effects?

21   A.  Yeah, great band.

22   Q.  Goo-Goo Dolls?

23   A.  A couple songs from them.

24   Q.  Incubus?

25   A.  Yes.
```

1    Q.   Feastie Boys?

2    A.   Yeah.

3    Q.   The Ramones?

4    A.   Yeah.

5    Q.   Aerosmith?

6    A.   Yeah.

7    Q.   Beck?

8    A.   I really haven't heard a lot of him, I've heard Loser.

9    Q.   And that's a song you like?

10   A.   My tastes sort of oscillate a little bit.  It's a good

11   song.

12   Q.   You also like the Matrix sound track, you heard that

13   yesterday?

14   A.   Yes.

15   Q.   And the Matrix song track has songs by Marilyn Manson?

16   A.   Yeah, Marilyn Manson, Death Tones, The Hives, Rommstein

17   I think is on there maybe.

18   Q.   Monster Magnet?

19   A.   Yeah, Monster Magnet.

20   Q.   The song Look To The Oar For The Warning is on there?

21   A.   Yes, it's on there.

22   Q.   In fact, all the artists we've just listed, those are

23   all in the shared folder we were looking at, Exhibit 13?

24   A.   Yes.

25   Q.   So you're not surprised that Exhibit 13, that shared

1  folder comprised of 40 pages, I don't know whether it's 816

2  sound recordings has over 50 of the artists that you like

3  and listen to, at least at one point in time did?

4  A.  No, no surprise.

5  Q.  You agree with that, right?

6  A.  Yes.

7  Q.  Now, Mr. Tenenbaum, you burned CDs of music from your

8  shared folder, correct?

9  A.  Yes.

10  Q.  So you took music that was in your KazaA shared folder

11  and you burned it to homemade CDs?

12  A.  Yes.

13  Q.  And you took some of that music with you to

14  Goucher College?

15  A.  Yes, I did.

16  Q.  You burned somewhere between 50 and 600 songs from your

17  shared folder to take with you to Goucher College?

18  A.  Yeah, that sounds right.

19  Q.  Now, when you testified, you didn't say 50 to 600 first.

20  What did you say it was when you were asked how many songs

21  you burned?

22  A.  I probably put it in like the order of 10 to the 2.

23  Q.  I think you said order of magnitude, 10?

24  A.  Yeah.

25  Q.  Could you explain that to the jury?

1    A.   Okay.  It's like a physics way of thinking as you think

2    in orders of magnitude like -- I'm explaining this.  Any

3    number between like 1 and 5, for example, you'd say it's

4    like order of magnitude 1, number 10,000, 30,000, 40,000,

5    sort of like you don't really care about the number itself,

6    you care about sort of how many digits it has.  It's like a

7    useful thing to think about for physicists.

8    Q.   Mr. Tenenbaum, you've also burned CDs to give to

9    friends, correct?

10   A.   Yes.

11   Q.   And you've also used thumb drives to give and receive

12   music from friends?

13   A.   I don't know.  I may have.  I don't have specific

14   recollection of using a thumb drive to transfer.  Actually,

15   yeah, I think I did, yeah.

16   Q.   To take music that you had and give it to somebody?

17   A.   Yeah, either to give to somebody else or for them to

18   give to me.  I think I used a USB stick at one point in

19   time.

20   Q.   It's a thumb drive, it's a device outside of your

21   thumb?

22   A.   Yeah, USB, thumb drive, I don't know the standard name

23   for it.  I don't think there's a standard name.

24   Q.   When you were asked the question about the CDs and how

25   many you burned with you to take with you to

1    Goucher College, is there a reason you didn't give a

2    number?

3    A.  Well, I tried to give it in the most precise way I could

4    because this is, I mean, it's the best of my memory.

5    Q.  And the most precise way to say order of magnitude 10?

6    A.  Yes.

7    Q.  Mr. Tenenbaum, you have claimed in this case that you

8    uploaded some music CDs to your computer in Providence,

9    Rhode Island?

10   A.  Yeah, I copied CDs from my computer, I copied music from

11   my CDs to the computer, yeah.

12   Q.  And the term we can agree is ripping, ripping CDs to

13   computer?

14   A.  I've seen that term used in like music programs and

15   ripping, but it's never related to common usage, but, sure,

16   we can call it ripping.

17   Q.  Okay.  Let's do that now.  When you ripped songs to your

18   computer, the program that you used, you fill in the artist

19   and the album?

20   A.  Are you asking was there a program?

21   Q.  Yes, I'm assume you used a program to rip songs?

22   A.  Yes.

23   Q.  And that program that you used would fill in the

24   artist's name and the name of the album?

25   A.  I don't know.  I think I used different programs at

1  different points in time. I think some of them would

2  conveniently fill in the associated like data on the file

3  and I think some of them wouldn't. I think some CDs it

4  would work, other CDs it wouldn't.

5  Q. And you didn't add any comments about the songs when you

6  put them, when you put them on your computer, did you?

7  A. Like awesome track or something, no, I don't think so.

8  Q. You never changed any of the metadata that was in

9  there?

10  A. I think I actually did on a few of them. The program I

11  was using, I think the playback program, it would sort by

12  album or artist or whatever, and so sometimes I would go in

13  and I would, you know, make consistent that you would have

14  the same data on a bunch of different files from the same

15  album. It made it easier to find it when I wanted to listen

16  to it.

17  Q. If you would put it in, it would make it consistent?

18  A. Not always. I was very diligent about that.

19  Q. But your goal was to make it consistent, you just

20  said?

21  A. Yes, if I did, that was the reason, yes.

22  Q. And you never added things like descriptions like you

23  said like awesome track or ripped by or anything like

24  that?

25  A. No.

1   Q.  You'd no reason to add any of that type of metadata?

2   A.  I don't know, the thought that you could express

3   yourself in metadata hadn't occurred to me at the time.

4   Q.  And you would have no reason to change or to vary the

5   name of the artist or anything like that, would you?

6   A.  No.

7   Q.  Now, I'd like to shift gears just a moment and talk

8   about some things that happened while you were at

9   Goucher College.  So this would have been your -- I don't

10  know whether it was your freshman year, but before we do

11  that, let me cover one thing.  You were born in 1983?

12  A.  Yes.

13  Q.  So in 2000 you turned 17?

14  A.  Yeah, the end of 2000, yes.

15  Q.  And 2002 when you went to college, you turned 19?

16  A.  Yeah, I turned 19 right after I got to college, a couple

17  months after.

18  Q.  And in 2004 when you were caught distributing songs on

19  KazaA, you turned 21?

20  A.  I turned 21 at the end of 2004, yes.

21  Q.  And in 2007, you were -- you turned 24?

22  A.  Yes.

23  Q.  So, let's go back to your days at Goucher.  So you were

24  19 years old at the time, and do you recall when the

25  Death Tones performed a new single live on the

1    David Letterman show?

2    A.  Yeah, it was right before or right coinciding with the

3    Death Tones releasing a new album, which was White Pony.

4    They put out, Death Tones had put out an album, Adrenalin,

5    that was their first one, the second album was Around The

6    Fir, and they were putting out this much anticipated third

7    album, and as part of that promotion, Chino Morano and the

8    Death Tones were going to play on Letterman.

9    Q.  And they did play on Letterman?

10   A.  They did.

11   Q.  And you recorded that broadcast, did you not?

12   A.  I did.

13   Q.  And you took that broadcast and you posted it to your

14   KazaA account?

15   A.  Posted it, yeah, I put it in the KazaA, yeah.

16   Q.  You put it in the KazaA shared folder?

17   A.  Yes.

18   Q.  And after that you went on a forum, I think it was

19   Death Tones fan forum or something like that, and you

20   notified people that they could get that song from you from

21   sublimeguy14@KazaA, didn't you?

22   A.  Actually I was on the forum before it even happened,

23   that was how I heard about the upcoming forum, that's how I

24   knew it was so hyped.  So it was a Death Tones forum, and it

25   was this thing online where you could write posts about the

1  Death Tones, what albums you like, what attributes you like

2  about them, this, this and that, and as part of that, one of

3  the recurring excited topics was this new album coming out,

4  and someone said, well, Dave Letterman, the Death Tones are

5  going to be on Dave Letterman upcoming tonight.  And I said,

6  you guys, I'll record that and I'll share that, I'll put

7  that up on KazaA, you can get it from me.

8  Q.  You initiated that post on KazaA, that was something you

9  put up first?

10  A.  Which post?

11  Q.  The KazaA post that you put in your shared folder of the

12  Death Tones being on David Letterman?

13  A.  I'm sorry.

14  Q.  You took that recording from the David Letterman and you

15  put that recording to be distributed to other people?

16  A.  Yes.

17  Q.  And you were the first person to do that as far as you

18  knew?

19  A.  Yeah, I think, no one else was saying they were doing

20  it, so I figured, yeah I would be the first.

21  Q.  Now, in addition to posting that recording, you were at

22  Goucher, you also upload music that you had to a network

23  neighborhood where other people could download it for

24  free?

25  A.  Yeah, that's right.  There's sort of a standard Windows

1    program, and you have multiple like Windows computers that

2    are connected together, there's an option to share files,

3    and so at Goucher they had this, and I had heard from my

4    older sister at college, that was how it worked, stuff was

5    shared on this network, and that's what we did, we would

6    take our files and whoever would want to would sit there and

7    share it, and there would be these collections of music or

8    movies or whatever is on there that you can get.

9    Q.   And you posted somewhere between 600 and 5,000 of your

10   songs on that Goucher file, that Goucher sharing network,

11   network neighborhood?

12   A.   I don't think I had 5,000 files, 5,000 music files at

13   the time.

14   Q.   Did you not testify --

15   A.   I said order of magnitude, I figured I'd be a little

16   more precise.

17   Q.   Let me finish my question first.

18   A.   I'm sorry.

19   Q.   You said order of magnitude 1,000, correct?

20   A.   Yes.

21   Q.   That would be based on my understanding what you said

22   between 600 and 5,000, if that testimony was testimony?

23   A.   Correct.

24   Q.   That's what you said at your deposition under oath,

25   correct?

1   A.  Yes, it is.

2   Q.  And you did that again while you were at Goucher?

3   A.  Yes.

4   Q.  And those songs that you posted were available for

5   others to download?

6   A.  Yes.

7   Q.  And you deliberately put that on the network for other

8   people to take?

9   A.  Yes.

10  Q.  Now, while you were at Goucher, the school put filters

11  in place to stop this type of file sharing, didn't they?

12  A.  Yeah, over the course of going to Goucher, I found that

13  every year that I went there there were sort of a few more

14  restrictions what could be shared and what couldn't.

15  Ultimately I think there were I guess so many whatever kind

16  of technical restrictions they had on it that peer-to-peer

17  programs wouldn't work at all.

18  Q.  And, again, so by your junior year the network

19  neighborhood program was pretty much useless?

20  A.  Yes, I think if you put music up like no one could see

21  it.

22  Q.  And that was because of the restrictions that Goucher

23  put in place?

24  A.  I assume so.  I don't know like how it was done.

25  Q.  Mr. Tenenbaum, could you turn to Exhibit 26, page 11.

1  Ms. Burton could you bring up page 11.  This is another

2  document that's in evidence.

3  A.  Where is it?

4  Q.  Exhibit 26, page 11.

5  A.  Where is Exhibit 26?

6  Q.  It's in the same book you're looking at.  It would be

7  between 13 to 34.

8  A.  Got it.

9  Q.  Page 11 specifically.

10  A.  Yes.

11  Q.  Actually why don't you go to the first page just for a

12  moment.  Ms. Burton, if you could pull up the first page of

13  this.  This is a student handbook for information technology

14  at goucher.edu.  Do you see that?

15  A.  Yes.

16  Q.  And down below it says, "Fall, 2003 semester"?

17  A.  Yes.

18  Q.  Ms. Burton, could you turn to page 11.  Could you pull

19  out Section 3.9 all the way at the bottom for the jury.

20  Now, Mr. Tenenbaum, the first -- this Section 3.9 is, "File

21  sharing allowed;" do you see that?

22  A.  I do.

23  Q.  And this is in the handbook from fall, 2003 at

24  Goucher College?

25  A.  Yes.

1  Q.  And the first paragraph there specifically warns of RIAA

2  lawsuits brought by members of the industry organization,

3  the RIAA have filed copyright infringement lawsuits against

4  individual college students who have used file sharing

5  programs to share copyrighted material; do you see that?

6  A.  Yeah, I see that the RIAA has filed copyrighted lawsuits

7  against individual college students, yes.

8  Q.  And the last sentence, "Goucher College wants you to be

9  aware of these issues and situations;" do you see that?

10  A.  Yes, I do.

11  Q.  The second paragraph, "To avoid the risk of potential

12  lawsuits due to copyright infringement, the college is

13  advising students to carefully restrict the use of file

14  sharing applications to material that is legal to share."

15  Do you see that?

16  A.  I see that.

17  Q.  "To disable file sharing software"?

18  A.  Yes.

19  Q.  And then at the bottom, I'll just read the first

20  sentence this is now the third paragraph, "The violation of

21  copyright law can have serious consequences in the area

22  of --" and, Ms. Burton, if you would go to the next page,

23  this paragraph details the consequences of civil liability;

24  does it not?

25  A.  Yes.

Q.  "Persons found to be infringed may be held liable for

substantial damages and attorneys fees.  The law entitles a

plaintiff to seek statutory damages of $150,000 for each act

of willful infringement."  Do you see that?

A.  Where are you reading this from?

Q.  From the civil liability, very first line, first three

lines.

A.  Okay, yeah.

Q.  And in the last paragraph of this section, if you go

halfway down, there's a sentence that at the end of the

line, Ms. Burton, could you highlight it, "In addition, if

you violate copyright law --" could you highlight the last

five lines.  This states that, "In addition, if you violate

copyright law by engaging in file sharing, you may be

subject to discipline and other applicable college policy."

Do you see that?

A.  Yes.

Q.  And, again, this handbook and this policy was in effect

while you were at Goucher in the fall of 2003?

A.  Yes.

Q.  That was your software year?

A.  Yes, that was the start of my sophmore year.

Q.  And in that year you turned 20 years old?

A.  Yeah, at the end, yeah.

Q.  And you received a copy of this handbook as part of

1    being a student at Goucher College; did you not?

2    A.   Yes, I think they put them in the mailbox for

3    everybody.

4    Q.   Could you turn to Exhibit 27, please.  Ms. Burton, could

5    you pull up the first page.  Thank you.  Mr. Tenenbaum, this

6    is another document that's in evidence.  This is the Goucher

7    student information technology handbook.  I believe this one

8    is for the fall, 2004 semester?

9    A.   That is correct.

10   Q.   This is also a handbook you received?

11   A.   Yes.

12   Q.   Ms. Burton, could you go to page 12, please, and pull

13   out Section 3.10 again.  And, Mr. Tenenbaum, this states

14   substantially or perhaps identically what was stated in the

15   2003 student handbook?

16   A.   Yes, it looks the same.

17   Q.   And if we turn to page 13, the last paragraph of this

18   section right above 3.11, the last paragraph, page 13, it's

19   Exhibit 27.  This also states what we read in the earlier

20   handbook that, "Violation of copyright law by engaging in

21   unauthorized file sharing may subject you to the discipline

22   under the college use policy"?

23   A.   Yes, I see that.

24   Q.   We didn't look at the page in the last one, but I want

25   to look at it in this one.  If you could turn to page 38 in

1    Exhibit 7.  Ms. Burton, could you pull out Section 6.  This

2    section states that, "Users must abide by all applicable

3    laws and college policies to protect the copyrights and

4    intellectual property rights of others.  Copyrighted works

5    may include, texts, cartoons, articles, photographs, songs,

6    software, graphics, and other materials."  Do you see

7    that?

8    A.  I do see that.

9    Q.  And, again, this is the policy at Goucher College when

10   you were there starting in the fall of at least as early as

11   the fall of 2003 and 2004?

12   A.  Yes.

13   Q.  And then in the middle, there's a sentence.  Ms. Burton,

14   could you highlight "It is the responsibility --"  Highlight

15   the next three lines.  That's fine.  All the way over.  "It

16   is the responsibility of the user to assume that materials

17   found on the web are copyrighted unless the copyrighted

18   materials contain an express disclaimer to the contrary.  Do

19   you see that?

20   A.  I do.

21   Q.  And, again, this was in the Goucher handbook while you

22   were at Goucher College?

23   A.  Yes.

24   Q.  Ms. Burton, could you turn to Exhibit 28, and,

25   Mr. Tenenbaum, if you could turn to Exhibit 28, too.  Now,

1   Mr. Tenenbaum, Ms. Burton it's kind of hard to pull this one

2   out.  I'll attempt to read it for the jury.  It states at

3   the top, "Goucher College computer use policy, guidelines

4   for acceptable use of computing resources."  Do you see

5   that?

6   A.  Yes.

7   Q.  And at the bottom, in the bottom left-hand corner it

8   says February, 2001?

9   A.  Yes.

10  Q.  Could you turn to page 3, please.  Ms. Burton, could you

11  pull out again Section 6.  So now this is the 2001

12  acceptable use policy for computing resources at Goucher

13  College, and, again, we have the same restriction that, "All

14  Goucher users and students must abide by college policies to

15  protect the copyrights of intellectual property rights of

16  others."  Do you see that?

17  A.  I do see that.

18  Q.  And that policy was in place during your freshman year

19  at Goucher College?

20  A.  I assume so if what happens in '01 carries over to '02,

21  yeah.

22  Q.  In fact, we saw the same language in '01, we just looked

23  at the 2004, and the language was virtually was identical?

24  A.  I assume it carries over.

25  Q.  And you received copies of these college handbooks?

1  A.  Yeah, they put them in our mailbox, I think.

2  Q.  Could you turn to Exhibit 29, please.  Ms. Burton, could

3  you pull out the first, the header of from the "from line"

4  all the way through the first full paragraph.

5  Mr. Tenenbaum, this is an e-mail that was sent to "Official

6  students at Goucher College in December of 2004."  Do you

7  see that?

8  A.  Yes, I do.

9  Q.  You were an official student at Goucher College, in

10  2004, were you not?

11  A.  I was.

12  Q.  And you recall that the subject of this e-mail was that

13  the Goucher student government association, students at

14  Goucher passed a resolution to block peer-to-peer sites?

15  A.  I'm sorry.

16  Q.  The students, the student governing body at Goucher

17  College passed a resolution to block peer-to-peer sites; do

18  you recall that?

19  A.  I do not recall that happening, but I see the letter, so

20  I assumed it happened, yeah.

21  Q.  But you became aware subsequently that there was a

22  student intiative to do that?

23  A.  I became aware a couple weeks ago that it was student

24  initiative that blocked peer-to-peer programs.

25  Q.  And that was at Goucher College while you were there?

1    A.   The student initiative?

2    Q.   Yes.

3    A.   Yes.

4              THE COURT:   Why don't we take a break at this

5    point for the morning.   All rise for the jury.

6              (A recess was taken.)

7              THE CLERK:   All rise for the jury.

8              THE COURT:   You can all be seated.   Proceed,

9    Mr. Reynolds.

10             MR. REYNOLDS:   Thank you, your Honor.

11   Q.   Mr. Tenenbaum, do you know what Napster is?

12   A.   Yes.

13   Q.   And back in 1999 and 2000, that time frame, you agree

14   with me that Napster was a file sharing program somewhat

15   similar to KazaA?

16   A.   Yes.

17   Q.   Users downloaded and distributed music and other files

18   for free?

19   A.   Yes.

20   Q.   And you used the Napster file sharing program?

21   A.   Yes.

22   Q.   And you used that program on the computer in your

23   bedroom in Providence, Rhode Island?

24   A.   Yes.

25   Q.   You used it to download music?

1   A.  Yes.

2   Q.  And you switched from Napster to KazaA after Napster was

3   no longer functioning?

4   A.  Yes.

5   Q.  And you knew that Napster was shut down?

6   A.  I knew that Napster wasn't working.

7   Q.  You knew that Napster was shut down because there was a

8   lawsuit regarding infringement?

9   A.  I don't know what I knew about it, it stopped working,

10  that was the main thing that I remember.

11  Q.  You have, I believe, your deposition transcript in front

12  of you.  Could you turn to page 108, please.  Do you have

13  that in front of you?

14  A.  Yes.

15  Q.  You recall Ms. Burton asked you questions?

16  A.  Yes.

17  Q.  And you were prepared by counsel?

18  A.  Yes.

19  Q.  And you gave these questions under oath?

20  A.  Yes.

21  Q.  Question:  "Was it your understanding that Napster shut

22  down?"  Answer:  "Yes."  Question:  "Do you know why it was

23  shut down?"  Answer:  "I don't know why.  I'm not a legal

24  expert, I'm not an expert in legal matters."  Question:

25  "What is your understanding?"  Answer:  "My understanding is

1    some sort of lawsuit against Napster or people who made

2    Napster, whatever, regarding copyright infringement."  Do

3    you recall giving those answers at your deposition?

4    A.  Yes.

5    Q.  And you read about that in the newspapers?

6    A.  Yeah, I probably did.

7    Q.  And you read about it at the same time it was happening,

8    when Napster was being shut down, did you not?

9    A.  Yes.

10   Q.  And when Napster was shut down, as you said, you went to

11   KazaA?

12   A.  Yes.

13   Q.  And you went to KazaA because you continued to want a

14   source for music without paying for it?

15   A.  Yes.

16   Q.  Now, we were just talking about the computer in

17   Providence, Rhode Island?

18   A.  Yes.

19   Q.  You switched from Napster to KazaA?

20   A.  Yes.

21   Q.  Now, let's shift gears and talk about your computer that

22   you used in Maryland and then that you also used here when

23   you were a graduate student at Boston College, and you're

24   still a graduate student?

25   A.  Yes.

1   Q.  Again, you used a Gateway computer at school?

2   A.  Yes.

3   Q.  Do you need a moment, Mr. Tenenbaum, water or

4   something?

5   A.  No, I'm fine.

6   Q.  Now, you installed the Limeware file sharing program on

7   your Gateway computer?

8   A.  Yes.

9   Q.  And you did that in about 2002 or 2003?

10  A.  Yes.

11  Q.  And you used the LimeWire file sharing program on your

12  Gateway computer?

13  A.  Yes.

14  Q.  You used that program to download music off the

15  Internet?

16  A.  Yes.

17  Q.  And just like on the KazaA network where other KazaA

18  users could download files from you, the same was true of

19  your LimeWire shared folder, others on the LimeWire network

20  could download music from you also?

21  A.  Yes.

22  Q.  Any music that you downloaded to your LimeWire shared

23  folder was then available to distribution to everyone else

24  on LimeWire?

25  A.  Yes.

1  Q.  Could you turn to Exhibit 35, and this is an exhibit

2  from Dr. Jacobson's report that we were looking at

3  yesterday.

4          MR. REYNOLDS:  Your Honor, just one minute before

5  we pull that up.  I'd like to publish this page to the jury,

6  your Honor.

7          MR. FEINBERG:  What page?

8          MR. REYNOLDS:  Page 1, I'm sorry.

9          THE COURT:  Are you on the document camera?

10         MS. BURTON:  I'm on the computer.

11         THE COURT:  It should be on the screen.

12         MS. BURTON:  I was just waiting for your Honor.

13         THE COURT:  Yes, go right ahead.

14  Q.  Again, Mr. Tenenbaum, this is a list of songs that we

15  were looking at yesterday during the deposition, I'm sorry,

16  during the testimony of Dr. Jacobson who provided testimony

17  that these are lists of song file names that were in the

18  C:\mymusiclimewire shared folder on your Gateway computer.

19  Do you recall that testimony?

20  A.  Yes, I do.

21  Q.  And you agree with me that you put these files in the

22  LimeWire my music shared folder on your Gateway computer?

23  A.  Yes.

24  Q.  You used LimeWire on the Gateway computer so that you

25  could download music without paying for it?

1    A.  Yes.

2    Q.  Just like you've done on KazaA?

3    A.  Yes.

4    Q.  Now, you also used other file sharing programs such as

5    Audio Galaxy?

6    A.  Yes.

7    Q.  And you used Audio Galaxy to download music on the

8    Gateway computer?

9    A.  Yes.

10   Q.  You used a program called iMesh on the Gateway

11   computer?

12   A.  Yes.

13   Q.  And you used that program to download music as well?

14   A.  Yes.

15   Q.  And iMesh like KazaA and LimeWire was a program when you

16   downloaded those files, they were being distributed to other

17   users?

18   A.  Yes.

19   Q.  And you stopped iMesh because ultimately that program

20   was blocked by Goucher College, wasn't it?

21   A.  Yes.

22   Q.  You also used the file sharing program called Morpheus

23   on the Gateway computer?

24   A.  Yes.

25   Q.  And you stopped using that program, too, because it was

1  blocked by Goucher College?

2  A.  Yes.

3  Q.  Mr. Tenenbaum, it's true that you used these various

4  programs at various times so that you could achieve the

5  maximum amount of music downloading and uploading with the

6  least amount of wasted effort?

7  A.  Yes.

8  Q.  I want to shift gears for a moment and talk about the

9  two computers in this case, both there was a PC desktop

10  computer in your bedroom that we've been talking about that

11  had the KazaA account on it, correct?

12  A.  Yes.

13  Q.  And that there was the Gateway computer that you've used

14  at college both, undergrad. and graduate?

15  A.  I'm sorry, I don't understand which.

16  Q.  I want to talk about both of them, I'm just saying there

17  were two.

18  A.  Could you say that again?

19  Q.  Sure.  You had a PC desktop computer that had your KazaA

20  account on it in your bedroom in Providence, Rhode Island?

21  A.  Yes.

22  Q.  And then you had a Gateway computer at both undergrad.

23  and graduate school in Boston, correct?

24  A.  Yes.

25  Q.  Could you turn to Exhibit 23, please.  Mr. Tenenbaum, if

1    you could look at the monitor screen.  This is the copy

2    that's in evidence.  Ms. Burton, could you pull out both the

3    header of the letter all the way through the signature, just

4    pull that out.  The copy that you have in hard copy in front

5    of you is not in evidence.  I want to look at the one on the

6    computer screen, which is in evidence.  This is a letter

7    that you sent to the plaintiffs representatives in about

8    November of 2005?

9    A.  Yes.

10   Q.  And this is about the same time you had this

11   conversation with your mother about who might be responsible

12   for the file sharing in this case?

13   A.  Yes.

14   Q.  And at the bottom of this letter, "While I do not have

15   access to the computer at college, meaning while you're at

16   college you don't have access to the computer; is that

17   fair?

18   A.  To the home computer, yes.

19   Q.  You say, "While I do not have access to the computer at

20   college, I will be home on November 22d.  If there are any

21   files existing in violation of copyrights, I will destroy

22   them at that time."  Do you see that?

23   A.  I do.

24   Q.  So the desktop computer that you used to download and

25   distribute music on KazaA still existed as of November of

1   2005?

2   A.  Yes.

3   Q.  And that would have been after are you received the

4   letter from plaintiffs in September of 2005 letter?

5   A.  Yes.

6   Q.  Now, what you just said now is different from what you

7   said at your deposition, isn't it?

8           MR. FEINBERG:  Objection.

9   Q.  Do you recall testifying at your deposition,

10  Mr. Tenenbaum, that you told Ms. Burton that the computer

11  that was in your house in Providence, Rhode Island was

12  actually not there in November of 2005?

13  A.  I don't understand.

14  Q.  Well, let me ask you this:  Did you look on the computer

15  for the files?

16  A.  I did.

17  Q.  Let's shift gears for a minute, Mr. Tenenbaum.  Let's

18  shift gears and talk about the Gateway computer that you had

19  at college, okay?

20  A.  Okay.

21  Q.  You're aware that plaintiffs requested an inspection of

22  that computer in September, 2008?

23  A.  Yes.

24  Q.  And you objected to that inspection initially, didn't

25  you?

1    A.  I imagine I did.

2    Q.  And while there was a motion pending in this court, you

3    took the Gateway in for repair at Best Buy?

4    A.  I did.

5    Q.  And you had the operating system reinstalled?

6    A.  Yes.

7    Q.  And the hard drive was reformatted in connection with

8    that reinstallation?

9    A.  Yes.

10   Q.  And this was after the plaintiffs had made a request to

11   inspect the computer?

12   A.  Yes.

13   Q.  And you have also deleted registry files from that

14   Gateway computer, did you not?

15   A.  I have.

16   Q.  And you deleted registry files when you were

17   uninstalling programs so the uninstall would be more

18   thorough, right?

19   A.  Yes.

20   Q.  And you did this on the Gateway computer?

21   A.  Yes.

22   Q.  Now, just to be clear, while you were getting the

23   Gateway computer, while you took it to Best Buy, you had

24   also had a Toshiba computer, correct?

25   A.  Yes, I still have it.

1    Q.  And during that time you could have used your Toshiba

2    computer for your graduate studies work, right?

3    A.  I do use my Toshiba for graduate studies work.

4    Q.  And because you took the Gateway in to be fixed was

5    because you found that to be a convenient time?

6    A.  Yes.

7    Q.  I want to go back to the testimony you gave.  Let me

8    strike that.  A moment ago you said you looked at the

9    files -- strike that.  Let me go back to the computer you

10   used in Providence, Rhode Island and specifically this

11   letter that we're looking at where you say in November, 2005

12   that you're going to go home and look for files on that?

13   A.  Okay.

14   Q.  And a moment ago you said that's actually what you did,

15   you went home and you looked for the files on that

16   computer?

17   A.  Yes.

18   Q.  What did you do with them?

19   A.  I'm sorry.

20   Q.  What did you do with those files?

21   A.  I didn't do anything with them.

22   Q.  Did you see them?

23   A.  I did.

24   Q.  Mr. Tenenbaum, didn't you testify in September of 2008

25   that in fact when you wrote this letter the computer was

1    already gone?

2    A.  I think I was talking about a different computer.

3    Q.  But you were talking about this letter with Ms. Burton,

4    were you not?

5    A.  I'm sorry.

6    Q.  Were you not asked the following question:  "What did

7    you mean by if there are any files in violation of

8    copyright, I will destroy them at that time?"  Answer:

9    "It's a conditional statement.  I didn't say that they

10   existed, I said if they did exist that I will destroy them."

11   Question:  "Right.  But if you have said that the sound

12   recordings at issue were located on the no name computer,

13   you have said that repeatedly throughout the course of the

14   litigation, the computer is gone, the computer is gone.  In

15   fact, your counsel represented that at the hearing

16   yesterday?  Answer:  "Yes."  Question:  "Yet you said when

17   you got home some days later that you would destroy any of

18   the sound recordings?  Answer:  "Again, conditional, if they

19   exist."

20          Question:  "If you knew the computer was gone and

21   had been destroyed, this statement doesn't make any sense.

22   Can you explain it?  If your statement is correct that the

23   computer was no longer in existence, how does that statement

24   make any sense?"  "Sure.  If A, then B, A doesn't have to be

25   a true statement for if A, then B to be true."

1    Question:  "This sentence doesn't make any sense

2  if the computer was already gone, correct?"  Answer:  "No."

3  Did you not give that testimony, Mr. Tenenbaum?

4  A.  I did.

5  Q.  Mr. Tenenbaum, could you turn to Exhibit 13 again.

6  Again, this is an exhibit, it's the 40-page exhibit of your

7  KazaA shared folder.  Do you see that?

8  A.  Yes.

9  Q.  Now, you kept these songs in your shared folder,

10  correct?

11  A.  Which exhibit was this?

12  Q.  Exhibit 13, pages 1 through 41.  You could turn to page

13  3 with us.  There's an exhibit book, it's a big one, it's

14  got Volume II, I think Exhibits 13 through 44.  Now, you

15  kept these songs in your shared folder, correct?

16  A.  Yes.

17  Q.  And, in fact, you also organized them by album as we saw

18  yesterday, we were able to look at a couple Nine Inch Nails

19  albums and some other albums?

20  A.  Yes.

21  Q.  And you kept these songs in your shared folder, at least

22  as late as August 10, 2004?

23  A.  Yes.

24  Q.  Could you turn to Exhibit 43, please.  Ms. Burton, could

25  you pull up the first page.

1          MR. REYNOLDS:  Your Honor, I believe I can publish

2    this page to the jury.  43.

3          THE COURT:  This is the Dr. Jacobson report.  Go

4    on.

5    Q.  Ms. Burton, could you pull out the first third of this.

6    Now, again, Mr. Tenenbaum now we're talking about the

7    LimeWire shared folder on your Gateway computer.  Do you

8    recall Dr. Jacobson's testimony that these, this Exhibit 43

9    are copies of the files or lists of the files that were in

10   your Limeware shared folder, at least as late as Febrauary

11   of 2007 and possibly as late as May, 2008?

12   A.  Yes, I recall the testimony.

13   Q.  And you don't have any reason to dispute Dr. Jacobson's

14   report, do you?

15   A.  No, it seems very likely.  I trust he's a competent

16   professional.

17   Q.  And, Mr. Tenenbaum, I will note here, we were looking at

18   this yesterday, this is a folder, the mymusic folder?

19   A.  Yes.

20   Q.  That's after the first backslash, it says mymusic; do

21   you see that?

22   A.  Yes.

23   Q.  And the next, after that, it says, "1, all other rap

24   R & B" and then another backslash?

25   A.  Yes.

1    Q.  That's a subfolder, right?

2    A.  Yes.

3    Q.  And you created these subfolders, correct?

4    A.  Yes, I did.

5    Q.  And you created multiple subfolders for things like,

6    this one says R & B, there was one that says Slow Jams,

7    there's another that says Aerosmith, Green Day, Limp Biskit,

8    Lincoln Park, many, many subfolders in your LimeWire my

9    music folder, correct?

10   A.  Yes.

11   Q.  Those are ones that you created?

12   A.  Yes.

13   Q.  And you used those subfolders to organize and store your

14   music?

15   A.  Yes.

16   Q.  Music that was being distributed to other LimeWire

17   users?

18   A.  Yes.

19   Q.  Mr. Tenenbaum, you gave an interview outside of this

20   courthouse last night where you made some statements about

21   your conduct in this case, did you not?

22   A.  Yes.

23   Q.  And you were asked a question, they told you to stop,

24   you don't argue that, and you answered yes to that question,

25   didn't you?

1    A.  Yes.

2    Q.  And then you were also asked but you kept doing it

3    anyway, and you answered yes to that question, didn't you?

4    A.  Yes.

5    Q.  Mr. Tenenbaum, at your deposition, you listed five

6    things that you did with the 30 songs that you downloaded in

7    this case, the 30 songs that are listed on Plaintiff's

8    Exhibits 56 and 57, I'm sorry, 55 and 56 that are at issue

9    in this case; do you recall that testimony?

10   A.  I'm sorry, do I recall what?

11   Q.  At your deposition you listed five different things that

12   you did with the 30 songs that are at issue in this case,

13   the songs that are listed on Exhibits 55 and 56, and one of

14   the things you did with those songs is that you listened to

15   the music you had downloaded, correct?

16   A.  Yes.

17   Q.  And you also talked about the music that you had

18   downloaded?

19   A.  Yes.

20   Q.  And the music moved you in some cases?

21   A.  Yes.

22   Q.  And sometimes you made CD mixes of those, correct?

23   A.  Yes.

24   Q.  And you also made all 30 songs at issue in this case

25   available for distribution on the KazaA network?

1    A.  Yes.

2         MR. REYNOLDS:  I have no further questions, your

3    Honor.

4         THE COURT:  Counsel.

5              CROSS-EXAMINATION

6    BY MR. NESSON:

7    Q.  Joel, where were you born?

8    A.  Pittsburgh.

9    Q.  And where did you grow up?

10   A.  A number of different places, Upstate New York,

11   Minnesota, Providence.

12   Q.  When did you get to Providence?

13   A.  I got there my sophomore year of high school.

14   Q.  And were you into music at that time?

15   A.  Yes.

16   Q.  Tell us when you first got into music.

17   A.  Well, I mean, you could go back, I saw Michael Jackson

18   on the '93 Super Bowl performing at the halftime show.  I

19   don't know if that counts.  I told my parents I wanted to be

20   a singer like Michael Jackson when I was like nine years

21   old, so it's little things like that.

22         We had CDs, the Dirty Dancing sound track was

23   there, but, I mean, the first time I got into it more

24   seriously was on the bus ride to school in sixth grade.  I

25   just moved from New York to Minnesota.  I sat next to a

friend of mine, his name was Tom, and he had a discman, I

didn't have one yet, they were still like 120 bucks, but we

had a wire adapter, something that would split the two

headphones, so what we would do every morning, we listened

to the exact same Sublime CD, exactly the same CD every

morning.  We would tell how far we were along by what track

we got to, and it always got to the same track by the end,

and he introduced me to a lot of great music, to No Effects,

to Garbage, the band, to sublime, of course, a number of

bands, and I assume he got these from his older sister

because we were both in sixth grade.

Q.  Is that where you got the name Sublime and got the idea

of thinking becoming sublimeguy at some later point?

A.  Yes.

Q.  Was your family a musical family?

A.  Absolutely.

Q.  Tell me about that?

A.  My mom was a professional harpist.  She goes around,

does weddings, funerals or baby showers.  When we buy a new

car, we've got to take into account whether or not it holds

a harp, this is a very serious concern whether it holds a

harp.  She plays piano just to get out what she wants to get

out of the piano.  My dad played bassoon.  He played, he

didn't do anything professional, clarinet, bassoon.  Also my

younger sister, I mean, we were all brought up on piano, we

1    diversed into our various instruments.  My younger sister

2    went into trumpet, there's that.  Then there's me.  My

3    parents, like I said, raised us on all piano, they forced

4    us, you got to practice, five minutes that's like five hours

5    when you were a little kid, so I played, and I would really

6    be much more interested in learning the stuff that I liked.

7         Then when I was 12, they let me branch off from

8    piano to a drum, so I took drum lessons for a number of

9    years, and there was a drum teacher who showed me a lot of

10   how you play various songs, taught me a little bit of

11   guitar, how to read tablature, so you've guitar tablature so

12   you can go online and you can type tabs, Hey, Jude, and

13   someone would say what he thinks the best way to play, Hey,

14   Jude on the guitar, so tablature.

15        Then in college my freshman year we all had to

16   take a frontiers course, and frontiers was like this gentile

17   way, I guess, to say like introductory course, so I took

18   frontiers of musicality with this very talented pianoist,

19   Jeffrey Chappel, and I saw him play and was just suddenly

20   interested in getting back into piano, and so every semester

21   afterwards I took private lessons, and that culminated in a

22   recital I had my senior year in piano.

23   Q.  And that's the recital your dad talked about?

24   A.  Yes.

25   Q.  And did your musical interests then continue?  Have you

1  written papers of any kind, music?

2  A.  I have.  I was actually a music minor in college, and

3  along with that obviously a number of papers written.  The

4  longer papers I wrote about the instruments about the

5  history of the piano, why the guitar is the only surviving

6  fretted string instrument, things like that, but also I took

7  a computer music course I think it was my sophomore year.

8  We learned about sort of making music tracks on the

9  computer, and it was done with some program that you can

10  only get on a Mac, and so I did that.

11        As a part of the computer music class, we were

12  required to go to at least a couple of the couple music

13  concerts that the other students were giving, show up,

14  listen to the music and write commentary on it, talk about

15  what we thought was effective in the music, did the lyrics

16  seem to coincide with the content, all sorts of thing like

17  that, and then on top of that I took a couple early intra

18  music courses, and it's basic stuff like cord progressions,

19  circle of fifth, stuff like that if anybody does any

20  like-amateur musician stuff.

21  Q.  Now, prior to your becoming acquainted with Napster, did

22  you have a means of obtaining and listening to music?

23  A.  Well, what was available was that you could physically

24  borrow a CD from a friend, but you borrow something from a

25  friend, you don't know when you're going to get it back, so

1  you could do that.  You could head down to the music store.

2  I think there was a Sam Goody or it became a Sam Goody in

3  the mall that would sell it for like 18 bucks, and you could

4  buy like the whole CD.

5  Q.  Did you listen to music on the radio?

6  A.  Oh, yes.

7  Q.  Tell us about that.

8  A.  I had sort of a favorite music stations wherever I went.

9  In Minnesota, it was 106.9 KORC.  In Providence, it's 99.5,

10  WBRU.

11  Q.  Did you record music from the radio?

12  A.  I did.  I remember one time in particular that one of

13  the radio stations was having like a top 100 songs of the

14  decade or something like that, so I guess 2000 or whatever,

15  and so I was just sitting there just waiting for the songs

16  that I liked ready with my tape deck, ready to record the

17  songs I wanted to record.

18  Q.  Did you have a collection of cassette music?

19  A.  Yes.

20  Q.  And give us some idea of the dimension of that.

21  A.  The dimension?

22  Q.  How much?

23  A.  How much, I think I filled maybe two sides of two tapes

24  just recording off the radio.

25  Q.  And did you have at that time a CD collection to any

1    extent of your own, 1999?

2    A.  '99, yeah, yeah, I had a small CD collection.  What I

3    would do sometimes was I would sort of save up money that I

4    had.  I actually when I was 14 started working at

5    McDonald's, I worked there a number of hours a week, I guess

6    like 20 hours or so a week, and every once in a while I

7    would save up money, and I would just go to the record

8    store, and I would just buy everything that I had heard

9    about.  So I remember one time going in and just sort of

10   looking at it and seeing the bill like 110 bucks or

11   something like that, and I'd take them home.  Some of the

12   CDs would turn out to be really good CDs, and some of them

13   would turn out to be I guess I don't like this artist, I

14   guess they had a pretty good single.

15   Q.  What did you find attractive about Napster?

16   A.  Napster, so before Napster, what I was actually doing

17   was I'd be going through like search engines like Google or

18   I guess at the time it was Yahoo, and I would type the name

19   of the artist .MP3 to see if that file was up somewhere, and

20   this took a long time just to find a song that would

21   actually up there, and then I got back to my computer at

22   home at one point, and this program Napster was installed.

23   I think one of my older sister's friends installed it first,

24   and I looked at it, and I was like --

25   Q.  Would you stop right there.  You didn't install Napster

1    on your computer?

2    A.  No.

3    Q.  Tell us about how it got installed on your computer.

4    A.  Well, I think my older sister, she has a friend who

5    comes and visits now and then, and he came, and this is I

6    guess when I wasn't there, and then I looked at the

7    computer, the icons on the desktop were moved around and

8    some programs were installed, and there was Napster.

9    Q.  And so that was your introduction to Napster?

10   A.  Yes.

11   Q.  And what did you find attractive then about using

12   Napster?

13   A.  Oh, it was great, it was all this searching that you had

14   done beforehand through websites, and, you know, very low

15   success rate, it was suddenly all there, it was like this

16   giant library in front of you of all sorts of things.  If

17   you want to know what you heard on the radio, who sings this

18   and who sings that and you want a song, it pops into your

19   head, it's there.  It's like Google, you type the name of

20   the song, whatever you would type into Google, and you have

21   this list of songs and you can get them pretty easily.

22   Q.  When you started Google, did you have any sense, excuse

23   me, when you started using Napster, did you have any sense

24   that what you were doing was illegal?

25   A.  I guess it wasn't foremost on my mind.  I knew it was --

1   I was getting something without paying for it, but it wasn't

2   at the forefront of my mind.  Obviously now I'm thinking a

3   lot more about whether downloading music is illegal, but at

4   the time it was just, oh, I got all this music.

5   Q.  Was other of your friends into Napster at that time?

6   A.  Yes, I think so.

7   Q.  As you continued to use Napster, what was your

8   purpose?

9   A.  To get music so I could listen to it so I could have it,

10  so I could share it with my friends, so I could share it

11  with my family.

12  Q.  Were you interested in in any way in hurting the record

13  companies?

14  A.  No.

15  Q.  Were you interested in any way in hurting the artists?

16  A.  Definitely not.

17  Q.  Did you at that time have any belief that somehow

18  artists and creators shouldn't be entitled to any kind of

19  return?

20  A.  No, I was never thinking that.

21  Q.  And is that your position even as you sit here today?

22  A.  Yes.  I think very much that artists should continue to

23  be paid for what they do.  I don't think that artists should

24  do this as necessarily just a hobby because they can't get

25  paid out of it, and I think my views aren't very unusual at

1    all.  I think that pretty much everyone of my generation

2    says, yeah, the artists should get paid, they should

3    continue to get paid because they're the ones, they're the

4    ones that are giving so much.  I mean, they spend obviously

5    all the time and all the effort to learn the equipment, to

6    learn the instrument as it is just to get the means to

7    express, but what's actually expressed is, you know, it

8    comes right from the artist, it comes right out of them.

9    Some of the artists give so much that there's barely any of

10   them left.

11   Q.  Do you have any particular artists in mind?

12   A.  Yeah.  We know Kurt Cobain.  He died, apparently stabbed

13   himself because he said his music wasn't real enough to him

14   anymore.

15   Q.  This is Kurt Cobain?

16   A.  Of Nirvana.

17   Q.  Comes As You Are, Nirvana, one of the five?

18   A.  Yes.

19   Q.  Yes.  Keep going.

20   A.  Bradley Nowell of Sublime had an ongoing heroin problem,

21   and eventually he overdosed on it, and if you listen to the

22   songs and you hear the lyrics, the music was his escape, the

23   music was what kept him alive so long, and Trent Resner, in

24   1994, he came out with A Downward Spirel, which was just a

25   magnificent CD, a great, what's the word, sort of a themed

1    piece, the whole CD was on a theme, Downward Spiral, then

2    nothing came out from Trent Resner of Nine Inch Nails for

3    five years.  We were wondering what was going on, like, come

4    on, Trent, we need something new.  It turned out in the

5    meantime, he had struggled with all sorts of problem, he had

6    a drug addiction, and he was just having serious issues

7    getting to do anything, and apparently it says in Rolling

8    Stone

9            MR. REYNOLDS:  Your Honor, I object.  I think

10   there's a lack of foundation and also to the narrative

11   response.

12           THE COURT:  Sustained.

13   Q.  When you were in Providence, you were starting sophomore

14   year in high school, and you continued through at Classical

15   High School until you graduated?

16   A.  Yes.

17   Q.  And that's where this friendship group formed?

18   A.  Yes.

19   Q.  Tell us how wide that friendship group was.

20   A.  How many people?

21   Q.  Yes, more or less.

22   A.  It was about -- it's kind of like Sex In The City in you

23   have a common group of people that are always there and then

24   they're there sometimes, sometimes not.  You know, so I

25   guess it would be a half dozen of us were together on a

1    weekly basis.

2    Q.  And did you spend time with your friends at your house

3    in Providence?

4    A.  Yes, I did.

5    Q.  And what are the various activities that you did with

6    your friends?

7    A.  A lot of time was spent just driving around in my car

8    looking for skateboard spots, that was our big thing,

9    skateboarding.  I basically explored all of Rhode Island

10   just by virtue of skateboarding.  What we would do in the

11   car is we would listen to absolutely everything.  And so a

12   big part of that was when we were at my computer, we'd say,

13   okay, what do we want to listen to in the car because my

14   car, it didn't have obviously an MP3 player, but I had this

15   elaborate stereo system in there, and so it was a matter of

16   which songs do we want to put on this CD, what do we want to

17   have at our disposal, so I have, I don't know, four CD racks

18   in the visor of the car just to be able to pop something

19   in.

20   Q.  Tell us about this car.  You have to be 16 to have a

21   license?

22   A.  Yes.

23   Q.  When did you get this car?

24   A.  When I was 14.

25   Q.  Tell us about that.

1    A.   Okay.  So in Minnesota you could actually drive when

2    you're 15, you get a full license when you're 15, something

3    like that, and so my grandma actually, she was basically a

4    used car lot.  She had this 1982 Buick Riviera --

5         MR. REYNOLDS:  Your Honor, I'd object,

6    relevance.

7    A.   Something relevant, I installed a stereo system in it.

8    This is something my dad helped me out with.

9         MR. REYNOLDS:  I object to the narrative of the

10   witness testifying without a question.

11        THE COURT:  The objection is sustained.  Pose

12   another question, please.

13   Q.   At some point you obtained a car?

14   A.   Yes.

15   Q.   Did you buy this car yourself?

16   A.   No.

17   Q.   This was a gift from your grandmother?

18   A.   Yes.

19   Q.   You were working at McDonald's at this point?

20   A.   Yes.

21   Q.   Did you have a money source from any other source?

22   A.   Well, my parents obviously paid for food and clothing.

23   Q.   In terms of your spending money?

24   A.   No, that was my only source.

25   Q.   And you worked at McDonald's.  What was your rate of

1    pay?

2              MR. REYNOLDS:  Your Honor, I object to the leading

3    questions and lack of relevance.

4              THE COURT:  Leading questions derived from the

5    fact that he has now been called in your case, so Mr. Nesson

6    can actually lead him.  Relevance is another question.  I'll

7    allow you a little bit more of this, Mr. Nesson.  Go on.

8    Q.  I'm merely interested in the electronic equipment that

9    you invested in for your car.  Was there such?

10   A.  Oh, yes.

11   Q.  Tell me how you equipped your car.

12   A.  So I had a dual 12 inch subwoofer in the trunk which I

13   had like a 500 watt amp. connected.

14   Q.  Wait a second, go slow.  Say that again.

15   A.  Dual 12 inch subwoofers sitting in the back of the car

16   which I had like a 500 amp. connected to.  I had replaced

17   all the factory speakers, the speakers that came with the

18   car, which was terrible quality, probably distorting it

19   anyway, so I replaced it with new front speakers, new rear

20   speakers, and my dad helped me enormously with wiring it.

21   Q.  And do I understand then that the trunk of the car

22   actually was occupied with big sound equipment?

23   A.  Yeah, this was sort of a recurring issue was if I wanted

24   to be able to carry any amount of stuff in the car, the

25   trunk was actually half taken up with a subwoofer, the trunk

1   of a giant 1982 Buick Riviera dinosaur.

2   Q.  So The picture is of a group of kids, skateboarding,

3   riding around the state in your car enjoying music that you

4   have obtained in one fashion or another played on CD

5   player?

6   A.  Yeah, that's how it was.

7   Q.  And I take it then if the music couldn't be easily put

8   into a CD format, it wasn't that useful to you?

9   A.  Right.

10  Q.  And so Napster then fits with this picture how?

11  A.  Well, on Napster, there was this huge selection of music

12  because it seemed like almost everybody was on Napster, and

13  so there was this just wealth of files that were there, and

14  they were all in MP3 format which you never had any problems

15  putting onto a CD to listen to elsewhere.

16  Q.  In other words, the MP3 format that was available

17  through Napster made it completely accessible to you as

18  music that you could use in your environment with your

19  friendship group?

20  A.  Yes, very convenient.

21  Q.  And so when you say your purpose in downloading from

22  Napster was to listen to music, it was not only to listen to

23  the music but to share it with your friends?

24  A.  Yes, to listen to the music, to have it in my

25  collection, to share it with my friends.

1   Q.   Did you have any credit card at that point?

2   A.   No.

3   Q.   And did you at that time begin building a digital music

4   collection?

5   A.   Yes.

6   Q.   Now, when Napster was taken down, when you found it to

7   be not workable, you shifted to KazaA.  Did you download the

8   KazaA program?

9   A.   Yeah, I think I did.

10  Q.   And you installed it?

11  A.   Uh-hum.

12  Q.   And you found that it worked pretty much the way Napster

13  did?

14  A.   Yeah, it was -- I mean, I've learned a lot from

15  Dr. Jacobson earlier about the inner workings of the stuff,

16  and it's interesting that Napster is different from KazaA,

17  which is different from iMesh, but it was basically the same

18  thing to me, it was a Google search position, and it was

19  music that would come out of it.

20  Q.   Now, how did you hear about new music that you might be

21  interested in?

22  A.   A variety of sources.  I could hear it on the radio.

23  That sort of became less and less relevant.  If I would read

24  about it online, Rolling Stone, I had a subscription for

25  Rolling Stone magazine for a while, and on the back of every

1  Rolling Stone magazine, it would say like who the hot

2  artists are in terms of like top college radio artists, top

3  selling at the billboard, stuff like that.  I watched MTV, I

4  heard about music that way, I obviously heard it from my

5  friends, the news, anything, anywhere that -- anything that

6  could possibly convey information to you could be telling

7  you about music.

8  Q.  When did you first get any intimation from the recording

9  industry that somehow you had been caught?

10  A.  That would be the first letter that got sent out to my

11  parents that said we suspect you're copyright infringing.

12  Q.  And tell us what happened after that.  What did you

13  do?

14  A.  So my mom got the letter, and she called me up, and she

15  said, "Joel, there's a letter here, it's talking about

16  copyright infringement.  Is this something that has to do

17  with you and your friends and all that?"  And I said, "Yeah,

18  that's probably about me."  She said, "Okay.  What do we do

19  about this?"  So, what we did was I think it was within a

20  week or so, drafted a letter, included a money order, sent

21  it to them saying here's settlement.

22           MR. REYNOLDS:  Objection, your Honor.

23           THE COURT:  Sustained.

24           MR. FEINBERG:  Your Honor, may we approach on this

25  issue?

1          THE COURT:  No.  Go on.

2          MR. REYNOLDS:  I move to strike the answer as

3     well.

4          THE COURT:  The answer is struck.  Next.

5     Q.  You're referring to the letter that was shown to you?

6     A.  Yes.

7     Q.  In which you stated that you would eliminate your music

8     files?

9     A.  Yes, that was the letter.

10    Q.  And why didn't you eliminate the music files?

11    A.  So I went home on college break on the date that I said

12    I was going to home on college break, and there I was in

13    front of my computer, and I couldn't do it, and it wasn't a

14    matter of I don't know how to do it, I knew how to delete

15    the files, you just select everything, you hit the delete

16    key.

17          I looked at it.  I couldn't do it.  It was this

18    huge collection of music I was making for years.  It was

19    everything I listened to, so what I started to do actually

20    was I started taking a piece of paper, write down the names

21    of the artists that were there so I could get them again,

22    so, in the meantime, I was like well, I'll do it next week.

23    They didn't accept -- I didn't get any reply from them, so

24    I'll wait, then the next week and the week after and then I

25    got the reply from the record company and --

1          MR. REYNOLDS:  Objection.  I object to the

2     narrative response.  We'd like a question and answer as

3     opposed to this narrative.

4          THE COURT:  Well, I think he's already answered

5     the question that was posed to him, which is why didn't you

6     do it.  Why don't you ask him another question.  I allow you

7     to lead so you can ask a more pointed question.

8          MR. NESSON:  Your Honor, I'd really like to

9     approach the bench on this.

10          THE COURT:  No, I want you to proceed.

11    Q.  Was there any other reason besides your attachment to

12    the work you had put in in assembling this music collection

13    that led you not to destroy it?

14    A.  Yes.

15    Q.  And what additional reasons were there?

16    A.  The reply from the record company.

17          MR. REYNOLDS:  Your Honor, I'm going to object,

18    and we may need a sidebar at this point.  I'm not sure what

19    this witness has in mind, but --

20          THE COURT:  So the answer is the reply.  Your next

21    question would be what was that reply?  Okay.  Sidebar.

22          (THE FOLLOWING OCCURRED AT SIDEBAR:)

23          THE COURT:  What's his answer going to be?

24          MR. NESSON:  His answer will be that he got

25    rejected by the recording company when he expressed a

1    willingness to cooperate with them.

2           THE COURT:  That's the reason why he didn't

3    destroy the recordings on his computer?

4           MR. NESSON:  That together with the fact that he

5    loved them, yes.

6           MR. OPPENHEIM:  Wait a minute.

7           MR. FEINBERG:  To be clear --

8           THE COURT:  Just a second.

9           MR. OPPENHEIM:  What happened here was that he

10   sent a money order to try to settle this case.

11          THE COURT:  I know.

12          MR. OPPENHEIM:  Then it was clearly less than we

13   were willing to accept.  We returned it.  It wasn't we

14   weren't willing to cooperate, we didn't accept this

15   unilateral for some tiny amount of money.  There was no

16   cooperation or discussion on this, so that really misstates

17   what happened here.

18          MR. REYNOLDS:  Your Honor, his testimony is

19   directly at odds with this witness' sworn testimony at his

20   deposition.

21          THE COURT:  What did he say at deposition?

22          MR. REYNOLDS:  He testified under oath at the

23   time, he said in that November 27th letter the computer was

24   already gone, and that's why we were asking him the

25   difference, why did you say it was there if it was gone?  He

1  never said that he looked for the files.  We asked him what

2  did you do when you got back, did you look for the files?

3  He said no.  This is directly at odds.  This is designed to

4  get in the settlement discussions through the back door.

5         MR. OPPENHEIM:  I don't mean to tagtime, you'll

6  remember the very first day Mr. Nesson appeared in this case

7  and we appeared here, Mr. Nesson asked for an immediate

8  trial date.  This was back in August of last year.  We said,

9  your Honor, we need some discovery, and Mr. Nesson said,

10 well, the deposition is scheduled for tomorrow.  We said we

11 need the computer.  He said the computer doesn't exist.  We

12 took his deposition the next day.  He indicated the computer

13 did exist.  We then went back and forth whether this

14 computer exists, whether it didn't.  It keeps changing and,

15 he shouldn't be allowed to do this.

16        MR. FEINBERG:  Judge, let me say three things.

17 There are three reasons, three more reasons why I think this

18 letter should be in not with the money number first, the

19 letter is an offer in settlement.  The language that you'd

20 allow in is part of the proposal to settle.

21        MR. REYNOLDS:  No.

22        MR. FEINBERG:  One can infer -- please, I didn't

23 interrupt.

24        THE COURT:  Go on.  We've already been over this

25 ground.  If we took the number, the jury would be allowed to

1     speculate what the rule doesn't allow, so this is the best

2     of limited alternatives.

3          MR. FEINBERG:  The other issue, this is a prior

4     inconsistent statement.  They're saying it's inconsistent.

5          THE COURT:  What do you mean later?

6          MR. FEINBERG:  They later said, he later says the

7     computer didn't exist, this is evidence that it did exist.

8          THE COURT:  Wait, what is the statement that would

9     suggest it did exist?  The letter, you already have the

10    letter in.

11         MR. FEINBERG:  The letter --

12         THE COURT:  The letter is in representing that it

13    did exist, so I don't understand.  The question here is only

14    why didn't you do what you indicated in the letter, and it

15    seems to me fair to say that he can't say because the record

16    company rejected my settlement.  The reason he can't say

17    that is first it looks like completely inconsistent; second,

18    it raisess the question, what are the terms of the

19    settlement, which he cannot get into, so at this point the

20    only thing I can think you could say, well, I think you

21    should leave it at that.

22         MR. FEINBERG:  May I add one other thing?  I

23    thought you said in your ruleing settlement discussions --

24         THE COURT:  The fact of them.

25         MR. FEINBERG:  This is the fact of settlement

1    discussions.  This is an offer in settlement, this letter.

2         THE COURT:  What he can say is because of the

3    record companies' response to my letter and leave it at

4    that, and you can read it that way.

5         MR. KAMHOLTZ:  If I could add something, why

6    couldn't the question be, here the letter we see here in the

7    exhibit is redacted, did you offer to settle the case, yes

8    or no, yes, was your offer accepted or rejected, it was

9    rejected.  Why can't that come in?

10        THE COURT:  Because that there were settlement

11   negotiations, we could come up with a stipulation there were

12   settlement negotiations that failed, but it seems to me

13   allow this in as an excuse for what he said doing in the

14   letter raises the question of who was settling for what, and

15   it's exactly what we can't get into.

16        MR. OPPENHEIM:  We could put in an evidence that

17   we made an offer.  We made many offers.

18        MR. FEINBERG:  Fine.

19        THE COURT:  I have ruled on this already.  You can

20   ask the question.  He can certainly say he didn't destroy

21   this music in part because he loved it and in part because

22   of the record companies' response.  You can do that in terms

23   of a leading question.

24        MR. REYNOLDS:  Now, can the witness be told?  He

25   wants to get it through the back door.  Somehow the witness

1    needs to be instructed he cannot discuss this voluntarily.

2          THE COURT:  We'll do this through a leading

3    question, and then you cross-examine him on the

4    inconsistency under oath what he said before and what he's

5    saying now.

6          MR. FEINBERG:  One more clarification.

7          MR. OPPENHEIM:  The statement you just made and in

8    part because of the record companies' response, I want to

9    make sure that the record companies were suggesting that he

10   shouldn't delete it, right, because that would be very

11   misleading as though we authorized it.  I'm not sure why we

12   aren't leaving it.

13         THE COURT:  I think you can leave it the demand

14   letter says don't destroy.  The objection is sustained.  The

15   question and the inquiry is out.

16         MR. FEINBERG:  May I ask one other point of

17   clarification?  Can Mr. Nesson ask the subsequent question

18   not related to this letter or settlement negotiations?

19         THE COURT:  No, you're going to do that by way of

20   stipulation, it seems to me.

21         MR. FEINBERG:  Can we read it?  I'm not sure you

22   agree.

23         THE COURT:  You will agree to a stipulation that

24   will say, well, because we're in the pickle now, you in your

25   opening talked about how --

1           MR. OPPENHEIM:   Just say the stipulation.

2           THE COURT:  That the litigation strategy was, you

3   know, to file these demand letters and most people settle,

4   very few went to trial.  You opened the door.  There was a

5   litigation strategy, and it was mostly settlement, so it

6   seems to me both sides should agree to a stipulation there

7   were settlement negotiations which failed.  Leave it with

8   that.

9           MR. OPPENHEIM:  I'm fine with this.

10          THE COURT:  You will not ask of this witness.

11          MR. NESSON:  When do I tell the jury that?

12          THE COURT:  At the end of the case.  You'll put it

13  in before argument.

14          (SIDEBAR CONFERENCE WAS CONCLUDED)

15          MR. NESSON:  May I have just a moment?

16          THE COURT:  Yes.

17  Q.  After you sent this letter and received a reply and

18  didn't destroy your music files, what happened next as far

19  as your interactions with the recording industry?

20  A.   The number came with a number to call.  It was the

21  settlement information line.

22          THE COURT:  Mr. Nesson, this is not where we just

23  agreed you would go.

24          MR. NESSON:  I'm sorry, your Honor, I needed

25  to -- forgive me your Honor.

1           THE COURT:  Next question.

2           MR. REYNOLDS:  Move to strike, your Honor.

3           THE COURT:  The answer is stricken, struck.

4  Answer.

5           MR. REYNOLDS:  We're fine with either.

6           THE COURT:  The answer is gone.

7  Q.  So you go off to Goucher College and in between the time

8  that we're talking about and -- well, let me just get to

9  Goucher College.  You get to Goucher College.  What is the

10  situation at Goucher College as far as music sharing when

11  you first come?

12  A.  Again, as I was telling Mr. Reynolds, it was essentially

13  when I got there, there were absolutely no restrictions on

14  anything.  You were free to share files as you might share

15  anything, as you might share a paper on the Windows program,

16  and then progressively every year that went by the controls

17  seemed to get stricter and stricter, and fewer and fewer

18  things would work, and finally by my junior year, senior

19  year, the programs didn't work at all.

20  Q.  Was there a widespread file sharing at Goucher?

21  A.  Yes.

22           MR. REYNOLDS:  Objection, foundation, your Honor,

23  vague and ambiguous.

24           THE COURT:  To the extent this witness knows, go

25  on, you can have it.

1   Q.   How did the file sharing at Goucher work?

2   A.   So on the Windows program, the network neighborhood, you

3   couldn't actually search by the artists name or the song

4   name, you couldn't do searches like that, so what you would

5   have to do is you would have to click on an individual's

6   computer name, and you would click on it and what you would

7   have on their music library just opened so you could look

8   and see what was there, so, for example, there was some guy

9   down the hall had a pretty hefty RadioHead collection, and

10  so I discovered RadioHead that way and put that on my

11  computer.

12  Q.   Was there any physical sharing of music while you were

13  early at Goucher?

14  A.   I don't think so.  I think it was mostly on the network.

15  It was already set up, it was kind of slow and pointless to

16  put it on a CD or anything, you just share it, you know, on

17  the network.

18  Q.   And as Goucher went forward with its increasing

19  constraints on student file sharing of music, what was the

20  response that you made to that in terms of your sharing

21  behavior?

22  A.   Well, I tried to keep sharing, and I tried other

23  programs but ultimately everything was blocked, so I just

24  couldn't do it.

25  Q.   And at this time you are still using KazaA?

1    A.  At this point I'm not because it doesn't do anything at

2    this point.

3    Q.  I don't mean at this point today.

4    A.  Okay.

5    Q.  At Goucher?

6    A.  That's what I mean.

7    Q.  Explain.

8    A.  So all the file sharing programs by my junior year, none

9    of them worked, none of them did anything, you wouldn't

10   connect to the KazaA server or LimeWire server, so the

11   programs didn't do anything, so I stopped using them.

12   Q.  And did you go to any other method of sharing music with

13   friends at that point?

14   A.  Well, at that point if I wanted to share music, I'd have

15   to do it with a physical CD or I guess a flash drive or

16   whatever, so my dad and I, for example, passed music back

17   and forth just on CDs themselves.

18   Q.  During this period from 1999 until you're at Goucher and

19   actually through Goucher were you buying any CDs?

20   A.  Yes, I was.

21   Q.  Could you describe that.

22   A.  The buying of CDs, sure.  So if it became -- I mean,

23   there are all sorts of reasons to be unsatisfied with what

24   you've downloaded so far.  You can't get the whole album,

25   and a lot of times it's hard to get the whole album because

1   there's one song or a couple songs that no one is really

2   into, so they're rare, so maybe only one person has it, and

3   you click on it, sometimes the connection doesn't work,

4   sometimes the quality is just terrible, sometimes the song

5   has other song like written over it for some reason, a lot

6   of times you don't get the whole song, it gets cut off like

7   halfway through, so if for whatever reason I wasn't happy

8   with what I got, and this was something I think I remember

9   discussing on the Death Tones forum, it was just basically a

10  lot of times I want to have the physical CD because I have

11  the whole thing, I have the product, I have the booklet, and

12  I have like the tracks as they originally are in this high

13  quality, and it's all there.

14  Q.  Have you brought with you your book of CD --

15       MR. REYNOLDS:  Objection, your Honor.  It's not in

16  evidence, never disclosed to plaintiffs.

17       THE COURT:  Sustained.

18  Q.  Can you tell us what CDs you purchased, that is,

19  actually laying out your money paying for?

20  A.  Yeah.  So the immediate one that comes to mind is Nine

21  Inch Nails, The Fragile, it was a double album that came out

22  in '99, and what I actually had done was downloaded two or

23  three songs of that album, and I liked it, and so I was this

24  is definitely worth it, so I actually went out and bought

25  the physical album, which was a double CD, so it's like 20

1    bucks or whatever.

2          Another thing I have, I have Nirvana, I have

3    Nirvana Never Mind.  Track 2 is Come As You Are, Track No 1

4    is It Smells Like Teen Spirit.  I don't remember if I bought

5    that CD before or after downloading songs or getting songs

6    from other people, but I ended up buying that.  A number of

7    CDs I bought over the years.

8          Limp Biskit Significant Other was an album that I

9    had.  Limp Biskit Three Dollar Bill was an album that I had

10   purchased at some point, and then that was how it was.  Now,

11   if I got a CD, I lost it, sometimes I'd download to replace

12   it.  Yeah, so any time I want to have the whole CD and clear

13   the whole thing, I'd go out and buy it.

14   Q.  Can you give us how many CDs you purchased?

15   A.  Do you mean over the years?

16   Q.  Yes.

17   A.  Over 100.

18   Q.  And would you be able to indicate the different genres

19   of music that you purchased by CD?

20   A.  Better than my dad could.  So I have a good variety of

21   classical, I have a couple CDs featuring the works performed

22   of Johann Sebastian Bach, Beethoven.  I think it was

23   actually I went out and bought online symphonies on CD, and

24   then my uncle went out and bought the same thing, so we

25   actually had two like different versions of Beethoven's nine

1    symphonies.

2         The Beethoven Five Piano Concerti handles a

3    concerti, so classical, we'll just say classical, then, of

4    course, I had some hip-hop R & B, which is mostly stuff that

5    I listened to with my friends, you know, it was what we were

6    into, it was what was on the radio.  I still follow, you

7    know, some of it.  The majority you can loosely throw under

8    the umbrella of rock, so this is like Death Tones, Nine Inch

9    Nails, punk rock like No Effects, The Ramones, Heavy Metal I

10   guess which would be Marilyn Manson, Rammstein, stuff like

11   that, so it's a whole umbrella of rock, alternative, that

12   kind of stuff.

13   Q.  When did you learn that you were really being sued?

14   A.  Well, I mean, do you count the letter that I got from

15   them?

16   Q.  No, next.

17   A.  When the lawsuit was filed.

18   Q.  When you hear about the lawsuit.

19   A.  Okay.  I think that was early August in 2007, I came

20   home to my apartment, and sitting there sort of leaning

21   against the door was this huge stack of papers, I don't

22   know, about 50 papers thick, and that was the complaint, the

23   complaint, which I later found out means like the normal

24   start of the lawsuit, here's what we're claiming against

25   you.

1   Q.  And what was the complaint against you, do you recall?

2   A.  I mean, I flipped through it trying to figure out what

3   was there, but it seemed that it came down to the stuff that

4   I had interaction with earlier about the letter that they

5   had sent me and phone calls and so forth, so I figured it

6   was about that, and I saw the words "copyright infringement"

7   and so, okay, they're suing me for either downloading or

8   uploading or sharing music.

9   Q.  And did you then consult with anyone about that

10  complaint?

11  A.  Yes, I talked to my mom.

12  Q.  And tell us about that.

13  A.  Okay.  So my mom, in addition to being a professional

14  harpist, is actually a state paid I guess you'd say child

15  custody attorney for the State of Massachusetts, so she has

16  practice in the overall forum of law where the complaint is

17  and what you have to do to a complaint in order for it not

18  just to be answered, but she was the furthest thing of any

19  sort of technical person.  I'm sorry, mom.

20       MR. REYNOLDS:  Your Honor, objection.  Narrative

21  response and also irrelevant.

22       THE COURT:  Overruled.  Go on.  Go on with the

23  question.  Go on with the question, don't go on with the

24  narrative.

25  Q.  Did you at that point consult a lawyer besides your

1  mother?

2  A.  Yes, there was -- we had a family friend from Minnesota

3  named Caruno Yen, and my mom still keeps in touch with her,

4  and she was a patent attorney there.

5  Q.  And did you retain her as a lawyer?

6  A.  No, I never did.  She talked with us and told us as much

7  was helpful as she knew, which I guess wasn't much, but she

8  was never my lawyer.

9  Q.  And tell us how you felt when you received this

10  complaint.

11          THE COURT:  Sustained.

12          MR. REYNOLDS:  Objection, your Honor.

13  Q.  Were you terrified when you received this complaint?

14          MR. REYNOLDS:  Objection, your Honor.

15          THE COURT:  Sustained.

16          MR. NESSON:  On what grounds, your Honor?

17          THE COURT:  His reaction to the complaint is

18  irrelevant to the case.  Go on, Mr. Nesson.

19  Q.  Did you appreciate the threat that this complaint

20  represented to you and your future?

21  A.  It seemed like a very serious threat.

22  Q.  And did it have impact not only on you but on your

23  family?

24          THE COURT:  Sustained.

25          MR. REYNOLDS:  I object.

1  Q.  Mr. Reynolds began his examination of you by asking you

2  to respond to and react to your responses to

3  interrogatory?

4  A.  Yes.

5  Q.  Were your interrogatory responses accurate?

6  A.  No.

7  Q.  Why did you lie at that point?

8  A.  It was kind of something I rushed through with my mom,

9  and I figured if you phrase things in a certain way it's not

10  like -- I don't know, it's what seemed the best response to

11  give.

12  Q.  You were on the defense, were you not?

13  A.  Yes.

14  Q.  And you were doing the best you could?

15  A.  Yes.

16  Q.  Without a lawyer advising you directly on the answers?

17  A.  My mom, but --

18  Q.  And you then in August, 2008 or was it September were,

19  became represented by me?

20  A.  Yes.

21  Q.  And almost immediately we were in deposition?

22  A.  Yes.

23  Q.  And in that deposition you made the responses that

24  Mr. Reynolds also reviewed to you?

25  A.  Yes, I did.

1    Q.  And would you describe those as less than fully

2    forthcoming?

3    A.  Yeah.

4    Q.  Were you deposed a second time?

5    A.  I was.

6    Q.  And at that second deposition, were you likewise

7    defensive and unforthcoming?

8    A.  No.

9    Q.  Tell me about the second deposition.

10        THE COURT:  No.  Please ask a question.  Don't do

11   a tell me about.

12   Q.  What was your posture in the second deposition?

13        THE COURT:  Give me a more specific question,

14   Mr. Nesson.

15   Q.  In your initial responses to the complaint, as

16   Mr. Reynolds reviewed with you, you were at pains to say how

17   many different people had been in the open environment of

18   your house and had potential access to the machine and could

19   have done whatever they were alleging would be done?

20   A.  Yeah, I was jogging my memory for every possible,

21   yeah.

22   Q.  At the second deposition, what was your posture with

23   respect to responsibility for what had been downloaded to

24   your machine?

25        MR. REYNOLDS:  Objection, your Honor, asked and

1    answered.

2           THE COURT:  You mean to say did you take

3    responsibility?

4           MR. NESSON:  Yes.

5    Q.  Did you take responsibility at a general level for what

6    was downloaded to your machine?

7    A.  Yes, and I take responsibility now.

8    Q.  So that you're not in the posture now of trying to say

9    someone else did it, the burglar did it or my sister did

10   it?

11   A.  If it does, it doesn't matter.  This is me, I'm here to

12   answer.  I used the computer, I uploaded, I downloaded

13   music, this is what I did, that's how it is, I did it.

14   Q.  And you did it starting 1999, and you continued more or

15   less with one program and followed by another program until

16   you desisted when?

17   A.  It was some time I think it was 2007, it might have been

18   as late as 2008.

19   Q.  And you desisted why?

20   A.  A number of reasons.  I mean, the whole file sharing

21   downloading music, I mean, I could just best describe it by

22   calling it messy.  You have all kinds of adware on the

23   computer, malware.  It's screwing the computer up.  You have

24   to search through songs to find out which is which.  You get

25   spoofs, it's been mentioned a lot before.  You can get a

song, then you listen to it, what the hell is this?  This
isn't that.

iTunes is what I use, it's what I've been using
for the last couple years.  There's a very good selection on
iTunes now, and I'm signed with that, with my credit card,
everyone is doing it that way for a reason, and there's a
big library there, and it's just easy, and I know that I'm
going to get the song that I ask for and that it will be,
you know, at least pretty high quality, very high quality,
and it's there and it's simple.

Q.  And this impending lawsuit coming down on you was also a
reason why you desisted?

A.  Yes, it was also a matter of that that -- I connected
the lawsuit was sort of related with this file sharing
stuff, and so at some point I decided that, well, it's
probably best just to not do that and whatever the
consequences of that are going to be when I should show up
in court.

Q.  In August of 2004, August 10th, were you even aware of
iTunes at that point?

A.  I don't think so.

Q.  Were you aware of any of the digital alternatives?

A.  I think I had seen Liquid Audio.  I didn't really
investigate it.  I think I heard the name before.  I don't
think I had heard of iTunes, maybe I heard Music Man or

1    Music Match.  I hadn't heard of this Press Play that people

2    are talking about.  I may have heard of iTunes.  I don't

3    think I had.

4    Q.  And were you in any position at that point in August,

5    2004, not only to switch your own musical acquisition

6    practices to digital downloads of these Press Play kinds but

7    also to switch over your friendship group who was also into

8    sharing music?

9    A.  It was an imposition to switch my friendship group.

10   Q.  Let me focus on you first.

11   A.  Okay.

12   Q.  Were you -- was it realistic on August 10, 2004 that you

13   would stop using KazaA and switch over to iTunes?

14             MR. REYNOLDS:  Objection, your Honor.

15             THE COURT:  Sustained.

16             MR. NESSON:  May I have a moment, your Honor?

17             THE COURT: Yes.

18   Q.  Joel, at any point in this history of you downloading

19   music from the peer-to-peer networks, did you ever do it for

20   the purpose of selling the music to anyone?

21   A.  No.

22   Q.  Did you ever do it for the sake of using the music to

23   promote any kind of commercial activity?

24   A.  No.

25   Q.  Was there any commercial aspect whatsoever?

1          MR. REYNOLDS:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.   No.

4    Q.   This was entirely for your pleasure and the pleasure of

5    your friends and family?

6    A.   Yes.

7    Q.   So completely personal kind of use?

8    A.   Yes.

9    Q.   Did you consider yourself -- you didn't consider

10   yourself committed only to this form of obtaining music?

11   A.   No, as I've said, I went out and bought a number of CDs

12   in the music store, would go down and actually buy the CDs

13   themselves, so it was sort of it was a hybrid approach, it

14   was whatever worked best, whatever was easiest, et cetera.

15   Q.   And to objections that somehow you were depriving

16   artists of revenue by using a peer-to-peer, was it the case

17   that your purchasing of CDs put you in a posture as a matter

18   of your personal state of mind where you felt you were being

19   reasonable and fair to the industry?

20         MR. REYNOLDS:  Objection, your Honor.

21   Relevance.

22         THE COURT:  Sustained.

23         MR. NESSON:  May we take the lunch break, your

24   Honor?

25         MR. OPPENHEIM:  Your Honor, I only have a few

1    questions.

2         THE COURT:  Are you finished now, Mr. Nesson?

3         MR. NESSON:  No, I'm not.

4         THE COURT:  We'll take a break between one and

5    two.  Again, ladies and gentlemen, enjoy your lunch but

6    don't talk to anybody.  All rise for the jury.

7         (A recess was taken.)

8         THE CLERK:  All rise.

9         THE COURT:  You can be seated.  Mr. Nesson.

10   Q.  Joel, how did you afford Goucher?

11        MR. REYNOLDS:  Objection, your Honor.

12   Q.  Do you need a minute?

13   A.  No, I'm good.

14        MR. REYNOLDS:  Objection, relevance.

15        THE COURT:  The objection as rephrased is

16   irrelevant.  Objection sustained.

17        MR. NESSON:  May I have a moment, Judge?

18        THE COURT:  Yes.

19   Q.  Did you have a scholarship at Goucher?

20   A.  Yes.

21   Q.  Do you have a scholarship or some sort of tuition help

22   at Boston University?

23   A.  Yes, I have full support at Boston University and they

24   pay me a stipend.

25   Q.  Was the scholarship at Goucher --

1        MR. REYNOLDS:  Objection.

2        THE COURT:  Sustained.

3        MR. NESSON:  Your Honor, may we approach on this?

4        THE COURT:  No.

5   Q.  When you took your computer to Best Buy, was it your

6   intention to erase any of your files?

7   A.  No, in fact, I was clear when I was thinking, when I was

8   talking to the guy making sure that all the music would be

9   preserved.

10  Q.  And why was that?

11  A.  Because of this whole proceeding here that you

12  can't -- well, okay, that's part of it, but I didn't want to

13  lose my music, but the other part of this you're not

14  supposed to screw with evidence.

15  Q.  Why did you take your computer to Best Buy?

16  A.  The thing wouldn't run.

17        MR. NESSON:  Thank you.  I have no further

18  questions.

19                  REDIRECT EXAMINATION

20  BY MR. REYNOLDS:

21  Q.  Good afternoon, Mr. Tenenbaum.

22  A.  Good afternoon, Mr. Reynolds.

23  Q.  You testified that a moment ago or before the break that

24  one of the purposes of peer-to-peer early on was to get

25  music to share with friends?

1    A.  Yes.

2    Q.  You were not friends with everyone on Napster, right?

3    A.  I did not have face-to-face contact, if that's what you

4    mean.

5    Q.  You were not friends with everyone on KazaA?

6    A.  No.

7    Q.  And you were not friends with everyone on LimeWire, were

8    you?

9    A.  No.

10   Q.  And you also testified you had no iTunes in 2004; do you

11   recall that testimony just before the break?

12   A.  Yes.

13   Q.  Would you turn to page 89 of your deposition, please.

14   Again, during this deposition you were questioned by

15   Ms. Burton?

16   A.  Yes.

17   Q.  You were represented by counsel?

18   A.  Yes.

19   Q.  And you testified under oath?

20   A.  Yes.

21   Q.  Were you not asked and did you not give the answer to

22   the follow questions, question:  "When did you start using

23   iTunes?"  Answer:  "I don't know."  Question:

24   "Approximately?"  Answer:  "If I had to guess?"  Question:

25   "Can you approximate?"  Answer:  "If I had to approximate, I

1  would say high school."  Did you give that testimony at your

2  deposition?

3  A.  I did.

4  Q.  Further down, line 11, you were asked this question,

5  "Did you have an iTunes account on the computer that was in

6  your room connected to your parents' Internet account?"

7  Answer:  "I think so."  You gave that testimony as well at

8  your deposition?

9  A.  Yes.

10 Q.  Mr. Tenenbaum, you said in your testimony before the

11 break that you lied in your written discovery responses to

12 the plaintiffs?

13 A.  Yes.

14 Q.  And those written discovery responses were prepared with

15 the assistance of your mother, a licensed attorney?

16 A.  Yes.

17 Q.  An attorney licensed in the State of Massachusetts?

18 A.  Yes.

19 Q.  And an active member of the Bar?

20 A.  Yes.

21 Q.  You then said you were less than forthcoming with your

22 answers at your first deposition?

23 A.  Yes.

24 Q.  You were represented by Mr. Nesson at that deposition?

25 A.  Yes.

1   Q.  Just to give one example, you have testified here today

2   that after sending this November 25th letter, and

3   Ms. Burton, could you bring up Exhibit 23.

4           MR. FEINBERG:  I'm going to object to this line,

5   your Honor.

6           THE COURT:  Exhibit 23, let me look at it online

7   for a second.  Mr. Reynolds, are you treading on some

8   slippery territory here?

9           MR. REYNOLDS:  I do not believe so, your Honor, I

10  merely want to point out that the testimony he gave a moment

11  ago is completely inconsistent with what he said.

12          MR. FEINBERG:  Objection to this, sidebar if we're

13  going to have this.

14          THE COURT:  I'm going to allow the questioning.

15  Go on.  Exhibit 23 can go on the screen.

16  Q.  You testified at your deposition regarding this computer

17  that you talked about in this November 21st, 2005 letter?

18  A.  Yes.

19  Q.  And you gave the following answers to the following

20  questions, "So you had spoken with Caruna before

21  November 21st, 2005," correct?

22  A.  Yes.

23  Q.  Answer, if this is stamped correctly -- let me back up.

24  Could you please take a look at page 222 of your deposition.

25  Do you have that in front of you?  Do you have that in front

1    of you?

2    A.  Yes.

3    Q.  And I'll be reading from line 17 through line 4 on the

4    next page, actually from line 15 on page 222 through line 4

5    on the next page.  Question:  "So you had spoken with Caruna

6    before November 21st, 2005, correct?"  Answer:  "If this is

7    stamped correctly, yes."  Question:  "And the computer was

8    still in existence at this time, correct?"  Answer:  "The no

9    name computer?"  Question.  "Correct."  Answer:  "I don't

10   think so.  Question:  "What did you mean by if there are any

11   files in violation of copyright, I will destroy them at that

12   time?"  Answer:  "It's a conditional statement.  I didn't

13   say that they existed, I said that if they did exist, that I

14   will destroy them."  Are those the answers you gave to those

15   questions at your deposition?

16   A.  Yes.

17   Q.  And again on page 225, line 17 through 23, question:

18   "But if you knew the computer was gone, why wouldn't you

19   just say that, the computer that if there were any files

20   existing in violation of copyright, they are now gone as

21   that computer was destroyed"?

22   A.  225?

23   Q.  Yes, 225, line 17.

24   A.  Okay.

25   Q.  I apologize.  Again I'll read it.  Question:  "If you

1    knew the computer was gone, why didn't you just say that,

2    the computer, if there were any files existing in violation

3    of copyright, they are now gone because that computer has

4    been destroyed?"  Answer:  "Because I said this instead,

5    which is also a true statement."  Is that the answer you

6    gave to that question at your deposition?

7    A.  Yes.

8            MR. FEINBERG:  Please note my objection, your

9    Honor.

10           THE COURT:  Overruled.

11   Q.  Mr. Tenenbaum, at your second deposition, that's when

12   you claim that you took responsibility for the infringement

13   in this case; is that correct?

14           MR. FEINBERG:  Objection, your Honor.  This gets

15   into the same issue.

16           THE COURT:  Overruled.

17   Q.  Is that correct?

18   A.  Yes.

19   Q.  That second deposition was taken just three weeks ago,

20   wasn't it?

21   A.  Yes.

22   Q.  On July 8th, 2009?

23   A.  Sounds right.

24   Q.  And that deposition was taken just after the plaintiffs

25   had inspected your Gateway computer over your opposition and

1  found evidence of infringement on your LimeWire sharing

2  account, correct?

3  A.  Yes.

4  Q.  Mr. Tenenbaum, on the stand now are you now admitting

5  liability for downloading and distributing all 30 sound

6  recordings that are at issue and listed on Exhibits 55 and

7  56 of the exhibits?

8  A.  Yes.

9        MR. REYNOLDS:  No further questions, your Honor.

10              RECROSS-EXAMINATION

11  BY MR. NESSON:

12  Q.  Joel, do you have any explanation of the discrepancy

13  between the recollections about iTunes that Mr. Reynolds

14  just brought out?

15  A.  It was six years ago, whatever, 2003.

16  Q.  Well,  --

17  A.  High school is like six or seven years.

18  Q.  Did you have iTunes on your computer back then or was

19  that only later that you --

20  A.  I don't know.  I don't remember that specifically.  I

21  don't think I had it on my computer then, but I don't

22  know.

23  Q.  So you believe that you just may have been in error in

24  responding?

25  A.  Yes.  When he said that to me, I looked at the

1    statement, and I was thinking to myself, no, I don't think

2    that's right.

3    Q.  Did you have iTunes on your computer as your best

4    recollection now in 2003?

5    A.  I don't know.  I don't know when I got iTunes on my

6    computer.

7    Q.  When you wrote the letter which you were just being

8    examined about, did you consider at that time that you were

9    taking responsibility for what you had done?

10   A.  Yes.

11   Q.  Did you think -- do you now think that what you did was

12   wrong?

13   A.  I think it's a part of the process of growing up and

14   learning things and seeing how you interact with everything

15   around you.  I think it's part of the growing up process,

16   and it's certainly nothing I do now or have done in a

17   while.

18   Q.  You were aware when you were downloading that the law at

19   least as articulated to you was saying you shouldn't be

20   doing it?

21   A.  That was something that progressed over the years as to

22   where I was of the law saying that.

23   Q.  And you come now to a situation to a state of mind in

24   which you think about this in a way that leads you not to do

25   it?

1    A.  Yes.

2    Q.  And not to do it as a matter of your having grown up or

3    just because there's a threat upon you?

4    A.  I think if the threat disappeared tomorrow and the

5    RIAA --

6              MR. REYNOLDS:  Objection, your Honor.

7              THE COURT:  Sustained.

8              MR. NESSON:  No further questions.

9              MR. REYNOLDS:  Can I have --

10             THE COURT:  No, no.  Mr. Tenenbaum, you're

11   excused.

12             MR. REYNOLDS:  Your Honor, can we have a sidebar?

13             THE COURT:  Okay, sidebar.

14             (THE FOLLOWING OCCURRED AT SIDEBAR:)

15             THE COURT:  Are you done?

16             MR. REYNOLDS:  That's what we need, I would like

17   to consult with co-counsel, we're certainly not going to

18   call the two people by deposition that we need to call.  We

19   have two other witnesses that we need to talk about.  What I

20   would like to ask is whether they are done?

21             MR. FEINBERG:  It's not our burden, Judge.

22             MR. OPPENHEIM:  I guess we need to understand, we

23   like to shorten it up.

24             THE COURT:  They'd like to now the schedule.

25             MR. OPPENHEIM:  What is the relevant testimony of

1    the technical expert given that he just stipulated to the

2    liability, what is the relevance of the mother's testimony

3    given they just stipulated to liability?  That may affect

4    whether or not we put our next two live witnesses on the

5    stand.

6            MR. FEINBERG:  First of all, I don't think we have

7    to tell these folks what the relevant testimony is;

8    secondly, as far as we're concerned, the relevance has to do

9    with damages, doesn't have to do with liability.

10           THE COURT:  The answer is they're going to put a

11   case on damages, you have to make your decision.

12           MR. OPPENHEIM:  In that respect, we would move

13   Dr. Pouwelse's, all of his testimony goes to the

14   identification of Mr. Tenenbaum.

15           THE COURT:  Not all of it, there was a MediaSentry

16   part which does, the other part was the time frame issue,

17   which for all intents and purposes is already in the case

18   many times over, when was KazaA available, when was iTunes

19   available.  I have allowed him to testify with respect to

20   that, but, as I said, it's already in several times over.

21           MR. REYNOLDS:  Okay.

22           THE COURT:  You make your own decisions.

23           MR. OPPENHEIM:  Give us one moment.

24           MR. REYNOLDS:  Take one more.

25           MR. KAMHOLTZ:  One thing about Dr. Pouwelse, we

1    would want him to testify to two additional matters.  One is

2    the prevelance of peer-to-peer networks on installed

3    computers.  There's research that's been done about that.

4              MR. OPPENHEIM:  It's not in his expert report.

5              THE COURT:  I read his expert report, and I read

6    his deposition.  Go on, next.  They're right.

7              MR. KAMHOLTZ:  The other matter would be the

8    percentage of Internet use that's devoted to peer-to-peer

9    file sharing, and he's got data about that.

10             THE COURT:  Again, I don't remember seeing that

11   either.  It's not in his expert report.  He can't testify.

12   You should check it.  I agree with the plaintiff here.

13             MR. KAMHOLTZ:  I believe he was deposed on those

14   matters.

15             THE COURT:  I read his deposition what was given.

16   My understanding, he was framing, setting the framing, the

17   chronology.  I think it's in already, but it's up to you.

18   I'll give you a few minutes.  Do you want to suspend?

19             MR. OPPENHEIM:  Just give us a second to talk.

20             (SIDEBAR CONFERENCE WAS CONCLUDED)

21             THE COURT:  Excuse me, ladies and gentlemen, we

22   are all making some decisions right now.  We don't mean to

23   completely leave you in the dark, actually we do mean to

24   leave you in the dark, so if you give us all a moment.

25             MR. OPPENHEIM:  Your Honor, the plaintiffs would

1    call Mr. Ron Wilcox.  We will try to do this expeditiously.

2         THE COURT:  That's what they all say, ladies and

3    gentlemen.

4         RON WILCOX, having been duly sworn by the Clerk,

5    testified as follows:

6         THE COURT:  I do want to tell you we're moving

7    along quickly.  Go on.

8                    DIRECT EXAMINATION

9    BY MR. OPPENHEIM:

10   Q.  Good afternoon, Mr. Wilcox.

11   A.  Good afternoon.

12   Q.  Who do you work for?

13   A.  I work for Warner Music Group.

14   Q.  And what is your title there?

15   A.  Executive counsel, business affairs, strategic and

16   digital initiatives.

17   Q.  And can you describe your responsibilities?

18   A.  Basically responsible for overseeing our business

19   relationships with our different partners in the digital

20   space and working with our senior executive staff on

21   developing our strategies in that area.

22   Q.  How long have you been with Warner Music Group?

23   A.  Just a couple months.

24   Q.  And where were you prior to joining Warner Music

25   Group?

1   A.   Well, I was a consultant for about a year with

2   representing different technology startup ventures as well

3   as some talent, artists and such.  Before that I was with

4   Sony Music, a series of companies that were CBS Records,

5   Sony Music and Sony BMG over a 25-year period starting in

6   1981.

7   Q.   So you were with Sony and all its predecessor entities

8   for how long?

9   A.   Twenty-six years.

10   Q.   And I don't want to go through every position you had

11   there, but what was the last position you held before you

12   left?

13   A.   Well, I had -- with Sony Music, the last position would

14   have been the executive vice-president, business affairs and

15   new technology and then in Sony BMG, it was the executive

16   vice-president, chief business and legal affairs officer.

17   Q.   And who did you work to in that capacity?

18   A.   I reported to the CEOs of the companies at the time.

19   Q.   And, again, in a high level, what were your

20   responsibilities in that capacity?

21   A.   Similar to current but it also involved overseeing our

22   relationships with our artists and talent, but basically the

23   business relationship with the distributors, our artists,

24   our licenseees, the full gamut of the business relationships

25   and business negotiations in that space.

1  Q.  I'd like to roll back the clock a little bit and talk

2  about the compact disc.  When did record companies begin to

3  sell CDs?

4  A.  In the early 1980s.

5  Q.  And without getting too technical, can you describe how

6  the CD format works?

7  A.  Well, the CD comes about because you encode the musical

8  single into a digital form, zeros or ones.  All the

9  information embodied in the music is converted into zeros

10  and ones.  The zeros and ones are stamped onto a CD which

11  essentially is either bumps or valleys, if you will, in the

12  CD, then there's a laser which reads the bumps and valleys

13  to decode the musical single that's been put on there

14  before.

15  Q.  Are CDs encrypted or protected?

16  A.  No.

17  Q.  Why not?

18  A.  Well, really 1979, 1980 I believe is when the CD

19  technology was perfected, if you will, and finished and when

20  we started selling in the early 1980s, it was not

21  anticipated that there be peer-to-peer file networks that

22  you would have an Internet with fast speeds that are

23  available, of course, at this point in time, that there

24  would be a capability of taking the enormous at the time

25  sound files that represented a musical track and being able

1    to -- there was just no memory available for that in the

2    public specter.  PCs, as far as I recall, very little, if

3    any, home PC penetration very modest, and those that were

4    there did not have CD drives.  There again, wouldn't have

5    memory or processer speed to begin to do with these files

6    what can be done in today's world.

7    Q.  DVDs, blue ray discs, these all have encryption

8    protection, right?

9    A.  Yes.

10   Q.  And that makes it much more difficult, not impossible,

11   but more difficult for individuals to extract the

12   information and put them on their computers and peer-to-peer

13   networks?

14   A.  Yes.

15   Q.  Why is it that record companies can't do the same things

16   with CDs?

17   A.  Well, the record companies have looked at doing that.

18   The basic issue is a combatibility issue that you have

19   hundreds of millions of CD players out in the marketplace,

20   car players, homes, portable, et cetera, that would be

21   rendered useless to play CDs that were encoded.

22   Q.  Let me go forward in time now and talk about, ask you

23   when did the record companies first begin to work on ways to

24   distribute music digitally over the Internet?

25   A.  Well, certainly by the mid-'90s we had groups that were

1    meeting frequently to discuss the opportunities new

2    technology was providing, and that continued through the

3    mid-'90s into the latter part of the '90s as we had

4    different partners potentially and actual partners come to

5    us and talk about how you get involved in selling music

6    online, for example, there was the Madison project,

7    Sony Music's office is where Madison Avenue, IBM's office,

8    Madison Avenue, so the name came up and called it the

9    Madison project and began to have other record companies

10   join up into this kind of think tank to develop ways to

11   sell music online.

12          There was another company, another project that

13   was called Nigel project that AT&T was involved in that had

14   some music companies involved as well, so it was all through

15   that era.  I mean, I started with in the beginning of the

16   '90s, my time was spent largely on --

17          MR. FEINBERG:  Objection, your Honor.  May I

18   approach on this?

19          THE COURT:  Briefly.

20          (THE FOLLOWING OCCURRED AT SIDEBAR:)

21          THE COURT:  Is this no decision?

22          MR. FEINBERG:  It's no decision when this man is

23   giving a history lesson, exactly what we were trying to do

24   and we weren't allowed to do it, and I think it's simply not

25   even relevant.  I don't know what the relevance of any of

1    this is, and it's expert testimony in a sense.

2          MR. OPPENHEIM:  I guess I have a couple of

3    responses.  This is a gentleman who explains over 30 some

4    years of working in these industries, he's experienced these

5    history, he's not telling it because he has read it in a

6    newspaper.  He's a very senior executive who's describing

7    it; that's No. 1.

8          No. 2, if you guys want to stipulate to the fact

9    they aren't digital dinosaurs as you've tried to make out

10   since the beginning of this case.  You've trying to say that

11   the music hasn't been available individually and the reason

12   Mr. Tenenbaum did what he could is because he couldn't get

13   the music otherwise, and this witness is responding to that.

14   I'm happy if you guys want to reach a stipulation to this to

15   withdraw this witness and move on.

16         MR. FEINBERG:  A stipulation on what?

17         MR. OPPENHEIM:  You tell me.

18         THE COURT:  He can testify, you have cast

19   aspersions at the unavailability of digital music on the

20   Internet and suggesting at one point that the reason why he

21   did what he did because of the failures of the record

22   company and so you can have the testimony.  We'll take it as

23   factual testimony.

24         MR. OPPENHEIM:  It won't go that long.

25         THE COURT:  Okay.

1          (SIDEBAR CONFERENCE WAS CONCLUDED)

2          THE COURT:  Go on.

3          MR. OPPENHEIM:  Thank you, your Honor.

4    Q.  Mr. Wilcox, you were describing a variety of different

5    projects the record companies were involved in.  Can you

6    give us a sense of what kind of resources the record

7    companies put into these early digital distribution

8    efforts?

9    A.  Well, as I was starting to say, when I started in the

10   '90s, my time was mostly focused on talent deals with

11   artists and such, and as we went into the mid to later '90s,

12   a solid 50 percent or more was focused in this area in terms

13   of trying to sell solutions for selling online.  I had at

14   one point early in the '90s designated one staff member, a

15   professional business affairs executive to be the specialist

16   in the area.

17          By the time the mid-'90s came, we had 3 to 5 top

18   executives and probably 6 or so by the time we got out, and

19   that's just in my area in the top level as opposed to any

20   support staff or technologists that were involved or that

21   people that were in sales, et cetera.

22   Q.  Can you put a monetary figure?

23   A.  Well, sorry, yeah, certainly hundreds of millions of

24   albums, no question.

25   Q.  And what was the perception of the record companies to

1  the concept of selling music on the Internet back in the

2  late '90s?

3          MR. FEINBERG:  Objection.

4          THE COURT:  Sustained.

5  Q.  Were the record companies invested -- why were the

6  record companies investing so much in so many resources in

7  selling music digitally on the Internet?

8          MR. FEINBERG:  Objection.

9          THE COURT:  Overruled.

10  A.  The companies saw it as a great opportunity to evolve

11  our business and grow it and to make music more readily

12  available to more people.  We had always embraced new

13  configurations, whether that was from historically I guess

14  from singles to LPs, from LPs to cassettes, cassettes to

15  CDs, and it was always a very exciting time, and I was

16  particularly, you know, it was exciting for me and all of

17  us, all the people in the music companies are generally

18  there because they love music, and to have this opportunity,

19  it was very exciting, and it was very focused.

20          MR. FEINBERG:  Objection.  Motion to strike.

21          THE COURT:  Overruled.

22  Q.  The early digital distribution efforts all included

23  forms of copy protection and encryption.  Why did the record

24  companies do that?

25  A.  The things that were the reasons that we didn't foresee

1  it in 1980, '81 were all there in front of us facing us,

2  obviously the effects of being able to rip the files from a

3  CD onto a hard drive or computer, make them available to

4  millions of people all over the world all for no

5  consideration was staring us in the face and hurting us

6  significantly, and we certainly felt an obligation to our

7  artists and employees and so on to do our best to protect

8  the music that we could.

9  Q.  Did those kind of protections prevent a user in that

10  period of time, the '99, 2000, 2001 period of time, from

11  being able to get digital tracks on their computer or onto

12  an MP3 player?

13  A.  No, you could sort of arrange what requirements you were

14  going to apply to a given transaction, and so there were

15  services that were available where you could download on

16  your computer, there were services where you could then take

17  that and transport it onto your portable player or rip it,

18  excuse me, or burn it to a CD.  There were a number of

19  options available such as that.

20  Q.  But let's say I went to one of these digital

21  distribution outlets and they had a copy protection that

22  didn't work with the MP3 player that I had purchased.  Did

23  that mean that I couldn't get digital music onto my MP3

24  player?

25  A.  Well, there were different compatible -- there are

1    incompatible systems among some of the different

2    participants in the marketplace as to their method of

3    encryption and such, and so many of them were attempting to

4    have sort of closed network arrangements.

5    Q.   And so what effect would users be able to somehow use

6    CDs to load their MP3 players?

7    A.   Not -- well, it depends on the MP3 player, but in some

8    cases you could do it but not the ones that were brought in

9    from the services.

10   Q.   When iTunes first launched, it had some copy protection

11   associated with it?

12   A.   Yes.

13   Q.   What was the name of that copy protection?

14   A.   Fair Play.

15   Q.   And if I wanted to -- if I didn't want to buy music on

16   iTunes but I wanted to get music onto my iPOD digitally, how

17   would I do that?

18   A.   You could buy a CD and then rip that onto your hard

19   drive and the file from that CD that were then on your hard

20   drive could be transferred to an iPOD.

21   Q.   What effect has unrestrained peer-to-peer had on record

22   company efforts to develop new digital distribution

23   mechanisms?

24            MR. FEINBERG:  Objection.

25            THE COURT:  Sustained.

1   Q.  Some have argued that record companies have had an

2   interest in shutting down the Internet in order to preserve

3   their CD business.  Do you have a reaction to that?

4           MR. FEINBERG:  Objection.

5           THE COURT:  Overruled.

6   A.  Absolutely not true.  As I say, the history and the

7   actual practice was to embrace new configurations, and the

8   resources that I mentioned before were significantly

9   committed to that including myself.

10  Q.  Some peer-to-peer users have argued that consumers in

11  fact buy more music as a result of peer-to-peer because

12  they're able to sample the music online and discover what

13  they want.  Has that in fact been the case from your

14  perspective?

15          MR. FEINBERG:  Objection.

16          THE COURT:  Overruled.

17  A.  We don't believe that to be the case.  Essentially, you

18  know, for the sampling or actively promoting music, we look

19  to there's sort of a push play analysis that's done.

20  Q.  That's different than Press Play?

21  A.  Yes, exactly, but the push aspect, for promotion, you

22  want to be able to push the music in front of consumers,

23  whether it be a radio, television, and, you know, printed

24  articles that may be speaking about the artists and so on as

25  opposed to, you know, they know the artists, they search for

the artists and they find the artists, that's more of a

pull, so what we focus our intention on is getting the push

of the music availability to the consumers.

Q.  What is Warner Music Group's perception of digital

distribution on the Internet going forward as of right now?

A.  Our total focus and attention is on it.  We have to

continue to grow the business the best we can.  We have

been -- there's been a battle between, you know, dealing

with illegal services and making those less attractive and

making the legal services more attractive and the best

proposition we can for the consumers.  That's been the

guiding principle for all this period.

          MR. OPPENHEIM:  No further questions.

                    CROSS-EXAMINATION

BY MR. NESSON:

Q.  Were these various efforts to explore encryption on CDs

in some way coordinated by RIAA, or were these all done

independently by the companies?

A.  To my recollection, there was one group particularly

that was focused on SDMI a few years back, but -- and these

discussions would occasionally take place at the RIAA level,

but the main focus was through SDMI.

Q.  And what year are we talking about with SDMI?

A.  '98 roughly.

Q.  And it went forward for several years?

1   A.  Yes, for a bit.

2   Q.  And it was finally given up?

3   A.  I believe so.

4   Q.  And when would you place that?

5   A.  I don't recall exactly.  I would guess, you know, early

6   2000s.

7   Q.  So that the industry's initial response to the threat

8   included the idea that perhaps we could encrypt in ways that

9   would actually protect the product?

10  A.  Yes.

11  Q.  But that didn't work out?

12  A.  Not through that initiative, no.

13  Q.  And when you talk about ripping a CD, the ripping

14  function on a computer is just built into the computer,

15  right?

16  A.  If you have a CD drive.

17  Q.  If you have a CD drive, in other words, there's nothing

18  special to ripping, ripping has a kind of an aggressive

19  quality to it, but it's just actually a typical function on

20  just about every computer, every computer that has a CD

21  drive?

22  A.  That would be my understanding, yes.

23  Q.  Were you then part of the environment in 1999 when

24  Napster hit that really saw the wave of your product swept

25  out into the open net?

1          MR. OPPENHEIM:  Objection.  I'm not sure what part

2     of environment he's asking.

3          THE COURT:  Can you make that more precise?  Were

4     you working for the company?  Did you have a responsibility?

5     What do you mean by part of the environment?

6     Q.  Could you tell us the reaction then of the recording

7     industry or your company to the immediate follow on after

8     Napster came out when a tremendous amount, in fact, the

9     whole catalogue of recorded music was suddenly open to

10    MP3?

11         MR. OPPENHEIM:  Objection.  Foundation.

12         THE COURT:  Overruled.

13    A.  We were concerned that our music was available for free,

14    and it would have significant impact on our artists and our

15    companies and getting music to the public in a legal way.

16    Q.  And that seemed like a really serious situation?

17    A.  Yes.

18    Q.  Could you -- would it be fair to describe that situation

19    as a growing fear in the music industry that a whole younger

20    generation of people growing up in the new technological

21    environment would learn the habit of getting music for free

22    and lose the habit of buying it at the store?

23         MR. OPPENHEIM:  Objection.

24         THE COURT:  Overruled.

25    A.  I wouldn't agree I guess with that whole growing theory,

1    there was a problem identified and not that hard to

2    identify.  We knew it was not a sustainable model for

3    business to have this product available for free in the

4    marketplace through legal services, and it was a subject of

5    great focus within the record companies and management

6    companies, artistic community to try and figure out how to

7    offer and provide legal services and minimize the impact of

8    the legalities.

9    Q.  So when you say in response to opposing counsel's

10   question that it was not and is not your purpose or your

11   company's purpose or your industry's purpose to shut down

12   the Internet, does that statement also apply to peer-to-peer

13   file sharing?

14   A.  We do not want files that have not been licensed or

15   otherwise authorized to be distributed in that method

16   available in those services.

17   Q.  Would it be fair to say that you, your company, the

18   industry is opposed to peer-to-peer file sharing?

19   A.  If they're not legally licensed or authorized to be

20   distributed files, whether it's movies or whether it's music

21   files or other copyrighted works, if they haven't been

22   authorized for that purpose, but that would be true whether

23   they were in a flea market on Amsterdam Avenue.

24   Q.  True, but has that not led you, your company, your

25   industry to take as much aggressive action as you can

1  against the technologies or peer-to-peer file sharing?

2  A.   That's not my belief, understanding or how I've acted.

3  The goal has been to, you know, we have a lot of -- we want

4  to have partners in the marketplace, we all have to have

5  partners to get our material distributed and through our

6  licensees and through our distributors.  There's no fear of

7  technology or anything.  We know that's a great salvation

8  for us, and we want to work actively with all technologies

9  to make it happen.

10 Q.   Have you partnered with any of the peer-to-peer sharing

11 technologies?

12 A.   Well, we've certainly, we've engaged in discussions over

13 the years with a number of them.  Kind of a fundamental

14 problem is that I guess I'd say the burglar that's been in

15 your house and having free reign doesn't necessarily want to

16 come in as an invited guest and live up to the social

17 conventions of that responsibility, and that's kind of been

18 where the tension was in those discussions.

19 Q.   And those tensions have continued all the way through so

20 that you have never been allied with any peer-to-peer

21 development?

22 A.   Well, we've worked out arrangements over time with

23 different of the services as they've evolved and have come

24 up with legal models, whether it was iMesh or as Napster

25 itself evolved as a brand.

1  Q.  These are outfits that start as peer-to-peer and then

2  they get converted over to some kind of a paid technology?

3  A.  I think a number of them have tried different business

4  models that would work so they could work with us and move

5  into a legal commercial enterprise.

6  Q.  When Joel Tenenbaum was first identified as downloading

7  and sharing, August of 2004, how many digital alternatives

8  of what you would call legitimate character were available

9  at that time?

10  A.  Probably a good many.  We had Liquid Audio would have

11  been up.  I would think perhaps a dozen.  Liquid Audio, AOL,

12  Press Play, Music Net, Buy Music, Amazon, Wal-Mart came

13  along.  Those are a few off the top of my head.

14  Q.  Were any of those digital alternatives offering MP3

15  files for sale?

16  A.  Not at the time.

17  Q.  And when was the first time that the industry started

18  offering MP3 files for sale?

19  A.  There may have been circumstances from time to time, but

20  as a general proposition in the last few years, probably

21  2007, 2008.

22  Q.  In other words, quite recent, and it is now possible to

23  buy all of this music in open MP3 format; is that not

24  true?

25  A.  Yes.

1    Q.   For 99 cents a crack basically?

2    A.   That's one price quote, yes.

3    Q.   And when you do that, you get a file that you can use on

4    anything and share with your friends and do whatever it is

5    you want with it?

6    A.   Yes.

7    Q.   That is a product that was his directly the same as the

8    product that Joel was taking advantage of through KazaA and

9    peer-to-peer networks?

10   A.   That's been bought and paid for --

11   Q.   Yes, exactly, that's the only difference.

12   A.   Through a licensed distributor.

13   Q.   Up to that time you had never offered that product?

14   A.   We were in a position really of essentially, we would

15   try and develop business models and alternatives, as I said,

16   trying to make the commercial applications attractive to

17   consumers.  We were always in a position of chasing free,

18   and it was a series of periods of time where we would try

19   and come up with ways to make our services more attractive

20   and ultimately the attractiveness of making MP3 files with

21   cooperation of some of our partners became the most

22   attractive proposition compared to continuing to hemorrhage

23   in the industry.

24        MR. NESSON:  Just give me a moment, if you

25   would.

1   Q.   You're familiar with portable digital media players?

2   A.   Yes.

3   Q.   What's the number of songs that you can now put on your

4   high quality iPOD or other digital media player?

5   A.   It varies a great deal but some can hold thousands.

6   Q.   Huge, and the thought is that you want all of those

7   songs -- well, strike that.  Would you say that the future

8   of the music business now lies in the digital realm?

9   A.   Yes.

10   Q.   And would you say it's taken the music business a while

11   to in a sense make a transition from the CD environment to a

12   readiness to make money in the digital world?

13   A.   No.  I have been too focused for too many years of my

14   life for the past 15 years in this space trying to make it

15   happen to even come close to that.

16   Q.   But that's exactly what I'm saying, I mean that's a

17   transition period for your industry?

18   A.   Well, there have been different models of technology,

19   changes more rapidly than ever, you're moving to adapt to

20   the different technologies that are coming down the road all

21   the time, there are different partners that are interested

22   in getting involved.  Simply put, in the old days, you had

23   Tower Records perhaps, and you sell them 100 CDs and then

24   you send them an invoice, they send you a check back, but

25   the amount of resources needed to focus on our relationships

1  with our digital partners is much more significant so it has

2  taken much more resources to be applied, but, you know, and

3  it's not a timing issue as just a level of resources in

4  order to commit to it.

5  Q.  And you have been under pressure, competitive pressure

6  from the peer-to-peer file sharing environment?

7  A.  I find it difficult to think of illegal services as

8  competitive, competitor, but, yes, as a practical matter,

9  we've had to find a way to make stealing less attractive and

10  make purchasing more attractive.

11  Q.  You've been trying to figure out ways to compete with

12  free?

13  A.  Certainly competing with free has been one of the

14  problems that we have faced.

15  Q.  And in that competitive environment, you, in fact, have

16  been developing new business models, it's been under the

17  pressure of that environment that in fact they've emerged;

18  is that not correct?

19  A.  Well, I think commercial opportunities leaves them to

20  emerge, and it's not just the record labels but many other

21  companies, from the early days, as I said, IBM, AT&T was

22  involved with Nigel, obviously Microsoft, Apple itself and

23  so on, very large companies always looking at their models

24  and how to commercialize the opportunities in music.

25  Q.  And it's taken them some time to figure it out?

1          MR. OPPENHEIM:  Asked and answered, your Honor.

2          THE COURT:  Sustained.

3  Q.  Fair enough.  Were you in any way part of the education

4  campaign that your industry undertook after 1999 to try and

5  teach a generation of kids that it was wrong to download

6  music and share music?

7          MR. OPPENHEIM:  Objection.  Exceeds the scope.

8          THE COURT:  Sustained.

9          MR. NESSON:  What was the basis for the objection?

10          THE COURT:  It exceeds the scope of direct

11  examination.

12  Q.  You say a key part of your work has been to figure out

13  ways to make the legal offerings more attractive and the

14  infringing opportunities less attractive?

15          MR. OPPENHEIM:  Objection.  Misstates his

16  testimony.

17          THE COURT:  Overruled.

18  A.  That has been one of the issues we face, yes.

19  Q.  Now, what have you done to make the infringing

20  activities less attractive?

21          MR. OPPENHEIM:  Objection.  Beyond the scope.

22  Same issue.

23          THE COURT:  I'll hear the answer.  Go on.

24  A.  Well, we have had to enforce our rights with people who

25  have infringed.  We've had ongoing discussions with the ISPs

1     and other technology companies involved with the industry,

2     if you will, of file sharing to try to come to some

3     understanding that would be mutually beneficial to see if we

4     can minimize that problem and maximize the commercial

5     opportunities.

6     Q.  And was an educational campaign part of that activity?

7            MR. OPPENHEIM:  Objection.  It's the same issue.

8            THE COURT:  Overruled.  We're coming to the end.

9     A.  I have a rough awareness that there may have been an

10    educational plan.  It wasn't anything of my day-to-day at

11    all.

12           MR. NESSON:  If I may have a moment, please.  No

13    further questions.

14           MR. OPPENHEIM:  One question, your Honor.

15           THE COURT:  All right.

16                    REDIRECT EXAMINATION

17    BY MR. OPPENHEIM:

18    Q.  Mr. Wilcox, when you get a copyrighted sound recording

19    in open MP3 form, is an individual allowed to do anything

20    they want to do with it including distribute it to others?

21    A.  No.

22    Q.  Why not?

23    A.  It would be subject to copyright laws.

24           MR. OPPENHEIM:  No further questions, your Honor.

25           THE COURT:  Anything further?  Thank you very

1    much.  The witness is excused.  Anything further?

2            MR. OPPENHEIM:  One last witness, your Honor.  The

3    plaintiffs call Silda Palerm.

4            SILDA PALERM, having been duly sworn by the

5    Clerk, testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. OPPENHEIM:

8    Q.  Good afternoon, Ms. Palerm.

9    A.  Good afternoon.

10   Q.  Could you please describe for the jury what you do for a

11   living?

12   A.  I am vice-president and senior litigation counsel at

13   Warner Music Group.

14   Q.  And what is Warner Music Group?

15   A.  Warner Music Group is a parent corporate company of

16   several music labels and most music publishing companies

17   including Warner Brothers Records, who is one of the

18   plaintiffs in this case.

19   Q.  How long have you worked in the music industry?

20   A.  I started working at Atlantic Records, which is another

21   one of Warner Music Group companies in 1997, then moved to

22   Warner Music Group in 2001.

23   Q.  Are you aware of the sound recordings that Warner

24   Brothers is suing on in this case?

25   A.  Yes, I am.

1    Q.   Are you aware that it's 10 sound recordings?

2    A.   I am.

3    Q.   And you've previously seen exhibits in this case,

4    Exhibits 55 and 56 describing 30 sound recordings; is that

5    correct?

6    A.   Yes, I have.

7    Q.   And the 10 sound recordings listed under Warner Brother

8    Records in those exhibits, are those the 10 you're suing

9    on?

10   A.   Yes, they are.

11   Q.   Does Warner Brothers generally register its copyrights

12   and sound recordings?

13   A.   Yes, we do.

14   Q.   Do you know whether Warner Brothers has copyright

15   registrations in the 10 sound recordings on Exhibits 55 and

16   56?

17   A.   We do.

18   Q.   There should be a stack maybe in a box.  It's

19   Exhibit 11.

20   A.   Is that the CDs?

21   Q.   Yes.

22   A.   Yes.

23   Q.   Do you recognize those CDs, Ms. Palerm?

24   A.   Yes, they are the CDs that contain the sound recordings

25   that Warner Brothers is suing under.

1  Q.  And does Warner Brothers, as a policy and practice,

2  include copyright notice?  Actually if you could just hold

3  those up so the jury sees them.  They've seen lots of CDs in

4  this case.  We won't go through all of them.

5  A.  Here they are.

6  Q.  As a matter of policy and practice, does Warner Brothers

7  include copyright notices on those CDs?

8  A.  Yes, we do.  We include them on the back on the

9  packaging, and then we also include them when you open it,

10  when you CD, there would be a notice.

11  Q.  And does Warner Brothers sell those CDs in retail

12  establishments?

13  A.  We sell these CDs, and we tell the establishments such

14  as Wal-Mart, Target, book stores, we also sell them online

15  when those same stores will have an online distribution.

16  Q.  Including like iTunes?

17  A.  Yes.

18  Q.  And do you know whether the 10 tracks at issue in this

19  case are available on Apple iTunes?

20  A.  Yes, they are.

21  Q.  Do you know when they began being distributed on Apple

22  iTunes?

23  A.  Well, depending on the release date of these recordings,

24  and I don't know when they are, but iTunes went on in 2003,

25  and most of our catalogue, if not all of it, became

1    available in 2003.

2    Q.  Have you had an opportunity in this case to compare the

3    track Green Day?

4    A.  Minority?

5    Q.  Minority, thank you, the track Minority by Green Day

6    that you legitimately sell to the version that was

7    downloaded from the defendant's computer?

8    A.  Yes, I have.

9    Q.  And when you did that comparison, did you come to a

10   conclusion about those two recordings?

11   A.  Other than they sounded exactly the same?

12   Q.  No, that was the conclusion I was looking for.

13   A.  Okay.

14   Q.  Does Warner Brothers, has Warner Brothers ever given

15   Joel Tenenbaum a license or authorization to copy any of

16   their sound recordings?

17   A.  Absolutely not.

18   Q.  How about to distribute their sound recordings?

19   A.  Absolutely not.

20   Q.  Does Warner Brothers Records ever license or authorize

21   anybody to upload or download their sound recordings to

22   peer-to-peer networks?

23   A.  No.

24   Q.  Have you had an opportunity previously to examine the

25   defendant's share directory in this case, which has been

1  labeled Exhibit 13?

2  A.  Yes, I have.

3  Q.  And in looking at that share directory, have you seen

4  other works on that share directory owned by Warner Music

5  Group?

6  A.  Many.

7  Q.  Do you have a sense of roughly how many?

8  A.  I don't, but, for example, we've sued on one track of

9  each one of these albums, I would say that all these albums

10  are in their entirety in that directory.  You also find a

11  lot, many other Death Tone albums, in fact, he testified

12  about his affinity for Death Tone, Alanis Morissette,

13  Red Hot Chilly Peppers, Goo Goo Dolls, a lot, and those are

14  just Warner Brothers, and there's also a lot of artists from

15  Atlantic Records, which is another one of our labels.

16  Q.  Do you have a sense of the number of jobs that have been

17  lost at Warner Music Group since the year 2000?

18        MR. FEINBERG:  Objection.

19        THE COURT:  Overruled.

20  A.  I do.  From the end of 2000 to the end of 2008, Warner

21  Music Group has lost over 2,000 jobs.

22  Q.  And how many people in total worked at Warner Music

23  Group during that period?

24  A.  We used to be more than, slightly over four thousand

25  people at the end of 2000, and now there's less than two

1    thousand people.

2    Q.  So roughly almost a 50 percent drop?

3    A.  Yes.

4         MR. OPPENHEIM:  No further questions, your Honor.

5                     CROSS-EXAMINATION

6    BY MR. FEINBERG:

7    Q.  There was a recession last year, ma'am.  Does that have

8    anything to do with a reduction in force?

9    A.  Actually, no, the reduction in force started way

10   before.

11   Q.  I didn't ask you whether it started way before, I asked

12   you if the recession that started last year had anything to

13   do with the reduction in force?

14   A.  Very little.

15   Q.  How do you know?

16   A.  Because the reduction in force happened before last

17   year.

18   Q.  And are you attributing all of it to peer-to-peer

19   illegal downloading, is that your opinion?

20   A.  My opinion is that the illegal downloading has affected

21   a lot of our business, yes.

22         MR. FEINBERG:  Thank you.

23         THE COURT:  Anything?

24         MR. OPPENHEIM:  We have no further witnesses, your

25   Honor, if we could approach.

1          THE COURT:  We will take a break.  All rise for

2     the jury.  We'll take a mid-afternoon break.

3               (JURORS EXITED THE COURTROOM.)

4          THE COURT:  Counsel.  Do you want to take a break

5     and come back again?  A break wouldn't be so bad for me

6     either.

7          MR. OPPENHEIM:  That's fine, your Honor.

8          THE COURT:  We'll take a ten minute break and

9     we'll address these issues.

10          THE CLERK:  All rise.

11               (A recess was taken.)

12          THE CLERK:  All rise.

13          THE COURT:  You can be seated.  Mr. Oppenheim,

14     Mr. Reynolds.

15          MR. REYNOLDS:  Your Honor, at this point, I guess

16     we would move for a Rule 50 motion on issues of ownership,

17     liability and willfulness.

18          THE COURT:  Ownership, liability and willfulness,

19     okay.

20          MR. REYNOLDS:  I'll be happy to make the motion

21     from the podium.

22          THE COURT:  No, don't be silly, you don't have to

23     make it from the podium.

24          THE COURT:  Mr. Nesson, do you take a position on

25     it?  For all intents and purposes, it appears that the

1  ownership and the liability issues have been conceded and so

2  the only issue arguably that should go to the jury are

3  willfulness and the amount of damages.  Does everyone agree?

4  　　　　MR. KAMHOLTZ:  Not quite, Judge.  We certainly

5  concede ownership as to everything, no question.  We concede

6  liability in the form of copying as to the five songs.  I do

7  think that there is a question, and we would move for

8  directed verdict on the 25 songs because I think that

9  there's been a failure of proof on the part of plaintiffs to

10  actually demonstrate that the songs that were downloaded by

11  Joel were in fact the copyrighted works.  Joel admitted from

12  the stand liability.  I think the question was do you accept

13  liability for the 30 songs, and he said yes, but he's

14  clearly not a lawyer.

15  　　　　THE COURT:  You understand we're not talking

16  necessarily about what he has admitted to, although that

17  would make this easier, we're also talking about directed

18  verdict, essentially whether any reasonable jury could find

19  otherwise, so as to that, I'm not obliged to stay with

20  Mr. Tenenbaum's concessions, I can look at the whole

21  picture, and what I don't understand is how there are any

22  issues left with respect to the downloading of the 25 songs

23  either.

24  　　　　MR. KAMHOLTZ:  Well, the issue is that they simply

25  didn't prove it.  We don't know, the jury doesn't know for a

1    fact that the downloaded songs were in fact what they

2    purport to be.  I mean, there was evidence that I believe it

3    was Dr. Jacobson looked at the titles of the files, he

4    looked at the metadata and sorth, but nobody looked at the

5    content of the underlying files except for those five songs

6    where the actual songs downloaded --

7            THE COURT:  The question is whether a reasonable

8    jury could possibly find in the light of the testimony of

9    this witness, and I've forgotten the name of the witness,

10   that they were not copyrighted songs, so, Mr. Reynolds,

11   Mr. Oppenheim, do you have a position on that?

12           MR. REYNOLDS:  Your Honor, Mr. Kamholtz is not

13   accurate when he says nobody checked.  The defendant himself

14   testified he listened to them and he kept them on his

15   computer and he stored them in his shared folder.  After

16   that, we have found evidence of not every one but most of

17   them were then transferred to his LimeWire shared folder

18   where Dr. Jacobson said they are there and they are what

19   they purport to be, so there's no question that those files

20   were in his shared folder and that they are the files --

21           THE COURT:  No, no, it's not just that he listened

22   to them and kept them on his computer, they're claiming that

23   you haven't made the link between songs that are owned by

24   the plaintiffs and those 25.  Is that what you're saying,

25   you're saying you haven't made that link?

1              MR. KAMHOLTZ:  They're absolutely correct.

2              MR. REYNOLDS:  Your Honor, he said that, the

3      defendant said that, the defendant said that he downloaded

4      all 25 of the songs that are listed on the exhibit list,

5      those songs.  They are the file names.  They are right

6      there.  He downloaded those songs.  He didn't download some

7      other song.  We asked him, did you download those songs, and

8      when you did, you listened to them.  He downloaded those

9      songs, not other songs.  I didn't ask him whether he

10     downloaded that file with that file name, I asked him

11     whether he downloaded that song, and he said yes, and he

12     said he listened to it, your Honor.  There is no question

13     that those files are what they purport to be.  No reasonable

14     jury could find otherwise.

15             MR. KAMHOLTZ:  I could be wrong, your Honor, but

16     my memory is that there were no questions that were

17     specifically asked as to each and every one of those 30

18     songs, did you download that song, did you listen to that

19     song.

20             THE COURT:  He was shown Exhibit 55 and 56, and he

21     made a concession with respect to all of them.

22             MR. KAMHOLTZ:  There are hundreds and hundreds of

23     songs on there, and I think that to show somebody a list of

24     I don't know what the number is on the 40 pages of songs and

25     say did you listen to those songs and to assume --

1          THE COURT:  This just strikes me as unbelievably

2    hypertechnical, unbelievably hypertechnical, and I will look

3    over his testimony, but right now it seems to me that

4    essentially liability has been conceded, if not through his

5    testimony, the statements of counsel, if not that, through

6    the preponderance of the evidence, liability has been

7    conceded, and the only question then becomes willfulness,

8    the definition of willfulness about which we have to decide

9    and damages.

10          MR. KAMHOLTZ:  There's one other issue.

11          THE COURT:  Yes.

12          MR. KAMHOLTZ:  They're claiming infringement on

13    the basis of copying and distribution, and there's been so

14    far as I can tell here no evidence at all of actual

15    distribution by Joel of any copyrighted work.  I would

16    concede that Joel testified, and the evidence I think is

17    plain, that there was an intent to distribute perhaps.

18    There's no question that he put these files, that they lived

19    in his shared music folder and that they were available, but

20    did anyone ever actually download other than MediaSentry?

21          THE COURT:  As I said in the London-Sire decision,

22    first there are two ways of looking at this, one way is to

23    look at this, and this is not in the draft instructions, but

24    it struck us that this is actually what this is, which is

25    what is it called, contributory, sort of what Napster and

1    Grokster were found, contributory infringement; is that the

2    term of art?

3         MR. OPPENHEIM:  You're right, your Honor, what I

4    think you're trying to refer to is contributory

5    infringement.

6         THE COURT:  Right, which is very interesting,

7    which was not raised in the Jamie Thomas case, but it does

8    seem to me bypasses some of the debate about making

9    available or not making available.  When you put it up on

10   your shared folder and others then take it down, others then

11   download it, you are at least exposed to contributory

12   infringement, and the question is whether or not that has

13   been made out here.  The making available debate is a

14   different debate.

15        MR. KAMHOLTZ:  The problem is we don't know if

16   anyone else downloaded these songs from Joel other than

17   MediaSentry, and, in fact, the evidence shows that when

18   MediaSentry tried to do it that apparently because his

19   computer was too crowded or too busy or too slow or

20   something they were shunted off to some other computer.

21        MR. OPPENHEIM:  Or infringing too much.

22        MR. KAMHOLTZ:  Well, we don't know what, but

23   MediaSentry itself had difficulty at least with respect to

24   that one song in downloading a song from Joel, and there's

25   simply no evidence at all that anybody downloaded a song

1  from Joel.  Now, clearly, copying we concede copying,

2  certainly as to those songs.

3       THE COURT:  If you concede copying, then it

4  doesn't matter because you're in damage land regardless.

5       MR. KAMHOLTZ:  I think you're right, but I do

6  think that in terms of the instructions to the jury and the

7  verdict slip that distribution should be off the table.

8       MR. OPPENHEIM:  Well, your Honor, in which case

9  we'll take the issue of liability to the jury on both

10  uploading and downloading, and we would like to put before

11  the jury that he has not accepted responsibility, and we'd

12  like to put him back on the stand to make this clear because

13  he stipulated to liability.  He put on, he gave the jury the

14  impression, he testified to it.

15       THE COURT:  That he's taken responsibility.

16       MR. OPPENHEIM:  He's accepted responsibility, and

17  now what we're hearing are all kinds of arguments to the

18  effect that we're not accepting responsibility.  If that's

19  the case, then that was purely --

20       THE COURT:  In fact, I believe your question was

21  for the things that you are accused of in this case.  I

22  believe that that was the question, and the answer was that

23  I'm accepting responsibility.

24       MR. OPPENHEIM:  Right, for the uploading and

25  downloading of the 30 works, which is what he was asked.

1          THE COURT:  Well, since the case has to go to the

2    jury with respect to I know you're moving on willfulness,

3    I'm going to give that to the jury as well because it's

4    essentially part and parcel of the determination of damages.

5    Since it has to go to the jury on damages, in any event, I'm

6    going to take under advisement briefly because I think that

7    quite apart from his concessions, I think his concessions on

8    the stand and counsel's concessions as well that this is

9    virtually decided, but it seems to me you can proceed with

10   your case on the issue of willfulness and damages.

11   Mr. Oppenheim.

12          MR. OPPENHEIM:  Your Honor, to the extent it's

13   important for us that if we don't have a directed verdict on

14   the issue of distribution that that does go to the jury

15   because for purposes of damages, establishing -- and any

16   potential appeal that may come later, establishing that it

17   was in fact distribution was important to us.  That's as a

18   preliminary matter.

19          THE COURT:  Well, what I was saying about

20   liability is what I understand I have in front of me is a

21   directed verdict, Rule 50 motion with respect to ownership,

22   downloading and distribution.

23          MR. OPPENHEIM:  Yes, your Honor.

24          THE COURT:  I will rule on that.

25          MR. OPPENHEIM:  Very well, your Honor.  With

1    respect to the issue of willfulness, we actually do not view

2    the issue of determination of willfulness as necessarily

3    part and parcel of the determination of damages.  As the

4    Court is well aware, you could well have the same finding of

5    damages under both a nonwillful finding and a willful

6    finding, so we believe that whether or not he is found

7    willful is a separate determination from the issue of

8    damages.

9            And we would like the Court to consider that in

10   the Rule 50 motion, and to the extent that the Court is

11   either willing to consider our argument, and even if it's

12   not willing to consider our argument, we'd like to make a

13   record here of the facts that we believe are indisputable on

14   this issue as to willfulness.

15           THE COURT:  Let's back off.  The first, I don't

16   want to have a jury waiting.  We have to talk about the

17   content of the willfulness instruction which bears as well

18   on your argument.  I have to admit that after reading your

19   papers, I'm more inclined to consider your position on

20   willfulness is, and I can explain that later.

21           What I'd like to do is recall the jury on the

22   question and have the defendant begin his case, and we'll

23   see where we are.

24           MR. OPPENHEIM:  Then, your Honor, just so I'm

25   clear, we'll renew our Rule 50 motion at the close of the

1   evidence?

2          THE COURT:  At the close of evidence, yes.

3          MR. OPPENHEIM:  We're reserving all of our rights.

4          THE COURT:  Yes, that's right, because I don't

5   want the jury to be waiting here.

6          MR. KAMHOLTZ:  I just want to make this clear on

7   the record that the definition of willfulness as it applies

8   to this case is in dispute, and you haven't yet ruled, but

9   certainly on our view of willfulness that it requires not

10  only knowledge but an intent to injure or a willful

11  purpose.

12         THE COURT:  I simply didn't wanted the jury to be

13  waiting, which is why I wanted to move on, but I do believe

14  that the plaintiffs have persuaded me of the three-tiered

15  nature of the statute.  In other words, that was an argument

16  Mr. Nesson made, which was very interesting, that there was

17  innocent infringer, there was a willful infringer, and then

18  there was the vast unwashed in the middle, and I couldn't

19  understand how it could be that you had an innocent

20  infringer, who didn't know anything, a willful infringer,

21  and it suggested that somebody in the middle was someone who

22  simply had knowledge but wasn't intending to do great

23  harm.

24         The plaintiffs have come foward with an argument

25  that suggests the innocent infringer categories are very

1    small, very precise category, one in which essentially the

2    copyright owners have not protected themselves by putting

3    the mark as they should.  This is a very narrow category.

4    The middle category is in fact the knowing, is in fact the

5    strict liability category, not a knowing category, a strict

6    liability category for people who have simply infringed

7    because this is a strict liability statute, and then the

8    willfulness category is as everyone seems to have concluded,

9    as every commentator, as every judge has concluded the

10   definition that they have offered.

11          That's where I'm going to rule.  I sometimes like

12   to chew it over a little bit more, but if you're insisting

13   on my ruling, that's the ruling.  That language is in the --

14   I don't have it in front of me, but it seems to me it's the

15   same language that the Judge in Minnesota did.  So having

16   said, that I suppose one can say why am I not directing on

17   the issue of willfulness if I conclude that it is a variant

18   of knowing?  I don't have the language right in front of

19   me.

20          MR. OPPENHEIM:  Willful infringement is an act

21   committed with knowledge of or reckless disregard for

22   plaintiffs copyrights I believe is the language, but, your

23   Honor, we're happy for expedience sake with the jury to deal

24   with this after the break.

25          THE COURT:  Yes, Mr. Nesson.

1      MR. NESSON:  I'll be extremely brief.  I only ask

2 because it relates to the upcoming examination.  On your

3 jury instructions 109, you list the various elements for

4 damage.  The element of the damage that I would like to

5 consider and be able to have the witness speak to is the

6 equivalent in the criminal case of time served.  That is, in

7 a criminal case when it comes to the punishment, the

8 sentencing person considers how much incarceration the

9 person's been through up to that point.

10      In terms of the justice of applying a penalty here

11 in the civil case, the equivalent, at least it seems to me,

12 is what the defendant has already gone through in this case

13 and what the impact of this case has been on the defendant

14 and his life and that that should be a component that the

15 jury hears about in considering the damages.

16      THE COURT:  You don't have to answer.  I will not

17 explicitly state that at all.  What the defendant has gone

18 through in this case is in part a function of what he chose

19 to do and part a function of what the decisions that he

20 made.  I don't want to get into then the legitimacy of the

21 positions he's taken during the course of this litigation

22 vs. the legitimacy of the positions that the record

23 companies have taken, so it seems to me this is not -- this

24 is simply not to be weighed at all.

25      So the factors will be the factors that I've

1   described, and it was for that reason that I have also

2   excluded any testimony about the impact of these cases on

3   Mr. Tenenbaum's family.  That's just not in the balance

4   here.  So, how long is your case?  Let me just ask you, we

5   could stop now as long as we can be assured that we will

6   finish tomorrow and get the case to the jury.

7            MR. OPPENHEIM:  Your Honor, one of the questions

8   we had, and we asked defendants this earlier is for a

9   proffer as to what Mrs. Tenenbaum was going to testify to

10  because we can't imagine that she has anything to testify to

11  that's within the scope and admissible.

12           THE COURT:  Have you deposed her?

13           MR. OPPENHEIM:  We have, your Honor.

14           THE COURT:  So why isn't that the answer?

15           MR. OPPENHEIM:  Because we don't understand that

16  there are any facts that she can offer that are relevant

17  within the scope other than the issue the Court just raised,

18  which is the incredible impact that this litigation has had

19  on her son, which obviously would not be admissible.  If

20  they put her on the stand and try 22 different ways to ask

21  that question, I'm just going to be out of my seat quite a

22  bit.

23           THE COURT:  Wouldn't be the first time.  Yes,

24  Mr. Kamholtz.

25           MR. KAMHOLTZ:  It's quarter of four.  I'd ask the

1    Court's indulgence to allow us to consider what your Honor

2    just said and we will have an answer for you first thing in

3    the morning.

4              THE COURT:  I understand, but I need your

5    assurance given the things that we said to this jury that

6    your case will be over.  I mean, what I'd like to do, what

7    I'd like to propose is this, at the very least, the

8    defendant's case would be finished by mid-morning, late

9    morning, that the jury will get the case by -- get the case

10   or at the least get the case by two o'clock in the

11   afternoon.  If everyone thinks that's going to happen, I'll

12   give you an early afternoon.  You think there's an issue

13   with respect to that?

14             MR. FEINBERG:  You're asking in terms of the

15   defendant's case?

16             THE COURT:  Yes.

17             MR. FEINBERG:  I think by the morning break we'll

18   be done.

19             MR. OPPENHEIM:  We think we can do that, so long

20   as we have time for closing, we can do closing in a half

21   hour, your Honor.

22             THE COURT:  I just want to make sure, as I said,

23   it's not time limits for the sake of time limits, it's time

24   limits for the sake of having told them that their life will

25   be on hold for X period of time, and I want to stick to

1    that.

2            MR. OPPENHEIM:  We totally agree, your Honor.

3            THE COURT:  We'll bring down the jury, they're

4    outside, we'll excuse them for the day, we'll tell them to

5    come back at nine o'clock.  We'll deal with any

6    miscellaneous issues we have to deal with.  All rise for the

7    jury.

8            (JURORS ENTERED THE COURTROOM.)

9            THE COURT:  You can all be seated.  So it always

10   happens that towards the end of the case, the whispering

11   increases, the sidebars increase, and you're left out in the

12   dark.  We would like to suspend for today.  I have

13   assurances from both sides that the evidence will be

14   completed probably some time during mid-morning tomorrow and

15   that you'll get the case for your deliberations some time

16   tomorrow.  That means arguments and it means my

17   instructions.

18           So my part of the bargain, as I mentioned to you,

19   will have been fulfilled.  The question then about your

20   deliberations, how long they take, all of that, that's your

21   determination, that's your decision, but my part of the

22   bargain will be fulfilled.  Since it looks like we're going

23   to do that, I won't subject you to another very lengthy day.

24           Again, especially as we get closer to a decision,

25   it is all the more important that you not talk about this

1    case to anyone, do your own research or see anything online

2    or on television or in any other form because the case will

3    be yours very shortly, and we want to make sure that you're

4    all on the same page with respect to the evidence that

5    you've heard and that the evidence is only what you've

6    learned in the four corners of this room and nowhere else.

7    So, leave your papers on your chair, and with that, ladies

8    and gentlemen, we'll see you tomorrow morning.  All rise for

9    jury.

10           (JURORS EXITED THE COURTROOM.)

11           THE COURT:  I want to raise a couple issues that I

12   think we need to resolve.  In addition to the draft jury

13   instructions which I've given to you, and I will tinker with

14   the language, I will take a look at the language, in any

15   event, and we'll try to send you another version, but if

16   not, the usual procedure with most Judges is that we say to

17   the parties, I will instruct on X or I'll instruct on Y or

18   I'll instruct on Z, I try to give you what I'm actually

19   going to say, not just, you know, not just leave it in the

20   abstract.

21           The problem with my procedure is that the First

22   Circuit still requires even though you're going to largely

23   know what I'm going to say at the conclusion of what I have

24   to say, you have to go to sidebar and raise your objections

25   again as if you were hearing it for the first time rather

1    than having these instructions days before, so I just wanted

2    to alert everybody to that, if there is an issue to be

3    preserved you have to preserve it.

4            MR. REYNOLDS:  Just so we understand, your Honor,

5    that is after you read the instructions, the jury is still

6    sitting in the courtroom, we have the brief sidebar?

7            THE COURT:  Yes.

8            MR. REYNOLDS:  I want to be sure of the

9    procedure.

10           THE COURT:  And I also like to give the jury

11   physically the instructions that I will have read.  Now, if

12   in fact I grant your Rule 50 motion and all that is before

13   the jury is willfulness and damages, I may not do that, the

14   issues will not be very complicated for them, but I will

15   then give it to them in hand, not just have it downloaded --

16   downloaded, listen to me, have it transcribed from the court

17   reporter because I find that actually difficult to follow, I

18   will give instructions in the form that I've given here with

19   captions, et cetera, et cetera, so they can organize the law

20   as well.

21           Whether I do that in this case will depend upon

22   how late a night I want to have.  These instructions are not

23   obviously the general instructions about burden of proof,

24   which I will repeat again, the instructions about

25   credibility, prior inconsistent statements, stipulations,

1    bias.

2          I will give an instruction which is the classic

3    instruction about how they have to follow the law as I give

4    it to them, then the question of the instructions on the

5    merits will depend upon whether I believe that infringement

6    ownership and infringement are out of the case because your

7    Rule 50 motion with respect to each of the songs, so that I

8    will let you know in the morning.

9          If that's out of the case, then all that as far as

10   I can see that is in the case is the issue of damages and

11   willfulness, as I've described it, and I will adopt

12   plaintiff's version of willful infringement or some version

13   of that.  We also provided you with what I thought was a

14   better draft jury verdict form than the Judge in Minnesota

15   which goes song by song which suggests that if the jury

16   finds that this is not willful, then the range of damages is

17   750 to 30,000; if the jury finds that it is willful, then

18   the range is 750 to 150,000.

19         I thought that this was -- it looks incredibly

20   complicated, but I thought it was easier because in fact the

21   damage award has to be song by song, and so I thought this

22   was the only way we could do it.

23         Finally, the other issue is that you had all

24   talked about a stipulation concerning the fact that there

25   was settlement discussions here and that they failed, which

1   is why we are in litigation, or some such, something that

2   would provide a context for the redacted letter and with a

3   line that would say that the jury shouldn't speculate as to

4   what the content of those negotiations were, and I hope you

5   can come up with some language.

6        MR. KAMHOLTZ:  Judge, I have a few comments on

7   your proposed instructions, and it seems as if we've lost on

8   our suggestion with respect to willfulness.

9        THE COURT:  Yes.

10        MR. KAMHOLTZ:  Obviously we will object to that,

11   but I do think that somewhere in your instructions, there

12   must be a distinction made to the jury that there's a

13   difference between an infringer who is knowing with a

14   reckless disregard and an infringer who's a commercial

15   infringer doing it for a commercial purpose for a profit

16   motive, and if you're not going to adopt our instruction as

17   to willfulness, I do think that those sort of factors have

18   to be included, as well as other factors that I will

19   suggest, has to be included in the instruction on damages.

20        So you list here 10 factors.  I think included in

21   those factors should be whether or not the infringement was

22   for a commercial purpose, whether or not the infringement

23   was for profit, whether or not the infringement was done --

24        THE COURT:  Well, if you look at No. 6, whether

25   profit or gain for the defendant was established.

1              MR. KAMHOLTZ:  Well, I think that's pretty weak,

2    frankly.

3              THE COURT:  What's the language you'd suggest?

4              MR. KAMHOLTZ:  Whether or not -- among the factors

5    you may consider is whether or not the infringement was done

6    for a commercial purpose.

7              THE COURT:  And that's better than whether profit

8    or gain for the defendant was established?

9              MR. KAMHOLTZ:  I think so, I think much better.

10             THE COURT:  I like my language better, but I'll

11   consider yours.

12             MR. KAMHOLTZ:  And I would also like whether or

13   not the infringement was done for profit.

14             THE COURT:  Gee, I could have sworn I liked my

15   language better.

16             MR. KAMHOLTZ:  And I would also like whether or

17   not the infringement was done with an intent to injure the

18   copyright holder.  And if I can continue --

19             THE COURT:  But that's No. 2, the defendant's

20   purpose and intent.

21             MR. KAMHOLTZ:  But that's very vague, and it's

22   sort of, you know, I think --

23             THE COURT:  I understand that, but that permits

24   you to argue, and all my instructions are supposed to do is

25   not weigh in on one side or the other but permit you to

1    argue.

2            MR. KAMHOLTZ:  Well, I think some of these factors

3    do weigh in on one side or the other, for instance, No. 7,

4    the revenue lost by the plaintiff.  First of all, that

5    presupposes that there was --

6            THE COURT:  Have you given me an instruction on

7    the factors to be considered, the statutory damages?  The

8    answer is no.  The answer, the instruction that I have on

9    statutory damages is a commercial, is a very broad

10   recitation about commercial-noncommercial.

11           MR. KAMHOLTZ:  Yes.  Well, that was certainly the

12   focus.

13           THE COURT:  Right.  That's certainly the focus.

14   Well, that's not good enough.  The proposed jury instruction

15   on this was -- just a second -- "If you find the plaintiffs

16   have proved that Joel's use was not fair, you may only award

17   damages," and the willfulness instruction was "Willfully

18   without permission knowing it to be a violation of law and

19   doing it anyway for the purpose of making money," which is

20   not the willfulness instruction.

21           Then the other thing I was offered was a

22   description of the three tiers of knowing, and I have an

23   instruction that goes, "From their viewpoint, my continuing

24   misimpression thereafter that we were litigating only these

25   seven songs must have amused them."  I don't have

1    instructions from you.

2           I think your suggestions are very interesting, but

3    the way we do this is we spent the time putting together and

4    drafting instructions, you give me language, I consider it,

5    you don't just get up and say, gee, I think you should have

6    mentioned X or Y when no one ever asked me about that, so if

7    you have some suggestions, I'll see them in the morning or

8    you can send them to us by e-mail tonight.

9           MR. KAMHOLTZ:  I will file it as soon as possible.

10   Thank you, Judge.

11          THE COURT:  Yes, Mr. Oppenheim.

12          MR. OPPENHEIM:  You were describing that some of

13   the more standard instructions you hadn't included, but you

14   didn't list one that we had put in our proposed instructions

15   with respect to treating, providing equal standing between

16   corporations.

17          THE COURT:  I have that.  That's all there.

18          MR. OPPENHEIM:  Then with respect to the factors

19   that you've described in 109, we obviously spent our time

20   last night on 110.  Would the Court be willing to accept a

21   short submission regarding these factors tonight?

22          THE COURT:  Yes, I'll take a look at that, yes.

23          MR. OPPENHEIM:  We'll just handle it that way.

24          THE COURT:  We'll take a look at it tonight, and

25   if it turns out that anything happens in the morning that we

1    should make an adjustment, the plan would be the defendant

2    would finish its case and if it in fact finishes by

3    mid-morning, we'll have some time to go over the

4    instructions, we can have the jury go and have lunch and we

5    can address it more carefully.

6           MR. OPPENHEIM:  One last issue, I know everyone is

7    anxious to go home.  The verdict form, which I agree it's a

8    vast improvement over Minnesota.

9           THE COURT:  You don't have to say that, but it's

10   nice you did.

11          MR. OPPENHEIM:  And I don't have a copy in front

12   of me, my apologies, but one of the things I was concerned

13   with is that the statement of the damages preceded the

14   determination of willfulness or not and that it strikes me

15   that really the analysis, the logical way that we have to

16   ask the jury to look at this is to say, do you find

17   willfulness?  If you do, then here's the damages range.  If

18   you don't, here's the damages range, that we shouldn't set

19   the damages range in front of the determination of whether

20   there's willfulness or not.

21          THE COURT:  I'm completely perplexed, and it's

22   late in the day.  The question, per sound recording, "For

23   each sound recording that you found the defendant infringed,

24   was his infringement committed willfully?  If no, what

25   damages do you award from 750 to 30,000?  If yes, what

1   damages did you award from 750 to 150,000?"

2           MR. OPPENHEIM:  My apologies, your Honor, I should

3   have interrupted and said not the verdict form, the

4   instructions.  In the instructions, we set forth the amount

5   of damages before this standard, and I realize we're going

6   to change this, but when we change it, I would hope that we

7   say, if the jury finds willfulness, we set a standard of

8   what willfulness is, and then we say, if the jury determines

9   willfulness, then here's the range as opposed to putting the

10  range first because that's not how the jury should think

11  about it.

12          THE COURT:  Let me look at that.  Okay.  Anything

13  else?

14          MR. REYNOLDS:  Nothing from plaintiffs, your

15  Honor.

16          THE COURT:  We'll see you in the morning then.

17          (Whereupon, the hearing was suspended at

18  4:00 p.m.)

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2    UNITED STATES DISTRICT COURT )

 3    DISTRICT OF MASSACHUSETTS    )

 4    CITY OF BOSTON               )

 5                    I, Valerie A. O'Hara, Registered Professional

 6    Reporter, do hereby certify that the foregoing transcript

 7    was recorded by me stenographically at the time and place

 8    aforesaid in Nos. 03-11661-NG, 07-11446-NG, Sony BMG Music

 9    Entertainment, et al. vs. Joel Tenenbaum and thereafter by

10    me reduced to typewriting and is a true and accurate record

11    of the proceedings.

12                        _____

13                        /S/ VALERIE A. O'HARA

14                        _____

15                        VALERIE A. O'HARA

16                        REGISTERED PROFESSIONAL REPORTER

17                        DATED AUGUST 26, 2010

18

19

20

21

22

23

24

25
```