UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -
                                )
SONY BMG MUSIC                  )
ENTERTAINMENT, ET AL.,          )     CV. NO. 03-11661-NG
                                )     CV. NO. 07-11446-NG
                                )
           PLAINTIFFS           )
                                )
VS.                             )     COURTROOM NO. 2
                                )
JOEL TENENBAUM,                 )     1 COURTHOUSE WAY
                                )
           DEFENDANTS           )     BOSTON, MA  02210
                                )
- - - - - - - - - - - - - - - - -

JURY TRIAL DAY 5

JULY 31, 2009

9:10 A.M.

BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE

VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S :

2        For The Plaintiffs:

3        Dwyer & Collora, LLP, by DANIEL J. CLOHERTY, ESQ.,
     600 Atlantic Avenue, Boston, Massachusetts  02210-2211;
4
         The Oppenheim Group, by MATTHEW J. OPPENHEIM, ESQ.,
5    7304 River Falls Drive, Potomac, Maryland  20854;

6        Holme Roberts & Owen LLP, TIMOTHY M. REYNOLDS, ESQ.,
     1801 13th Street, Suite 300, Boulder, Colorado  80302
7
         For the Defendant:
8
         Harvard Law School, by CHARLES NESSON, ESQ.,
9        1525 Massachusetts Avenue, Cambridge, Massachusetts
     02138;
10
         Feinberg & Kamholtz, by MATTHEW H. FEINBERG, ESQ. and
11   MATTHEW A. KAMHOLTZ, ESQ., 125 Summer Street, Boston,
     Massachusetts  02110.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

**EXAMINATION**

| Witness Name | Direct | Cross | Re-Direct | Re-Cross | Voir Dire |
|---|---|---|---|---|---|
| WAYNE MARSHALL<br>  By Mr. Nesson | 21 | | | | 14 |

**CLOSING ARGUMENTS**

| | | |
|---|---|---|
| BY MR. NESSON | 33 | |
| BY MR. REYNOLDS | 66 | |

**JURY CHARGE**        91

1                        PROCEEDINGS

2              THE CLERK:  All rise.  United States District

3    Court is now in session.

4              THE COURT:  You can all be seated.  I understand

5    we're waiting for the witness?

6              MR. NESSON:  Yes.

7              THE COURT:  When is the estimated time of arrival?

8              MR. NESSON:  It was about two minutes ago.

9              THE COURT:  Okay.

10             MR. NESSON:  I spoke to him at 9:35, and he was at

11   that point in traffic, and he said he would be here in 20

12   minutes.

13             THE COURT:  This is Mr. Marshall?

14             MR. NESSON:  Yes.

15             THE COURT:  And he's going to do the

16   demonstration?

17             MR. NESSON:  Yes.

18             THE COURT:  The demonstration, so I can translate

19   this, it had one kind of significance when infringement was

20   still an issue, but you want him to demonstrate, I take it,

21   the ease with which one can download multiple sounds as an

22   aspect of the damages?

23             MR. NESSON:  Yes.

24             THE COURT:  The problem is --

25             MR. OPPENHEIM:  Your Honor, that's not correct.

1          THE COURT:  What's not correct?

2          MR. OPPENHEIM:  What he just answered to your

3    question.  What they intend to show are U2 videos.  Those U2

4    videos are not downloaded, they are streams, and had they

5    asked any of the record company executives that came to this

6    proceeding, and we brought in a slew of very senior

7    executives.  For instance, if they would have asked the UMG

8    and Sony executives, they would have been told that.  These

9    are fully licensed, those companies get paid for those

10   videos being played, they would have been able to ask

11   whether they were available in the relevant time frame.

12         THE COURT:  How do U2 videos have anything to do

13   with this case?

14         MR. NESSON:  It's not the videos, your Honor, what

15   I really want to show is that these songs are each now

16   available in MP3 format from Amazon from 99 cents.

17         MR. OPPENHEIM:  This is entirely -- I mean, it was

18   one thing where they waited to yesterday to suggest they

19   were going to show us U2 videos.  This is the very first

20   moment I've heard that they're going to go on Amazon and

21   start demonstrate things.  They could have asked any of the

22   record company executives that flew to Boston for this

23   important proceeding, they could have asked questions about

24   this.  They didn't.

25         THE COURT:  Not only that, there has been an issue

1    about when these songs were available on iTunes.

2    Mr. Oppenheim, this is in support of your point, you had

3    numbers of people try to characterize when the record

4    companies were able to in effect capture the digital market,

5    and so there's testimony about that.

6         Is it contested as to when?  I mean, in other

7    words, what's the difference between the testimony of some

8    of your witnesses who said here's the moment in time that

9    these songs were available digitally for a fee and what this

10   testimony is?  What's the big deal?

11        MR. OPPENHEIM: Your Honor, and your point is a

12   fair one, if I thought that the only thing this witness was

13   going to do was to get up and demonstrate that the record

14   companies are selling the product that the defendant has

15   acknowledged taking illegally, but I don't for a moment

16   believe that that will be the beginning and the end of the

17   testimony.

18        What we were provided yesterday by way of notice

19   of what Mr. Marshall, the former expert, now fact witness

20   was going to attest to, and I'm happy to hand this up, your

21   Honor, is a lengthy discussion of songs that have always

22   been sharable, and I am concerned that I will continue to

23   have to get up out of my seat and continue to object,

24   something that we have tried vigorously not to do.

25        THE COURT:  Is this your only witness?

1           MR. NESSON:  That's it.

2           THE COURT:  What we can do is we can have him on

3     voir dire, have him on voir dire out of the presence of the

4     jury.  We have the time to do it.  He will do whatever

5     demonstration in front of me that he's going to do, and his

6     testimony, if it survives, would conform exactly to what,

7     you know, to what the voir dire suggested.  My understanding

8     was that it was only a demonstration.

9           Initially I understood it was a demonstration of

10    the technology involved here, and it went to damages because

11    it was easy to download 1 song as 15, and that would

12    certainly bear on the arguments you want to make to the jury

13    at this point.  This point is a different point, which is

14    the ease which one can pay to some degree also to some

15    degree cuts against your client.  It goes in both

16    directions, but let's look at the demonstration and see what

17    it is and see whether it's necessary.  We have a little bit

18    of time to do it.

19          I've gone through your instructions.  I'm a night

20    person, as you can tell by the time of my endorsements, so

21    this one was at I think about 12:30.  When I had occasion to

22    read the transcript last night, which I had not read, I only

23    had my notes of it, I get a running transcript, but I had

24    not consulted it when I initially ruled.

25          As I said, it seemed to me that the last question

1    asked of Mr. Tenenbaum by the plaintiffs essentially

2    established liability, and so that's the reason I directed

3    when I did.  The only issue then is the question of damages.

4    Both sides have offered language that is not in the case

5    law.  That doesn't offend me.  If it's logical, I put it

6    in.

7          Everything that everyone has proposed as jury

8    instructions are capable of being argued.  In other words,

9    you certainly can argue in the terms that you've described.

10   There's no question about it.  Whether or not I highlight

11   that factor in my instructions is an entirely separate

12   question, and what I was hoping was that the instructions

13   would be at a level of generality to permit both sides to

14   argue, and so that's what I've done now.

15         There were things that I've taken out of the ones

16   that you gave me, the plaintiffs gave me.  I don't have it

17   in front of me, but if you want to address your concerns

18   about this, you can address them now.

19         I want to tell you the one issue that I have been

20   struggling with is that on the one hand the plaintiff

21   objected to one factor being the means of the infringement,

22   and you suggested it doesn't matter whether it is, you know,

23   piracy in China or piracy in Medford, digital or by truck,

24   and I took it out, but I'd like to actually hear argument

25   about that because it does seem to me that this may be a

1    completely ridiculous analogy, but we face some of the same

2    issues when we deal with child pornography.

3         For example, the statutes were intended to deal

4    with the person who got out of bed in the morning, went to

5    the local store, bought a video, the video came back, the

6    kind of intentionality that it took to do that, and the

7    statute was set up so for each image you got additional

8    time, and that no longer looked as legitimate when you were

9    dealing with someone who could press a button and get 500

10   images.

11        It was not the same kind of intentionality, and I

12   think that this is the core of what the defendants are

13   arguing, which is this may be wrong and bad, and for all the

14   reasons, you should get damages, but it's a different

15   environment to be able to do a couple clicks and suddenly

16   get a thousand songs than it was when the statute was

17   drafted, and when to get that kind of infringement, you

18   really had to take major steps.  I've taken out means, but

19   I'm on the fence.

20        Mr. Oppenheim, you disagree strenuously, you don't

21   even have to do that sentence, you can now continue.

22        MR. OPPENHEIM:  Thank you, your Honor.  I think

23   distinguishing in the damages are between online copyright

24   infringement and physical copyright infringement is contrary

25   to what Congress intentionally did.

1          THE COURT: All I'd be saying is the means.

2          MR. OPPENHEIM: If the reason why we're including

3    that as a factor is because there may be a distinction

4    between a defendant who infringes online using peer-to-peer

5    as opposed 20 years ago somebody who was sitting there and

6    making cassettes in the back of a warehouse where they had

7    to do it, you know, one at a time and it quite a bit of

8    effort.

9          THE COURT: Right.

10          MR. OPPENHEIM: If the point is to try to

11   distinguish in those situations, I think that that's

12   directly contrary to what Congress was legislating about in

13   1999 when they adjusted the statutory damage regime. In

14   that legislation, Congress specifically said that they were

15   in fact increasing the penalties in order to deal with the

16   problem of online infringement.

17          And so now what we're suggesting is we're going to

18   include a factor in recognition of the fact that this is

19   easier, not maybe as malicious. So I disagree in that

20   respect. I also think, your Honor, that to the extent that

21   that -- the means, if you will, should be considered, that I

22   would presume that that really is subsumed within what your

23   Honor has included the nature of the infringement.

24          THE COURT: Yes, yes.

25          MR. OPPENHEIM: So I think in that respect it may

1   be repetitive.

2           THE COURT:  I mean, there's no question that they

3   can argue that.  The question is whether I highlight it.

4   Yes.

5           MR. KAMHOLTZ:  Every one of the cases that the

6   plaintiffs cite in their briefs have to do with suits

7   brought by big corporations against big time corporate

8   infringers, and there needs to be something in these

9   instructions that focuses the jury's attention on the fact

10  that a kid clicking on his bedroom on a computer is somehow

11  vastly different with respect to culpability.

12          THE COURT:  How do you address his argument that,

13  you know, I'm not a free actor here, but how do you address

14  his argument that Congress increased these penalties

15  precisely to deal with the downloaders, and, therefore, why

16  should I be making a distinction if Congress obviously has

17  not?

18          MR. KAMHOLTZ:  I think there are downloaders and

19  there are downloaders.  The means that Joel used was sitting

20  in his room at night clicking on his computer as opposed

21  to --

22          THE COURT:  How is that different than any other

23  downloader?  If this was the constituency that Congress was

24  trying to get at by upping the penalty --

25          MR. KAMHOLTZ:  I don't think that's clear at all.

1    I think that the copyright law as a whole is directed

2    against commercial infringers, electronically or not.

3           MR. OPPENHEIM:  Two brief responses, if I may,

4    your Honor.  I disagree respectfully with Mr. Kamholtz with

5    respect to the authority that we cited is all big companies.

6    Much of that authority involves individuals.  Now I haven't

7    gone through it case-by-case, but I could.  No. 2, we have a

8    specific jury instruction that I understand the Court is

9    going to offer which says there is no distinction between a

10   corporation and an individual, and so this argument really

11   is contrary to that.

12          So that's my first response.  The second is that

13   he says that the 1999 legislation, it's not clear that it

14   was intended to address this kind of situation, and I will

15   read a portion of the House report.  "Many computer users

16   are either ignorant that copyright laws apply to Internet

17   activity, or they simply believe they will not be caught or

18   prosecuted for their conduct.  Also, many infringers do not

19   consider the current copyright penalties a real threat and

20   continuing infringing even after a copyright owner puts them

21   on notice.  In light of this disturbing trend, it is

22   manifest that Congress respond appropriately with updated

23   penalties to disway such conduct."  I don't know how much

24   more on point you could ever ask legislative history to

25   be.

1          MR. KAMHOLTZ:  Well, just one other point, all

2    that legislative history and statute itself came down before

3    Napster, before the advent --

4          THE COURT:  1999.

5          MR. OPPENHEIM:  That's again incorrect, your

6    Honor.  It was 1999 legislation --

7          MR. KAMHOLTZ:  That came out in 1999.

8          THE COURT:  Well, as I said, you certainly can

9    argue this in your closing, you can argue the difference

10   between this and other kinds, the only question is whether I

11   highlight by adding an additional factor that had to do with

12   means or whether or not we keep it folded.  It may not be a

13   distinction without a difference.  I understand Mr. Marshall

14   has walked in.  I can tell from the flurry of activity.  Do

15   you want to spend a second to deal with him, then we'll have

16   a voir dire.  Maryellen, we'll tell the jury we'll start in

17   about a half an hour.

18          MR. OPPENHEIM:  One last question, your Honor.

19          THE COURT:  Yes.

20          MR. OPPENHEIM:  We're just kind of going through

21   the draft jury instructions.

22          THE COURT:  You'll have an opportunity after, what

23   we'll do is we'll take the last witness, let the jury know

24   that evidence is closed, then have an opportunity to confer

25   one more time.

```
 1              MR. OPPENHEIM:  Thank you, your Honor.
 2              (A recess was taken.)
 3              THE CLERK:  All rise.  United States District
 4    Court now is in session.
 5              THE COURT:  You can be seated.  Let's have a
 6    voir dire of Mr. Marshall.
 7              WAYNE MARSHALL, having been duly sworn by the
 8    Clerk, testified as follows:
 9              THE COURT:  Proceed.
10                        VOIR DIRE
11                    DIRECT EXAMINATION
12    BY MR. NESSON:
13    Q.  Mr. Marshall, would you state your name, please.
14    A.  Wayne Marshall.
15    Q.  What do you do for a living?
16    A.  I'm an ethnomusicologist.
17    Q.  Where are you an ethnomusicologist?
18    A.  I'm now at M.I.T. as a Mellon fellow.
19    Q.  And would you be able to step to the machine that's
20    hooked up to the projector and do a demonstration for the
21    Court?
22    A.  Yes, I can.
23              THE COURT:  Go right ahead.  What am I hooked up
24    to?  Is it podium 2?
25              MR. OPPENHEIM:  It's on now.
```

1          THE COURT:  Okay.

2     Q.  Could you demonstrate the ease with which one currently

3     seeking to obtain a free MP3, that is, an unencrypted file,

4     the ease by which one can do that by going to Amazon and

5     purchasing it for 99 cents?

6     A.  Sure.  I'm just going to navigate to Amazon.com.  Do you

7     have a particular song?

8     Q.  Yes, let's do Nirvana, Come As You Are.

9     A.  It pops up right there in the dropdown, and we see the

10    second listed item is actually download MP3 for 99 cents,

11    direct link, and I can click on that.  It allows you to

12    stream it if you'd like.

13    Q.  Yes, could you give us a little preview of the

14    experience of the user who is interested in this song,

15    considering whether to buy it and then the actual process of

16    buying it.

17    A.  Here it is.

18    Q.  All right.  I like that.  Let's see if we can buy it.

19    A.  Okay.  Now it's going to ask me for the particular

20    sign-in info.

21          THE COURT:  You don't have to include your credit

22    card information.

23          THE WITNESS:  Well, it has it, and I don't think

24    it will show it to everybody, but I don't mind spending .99.

25          MR. OPPENHEIM:  We'd love to be paid for this,

1    your Honor.

2              MR. NESSON:  Let's do that.

3    A.  You know, I already bought this song back in the '90s,

4    but I can do it again.  I hope I remember this.  You see

5    it's downloading here.

6              THE COURT:  Anything further to demonstrate,

7    Mr. Nesson?

8    Q.  Cancel that one.  I'm going to let the Court keep the

9    copy of Come As You Are.

10             THE COURT:  Thank you, go on.

11   Q.  Now, if you would, Mr. Marshall, would you go to YouTube

12   and see what you can find for Nirvana, Come As You Are.

13   A.  Here is a video officially hosted by Universal Music

14   Group, which you note imbedding is disabled by request.  It

15   means you're not allowed to imbed it in a web page or blog,

16   you have to watch it here.  Now, if you want an MP3 of

17   this -- I'm trying to pause it, it's lagging.  You see

18   there's a thing that pops up right away that will actually

19   take you directly to the Amazon page or the iTunes store

20   where you can buy the song.  YouTube incorporated that a

21   little while ago, maybe some time last year.  I don't

22   remember the date.  But if you want to not buy it for 99

23   cents, you can go to a place like KeepVid.  I don't know why

24   this is still playing.  I think it opened here.

25             MR. OPPENHEIM:  Objection, your Honor.  If he's

1    about to engage in an infringement, we object.

2            THE COURT:  What is KeepIt?

3            THE WITNESS:  KeepVid.

4            THE COURT:  KeepVid, the allegation, this is an

5    infringing use?

6            MR. OPPENHEIM:  If he's about to take a music

7    video that is licensed and released by Universal Music Group

8    on YouTube, and he's about to use some other technology in

9    order to take a streamed video and store it to his computer

10   without authorization, we object.

11           MR. OPPENHEIM:  And may I respond?

12           THE COURT:  Yes.

13           MR. NESSON:  Fair use, we are in a courtroom of

14   the United States Government, we are in the midst of a

15   trial.

16           THE COURT:  What's the relevance of it?  Fair

17   use --

18           MR. NESSON:  I just want to show two things, your

19   Honor, I want to show that currently today for every one of

20   these songs, it is easy to the point of child's play, both

21   to obtain the song for 99 cents, if you want to go buy it on

22   Amazon, and to take the video of the song from YouTube and

23   download it to an MP3 file simply by using a readily

24   available program that's right here on the net.

25           THE COURT:  What's the significance of that, and

1    to what degree in fact does that rebound to your client's

2    detriment because if the testimony here was that iTunes was

3    available in 2007 --

4               MR. OPPENHEIM:  Three.

5               THE COURT:  2003, doesn't that make his conduct in

6    not doing this look all the more, all the worse?

7               MR. NESSON:  I don't believe so, your Honor,

8    because the iTunes music that was being downloaded required

9    somebody to go into the whole iTunes environment.  It came

10   through encrypted with an encryption program called

11   FairPlay.  It does not have any of the same kinds of --

12              THE COURT:  Where is this testimony in the trial?

13   What you're saying now, who has testified to that fact?

14              MR. NESSON:  Ron Wilcox, your Honor.

15              THE COURT:  In this trial?

16              MR. NESSON:  Yes, yes, in this trial.

17              THE COURT:  That talked about the encryption of

18   iTunes and the difficulty?

19              MR. NESSON:  Yes, talked about iTunes being

20   encrypted with FairPlay.

21              THE COURT:  Why do you need the video portion in

22   order to make the argument and therefore the infringing

23   issue in order to make the argument you want to make?  Why

24   not just the Amazon MP3 link?

25              MR. NESSON:  I'll stick with the Amazon, that

1   would be fine.

2          THE COURT:  Anything further?

3          MR. OPPENHEIM:  Your Honor, with respect to that,

4   we'll stipulate there are -- we actually disclosed, as we

5   were supposed to, exhibits in advance.  One of those

6   exhibits is the iTunes screen shot for every one of the

7   recordings at issue.  We don't need to have somebody do an

8   demonstration of this.  There's been testimony about it.

9   There are exhibits in it, and now we're venturing into

10  unknown testimony.

11         THE COURT:  It's not unknown testimony.  We're at

12  the 11th hour.  I will allow Mr. Marshall to demonstrate the

13  Amazon download of an MP3.  If you have screen shots of

14  iTunes that you wish to offer as rebuttal, I don't think

15  it's necessary.  Mr. Marshall will simply demonstrate the

16  Amazon downloading of an MP3, of one of the songs at here.

17         MR. OPPENHEIM:  Fine, your Honor.  By way of

18  clarification, will the plaintiff, excuse me, will --

19         THE COURT:  You're the plaintiff, he's the

20  defendant, remember that.

21         MR. OPPENHEIM:  I've gotten so confused, your

22  Honor, following your lead.  Will the defendant be allowed

23  to inquire of Mr. Marshall about anything else because I

24  remain concerned since they previously have attempted to

25  offer him as an expert and they disclosed all these other

1    things that he would like to testify to, I just want to make

2    sure I know the full bounds of his testimony.

3           THE COURT:  Mr. Nesson, his testimony would be

4    what it just was, right?

5           MR. NESSON:  Yes, your Honor.

6           THE COURT:  He's not.  That's it.

7           MR. OPPENHEIM:  Thank you, your Honor.

8           THE COURT:  I imagine at the conclusion that the

9    defendant will rest, the plaintiff will rest, we'll take

10   another break just to go over the instructions one last

11   time, and then we'll proceed.

12          MR. OPPENHEIM:  Obviously we continue in our

13   objection for purposes of preserving on appeal, there was no

14   notice of this, he's an improper witness that no notice of

15   this witness as a fact witness, that this demonstration was

16   not provided as a notice and that it's not relevant.

17          THE COURT:  Okay.  All right.  Take a few

18   minutes.

19          MR. NESSON:  Just one other thing, I intend to ask

20   Mr. Marshall if he's related to me.  Is that allowed?  I

21   want to deal with the bias issue.

22          THE COURT:  Well, if they're not going to raise

23   it, then you shouldn't raise it.  He doesn't look like you,

24   it's easy.  Okay.  As long as no one points to the adorable

25   baby that was here a few moments ago, we should be fine.

1          MR. NESSON:  My granddaughter named Charlie.

2          THE COURT:  We'll set up again, Maryellen.

3          (A recess was taken.)

4          THE CLERK:  All rise for the jury.

5          (Jurors entered the courtroom.)

6          THE COURT:  You can be seated.  Proceed.

7          MR. NESSON:  The defense calls

8    Dr. Wayne Marshall.

9          THE COURT:  Take the stand, please.

10         WAYNE MARSHALL, having been duly sworn by the

11   Clerk, testified as follows:

12                    DIRECT EXAMINATION

13   BY MR. NESSON:

14   Q.  Would you tell the jury your name.

15   A.  Wayne Marshall.

16   Q.  And tell the jury what you do.

17   A.  I'm an ethnomusicologist.

18   Q.  And you're here to do a very brief demonstration for the

19   jury?

20   A.  Yes.

21   Q.  Would you step to the witness stand with the Judge's

22   permission?

23          THE WITNESS:  May I?

24          THE COURT:  Yes, you may.

25   Q.  An ethnomusicologist.  What's that?

1          MR. OPPENHEIM:  Your Honor.

2          THE COURT:  Sustained.

3   A.  It's --

4          THE COURT:  No, no, no you can't answer.  Proceed

5   to the demonstration.

6   Q.  Would you demonstrate for the jury the ease with which

7   it is now possible to purchase a song.  Let's do Come As You

8   Are, Nirvana as the example.

9   A.  Okay.

10  Q.  In an MP3 format on the net.

11  A.  Sure.

12  Q.  Probably the easiest place to go is Amazon.com, so I'm

13  just going to navigate there.  You said Nirvana, Come As You

14  Are?

15  A.  Nirvana, Come As You Are.  I'm just going to type right

16  here in the top search bar, Nirvana, you see it's already

17  giving me options in the dropdown, and there it is.  I'm

18  just going to hit return, Nirvana, Come As You Are.  First

19  we get a book by that title, but the second return is a

20  direct link to download the MP3 for 99 cents.  I can click

21  on that.  I can preview it here if you want.

22  Q.  Would you do that, please.

23          (MP3 playing)

24  A.  It will stream me an excerpt of the song.

25  Q.  A little more volume, please.

1   A.  That's the best I can do here.

2   Q.  That allows you to preview the song without buying it?

3   A.  Yes.

4   Q.  And now you make the decision, yes, I'd like to purchase

5   this for 99 cents?

6   A.  Yes.

7   Q.  How easy is it to do?

8   A.  It's one click away as they trademark here.  Because I'm

9   already signed in, I'm signed in, it says, Hello,

10  Wayne Marshall, because we ran through this once before the

11  jury came out, it won't even ask for any information, it

12  will just go right there, so I can click it, and I'll spend

13  another dollar on this song.  So I've downloaded it.  You

14  can see here it's loading a second copy, and when that

15  finishes downloading, it will automatically pop up in iTunes

16  and play.  It has all this metadata associated with it.  You

17  can see the album cover.

18  Q.  What you get then is an MP3 file?

19  A.  Right.

20  Q.  Just like the kind of MP3 files that Joel Tenenbaum was

21  downloading?

22          MR. OPPENHEIM:  Objection, your Honor.

23          THE COURT:  Sustained.  Sustained.  Anything

24  further?

25  Q.  Could you, if asked, do this same process and download

1  each of the songs that are at issue here in the case for 99

2  cents?

3  A.  By Amazon, yes, I'm sure you can very easy.

4          MR. NESSON:  Thank you very much, Mr. Marshall.

5          THE COURT:  Anything further?

6          MR. OPPENHEIM:  No, your Honor.

7          THE COURT:  Thank you.  The witness is excused.

8  Any further witnesses?

9          MR. NESSON:  No, the defense rests.

10          THE COURT:  Okay.  So as I've told you, the gaps,

11  we wind up spending time talking a lot without you as the

12  trial ends.  We're going to do that now, so you're going to

13  have your third coffee break of the morning, and we will

14  chat for I would venture to say about 15 minutes, at which

15  point we'll go directly into arguments of counsel and

16  instructions to you, the jury.  So we'll pause again.  All

17  rise for the jury.

18          (Jurors exited the courtroom.)

19          THE COURT:  You can all be seated.  So I will not

20  instruct on means.  The instructions then are as you have

21  seen with the factors that are listed in front of you.  Is

22  there anything else I need to address with respect to the

23  instructions?

24          MR. OPPENHEIM:  Yes, your Honor.  A number of

25  points, please.

1          THE COURT:  Pardon?

2          MR. OPPENHEIM:  Yes, your Honor.  With respect to

3     IIB on page 2, the draft instructions says, "In this case

4     there is no contest as to either element necessary for

5     liability."  That, your Honor, respectfully is not an

6     accurate statement.

7          THE COURT:  What would you propose?  I want to let

8     them know that the case has changed, and I wanted to do it

9     in a way that didn't cast aspersions on either side.

10          MR. OPPENHEIM:  I agree with that, your Honor, and

11     I have a proposal.

12          THE COURT:  What's your proposal?

13          MR. OPPENHEIM:  There is no issue as to

14     liability.

15          THE COURT:  Better.  Okay.  Anything else?

16          MR. OPPENHEIM:  Yes, your Honor, on page 3, your

17     Honor, a number of issues with respect to both A and B, and

18     I will start with A.  Actually I will start with A2, and

19     going through the factors, Factor (g) currently reads, "The

20     defendant's continuation of infringement after notice or

21     knowledge of this lawsuit."  I believe more accurately the

22     factors should consider the defendant's continuation of

23     infringement after notice or knowledge of claims.

24          You shouldn't have a situation where --

25          THE COURT:  You're right, lawsuit is fine, I agree

1    with you.  Okay.

2           MR. OPPENHEIM:  Your Honor, I would also propose

3    that the current structure of 3B in willful is backwards.

4           THE COURT:  I know.  You said that.  I don't

5    agree.  Next.

6           MR. OPPENHEIM:  Just for purposes of preserving my

7    record on that issue, plaintiffs believe that the jury

8    should be instructed on the standard of willfulness before

9    they are instructed as to what the damages should be.

10          Turning to the next issue within that same

11   provision, your Honor, I believe that we should be

12   consistent in the way we describe the damages for willful

13   and nonwillful.

14          In III. A. 1, we have language which is fine.  We

15   should use that same language for purposes of willful

16   infringement, and so we should -- if we're going to lead

17   with this, we should have the instruction read, "If you find

18   the defendant's infringement of a copyrighted work was

19   willful, then the copyright act entitles a plaintiff to a

20   sum of not less than $750 and not more than $150,000 per act

21   of infringement.  That is, per sound recording downloaded or

22   distributed without license, as you consider just."  We use

23   that language above, we should use that same language below

24   so there is parity between the two.

25          THE COURT:  It seems innocuous.  Anything wrong

1    with that, Mr. Nesson?

2            MR. NESSON:  Well --

3            MR. KAMHOLTZ:  At least as to the final point, I

4    think it should remains as it is.  Our objections are

5    frankly more global, and we'll be making them at the

6    sidebar, but our principal objection is in light of the

7    Court's refusal to include in willfulness any notion at all

8    of an intent to injure the copyright holder on any malicious

9    intent or any commercial purpose which we think --

10           THE COURT:  Me and five or six thousand other

11   courts, but go on.

12           MR. KAMHOLTZ:  I understand that.  If it's not

13   going to be in the definition of willful, it seems to me it

14   has to be in the factors with respect to damages so that the

15   jury knows that there's a difference between the Joel

16   Tenenbaums of the world and big corporate pirates.

17           THE COURT:  You certainly can make that argument.

18   There is a range here, and where you situate the defendant

19   on the range is something you'll be doing in your closing

20   arguments.  You can certainly make that argument.  I won't

21   highlight it.

22           MR. KAMHOLTZ:  I understand that, but that's

23   argument of counsel.  I think the discretion of the jury

24   with such a huge range here from 750 to 150,000.

25           THE COURT:  And you'll have an opportunity to

1    argue if there's a damage award.  As I said, I think that's

2    where there's going to be some action here.  Is there

3    anything else?  Mr. Nesson, you wanted to use the

4    instructions and the verdict slip in some way in your

5    closing?

6              THE COURT:  Yes, your Honor.

7              MR. NESSON:  I would like to show the jury the

8    factors on a screen and then key my argument to the

9    factors.

10             THE COURT:  That's not a problem.

11             MR. NESSON:  I'd like to show the jury the verdict

12   form and go through with the jury the various ways in which

13   at least my arguments would bear on how they might fill it

14   out.

15             THE COURT:  That's also not a problem, but you

16   understand that you can't instruct the jury as to the law,

17   however very much you want to, but you can certainly use my

18   instructions as a framework for your argument, that's fine.

19   You can't be fighting with me on the law, but you certainly

20   can talk about the legal framework that I'm giving and argue

21   the facts in terms of that.  If there's a problem, then

22   there will be a mistrial, so you don't want that as a

23   problem.

24             MR. NESSON:  Well, I guess we'll have to see.

25             THE COURT:  We won't have to see, you cannot argue

1    with the nature of the law and the legal instructions, you

2    can only argue in terms of the facts and accept the law as

3    the framework.

4              MR. NESSON:  I will do my best, your Honor.

5              THE COURT:  Counsel.

6              MR. OPPENHEIM:  Your Honor, I hadn't yet completed

7    with respect to the jury instructions, I have two additional

8    issues, hopefully brief.

9              THE COURT:  Okay, go on.

10             MR. OPPENHEIM:  May I complete this issue that you

11   just raised with Mr. Nesson?  I want to avoid the mistrial

12   the Court just suggested it, too, would like to avoid, and

13   so I want to make sure that during the course of the closing

14   arguments that the only thing that is referred to is the

15   evidence in the case, and that does not include the

16   questions of counsel if the witnesses did not attest to

17   that.

18             We've had lengthy speeches by defense counsel as

19   to matters that are not in evidence, and I want to make sure

20   that we end up with a closing argument that corresponds with

21   the evidence that's been presented.

22             THE COURT:  I assume that he will, and I will

23   monitor this, and you can object in the course of his

24   closing, if that's a problem.

25             MR. OPPENHEIM:  I understand that.  Your Honor, we

1    prefer not to object.

2          THE COURT:  I understand.  I have to assume the

3    good faith of counsel, and that's my instructions and I have

4    to assume people will abide by my instructions.  As I say,

5    you're not only courting a mistrial, you're also courting

6    contempt when you run afoul of the instructions.

7          MR. OPPENHEIM:  Very well, your Honor.

8          THE COURT:  Go on.

9          MR. OPPENHEIM:  With respect to the jury

10   instructions, I'm not sure if the Court intends to give this

11   instruction as part of its more standard instructions or

12   not, but I raise it because we have not seen this.

13   plaintiffs' proposed instruction No. 30 which reads,

14   "Knowledge may be either actual or inferred from the

15   evidence.  You may consider any statements made and acts

16   done by the defendant and all the facts and circumstances in

17   evidence which may aid in a determination of the defendant's

18   knowledge or intent."  I don't know whether that is part and

19   parcel of the standard instructions you've referred to.

20         THE COURT:  In what respect is that different than

21   my instruction on knowledge and intent on page 3, 3.B.3?  It

22   sounds like the same to me.

23         MR. OPPENHEIM:  You're right, your Honor.

24         THE COURT:  Okay.

25         MR. OPPENHEIM:  Then last but not least,

1   plaintiffs' proposed instruction No. 35 which reads,

2   "Reckless disregard can either be inferred from continuous

3   infringement, a past pattern of infringement, continuing

4   infringement despite warnings, or other circumstances."

5        THE COURT:  That would have been in addition to

6   knowledge and intent?

7        MR. OPPENHEIM:  Yes.

8        THE COURT:  I think that's fair.  I'll check the

9   reference, but I will do that.

10       MR. OPPENHEIM:  I believe just for my mother's

11  grammar school upraising, there's typo in I.A.

12       THE COURT:  Okay.

13       MR. OPPENHEIM:  In order to preserve the record,

14  your Honor, we also note our objection with respect to

15  the --

16       THE COURT:  You don't need to do that now.  You

17  don't need to do that now.  As I said, we have to have the

18  ceremony of post objections, with which I disagree, given

19  the procedures I use in the front end, it seems crazy to

20  have to do this after I've gone over the instructions, but

21  that's my orders.

22       MR. NESSON:  Do I have a moment to go to the

23  bathroom?

24       THE COURT:  I'm sorry, of course you do, five

25  minutes, then we'll start.

1          (A recess was taken.)

2          THE CLERK:  All rise for the jury.

3          (Jurors entered the courtroom.)

4          THE COURT:  You can be seated.  Now, ladies and

5    gentlemen, you will hear from the lawyers in their final

6    arguments to you.  This is the point that they will try to

7    persuade you of their positions.  Bear in mind that what the

8    lawyers say to you is not evidence, and if they purport to

9    summarize the evidence in the case, bear in mind that you

10   are the determiners of what the evidence is, that their

11   summaries may be inconsistent with your memories, and if

12   that's so, your memories control.

13          Also bear in mind that after the lawyers address

14   you, I'm going to address you and tell you what the law is,

15   and the decision that you make is within the four corners of

16   the law as I give it to you.  It is not available for the

17   lawyers to argue to you, not appropriate for them to argue

18   to you that the law is wrong, that you should accept a

19   different standard than the legal standard that I'm giving

20   to you.

21          I am the determiner of the law, you are the

22   determiner of the facts, and so when they refer to my

23   instructions, they have to be referring to the instructions

24   that I will in fact be giving, and if they misstate it,

25   again, my resolution of what the law is is the framework

1    that you are obliged to follow.

2           So with that, we now reverse the order.  The

3    defendant argues to you first and then the plaintiff.

4    Mr. Nesson.

5                      CLOSING ARGUMENTS

6           MR. NESSON:  How do you do?  My first case in

7    court was in the district court in Cambridge.  It was when I

8    was very young, maybe 20 years old.  I made an illegal left

9    turn at Harvard Square and got a ticket for it, and I

10   figured, what the hell, I'll go to court.

11          So I went to court, and the way it works is the

12   Judge calls you up, you approach, pull up in front of other

13   people in court and His Honor says, "You made an illegal

14   left turn," and he says, "how do you plead?"  I said

15   "Guilty."  He then said, "Guilty, you have a right to

16   appeal," and he went on, and I said, "I appeal," at which

17   the point the Judge looked at me and said, "Sit down over

18   there."  So I sat down, and he then went through every other

19   defendant in the court until it was dead empty.  Oh, I

20   forgot, I forgot, guilty, the Judge says "$20, you have a

21   right to appeal," and I said, "I appeal."

22          I sit down, he clears out the courtroom.  When

23   it's empty, he calls me back up and says, "You pleaded

24   guilty?"  I said, "Yes, your Honor."  "Then you appealed?"

25   I said, "Yes, your Honor."  He said, "What's the basis for

1   your appeal?"  I said, "Your Honor, I think $20 is too much

2   for a left turn," and he laughed, and he turned to the clerk

3   and said, "Make it 10."  That was my first victory in

4   court.

5       This case is about $20 too much for a left turn.

6   This case is about damages, and it's a question of the

7   justness of the damage that will be awarded by you against

8   Joel in favor of the plaintiffs.

9       You are here to apply the law as the Judge gives

10  it to you.  You apply that to the facts of the case.  You

11  decide how much money it is just for the defendant to pay to

12  the plaintiffs if they convince you that you should make an

13  award.  Just has to do with justice.  Let the punishment fit

14  the crime.  You are a jury, a jury of the defendant's peers.

15      The core of jury practice is the faith and the

16  wisdom of the jury.  The jury is the root of the people in

17  the justice system.  Everything else is illegal.  You are

18  human.  It's the essence of what juries bring to this

19  process that you bring common sense, common wisdom, your own

20  good sense of what a good result should be.

21      Now, could I ask, Isaac, would you call up what

22  will be the Judge's instructions on damages.  The Judge will

23  instruct you, and the Judge has provided us with an advance

24  of it, so I'm eager for you to see it.

25      MR. OPPENHEIM:  Your Honor, is this the final

1    version?

2          MR. REYNOLDS:  Objection.  It's got handwriting on

3    it.

4          THE COURT:  Yes, please, you can't do that.  It is

5    not the final version, it has handwriting on it, and

6    therefore you cannot show it, so you can certainly refer to

7    it.

8          MR. NESSON:  It has the handwriting of the change

9    that was made, your Honor.

10         THE COURT:  I understand.  Why don't you show it

11   to me.  Let me make sure that that is the version.

12         MR. OPPENHEIM:  May I approach as well, your

13   Honor?

14         THE COURT:  Sure.  Yes, this is fine.

15         MR. OPPENHEIM:  May I see it?

16         THE COURT:  This is fine.  Okay.  Go on.

17         MR. OPPENHEIM:  I'm sorry, your Honor.

18         THE COURT:  Wait just one second.  Take it off,

19   please.

20         MR. OPPENHEIM:  One of the things that we were

21   going to do that haven't been done --

22         THE COURT:  This is as I'm going to give it.

23         ( THE FOLLOWING OCCURRED AT SIDEBAR:)

24         MR. OPPENHEIM:  I thought you were going to change

25   this language to be consistent with this language.

1      THE COURT:  I was but the additional factors.

2      MR. OPPENHEIM:  You're just going over the factor?

3      MR. NESSON:  Yes.

4      ( THE SIDEBAR CONFERENCE WAS CONCLUDED.)

5      THE COURT:  You can put it on.  Thank you.

6      MR. NESSON:  Now I believe you will get these

7  instructions after the Judge charges you, and here I'm just

8  interested in focusing on the statutory damage instruction.

9  First, statutory damage, statutory damage is an artifact of

10  the copyright law that says that the plaintiffs don't have

11  to prove actual damage, they can be entitled to statutory

12  damage, and this instruction will then charge you with what

13  you need to consider.

14      Each plaintiff has elected to recover statutory

15  damages.  That's a special kind of damage.

16      MR. OPPENHEIM:  Objection, your Honor.

17      THE COURT:  Overruled.  Go on.

18      MR. NESSON:  Each plaintiff has elected to recover

19  statutory damages instead of its actual damages for the

20  defendant's copyright infringement.  Now just reading the

21  first two paragraphs, "The copyright act entitles the

22  plaintiff to a sum of not less than $750 and not more than

23  $30,000 per act of infringement.  That is, per sound

24  recording downloaded or distributed without license, as you

25  can just."

1          Isaac, would you underline the word "just," just

2    give it emphasis.  "In determining the just," and underline

3    that again, "the just amount of statutory damages to award

4    an infringing defendant, the jury is entitled to weigh a

5    number of factors.  Among those factors you may consider,

6    and there's a list that follows, and I'm going to come back

7    to this list in just a moment, but you see that list there.

8          Then the concluding paragraph of this, "This list

9    of factors is not exhaustive, nor have they been offered in

10   any particular order.  You may include any other

11   considerations you believe relevant to a just and

12   appropriate determination of damages.  Isaac, would you

13   underline "a just and appropriate determination of damages."

14         Before I turn to the actual list of factors here

15   and discuss those with you, I would like to discuss two of

16   the witnesses from the plaintiffs' case.  First,

17   Dr. Stan Liebowitz.  He did very well as a witness.  He was

18   clear and convincing that open sharing among peers has

19   caused a decline in the revenue of the recording industry,

20   but first note just how careful he was to circumscribe his

21   focus to the recording industry.  He does not include within

22   his focus the performance side of music or any other

23   ancillary business built on music star power.

24         MR. REYNOLDS:  Objection, your Honor.

25         THE COURT:  Overruled.

1          MR. NESSON:  And second, the point he makes about

2     this industry being hurt by the advent of an open connected

3     global network of peers makes sense.  Invention of the

4     peer-to-peer networks that blossomed with Napster radically

5     changed the business environment of recorded music.  It

6     required the recording industry to adjust and evolve.  It

7     was a new environment, but progress happens.  Progress

8     happens.  It is not the open peer-to-peer network that is

9     here on trial, it is Joel Tenenbaum.

10          The issue is not the damage that peer-to-peer

11     technology caused to this industry, it's what Joel did that

12     is here in issue and what's appropriate in response to what

13     Joel did.

14          Mr. Liebowitz spoke of property rights, property

15     rights in bits floating free in the open network of

16     cyberspace are weak because nothing prevents the bits from

17     being consumed except the law, law that has no fences to

18     help it, no safes, no locks, just the law.

19          Moreover, this is law that is to be taught to

20     children, children coming, growing up in a digital

21     environment.  They have to be taught this law.  Imagine the

22     parents' job in teaching a child this law.  Think of how

23     parents teach children.  You start with a young child.  The

24     first you try and teach a child is how to share.  Sharing is

25     one of the first principles we teach to our children, how to

1   share, how to share nicely.

2       Once we have some effect of sharing, and when you

3   think about what kids share, music certainly comes to mind.

4   Kids share songs, they sing songs together.  They sing them

5   in choruses at school, they sing happy birthday at their

6   parties.  The idea of song is instinct in the child's

7   environment in an open sharing format at their early age.

8       Next you teach a child the idea of property.  This

9   is mine, this is yours, how you respect someone else's

10  property.  Now that's a hard idea for children but not

11  completely impossible.  The idea of real property, real

12  property has to do with physical things.  It makes sense as

13  a matter of principle to a kid that if you have something

14  that's mine, then I don't have it.  If I take something away

15  from you, you don't have it, I do.  It's nature that you and

16  I can't have it at the same time.  If I take it away from

17  you, I am trespassing.  We can get that across.  It's

18  sometimes hard to get that across to kids.  Kids have some

19  tendency to see the candy in the store and put it in their

20  pocket perhaps, learn, have to learn that that's not right,

21  you shouldn't take from other people what's theirs.

22      That's a principle that kids can understand and be

23  taught that makes sense for real property, physical

24  property.  Now imagine on top of that that you have to teach

25  your child about intellectual property, virtual property.

1    The idea, the very idea of virtual property as a concept is,

2    to say the least, very challenging, the idea that someone

3    owns a song.  Imagine that from a child's point of view.

4    What, own a song, these things that float around that have

5    no particular physical embodiment.  Am I somehow trespassing

6    if I sing someone's song?  Am I somehow trespassing if I'm

7    sharing music?  Think how hard that idea is to get across.

8          Mr. Liebowitz offered the example of the jewelry

9    store.  You'll recall vandals break into a jewelry store on

10   a regular basis to a point where the owner of the store

11   can't really make money being a jeweler, and so he goes off

12   to another trade.  You think about that as a base, a

13   metaphorical base and now translate it.

14          You'll recall that Mr. Liebowitz spoke about "Beam

15   me up, Scotty."  You recall I asked him to imagine that

16   somehow the fences were taken down and that the jewels were

17   just out on the street, and he responded to that by saying,

18   "Agh, third category, beam me up, Scotty," and we all had a

19   good laugh about it.  I just think about Scotty and "Beam me

20   up."  Think about a kid in his bedroom, not going to a

21   store, not trying to rob it, just at his machine, and he is

22   able just by becoming a master of this technological

23   environment to call up music.  That's Scotty, that's beam me

24   up.  That's sit down and beam me up, free music.  That's the

25   way it works.

So now this rule that we have to teach this child
in the bedroom where he's alone with the computer, maybe a
computer that the parents didn't really understand that well
on a network the parent doesn't understand that well using
programs that the parent doesn't understand that well.  The
parent has got to teach this child that you can't download
songs.

Well, what songs?  Copyrighted songs.  We've heard
the evidence from the plaintiffs that each of these songs in
a store you buy on a CD, and on the back of the package
there's a copyright.  So these are copyrighted songs, but
there's no copyright on the MP3 file.  When Scotty beams up,
the song that he wants from KazaA, it doesn't come with a
copyright notice on it.  In fact, the free bits that are out
there floating in cyberspace, they don't have copyright
signs on them, so what we have to teach the child then is
even though music isn't copyrighted in any way that you see
a copyright, you just have to understand that it's
copyrighted.

You just have to know that.  You just have to
assume that if you want music on the net, you shouldn't be
able to get it for free even though it's there for free.
That's a tough proposition to explain to a kid and an even
tougher proposition to police.  How is the parent going to
police that proposition?  Well, probably the parent is going

1    to say you can't have a computer, or if you have a computer,

2    you shouldn't have any of this file sharing technology on

3    it, even though file sharing is exactly what the Internet

4    is, that's it, peer-to-peer connection in an open net.

5        And so the result of that from the parents' point

6    of view is an effort to constrain what the child does in

7    this cyber world on the net coming from an authority figure

8    who doesn't really understand it, is not really there

9    looking over the kid's shoulder, and what's the explanation

10   to the child?  What's the reason why?  The reason why, is it

11   wrong somehow to do it?

12       Well, we could try and explain to the child that

13   the artists who made the music somehow needed to make money

14   from music, and the way they make money is instead of you

15   getting the CD or the song here in KazaA, you need to go to

16   the store and pay money for it, even though the response

17   might be but, mom, but, dad, I don't have money to go to the

18   store, I don't have a credit card to buy it online.  That's

19   the situation that is faced.

20       Mr. Liebowitz offered a second metaphor for us to

21   think about.  He put the most serious problem that

22   peer-to-peer file sharing has created for the industry and

23   for the country, the social harm on its tendency to diminish

24   the amount of professionally produced music, and he used the

25   example of the Red Sox.

1     Now, I'm as much as a Red Sox fan, well, maybe not

2   as anybody, but, all right, I understand professional

3   baseball, professional basketball, professional football.

4   I'm not sure that music is quite the same.  I'm not sure to

5   start with that he's even right about baseball and

6   basketball and the various different sports.  It is not

7   always the case that you get a better product by paying more

8   and more for it.

9     The amount that athletes are now paid is quite

10   extraordinary, but the truth is, at least for many people,

11   March Madness is much more exciting basketball than going to

12   see the Celtics, much more interesting because it has much

13   more life in it.  It's much closer to things that our kids

14   actually do rather than these things that extraordinary

15   physical specimens are able to pull over.

16     So it's not completely clear that it works even

17   there, but now you come to music.  Music is something that

18   existed long before the recording industry ever got there.

19   Music starts with individual people who are, creative

20   artists and it develops.  This industry makes a practice of

21   kind of browsing the younger people who are in the garages

22   learning how to play and in bands and looking, looking for

23   the next Justin Timberlake that they can somehow produce

24   into a megastar.

25     And, it's true, the result of this system produces

1   some real big stars, no question, Britney Spears as an

2   example of a creative artist, someone who is marketed,

3   presented, packaged and made into a huge figure, but it's

4   not clear on the surface of things that we're better off

5   having these pyramids with megastars at the top produced by

6   this industry as opposed to a situation which Stan Liebowitz

7   was perfectly ready to admit, but, in fact, peer-to-peer has

8   produced much more music than has been produced in the past,

9   more albums being produced, more music being enjoyed, more

10  people actually becoming producers.

11          MR. REYNOLDS:  Objection, your Honor.

12          THE COURT:  Overruled.

13          MR. NESSON:  Let me talk to you a little bit about

14  Ron Wilcox.  He was the other witness that at least I

15  thought was very impressive from what the plaintiffs had to

16  offer.  He was knowledgeable, deeply involved in the whole

17  digital side of music, and from him you could really get the

18  story of how the music business has been struggling to move

19  from its foundation as an atoms business, selling CDs in

20  stores, to a bit business, selling bits online.

21          He testified convincingly that the industry has

22  been at work to find ways to compete with a digital product.

23  He tells the story of how the industry tried but eventually

24  gave it up encasing their songs, their recorded songs, in

25  encryption envelopes, that is actually building little

1      fences around their bits, and you recall he explained why

2      they gave up on the SDMI digital rights management

3      controlling their product.

4               MR. OPPENHEIM:  Objection.  Misstates the

5      evidence, your Honor.

6               THE COURT:  To the extent that this comment or the

7      comment about much more music having been produced in the

8      past than being produced today, again, your memory controls.

9      Go on, Mr. Nesson.

10               MR. NESSON:  Well, that actually was not Wilcox,

11     that was Liebowitz.

12               THE COURT:  I understand.  There has been

13     objections to that, and if there are two views of that, the

14     jury determines which is theirs.

15               MR. NESSON:  I completely affirm what the Judge is

16     saying, it's your memory here that counts, it's your

17     understanding of the evidence that counts.  I'm merely

18     arguing to you, and what I say is not evidence, it's only

19     argument, but I'm entitled in argument to you to my

20     recollection of the evidence and to framing the evidence and

21     inferences from it as part of that argument, so I surely

22     intend to stay within those bounds.

23               If you recall, Mr. Wilcox used the word in

24     explaining why digital rights management didn't work with

25     recorded music with the word "compatibility."  You recall he

1    said the problem was compatibility.  There are too many

2    different kinds of devices that people use for music.  They

3    have their iPOD, they have their player in the car, they

4    have their computer at home, they have this, and people want

5    to be able to buy a song and play it on everything they've

6    got, and since there are so many different varieties of

7    stuff that people have, and the problem with encryption is

8    that you somehow have to make it compatible with each one of

9    these devices.  The market didn't want it.

10           What the market wanted was a product that was free

11   in the sense of compatibility, an MP3 file, and he explained

12   to you how the marketplace effectively demanded MP3 format

13   and how the industry moved from first a time when they were

14   offering no products digitally to a time when they were

15   offering with lots of different formats and the forms their

16   songs in a digital form but limited in terms of what you

17   could do with it to finally where they are now which

18   Wayne Marshall showed you.  He showed you that each one of

19   these songs with which Joel is charged with having

20   downloaded in MP3 format is now available from the industry,

21   one click, 99 cents, but that didn't happen until 2007.

22           MR. OPPENHEIM:  Objection.  That's certainly not

23   in evidence.

24           THE COURT:  Sustained.

25           MR. NESSON:  Well, again, I ask you to recall it

1    as you choose, but it's at least my recollection of the

2    evidence that he clearly said eventually the industry gave

3    up the digital rights management and now sells our product

4    in MP3 format on Amazon just as Wayne Marshall demonstrated.

5    That was not the case in 2004.  Joel, when he went looking

6    for a song in August 10, 2004, did not have the option of

7    getting a compatible file in MP3 format in a slick and easy

8    way, one click on the net for 99 cents.

9         Now, maybe he wouldn't have paid the 99 cents, but

10   maybe he would have.  If we're talking about a transition of

11   people moving into a legitimate environment, then the ease

12   with which one can access that environment and the quality

13   of the product in terms of usability by the person paying

14   for it is clearly the elements of the competition, and when

15   the industry moved from not making such product available to

16   its present state of making those products available, it was

17   moving in transition from the old environment where

18   basically it's a CD company to this new environment that

19   Mr. Wilcox stands proud of now.  He's proud.  Our industry

20   is now ready to go in this digital environment.

21        We've come through a period in which we've had to

22   slim down.  We've lost a lot of people because the Internet

23   made life tough for our business, but now we've come

24   through, we've worked out our new business models, we've

25   worked out our new business plan, and we're ready to go.

1      That's the story that in a way parallels Joel's

2  story.  In a sense you can see what you have before you here

3  as a coming of the age story.  For Joel moving from being a

4  young skateboard kid who's downloading on KazaA through this

5  extraordinary process to where he sits now but also for this

6  industry.  It's been a coming of age process in the digital

7  environment.  This industry I believe is still in its

8  infancy as far as the digital world is concerned.  They

9  haven't been ready to go for long, if they're ready to go

10  now, fine.  But in the process of that coming of age, the

11  question is who should be blamed for the difficulty that the

12  Internet environment presented?

13      So if you would now come back to the damages

14  components in the Judge's instruction.  The first on the

15  list is the nature of the infringement, the nature of the

16  infringement.  Well, what are the different kinds of

17  infringement?  How would one array the different kinds of

18  infringement so that one could identify where this

19  infringement rests on the spectrum?

20      At the very top end where copyright infringement

21  is concerned, we have this outright counterfeiting, that's

22  really what copyright is fundamentally about,

23  counterfeiting, making a copy of someone else's thing and

24  selling it as a substitute for the thing being sold by the

25  legitimate owner of it, counterfeiting, and there are flat

1    out criminal copyright syndicates, which are manufacturing

2    counterfeit materials and selling them for money, taking

3    literally the market away from the legitimate owner and

4    claiming it for themselves.

5         That's a copyright infringer who knows damn well

6    what he's doing, is doing it for the money, is doing it with

7    full knowledge that it's dollar for dollar injury to the

8    copyright owner.  It is criminal.  That's pretty serious.

9    We could drop down a level just on what we've seen here to

10   what you might call the malicious but noncommercial

11   infringer, that is someone who's not infringing for the

12   money.

13        MR. REYNOLDS:  Objection, your Honor.

14        THE COURT:  Overruled.  Go on.

15        MR. NESSON:  Someone who is not infringing for the

16   money but is in it to injure the copyright owner, and you've

17   seen some evidence that there are those kinds of people

18   existing, people who are out to release whatever it is that

19   is being put out as soon and as quick as possible and in as

20   much dimension as possible.

21        All right.  Then we get down to what you might say

22   is Joel's kind of infringement, that's an infringement by a

23   noncommercial person, actually a kid, who's not doing it for

24   money, he's doing it for his personal benefit, he likes the

25   music, he shares the music, he builds his collection, he's

1   not doing it hostily to the industry, in fact, you listen to

2   Joel, there's quite a mix, he downloads some, he buys some,

3   he sometimes uses the download to lead him to music that's

4   in the store.  He recognizes differences in quality.  He's

5   like into it.

6          So he's down at a level where one would say of the

7   nature of the infringement, it's hard to imagine an

8   infringer who is less, who is lower on that scale than Joel.

9   Now, maybe you say he just downloaded once and then he never

10  did it again.  There are some people like that, I'm sure.

11         Joel is someone who downloaded over a period of

12  time, and he built a collection at the time when they looked

13  at his file, he was up to 800, some 800 songs.  Think of

14  that in album terms, divide 800 by 18 songs on a CD, and you

15  get a sense of the collection that he had amassed through

16  the digital environment, and he has a physical collection as

17  well, and both of them, in fact, build over the course of

18  his time.

19         Further on the nature of the offense, the nature

20  of the infringement, this is a civil offense.  This is not

21  criminal.  This is a first time offense.  This is his first

22  time in court, so we're basically talking about a kid who

23  infringes, first time offender called into court and you're

24  called upon to say what's the right punishment for this

25  person?

1            You think of other civil offenses, other offenses

2    that kids get involved with, kids growing up, what are we

3    talking about?  We're talking about people who drink beer,

4    underage, violate the law, maybe smoke pot, a little bit,

5    civil offense against the law, download music, civil

6    offense, first time offender.  That's in the way of judging

7    the nature of the infringement in terms of the seriousness

8    of his actual action.

9            When you put that in the framework of that jewelry

10   store, we're not talking about somebody who broke into a

11   store, who went past locks, who took the chance that he'd be

12   caught by the security guard, we're talking about a kid in

13   his bedroom who clicks on a computer screen.

14           The second category listed is the defendant's

15   purpose and intent.  The purpose and intent.  The

16   defendant's purpose and intent was to enjoy free music and

17   the open net.  I think that that's a part of it.  This is

18   clearly a young man who liked technology.  He enjoyed the

19   fact that he was in this cyber environment and able and

20   competent to be able to go out and find things and be

21   rewarded by building a music collection.  His purpose was

22   completely personal, no maliciousness, no intent to

23   injure.

24           The third listing here is the profit that the

25   defendant reaped or, and, if any, and/or the expense that

1    the defendant saved.  Well now here is something.  It is

2    clear that part of what was attractive to Joel in doing this

3    downloading from KazaA is that the music was free, no

4    question about that, and so there is some savings to Joel if

5    you imagine that instead of downloading he would have gone

6    to the store and bought it.  He saved the price of the

7    tracks in the store.

8            Now, there's no necessary logic that drives you

9    through to the conclusion that Joel would have actually gone

10   and spent that money.  In fact, it's very likely that he

11   might have spent some but probably not all, so some part of

12   what he downloaded he might have spent in a store, and after

13   the store owner took out their share and passed on whatever

14   it was, some of that would get back to this recording

15   industry, so there is some component of gain for the

16   defendant, but I suggest to you that it's not necessarily

17   huge and quite speculative in its quality.  You just can't

18   tell whether a young kid, the younger they are, the less

19   money, and the less able they are to go to the CD store

20   would in fact do a direct substitute if I can't get it for

21   free, I'll buy it.

22           One reason you can't do it is because the thing

23   that you buy in the store is just not the same product, it's

24   not what he wanted exactly, it's not the MP3 product.  He's

25   got to go to the store and buy a whole bunch of stuff he

1    doesn't want, the other 17 songs on the track, on the CD,

2    and it's then in a physical form which is not actually the

3    form he wants it in.  To be completely compatible, he wants

4    it in digital form.

5         The profit that the defendant reaped, if any,

6    and/or the expense that the defendant saved.  Well, you see

7    that factor, you have it.  The revenue lost by the plaintiff

8    as a result of the infringement.  Well, that we've heard has

9    two components.  One is just the same component we've just

10   reviewed, the money he would have spent had he been forced

11   to do it by the absence of the free alternative.  It results

12   in some money lost.

13        The other component is this imagined component of

14   Joel putting up a song, what in fact you understand now he

15   downloads the song, it automatically is shared by the KazaA

16   program, and the thought is that it's shared to millions of

17   people as if that act of sharing is what causes all the

18   damage.

19        But you recall the testimony very clear that these

20   were very popular songs, so that when someone went to KazaA

21   in 2004, there were many, many copies of these songs

22   available.  It's like those bits that I spread on the floor,

23   and when some new person goes to KazaA, it turns out that

24   there are loads of copies available.  The fact that one more

25   becomes available doesn't change anything.

1          The operative question before and after Joel

2     downloaded his song is can other people find the song

3     easily?  Yes, they could before, yes, they can after.  The

4     one additional copy that Joel adds to the sea of copies that

5     are available to be searched and downloaded doesn't really

6     add anything to the ease with which a user coming anew to

7     that environment will get a song.

8          So what I'm saying is that if you focus on the

9     revenue lost by the plaintiff by reason of the infringement

10    and you're focusing on what Joel did with these songs, I say

11    they lost no revenue.  I don't mean to -- I mean to separate

12    from that first category of the alternate going to the store

13    and paying for it, but the idea that Joel putting this in

14    his shared folder cost these companies money, when you look

15    at it closely, you can see it's just not true.

16         If it were a new song, brand new song that came

17    out so if you went to KazaA after it came out and searched

18    for it, you wouldn't find it, and Joel put that song up, if

19    he was the initial ripper, the seeder, the one who is at the

20    bottom of this cone, puts the first one up, then, yes, they

21    could say the millions that come after are all attributable

22    to that first seed.

23         That's what it grew from because the way it works

24    is once that seed is up and somebody comes and looks and

25    finds it and puts it in their shared folder, then there are

1    two, and when somebody else comes and finds two, then there

2    are three, but by the time it gets up to the thousands upon

3    thousands, at that point it's easy to find them and easy to

4    download them, and the difference between a thousand and a

5    thousand and one doesn't make any difference to the user who

6    is looking to download the song.  So these millions of

7    people to whom they are distributing the song, attributing

8    that to Joel doesn't really amount to anything when you

9    actually take a look at it.

10         The value of the copyright.  Well, again, there

11   are two ways to look at it.  Clearly the copyrights are of

12   great value to the plaintiffs.  You saw the millions of

13   dollars that they make on these songs, great value, but if

14   you look at it from Joel's point of view, what is the value

15   of the copyright?  I'd submit to you it's 99 cents.  I

16   submit it's what he has to pay for it if he went and

17   purchased it on the Amazon, 99 cents.

18         The duration of the infringement, and then the

19   following factor is quite related, the defendant's

20   continuation of infringement after notice or knowledge of

21   claims, both of those dealing with duration.  Here would be

22   my proposition to you as a way to think about this.  Joel

23   was addicted.  He became addicted to free music with

24   Napster.  He's a young kid who loves the music, this

25   industry is putting out huge marketing on the music.

1    You heard again Mr. Wilcox talk about what they

2    spend in order to create a desire amongst the consuming

3    public, a love for their music, wanting their music and into

4    that environment comes Napster so that a kid can go on

5    Napster and easily get music for free, and Joel starts into

6    that process in 1999 in a way that truly addicts him.  He

7    build his music collection.  He arranges them in subfolders.

8    He likes the technology.  He builds up over time a

9    considerable collection.

10    When it gets to the point of him being told get

11    rid of it, he doesn't want to do it, he doesn't want to do

12    it, and he doesn't want to give up the process of being in

13    this environment where he's got a very useful and functional

14    for him way of enjoying music.

15    So I would suggest to you that when you think of

16    the duration of the infringement, you can think of it in two

17    ways.  One, oh, he didn't stop here, he didn't stop here, he

18    didn't stop there, but the opposite way to think of it is

19    just how much it took to get him to stop, just how strong

20    his attachment was, and where does that attachment come

21    from?  It comes from the fact that he starts in 1999 when

22    it's really very unclear whether what's being done is

23    illegal or not.

24    There was no real understanding at that time,

25    certainly not amongst the children who were using it, and as

1    time goes by, this industry begins its education campaign.

2    You start hearing that downloading is illegal, you start

3    getting the promos in movie theaters that we've all heard

4    and the announcements ahead of anything we get on

5    television, and certainly our rhetorical environment starts

6    to fill with the idea that downloading music on peer-to-peer

7    networks is illegal, and that penetrates through to Goucher.

8           In fact, part of their education campaign is to

9    try to put that out through universities and schools all

10   over, and the message comes through to Joel in increments,

11   and it eventually finally penetrates to a point where he

12   stops when he grows up a little, he gets hit with this

13   lawsuit, it becomes a real reality to him, then he stops.

14          That's just where it is with Joel.  It's for you

15   to consider whether that duration is something that should

16   be held against him in a way that leads you to punish him

17   severely or whether you're capable of seeing that from

18   Joel's point of view.

19          The need to defer this defendant and other

20   potential infringers.  Deterrence.  The need to deter this

21   defendant, well, I think you've got a pretty good picture

22   from Joel on the witness stand that at this point he's an

23   iTunes man.  He's by reason of all that's happened not real

24   in need of a whole lot of personal deterrence at this point,

25   but the real function here, and let's be clear about it from

1    the plaintiffs' point of view is not so much to deter Joel.

2         Joel isn't their target except as this lawsuit

3    focuses on him.  Their real target is his whole generation.

4    They're in an education mode, and this lawsuit is part of

5    their education mode.  They're not in it for the money.

6    They've told you, they're not making money on this.  You can

7    see the lavish lengths to which this lawsuit has gone.

8         When you think about it, you may think it's quite

9    amazing, in fact, that here we are in the federal court of

10   the United States of America.  It's a federal case in which

11   all this time and all this proof has been amassed where

12   depositions have been taken of the defendant, I don't know,

13   13 hours' worth and depositions of his mother and his father

14   and his sisters and his friends.  Just imagine that in terms

15   of the force each one of those moved by subpoena and backed

16   by the authority of the United States Federal Court.

17        This is a federal case, and what's it about?  It's

18   about a kid in his bedroom clicking on a computer screen.

19   It seems out of proportion.  So, from the industry's point

20   of, view it's not Joel that's the target.  They are making

21   message, they are trying to send out a message to all of the

22   Joels in the world that if you do this, you are going to get

23   nailed and really nailed hard.

24        It's like the economists think about things like

25   how you judge penalty in relation to the power of law

1    enforcement.  It relates in fact to what Stan Liebowitz was

2    saying as an economist.  If you've got a situation where

3    there's a lot of parking violations but you've only got one

4    cop so he is spread so thin he can't do much, what does the

5    economist say you should do?  The economist says you should

6    go after someone and hit him with a penalty that's so large

7    that that penalty will scare all the rest of the people, and

8    that will be a really efficient use of your weak law

9    enforcement.  You'll back up the fact that you're only one

10   cop with a huge penalty on whomever it falls, and that kind

11   of technique will frighten everyone else into obedience.

12   That's where they are here with deterrence.

13        Now, deterrence is a very interesting subject

14   philosophically when you connect it with the concept of

15   justice because implicit in the idea of deterrence, not just

16   deterring Joel specifically but Joel and his generation, the

17   idea is that you sacrifice one person, you put his head on a

18   stake and you hold it up in front of the rest, and the

19   question is, is that just?  Is that just to the person whose

20   head is on the stake?  I suggest that it may not be.

21        So now these instructions are very clear at the

22   beginning that these factors being considered here are not

23   in order, there's no particular priority offered, and

24   they're not exhaustive.  Other factors can be considered, so

25   I'd like to suggest some.

1          THE COURT:  You have five more minutes to suggest

2     some.

3          MR. NESSON:  First I'd like you to consider the

4     arbitrariness of the selection of Joel.  You heard from

5     MediaSentry that they're out looking over the world.  Their

6     job is just to deliver someone who fits the protocol to the

7     plaintiffs to prosecute, and they pick out Joel, but why

8     Joel?  Was he different from any others?  Completely

9     arbitrary in fact in selection.

10          Second, you see arbitrariness in the number of

11     counts.  Here we have 30 counts, but it could have been 851.

12     It probably could have been 2,000.  That's completely

13     arbitrary selection.  They say the plaintiffs, the recording

14     industry says we choose what we want to be reasonable, but

15     no, no, that's them choosing what they consider to be

16     reasonable, and reasonable here is 30, which they allege to

17     be willful, which comes out to megamillions, four million,

18     five hundred thousand dollars at the top, and they could

19     have doubled it perfectly easy.  That's arbitrary.

20          I'd also ask you to consider fruitlessness,

21     fruitlessness, this is part of a litigation campaign that

22     they began back numbers of years ago.  We're at the dead end

23     of it.  They've announced the end of this campaign.

24          THE COURT:  Sustained.  That is completely and

25     totally inappropriate.  Go on, counsel.  Not part of the

1  record at all.

2          MR. NESSON:  I absolutely asked that question.

3          THE COURT:  Go on, counsel.

4          MR. NESSON:  And, finally, I'd ask you to consider

5  as a matter of justice whether the industry shares any of

6  the responsibility for the problem, whether any of their

7  actions, either in their slackness or lack of speed in

8  responding to the new environment by presenting an actual

9  alternative, whether any of the precautions they might have

10 taken could have helped.

11         Now, before I close, I have just a few more things

12 to say.  First, I'd like to show you the verdict form with

13 your Honor's permission.

14         THE COURT:  Yes, of course.

15         MR. NESSON:  You're going to be asked by the Court

16 to fill out a verdict form.  It's got a format in which

17 there are 30 listed songs and in which you will be asked

18 first to choose whether defendant acted willfully or not,

19 and if you find willfully, you then move over to the right

20 hand and fill in an appropriate number.  You can see if you

21 leaf through that this verdict form goes on for a

22 considerable number of pages listing 30 different songs.

23 This looks in a way like a kind of school exam, here's a

24 test, you fill in the answers, and one way to do this is to

25 do it as a school exam.

1          If you come to the last page of this down to 30

2     where the foreperson signs it and dates it, I would say to

3     you that justice is in the bottom line.  The question of

4     whether what you do in relationship to Joel is just depends

5     on the bottom line, the total number when you get down to

6     the bottom.

7          If that number is so large that it's

8     disproportionate to what Joel did, I'd say you haven't done

9     your job.  If that number is appropriate to what Joel did,

10     if you feel that that bottom line that you come to is just

11     and appropriate for what Joel did, then you are doing your

12     job as far as I'm concerned.

13          Now, you have the power to fill in these boxes.

14     You actually have the power not to fill in the boxes.  If

15     you don't --

16          MR. OPPENHEIM:  Objection, your Honor.

17          THE COURT:  I'll adjust with instructions.  Go on,

18     counsel.

19          MR. NESSON:  If you as an American jury charged

20     with the responsibility of being wise and just should decide

21     that you don't need to fill in any of these boxes, that's

22     within your power.

23          MR. OPPENHEIM:  Your Honor, it's totally

24     inappropriate.

25          THE COURT:  It is.  I'll address that shortly.

1    Finish your closing, counsel, and I'll address that issue.

2          MR. NESSON:  So now as you proceed, if you are to

3    say, for example, that the first box should be filled in

4    as -- well, let's just imagine that you decide that Joel is

5    not willful and that you want to do the minimum, so you put

6    $750 in that box.  Now you come to the second one.

7          Here's the metaphor I'd like you to consider.

8    Let's just suppose you're a parent and you have made a rule

9    for your child I don't want you smoking cigarettes.  If I

10   find that you've smoked a cigarette, you will be punished

11   $10.  Then you find in the kids' room an empty pack and

12   another pack with 10 cigarettes still in it, so you've got

13   the evidence this kid smokes 30 cigarettes.  What penalty do

14   you impose?  Do you say I caught you smoking, $10, or do you

15   say I caught you smoking 30 cigarettes, $300?

16         In other words, the way justice works, it doesn't

17   just work seriatim, each thing completely separate as if the

18   charge is broken up in the same kind of bits that the tracks

19   were broken up in.

20         MR. OPPENHEIM:  Your Honor, what he's

21   advocating --

22         THE COURT:  I understand, counselor.  He's just

23   about finished, Mr. Nesson, aren't you?

24         MR. NESSON:  Yes, I am, your Honor.

25         THE COURT:  All right.

1          MR. NESSON:  We are now in a new medium of

2     cyberspace.  It's the space made of free bits that a young

3     mind on the net can reach.  That's the free world of

4     cyberspace as opposed to the space of bits which a young

5     mind has to pay for.  It's for you to decide the justice of

6     this industry putting their calamity off on kids.  I suggest

7     to you that that graph that Liebowitz showed you with the

8     downturn, that could just as easily have been a graph

9     showing the revenues of the horse and buggy business when

10     the automobile came in.  That is, progress happens, it's not

11     Joel who's responsible for that downturn, and there's no

12     reason for them to put their calamity off on the kids.  It

13     was not Joel who created the open net.  He merely rebelled

14     in using it, and I suggest that you cannot deeply blame

15     him.

16          The plaintiffs are asking you to put out a

17     message, that's what this lawsuit is about, them generating

18     a message.  I'm asking you to put out a message, a different

19     message than they're asking you to put out.  I would like to

20     conclude.  We've heard music at a number of times during

21     this trial, but it has been music treated as product.  We've

22     never really listened to it.  I would like to conclude by

23     asking you to listen to a piece of music, really listen to

24     it.

25          THE COURT:  You have run out of time, Mr. Nesson.

1    That's really not available at this point.

2            MR. NESSON:  Well then I will come to my closing.

3    This is the last time that I am able to stand up and speak

4    to you.  Once I sit down, I'm done.  It is a tremendous

5    responsibility to take on the defense of anyone.  It is a

6    point of emotional tension when I actually pass the case to

7    you.  There's a story that's told about this that impressed

8    me when I heard it.  I'd like to pass it to you.

9            It's a story about an old Indian wise man and a

10   young wise guy boy.  The boy comes to the old man and says,

11   "Old man, I have a little bird cupped here in my hand.  Is

12   it alive or is it dead?"  And the old man looks at the boy

13   and knows that if he says it's alive, the boy will crush the

14   bird in his hand and show the old man that it's dead, and if

15   he says it's dead, he'll open his hands, and the bird will

16   fly up in his face.  So the old man says to the boy, "My

17   son, my daughter, the bird is in your hand."  Thank you.

18           THE COURT:  Ladies and gentlemen, to the extent

19   that the argument of counsel is inconsistent with my

20   instructions, rather than take the time now to instruct you,

21   I'll instruct you shortly and point out the way in which it

22   was inconsistent.  Go on, counsel.

23           MS. BURTON:  Your Honor, can we please turn on the

24   computer?

25           THE COURT:  You want to turn on the computer.

CLOSING ARGUMENTS

1          MR. REYNOLDS:  Thank you, your Honor.  May it

2    please the Court, counsel.  Ladies and gentlemen, on behalf

3    of myself, Mr. Oppenheim, Ms. Burton, Ms. Pariser and all of

4    my clients, I want to thank you for your service in this

5    trial.  We know it was not by choice, we know how important

6    your time is, and we appreciate your kind attention.

7          Mr. Nesson is a very eloquent speaker, and I

8    admire his ability to speak so clearly on such a wide

9    variety of topics, especially without notes.  One of the

10   things that Mr. Nesson did was told a story about his first

11   court experience, and as I was sitting there, it reminded me

12   of my first court experience, which was not so successful.

13   I wasn't a lawyer, I was in the fourth grade, and I stole a

14   charms blow-pop from a 7-11.  A charms blow-pop cost three

15   cents.  I got caught, I got punished for it, and I learned

16   that you don't take what doesn't belong to you.

17         Ladies and gentlemen, the defendant would have you

18   believe that this case is about perception.  It's about the

19   new digital world.  It's about a lack of alternatives for a

20   kid who just wanted to enjoy music with his friends.  None

21   of that is true, and none of it can excuse what the

22   defendant in this case.  The defendant is a hard core

23   habitual long-term persistent infringer who knew what he was

24   doing was wrong and did it anyhow.

1          He refused to take responsibility for years.  He

2     told you yesterday that he was finally willing to do that,

3     just yesterday, but that's not the case.  You will see in

4     the jury instructions there will be a stipulation to

5     ownership, ownership of the copyrights.  You won't see any

6     stipulation to liability from the defendant, so much for

7     taking responsibility.

8          At the beginning of the trial, I said we would

9     prove four things, that my clients owned the copyrights to

10    the 30 songs, that the defendant Joel Tenenbaum without

11    permission copied and distributed at least those 30 songs to

12    MediaSentry and to other users on KazaA, that the defendant

13    knew what he was doing was wrong and that the defendant

14    continued to infringe long after he was put on notice of the

15    claims against him.

16         Here we are, the trial is over, the case is in

17    your hands, as Mr. Nesson said.  I respectfully submit that

18    we have proven all four things I said we would.  Indeed, the

19    Court will tell you that there is no issue with respect to

20    liability, no issue with respect to liability.

21         The defendant, Joel Tenenbaum, infringed all 30 of

22    plaintiffs' copyrighted sound recordings by downloading them

23    and distributing them without permission.  The issues before

24    you now are, 1, whether the defendant's conduct was willful;

25    and, 2, the determination of damages.

1    Now, before I launch into my remarks regarding the

2    elements regarding what happened here, what Joel did, I want

3    to talk about the burden of proof.  The defendant's counsel

4    in closing remarks and throughout the trial and even in

5    opening statement used terms like crime and charged and

6    forced process.  This is not a criminal case.  The defendant

7    would have you believe that we'd have to prove willfulness

8    beyond a reasonable doubt.  That is not so, as Judge Gertner

9    will instruct you, I believe.

10    MR. NESSON:  Objection, your Honor.  I never said

11    that.

12    MR. REYNOLDS:  As Judge Gertner will instruct you,

13    I believe, our burden is to show you that the greater weight

14    of the evidence, in other words, that it is more likely so

15    than not so that the defendant's conduct was willful.  I

16    respectfully submit that we have more than met our burden on

17    this issue.

18    So with respect to willfulness, I'll turn to that

19    issue first.  I believe Judge Gertner will instruct you that

20    willfulness means infringement committed with knowledge or

21    with reckless disregard of the plaintiffs' copyrights.

22    Willfulness is a question that you must decide, but I submit

23    to you that the overwhelming weight of the evidence shows

24    that the defendant's conduct here was willful.  The

25    defendant knew what he was doing was wrong and acted in

1    complete disregard for the plaintiffs' copyrights, for any

2    copyright, for that matter.

3          The defendant, first, let's talk about what the

4    defendant knew.  The defendant received repeated warnings

5    from multiple sources that what he was doing was wrong.

6    Recall that the defendant started infringing on Napster in

7    1999.  He knew at the time it happened that Napster was shut

8    down because of a lawsuit against Napster for copyright

9    infringement.  That was in the early 2000s, 2001, I believe.

10   He knew before he went to college at Goucher that Napster

11   had been shut down.  He told you that.

12         Second, while the defendant was at Goucher, he

13   received, I'm sorry about that, second, while the defendant

14   was Goucher, his father read about these very lawsuits and

15   called the defendant and told him, stop, stop, what you're

16   doing is wrong.  What was the defendant's reaction?  He was

17   not concerned.  You heard Dr. Tenenbaum.  The defendant was

18   not concerned.  They only sue people who do it a lot, that's

19   what he said.

20         Now, I want to talk a moment about what Mr. Nesson

21   said about teaching kids about sharing.  There's two things

22   about that.  One, this isn't sharing.  This is not sharing

23   like we teach our kids.  You heard Dr. Liebowitz, sharing is

24   partaking of something together, sharing something.  This is

25   taking, copying, having two copies and distributing it to

1   other people so they can make further copies.  This is not

2   sharing.  No. 2, the defendant's father did teach him, he

3   told him to stop, and the defendant didn't listen.

4          Next, while the defendant was at Goucher College,

5   he received multiple warnings to stop.  Here's the Goucher

6   student handbook for information and technology for the fall

7   of 2003.  We won't look through the handbook, but you

8   remember there were repeated warnings throughout all these

9   handbooks telling the defendant exactly his conduct in this

10  case was wrong and there were significant penalties.

11         This policy was in place the entire the defendant

12  at Goucher, two years before he was caught infringing, and

13  Goucher specifically warned that the file sharing of

14  copyrighted works was specifically illegal and even spelled

15  out the consequences.  The defendant admitted receiving

16  multiple warnings from Goucher like this one.

17         The defendant also knew that Goucher was shutting

18  down peer-to-peer services.  Remember his own testimony,

19  when he started at Goucher, they had peer-to-peer services.

20  By his junior year, they were completely shut down.  One by

21  one they got shut off.  He knew this was wrong.

22         You recall Mr. Nesson's testimony that there's no

23  copyright on the works that are distributed on KazaA.  That

24  may be so, but you didn't hear the defendant himself tell

25  you once that he didn't understand these songs are

1    copyrighted.  He was on the stand.  Mr. Nesson could have

2    asked him that, and he didn't.  The defendant never once

3    told you that he didn't understand that these songs he was

4    downloading, taking for free and distributing to others

5    weren't copyrighted.

6            Next, in September of 2005, my client sent the

7    defendant a letter specifically telling him that he had been

8    caught infringing and that he needed to stop.  You recall

9    the testimony from Mr. Leak about the second page of this

10   letter warning the defendant, telling him this activity that

11   you're engaged in harms the very people you claim to

12   respect, the artists, the engineers, the producers who don't

13   get royalties from this.  Stop it.  It is illegal.

14           Then after this letter was sent, the matter was

15   not resolved, my clients filed this lawsuit against the

16   defendant and again expressly told him, hey, what you're

17   doing is wrong, stop it.  Now, with all these repeated

18   warnings, what did the defendant do?  Did he stop?  Did he

19   even consider it?  Not at all.  On the contrary.

20           The evidence that you have seen shows that the

21   defendant not only continued to infringe but that he

22   actually increased both the size and scope of his

23   infringement.  Let's walk through some of the evidence.

24   First, the evidence shows that every time the defendant was

25   confronted with some type of road block, program being shut

1    down, Napster being shut down, he just switched to another

2    program.  He just went from one to the other because he

3    wanted to get his music for free.

4         After Napster was shut down by the Court order, an

5    order that the defendant knew about, he continued to want a

6    source of free music so he went to KazaA, he then shifted to

7    KazaA and other file sharing programs.  Starting in college

8    and moving right on in to grad. school here in Boston, he

9    used Audio Galaxy, IMatch, Morpheus, LimeWire.  You heard

10   the defendant tell you on the witness stand that he used

11   these various programs at various times because he wanted to

12   obtain the maximum amount, maximum amount of downloading and

13   uploading with the least amount of effort.  He told you

14   that.

15        Next, at Goucher College, the defendant not only

16   continued his infringement, but he acted just like one of

17   those ripping groups that we've been hearing about during

18   trial.  When the Deftones performed a brand new single live

19   on the David Letterman show, a single that had not yet been

20   released, the defendant recorded that song off of the

21   television, put it into his KazaA shared folder and made it

22   available to everyone on the KazaA network and then went

23   beyond that, he went to the Deftones forum and told them,

24   hey, you guys can get this song from me, everyone in the

25   forum, copyrighted material, come and get it from me, look

1    up sublimeguy14, it's all yours.

2         Mr. Nesson would have you believe that none of the

3    songs were ever downloaded from anyone from the defendant.

4    It's inconceivable that this song was not downloaded many

5    times by other people.

6         The defendant ripped that song to his KazaA shared

7    folder and then told the forum they could get it for free,

8    but the defendant's ripping activity didn't stop there.  He

9    told you himself he couldn't remember the exact number, but

10   when he testified at his deposition, he stated that he put

11   between, and, again, this is just three weeks ago, three

12   weeks ago for the first time he said this, he put between

13   600 and 5,000 songs from his music collection, a collection

14   that no doubt consisted primarily of songs he already taken

15   without paying for them from these various networks he had

16   been involved with, he took those songs and he put them on a

17   brand new network, in the words of Mr. Nesson, the

18   defendant, Joel Tenenbaum, seeded that new network and put

19   brand new songs on it for everyone to download, somewhere

20   between 600 and 5,000.

21        This was the so-called network neighborhood at

22   Goucher College, you recall the defendant's testimony from

23   yesterday.  In other words, in Mr. Nesson's words, just like

24   a pirate ripping group, the defendant seeded those songs to

25   the network, made them available for download for everyone

1    else.  It's inconceivable that those were not in fact copied

2    and distributed many times over.

3          The evidence also shows, ladies and gentlemen,

4    that the defendant continued to infringe after he was put on

5    notice of this lawsuit.  Remember again the plaintiffs'

6    September 2005 letter specifically telling the defendant he

7    had been caught, what he was doing was wrong and needed to

8    stop.  The letter told the defendant again about the harm

9    that he was causing.  After receiving this letter, the

10   defendant continued to download and upload music on

11   LimeWire.

12         You heard Dr. Jacobson tell you that he found

13   evidence on defendant's hard drive showing that the

14   defendant had more than 2,000 songs on his LimeWire shared

15   folder.  A list of these 2,000 plus songs is found on

16   Exhibit 43.  This is in evidence.  Scroll through that list,

17   single page, I forget how many pages there were, more than

18   2,000 sound recordings were being distributed from the

19   defendant's LimeWire shared folder as late as February, 2007

20   and possibly as late as May, 2008, more than two years after

21   the plaintiff sent that letter in September, 2005 and during

22   the course of this lawsuit the defendant was continuing to

23   download and distribute on LimeWire, not just a few songs,

24   thousands of them.

25         Now, defendant's infringement may have continued

past even that date, but we don't know, and we don't know because we can't tell because, as defendant said himself, for the sake of "convenience" he had his operating system reinstalled on the Gateway computer before producing his computer to plaintiffs for inspection. He also had two registry files removed.

Dr. Jacobson told you that we can't be sure what information was missing, and that all he knows is the operating system was replaced and the registry files are gone, but we do know one thing, and that is that the operating system was replaced, defendant okayed that after plaintiffs had requested to request the computer and during a time when the defendant was objecting to the inspection.

You're the judges of the evidence, ladies and gentlemen. Mr. Nesson said something during his closing remarks that I think you need to judge the accuracy of this statement. Was the defendant, is he a first time offender? That's what Mr. Nesson said, the defendant is a first time offender. I guess that's true if you realize that this is the first time he got caught, but he's been offending for years, and not only that, he continued to offend after he got caught. The defendant is not a first time offender, ladies and gentlemen.

Finally, not only did the defendant ignore the repeated warnings and continue to infringe on a massive,

1    massive scale, the evidence shows that the defendant for

2    years refused to tell the truth about what he had done, that

3    he lied about it and that he tried to blame others.

4           I won't go into all the details because I think

5    you've heard enough already, but you heard the defendant

6    himself tell you yesterday on the witness stand that he lied

7    in his written discovery responses to plaintiffs.  He

8    intentionally lied.

9           Pull up 33.  We asked the defendant in plain

10   language, plain terms, did you do this?  What was his

11   response?  "I have no knowledge of who downloaded an online

12   media distribution system to the computer."  That was not

13   true.  He told you it wasn't true for the first time

14   yesterday.  He downloaded the very KazaA program that's at

15   issue in this case.  Yesterday was the first time he ever

16   said that.

17          Would you call up the next, please.  We also asked

18   the defendant in plain terms, "Did you use this user name,

19   sublimeguy14@KazaA?"  These are his responses?  "I have no

20   knowledge or recollection of an online media distribution

21   system used or any dates."  Ladies and gentlemen, that's not

22   true.  The defendant told you that he created the

23   sublimeguy14 user account on his computer.

24          Then after these, after these lies, the defendant

25   also lied in his deposition.  Specifically he lied about

1    what happened to the computer on which he had used KazaA.

2    The defendant was asked about this specific computer, the

3    computer that he used to infringe on KazaA.

4         We asked him, what happened to it?  He stated

5    under oath that the computer was gone at the time he wrote

6    this letter to plaintiffs in November of 2005.  He told you

7    yesterday, however, that the computer was not gone when he

8    wrote this letter, that he still had the computer and that

9    the songs were still on it and that he didn't delete them.

10         That computer and those songs were never produced

11   to plaintiffs in the course of this lawsuit because the

12   defendant had told us that the computer was gone, told you

13   yesterday for the first time that that was a lie, that he

14   still had the computer.

15         The defendant also blamed others for his conduct.

16   He blamed his friends, he blamed his sisters, he blamed the

17   foster child that stayed in the house.  For each one, the

18   defendant stated under oath in his deposition he "believed"

19   that they had all used his KazaA account when he knew that

20   wasn't true.  He knew it wasn't true.  He knew this was him,

21   he did this, yet he blamed others.

22         The defendant could have ended all of this a long

23   time ago had he simply told the truth.  He didn't do that.

24   Instead, he wasted the time and effort of everyone in this

25   process with lies and misdirection, but I respectfully

1     submit, ladies and gentlemen, that that's not the end.  The

2     defendant still doesn't get it.  The defendant still has

3     copies of the songs that he took for free.  He took them

4     without paying for them.

5          The files that he downloaded without permission

6     are still on his hard drive.  He told you he can't part with

7     them, he took them for free, and he can't part with them.

8     When you recall the testimony of the defendant yesterday on

9     the stand, ask yourselves did he once say that what he was

10    doing was wrong?  Did he once tell you that?  I don't

11    believe he did.

12         So after all this, what does the defendant's

13    counsel tell you in closing?  He tells you the defendant was

14    just a kid, that the defendant has no usable alternative but

15    to take what didn't belong to him.  Again, none of this is

16    true, and none of this excuses the defendant's conduct.

17    First, the defendant was not a child.  Let's put that out of

18    our minds right away.  He is an adult and he has been an

19    adult for almost the entire time that he's been engaging in

20    this activity.

21         The defendant turned 19 in 2002 when he went to

22    Goucher College and started seeding the network neighborhood

23    with those anywhere from 600 to 5,000 songs and putting the

24    Deftones song on his KazaA account and advertising it to the

25    Deftones forum.  He was an adult at that time.  The

1    defendant was 20 in August, 2004 when he was caught

2    distributing 816 files on KazaA.  He was 21 when he received

3    plaintiffs' letter that told him he had been caught, and he

4    was 23 and 24 when he continued to infringe in 2007 and 2008

5    on the LimeWire program.  Thus, not only was the defendant

6    not a child during all this time, but the evidence shows

7    that his conduct actually became worse every single year.

8    He distributed more and more and more songs.

9            I'd also ask you to look at Exhibit 42.

10   Dr. Jacobson told you about this exhibit.  We looked at a

11   few songs that Dr. Jacobson pointed out to you.  In the

12   interests of time, we pointed to a few songs that

13   Dr. Jacobson pointed out were downloaded, and they were

14   downloaded some of them during the course of this lawsuit.

15           Dr. Jacobson also pointed out that hundreds of MP3

16   files were added to the defendant's computer on a single day

17   in October of 2007, and that's just one example.  Thumb

18   through this Exhibit 42.  You'll have it in the jury room.

19   There were days when hundreds, 500 songs in a single day

20   were added to the defendant's shared folder, 500.  That's

21   just one example.

22           There's also been a sort of assertion, an

23   underlying theme that, hey, everybody was doing it.  Well,

24   as we all know, just because everybody might be doing it

25   doesn't make it okay; but, more importantly, there's no

1    evidence here to the contrary, there's no evidence from any

2    of the friends that we had called, that we had to depose

3    because the defendant blamed them, there was no evidence

4    that they were doing it, and what evidence there is shows

5    that the students at Goucher shut this stuff down, the

6    students at Goucher College themselves took action year

7    after year to shut these programs down.  Those were the

8    defendant's peers.  They did the right thing, the defendant

9    did not.  Instead he tried to find ways to get around it.

10       Defendants also made the argument that there was

11   no usable alternative.  I would suggest to you, ladies and

12   gentlemen, you are the judges of the facts here, but I would

13   suggest to you that that statement is flatly contradicted by

14   the evidence.

15       You heard from Ron Wilcox who has devoted the

16   better part of his career to developing new ways to

17   distribute songs on the Internet.  He told you that the

18   digital distribution of songs started in 1999 and that by

19   2003 with the launch of iTunes almost the entire catalogue

20   of the major record companies was available online.  In

21   fact, recall the defendant's counsel statements that he made

22   in his opening statement, which are true, that there was a

23   "plethora of digital alternatives in 2004."

24       Yet even despite this plethora of alternatives,

25   the defendant continued to infringe for years after 2004.

1    You've also heard some argument that the defendant, he

2    wanted his music in a more convenient forum, he had an

3    addiction to downloading.  Ladies and gentlemen, simply

4    wanting something in a more convenient form doesn't give you

5    the permission to take it.

6            I wanted a charms blow-pop, but I didn't have the

7    right to take it.  The same with the addiction, first of

8    all, I'd submit there's no evidence of any addiction here.

9    He wanted music for free.  That's not an addiction, and even

10   if it is, it doesn't excuse continuing infringement for

11   years.  Also, there's been some suggestion that my clients

12   sue music fans.  Well, I don't think there's any evidence to

13   support that.  I think the fact is just because the

14   defendant likes music doesn't make it okay for him to steal

15   it.

16           You might think you might like a piece of jewelry,

17   but you can't go in the store and simply take it and walk

18   out.  That brings us to I think Mr. Nesson's bits and atoms

19   argument that he made.  He's made it in opening statement,

20   he's made it during the course of the lawsuit, during the

21   course of trial and also in closing.  He argues that this is

22   just bits on the net, it was just there.  It may be so that

23   the bits were there, but the bits that make up songs, movies

24   and pictures and things that we all enjoy on the Internet,

25   if those are copyright protected, they have the same

1    protection as the atoms, there's no difference.  The law

2    makes no distinction.  You can't take them.

3         There's also been some discussion about the

4    Internet, you know, that this is somehow the fault of the

5    Internet, that my clients blame the Internet.  It's simply

6    not the case.  The Internet has capacity for great things.

7    We all agree with that, but illegal file sharing is not one

8    of those great things.  It's illegal.

9         The defendant tries to blame the Internet.  He

10   stated, the defendant's counsel stated I believe in opening

11   statement, "The Internet caused the record companies

12   tremendous problems.  The Internet was not Joel's fault."

13   No one is blaming the Internet here.  The Internet is not

14   the problem.

15        Just like anything, the Internet has good and bad

16   elements.  Illegal file sharing is a bad element.  The

17   defendant knew it was a bad element.  He knew it was against

18   the law.  This is not -- I want to bring out something else,

19   the defendant stated, you know, we need to look at the jury

20   instructions and we should look at the defendant's conduct,

21   then he proceeded to talk about lots of other things, the

22   Internet and the business and all that.  This is not about

23   the Internet, this is about what the defendant did, and that

24   should be the focus.

25        There's also been some discussion I believe

1    Mr. Nesson said in opening statement, "Joel is not trying to

2    hide anything now.  Joel is not trying to hide anything

3    now."  Well, that's nice, but Joel hid everything for years,

4    for years, and he continued to infringe even while this

5    litigation was going on.  He claims he took responsibility

6    at his recent deposition, which was just three weeks ago.

7    But even that was just after we had gotten, finally gotten

8    the Gateway computer to look at it and found evidence of

9    massive infringement.

10          Remember, we had been trying to get the other

11    computer, which the defendant said was gone, when we finally

12    were able to inspect the Gateway computer just recently, it

13    turned out there was massive infringement on it, and at that

14    time the defendant seemed to have a bit of a change of

15    heart, but even then he didn't take responsibility.

16          You've heard the defendant's counsel in opening

17    remarks, he challenged the evidence, "You won't see any

18    evidence that Joel distributed these 25, maybe the 5 were

19    distributed to MediaSentry, but, ladies and gentlemen, you

20    won't see any evidence that the 25 were distributed."  He

21    cross-examined plaintiffs' witness on this very point.

22          MR. FEINBERG:  Objection to that, your Honor,

23    motion to strike.

24          THE COURT:  Overruled.  Go on.

25          MR. REYNOLDS:  He cross-examined Dr. Jacobson,

1    even challenged Dr. Jacobson's credibility.  Dr. Jacobson,

2    who has received funding from the FBI, the Department of

3    Justice, the National Science Foundation, they challenged

4    his credibility.  They challenged him for relying on the

5    MediaSentry evidence.

6         I believe the question was you don't know whether

7    MediaSentry's computers were infected such that perhaps they

8    had misidentified Joel, perhaps they had collected the wrong

9    evidence.  Why did they do all this?  Why did they do all

10   this?  Days of testimony.  Because defendant was not

11   accepting responsibility, even during the course of this

12   trial.

13        He made us come to trial, all of us, and sit

14   through days of testimony, explaining in detail how we

15   identified the defendant, how we knew he was downloading,

16   how we knew he was uploading, why we believe that he was not

17   telling the truth when he tried to blame others, more than

18   half a day of Dr. Jacobson alone regarding peer-to-peer

19   network.  Recall the defendant's testimony, he smiled, he

20   told you he appreciated that testimony, he learned

21   something, he enjoyed it.

22        The defendant made us go through years of work,

23   months of effort preparing for trial just so he could say

24   after years of lies and deception, yes, I did it.  He sent

25   plaintiffs on a multi-year goose chase, wild goose chase,

1    for what?  At the beginning of this case I told you that we

2    were here to ask this defendant responsible for what he has

3    done.

4         The evidence showed you that this defendant copied

5    and distributed my client's copyrighted sound recordings

6    over KazaA.  Not only did he do that, but then he refused to

7    accept responsibility.  The issue remains to determine the

8    appropriate remedy.

9         In his opening remarks Mr. Nesson told you to

10   apply the damages to what Joel did, and that is exactly what

11   we want you to do.  You heard Mr. Nesson talk about how you

12   can get songs for a dollar online, and the suggestion is

13   that that somehow represents the harm here.  With all due

14   respect, Mr. Nesson is wrong.  The defendant not only

15   downloaded these songs, but he distributed them for free,

16   hundreds, if not millions of others.  I submit here that the

17   harm is significant.

18        The defendant's counsel in closing remarks said

19   the harm, it doesn't amount to anything, it doesn't amount

20   to anything because there were so many files out there.  The

21   defendant would have you believe that even though he had

22   thousands, thousands of works on his computer for years that

23   everybody was downloading from everybody but him, everybody

24   but him, despite the evidence from the defendant himself who

25   told you that he saw the traffic tag, remember, he saw the

1    traffic tag, he saw people were downloading from him.  He

2    was distributing.  He saw that he was distributing music,

3    and he continued to do it even after he had notice.

4         The defendant chose to engage in file sharing, and

5    he did so on a massive scale over a very long period of

6    time, over 800 songs in his KazaA shared folder in 2004 and

7    more than 2,000 songs in his LimeWire shared folder in 2007

8    and 2008, all of which he was giving away for free to

9    everyone on these networks for years, and those are just the

10   ones we know about it.

11        He said he was using IMesh, Morpheus, these other

12   programs as well.  There's no question that these songs were

13   distributed to other users, and I would suggest to you based

14   on the defendant's testimony that he saw the traffic tab

15   with files being distributed that these thousands of songs

16   were in his shared folder and the computers were turned on

17   most of the time, you heard that testimony from the

18   defendant's sister and father, that these songs were

19   distributed not once, but many times, multiple times, many

20   times over for years.

21        You heard Dr. Liebowitz, an economics professor

22   from the University of Texas.  He used this chart to explain

23   how illegal file sharing, like the defendant engaged in, has

24   caused a sharp decline in the sales of legitimate albums.  I

25   think this chart speaks for volumes and shows the

1    significant decrease in sales that has been caused by

2    illegal file sharing.  He also explained how illegal file

3    sharing has weakened the value of the copyright and made it

4    more difficult to develop new online markets for plaintiffs'

5    works.

6          Now, contrary to what Mr. Nesson said in his

7    closing remarks, Dr. Liebowitz did not say that the Internet

8    has weakened property rights.  Again, this attack on the

9    Internet.  Dr. Liebowitz didn't say that, what Dr. Liebowitz

10   said is that illegal file sharing has weakened property

11   rights, let's be specific, it's not the Internet's fault,

12   it's illegal file sharing.

13         You also heard from Mr. Leak, Ms. Cho and

14   Ms. Palerm, they told you that online copyright infringement

15   has real and significant impacts on everyone in the record

16   business.  When record companies lose sales to illegal

17   downloaders, artists, musicians, songwriters, engineers,

18   producers all lose royalties.  Lost sales to free illegal

19   downloads has also caused significant layoffs and harmed my

20   client's abilities to develop new artists and produce the

21   music that we all enjoy.

22         You heard Mr. Leak testify and I believe some of

23   the other witnesses that there's no such thing as a license

24   to give away the music for free on the Internet because it

25   would essentially destroy the company.  The company would

1    have no asset if it just allowed people to give its

2    copyrighted music away for free.

3           Judge Gertner will instruct you that in deciding

4    the proper measure of statutory damages, you may consider,

5    among other things, the willfulness of the defendant's

6    conduct, the defendant's continuation of infringement after

7    notice of knowledge of copyright or reckless disregard for

8    the copyright, the effect of the defendant's conduct on the

9    plaintiffs' revenues and the loss of value on plaintiffs'

10   copyrights and the need to deter this defendant and other

11   potential infringers.

12          Now, I've already talked about the other factors,

13   but I ask you to also consider that the need for deterrence

14   here is great.  This defendant did not take responsibility

15   after he got caught.  He infringed my client's copyrights

16   and then lied about it, then tried to blame others, all the

17   while continuing to infringe, even during the course of this

18   lawsuit.

19          How much in damages should be awarded here is your

20   job, ladies and gentlemen.  We leave it in your good hands.

21   We only ask that you hold this defendant responsible for

22   what he's done.  The defendant took hundreds of my client's

23   copyrighted sound recordings, and he distributed them to

24   people on MediaSentry and to millions of others on these

25   networks for years.  The record companies could have sued

1    him for hundreds of infringements, but they sued on just 30

2    of them.  What the defendant did was wrong, and he knew it,

3    and we're here to ask you to hold him responsible.  Ladies

4    and gentlemen, thank you very much for your kind attention.

5         THE COURT:  I think we'll take a very brief break

6    here because then I will instruct you.  Just five minutes,

7    ladies and gentlemen, then you'll come back down again,

8    we'll have lunch for you upstairs, but don't start eating.

9    All rise for the jury.

10        (Jurors exited the courtroom.)

11              .

12        THE COURT:  You can be seated.  I just want to

13   identify a couple of things.  There was a stipulation on the

14   litigation, there was going to be a stipulation?

15        MR. OPPENHEIM:  There were two stipulations, your

16   Honor, we've signed them, we've put them in the evidence.

17   I'm not sure whether you want to include them in the jury

18   instructions or not.

19        THE COURT:  No, I don't need them.  I just wanted

20   to make sure that it was included, and I will give the

21   instruction that it's the jury's memory that counts.  I am

22   troubled with whether my memory was off with respect to the

23   comment that was made and objected to about whether there

24   was testimony about how the lawsuits had stopped, and I

25   actually can't find it in my running transcript, but if that

1    was in, then I will certainly make reference to that.  Your

2    objection to that comment was what?

3          MR. OPPENHEIM:  I didn't believe it was in

4    evidence.

5          THE COURT:  Okay.  I can't find it on my notes one

6    way or the other, but I will certainly let the jury know

7    that to the extent I may have weighed in on a fact-finding

8    that my memory is as flawed as everybody else's because I

9    can't find it one way or the other.

10         MR. OPPENHEIM:  Just to be clear, it wasn't just

11   that he referenced the fact that the lawsuits had stopped,

12   it was the way he referenced talking about the fruitless

13   effort that was prejudicial and appropriate.

14         THE COURT:  Oh, I think the argument about the

15   arbitrariness, the arguable arbitrariness of the selection

16   and the starting and stopping of the litigation is perfectly

17   fair, but I think if I erred, I thought it had not been in

18   the case.  My law clerk has a different memory.  I can't

19   find it in my notes.  I will say something about that.  I

20   also will add this comment that the jury must decide on

21   damages given the finding of liability, and when they do,

22   they must decide within the statutory range.

23         That I will just add, but then we'll take a few

24   minutes, then we'll come out again.  Thank you.

25         THE CLERK:  All rise.

1          (A recess was taken.)

2          THE CLERK:  All rise for the jury.

3          THE COURT:  You can all be seated.  Counsel, and

4    everyone?

5          MR. FEINBERG:  Your Honor, may we approach for

6    just a moment?

7          THE COURT:  You'll have an opportunity.

8          MR. FEINBERG:  Not the instructions.

9          THE COURT:  Counsel at sidebar.

10         (THE FOLLOWING OCCURRED AT SIDEBAR:)

11         MR. FEINBERG:  A minor issue, Judge, there were

12   two stipulations.  I know your Honor is going to be talking

13   about stipulations.  I ask they be published to the jury.

14         THE COURT:  They're part of the evidence.

15         ( THE SIDEBAR CONFERENCE WAS CONCLUDED.)

16                         JURY CHARGE

17         THE COURT:  Okay.  My instructions will not take a

18   long time.  As you saw, you have a fabulous lunch waiting

19   for you.  You have heard the evidence and the arguments, and

20   it's my job now to instruct you about the law.  As I said,

21   the law you have to follow and obey.  When I finish, you'll

22   begin your deliberations.

23         My instructions are divided in three parts.  First

24   I will give you the general instructions that I typically

25   give a civil jury, then I will talk more specifically about

1    the issues in this case, then I will conclude with

2    instructions about how you conduct your deliberations.

3         Bear in mind that I have to instruct you about

4    everything.  I have to instruct you about all of the issues

5    that you have for your deliberations.  Don't draw any

6    conclusions from what I'm talking about that I have a

7    position one way or the other.  I assure you I don't.  In

8    any event, whatever position I had is irrelevant, you are

9    the deciders in this case, the decision makers, I'm sorry,

10   deciders is what our former president used to say.

11        This is a civil action, and in a civil action the

12   burden is on the plaintiff to prove every essential element

13   of a claim by, and the term is a fair preponderance of the

14   evidence.  To establish something by a preponderance of the

15   evidence means to prove to your satisfaction that something

16   is more likely so than not so.

17        It's as if there were evenly balanced scales at

18   the beginning, if the plaintiff can tip the scales, even

19   slightly in their favor, then the plaintiff will prevail.  A

20   fair preponderance of the evidence does not mean that the

21   plaintiff has to call more witnesses or produce a greater

22   volume of evidence than the defendant, whether there is a

23   fair preponderance of the evidence is determined by the

24   quality and persuasiveness of the evidence, not the number

25   of witnesses or documents.

1           In determining whether a claim has been proved by

2      a preponderance of the evidence, you may consider the

3      relevant testimony of all the witnesses, regardless of who

4      may have called them, and the relevant exhibits received in

5      evidence, regardless of who may have produced them.

6           Again, the plaintiffs do not have to prove their

7      case beyond a reasonable doubt.  That is the criminal

8      standard.  The standard here is more probable than not a

9      fair preponderance of the evidence.

10           Now, as I said, all along, you have to determine

11      the facts.  You're the sole and exclusive judges of the

12      facts.  You have to decide the weight, the effect, the value

13      and the reliability of the evidence and the credibility or

14      believability of the witnesses.

15           Once you determine the facts, it's your duty to

16      apply those facts to the law as I explain it to you in order

17      to decide whether the plaintiffs have carried their burden

18      of proof.  If the lawyers say something different, you have

19      to follow my instructions.

20           One word about facts.  We have an object lesson in

21      the ways in which different memories, people can have

22      different memories of the facts.  At one point I interrupted

23      Mr. Nesson wrongly to indicate that testimony with respect

24      to when these lawsuits had been stopped, and I interrupted

25      him because my memory of the evidence was different.  In

1  fact, I was wrong, and he was correct.  So, in the final

2  analysis, the issue is your memory of the evidence and not

3  my memory and not the memory of the lawyers on either side

4  in this case.

5         Let me remind you that four days ago in a very,

6  very long afternoon, you swore that you would be

7  scrupulously fair and impartial, and we hold you to that.

8  You have to determine the facts, without prejudice, without

9  fear or favor solely from a fair consideration of the

10  evidence.  Once you let favor or bias or sympathy enter into

11  your deliberations, there is a substantial risk that you

12  will not arrive at a true and just verdict.

13         In the same vain, you may not consider any

14  personal feelings you might have about the parties in this

15  case or any witnesses who testified during the course of the

16  trial, personal feelings about race, religion, national

17  origin or gender, and you can't decide the case on the basis

18  of anything that you may have read or heard outside the

19  courtroom or according to any guesswork or speculation.  You

20  can't speculate about issues about which there has not been

21  evidence in this case.  You may not speculate either about

22  the consequences of your verdict.

23         You have to confine your deliberations to the

24  evidence and nothing but the evidence.  With respect to bias

25  or prejudice, again, a corporation is entitled to the same

1    fair trial as a private individual.  All persons, including

2    corporations and other organizations, stand as equals before

3    the law and are to be treated as equals.  If there are gaps

4    in the evidence, you can't fill the gaps with your

5    prejudices or stereotypes or your speculation.

6           Now, let me talk about the evidence for a moment.

7    You will have in the jury room certain stipulations between

8    the parties.  They have not been read to you here, but

9    they're part of the exhibits that you're going to get in the

10   jury room.  A stipulation is simply a statement by both

11   sides that the facts recited in the stipulation don't have

12   to be proved by independent evidence, don't have to be

13   proved by a witness or an exhibit.  There's no disagreements

14   between the parties with respect to the facts that are

15   stipulated to.

16          During the course of this case, testimony was

17   introduced by means of reading from a deposition transcript.

18   You are to evaluate and consider that evidence introduced in

19   that fashion the same way you would evaluate and consider

20   any other evidence introduced in this case.

21          Testimony introduced by reading from a deposition

22   transcript is to be treated in the same fashion as any other

23   evidence.  You have notes, and your notes are to assist your

24   memory.  If your memory is different from your notes, as I

25   said, mine apparently was, rely on your memory.  The notes

1    that you have are no more evidence than anything else.

2            As I said at the beginning, part of your role as

3    jurors is to consider and evaluate the evidence that has

4    presented during the course of the case, and as part of that

5    responsibility, you are obliged to draw inferences, and I

6    told you about two kinds of evidence, that is to say, direct

7    evidence and circumstantial evidence and told stories about

8    my sons.

9            I won't reiterate that story, it's bad enough I

10   tell it even once, but direct evidence is evidence of what a

11   witness sees, hears, touches or in some way perceives with

12   one or more of his or her senses.  Circumstantial evidence

13   exists where a witness cannot testify directly about the

14   fact that it is to be proved but you're presented with

15   evidence of other facts and asked to draw reasonable

16   inferences from them about the facts to be proved.

17           What do I mean by an inference?  An inference is a

18   permissible deduction that you may make from the evidence

19   you've accepted as believable.  We draw inferences every

20   day.  They are little steps in reasoning, steps from which

21   you take known information, or in this case, information

22   which you found to be credible, apply your experience in

23   life to it and draw a conclusion.

24           Some inferences are consistent with the

25   plaintiffs' case, some may be consistent with the

1    defendant's case.  Circumstantial evidence, the law makes no

2    difference between circumstantial evidence and direct

3    evidence.  The plaintiffs can meet their burden of proof by

4    circumstantial evidence, so long as you find the evidence

5    credible and the inferences that they would have you draw

6    reasonable.

7         Again, the evidence, you have to evaluate the

8    testimony of the various witnesses that you've seen in terms

9    of their credibility, and credibility is just a fancy word

10   for believability.  It's really your function and your

11   function alone.  It's really the genius of the system that

12   you are to determine the believability of witnesses whose

13   testimony is presented in this case.

14        You can believe all of what a witness has said to

15   you, you can believe some of what a witness has said to you,

16   you can believe none of what a witness has said to you,

17   that's really up to you to decide.  Credibility includes

18   things like the conduct and demeanor of the witness while

19   testifying, the frankness or lack of frankness that the

20   witness displayed while testifying, the reasonableness or

21   unreasonableness of the testimony itself, its probability or

22   improbability, the opportunity that the witness may have had

23   to know the facts about which he or she was testifying, the

24   accuracy of the witness' recollection, the degree of

25   intelligence shown by the witness, whether the witness seems

1    to be trying to fill in gaps in his or her memory of events

2    with information obtained afterwards.

3           You may also consider whether a witness has a

4    motive for testifying, and, of course, the interest or lack

5    of interest that the witness may have in the outcome of a

6    case.  You should take into consideration the appearance of

7    the witness and any bias he or she may have shown in the

8    testimony.  Again, that's not an exhaustive list.

9           There were times during the course of the case

10   when there was evidence that one side or the other sought to

11   present a prior inconsistent statement.  In the case of an

12   ordinary witness, not a party in this case, the testimony

13   that you're to consider is the testimony of the individual

14   on the stand and the exhibits.

15          There may be instances which a lawyer will try to

16   show that on another occasion, this witness made a different

17   statement, said something different.  The statement that the

18   witness said on another occasion is not substantive

19   evidence, is not actual evidence, but you can use it to

20   evaluate whether or not the witness in front of you is

21   telling the truth.

22          You have to decide were these statements

23   inconsistent, is there an explanation for it, did the

24   witness provide an explanation.  The parties stand in a

25   different situation.  Their out of court statements can be

1    used for the truth of the matter.  You can consider an out

2    of court statement of a party in this case.

3            There's also been expert testimony, individuals

4    who by knowledge, skill, training, education or experience

5    have become an expert in a field.  Again, expert testimony

6    is just like any other testimony.  You can believe all of

7    it, some of it or none of it.  This is a lay process.  You

8    are to evaluate expert testimony just as you evaluate

9    everything else.

10           Then finally, as I said, what the lawyers have

11   said is not evidence.  Your reactions to the lawyers don't

12   matter.  When they have said something, when they or the

13   Judge has said something that isn't accurate, your memory is

14   what controls.

15           Now, I'm going the deal with the very specific

16   instructions in this case about the issues in this case.

17   Mr. Toomey, will you please go up to the document camera not

18   until I tell you to turn it on though.  This is an action

19   for copyright infringement.  A "copyright" is an exclusive

20   right to copy.  Copyrighted work can comprise a number of

21   different kinds of works including, as here, musical works.

22           The owner of a copyright generally has the right

23   to exclude any other person from reproducing, preparing

24   derivative works, distributing, performing, displaying or

25   using the work covered by the copyright for a specific

1    period of time.

2         Now, one who either reproduces or distributes a

3    copyrighted work during the term of a copyright infringes

4    the copyright unless licensed or authorized by the copyright

5    owner.

6         In this case, each plaintiff contends that it is,

7    and all relevant times has been, the copyright owner or

8    licensee of exclusive rights under U.S. copyright with

9    respect to certain copyrighted sound recordings and that the

10   defendant, Joel Tenenbaum, without the permission or consent

11   of such plaintiff used a peer-to-peer network to download

12   the plaintiffs' copyrighted recordings and/or to distribute

13   the copyrighted recordings to the public.

14        Each plaintiff contends that Mr. Tenenbaum's

15   actions constitute infringement of its exclusive rights

16   under copyright law.

17        The sound recordings are the five that are in

18   Exhibit 55 and the 25 that are in Exhibit 56.  They are all

19   included in the verdict slip, which we'll show you in a

20   moment.

21        For each sound recording on which the plaintiffs

22   can claim copyright infringement, they had to prove two

23   things in order to prevail:  First, that the plaintiffs are

24   the owner of the work protected by the copyright act; and,

25   second, that the defendant infringed one or more of the

1    rights granted by the act in the copyright holder, but as

2    you have heard during the closing arguments, in this case,

3    there is no issue as to liability, there is no issue as to

4    liability.

5         So you must then decide on the damages given this

6    finding of liability, and when you do, you must decide

7    within the statutory range.  Do you want to put up the

8    verdict slip.  You're going to have this in the jury room,

9    and it lists each of the sound recordings and then asks you

10   about certain questions about that.

11        Each plaintiff has elected to recover statutory

12   damages instead of its actual damages for the defendant's

13   copyright infringement.  The copyright act entitles a

14   plaintiff to a sum of not less than $750 and not more than

15   $30,000 per act of infringement, that is, per sound

16   recording downloaded or distributed without a license as you

17   consider just.

18        In determining the just amount of statutory

19   damages to award against an infringing defendant, the jury

20   is entitled to weigh a number of factors.  Among these

21   factors, you may consider:  (a), the nature of the

22   infringement; (b), the defendant's purpose and intent, (c),

23   the profit that the defendant reaped, if any, and the

24   expense that the defendant saved; (d), the revenue lost by

25   the plaintiff as a result of the infringement; (e), the

1    value of the copyright; (f), the duration of the

2    infringement; and, (g), the defendant's continuation of the

3    infringement after notice or knowledge of these claims; and,

4    (h), the need to deter this defendant and other potential

5    infringers.

6           This list of factors is not exhaustive, nor have

7    they been offered in any particular order.  You may include

8    any other considerations you believe relevant to a just and

9    appropriate determination of damages.

10          If you find that the defendant's infringement of

11   the copyrighted work -- well, let me put it this way, the

12   Copyright Act entitles a plaintiff to a sum of not less than

13   $750 and not more than $150,000 for an act of infringement

14   that you find to be willful as you consider just.

15          So, willful means that a defendant had knowledge,

16   that his actions constituted copyright infringement or acted

17   with reckless disregard for the copyholder's rights.

18          In determining the just amount of statutory

19   damages for a defendant who infringed willfully, if you find

20   that, you may consider the willfulness of the defendant's

21   conduct, together with all those factors that I have listed

22   concerning statutory damages.

23          Knowledge or intent may be proved like anything

24   else.  You may consider any statements made and acts done by

25   the defendant and all the facts and circumstances in

1  evidence which may aid in determination of the defendant's

2  knowledge or intent.

3       Reckless disregard can be inferred from continuous

4  infringement, a past pattern of infringement, continuing

5  infringement despite warnings or other circumstances.

6       So if you look at the verdict slip here, take, for

7  example, the first one, the Incubus, New Skin, with respect

8  to this sound recording, was the defendant's infringement

9  committed willfully?  If you conclude no, so the slip says

10  if you answered no, what damages do you award the plaintiff

11  for this copyrighted work from $750 to $30,000?

12       If you conclude yes, the second alternative, if

13  you answered yes, what damages do you award the plaintiff

14  for this copyrighted work from $750 to $150,000?

15       When you go back to your deliberation room, we'll

16  ask that the first thing you do after you eat lunch -- the

17  first thing you do is eat lunch -- the second thing you do

18  is determine who the foreperson would be.  The foreperson is

19  just the person who will sign the verdict slip on all your

20  behalves and will communicate with the Court.

21       All your communications with my staff, with the

22  Court, are communications that are done formally.  We ask

23  you to put everything in writing.  No one can speak to you

24  about what you're doing.  No one needs to know anything

25  about the nature of your deliberations or your vote or

1   anything like that.

2       This is a collective decision-making process.  We

3   ask that you not begin your deliberations until everyone is

4   in the room.  If the deliberations continue to another day

5   and you all have to come here another day or however long

6   you wish, again, you don't deliberate until everybody is in

7   the room.  This is a collective group process.

8       Your verdict has to be unanimous.  No cell phones

9   should be used during the course of the deliberation, no

10  cell phones in the jury room, and as I said, any

11  communications that you have with the Court have to be in

12  writing.

13      I'll talk to the lawyers now at sidebar to see if

14  there are any other issues that they want me to address in

15  the instructions, so one more moment of whispering at

16  sidebar.  Counsel.

17      ( THE FOLLOWING OCCURRED AT SIDEBAR:)

18      THE COURT:  Mr. Oppenheim.

19      MR. OPPENHEIM:  With respect to your description

20  of the factors, with respect to the description of the

21  factors associated with a determination of statutory

22  damages, we believe that the factors should include the

23  following four factors which were not included:  Defendant's

24  knowledge of his activities --

25      MR. NESSON:  I didn't hear.

1          MR. OPPENHEIM:  I'm sorry, the first factor that

2   was omitted we believe should be included is defendant's

3   knowledge of his activity; the second factor that we believe

4   should be included and was omitted was the extent of the

5   distribution of the copyrighted works; third, that a factor

6   should be included as to any infringing conduct beyond the

7   copyrighted works at issue in this case; and last, but not

8   least, that a factor should be included regarding any post

9   infringement conduct intending to hide or obscure the

10  infringing behavior.

11          As well, I would note, your Honor, in reading what

12  is described as III.A2.(c), the Court read it as the profit

13  that the defendant reaped, if any, and the expense that the

14  defendant saved.

15          THE COURT:  And/or.

16          MR. OPPENHEIM:  As opposed to and/or.

17          THE COURT:  I'll say that again.  Okay.

18          MR. OPPENHEIM:  The plaintiffs also object to the

19  manner in which the willful infringement --

20          THE COURT:  The order.

21          MR. OPPENHEIM:  Provided the order of the

22  description, did not inform the jury they determine

23  willfulness, that they are told the amount of the willful

24  infringement statutory range.  One moment, please.

25          As well, your Honor, given the defense counsel's

1    expressed request that instruction to the jury that they can

2    avoid filling out certain boxes on the verdict form, which

3    we believe was an expressed request for nullification, which

4    has been a consistent theme in matters outside of this Court

5    that have been published on the Internet by defendant's

6    legal team, that there should be an instruction to the jury

7    expressly that they must fill all boxes, should be all

8    boxes, they ought to assess damages with respect to each and

9    every one of the works within the statutory.

10           THE COURT:  I believe I addressed that when I said

11   you must decide on damages given this finding of liability

12   and it must be within the statutory range.

13           MR. OPPENHEIM:  Your Honor, just note my objection

14   for the record.  As well, your Honor, two other objections,

15   the repeated use of the word "just" is repetitive and

16   unnecessary and unjustly makes that factor more weighty than

17   it should be as well.

18           MR. NESSON:  The more just that we're saying --

19           MR. OPPENHEIM:  As well as the fact that the

20   language in the beginning of the introduction of the

21   nonwillful damages section need not reference instead of

22   actual damages, the current language, the language the Court

23   uses, "Each plaintiff has elected to recover statutory

24   damages instead of its actual damages for the defendant's

25   copyright infringement."  There's no need or reason for us

1    to have instructed the jury not to obtain actual damages as

2    though to create some inference that they could take

3    negatively.

4           THE COURT:  Okay.

5           MR. KAMHOLTZ:  Yes, thank you, Judge.  On the

6    question of damages, first of all, we object as a general

7    matter to applying this scheme to a noncommercial user, and

8    we further object as a general matter in stressing to the

9    jury in awarding damages to the statutory range.

10          More particularly, on the damages instruction, we

11   object not including the three factors that we suggested

12   which are specifically to take into account whether or not

13   this involved a noncommercial use, to specifically take into

14   account whether or not there was an intent to cause harm to

15   the copyright holder and --

16          MR. REYNOLDS:  Means?

17          MR. KAMHOLTZ:  Means?

18          THE COURT:  He means that you should say that I

19   should have a factor of the means by which the copyright

20   infringement took place.

21          MR. KAMHOLTZ:  That was the first factor.

22          MR. REYNOLDS:  Thank you, Judge.

23          MR. KAMHOLTZ:  The additional factor that they

24   should be instructed to consider age at maturity.  On the

25   question of willfulness, again, as we proposed, we object to

1    failure to instruct that willfulness requires some more

2    knowledge and reckless disregard, that it requires a finding

3    that this involved a commercial use and a specific intent,

4    malicious intent to cause injury to the copyright law.

5            THE COURT:  I will read the and/or part.

6            MR. OPPENHEIM:  Thank you, your Honor.

7            (SIDEBAR CONFERENCE WAS CONCLUDED)

8            THE COURT:  I'm going to correct one comment, one

9    statement that I made rather because I said it wrong.  One

10    of the factors that you may consider in evaluating the

11    statutory damages range is the profit that the defendant

12    reaped, if any, and/or, the expense that the defendant

13    saved.

14            We will have the substantive instructions for you

15    after lunch, and that will be submitted to you.  We'll take

16    a moment to go over the exhibits to make sure whatever you

17    see is in fact something that has been introduced into

18    evidence.  So with that, ladies and gentlemen, you will have

19    the case for your deliberation.  All rise for the jury.

20            (Jurors exited the courtroom.)

21            MR. KAMHOLTZ:  The defendant has no problem with

22    the CD player going to the jury room.

23            MR. REYNOLDS:  We have no objection.

24            MR. KAMHOLTZ:  Defendant is content with the

25    exhibits.

1          MR. REYNOLDS:  I stipulate to the Exhibits 1

2    through 59.

3          MR. KAMHOLTZ:  Defendants stipulate to the

4    Exhibits 1 through 59.

5          (A recess was taken at 4:25 p.m.; jury

6    deliberating.)

7                        JURY VERDICT

8          THE CLERK:  All rise for the jury.

9          (Jurors entered the courtroom at 5:15 p.m.)

10                       <u>JURY VERDICT</u>

11         THE COURT:  You can all be seated.

12         THE CLERK:  Madam foreperson, has the jury reached

13   a unanimous verdict?

14         THE JUROR:  Yes, your Honor, we have.

15         THE CLERK:  "There's no issue as to liability in

16   this case.  You must determine the just amount of damages

17   for each act of infringement, as set out below.  With

18   respect to each sound recording, was the defendant's

19   infringement committed willfully?"  "Yes."  "If you answered

20   yes, what damages do you award for each copyrighted work,

21   from $750 to $150,000?  $22,500 per copyrighted work."

22         THE COURT:  Do the parties require that we read

23   each listed work, or is it enough for each listed work?

24         MR. OPPENHEIM:  That's fine for plaintiffs.

25         THE COURT:  Does the defendant care if we read

1   each listed work?  There's a verdict with respect to each of

2   the copyrighted works.  My understanding it is the same

3   number for each work.  Do you want us to read each work and

4   the number, or is my clerk's rendition of this okay?

5           MR. NESSON:  I don't suppose it matters.

6           THE COURT:  Okay.  All right.

7           THE CLERK:  So say you, members of the jury, so so

8   you madam foreperson?

9           ALL JURORS:  Yes.

10          THE COURT:  Thank you.  Thank you very much for

11  your service.  I think we're the only people in the building

12  at this point.  Thank you for your work.  Thank you.  It was

13  an extraordinary schedule, a 9 to 5 schedule which was very

14  difficult.  There were times when I looked over and I was

15  wondering how you were managing.  Thank you all very much,

16  and I'll come up and say a few words to you.  Please, before

17  I get up there, would you please tear your notes.  This is

18  not something we wish to see, so I'll be up in a second.

19  Thank you.

20          (Jurors exited the courtroom.)

21          THE COURT:  Is there anything we need to address?

22          MR. OPPENHEIM:  We have a number of issues.

23  They're brief.  One of which is we would like --

24          THE COURT:  You can all be seated.

25          MR. OPPENHEIM:  I would just preview what the four

1  issues are quickly, one is when a judgment is entered, we'd

2  like your Honor to ask that the injunction that's pled in

3  the complaint to be included in the judgment.

4        THE COURT:  Okay.

5        MR. OPPENHEIM:  Secondly, we don't know whether at

6  this point there will be any post trial motions by

7  defendant.  We would ask the Court as a matter of process

8  whether we can extend the time for filing of any motions for

9  attorneys fees or costs on our part until a period 15 days

10 after any post trial motions by the defendant are completed.

11 That will give us an idea to decide whether or not to

12 proceed with any such motions dependent on what happens with

13 respect to defendant's post trial motions.

14       THE COURT:  You mean 15 days after post trial

15 motions are resolved?

16       MR. OPPENHEIM:  Yes, your Honor.

17       THE COURT:  That makes sense.  Third, your Honor,

18 with respect to the pending sanctions motion, we don't want

19 to ask, I'm not asking the Court to rule on it now, but in

20 the interim, your Honor, now that the case is over, we want

21 to very much make sure that these recordings are destroyed.

22 Neither Mr. Reynolds or I have a desire to be put on the

23 Internet, including depositions of ours, of video and of

24 Mr. Reynolds' image.  All that was without permission.  We

25 don't want it to be used for classroom.

1          THE COURT:  They are recordings of conversations

2     with you as well as the audio and video of you?

3          MR. OPPENHEIM:  Of depositions, yes.  It's all

4     briefed in the sanctions motion.  We just don't know when we

5     might have the opportunity to address the Court, but now

6     that the trial is complete, we don't want the defendants or

7     defendant's counsel to believe, well, this won't affect the

8     jury, so I can now release these materials.

9          We believe that regardless of the Court's order,

10    the wire tapping statute was quite clear.  There was no

11    consent.  We would very much like an order that those

12    recordings be destroyed immediately.  We have no desire to

13    participate whatever might be done with those recordings,

14    your Honor.

15         Last, but not least, I know that you're going to

16    go up and chat with the jury, to the extent that the Court

17    might allow us also to have an opportunity to talk to the

18    jury?

19         THE COURT:  I'd love to, I typically do that.  I

20    didn't offer that as an option because it was 5:30 on Friday

21    afternoon summer vacation.  If they'd love to speak to you,

22    both sides can come up.

23         MR. OPPENHEIM:  We would appreciate that, your

24    Honor.  Thank you.

25         THE COURT:  Does the defendant have any position

1   on the question of the release of the tapes, or, I'm sorry,

2   the destruction of the tapes?  These are depositions and

3   recordings of counsel.

4           MR. OPPENHEIM: I don't know that it's necessarily

5   tapes because I think it's digital.  I don't know what form

6   it's in, but it includes video deposition, there's some

7   video, the Pouwelse deposition, there are audio files of

8   other depositions, then I think there's a conference with

9   the Court, and there may be some telephone conversations,

10  but the entirety of what they are, we ask that they all be

11  destroyed.

12          THE COURT:  Do you want to respond in writing or

13  do you want to respond now?

14          MR. NESSON:  I don't want to destroy this

15  material.

16          THE COURT:  What would you plan to do with it?

17          MR. NESSON:  At the moment I have no plan.

18          THE COURT:  Why don't you write a letter to me

19  with respect to what you want to do with it, if anything, in

20  a week, okay, letting me know by August 10th.  Okay.

21          MR. OPPENHEIM:  We assume we'll get a copy of that

22  letter, your Honor?

23          THE COURT:  Yes.

24          MR. NESSON:  I could say right now that I would

25  want to use it in my teaching, at the least.

1          MR. OPPENHEIM:  Your Honor, we don't consent to

2     that.

3          THE COURT:  Okay.  Well, I will wait to hear, see

4     if there's a more full response, and then we'll make a

5     decision.  I assume nothing will be done with this material

6     until you hear from the Court.  Other than that, I'll let

7     you know if the jury wants to hear from you.

8          MR. OPPENHEIM:  Thank you, your Honor.

9          THE CLERK:  All rise.

10          (Whereupon, the hearing was suspended at

11     5:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2    UNITED STATES DISTRICT COURT )

 3    DISTRICT OF MASSACHUSETTS     )

 4    CITY OF BOSTON                )

 5                   I, Valerie A. O'Hara, Registered Professional

 6    Reporter, do hereby certify that the foregoing transcript

 7    was recorded by me stenographically at the time and place

 8    aforesaid in Nos. 03-11661-NG, 07-11446-NG, Sony BMG Music

 9    Entertainment, et al. vs. Joel Tenenbaum and thereafter by

10    me reduced to typewriting and is a true and accurate record

11    of the proceedings.

12                          _____

13                          /S/ VALERIE A. O'HARA

14                          _____

15                          VALERIE A. O'HARA

16                          REGISTERED PROFESSIONAL REPORTER

17

18

19

20

21

22

23

24

25
```